D1FLCIB1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

       v.                      11-CR-424 (NRB)

GULAY CIBIK, REFAEL BRODJIK,
a/k/a "Rafi," NATHAN SCHWARTZ,
HAROLD TISCHLER, a/k/a
"Hershy,",

               Defendants.         Jury Trial

------------------------------x

                           New York, N.Y.
                           January 15, 2013
                           9:34 a.m.

Before:

                HON. NAOMI REICE BUCHWALD,

                           District Judge

                     APPEARANCES

PREET BHARARA
    United States Attorney for the
    Southern District of New York
JANIS ECHENBERG
JAMES J. PASTORE, JR.
    Assistant United States Attorneys
MICHAEL DINET, Paralegal Specialist

DONALDSON CHILLIEST LLP
    Attorneys for Defendant Gulay Cibik
BY:  XAVIER R. DONALDSON, ESQ.

LAWRENCE D. GERZOG, ESQ.
JEREMY L. GUTMAN, ESQ.
    Attorneys for Defendant Refeal Brodjik

D1FLCIB1

1                          APPEARANCES
                           (Continued)
2

3   BRILL LEGAL GROUP, P.C.
         Attorneys for Defendant Nathan Schwartz
    BY:  PETER E. BRILL, ESQ.
4

5   PAUL GREENFIELD, ESQ.
         Attorney for Defendant Harold Tischler

6   ALSO PRESENT:  DEIDRE GORDON, Special Agent, Homeland Security
                    RYAN GIBBS, Special Agent, U.S. Dept. of Labor
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  When I say nine, I mean nine, not 9:35,

3     for signing in purposes, okay.  There's a jury downstairs ready

4     for us as soon as we're ready for them.  I think since you'll

5     announce yourselves later, we don't have to do a roll call

6     right now.

7          But are there any matters that we need to discuss

8     before we get the jury up?

9          MS. ECHENBERG:  Your Honor, there are a few

10    outstanding issues.  I'm not sure any of them need to be dealt

11    with today, but I can let you know what they are.

12         THE COURT:  Just tell me they what they are.

13         MS. ECHENBERG:  Sure.  There was one issue on the

14    motions that was left unresolved at our motions conference.  We

15    had made a motion to exclude certain sexual activity and a

16    one-time cocaine use by Sam Salamon, who's one of the

17    cooperating witnesses.  Mr. Tischler said he was going to get

18    back to the Court on his view on that.  I think he still

19    intends to make a motion to be able to cross on those issues.

20         THE COURT:  Is this the affair or is this the hiring

21    allegedly of prostitutes at the workplace?  What is it because

22    I don't recall things being left undecided.

23         MR. GREENFIELD:  I think it's he's a philanderer.

24    When he was married, he went out with other women, he cheated

25    on his wife.  Now, you want to categorize that as his sexual

1   activities, I'm not interested in any gory details, but I ought

2   to be able to establish that somebody who my claim is they took

3   advantage of his friend and abused him and cheated him and lied

4   to him. I don't see why I can't establish that he did the same

5   thing with his wife, within limitations, of course. But I

6   don't think it ought to be something that's off the table.

7         MR. GERZOG: Your Honor, I wasn't here on Friday, but

8   especially when it comes with regard to a Hasidic man who takes

9   very serious vows before God which many people don't take so

10   seriously but the Hasidic take very seriously, it goes to

11   credibility as much as testifying falsely under oath. I guess

12   God can't prosecute you for perjury, at least not in this life.

13   But, you know, his willingness to just say whatever he has to

14   say whenever he has to say it goes to his credibility in my

15   view.

16         MS. ECHENBERG: Your Honor, I think anything, first of

17   all, I think the witness will deny that he had an affair and

18   that he was a philanderer. But in any event, I think that's a

19   distraction. That's not what this trial is about. He's going

20   to admit tremendous fraudulent conduct in relation to this

21   crime. There's going to be a lot to cross-examine this witness

22   about. And his own personal activities on his own time I don't

23   think are relevant and I think they're a distraction and

24   they're overly prejudicial and there's not sufficient probative

25   value.

D1FLCIB1

1           THE COURT:  Let me make this -- why don't we call down

2   to the jury clerk.  It's going to take them about 15 minutes.

3   And we can use the time and what we get through, we get

4   through, what we don't, we don't, but we can keep talking about

5   this.

6           MS. ECHENBERG:  There are a few other issues I want to

7   flag which I can do after the call.

8           MR. BRILL:  Judge, I wanted to raise one thing with

9   regard to the jury.  Sorry to interrupt.

10          We had been talking, I know your Honor briefly

11  mentioned that you thought that ten challenges were sufficient.

12          THE COURT:  I told you a week and a half ago.  Okay?

13          MR. BRILL:  Yes, Judge.

14          THE COURT:  You can divide them any way you like.  But

15  the jury has been called based on my advice to you a week and a

16  half ago as to what the challenges were.

17          MS. ECHENBERG:  Would you like me to flag those other

18  issues for your Honor?

19          THE COURT:  Yes.

20          MS. ECHENBERG:  So there was a ruling with regard to

21  Mr. Schwartz that the government cannot cross Mr. Schwartz on

22  the alleged photocopier fraud that was engaged in between

23  Mr. Schwartz and Mr. Salamon.  At the time my colleague,

24  Mr. Pastore, raised that if we were not going to be able to

25  cross on that, that no one else would be able to do that as

D1FLCIB1

1    well.  Excuse me.

2                THE COURT:  If you weren't going to do it.

3                MS. ECHENBERG:  If we weren't able to bring it out on

4    direct, then other defense counsel wouldn't be able to bring it

5    out on cross.

6                THE COURT:  I think it's the opposite.  If the

7    defendants were going to try to bring it out on cross, and he

8    wanted the opportunity to bring it out on direct.

9                MS. ECHENBERG:  Correct.  If I said that in the

10   reverse, that's what I meant.  So that's No. 2.

11               No. 3 is I wanted to put on the record, although this

12   may change depending on how you rule with regard to

13   Mr. Salamon, that we had left open whether an affair between

14   Mr. Schwartz and Mr. Salamon's wife was going to be raised at

15   trial.  We were leaving it in Mr. Schwartz's court to decide.

16   Mr. Brill has advised me that he does not want that to come out

17   at this trial.  So we don't intend to raise it on direct, and

18   he says he won't raise it on cross.

19               Now, given that Mr. Greenfield is now arguing about

20   Mr. Salamon's infidelity, that may change our view.  So we'll

21   see how you rule on that.

22               And finally --

23               THE COURT:  Mr. Salamon's infidelity with

24   Mr. Schwartz's wife?

25               MS. ECHENBERG:  It's the reverse.  Mr. Schwartz had an

D1FLCIB1

1    affair with Mr. Salamon's wife.

2            MR. GREENFIELD:  Which he denies.

3            MS. ECHENBERG:  Which he denies, and Mr. Tischler

4    alleges that Mr. Salamon was unfaithful.

5            MR. GREENFIELD:  Mr. Tischler wants to inquire to.

6            Secondly, this is the first I've heard about

7    Mr. Salamon having an affair with a specific person.

8            MS. ECHENBERG:  No, Mr. Salamon had no affair with no

9    person.

10           MR. GREENFIELD:  So I've made no allegation about

11   Mr. Schwartz and Mr. Salamon's wife.  All I'm saying is that

12   what's good for the goose is good for the gander.  The

13   government argues that if my client takes the stand, they can

14   cross-examine him about his questionable representations as to

15   his income and his income taxes, his applying for medical

16   health coverage, all of which they say goes to his credibility.

17           I say, well, if you're going to do that, whether

18   you're going to do that or not, I'm entitled to inquire into

19   the credibility of their main witness who's a philanderer.

20   Plain and simple.  When he was married, he broke his vows and

21   he cheated.

22           THE COURT:  What's your good faith basis for that

23   question?

24           MR. GREENFIELD:  My good faith basis is I don't know

25   the name of the people.  Well, I do have a good faith basis

1  that he was advertising on, you know, some -- I don't know what

2  you call them.  You know, looking for --

3          THE COURT:  What is it?

4          MR. GREENFIELD:  Not Craig's list but something like

5  that.

6          THE COURT:  Do you have a copy of it?

7          MR. GREENFIELD:  I actually do and --

8          MS. ECHENBERG:  And, your Honor --

9          MR. GREENFIELD:  -- it's not Craig's list.  I don't

10 remember what it is.

11         It's sugar daddy for me.com, okay.  I hate to say that

12 now, I just wanted to --

13         THE COURT:  I just wanted to be sure you had beyond

14 pure rumor.

15         MR. GREENFIELD:  Listen, if he denies it, I'm stuck

16 with it, you know.  But with reference to that listing, anyway,

17 with reference to that listing, he also represents that he's a

18 lawyer in that ad.  So it's relevant for that purpose.

19         THE COURT:  All right.  Doesn't sound so off the wall.

20         MS. ECHENBERG:  Your Honor, I think lying on a bank

21 application is one thing.  I think getting into people's

22 personal lives and what they do on their own time.

23         THE COURT:  The interesting thing about privacy is

24 when you put yourself on the internet, you expose yourself.

25 And I didn't mean a double entendre there, but I think you have

1  to kind of deal with the consequences of putting yourself out

2  there.  All right.

3          In any event, this is not coming up today.  So we'll

4  give it a little more thought.

5          MS. ECHENBERG:  And one more brief issue, your Honor.

6          THE COURT:  Yeah.

7          MS. ECHENBERG:  We were advised on Friday by

8  Mr. Gerzog of a change in position about stipulations.  We had

9  discussed with all counsel that they would stipulate to the

10  standard business records and other things, and Mr. Gerzog

11  advised us on Friday that his client was choosing not to

12  stipulate to any evidence that related directly to his client.

13  He has signed stipulations that relate to documents related to

14  other defendants.

15          And so because of that, we arranged to call a number

16  of witnesses who will testify about the retrieval of documents

17  during searches and that includes documents that were retrieved

18  from computers.  And so we will have a technician from Homeland

19  Security Investigations who will talk about the process he used

20  to retrieve certain documents from computers.

21          We don't view that witness as an expert under Rule

22  702.  He's not going to be testifying about his opinion.  He's

23  going to be testifying about what he did to download a forensic

24  image of the computer and where he found various emails, just

25  like other agents will be testifying about what rooms and where

1    they found other physical documents.

2            We were advised this morning by Mr. Brodjik's counsel

3    that they believe that witness is an expert and they want him

4    to be qualified as an expert.  We don't think that's

5    appropriate here, but I just wanted to flag it for your Honor.

6            MR. GERZOG:  I don't necessarily want him to be

7    accredited as an expert.  The question is what is he going to

8    say.  If he's going to say, if he's going to testify as to

9    facts, that's fine, he's not an expert, just facts.

10           If he's going to say this address on this computer

11   means that it was received from another computer and someone

12   else's account and the internet works by sending this account

13   to that account and so forth, that's beyond, that's expert

14   testimony.  If he just says I found a computer --

15           THE COURT:  Do you want Al Gore to explain the

16   internet?

17           MR. GERZOG:  I beg your pardon?

18           THE COURT:  Do you want Al Gore to come and explain

19   the internet?

20           MR. GERZOG:  I don't know how much Mr. Gore, despite

21   his claims of invention, knows about the internet.  I can tell

22   you I certainly don't know how it works.  I type it in; it pops

23   up magically in somebody else's box.  I don't know why but it

24   does.

25           THE COURT:  What's the guy going to talk about again?

1    MR. PASTORE:  Your Honor, I'm happy to address it

2    because I believe I'm going to be putting him on as the

3    witness.  He is going to be talking about there were

4    approximately 11 emails that were retrieved that we've asked

5    him to extract from the computer images.  He's going to explain

6    where on the computer and where the images, where the emails

7    were extracted from.  And in the course of doing that, he may

8    define for the jury what the difference is, where different

9    emails may be stored and why they may be stored there.

10        So he's essentially going to testify about where he

11   pulled the emails from and how he can tell he pulled the emails

12   from that location.

13        Frankly, had we not been notified on Friday that the

14   defendant was now not stipulating, we wouldn't have called this

15   witness.  It would have come in through a stipulation these

16   were recovered pursuant to a search of a computer seized in a

17   particular location.

18        So I'm a little bit concerned that there's a two step

19   where there's an argument that he should be qualified as an

20   expert and an argument that he can't be produced as an expert

21   because of late notice through no fault of the government.

22        MR. GERZOG:  No one is suggesting he can't be

23   introduced as an expert.  It sounds like he's going to be a

24   fact witness and that's fine and then we're done.

25        THE COURT:  Let's assume he was an expert.  Is he

1  unqualified to be an expert?  Isn't this much ado about very

2  little?

3         MR. GERZOG:  All we asking for, Judge, is the summary

4  of his testimony that we're entitled to under the rules if he's

5  going to be qualified as an expert and if he's going to testify

6  as an expert witness.  All Mr. Pastore has to do is type up a

7  three-paragraph statement that he is going to testify as to the

8  following, colon, whatever it is.  It will take him 15 minutes.

9         THE COURT:  You figure out how you want to call him.

10         MR. PASTORE:  Certainly, your Honor.

11         THE COURT:  I have a question.  Is that it on

12  preliminaries?

13         I have a question for the government.  We've been, you

14  know, working on the charge here, and I don't understand, I

15  guess what made me think about this is the length of the

16  proposed charge which seems, frankly, disproportionate to the

17  substance of the case.

18         What is the advantage to the government of charging

19  both immigration fraud and mail fraud and wire fraud here?  I

20  mean is there any reason that that would increase the sentences

21  that the defendants are exposed to, any reason that you think

22  practically that the jury will, you know, acquit on one and

23  convict on the other?  I don't see it and maybe this is

24  something I'm missing.

25         It just seems to complicate things and I don't know

1    why.  If you have a good reason, there's no problem, of course.

2            MR. PASTORE:  Sure, your Honor.  Your Honor raises a

3    good point and we can confer on it, perhaps get back to your

4    Honor -- are you going to want to lay it out for the voir dire

5    with the jury?

6            THE COURT:  I wasn't really.  I suspect that whatever

7    I tell them today, by a week and a half from now they will have

8    forgotten.  So I'm not worried that somebody is going to pop

9    and say hey, Judge, whatever happened to that wire fraud count?

10   I'm not really concerned about that.

11           It was really more that as we were drafting this, this

12   charge with all those objects of two conspiracies was growing

13   up to like a hundred pages which is -- it's not a capital case.

14   It's not the Blood's case which I had.  It just made me ask why

15   was it, was there a really good reason?  And if there is, I'm

16   not arguing.

17           MR. PASTORE:  Here is the thinking.  On the one hand,

18   there's the immigration fraud defrauding the United States

19   government.  On the other hand, there's the mail and wire fraud

20   to the extent that clients were tricked or fooled or paid for

21   dishonest legal services and they were unaware they were paying

22   for such services.

23           THE COURT:  That was actually a question I had as I

24   was reading the draft this weekend was I didn't notice anything

25   in the indictment that talked about the clients being victims,

1    so.

2            MR. PASTORE:  I understand.

3            THE COURT:  That was a possibility and you remind me

4    that that was a thought I had.

5            MR. PASTORE:  Your Honor, if it's okay with the Court,

6    we'll confer overnight and advise the Court whether we intend

7    to proceed on that count or whether at this point and with

8    these particular defendants it might be superfluous.

9            MR. GERZOG:  Judge, I'm sorry, one more thing.  I

10   understand that you have advised the government that they

11   should have two witnesses ready to go today.

12           THE COURT:  I'm an ever optimistic person.

13           MR. GERZOG:  And I was wondering, A, if we could get

14   the names of those witnesses and, B, if at the end of each

15   trial day we could get the names of the next day's witnesses.

16           THE COURT:  Sure.

17           MS. ECHENBERG:  Your Honor, I can tell you who those

18   witnesses are.  The first is Faith Campbell, who works for

19   citizenship and immigration services.  And the second is Elissa

20   McGovern, who works for the Department of Labor.

21           And I apologize, your Honor, there's one more thing.

22   Just because we have all the defendants here and a couple of

23   them we weren't able to review our previous plea offers.  So if

24   I could just run through that quickly.

25           So we had initially provided a plea offer, a written

1    plea offer to Mr. Doubelay, who was representing Refeal Brodjik

2    at the time. We had provided that on November 28, 2012, and

3    that offer expired on December 3, 2012. At our last conference

4    there was some question as to whether Mr. Brodjik had received

5    that offer, so we provided it personally to Mr. Brodjik in the

6    presence of Larry Gerzog, another copy, written copy of that

7    plea offer, and it remained open until January 7 at 5 p.m. and

8    was rejected.

9          We offered Gulay Cibik a plea offer on October 19,

10    2012, and that plea offer expired on October 26, 2012, and was

11    rejected.

12          We offered Harold Tischler a written plea agreement --

13    all of these plea agreements were in writing, your Honor -- on

14    September 12, 2012 -- excuse me. We offered that on

15    September 5, 2012, and it expired on September 12, 2012. The

16    plea offer was rejected.

17          And we offered Nathan Schwartz a written plea offer on

18    June 20, 2012, and that expired on July 6, 2012, and was also

19    rejected.

20          MR. GREENFIELD: For Mr. Tischler who's here in court,

21    I acknowledge that's correct. That letter was received by me,

22    discussed by me with Mr. Tischler, and has not been accepted,

23    was not accepted.

24          MR. GERZOG: For Mr. Brodjik I will say that we went

25    to a conference room in the U.S. Attorney's Office. The plea

D1FLCIB1

1    offer was handed to me.  I said out loud, this is a plea offer

2    and I'm handing it to my client.  I handed it to my client.  My

3    client looked at it.  We discussed it.  And then in what I

4    would describe as a belt, suspenders, and duct tape move,

5    Mr. Pastore sent me an email the next day telling me that what

6    had happened the previous day had happened, to which I replied,

7    I agree.

8              THE COURT:  Mr. Donaldson.

9              MR. DONALDSON:  Brevity.  We received the offer, as

10   well, in writing and we went over it several times and

11   Ms. Cibik rejected the offer.  Thank you.

12             MR. BRILL:  As to Mr. Schwartz, the agreement was

13   provided to him, we discussed it, and it was rejected.

14             THE COURT:  Mr. Donaldson.

15             MR. DONALDSON:  If we have a break a minute before the

16   jury comes up, can I run to the little boy's room.

17             THE COURT:  You can run to the big boy's room.

18             (Pause)

19             (Continued on next page)

20

21

22

23

24

25

D1f1cib2

1          (A jury of twelve and four alternates was impaneled

2     and sworn)

3          THE COURT:  All right.  Members of the jury, now that

4     you have been sworn, I will give you some preliminary

5     instructions to guide your participation in this trial.

6          Before counsel for the government and the defendants

7     make their opening statements, in which they will tell you what

8     they anticipate the evidence will show, I want to explain to

9     you some of the key legal principles that you should keep in

10    mind throughout the trial.  I will instruct you again on the

11    law in greater detail before you begin your deliberations.

12         It will be your duty to find from the evidence what

13    the facts are.  You and you alone are the judges of the facts.

14    You will then have to apply those facts to the law as I explain

15    the law to you.  You must follow the law whether you agree with

16    it or not.  And further, nothing I may say or do during the

17    course of the trial should be taken by you as indicating what

18    your verdict should be.  Your verdict may be based only on the

19    evidence in this case, and I will briefly describe what that

20    is.

21         The evidence from which you will find the facts will

22    consist of the testimony of witnesses at trial, documents and

23    other things received into the record as exhibits, and any

24    facts the lawyers stipulate or agree to or the court may

25    instruct you to so find.

D1f1cib2

1    Certain things are not evidence and must not be

2 considered by you in your deliberations. I will list them for

3 you now.

4    First, statements and arguments by the lawyers are not

5 evidence. Questions by the lawyers are not evidence. Only the

6 answers given by the witness are evidence. A question asked by

7 the attorneys is important only insofar as it places the

8 witness' answer into context. For example, if the witness is

9 asked on cross-examination, "It was raining on June 2nd,

10 wasn't it?" and the witness answers no, based on that question

11 and answer alone, there is no evidence in the case that it was

12 raining on June 2nd.

13    Second, objections to questions are not evidence.

14 Lawyers have an obligation to their clients to make objections

15 when they believe evidence is improper under the rules of

16 evidence. You should not be influenced by the objections nor

17 by my rulings on them. If the objection is sustained, ignore

18 the question. If it is overruled, treat the answer as you

19 would any other. If you are instructed that some item of

20 evidence is received for a limited purpose only, you must

21 follow that instruction.

22    Third, testimony that the court has excluded or told

23 you to disregard is not evidence and must not be considered.

24    And fourth, anything you've heard outside the

25 courtroom is not evidence and must be disregarded. You are to

D1f1cib2

1    decide the case solely on the evidence presented here in the

2    courtroom.

3         Now there are two kinds of evidence -- direct and

4    circumstantial.  Direct evidence is direct proof of a fact such

5    as the testimony of an eyewitness.  Circumstantial evidence is

6    proof of one fact from which you could conclude that another

7    fact exists.  I will give you further instructions on these as

8    well as other matters at the end of the case, but bear in mind

9    that you may consider both kinds of evidence.  It will be up to

10   you to decide which witnesses to believe, which witnesses not

11   to believe, and how much of any witness' testimony to accept or

12   reject.  It is important that you listen carefully to the

13   witnesses as they testify and form no judgment with respect to

14   any witness or the outcome of the case as the trial moves

15   forward.  At the conclusion of the trial, you will be called

16   upon to appraise the credibility or truthfulness of most

17   witnesses, if not all.  I will give you some guidelines for

18   that at the end of the case.

19        A case can be presented only step by step, witness by

20   witness, before the totality of the evidence is before you.  We

21   know from experience that frequently we will hear a person give

22   his version of an event, which sounds most impressive and even

23   compelling, and yet when we hear another person's version of

24   the same event or even the same witness cross-examined with

25   respect to it, what seemed so very compelling and impressive

1    may be completely dissipated.  For this reason it is important

2    to keep an open mind throughout the trial.

3         Now a few more words about the roles of the court, the

4    lawyers, and the jurors.  In order to ensure that you continue

5    to keep an open mind, you are not to discuss the case among

6    yourselves during the progress of the trial or talk to any of

7    the witnesses or counsel in the case or anyone about the case.

8         You are also not to permit anyone to talk to you about

9    the case.  This instruction extends to your family and friends

10   as well.

11        The only time that you are permitted to discuss or

12   consider the case is when it is submitted to you for your final

13   consideration after all the witnesses have been heard and the

14   lawyers have given their summations and after you have heard

15   the court's instructions on the law.

16        Also, do not permit any third person, including the

17   attorneys, parties, or witnesses, to discuss this case with

18   you.  The attorneys are instructed not to communicate with you

19   in any way, so if you meet an attorney here in the courthouse

20   and he or she does not speak to you, do not be offended.

21   They're simply following my instructions.

22        Moreover, if any person should attempt to communicate

23   with you or talk to you about the case, it is your duty to

24   report that to me immediately.

25        Be sure that I am informed if any person that you know

1   comes into the courtroom.  This is a public trial so that could

2   happen, but it is important that you do not hear from them what

3   may have happened in court while the jury was not present.  So

4   if you should see a friend or relative come into the courtroom,

5   please send me a note through my law clerk at your first

6   opportunity.

7           Also, be sure not to try to do any research or make

8   any investigation about the case on your own, whether by use of

9   the internet or by other means.

10          As I stated earlier, do not take anything I say or do

11  during the trial as indicating what your verdict should be.

12  Don't be influenced by my taking notes.  What I write down may

13  or may not have anything to do with that which you will be

14  concerned about during the trial.

15          And remember that the evidence upon which you will

16  decide the case is the evidence that you hear in this courtroom

17  and that evidence alone.

18          I now want to introduce to you the charges in the case

19  and the processes that the parties will follow in presenting

20  and rebutting the proof.

21          The defendants have been charged in an indictment

22  which, as I have explained to you previously, is not evidence

23  of the guilt of the defendants.  The indictment does not change

24  in any way the presumption of innocence that the law gives

25  every accused.  The indictment was voted on by a grand jury and

1    it is the way that the government brings into court people the

2    government believes to have violated the law.  The defendants

3    have pleaded not guilty to the indictment.

4         As stated earlier, the indictment contains seven

5    counts.  I will summarize for you the specific charges against

6    the defendants.

7         Count One charges the defendants with conspiracy to

8    commit immigration fraud and to submit false statements to the

9    United States government.  Specifically, Count One charges that

10   from in or about 1996 through in or about 2011, the defendants

11   engaged in a scheme to profit by, among other things,

12   contributing to, preparing, and/or submitting fraudulent

13   applications to obtain alien labor certifications on behalf of

14   nonU.S. citizens from the United States Department of Labor by

15   falsely representing that U.S. employers wished to employ them,

16   which in turn allowed those noncitizens to petition for or

17   adjust their legal status in the United States.

18        Counts Two, Three, Five, and Six charge the defendants

19   separately with making false statements to immigration

20   authorities.

21        Count Four charges defendant Refeal Brodjik with

22   making false statements in a naturalization application filed

23   on his own behalf.

24        And Count Seven charges the defendants with conspiracy

25   to commit mail and wire fraud between 1996 through 2011 in

D1f1cib2

connection with the conduct alleged in Count One.

Specifically, Count Seven alleges that the defendants utilized

the mails and wire communications to further the scheme to

defraud immigration authorities described in Count One.

As a result of the defendants' pleas of not guilty,

the burden is on the prosecution to prove their guilt beyond a

reasonable doubt.  As I will instruct you in more detail at the

conclusion of the evidence, reasonable doubt may be defined as

doubt based upon reason and common sense.  It is a doubt that a

reasonable person has after carefully weighing all of the

evidence.  The burden to prove guilt beyond a reasonable doubt

never shifts to the defendants for the simple reason that the

law never imposes upon the defendants in a criminal case the

burden or duty of calling any witnesses or producing any

evidence.  The law presumes the defendants to be innocent of

the charges against him or her.  If, after consideration of all

the evidence presented and following the rules of law that I

will explain at the conclusion of the trial, you have a

reasonable doubt as to any defendant's guilt, you must acquit

that defendant; that is, you must find the defendant not

guilty.  If, however, after careful consideration of all the

evidence presented and following the rules of law that I shall

explain to you, you have no reasonable doubt as to a

defendant's guilt, you must convict that defendant; that is,

you must find the defendant guilty.

1      It is also, as I've told you earlier, a fundamental

2  principle of law that a criminal defendant has the right not to

3  testify.  If a defendant does not testify, you may not draw any

4  inference against him or her based on that decision, and that

5  fact may not enter into your deliberations.

6      Now let me give you a brief overview of what will take

7  place during the trial.

8      First, the government will present its opening

9  statement.  Defense counsel may then give their opening

10  statements.  An opening statement is neither evidence nor

11  argument.  It is an outline of what the party believes the

12  evidence presented at trial will show, and also to help you

13  follow the evidence as it is presented.

14      Next you will hear the testimony of witnesses.  The

15  government will call its witnesses first.  Each witness will

16  first give direct testimony, then may be cross-examined by the

17  defense.  Sometimes there is redirect testimony and

18  recross-examination.

19      Also exhibits, stipulations of fact may be received

20  into evidence.

21      Following the government's case, the defendants may

22  but need not call witnesses.  If a defendant does call

23  witnesses, those witnesses will be examined and cross-examined

24  just as the government's witnesses were.

25      If the defense presents evidence, it is possible that

1    the government may then present some rebuttal evidence.

2            After all the evidence has been received, the

3    attorneys will make their closing arguments.  They may review

4    the evidence and make arguments to you as to what conclusions

5    they think you should or should not draw from the evidence.

6    Those arguments are not themselves evidence, but they may be

7    helpful to you in reviewing the evidence during your

8    deliberations.

9            After these arguments or summations, I will then give

10   you detailed instructions on the law that applies and controls

11   in the case.  You must follow my instructions.

12           You will then retire to deliberate on your verdict.

13           And let me just mention something that I forgot to say

14   earlier.  While I explained to you my 9 to 2:15 trial day, I

15   just want to say that when we are in the time of summations and

16   deliberations that it's not unusual for us to extend the day

17   longer than that because we just simply need time, hours, and I

18   need to give you certain breaks in between the multiple

19   summations, and I'm sorry that I forgot to mention that, but of

20   course we'll try to work with everyone's schedule.

21           Anyway, we will now commence with the opening

22   statement by the government.  Ms. Echenberg?

23           MS. ECHENBERG:  Yes.  Thank you, your Honor.  May I

24   move the podium?

25           THE COURT:  Absolutely.

d1f1cib2              Opening - Ms. Echenberg

1          MS. ECHENBERG:  Just a few blocks from this courtroom,

2     there was a law firm -- a law firm that made millions of

3     dollars committing a massive fraud.  For over a decade that law

4     firm had thousands of clients who came in and who were seeking

5     legal status in the United States.  They wanted to be able to

6     stay here permanently.  But those clients didn't meet the

7     requirements to stay in the United States permanently.  They

8     didn't meet the requirements for something called a green card.

9     But that didn't stop the law firm.  They just made up stories

10    about these clients.  They created jobs for them, they created

11    fake work experience for them, and they created all sorts of

12    phony documents to support that made-up story, and they put

13    that in applications that they submitted to the Department of

14    Labor and to the U.S. immigration authorities.

15          The law firm relied on a large network of people to

16    commit this fraud, both people who were inside the law firm and

17    people outside the law firm.  The four defendants in this case

18    were part of that network.  These two defendants at this table,

19    Gulay Cibik and Refeal Brodjik, they worked at the law firm.

20    And these two defendants in the back, they were part of that

21    outside network that helped the law firm succeed in the fraud.

22          Ms. Cibik, like I said, worked at the law firm, and

23    she was personally involved in preparing fraudulent

24    applications.

25          Mr. Brodjik also worked at the law firm.  He helped

1    prepare phony documents, he distributed fraud proceeds, and he

2    lied in his own applications to immigration authorities for

3    naturalization here.  That just means to become a United States

4    citizen.

5         Mr. Schwartz and Mr. Tischler were part of that

6    outside network.  They were paid to lie repeatedly to federal

7    authorities about their intentions to hire certain of the

8    firm's clients.  They claimed falsely that they were going to

9    hire hundreds of people for their businesses, and they had no

10   intention of doing that.

11        Now why did these four defendants do this?  They did

12   it to make money for themselves and for their partners in

13   crime.  All four defendants made tens of thousands of dollars

14   being a part of this fraud.

15        Now during this opening statement I'm going to do two

16   things.  I'm going to give you a preview of what I expect the

17   evidence will show, and I'm going to explain to you how I think

18   the government is going to prove its case.

19        So what will the evidence show?  During this trial

20   you're going to learn that there are different ways that an

21   immigrant, someone from outside the United States, can get

22   legal status to stay here permanently.  You'll learn that

23   immigrants can get green cards, or permanent residents, if they

24   can show that they fill a need in the job market.  For example,

25   immigrants who work in certain skilled labor jobs like

1    construction can get green cards if they can show that there's

2    an employer who's willing to hire them and they can show that

3    there's no American who can fill that job.  Immigrants can also

4    sometimes qualify for green cards if they work for certain

5    religious organizations or if they have a very special skill,

6    they are world-renowned artists, or a scientist or an athlete.

7            You will learn that the law firm prepared and

8    submitted to immigration authorities thousands of applications

9    that falsely claimed that their clients met these very special

10   requirements.  They made up jobs, they made up work experience,

11   and they prepared a host of phony documents to support those

12   made-up jobs, fake experience letters saying that people had

13   experience in certain fields when they didn't, fake tax returns

14   to make it look like companies could support hiring many, many

15   employees when they really couldn't.  And they paid a network

16   of business owners to be in on the fraud, to help them commit

17   the fraud, to say, yes, we're going to hire those people, even

18   though those business owners never intended to hire any of

19   those clients.

20           Now let me tell you a little bit more about what the

21   evidence will show about each of these four defendants.

22           Ms. Cibik recruited clients to the firm.  She met with

23   them personally, she coached them on how to lie in

24   applications, she paid business owners to pose as people who

25   were going to hire her clients, and she herself prepared phony

1    applications.

2           Mr. Brodjik helped prepare phony documents for these

3    applications, and he also funneled the firm's profits to the

4    head of the firm.  And in addition to his own role in the

5    fraud, he lied in his immigration applications.  He filed an

6    application for a green card that was filled with lies, one

7    that he did through the firm -- through the firm's fraud.  And

8    then years later he applied to become a United States citizen,

9    and he lied in that application too.  Among other things, he

10   told immigration authorities that he never worked with the

11   firm.  He didn't mention it in his application.  Instead he

12   said he'd been self-employed, because by that time the firm was

13   already under investigation.

14          Now as I said, Nathan Schwartz and Harold Tischler

15   were part of that outside network that was paid to help the

16   fraud succeed.  They lied over and over to the Department of

17   Labor, claiming that they were going to hire clients of the

18   firm when they had no intention of doing that.

19          As I mentioned earlier, one of the lies told in some

20   of the immigration applications was that a client had a job

21   with an employer who had a special need for skilled labor and

22   who couldn't find an American to fill that job.  That's the lie

23   that Mr. Schwartz and Mr. Tischler told.  They got paid to lie.

24   They got paid to falsely claim that they were hiring clients of

25   the firm and they didn't intend to do that.  To do that, they

1  provided the law firm with the names and the addresses and

2  phone numbers and tax ID numbers for businesses that they were

3  associated with so the law firm could include that information

4  on these immigration applications.  None of these companies had

5  the capacity to hire maybe more than two or three people, yet

6  Mr. Tischler and Mr. Schwartz allowed their companies to be

7  used in hundreds of applications claiming that they were

8  willing to hire these firm clients.  Why?  Because they got

9  paid to do it.  In fact, the more of these applications that

10 went through, the more they got paid.  Each fraudulent

11 application listed either Mr. Tischler or Mr. Schwartz as the

12 employer, and if the application was approved, it was sent to

13 them by mail.  They were sent to Mr. Tischler's house and also

14 to his business address, and they were sent to three mailboxes

15 that Mr. Schwartz controlled.  So they would get a document

16 saying that the employment was approved, and then they would

17 bring that document into the law firm and they'd get paid, and

18 then the law firm could continue with the next step of the

19 application process.

20          And you'll learn that sometimes the Department of

21 Labor, who was part of this approval process, would call.  They

22 would want to check and see if an employer was really saying

23 that they were going to hire someone.  And they would call to

24 check, and Mr. Tischler and Mr. Schwartz would lie and they

25 would say, yes, we do intend to hire this person.

1      So that's an overview of what I expect the evidence

2  will show, about how the fraud worked and what the defendants'

3  roles in the fraud were.

4      Now how will the government prove its case to you?

5  You will see those fraudulent applications that were submitted

6  by the firm, you'll see false applications prepared by

7  Ms. Cibik, and you'll see checks that she wrote to another

8  employer who did the same thing that Mr. Tischler and

9  Mr. Schwartz did, agreed that his company could be used as a

10  phony employer.  You'll see Mr. Brodjik's own naturalization

11  application filled with lies, and you'll see hundreds of filed

12  applications that list either Mr. Tischler or Mr. Schwartz as

13  the employer.  You'll see that hundreds of approved

14  applications were sent directly to Mr. Tischler or to

15  Mr. Schwartz at those locations that I mentioned.  And you will

16  see the Department of Labor call log which will show calls from

17  Nathan Schwartz and Harold Tischler confirming that they

18  intended to hire those firm clients.  You'll see the law firm's

19  own files.  You'll see the working files of this fraud.  You'll

20  see e-mails found on the firm's computers from Ms. Cibik to

21  Mr. Brodjik, talk about their knowledge of the fraud, talk

22  about what they're doing as part of the fraud, and you'll see

23  documents that came from Mr. Brodjik's house.  You'll see firm

24  files he had at home.  And you'll see more e-mail exchanges he

25  had at home that talk about his role in the fraud.

1    You're also going to hear from a number of witnesses.

2 You're going to hear directly from one of the law firm's

3 clients who met with Ms. Cibik.  And you're going to learn how

4 Ms. Cibik coached him about how to lie about his work

5 experience, how she sold him a phony employer, and how she

6 prepared a fraudulent application for him.  And you're also

7 going to hear from a law enforcement agent who interviewed

8 Ms. Cibik during the investigation, and Ms. Cibik admitted to

9 that agent that she would change clients' jobs in applications

10 so that the job was something more likely to be approved.  And

11 you're going to hear directly from two law firm employees who

12 are going to tell you, from an insider's perspective, how

13 things worked at the law firm, exactly how the fraud worked.

14 They will tell you that virtually every immigration application

15 prepared at this law firm was fraudulent.  They will tell you

16 about the bogus stories that the firm made up so that

17 applications would be approved.  They will tell you about the

18 phony documents that were prepared by the firm and by part of

19 that outside network to support the applications.  And they

20 will tell you about their firsthand experience with these four

21 defendants.

22    One of them, David Grynsztajn, will tell you about

23 working with Gulay Cibik on fraudulent applications.  He'll

24 also tell you about his interactions with Refeal Brodjik and

25 he'll tell you how he saw Harold Tischler coming into the law

1    firm, dropping off documents, and getting paid.

2             The other employee, Sam Salamon, will tell you that he

3    personally paid Harold Tischler and Nathan Schwartz to pose as

4    an employer as part of this fraud, to lie to federal

5    authorities about their intentions to hire firm clients.  He'll

6    tell you about all the conversations he had with them, about

7    their role in the fraud, and how they both wanted to make more

8    and more money and wanted more and more applications to use

9    their name and their companies so they could keep making money.

10            Now as to these two witnesses, these former law firm

11   employees, they've pled guilty to the crimes they've committed,

12   and they're testifying as part of a cooperation agreement with

13   the government.  And they're hoping that they'll get a break on

14   their sentences in exchange for testifying.  So I encourage you

15   to evaluate their testimony carefully, see how it lines up with

16   the other evidence in the case, the documents and the testimony

17   by other witnesses.  If you do that, I submit that you'll see

18   that what they have to say fits in with the rest of the

19   evidence in the case, and it paints a compelling picture of

20   this massive fraud that occurred and the four defendants' roles

21   in that fraud.

22            So that's how the government will prove its case.

23            Before I sit down, I'm going to ask you to do three

24   things.

25            First, listen carefully to the evidence.  It's going

1    to come in in bits and pieces and it won't always be in

2    chronological order.

3            Second, listen to Judge Buchwald's instructions on the

4    law.

5            And third, use your common sense, that same common

6    sense that you use every day as New Yorkers, and if you do

7    that, I submit to you that the government will get a fair

8    trial, these four defendants will get a fair trial, and you'll

9    come to the only conclusion that is consistent with the law and

10   the evidence -- that all four of these defendants are guilty as

11   charged.

12           Thank you.

13           THE COURT:  Thank you.

14           Now the defendants agreed among themselves that

15   they're going to --

16           MR. GERZOG:  Indictment order, your Honor.

17           THE COURT:  Indictment order?  Okay.  Fine.  So the

18   first name on the indictment is Ms. Cibik.

19           MR. DONALDSON:  Your Honor, can I have one moment.

20           THE COURT:  Yes.

21           MR. DONALDSON:  I'm a little bit taller so you'll have

22   to excuse me.

23           Good afternoon.  Good afternoon.  I am -- I have this

24   belief in the Shakespearean thing, brevity being the soul of

25   wit, so I'm going to be as brief as possible.

1    I heard everything that the government said and I am

2    hoping, I'm really hoping, that you all were listening very,

3    very carefully to what she said.  I was listening very

4    carefully and I was making notes.  Because as the court will --

5    or has instructed you and will instruct you again, what we say

6    up here right now is not evidence.  It's just not.  What I say,

7    what the government so fantastically said is not evidence.

8    What I say right now is not evidence.  What my co-counsel after

9    me will say is not evidence.  But we still want you to listen

10   to it very carefully because I believe the words were, they

11   want to paint a picture of what this massive fraud was.

12   They're going to show certain things and use certain pieces of

13   evidence to show that.  I was writing all that down because I

14   don't get the opportunity to talk to you except two times --

15   once now and once when we finish.  And I can assure you when we

16   finish I'll be talking to you again.  So let me get to it.

17        My name is Xavier R. Donaldson, and as the court has

18   said several times, I represent Ms. Gulay Cibik, this woman

19   sitting to my right.  It is my/our belief that this case is

20   about fraud, definitely about fraud, because there was a

21   massive amount of fraud that occurred, and in fact, as the

22   government has noted and I believe the court has noted as well,

23   several persons have pled guilty to that fraud.

24        But what this case is about regarding Ms. Cibik is

25   what I like calling, and I believe most people have called an

1    obedience to authority.  An un -- sometimes -- yielding

2    obedience to authority.  This authority has the appearance

3    initially of a sheep, a kind sheep, a kind person, a helpful

4    person, but in fact this authority was actually a liar, a

5    thief, and, quite frankly, probably one of the largest

6    sociopaths you'll hear about.  Mr. Earl David, a lawyer, an

7    author, and what I imagine you'll hear was a reputable person

8    in his community.  He was in fact in charge of a very large

9    massive law firm -- well, law firm that caused massive fraud.

10   There is no doubt about that.

11          The evidence will also show that Ms. Cibik, my client,

12   came to him as a client, came to him as a Turkish immigrant

13   seeking assistance, came to him to get her card so that she

14   could work here legally, so that she could matriculate into

15   American society.  She came to him for help.  That's what the

16   evidence will show, and that that's how they met, her asking

17   him for help.  Her walking up to the sheep, her basically

18   walking to his door.

19          The evidence will also show that thereafter,

20   Mr. David, knowing that Ms. Cibik is Turkish, or of Turkish

21   descent, speaks Turkish, and that is a gold mine for him

22   because she can now help him make money.  She can now be used

23   to help him continue his fraud, because let's be clear, that

24   fraud that they're talking about, this massive amount of fraud

25   that occurred didn't start with Ms. Cibik.  It was already

1    happening before she got there.  Again, she came there for

2    assistance.  And then he saw a gold mine, he saw a pot.

3           He then hired her as translator, and the evidence will

4    show she sat outside the door of his office, a two-floor office

5    on Wall Street, the beacon of capitalism.  She sat outside his

6    office and helped him to translate for other people seeking

7    help.  The evidence will show she sat outside the door, and

8    when someone needed translation, he would call her in.  "Please

9    help."  That's how she made -- that's how she made extra money,

10   because she had her own job in the day, but for extra money,

11   like most persons are now doing, she wanted to help out.

12          The evidence will also show that ultimately this liar,

13   this sociopath, this grand theft person, Mr. David, lawyer --

14   I'm using that word loosely -- this lawyer, this member of our

15   bar, asked her to help him out more because he figured she can

16   bring in more clients, more Turkish clients, because that's

17   what he was focusing on.  That's what the immigration fraud was

18   focusing on, that Eastern European bloc, that throng of

19   Russians, Polish persons, Turkish, Jewish persons, that's what

20   he was focusing on, and he had a woman here who spoke Turkish,

21   who could help him out with that, who could be his face.  "Come

22   on in, Ms. Cibik.  Help me out.  I helped you out."  And that's

23   how that begins.  So he would ask her, "Please, fill out this

24   application."  She would do it.  "Please, fill out this

25   application."  She would do it.  "Please, write this for me."

1   She would do it.  "Please, do this for me."  She would do it.

2   And that's what the evidence will show, that there was an

3   obedience to authority by a woman who started out in need.

4   That's all this evidence will show.

5         The evidence will not show -- the evidence will not

6   show that Ms. Cibik intended to break any laws.  It just won't

7   show that.  You're not going to see any of her signatures on

8   any fake documents, you're not going to see any of her

9   fingerprints on these fake documents, you're not going to

10  see -- or I don't believe you're going to see or anyone's going

11  to come here and testify that she actually created that

12  particular experience letter.  You're just not going to see

13  that.  So what you are going to continually hear about is a

14  lawyer and two persons on another floor who did their best to

15  make as much money off of immigrants as they could.  Not

16  Ms. Cibik.

17        I want to leave you with one thing, and again, I am a

18  firm believer in brevity being the soul of wit.  I want to

19  leave you with one thing, if I may, your Honor.  I like telling

20  stories all related to the trial aspect of a case.  And I have

21  this truck.  It's one of these new trucks with the little

22  gizmos in it, nice little lights and stuff in it.  So I went to

23  the -- my oil light change came on, so I went to the oil change

24  person, went to the store, went inside, "Please fix my oil."

25  Gave them my truck.  I'm tall.  I need a truck.  I gave them my

D1f1cib2                    Opening - Mr. Donaldson

1    truck.  And then I paid them the $50.  They gave me back my

2    truck.  I drove off.  I got down the block and the light was

3    still on.  Okay.  You don't know me, but I got mad.  I said,

4    oh, wait a minute.  They might have tried to get me for $50.

5    My light's still on, they didn't fix my oil.  I went back to

6    that place, started screaming, yelling, screaming, yelling,

7    screaming.  The man looked at me, walked outside to my truck,

8    pressed the little button, the light went off.  I said, "Whoa.

9    Sorry, sir."  And he looked at me and said, "Don't assume.

10   Listen first."  Don't assume.  Listen first.

11           And you're going to hear from Sam Salamon.  He's going

12   to tell you all these things.  I'm going to ask you to listen,

13   but don't assume first.  We're coming next.

14           You're going to hear from David Grynsztajn.  He's

15   going to tell you all types of things.  I'm going to tell you

16   don't assume, I'm coming next.

17           After the case is finished, it's going to be crystal

18   clear that my client, Ms. Cibik, is not guilty of breaking any

19   laws.  She was simply a victim of obedience to authority.

20           I want to thank you all very much for your time.  Nice

21   speaking to you.

22           THE COURT:  Counsel for Mr. Brodjik?

23           MR. GERZOG:  Thank you, your Honor.

24           Good afternoon, ladies and gentlemen.  I want to

25   congratulate you on winning the reverse lottery.  You go

 1   downstairs and you pay a dollar, and if you can beat the

 2   750 million to 1 odds, you become a millionaire, but out of the

 3   5 million people in the Southern District of New York, you beat

 4   the odds, and here you are serving on jury duty in this case.

 5        Now some of you may think it's a pain in the neck,

 6   some of you may think, hey, this might be an interesting

 7   experience.  I might learn something, I might enjoy this.  But

 8   whatever happens and however you feel about it, let me tell you

 9   that it is a very hard job.

10        We will only be together about two weeks, but in that

11   two weeks you have to do two things that are very, very hard.

12   One is, you have to try four different people separately.

13   This -- the fact that there are four defendants doesn't mean

14   that they all rise or all fall together.  Now I have nothing

15   against the three people that are on trial that I don't

16   represent.  I wish them well.  I don't know them.  I have

17   nothing to do with them.  But Mr. Brodjik, would you stand up

18   for a second.

19        This man, Refeal Brodjik, is Mr. Gutman's client and

20   my client.  He's the one I care about.

21        Thank you, Mr. Brodjik.

22        And I have to ask you, when you listen to the

23   evidence, think about, what did they say -- what did that

24   witness say about Mr. Brodjik?  What did this piece of paper --

25   what does this piece of paper say about Mr. Brodjik?  Because

1    the second part of your hard job is that you have to use rules

2    that are a little bit counterintuitive, that are not really in

3    keeping with the way we run our lives, and I like to call those

4    two rules where there's smoke -- the first one is, where

5    there's smoke, there's fire.  Normally in our lives, if

6    something looks like something's going on, it usually is.  If

7    something looks like it's too good to be true, it usually is.

8    Well, here we all are in this beautiful courtroom.  I can't

9    imagine how many tax -- how many millions of our tax dollars it

10   took to build this courtroom, but we're all dressed up, we have

11   Judge Buchwald here, everything is very formal and very nice,

12   and there's a tendency to think, well, jeez, if we're all here,

13   if the government went to this much trouble to bring everybody

14   together and build this courthouse and do all this, something

15   must have happened.  He must have been guilty of something.

16   Ladies and gentlemen, he is presumed innocent under our law.

17   It is a constitutional guarantee.  It is as fundamental a law

18   as your right to choose your religion, as your right to choose

19   the place you live, as your right to choose your spouse, as

20   your right to do any of the things you do and any of the rights

21   we enjoy as Americans.  He is presumed innocent today.  He will

22   be presumed innocent tomorrow.  When Sam Solomon comes on the

23   stands and tells lies about him, he will be presumed innocent

24   then.  When other witnesses come on the stand and say things

25   about him, he will be presumed innocent by you and he must be

1   presumed innocent by you then.  The only time the presumption

2   of innocence goes away is if, at the end of the trial, after

3   you have heard all the evidence, you are unanimously convinced

4   that he -- that the government has met its burden of proving

5   him guilty beyond a reasonable doubt.  Not possibly guilty, not

6   probably guilty, not, well, something maybe went on, I don't

7   know exactly what it was, but guilty beyond a reasonable doubt.

8   That's what the government has to do.  And I'm asking you,

9   ladies and gentlemen, to hold them to that standard.  That's

10  counterintuitiveness number one.  We're all here together, but

11  he is presumed innocent.

12          The second is, Mr. Brodjik has the right not to

13  testify in this case, and I don't expect that he will.  I don't

14  know for sure, two weeks is a long time, but I don't expect

15  that he'll testify.  He has that absolute right under the

16  Constitution.  You cannot hold that against him in any way at

17  all.  Now again, that's a little counterintuitive.  I imagine

18  some of you have children.  If you leave a plate of cookies on

19  the table and you step outside for a minute and you say to the

20  kids, "Don't eat those cookies," and you come back in and the

21  cookies are gone and you say to the kids, "What happened to the

22  cookies?" and the kids say, "I'd prefer not to say," then you

23  think you have an idea of what happened to the cookies.  But

24  it's not how it works in a courtroom.  You might feel like,

25  hey, if I was being charged with a federal crime and I was not

1    guilty, I would tell the world, I would tell everybody that

2    would listen, I would tell the guy in the news stand, I would

3    tell the judge, I would tell anybody who would listen to me.

4    That's not how it works.  There's a lot of reasons people

5    choose not to testify, but you cannot hold his choice not to

6    testify, the fact that he chooses not to testify in any way

7    against him.

8           Now, ladies and gentlemen, frankly, I don't expect you

9    to hear much about Rafi Brodjik.  We'll be together two weeks,

10   but as you're thinking about it, think, today, you know, what

11   did we hear about Rafi Brodjik?  Did we hear anything about

12   him?  Did we hear evidence against him?  What was it?  Don't

13   mix the four defendants together.  Don't say, well, we heard a

14   lot of evidence about fraud.  Yeah, Earl David.  You heard Earl

15   David is a fraudfeasor.  He escaped to Canada when the

16   government started investigating him or when he found out that

17   the government was investigating him.  Eventually he was

18   extradited, eventually he pled guilty.  He's a very bad man.

19   He made a lot of money.  He did a lot of bad things.  Okay?

20   But don't conflate Earl David or Sam Salamon or any of these

21   other individuals with Rafi Brodjik.  Pay attention to what the

22   evidence is against Rafi Brodjik.

23          Now at the end of the case I'm going to get the

24   opportunity to address you again, and at that time I'm going to

25   try to lead you through whatever evidence has come out, if any,

1    against Rafi Brodjik.  I'm not going to be taking notes when

2    they're talking about Ms. Cibik.  I have no animus towards

3    Ms. Cibik, but I could care less what happens to Ms. Cibik,

4    quite frankly.  I hope she's not mad at me about that, but I

5    have a responsibility to Mr. Brodjik.  So I am going to focus

6    you in my summation on whatever evidence there was against

7    Mr. Brodjik.  And I'm going to ask you to consider that

8    evidence very carefully.

9            I'm also going to ask you to do one other thing.  You

10   can see by looking at him that Mr. Brodjik is a Hasidic Jew,

11   and you will see I believe some of the witnesses are going to

12   be Hasidic Jews, and if you live in the New York metropolitan

13   area, you probably have some experience with Hasidic Jews.

14   You've at least seen them around.  And they wear clothing and

15   they dress in the style that's more 19th Century than 21st,

16   and they have certain beliefs that even more secular Jews don't

17   believe, and they have a certain set of laws, religious laws

18   that they abide by that more secular Jews don't abide by.  But

19   again, this is America.  And whether you think Hasidic Jews are

20   wonderful, community-minded people that stick together and help

21   each other out and that's a wonderful thing or you think

22   they're ganefs who try to finagle the system or, you know, do

23   something wrong or they're just weird looking, they don't look

24   like us so they're bad, you've got to put that out of your

25   mind.  You can't have sympathy, you can't think, oh, well, you

1    know, he's probably a pretty good guy, you can't say, oh, well,

2    you know, he's a Hasidic Jew, come on, what do you expect?  And

3    we picked -- not only the defense lawyers but the government

4    picked this jury out of all the people that were sitting in the

5    room because we thought these 16 people were the fairest of the

6    people in the room, were the fairest of the people, could be

7    the fairest and would not consider that factor against

8    Mr. Brodjik and would honor the presumption of innocence and

9    would grant Mr. Brodjik his constitutional right.

10             Now, ladies and gentlemen, when I come back and speak

11   to you at the end of the case, as I said, I'm going to go

12   through the evidence, such as it may have come in, against

13   Mr. Brodjik, and I'm going to show you that the government has

14   not met its burden, that the government has not proved beyond a

15   reasonable doubt that Refeal Brodjik is guilty of any of the

16   crimes he is charged with.

17             Thank you.

18             THE COURT:  Mr. Brill?

19             MR. BRILL:  Thank you, your Honor.

20             A few hours ago you heard, my name is Peter Brill.  I

21   represent Nathan Schwartz.  And when we came in this morning,

22   we randomly chose places to sit, and it just worked out

23   somewhat logically, because you have the two people who worked

24   for the law firm in the front and you have the two people who

25   the government claim were the outside conspiracy in the back.

1    It helps to give a little logical consistency to the case, and

2    it also serves to show a certain amount of separation between

3    Mr. Schwartz and Mr. Tischler, who actually met each other once

4    about 25 years ago briefly, and Ms. Cibik and Mr. Brodjik, who

5    Mr. Schwartz has never met, that is, up until the time that

6    they were all arrested because the government alleged that they

7    were part of one vast conspiracy.  The only reason that they --

8    they're being called part of a vast conspiracy is because the

9    government is saying that they're part of a vast conspiracy.

10   The only people who can determine if they're part of a vast

11   conspiracy is you.  Not because the government says so.

12        The reason Nathan Schwartz is here today is not

13   because of Earl David, as you've heard his name.  Earl David

14   was, as everyone has said, a pretty bad guy.  Not because of

15   Earl David.  Nathan Schwartz doesn't know Earl David, never met

16   Earl David.  Nathan Schwartz knew one person, this guy whose

17   name you've also heard.  His name is Sam Salamon.  And Nathan

18   for the most part grew up in Rockland County.  His father was a

19   pretty well-known guy within the Hasidic community.  And for

20   work he ran a lumberyard, owned a lumberyard.  That's his

21   father.  And when he was about 17 years old, Nathan met this

22   guy Sam Salamon.  Sam also was about 17.  And they, you know --

23   they were friends.  Didn't matter if they were Hasidic or

24   Catholic, whatever.  They were just friends like any other

25   teenagers who became friends.  And they hung out.  And when

1   Nathan's father ran into some financial trouble and Nathan

2   wasn't able to work there anymore, then Sam said, "Sure, come

3   and work for my father.  My father owns a copy machine

4   business."  And so Nathan said sure, came and worked with the

5   copy machine business, just basically the way anyone else who

6   has a good friend would do for their good friend.

7          And that's what happened.  They were friends for a

8   while and then they lost touch for a while.  Nathan got

9   married, he had children.  Sam got married and had children.

10  They lost touch.

11         Now Nathan, as you'll probably come to find out

12  through this trial, is -- well, in Yiddish, you might describe

13  him as a schnook.  In English, you might describe him as a

14  sucker or a patsy, or just basically someone who's very

15  gullible.  He's a person who's very generous, who will give you

16  the shirt off his back, but he's also a person who throughout

17  his life has decided that whenever he has a brilliant idea in

18  his own mind that he's going to go out and he's going to go for

19  it, and that's great and that's admirable and that's the

20  American way, but unfortunately for Nathan, for Mr. Schwartz,

21  most of those ideas don't work out, and so he never made a lot

22  of money, he's never been real successful.  He's been able to

23  support his family, but not much more than that.

24         And there came a time, as the real estate market was

25  heating up in the early 2000s, that he actually had a good

1   idea.  He had an idea to start building houses and helping out

2   with the housing market.  It was booming at the time.  And he

3   started a framing business.  Not framing as in picture frames

4   but framing as in framing houses.  And he started hiring

5   people.  And he ran into a situation where some of the people

6   that he was hiring were not certified to work or some people he

7   wanted to hire were not certified to work.  And he had lost

8   touch with Sam Salamon at this time, and he found out through

9   the grapevine that Sam Salamon apparently had become a lawyer

10  and was working in the immigration field.  Well, as it turns

11  out, Sam had never become a lawyer.  Sam, in one of his many

12  lies, held himself out as a lawyer, held himself out as a

13  lawyer working, as it turns out -- not that he told anybody

14  this part in this conspiracy with Earl David -- to bring in all

15  sorts of false claims of people having to write to work in this

16  country.

17          Well, Mr. Schwartz went to his friend, or the person

18  he thought was his friend, Sam Salamon, said, "Sam, I've got --

19  I understand you're working in this field.  I've got these two

20  guys who I want to be able to legalize so they can work for me.

21  They're skilled framers.  This business is taking off.  I'd

22  like you to help me legalize these workers."  Sam said sure.

23  He's been his friend for practically 30 years at this point.

24  And he helps him.  And they go through this application process

25  together, and Mr. Schwartz gives Mr. Salamon all of the

1    information that he needs to legalize these people.

2    Mr. Salamon charges these clients appropriately, as a lawyer

3    would, to legalize their immigration applications, and that's

4    when their friendship starts up again.  As I said, they had

5    lost touch.

6           Mr. Salamon's primary office, along with Mr. David's,

7    was down here, as Ms. Echenberg said, a few blocks from this

8    courthouse, over on Wall Street.  A couple offices.  One on

9    Maiden Lane, one on Wall Street, but within a few blocks from

10   here.  Mr. Schwartz lived up in Rockland County.  Mr. Salamon

11   lived up in Rockland County.  And Mr. Salamon said to

12   Mr. Schwartz, "Nathan, could I see clients in your office?"

13   Sure.  "Yeah, it's a long trip.  They don't want to come down

14   to New York City, especially not lower Manhattan.  Could I use

15   your office?"  He said, "Sure.  Of course you can."  Why

16   wouldn't he?  If he needs the space to see clients, he's his

17   old friend.  "Sure.  Come on.  Use the office when I'm not

18   using it."

19          Mr. Schwartz kept a shelf with all of his companies

20   that had never gone anywhere, with all of these pipe dreams

21   that had never gone anywhere, and as you'll see and as you'll

22   find out, all of those companies, all of those companies were

23   the source of the hundreds and hundreds of fraudulent

24   immigration applications that came under Mr. Schwartz's name.

25          Now Mr. Schwartz had a couple of post office boxes

that he used as mailing addresses for his company, and he got

legitimate mail from the Department of Labor for the two

applications that he had applied for for these two workers.

Mr. Schwartz had no concept of immigration law.  Mr. Schwartz

had no concept of what the Department of Labor was about.

That's what you use your lawyer for.  If you don't know how the

law works, you ask your lawyer.  So he said, "Sam, I'm getting

this mail.  What should I do with it?"  "Give it to me."  The

mail would come addressed to the companies that were the

legitimate -- where he was claiming the legitimate workers, the

two legitimate workers.  Olympia and York was one of them,

Contour Framing was the other one.  But there would be a lot of

mail coming under those names.  The mail itself in that address

window, you know, the plastic window you see on the envelope,

doesn't say regarding this person, doesn't say regarding that

person, just says the company and the address.  So Nathan would

give some of this mail to Mr. Salamon.

          And other mail would be coming, and he would ask

Mr. Salamon, "What's this mail coming from?"  And Mr. Salamon

would say, "Oh, something screwed up in our office.  Just, you

know, throw it out."  And he would do that.

          Now the government, of course, is going to claim that

Mr. Salamon was paying Mr. Schwartz, that every time

Mr. Schwartz gave him one of those envelopes, Mr. Schwartz was

a knowing part of this conspiracy, that he would give him an

1   envelope, Mr. Salamon would give Mr. Schwartz the money.  Of

2   course it's all in cash; right?  There's no record of it

3   anywhere.  It's only what Mr. Salamon says.  And that's the

4   problem with this entire case, because what you're going to

5   have to be relying on, if you think that the evidence here is

6   going to lead anywhere, is the testimony of a single person,

7   Mr. Salamon, who, as Ms. Echenberg told you right from the

8   beginning -- and she told you that right from the beginning

9   because you're not going to find it out later, it's not going

10  to be a surprise later -- that he's already pleaded guilty,

11  he's looking forward to being a convicted felon, and he is

12  testifying in court specifically to avoid punishment, and the

13  only people who will determine whether he did a good job,

14  whether he was a good boy, are the people sitting at this

15  table.  I don't get to say if Sam Salamon was being a good boy.

16  Nobody else back here gets to say if Sam Salamon was being a

17  good boy.  The only people who get to say, "Sam, we're going to

18  tell the court that you were a good boy," is the government.

19  The government's going to put up a witness, the witness is

20  going to testify exactly what the government wants him to

21  testify to, and that witness will be stabbing Mr. Schwartz in

22  the back, his friend of 30 years, to avoid getting punished

23  himself.

24          The government will also put up documents -- document

25  upon document upon document.  And what's interesting, as

1    Ms. Echenberg mentioned about these documents, is that there's

2    some things will say, oh, they called Mr. Schwartz and

3    Mr. Schwartz confirmed blah, blah, blah.  We don't have any

4    record of who they spoke to other than the name of

5    Mr. Schwartz.  If you know -- if I called up the person who was

6    posing as Mr. Schwartz and said, "Mr. Schwartz, are you

7    sponsoring this immigrant?" they wrote down, "Yes, we spoke to

8    Mr. Schwartz."  Those numbers don't correspond to Mr. Schwartz,

9    the e-mail addresses that they used were all fictitious e-mail

10   addresses created by this law firm.  They have, as I said, no

11   record of any money changing hands, only what this witness is

12   going to say.  On hundreds and hundreds and hundreds of

13   immigration files, the signatures are not Mr. Schwartz.  The

14   signatures on the application, "I, Nathan Schwartz," you know,

15   "attest that this is an accurate application," none of those

16   are Mr. Schwartz's signature.  Mr. Schwartz's signature

17   appeared twice.  His actual signature, twice.  Once on the one

18   employee that he sponsored, once on the application of the

19   other employee that he sponsored.  And then hundreds and

20   hundreds of times someone else signed them.  The evidence is

21   going to show that that was without Mr. Schwartz's knowledge,

22   that Mr. Schwartz, as I said, was a sucker, was a patsy, was

23   guilty of one thing and one thing only, and that is in trusting

24   his friend of 30 years, the person that I hope and I trust at

25   the end of this trial you will find is as completely unreliable

1    as he has shown himself to be during this entire criminal

2    enterprise that he, along with Mr. David and along with all of

3    those other people who have pleaded guilty, have acknowledged

4    their responsibility for.

5            So that's going to be their case against Mr. Schwartz.

6    One liar, one witness who is out to save his own hide.  The

7    government expects that that will convince you beyond a

8    reasonable doubt of Mr. Schwartz's guilt.  I expect that it

9    won't.

10           Thank you.

11           MR. GREENFIELD:  Well, nothing like being the last guy

12   up when everybody wants to go home, but be that as it may, what

13   I want to say to you now is important.  I will be as brief as I

14   can, but I trust that you understand the seriousness of this

15   matter.

16           Once again, my name is Paul Greenfield.  I represent

17   Harold Tischler.

18           Much of what Mr. Brill said sort of steals my thunder,

19   but it's the way that Mr. Salamon operated.  Harold Tischler

20   wasn't his friend for 30 years, but he certainly thought he was

21   his friend.  You'll hear testimony as to how he -- Harold met

22   Sam Salamon, how Sam Salamon held himself out to be a wildly

23   successful, powerful lawyer.  I heard Ms. Echenberg refer to

24   him as an employee of the law firm.  I mean, that's the same

25   thing as saying that Lucifer is the guy who works in the

1    basement.  He wasn't an employee; he was running the show.  The

2    real -- the person who was really benefiting from all of these

3    employee -- employer sponsorship applications was Mr. Salamon

4    and the group that he headed within that law firm.

5            Sam Salamon was a bird of prey.  When he met Harold

6    Tischler, he was trolling for people who would give somebody a

7    job, and when he stumbled across Harold Tischler, he actually

8    struck gold, because Harold Tischler is a charitable man, a man

9    who has a long history, the evidence will show, the proof will

10   show, of providing employment to many people in need, always

11   trying to help somebody get a job, getting work for the

12   downtrodden, people on work release.  The government said that

13   there were hundreds and hundreds of applications.  As we point

14   out to you now, but it wasn't in Ms. Echenberg's opening, every

15   one of these applications that bears Mr. Tischler's name and

16   one of his companies -- by the way, he ran legitimate

17   businesses.  You'll hear evidence that some companies were just

18   made up.  His companies that he was involved in, he agreed to

19   sponsor three people, you'll hear that those -- those companies

20   were legitimate.  But the documents that were forged that have

21   Mr. Tischler's name and signature on them, you look for

22   yourselves.  They look like they're signed by at least 15

23   separate people, none of whom are Harold Tischler.

24           Now what's the answer to that?  When I was a young

25   boy, my father took me to a juggling show, and in the middle of

1    the show, the guy was juggling plates and he dropped one, and

2    he yelled out, "It's in the act."  And then he kept going.

3    Well, you know, it wasn't in the act.  That's what you say when

4    you do something wrong and you get caught.  And it's the same

5    thing with Mr. Salamon.  You're going to hear testimony that

6    the deal was, "Don't worry, we'll pay you, but we're going to

7    forge your name.  So if anybody comes to you, you can say I

8    didn't know anything about it."  Baloney.  They forged his

9    name, not because he was a co-conspirator, a partner in crime,

10   but because they took advantage of him.  They abused -- they

11   used his friendship and abused it.

12           There are a lot of documents in this case that the

13   government will try and connect to Harold Tischler.  None of

14   them were created by Harold Tischler.  99 percent of them have

15   somebody else signing his name.  They made up stationery.  You

16   know, this is the age of the computer.  You know, they've got

17   stationery with Harold Tischler's company on it, Vintage

18   Partners, Fix Anything Plumbing Company.  They did.  Anybody

19   with a keyboard and a computer can make up stationery.  That's

20   what they did.  It will be obvious to you that that's what they

21   did.

22           (Continued on next page)

23

24

25

1           MR. GREENFIELD:  There's going to be evidence that

2    there were tax returns filed on behalf of Mr. Tischler's

3    companies that claimed that they made $3 million, two and a

4    half million dollars, and supposedly I guess the argument is

5    going to be that Mr. Tischler in return for I believe the

6    testimony is going to be $300 agreed, sure, file with another

7    agency in the government a false tax return that doesn't have

8    my signature on it, that I believe the government will concede

9    was manufactured without Mr. Tischler's knowledge, submitted

10   without his knowledge.  Why would he want for $300 the

11   government to get a tax return from him in which his -- the

12   claim is he made $3 million when he made nothing of the sort.

13          Mr. Salamon is going to take payment in cash.  Well,

14   that's convenient because there are no records.

15          The evidence is going to show you that Harold Tischler

16   was a perfect target for a man like Sam Salamon, that he and

17   other people in the firm, without Mr. Tischler's knowledge,

18   formed corporations using his name, created all sorts of

19   records and documents without his knowledge or approval, forged

20   his name on a lease for the law firm, rented space in his name

21   without telling him about it.  I don't know how they're going

22   to explain that.  Why would he do that?  I have no idea.

23          There's also going to be evidence and not -- and from

24   the government witnesses that on more than one occasion an

25   honest, innocent sponsor, somebody who said, listen, I'm

1   willing to sponsor one or two or three aliens and I can give

2   them employment, would call up and complain that they're

3   getting 20 letters, 30 letters, 50 letters, 150 letters, and

4   that Mr. Salamon and the other people at his direction

5   instructed people like Mr. Tischler, don't worry about it, made

6   up some sort of cock and bull story, and that you'll be asked

7   to say, well, it's pretty obvious now that we look back it

8   wasn't true.

9           Just keep in mind it's not the weight of the evidence

10  you need to consider alone; it's the context.  It's very easy

11  to look back now and say over this five- or six-year period

12  that there was a fraud going on and you should have known about

13  it, how could you possibly say you didn't.  That's always the

14  case with a con man.  Con stands for confidence.  Sam Salamon

15  was a confidence man.  He gained the confidence of victims such

16  as Harold Tischler and used it.

17          And when he came across somebody who was truly

18  trusting in this community -- there's something called cholent.

19  It's a stew that Orthodox Jewish people eat.  And there's a

20  tradition that one night a week, the boys hang around together

21  when they're young and even as they get older and they share

22  this meal.  Harold Tischler met Sam Salamon, he shared this

23  cholent with him.  He came to visit him in the office.  Sam

24  Salamon was wearing $3,000 suits.  He was driving a brand-new

25  Mercedes or was it an Audi -- I don't know.  He had business

1    cards that said he was a lawyer.  He went up to visit him in

2    the law firm and there was this huge desk and this guy that

3    everybody was kowtowing to.

4         And now when we look back, the government says, well,

5    you should have known this was a fraud or you did know it was a

6    fraud.  He didn't.  There's not going to be any evidence that

7    he did.

8         There's going to be a lot of argument over the fact

9    that many, many envelopes came to Mr. Tischler, maybe 200.  I

10   don't know, somewhere around there.  So the argument is going

11   to be how could you get 200 letters and tell us now that you

12   didn't know what it was about.  But, the government alleges now

13   that this conspiracy lasted over five or six years.  It's not

14   like somebody came to him on a Tuesday morning and dumped 250

15   letters in his mailbox, you know.  These things added up.  At

16   first there were a few and then there were a few more.

17        And do you believe that this lawyer is telling you

18   don't worry about it.  That's the government.  They send

19   duplicates.  He's got an explanation for why the one guy who

20   agreed to sponsor was denied so we're going to replace him with

21   somebody else, all sorts of stories.  None of them true, very

22   easy to see now that they weren't true.  Not so easy when

23   you're in the middle of the forest.

24        So what I ask of you people, you jurors, is what every

25   lawyer on both sides of the case always says as long as I've

1    been doing this.  Use your common sense.  It must be that

2    somebody's common sense is going to hurt me and somebody is

3    going to help the other guy.  That's not the case here.  You

4    look at this case fairly, honestly, objectively.  Judge the

5    quality of the witnesses, the quality of the evidence, and you

6    will see that the government not only hasn't proven the case,

7    but they brought you a case based upon the testimony of the

8    worst offender in the whole conspiracy, the guy who has one

9    motive and one motive only, and that's to get out from under

10   this because at the end of the day, he's looking to say, see, I

11   gave up all of these guys.  Government, write a letter for me

12   and tell the judge that they should go easy on me.  That's his

13   motive and you got to consider that.

14        This is a massive fraud.  Indeed, millions of dollars

15   were collected by Sam Salamon and his cohorts, not by Harold

16   Tischler.

17        So I'm going to stop now so we can all go home.  But I

18   want you to know that everything that everyone has said here

19   about, they're not just platitudes.  Harold Tischler is not

20   only is presumed innocent, you have to find him guilty beyond a

21   reasonable doubt.  He's entitled to be treated individually.

22   He's on trial with four people because the government has

23   brought an indictment and put them all together.  He doesn't

24   know these people.  He didn't conspire with them.  He didn't

25   conspire with Sam Salamon.  He was victimized and here he is

1  today.  He's pled not guilty.  He's presumed not guilty.  I ask

2  you to be fair, impartial, and to withhold judgment until

3  you've heard all the evidence.

4           Thank you very much.

5           THE COURT:  Thank you, Mr. Greenfield.

6           Okay.  It's been a long day.  Two things I always have

7  to tell you and if I forget, please remind me.  One, do not

8  talk about the case with anyone.  Two, keep an open mind.

9           There is one thing I'm going to have to ask you to do

10 before I let you go.  I went you to go with my law clerk.

11 She's going to take you back into the jury room.  She's going

12 to tell you how to enter the jury room in the morning and she's

13 going to ask you for contact information so if we need to reach

14 you in an emergency unexpectedly, we can.  She's also going to

15 give you information about how to contact us if you have an

16 emergency.

17          I really hope that we will start tomorrow promptly at

18 nine.  Remember that any juror who's late -- the lawyers will

19 be here.  We'll be here -- any juror who's late keeps the other

20 jurors waiting and we really are trying very hard to respect

21 your time.  So respect each other.  Be on time.  Have a nice

22 night.  See you in the morning.  We'll start with the testimony

23 first thing.  Okay.  Thanks again.

24          (Jury not present)

25          THE COURT:  Is there anything we need to talk about?

D1FLCIB3

1          MS. ECHENBERG:  Not from the government.

2          THE COURT:  Mr. Donaldson.

3          MR. DONALDSON:  I'm sorry.  Simply we wanted to know

4     which witness is going to be called tomorrow.

5          MR. PASTORE:  Yes, your Honor, the government

6     anticipates that Faith Campbell from CIS, Elissa McGovern, the

7     Defendant of Labor.  Ilhan Altintas and David Greenstein,

8     although we're not sure which order for those last two.  We

9     have to talk to Mr. Altintas about his personal schedule.  He's

10    a lay witness.  And possibly Nicholas Cycyk, whose name I'm

11    sure I'm mispronouncing, C-Y-C-K.  So those will be the maximum

12    number of witnesses that we'd get to tomorrow.

13         THE COURT:  Is there anything else?

14         MR. DONALDSON:  No.

15         THE COURT:  So let's just be ready to go at nine.

16         MS. ECHENBERG:  Thank you, your Honor.

17         (Adjourned to January 16, 2013, at 9 a.m.)

18

19

20

21

22

23

24

25