D1g1cib1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          11-CR-424 (NRB)

5    GULAY CIBIK, REFAEL BRODJIK,
     a/k/a "Rafi," NATHAN SCHWARTZ,
6    HAROLD TISCHLER, a/k/a
     "Hershy,",
7
               Defendants.                 Jury Trial
8    ------------------------------x
9
                                           New York, N.Y.
10                                         January 16, 2013
                                           9:12 a.m.
11

12   Before:

13                  HON. NAOMI REICE BUCHWALD,

14                                         District Judge

15                           APPEARANCES

16
     PREET BHARARA
17        United States Attorney for the
          Southern District of New York
18   JANIS ECHENBERG
     JAMES J. PASTORE, JR.
19        Assistant United States Attorneys
     MICHAEL DINET, Paralegal Specialist
20
     DONALDSON CHILLIEST LLP
21        Attorneys for Defendant Gulay Cibik
     BY:  XAVIER R. DONALDSON, ESQ.
22
     LAWRENCE D. GERZOG, ESQ.
23   JEREMY L. GUTMAN, ESQ.
          Attorneys for Defendant Refeal Brodjik
24

25

D1g1cib1

APPEARANCES
(Continued)

BRILL LEGAL GROUP, P.C.
     Attorneys for Defendant Nathan Schwartz
BY:  PETER E. BRILL, ESQ.

PAUL GREENFIELD, ESQ.
     Attorney for Defendant Harold Tischler

ALSO PRESENT:  DEIDRE GORDON, Special Agent, Homeland Security
               RYAN GIBBS, Special Agent, U.S. Dept. of Labor

D1g1cib1

1          (Trial resumed)

2          (In open court; jury not present)

3          THE COURT:  Good morning, everybody.

4          MS. ECHENBERG:  Good morning, your Honor.

5          THE COURT:  Mr. Gerzog, I understand there's something

6    you wanted to put on the record before we started?

7          MR. GERZOG:  Yes, your Honor.  Yesterday my

8    19-year-old college daughter -- college student daughter came

9    to watch me do my opening statement at about 2:15.

10          THE COURT:  Was she impressed?

11          MR. GERZOG:  I will withhold comment.

12          THE COURT:  Okay.

13          MR. GERZOG:  She was sitting in the -- she sat down in

14    the pews, not knowing anything about court or where anybody was

15    or who anybody was.  She sat down, and one of the jurors, the

16    African American lady, said to her, "You're new."  And my

17    daughter said, "What do you mean?"  And she said -- and the

18    juror said, "You weren't here this morning."  And my daughter

19    said, "Oh, I'm just here to see my father give his opening."

20    And the juror said, "Oh, that's cool.  Which one is your

21    father?"  And she said, "He's the lawyer at the middle table

22    with the curly hair."  And the woman said, "Have you ever seen

23    him do an opening before?"  And she said, "I have seen him at

24    trial before but I've never seen him do an opening."  And the

25    woman said, "I guess I ought to tell you that I'm one of the

D1g1cib1

1    prospective jurors," at which point my daughter said, "I guess

2    I'd better move my seat," and got up and moved away.

3            THE COURT:  Sounds like a very mature 19-year-old.

4            MR. GERZOG:  So I just wanted to let you know --

5            THE COURT:  She gets points.

6            MR. GERZOG:  Okay.

7            THE COURT:  She can come back after having been so

8    good; how about that?

9            MR. GERZOG:  Very good.

10            THE COURT:  We were missing a couple of jurors a few

11    minutes ago.

12            MS. ECHENBERG:  Your Honor, can I raise one issue?

13            THE COURT:  Sure.

14            MS. ECHENBERG:  So our second witness today is going

15    to be an employee from the Department of Labor who's going to

16    talk about the alien labor certification program and how it

17    works.

18            THE COURT:  Yes.

19            MS. ECHENBERG:  And she's also going to be a custodian

20    of records for several of the files of the Department of Labor,

21    principally all of the applications that we'll put in that

22    listed Harold Tischler and Nathan Schwartz as an employer

23    sponsor, and part of those files include call logs, where

24    employees of the Department of Labor keep records every time

25    they have an interaction with someone related to that

1    particular file.  So there are call logs that are associated

2    with various files.  And we intended to put those records in as

3    business records, or as records kept in the regular course of

4    business.  She'll testify that they were part of the Department

5    of Labor's regular course of business, they were recorded

6    contemporaneously with the phone calls.  Defense counsel has

7    advised that they are going to object to the admission of those

8    documents as documents kept in the regular course of business,

9    so I just thought if we could get a ruling from your Honor

10   before the witness testifies.

11            THE COURT:  What would be the basis for that?

12            MR. BRILL:  The -- it seemed to us, Mr. Greenfield and

13   I, that it's not only the government's purpose to bring them in

14   as business records but to bring them in as either *res gestae*

15   or admissions by the defendants, Mr. Tischler or Mr. Schwartz,

16   as having involvement in this scheme because there are notes

17   within these call logs that say they allegedly spoke to our

18   clients and our clients confirm they are -- these alien

19   applications as being accurate.

20            Now our clients, I believe -- I don't want to speak

21   exclusively for Mr. Greenfield, but certainly with respect to

22   Mr. Schwartz if not Mr. Tischler, our clients deny ever having

23   these conversations except for the two for Mr. Schwartz and the

24   three for Mr. Tischler that were legitimate applications.  And

25   there are a couple of dozen exhibits, each that the government

D1g1cib1

1    intends to enter.

2           There are, more tellingly, numbers on other entries

3    where the record does not say that they spoke to Mr. Schwartz.

4    Those numbers don't correspond to numbers that were either in

5    service for Mr. Schwartz at the time or actually ever used by

6    Mr. Schwartz.  Now for the records that have the phone numbers,

7    there's no record of conversation, and for the record of the

8    conversation, there's no record of what phone number was

9    called.  So it's a little more confusing that way.

10          But the damaging issue for us specifically is, "Spoke

11    to Mr. Schwartz, Mr. Schwartz confirmed this," this issue,

12    where you don't know who made the entry.  All it says is that

13    it was entered by a specific person, not that that was the

14    person who had the conversation.  We don't know what phone

15    number was called.  And whereas the custodian of records may

16    say that this is a regular -- a record kept in the regular

17    course of business of the Department of Labor, there's still a

18    reliability issue because the information contained -- I

19    understand --

20          THE COURT:  The person writing this down is totally

21    unaware at the time that there's going to be a case in this

22    courtroom.

23          MR. BRILL:  Right.

24          THE COURT:  There's no reason for them to deliberately

25    misstate what they entered; right?

D1g1cib1

1          MR. BRILL:  No.  We don't know whether the person who

2     had the conversation, as I said, Judge, was the person who

3     entered it.  So we have no ability to confront these people now

4     if they're being brought in as business records.

5          THE COURT:  But first of all, don't you have all sorts

6     of capacity to engage in effective cross-examination to

7     establish the doubt that these entries reflect actual

8     conversations with your client?

9          MR. BRILL:  I can almost guarantee you -- I could be

10    wrong, but I can almost guarantee you that the responses that

11    the person that the government is calling today to try to bring

12    in these records will be, "I have no knowledge of that," "I

13    have no knowledge of that," "I have no knowledge of that."

14         THE COURT:  Well, if you ask the question of this

15    person, "Do you know that the individual listed as the person

16    at the other end of the conversation actually was that person?"

17    they would say, "I have absolutely no way of knowing."

18         MR. BRILL:  That person --

19         THE COURT:  If you ask them, "Could someone have

20    pretended to be Mr. Schwartz and given the name?" and they

21    would say, "Absolutely."

22         MR. BRILL:  I think that's flat out speculation on the

23    part of a custodian of records, who may have little, if any,

24    connection to --

25         THE COURT:  Isn't it just like examining call records

D1g1cib1

1  where you have the numbers called and the lawyer says, "Well,

2  you don't know what was said in that call and you don't really

3  know who actually made the call, all you know is you have these

4  phone numbers"?

5      MR. BRILL:  I understand the court's point.  This is

6  far more damaging to use his name.  It's not, you know, who's

7  on the phone; it's your saying that this person was on the

8  phone.  Now, again, in a situation -- you know, the AT&T

9  representative who comes in with phone records is going to have

10  the exact same responses.  "I have no idea.  I was just sent

11  here to authenticate records.  I have no idea what goes on with

12  the Department of Labor."

13      Now if the government were required to produce the

14  people who created these records, then you'd have an effective

15  cross-examination.  I, you know -- as the court has already

16  informed the jury, it's the answers that count, and the answers

17  to all of those questions from Mr. Greenfield and myself will

18  be, "I have no idea."

19      THE COURT:  That's pretty good reasonable doubt, isn't

20  it?

21      MR. BRILL:  As opposed to -- let's take, Judge, one

22  example here.  Excuse me.  One of the people who says, "Nathan

23  Schwartz returned my call and confirmed sponsorship," in

24  government's proposed Exhibit 101-2-A, it says, "Entered by

25  Nina Gillis."  Now if Nina Gillis -- we know who this person

D1g1cib1

1    is, and the person is clearly available to the government.  If

2    this person comes in here and says, "I spoke to someone, I

3    don't know who that person was, this is the number I called,"

4    that is far more -- and the number, Judge, as I said, is not on

5    this exhibit.  There's -- and there's no way, as far as I can

6    tell, to confirm through this exhibit what number was actually

7    called.

8           THE COURT:  And, you know, she would say no more than,

9    "I have absolutely no recollection of that actual conversation

10   today, but what I wrote down then was accurate as to time.

11   Independent of what's on the piece of paper, I don't have any

12   memory of that."

13          MR. BRILL:  Well, right, but --

14          THE COURT:  I mean, that's the reality.

15          MR. BRILL:  But at least that's the person who was

16   actually involved in the transaction.  Right now all we have is

17   someone who has no knowledge of the transaction whatsoever.

18          THE COURT:  Isn't that worse for you?

19          MR. BRILL:  It could be worse, frankly.

20          THE COURT:  No.  I mean, the point is, then you really

21   have a human being saying, "I always, you know, make an entry

22   at the time that's accurate.  I don't have a memory about it

23   now, but what I wrote down, that happened then.  That's what he

24   said at the time.  If I wrote it down, that's what happened."

25   Why is that better for you than having this come in in this

D1g1cib1

```
 1    more disembodied way, where you are able to cross and establish
 2    that the witness can't say?
 3              MR. BRILL:  Because I imagine the government's going
 4    to then close by saying, "We have these very reliable records
 5    from the Department of Labor that say they spoke to Nathan
 6    Schwartz."
 7              THE COURT:  It would be more reliable if the actual
 8    person who made the entry got on the stand and testified.
 9              MR. BRILL:  All right.
10              THE COURT:  Right?  Wouldn't it?
11              MR. BRILL:  Judge, with all due respect, that's your
12    opinion, and I respect your opinion, but I believe,
13    respectfully, we are --
14              THE COURT:  But isn't a business record just what that
15    is?
16              MR. BRILL:  I don't know if this is a business record.
17    I know that the person on the stand will testify that --
18    they'll say all the right words to make this a business record.
19    What I think is that we are lacking the ability to confront
20    the --
21              THE COURT:  But that's exactly how it happens all the
22    time with the business records.
23              MR. BRILL:  And just as the Supreme Court has said,
24    you know, with the drug test results -- I know it's taking a
25    slight leap, but we should be able to confront the accuser here
```

D1g1cib1

1   just as we should be able to confront the lab technician with

2   the drug test results.

3           THE COURT:  Let me hear from the government.

4           MS. ECHENBERG:  Yes, your Honor.  First of all, I

5   would just cite a case to you, *United States v. Stewart*, which

6   is 433 F.3d 273, and it's a Second Circuit case decided

7   January 6, 2006, and it talks specifically about a phone log

8   being received in evidence as a business record, and it talks

9   about how, you know, business records are made reliable by

10  their regularity and continuity which produce habits of

11  precision by actual experience of business in relying upon them

12  or by duty to make an accurate record as part of a continuing

13  job or occupation, and that's exactly what's going on here.

14          There are -- and I had passed up to Ms. Tannenbaum

15  some exhibits for later.  I don't know if they made their way

16  to the bench.  But the exhibits that are marked 101- and then

17  there's a number and then there's an A at the bottom, these are

18  the phone logs that we intend to put in, and you'll see that

19  they note a date and they note who it's entered by, and I

20  expect that the Department of Labor witness will testify that

21  the person who entered it, it's their job to make an entry

22  every time they have communication about a particular case.  If

23  you look at the top of the record, there's a case number that

24  starts typically with an A, sometimes with a C or a P, and that

25  is a case number that correlates to the actual case that this

D1g1cib1

1    is related to.  So Government Exhibit 101-2-A is a call log for

2    all the interactions related to Case Number A-08043- -- I

3    believe that's 23125.  And so we'll match it up to the file for

4    that case, and in that file will be the application for alien

5    labor certification, and in that file would be the employer

6    contact number, phone number, for that file.  And what the

7    witness will explain is that whatever the case number is, the

8    number they called is the number that's in the employer contact

9    part of the application, so that would be the number that they

10   called.  All she can testify to is that would be the number

11   that they called, and whatever interaction they would have had,

12   they would have recorded here.  And it is certainly our job,

13   later in the case, to show how those phone numbers correspond

14   to the defendants.

15          But I think these records fall squarely in the

16   definition of public records.  These are, you know -- you know,

17   Mr. Brill mentioned the drug lab cases, and I think he's

18   referring to *Melendez-Diaz*, a Supreme Court case.

19          MR. BRILL:  Yes.

20          MS. ECHENBERG:  Business records are specifically

21   carved out of that case.  I have the case here, and I can find

22   the cite for you in a moment.

23          But as your Honor mentioned, business records are

24   themselves reliable because they're prepared in the ordinary

25   course of business, and so the Supreme Court has decided -- and

D1g1cib1

1    the statute is there so that you don't have to call every

2    single person who might have touched that business record.

3    That would be, you know, very difficult, and these -- these

4    records are not testimonial.  They are -- what we are putting

5    them in for is the fact that these records exist, that a person

6    at the Department of Labor made this record contemporaneous at

7    that time, and they certainly can cross-examine the witness

8    about whether she knows if they actually spoke to the actual

9    Nathan Schwartz, and she'll say she doesn't know.

10            MR. BRILL:  One more point, your Honor, to touch on

11   what Ms. Echenberg just said.  The fact that -- we would also

12   object to this witness being able to say, just without any

13   other justification, that, well, the number that's in the A

14   file is the number they would have called.  It's not what

15   number they would have called; it's what number they actually

16   did call.  Those are two different issues.  And so I don't

17   think the witness --

18            THE COURT:  The Supreme Court has not eliminated

19   business records and public records and reports in criminal

20   cases.

21            MR. BRILL:  No, of course not.  I understand.

22            THE COURT:  All right?  So --

23            MR. GREENFIELD:  Can I just point out one other thing,

24   Judge.  Some of these documents -- and I have about 15 of

25   them -- say -- have the entry, "We spoke to Mr. Tischler," or

D1g1cib1

1    some of them don't refer to it.  They say they didn't make

2    contact.  But a number of the ones that either say they did or

3    didn't also contain the following entry:  "This case is

4    associated with employer POC that has been implicated in the

5    Earl David/Jed Philwin investigation.  Per instructions from NO

6    firm team (ph), please audit, verify the job order with DS

7    Hemingway (ph) and request a notarized affidavit from the

8    employer stating their knowledge of the application."

9         To me that -- whether this is a business record or not

10   or it's offered to show that they made contact with

11   Mr. Tischler, I think that's a hearsay statement then, it's

12   gratuitous, and doesn't belong.  It can certainly be redacted

13   out of these documents.

14        THE COURT:  Wait.  Wait.

15        MS. ECHENBERG:  Your Honor, if I could address that.

16        THE COURT:  Wait.  Wait.  There's a juror in the room.

17   Hold on.

18        MS. ECHENBERG:  Oh, I apologize.

19        (Pause)

20        THE COURT:  Just, first, I found that it's 112-11-A.

21   Is that the one?

22        MR. BRILL:  It's in quite a few of them.

23        MR. GREENFIELD:  It's in 110-31-A.  It's in about five

24   or six of them or more.

25        THE COURT:  Well, that seems to raise a different

D1g1cib1

1    issue.

2         MS. ECHENBERG:  Yes.  I mean, I think, you know, the

3    one you're looking at, that call, that note comes before --

4    well, I mean, this one is particularly interesting.  What I was

5    going to say is that for all of these records, I think with the

6    exception of 112-11-A, that notation comes after the contact

7    with Harold Tischler or Nathan Schwartz, and then if you look

8    at the top of the record, you'll see that those cases were then

9    denied, and what the Department of Labor witness will explain

10   is that the confirmation was made, the process was moving

11   along, and then Department of Labor started an investigation.

12   She doesn't know the facts of the investigation but she knows

13   that there was an investigation related to certain files, and

14   then there would have been additional auditing, and that is why

15   those cases were denied.

16        In this case, what's very interesting about this one

17   is that that notation comes first and then you know that this

18   is one where Harold Tischler withdraws his sponsorship, and

19   that's because, you know, you notice the date is April 28th,

20   2009.  There will be evidence in the case later that in

21   January of 2009 several people were arrested, Mr. Tischler and

22   Mr. Schwartz received subpoenas in connection with this case,

23   and there were search warrants for all of the Earl David law

24   firm locations.  So it is actually relevant that after the case

25   is being investigated, then all of a sudden Mr. Tischler is no

D1g1cib1

1       longer willing to continue to sponsor.

2               It's not for the truth.  It goes to the defendants',

3       you know, state of mind.  But on the other records, it comes

4       after the confirmation, it comes after the relevant piece of

5       information.  And again, it's the ordinary course of their

6       business is to note in these files when something is being

7       investigated so that they can do a secondary audit --

8               THE COURT:  Right.

9               MS. ECHENBERG:  -- of these files.

10              THE COURT:  But can't you avoid, you know, the taint

11      that comes from the reference to Earl David by just striking

12      that sentence and simply having a per instruction without

13      reference, please audit, verify the job order, and do this, and

14      then you have your sequence without, you know, the sort of

15      guilt by association issue, which obviously we keep cautioning

16      the jury about.

17              MS. ECHENBERG:  Yes, of course, your Honor.  Yes, that

18      makes perfect sense, and we will endeavor to get those

19      redactions in place.  This is our second witness this morning,

20      so --

21              THE COURT:  Mr. Greenfield, does that solve it?

22              MR. GREENFIELD:  That's solved.  Thank you.

23              THE COURT:  All right.  Do we finally have all jurors?

24              THE LAW CLERK:  Yes.

25              THE COURT:  Okay.

D1g1cib1

1          MR. GERZOG:  We have some evidentiary issues with

2    respect to Mr. Grynsztajn, but he's not at least till the third

3    witness, so we can defer that.

4          THE COURT:  Yes.  I think I did communicate yesterday

5    how strongly I feel, when the jurors are here, to have them in

6    the box hearing testimony, and we can take up things at the

7    break, we can take them up at 2:15.

8          Okay.  So we'll bring the jury in.

9          I just want to remind everybody, the only kind of

10   liquids you're allowed here is water in bottles, okay?  They

11   spent a lot of money on this building.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

D1g1cib1

1           (Jury present)

2           THE COURT:  Good morning, everyone.

3           THE JURORS:  Good morning.

4           THE COURT:  I note several of you were a little late

5    this morning, and I appreciate that the weather was pretty bad

6    and depending on where you were coming from, there was snow on

7    the ground, if not rain.  I just urge you to try tomorrow and

8    succeeding days to aim to be here early so that if there are,

9    you know, any delays, like I encountered last night in the

10   subway when I left and proceeded to stand for half an hour

11   between here and 42nd Street, you know, let's look to be able

12   to get started on time.

13           So, anyway, now we're going on to testimony, and the

14   government's going to call its first witness.

15           Mr. Pastore?

16           MR. PASTORE:  The United States calls Faith Campbell.

17           THE LAW CLERK:  If you would just remain standing,

18   raise your right hand.

19           (Witness sworn)

20           THE LAW CLERK:  Please state your full name and spell

21   your last name for the record.

22           THE WITNESS:  Faith Campbell, C-A-M-P-B-E-L-L.

23           MR. PASTORE:  Your Honor, may I inquire?

24           THE COURT:  Please.

25

D1g1cib1                          Campbell - direct

1    FAITH CAMPBELL,

2         called as a witness by the Government,

3         having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MR. PASTORE:

6    Q.  Good morning, Ms. Campbell.

7    A.  Good morning.

8    Q.  Can you tell us how you're currently employed.

9    A.  Yes, I'm an adjudications officer with Service Center

10   Operations in Washington, DC.

11   Q.  And what organization do you work for?

12   A.  U.S. Citizenship and Immigration Services.

13   Q.  Is that agency sometimes referred to as C-I-S, or CIS?

14   A.  Yes.

15   Q.  How long have you been in your current position?

16   A.  I've been with Service Center Operations a little over two

17   weeks.

18   Q.  Can you describe what your duties and responsibilities are

19   at the Service Center.

20   A.  Yes.  I oversee the I-140 labor certification program for

21   the Service Center.

22   Q.  And when you say I-140, what is that, in general terms?

23   A.  That is an immigrant petition for alien worker.

24   Q.  And you said you've only been in this position for two

25   weeks.  What were you doing before that?

D1g1cib1                         Campbell - direct

1    A.  I'm an immigration services officer with Texas Service

2    Center, Level 3.

3    Q.  How is it you're assigned to this new post?

4    A.  I'm serving a temporary promotion.

5    Q.  So in other words, your permanent position is at the Texas

6    Service Center?

7    A.  That's correct.

8    Q.  And when we say Texas Service Center, what do you mean, in

9    general terms?

10   A.  That is the service center with U.S. Citizenship and

11   Immigration Services that processes I-140s.

12   Q.  And how long have you been employed at the Texas Service

13   Center?

14   A.  Since November 2004.

15   Q.  What are your duties and responsibilities at the Texas

16   Service Center?

17   A.  I adjudicate immigrant petitions and applications, I

18   conduct training for officers, and I mentor officers as well.

19   Q.  What types of training do you conduct for officers?

20   A.  I conduct form-specific training, such as I-140s.

21   Q.  And you said you've been doing that since about 2004?

22   A.  That's correct.

23   Q.  Prior to 2004, what were you doing?

24   A.  I was a district adjudications officer with the Houston,

25   Texas district office.

D1g1cib1                          Campbell - direct

1   Q.  Please explain for us the difference between district

2   adjudications office on the one hand and the Texas Service

3   Center on the other.

4   A.  Sure.  A district office conducts interviews for

5   immigration benefits, whereas a service center does not, and

6   the service center conducts all of their reviews based on

7   paper.

8   Q.  So when we talk about the adjudications at the district

9   adjudications office, what types of benefits are we talking

10  about?

11  A.  At a district office we would review applications for

12  adjustment of status primarily or immigrant petitions for

13  relatives.

14  Q.  And what form or forms would those be submitted on?

15  A.  I-485s, which is an application to adjust their status, or

16  an I-130.

17  Q.  What is it that determines what form is to be used?  You

18  mentioned a couple -- I-140s, I-130s, I-485.  What determines

19  that?

20  A.  The regulations that we use to adjudicate the form

21  determines the form.

22          MR. PASTORE:  Your Honor, may I approach the witness?

23          THE COURT:  Sure.

24          MR. PASTORE:  I'm handing the witness what's been

25  marked for identification as Government's Exhibit 803.

D1g1cib1                          Campbell - direct

1   Q.  Ms. Campbell, do you recognize that?

2   A.  Yes.

3   Q.  What is it?

4   A.  That's the Form I-140.

5   Q.  How do you recognize it as such?

6   A.  Format and title.

7   Q.  And are you familiar, in your training and experience, with

8   I-140s?

9   A.  Yes.

10  Q.  And have you personally adjudicated I-140 applications?

11  A.  Yes.

12          MR. PASTORE:  Government offers 803.

13          MR. GERZOG:  Without objection.

14          MR. DONALDSON:  No objection.

15          THE COURT:  Received.

16          (Government's Exhibit 803 received in evidence)

17          MR. PASTORE:  Your Honor, may we publish it to the

18  jury by displaying it on the screen?

19          THE COURT:  Sure.

20  Q.  Okay.  Ms. Campbell, do you see -- do you have a screen in

21  front of you there?

22  A.  Yes.

23  Q.  So obviously feel free to use the screen or the document

24  that's in front of you.

25          I want to focus first on Part 1 of this document.

D1g1cib1                        Campbell - direct

1    What information, in general, is called for here?

2    A.   This is the employer's information, their name, their

3    address, their tax ID number or Social Security number, if they

4    have any.

5    Q.   Okay.  You said employer.  Let's step back for a minute.

6    Tell us in general how the process works when an employer is

7    filing an I-140 and why they would be filing an I-140.

8    A.   Sure.  A petitioner, an employer files an I-140 to hire an

9    alien for permanent employment in the United States.

10   Q.   And is there a process -- what's the first step in that

11   process?

12   A.   Well, the first step, it depends if the job does require a

13   labor certification.  If it does, the petitioner or employer

14   first has to obtain a labor certification from the Department

15   of Labor.

16   Q.   Are you familiar with how that process works?

17   A.   Yes.

18   Q.   How are you familiar with how that process works?

19   A.   Because several classifications that rely on the I-140

20   require a labor certification.

21   Q.   You mentioned classification.  What do you mean by that?

22   A.   There are three preferences for an I-140 -- first, second,

23   and third -- and within those preferences, we refer to those

24   classifications as such.

25   Q.   Okay.  So tell us what type of aliens fit into the first

D1g1cib1                          Campbell - direct

1    preference.

2    A.   First preference will consist of aliens of extraordinary

3    ability or aliens who are outstanding professors or researchers

4    or multinational executives or managers.

5    Q.   What about the second preference?

6    A.   Second preferences are aliens of exceptional ability and

7    members of the professions who have advanced degrees.

8    Q.   And what about third, the third classification?

9    A.   Third preferences are professionals, skilled workers, and

10   other workers.

11   Q.   So, for example, a cook or a baker, what classification

12   would they typically fall into, in your experience?

13   A.   Skilled worker.

14   Q.   And for which classifications are labor certifications

15   required?

16   A.   A labor certification is required for all third preference

17   classifications and some second preference classifications.

18   Q.   What does it mean if someone has a first preference versus

19   a third preference?

20   A.   A first preference means the alien beneficiary has greater

21   probability of obtaining a visa in a given fiscal year.  They

22   are higher on the list of priorities.

23   Q.   So it's, quite literally, they have a preferred status over

24   someone who's in the third category?

25   A.   That's correct.

1  Q.  With respect to these skilled workers, the labor

2  certification process, what is the first step that's -- that

3  occurs in that process?

4  A.  The petitioner would have to obtain a labor certification

5  from the Department of Labor indicating that there is no

6  available U.S. worker.

7  Q.  Do you know how they go about doing that?

8  A.  The petitioner would file the labor certification, which

9  was an ETA 750, Part A and B, and it's currently an ETA Form

10  9089.

11  Q.  And is there a sort of shorthand or colloquial version for

12  what the form is currently called for the Department of Labor?

13  A.  We call that just a labor certification, or the labor cert.

14  Q.  Okay.  Are you familiar with something called the PERM

15  process?

16  A.  Yes.

17  Q.  What is that?

18  A.  The PERM process is how the Department of Labor currently

19  reviews labor certification applications.

20  Q.  With respect to the actual labor certification that you

21  just mentioned, under the old system, do you know what was

22  actually generated when the Department of Labor approved a

23  certification application?

24  A.  The labor certification itself, which was the ETA Part A

25  and B, would contain a multicolored stamp from the Department

D1g1cib1                    Campbell - direct

1   of Labor.

2   Q.  And was there any other form generated?

3   A.  No.

4   Q.  And what color was the certification?

5   A.  Was white.

6   Q.  What about with the PERM process, any changes?

7   A.  Yes, it's a completely different form.  It's longer and

8   captures more information, and it's also on bluish-gray paper.

9   Q.  And how are you familiar with these different types of

10  forms?

11  A.  In my course of adjudicating I-140s.

12  Q.  And why would you be familiar with labor certifications

13  when you're adjudicating immigration petitions?

14  A.  It's a required piece of evidence for those classifications

15  that require labor certs.

16  Q.  So if the labor cert is missing, can the I-140 be

17  processed?

18  A.  USCIS would issue a request for that evidence.

19  Q.  With respect to the I-140, in addition to the actual form

20  itself, when you're dealing with somebody who's a skilled

21  worker, this third classification, is there any other

22  information that must be provided along with the I-140?

23  A.  Yes.  The petitioner would have to give any proof of

24  experience that is required by the labor certification and any

25  proof of educational credentials that's required by the labor

D1g1cib1                          Campbell - direct

1  certification, along with proof that the petitioning employer

2  has the ability to pay the proper wage.

3  Q.  Okay.  And when we're talking petitioner, is that the alien

4  or is that the employer?

5  A.  That's the employer.

6  Q.  Okay.  So it's actually the employer who petitions on the

7  I-140 for an alien, to your understanding?

8  A.  Yes.

9  Q.  How would an employer show that they had the ability to pay

10  the proper wage?

11  A.  The petitioner can submit its federal income tax returns,

12  audited financial statements, or annual reports.

13  Q.  And in the course of your duties do you rely on those types

14  of documents?

15  A.  Yes.

16  Q.  Are there any interviews conducted of the employer?

17  A.  No.

18  Q.  So it's entirely done on the papers that are submitted; is

19  that right?

20  A.  Correct.

21  Q.  With respect to the I-140, I want to go back and look at

22  the form itself.

23        Let's focus on Part 2 of the I-140.  Can you tell us

24  in general terms what the different boxes that are labeled a

25  through i mean.

D1g1cib1                      Campbell - direct

1    A.  Those are the classifications.

2    Q.  So in terms of the first preference alien, what would --

3    what box would be checked?

4    A.  A, b, or c.

5    Q.  And in terms of the third preference alien, the labor

6    certifications, what box would be checked?

7    A.  E or g.

8    Q.  When a person petitions -- an alien petitions as

9    extraordinary or exceptional ability, do they actually have to

10   need an employer?

11   A.  An alien of extraordinary ability does not have a job

12   offer.  Aliens of exceptional ability may require a job offer.

13   Q.  And is it possible that they could just apply for

14   themselves without a sponsor?

15   A.  If a job offer is not required, an alien may self-petition.

16   Q.  But for the third preference folks that we're talking

17   about, is a sponsor always required?

18   A.  That's correct.

19   Q.  Okay.  I want to go now to Part 3 of this form, of the

20   I-140.  Tell us what information is required here.

21   A.  That is information about the alien beneficiary -- their

22   name, their address, their date of birth, A number, if they

23   have any, Social Security number, and their immigration

24   information.

25   Q.  Okay.  And do you see where it says "Date of arrival" in

1    Part 3?

2    A.   Yes.

3    Q.   Why might that information be important?

4    A.   That might indicate to USCIS the person will later apply

5    for adjustment of status.

6    Q.   So what benefit is actually granted if an I-140 is

7    approved?

8    A.   The only benefit is the person is given a priority date and

9    a classification, which they can later use to apply for an

10   immigrant visa abroad or seek adjustment of status.

11   Q.   Okay.  So let's break that down a little.  When you say

12   adjustment of status, what do you mean by that?

13   A.   The beneficiary of this I-140 can file a 485 when his or

14   her visa becomes available.

15   Q.   And if the 485 is granted, what does the alien receive?

16   A.   The person will receive a green card or permanent

17   residence.

18   Q.   So does the I-140 entitle someone automatically to a green

19   card?

20   A.   No.

21   Q.   You mentioned that there might be folks abroad who would

22   get a visa.

23   A.   That's correct.

24   Q.   So what if you are currently in the United States, you're

25   not abroad, you're already here, and you file an I-140; what's

1    the benefit?

2    A.   There is no benefit.  Again, the only benefit is the person

3    will get a priority date with a preference that he or she can

4    later use to file for adjustment of status.

5    Q.   Okay.  So do I understand correctly that they'd be placed

6    into one of these classifications -- first, second, third?

7    A.   Yes.

8    Q.   And what's a priority date?

9    A.   The priority date is determined by, whether the job offer

10   required a labor cert, it's that date the labor cert was filed

11   with the Department of Labor, or if no job offer is required,

12   it's the date that the I-140 is filed with the agency.

13   Q.   And why might a priority date be important?

14   A.   It determines if the visa is available for the person's

15   classification.

16   Q.   Let's go to the next page of this form, the I-140.

17            Okay.  What information is called for in Part 4?

18   A.   That information tells USCIS if they will seek an immigrant

19   visa abroad or adjustment of status in the United States.

20   Q.   Okay.  So if we look at the first box, where it says,

21   "Alien will apply for a visa abroad at the American consulate,"

22   is that what you were just describing, someone who's outside

23   the United States looking to enter?

24   A.   That's correct.

25   Q.   And when would someone check the second box, "Alien is in

1    the United States and will apply for adjustment of status"?

2    A.   That is when the person is actually in the United States.

3    Q.   Let's go down to Part 5, which calls for additional

4    information about the petitioner.  What information, in

5    general, is called for here?

6    A.   That is information about the employer, whether they're an

7    employer business or an individual, type of business that they

8    operate, when it was established, how many employees they have,

9    and information about their income.

10   Q.   Focusing on the labor-based certifications or the third

11   preference alien, what information in here would you rely on

12   when you adjudicated I-140s?

13   A.   The type of business that they have, the date they were

14   established, and the number of employees.

15   Q.   Why might the type of business, the date it was

16   established, and the current number of employees be significant

17   in your adjudication?

18   A.   The current number of employees would give us an indicator

19   about their ability to pay.  That's the relevant factor.  And

20   the type of business and the date established, we want to make

21   sure it's the same employer as listed on the labor

22   certification.

23   Q.   What about gross annual income?

24   A.   That's information that would be perhaps relevant to

25   ability to pay.

D1g1cib1                          Campbell - direct

1  Q.  And when you say ability to pay, what do you mean by that?

2  A.  That is a required piece of evidence that a petitioner

3  gives us to prove they can pay the proper wage listed on the

4  labor certification.

5  Q.  And so this is in addition to the tax returns or financial

6  statements that you were discussing before?

7  A.  That's what it is.

8  Q.  Let's focus now on Part 6.  What information is called for

9  here?

10  A.  That's information about the job opportunity, the title,

11  the job description, and the location where they'll work,

12  whether it's permanent and full time.

13  Q.  And what, if any, information is material when you

14  adjudicate I-140s?

15  A.  The job title and job description, the address where

16  they'll work, and whether it's permanent and full time.

17  Q.  Why would that be significant to your adjudication?

18  A.  We need to make sure it's the same job opportunity that was

19  listed on the labor certification.

20  Q.  Let's go to Part 7.  Fairly self-explanatory, but what

21  information is called for here?

22  A.  That is information about the alien beneficiary's family

23  members, spouse, and their children.

24  Q.  Let's go to the next page.

25            Okay.  What information is called for in Part 8 and 9?

1  A.  Part 8 is the employer certification under penalty of

2  perjury that all the information is true and correct.

3  Q.  And what about Part 9?

4  A.  Part 9 is the person's signature who prepared the form.

5  Q.  So does the alien sign this form?

6  A.  No.

7  Q.  Who signs this form?

8  A.  Only the employer and any preparer.

9  Q.  With respect to the alien who's ultimately seeking the

10 visa, what information, if any, has to be provided with respect

11 to that alien, aside from the I-140?

12 A.  I'm sorry.  Can you repeat the question.

13 Q.  Sure.  In addition to the I-140, does an alien have to

14 provide other information associated with their application?

15 A.  Application for adjustment of status?

16 Q.  No.  With the I-140 itself.

17 A.  Immigrant petition?  No information is provided by the

18 alien.

19 Q.  Are you familiar with something called an experience

20 letter?

21 A.  Yes.

22 Q.  What is that?

23 A.  That's a letter of employment experience that a petitioner

24 submits regarding an alien beneficiary's prior experience or

25 employment.

D1g1cib1                        Campbell - direct

1    Q.  And when in the process is that submitted?

2    A.  That's submitted with the Form I-140.

3    Q.  And what information -- how does that factor into your

4    adjudication process?

5    A.  If a labor certification requires certain experience, we

6    review that letter of experience to determine if that

7    experience is qualifying.

8    Q.  Aside from that letter, do you rely on any other evidence

9    in terms of the alien's experience?

10   A.  We may request additional evidence if it's deemed

11   necessary.

12   Q.  Is there an interview associated with an I-140?

13   A.  No.

14   Q.  You mentioned adjustment of status before.  I'm showing you

15   what's been marked as Government's 805.  Do you recognize that

16   document?

17   A.  Yes.

18   Q.  What is it?

19   A.  That is the Form I-485.

20   Q.  And how are you familiar with it?

21   A.  I've adjudicated those.

22   Q.  And when did you adjudicate I-485s?

23   A.  In my career.

24   Q.  And is that at the Texas Service Center or the

25   adjudications office?

D1g1cib1                         Campbell - direct

1   A.  Both.

2              MR. PASTORE:  Your Honor, government offers 805.

3              MR. GERZOG:  Without objection.

4              MR. DONALDSON:  No objection.

5              THE COURT:  Received.

6              (Government's Exhibit 805 received in evidence)

7              MR. PASTORE:  Your Honor, may we publish to the jury?

8              THE COURT:  Sure.

9              MR. PASTORE:  So let's go ahead and bring up on the

10  screen Government's 805.

11  Q.  Okay.  If someone files an I-485 and it's approved, what's

12  the ultimate benefit that they receive?

13  A.  The person receives a green card or permanent residence.

14  Q.  And does an I-485 always have to be predicated on an I-140

15  or are there other petitions that could lead to an I-485?

16  A.  No, there are other petitions or benefits which may lead to

17  a 485.

18  Q.  What information is called for in Part 1 of the form?

19  A.  This is biographical information about the applicant, their

20  name, date of birth, their address, and immigration

21  information.

22  Q.  So now we're focused on the alien, not the employer; is

23  that right?

24  A.  That's correct.

25  Q.  Okay.  Let's scroll down to the next portion of this form,

D1g1cib1                          Campbell - direct

1   where it says Application Type, and it's got boxes a through f.

2   Focusing first on box a, can you tell us, under what

3   circumstances would this box be checked?

4   A.  A would be used by an individual who is the beneficiary of

5   an immigrant petition such as an I-140.

6   Q.  Okay.  And under what circumstances would box b be checked?

7   A.  Box b would be used by perhaps a derivative spouse or child

8   of an alien beneficiary of an I-140.

9   Q.  So explain what you mean by derivative beneficiary.

10  A.  So an alien beneficiary of an immigrant visa petition would

11  have a spouse or a child who would be afforded accompanying or

12  following to join benefits on an I-485.

13  Q.  So if a wife were to file the I-140, what benefits, if any,

14  might accrue to the husband?

15  A.  The only benefit is the husband is allowed to file a 485 as

16  an accompanying or following to join beneficiary of his wife.

17  Q.  Would the husband have to file an I-140?

18  A.  No.

19  Q.  So in other words, his benefit derives from the wife's

20  I-140?

21  A.  Yes.

22  Q.  Okay.  Let's focus on the next portion of this document.

23  Next page, please.

24          Okay.  What information is called for in Part 3?

25  A.  This is more biographical information about the applicant

D1g1cib1                              Campbell - direct

1   and immigration history.

2   Q.  Okay.  Now if we go to the next page.

3         Okay.  You see the series of questions on this page?

4   A.  Yes.

5   Q.  What is -- what's the purpose of these questions?

6   A.  These are questions helping USCIS determine if the

7   applicant is admissible to the United States.

8   Q.  I want to focus in on the first question.  What information

9   is called for there?

10  A.  This is information about an applicant's criminal record,

11  whether they've been arrested or not.

12  Q.  If the applicant were to answer yes to any of these

13  questions, how would that affect their application?

14  A.  USCIS would request more evidence to determine if they're

15  eligible for the benefit.

16  Q.  And if the person checks no, what happens?

17  A.  USCIS would proceed and would not request any more

18  evidence.

19  Q.  So in your adjudication of I-485, do you rely on the

20  answers that are given to question 1?

21  A.  Yes.

22  Q.  Let's focus now on question 10, please, which is a bit

23  further down the page.

24        What information is called for here?

25  A.  This is information to determine if the applicant ever

D1g1cib1                    Campbell - direct

1    committed fraud or willful misrepresentation of a material

2    fact.

3    Q.  And how might an applicant's answer to this question affect

4    their application?

5    A.  If they answered yes, they may be inadmissible to the

6    United States.

7    Q.  With respect to this I-485, are there other documents that

8    are required to be submitted at the same time as the I-485?

9    A.  Yes.

10   Q.  What are those -- what information is that?

11   A.  We require a G-325, which is a biographical piece of

12   information, and we require medical examination for an

13   employment-based applicant, we would require proof of the job

14   offer, and other biographical information, such as their birth

15   or marriage certificate, and any other miscellaneous

16   information that's deemed necessary.

17   Q.  When you mentioned job offer, what type of proof might you

18   rely on to determine if the person had a job offer?

19   A.  That would be a letter from the intended employer on their

20   letterhead.

21   Q.  From time to time are interviews conducted prior to green

22   cards being issued?

23   A.  Yes.

24   Q.  Are they always conducted?

25   A.  No.

D1g1cib1                          Campbell - direct

1   Q.  Under what circumstances might you conduct an interview?

2   A.  We might conduct an interview if the applicant entered the

3   United States illegally or perhaps has a criminal record.

4   Q.  And with respect to those interviews, would someone who's

5   adjudicating an I-485 ever conduct further investigation into

6   the employer, in other words, the job offer?

7   A.  The USCIS officer would not.

8           MR. PASTORE:  Your Honor, may I approach the witness?

9           THE COURT:  Sure.  You don't have to ask.

10  Q.  I'm handing you what's been marked for identification as

11  Government's 802.  Do you recognize that document?

12  A.  Yes.

13  Q.  What is it?

14  A.  That's the G-325 biographical information.

15  Q.  And how do you recognize it?

16  A.  Format and title.

17  Q.  And are you familiar with these based on your training and

18  experience?

19  A.  Yes.

20          MR. PASTORE:  Your Honor, the government offers 802.

21          MR. GERZOG:  No objection.

22          THE COURT:  Received.

23          (Government's Exhibit 802 received in evidence)

24          MR. PASTORE:  If we could publish it for the jury.

25          (Continued on next page)

D1GLCHI2                      Campbell - direct

1   BY MR. PASTORE:

2   Q.  So when is this particular form submitted?

3   A.  It's submitted in conjunction with a 485.

4   Q.  Are you familiar with a section of the immigration law

5   known as 245(i)?

6   A.  Yes.

7   Q.  What is that?

8   A.  That's the section of law that allows an otherwise

9   ineligible alien the ability to adjust their status to a lawful

10  permanent resident.

11  Q.  In general, under what circumstances might an otherwise

12  ineligible alien be able to adjust?

13  A.  The individual is the beneficiary of what's called a

14  grandfathered immigrant visa petition or a labor certification.

15  Q.  Okay.  When you say grandfathered immigration petition or

16  labor certification, what do you mean by that?

17  A.  That is an immigrant visa petition or labor certification

18  that was filed prior to the end of the 245(i) period, which is

19  April 30 of 2001.

20  Q.  Okay.  So in other words, the labor cert had to be filed

21  before April 30, 2001?

22  A.  Mm-hmm, that's correct.

23  Q.  Now, are there other residency requirements associated with

24  the 245(i)?

25  A.  Yes.

D1GLCHI2                          Campbell - direct

1    Q.   What form, if any, is required if you're applying under

2    245(i)?

3    A.   The supplemental A to form I-485 is required.

4    Q.   Handing you what's been marked for identification as

5    Government Exhibit 806.  Do you recognize that?

6    A.   Yes.

7    Q.   What is it?

8    A.   That's the supplemental A to form I-485.

9    Q.   How do you recognize it as such?

10   A.   Format and title.

11   Q.   And are you familiar with these in your training and

12   experience?

13   A.   Yes.

14             MR. PASTORE:  Your Honor, government offers 806.

15             MR. GERZOG:  No objection.

16             THE COURT:  Received.

17             (Government's Exhibit 806 received in evidence)

18             MR. PASTORE:  May we publish it?

19   Q.   Okay.  In addition to the I-485 supplement A, what other

20   information, if any, must be provided?

21   A.   The applicant will submit a $1,000 penalty fee.

22   Q.   And what information is called for in part A of this form?

23   A.   This is information about the applicant seeking the

24   benefit.

25   Q.   If we look at part B, what information is called for there?

D1GLCHI2                          Campbell - direct

1   A.   This is the applicant's indication of how they're eligible

2   under 245(i).

3   Q.   If we look at box B, I am the beneficiary of a visa

4   petition filed on and after January 15, 1998, and on or before

5   April 30, 2001, what does that refer to?

6   A.   That is an eligibility for 245(i) under the LIFE Act.

7   Q.   And what might a visa petition be, is that the I-140 we've

8   been discussing?

9   A.   It may be an I-140 or other immigrant visa petition.

10  Q.   And in addition to the supplement A, is there any other

11  information that's required at this stage?

12  A.   Beneficiary of that immigrant visa petition would have to

13  show he or she was physically present in the United States.

14  Q.   You mentioned earlier that sometimes CIS will request

15  additional information from an applicant.

16          How would that request typically be communicated to

17  the applicant?

18  A.   That will be issued through the mail in a letter.

19  Q.   Do you have before you Government Exhibit 801?

20  A.   Yes.

21  Q.   What is Government Exhibit 801?

22  A.   That is a G-28.

23  Q.   Under what circumstances would a G-28 be issued or filed, I

24  should say?

25  A.   Whenever the employer submits this in conjunction with

D1GLCHI2                         Campbell - direct

1   their I-140 or an applicant submits this in conjunction with

2   their 485 and they're represented by a legal representative or

3   an attorney.

4   Q.  And how do you recognize this as a G-28?

5   A.  Format and title.

6          MR. PASTORE:  Government offers 801.

7          MR. GERZOG:  No objection.

8          (Government's Exhibit 801 received in evidence)

9          MR. PASTORE:  If we could publish 801 for the jury.

10  Q.  So where on this form would the person indicate that

11  they're being represented by an attorney?

12  A.  They would place their information at the top and their

13  signature at the bottom.

14  Q.  In addition to the three preferences that we've been

15  describing, are you also familiar with a fourth preference

16  employment-based application?

17  A.  Yes.

18  Q.  What is that?

19  A.  Those are special immigrants.

20  Q.  Are you familiar with what type of immigrants might fall

21  under special immigrants?

22  A.  Religious workers, for example.

23  Q.  Can you tell us in general terms how does the religious

24  worker program work in your experience?

25  A.  Sure.  The 360 is the immigrant visa petition used in those

D1GLCHI2                        Campbell - direct

1   proceedings, and it may be filed by the alien or the

2   petitioning employer to petition for someone to work as a

3   minister or a religious worker.

4   Q.  And the I-360, is this a form that can be relied on to file

5   a I-485?

6   A.  Yes.

7   Q.  So this is essentially a path to a green card?

8   A.  Yes.

9   Q.  Is there another type of religious worker visa?

10  A.  There's a nonimmigrant religious worker.

11  Q.  What do you mean by nonimmigrant religious worker, what do

12  you mean by that?

13  A.  That is a type of nonimmigrant visa classification for

14  which the individual can come temporarily into the United

15  States to work.

16  Q.  And can that be the basis of an I-485 getting a green card?

17  A.  No.

18  Q.  What form is that type of visa filed under?

19  A.  It's filed on a form I-129.

20  Q.  And are you personally familiar with I-29s and I-360s in

21  your training and experience?

22  A.  Yes.

23  Q.  At some point have the procedures for those programs

24  changed?

25  A.  Yes.

D1GLCHI2                        Campbell - direct

1   Q.  When did that occur?

2   A.  2008.

3   Q.  Why did that occur?

4   A.  Due to a new regulation which was promulgated by the

5   agency.

6   Q.  Do you know what the basis of the new regulations was?

7   A.  A report which indicated fraud in these petitions.

8   Q.  Are you familiar with something called an A file or an

9   alien file?

10  A.  Yes.

11  Q.  What is that?

12  A.  It is an individual's permanent record before the agency.

13  Q.  And are those records kept in their regular course of

14  business?

15  A.  Yes.

16  Q.  Are the records contained in there made at or near the time

17  of the transactions by someone with knowledge of the

18  transactions?

19  A.  Yes.

20  Q.  And does CIS rely on them in conducting its business?

21  A.  Yes.

22  Q.  Are you familiar with something called a T file?

23  A.  Yes.

24  Q.  What is a T file?

25  A.  It is a temporary file.

D1GLCHI2                          Campbell - direct

1    Q.   Why might a T file be created?

2    A.   At the time the T file was created because the individual

3    could not obtain the permanent A file.

4    Q.   When you say the individual, who are you referring to?

5    A.   That may be someone who works in records or the contractor.

6    Q.   And the T file --

7              THE COURT:  Excuse me, could you explain that more

8    clearly.

9              MR. PASTORE:  Certainly.

10   Q.   When you say someone who is working with it or a

11   contractor, what do you mean by that?

12   A.   If a person files an immigration form and the mail room

13   cannot obtain their A file, at that time the records or

14   contractor or official will create a T file for the person.

15   Q.   And what ultimately happens to the documents in the T file?

16   A.   They're eventually consolidated into the permanent A file.

17   Q.   So, for example, if an A file was checked out by another

18   employee, what would happen to a petition?

19   A.   The petition would be housed into the T file until it could

20   be permanently consolidated into the A file.

21   Q.   And are T files also made in the ordinary course of CIS

22   business?

23   A.   Yes.

24   Q.   Made at or near the time of the transaction by people with

25   knowledge of the transactions?

1    A.   Yes.

2    Q.   And does CIS regularly rely on those records in conducting

3    its business?

4    A.   Yes.

5              MR. PASTORE:  Your Honor, may I have a moment?

6              No further questions at this time.

7              THE COURT:  I was just curious about something.

8    Nothing, I don't think, to do with the case.

9              You were talking, one of the exhibits had a whole

10   bunch of questions, things like have you ever committed a

11   crime, do you intend to become a criminal, etc.

12             Do you do fingerprint checks on aliens or just take

13   their word for it that they've never committed a crime?

14             THE WITNESS:  We conduct fingerprint checks on any

15   applicant who is 14 years and older up to the age of 79.

16             THE COURT:  I just wanted to clarify that.  That makes

17   more sense.

18             Is there any cross-examination?

19             Let me just say I think unless counsel agrees to

20   another order, and it's up to them, that we're just going to

21   use the order that the defendants have been named in the

22   indictment.  But I want to emphasize to you that that order

23   doesn't have any meaning.  So you're not supposed to assume

24   most to least or least to most or anything else.  Honestly, I

25   have no idea why the government picked the order that they did.

D1GLCHI2                          Campbell - direct

1                   So we're just going to begin with Mr. Donaldson.

2                   MR. DONALDSON:  Yes, Judge, I'll have a few questions.

3       CROSS-EXAMINATION

4       BY MR. DONALDSON:

5       Q.  Good morning, Ms. Campbell.

6       A.  Good morning.

7       Q.  Thank you for coming.  I just have a few informational

8       questions for you.  Hopefully you can clear these up for me.

9                   You spoke about three preferences, the extraordinary

10      ability preference -- what was the second one?

11      A.  First preference consists of extraordinary ability,

12      outstanding professors or researchers and multinational

13      executives or managers.

14      Q.  What was the second preference?

15      A.  Second preference are aliens of exceptional ability or

16      members of the professions holding advanced degrees.

17      Q.  So there's a difference between extraordinary and

18      exceptional?

19      A.  That's correct.

20      Q.  And the third preference was the skilled workers?

21      A.  Skilled worker, professionals, and other workers.

22      Q.  And I believe you said first, the first preference,

23      preference one, that's as it says by priority.  So if you're in

24      that section you get moved to the top of the line?

25      A.  That's correct.

D1GLCHI2                          Campbell - cross

1   Q.  And would you agree this is a complicated process for

2   preference?

3   A.  First preference is requires more evidence and is more

4   complicated.

5   Q.  In your experience, that's normally -- who completes those

6   particular applications, from your experience, the employer,

7   who does it?

8   A.  First preference can be filed by an employer for all three

9   of those classifications or the alien beneficiary can seek the

10  alien of extraordinary ability classification.

11  Q.  And when the alien does it, they supply the information

12  themselves?

13  A.  That's correct.

14  Q.  And the information normally consists of what?

15  A.  It consists of lots of different documentation, but it

16  would have to show that they are at the top of the field and

17  they have sustained the claim.  They have to meet several

18  criteria.

19  Q.  For example?

20  A.  Receipt of nationally or internationally recognized prizes

21  or awards for excellence in the field, for example.

22          THE COURT:  Like Nobel prize might do it.

23  Q.  Big stuff?

24  A.  A Nobel prize might do it.

25  Q.  Okay.  I'm pretty good but okay.

D1GLCHI2                     Campbell - cross

1              So you said something about job offers.  What do you
2      mean by job offers?
3      A.  A job offer is required for any classification other than
4      aliens of extraordinary ability or for those aliens who seek a
5      waiver of a job offer requirement in the national interest.
6      Q.  Just so I'm clear, so there doesn't have to actually be a
7      job, there just has to be a job offer?
8      A.  All of the classifications require a job offer unless
9      they're in those two which I said, and the alien beneficiary
10     does not have to work for those employers until he or she
11     obtains a green card.
12     Q.  So it's the -- I just want to be clear on that.  So it's
13     correct to say then that the sponsor or employer doesn't --
14     strike that -- not strike that, excuse me -- that the applicant
15     doesn't have to actually work for the employer, just that there
16     is an offer to work?
17     A.  That's correct.
18     Q.  And that's okay?
19     A.  Correct.
20     Q.  And you also said -- I guess it's the same line as the
21     Court -- when sponsors are employers, sponsor and employer are
22     the same person?
23     A.  Correct.
24     Q.  So when you check for these -- strike that again.
25              When the employer sends in or you receive documents

D1GLCHI2                        Campbell - cross

1    related to the employer, you accept those documents, you don't

2    check them?

3    A.  When we receive evidence, whether it be concerning the

4    employer or the alien, we accept it on its face, preponderance

5    of the evidence.

6    Q.  So unlike the part about the crime, you don't do like --

7    for them you do a fingerprint check; is that correct?

8    A.  Correct, for an applicant.

9    Q.  To make sure they have a clean record?

10   A.  Correct.

11   Q.  But when the employer sends in information saying I intend

12   to offer John Diaz a job, you say okay?

13   A.  We accept it on its face.

14           MR. DONALDSON:  No further questions.

15           MR. GERZOG:  Your Honor, if I can just inquire from

16   here.

17   CROSS-EXAMINATION

18   BY MR. GERZOG:

19   Q.  Ma'am, do you know this gentleman?

20   A.  No.

21   Q.  Do you have any evidence to give this jury about this

22   gentleman?

23   A.  No.

24           MR. GERZOG:  Nothing further.

25           THE COURT:  Mr. Brill.

1          MR. BRILL:  I am not going to try to walk over

2    Mr. Schwartz, Judge, if that's okay.  So it will be pretty

3    quick as well.

4    CROSS-EXAMINATION

5    BY MR. BRILL:

6    Q.  Good morning.

7    A.  Good morning.

8    Q.  In terms of the form I-140, Government Exhibit 803, do you

9    have that in front of you?

10   A.  Yes.

11   Q.  Would it be possible to put that back up on the screen.

12          Looking at page 3 of that document, if you could, what

13   type of information is required here?

14   A.  On page 3?

15   Q.  Yeah.

16   A.  Part eight is the employer certification, their signature,

17   their name, their date, and the daytime telephone number and

18   email address, if they have any.

19          Part nine is the same information about their

20   preparer.

21   Q.  So let's say if part eight is supposed to be filled out

22   generally by the person who is the person making this petition,

23   correct?

24   A.  The employer, yes.

25   Q.  The employer, right.  And so if -- so signature of person

D1GLCHI2                        Campbell - cross

1    preparing this form if other than above in part nine, what

2    would you normally expect to find there, who would prepare the

3    form if it's not the employer, it could be an attorney or

4    something like that?

5    A.   It may be an attorney, a legal representative, or simply

6    just a preparer.

7    Q.   But under eight you're required to have the employer's name

8    and information, correct?

9    A.   That's correct.

10   Q.   Is there an actual place -- I'm sorry, there it is,

11   petitioner signature under eight.

12          What steps are taken to verify that the petitioner,

13   that is, the employer, is in fact the person who signs this

14   form?

15   A.   USCIS takes the information on its face.  We also would

16   look at a labor certification to see if it's the same employer.

17   Q.   So you look at the name of the employer and compare it from

18   the labor certification to the I-140, right?

19   A.   Correct.

20   Q.   But you don't take any additional steps -- not you

21   personally, of course -- take any additional steps to confirm

22   that the signature is an actual signature of the employer or

23   employer's representative?

24   A.   That's correct.

25          MR. BRILL:  Thank you.  Nothing further.

1              MR. GREENFIELD:  I just have a few questions.

2    CROSS-EXAMINATION

3    BY MR. GREENFIELD:

4    Q.   Good morning.  You mentioned in addition -- could you leave

5    that form up.

6              You mentioned that there has to be an employer's

7    signature on the I-140.  And you also referenced, I believe,

8    that you might ask for a letter from the employer at some

9    further, different time in the process to confirm that they're

10   offering the job; is that correct?

11   A.   Correct.

12   Q.   Do both of those documents, when you receive them, do they

13   end up in the same file, the A file?

14   A.   Correct.

15   Q.   Does anyone look at the two documents to see if they appear

16   to be signed by the same person?

17   A.   The officer conducting the 485 review would look at that

18   information.

19   Q.   Is that something that's considered in the normal course of

20   business?

21   A.   Yes.

22   Q.   And would it be incumbent upon the officer reviewing it to

23   make some, take some action if the two signatures purported to

24   be by the same person but clearly were written by different

25   hands, would he -- would it be incumbent upon that officer to

D1GLCHI2                        Campbell - cross

1   take some action?

2            MS. ECHENBERG:  Objection.  Incumbent?

3   Q.  Is that something they're supposed to do if they look at

4   one signature and they look at another one and clearly they

5   were written by two different people, are they supposed to do

6   something?

7   A.  If the two signatures are different, the officer would

8   determine if additional evidence is necessary or further review

9   is required.

10  Q.  And there's also a place on the I-140 for a social security

11  number, section one, I believe?

12  A.  I'm sorry?

13  Q.  In section one?

14  A.  If the person is an individual, the employer.

15  Q.  Right.  So it's not asking for both the employer

16  identification number and the social security number, either

17  one or the other; is that correct?

18  A.  That's correct.

19           MR. GREENFIELD:  No further questions.  Thank you.

20           MR. PASTORE:  Briefly, your Honor.

21  REDIRECT EXAMINATION

22  BY MR. PASTORE:

23  Q.  With respect to the job offer, does the job offer have to

24  be genuine for immigration to approve the petition?

25  A.  The job offer must been bona fide from its inception.

1    Q.  And when you say bona fide, is there -- who is it that

2    checks to see whether it's a bona fide job offer?

3    A.  The USCIS officer conducting the 485 review and the I-140

4    review.

5    Q.  And how does the Department of Labor figure into this

6    process?

7    A.  The Department of Labor does not evaluate any evidence.

8    Q.  For the immigration application?

9    A.  Correct.

10   Q.  For the labor certification, are you aware of whether any

11   review is conducted?

12   A.  The Department of Labor will conduct a review to determine

13   if the petitioner attempted to find qualified and available

14   U.S. workers for that position.

15   Q.  Are you aware based on your training and experience what

16   that review consists of in general terms?

17   A.  They review recruitment materials and any other

18   information.

19   Q.  And so when immigration gets -- sorry.  Let me rephrase

20   that.

21         What if anything does immigration receive from the

22   Department of Labor to confirm that that review has in fact

23   been done?

24   A.  The only thing we have is the certified labor

25   certification, the ETA form.

D1GLCHI2                        Campbell - redirect

1    Q.  And with respect to the offer of employment, what's the

2    purpose of having taxes submitted or financial statements

3    submitted by the employer to immigration?

4               MR. DONALDSON:  Objection.  I don't believe that I've

5    heard that come into evidence about taxes.

6               THE COURT:  Go ahead, Mr. Pastore.

7    Q.  Just so that we're clear, in addition to the I-140, is

8    there additional information that's submitted with the I-140?

9    A.  The petitioner's proof that they can pay the proffered wage

10   listed on the labor certification.

11   Q.  Remind us what that proof may consist of.

12   A.  Federal income tax reports, annual reports, or audited

13   financial statements.

14   Q.  And what's the purpose of reviewing that information?

15   A.  We have to make sure that petitioner can pay the wage

16   listed on the labor certification, that they will not undercut

17   the wages of U.S. workers.

18               MR. PASTORE:  Thank you.  No further questions.

19   RECROSS EXAMINATION

20   BY MR. GREENFIELD:

21   Q.  So it's possible that there might be a third signature that

22   would be in that A file of the employer, right, on his tax

23   return?

24   A.  The tax return may contain the signature of an individual

25   from the employer or their tax preparer.

1    Q.  And if it purported to have the signature of the employer,

2    the same person who signed the I-140 and signed the letter

3    confirming that there was a job offer, would somebody also have

4    to -- would it be expected, someone or the agent be expected to

5    at least take some look and see if the three signatures

6    purporting to be by the same person are in fact different?

7    A.  The same person who filed and submitted the 140 may or may

8    not have signed the tax returns.

9    Q.  I understand that.  But if it's the same -- my client's

10   name is Harold Tischler.

11           You don't know Mr. Tischler, correct?

12   A.  Correct.

13   Q.  If within that A file there was an I-140 that purported to

14   have Mr. Tischler's signature and a letter confirming

15   employment offer that purported to have Mr. Tischler's

16   signature and a tax return showing whatever would be deemed a

17   sufficient amount of income to pay that wage and that purported

18   to be signed by Mr. Tischler, but if you look at all three of

19   them, you see they're written by three different people, would

20   that be something the agent would be expected to take action

21   on?

22           MS. ECHENBERG:  Objection.

23           THE COURT:  I'll allow that.

24   A.  The officer will conduct the review and determine if

25   additional evidence is necessary or if they need to conduct

D1GLCHI2                         Campbell - recross

1    further analysis.

2    Q.  Based upon what I just --

3    A.  Different signatures.

4              MR. GREENFIELD:  Thank you.  No further questions.

5              MR. PASTORE:  Your Honor, one question.

6    REDIRECT EXAMINATION

7    BY MR. PASTORE:

8    Q.  The tax returns that are submitted, do they in fact have to

9    be signed?

10   A.  No, they do not.

11             THE COURT:  Anything else?

12             I'm afraid we have to send you back to the outside

13   world.

14

15             MS. ECHENBERG:  The government calls Elissa McGovern.

16             MR. PASTORE:  Your Honor, if I may approach to

17   retrieve the government exhibits.

18    ELISSA McGOVERN,

19        called as a witness by the Government,

20        having been duly sworn, testified as follows:

21   DIRECT EXAMINATION

22   BY MS. ECHENBERG:

23             MS. ECHENBERG:  May I proceed, your Honor?

24             THE COURT:  Yes, please.

25   Q.  Good morning, Ms. McGovern.

1    A.  Good morning.

2    Q.  Where do you work?

3    A.  I work at the U.S. Department of Labor in the Office of

4    Foreign Labor Certification, which is located in the Employment

5    and Training Administration of the U.S. Department of Labor in

6    Washington, D.C.

7    Q.  How long have you worked there?

8    A.  I have worked there for approximately six years.

9    Q.  What is your current title?

10   A.  My current title is program manager for the division of

11   policy within the Office of Foreign Labor Certification.

12   Q.  What are your responsibilities in that job?

13   A.  I am responsible for all regulations and regulatory

14   guidance that comes out of the Office of Foreign Labor

15   Certification.  I'm also responsible for paperwork reduction

16   act forms.

17   Q.  And do you conduct training as part of your job

18   responsibilities?

19   A.  I do.

20   Q.  And who do you train?

21   A.  I have trained our Atlanta National Processing Center, who

22   handle the permanent labor certifications.  I've trained our

23   Chicago National Processing Center, who handle the temporary

24   labor certifications.

25   Q.  Have you held any other jobs at the Department of Labor?

1    A.  Yes.  Prior to this job I was the policy and regulatory

2    manager for the division of policy for the Office of Foreign

3    Labor Certification.

4    Q.  And what were your responsibilities in that job?

5    A.  They were very similar to my current responsibilities.  I

6    did training.  I wrote regulations or oversaw the drafting of

7    regulations and all regulatory guidance that the office issues.

8    Q.  And did you also conduct similar training in that job?

9    A.  Yes, I did.

10   Q.  What is the Office of Foreign Labor Certification?

11   A.  The Office of Foreign Labor Certification is that office

12   within the department, the U.S. Department of Labor, that is

13   responsible for ensuring the secretary's, Secretary of Labor's,

14   statutory requirements with respect to foreign temporary and

15   permanent workers seeking to come to the United States.

16   Q.  And just generally what are those statutory requirements?

17   A.  Well, the Immigration and Nationality Act contains certain

18   statutory requirements with respect to both temporary and

19   permanent workers.

20          The admission of a foreign worker on a permanent basis

21   must be based on an offer of employment.  In other words, to

22   get a green card, they have to come in, they have to be

23   sponsored by an employer, and the Secretary of Labor has to

24   certify that that the entry of that foreign worker does not

25   adversely affect the wage and working conditions of U.S.

D1GLCHI2                        McGovern - direct

1    workers who are similarly employed.

2            They also have to make sure that in the permanent

3    program that there is no U.S. worker who is minimally qualified

4    for that job.

5            So the Office of Foreign Labor Certification oversees

6    programs that are designed to ensure that those certifications

7    take place.

8    Q.  And focusing on the permanent program, what's the

9    difference between the temporary program and the permanent

10   program?

11   A.  As I said, permanent employment in the United States for an

12   immigrant is based on a job offer from an employer in the

13   United States.  That's a green card.

14           We also oversee temporary entry of various workers

15   into the United States, again based on the employer's making

16   certain attestations to us or agreeing to certain obligations.

17   Those workers come in on a temporary basis either for a few

18   months or a few years.

19   Q.  How does, just in general, how does the Department of Labor

20   go about certifying that the foreign worker will not adversely

21   affect the wages or the working conditions of United States

22   workers and will not take the job of United States worker?

23   A.  With respect to the permanent program, since March of 2005,

24   the certification is done through an attestation-based program.

25   The employer makes -- undertakes certain obligations.  They

D1GLCHI2                    McGovern – direct

1    take certain steps.  They do certain kinds of recruitment.  It

2    depends on what kind of a job it is that mandates what kind of

3    recruitment has to take place.

4           And then certifies, self-certifies to the Department

5    of Labor that they've done everything, that there's no

6    minimally qualified U.S. workers who's come forward who's

7    available and willing to take that job and that they wish to

8    sponsor a foreign worker for that position.

9    Q.  And you mentioned that there are a variety of types of jobs

10   that this certification process is used for.

11          What types of different jobs?

12   A.  It is generally for any kind of a job for which an employer

13   is seeking a foreign worker.  We divide it -- in the permanent

14   program the type of recruitment that's required is divided

15   between professional jobs, those jobs that require a bachelor's

16   degree for entry into the position, or nonprofessional jobs,

17   jobs that do not require.

18          And we do not look at whether the job fits into any

19   particular category under the Immigration and Nationality Act.

20   We simply look at whether the job is professional or not

21   professional, and we look at the recruitment that's done based

22   on those types.

23   Q.  So focusing briefly on professional jobs, what do you mean

24   by that?

25   A.  Professional jobs are jobs that require a bachelor's

1   degree.

2   Q.  And what is the verification process for a professional

3   job?

4   A.  Well, the verification process is the same for both

5   professional and nonprofessional positions.  The only

6   distinction is the type of recruitment that has to take place.

7           In a professional position, there have to be two print

8   ads in a newspaper.  There have to be at least three other

9   kinds of recruitment within a menu, if you will, of six or

10  seven different other kinds, radio ads, or participation in job

11  fair or additional recruitment through newspapers, websites.

12  There also has to be a job order placed with the state work

13  force agency in the state where the job is located for no less

14  than 30 days.

15          For a nonprofessional position, the state work force

16  agency job order must be placed for, again, no less than 30

17  days, and the two newsprint ads and that's it for a

18  nonprofessional job.

19  Q.  And how do you verify that those requirements have been

20  met?

21  A.  We take a certain percentage of those cases and we audit

22  them prior to certification and we ask to see the newspaper

23  ads, we ask to see the recruitment, we ask to see a copy of the

24  job order.  We ask to see that they received a prevailing wage

25  to ensure that U.S. worker wages are on par with the wage

1   that's being offered to that foreign worker.

2   Q.  And if the application is not part of that percentage

3   that's audited, does the Department of Labor just rely on

4   what's in the application on its face?

5   A.  We do.

6   Q.  You mentioned that starting in March of 2005, there was an

7   online process; is that correct?

8   A.  That is correct.

9   Q.  Prior to March 2005, what was the process?

10  A.  Prior to March 2005, we worked through the state work force

11  agencies.  Applications would be received through the state

12  work force agencies.  The state work force agencies --

13  Q.  I apologize, let me just clarify my question.

14          There was an online process in March 2005.  Was it a

15  manual process prior to that?

16  A.  Yes, it was.

17  Q.  And other than it being a manual process, was it

18  substantively the same type of requirement that was requested?

19  A.  It was different in that the recruitment was overseen by

20  our state work force agencies pursuant to our regulations.

21  Q.  And was the recruitment overseen by the state work force

22  agencies in every case up until March of 2005?

23  A.  No.  As a result of some changes in laws, the department

24  and the state work force agencies were flooded with

25  applications.  As a result of this huge number of applications,

1    there were certain streamlining processes put into place in the

2    early 2000s to try to get through some of that backlog.  We

3    moved all the cases into two processing centers to try to get

4    through them all, took them from the states.

5          There's also been in those regulations, the

6    regulations that existed prior to March of 2005, there was a

7    procedure for a waiver of recruitment where, similar to what we

8    have now, an employer could come and say, I've done all my

9    recruitment, here's what I did, I don't want to have to do it

10   twice.  And those cases would generally be, we call them

11   reduction in recruitment or waiver of recruitment cases, and

12   they would be processed very similar to what we have in the

13   permanent process now, except it was all done manually.

14   Q.  So let me just make sure I understand what you're saying.

15         Through the 2000s, there was a certain percentage of

16   cases, both the cases where the applicant could apply for the

17   waiver and also the cases that were part of that backlog

18   reduction, where the Department of Labor was basically relying

19   on what was in the application on its face with regard to

20   recruitment?

21   A.  That is correct.  Any case where there was a reduction in

22   recruitment and it was accepted to be a reduction in

23   recruitment case, we would essentially accept what the employer

24   had to say on that application.

25   Q.  And who is it that makes the application to the Department

1   of Labor for this certification?

2   A.  It is the employer.  It is an employer-based process.

3   Q.  And if an employer wants to make an application, how do

4   they start, currently, how do they start the process?

5   A.  If they wish to file, most employers go online and complete

6   the application online and submit it online.  They have to

7   create an account in our online system and then once that

8   account has been created and they're authorized to file within

9   that account, they can file an application.

10  Q.  What information needs to be provided for an employer to

11  set up an account?

12  A.  An employer needs to provide certain -- I mean they have to

13  give us their FEIN.

14  Q.  What is an FEIN?

15  A.  It's a federal employer ID number, identification number,

16  that is provided to them when they establish their process by

17  the IRS, I'm sorry, the Internal Revenue Service.

18  Q.  And what other information if any does an employer need to

19  provide to register in the online system?

20  A.  They have to give us an employer contact.  They have to

21  give us certain basic information about their establishment,

22  their address, who their -- who's in charge.

23         They have to, if we have a question about the

24  employer, if we can't find either their employer identification

25  number in any database, we will ask them for certain -- we'll

1    come to them and say, okay, we can't find you.  Can you give us

2    some additional information about yourself?  We ask for tax

3    records, we ask for business, you know, any business records,

4    utility bills, things that establish that they are indeed a

5    business, something that they've received from the IRS that

6    show that the IRS recognizes them as a business.

7    Q.  And what's, once an employer has registered in the online

8    system, what's the next step?

9    A.  The next step is they have to do the recruitment.  They

10   have a time frame in which they can do that recruitment.  It

11   has to be within 180 days prior to filing.  There is a

12   mandatory period prior to filing of about 30 days, what we call

13   the cooling off period, where they have to make sure that they

14   have interviewed, reviewed the resumes, that they have

15   interviewed anyone who is minimally qualified or looks

16   minimally qualified and then submit the application again

17   within 180 days of initiating that recruitment.

18   Q.  What happens after the application is submitted?

19   A.  After the application is submitted, the employer contact

20   information that is on that application will receive a request

21   to verify that they are sponsoring that foreign worker for

22   permanent residence through this application.

23   Q.  And why is that request made?

24   A.  Because even though they've established an account, we need

25   to make sure that it is indeed the employer who has filed that

D1GLCHI2                        McGovern - direct

application and that they are indeed sponsoring that foreign

worker and that the employer contact is aware that their name

is being used to make these attestations so that they

understand the obligations that they have just been committed

to.

Q.  And how is that first verification transmitted?

A.  The first verification is transmitted through email.

Because the form is submitted online, we obviously have an

email address from the employer.  So we then use that contact

information that's on the application to send an email to the

employer asking them four questions:

        Are they in fact the contact or do they work for the

employer or are they the employer?  Do they know that an

application was submitted on behalf of that employer on behalf

of that foreign worker?  Is the job open to U.S. workers?  And

are they indeed sponsoring that foreign worker for U.S.

permanent residence?

Q.  And if those answers -- if that email is responded to, what

happens next?

A.  The application goes on to be processed.

Q.  And if that email is not responded to, what happens next?

A.  The current process is to wait seven days.  If no response

to that email is received --

        MR. BRILL:  Objection as to current process.

        THE COURT:  Did the process that you used change

1  recently?

2          THE WITNESS:  I can speak from what I know from when I

3  arrived at the department in 2006, which was that email went

4  out.  Some time went by.  It has been standardized now to be

5  seven days.  Prior to that time it might have been seven days

6  or it might have been ten days.  Then the phone was picked up

7  and the employer contact information that's on the form was

8  used to make a phone call.

9  Q.  What happened during that phone call?

10  A.  Well, the individual making the phone call would ask the

11  same questions once they get ahold of the employer contact.

12  Q.  And would the response to those questions be recorded

13  anywhere?

14  A.  We would put a summary of -- the person who made the phone

15  call would put a summary of the phone call in our case notes.

16  Q.  And how do you know that?

17  A.  Because I've seen the case notes and I've actually been in

18  Atlanta and overheard some of those phone calls.

19  Q.  And if the Department of Labor was unable to reach the

20  employer either by email or by phone, what happened next?

21  A.  Well, if they didn't reach them with the first phone call,

22  if there was somebody on the other end they'd leave a message.

23  If they didn't hear back, they'd pick up the phone again.  And

24  usually three, possibility four phone calls would be attempted.

25  If there was no response at the end of those phone calls, the

1    application would be denied and that is the process that

2    continues.  The application is denied.

3    Q.  And if the phone call was successful, they were able to

4    reach the employer and they got the answers they were looking

5    for, what happened next?

6    A.  Then the application gets processed.  That would be entered

7    into our case notes that they reached employer contact and that

8    they verified sponsorship and then the case would be processed

9    from that point on.

10   Q.  And when you say the case would be processed, generally

11   what do you mean?

12   A.  What I mean is that it's reviewed by a live body, by a

13   federal analyst, U.S. federal employee who looks at the

14   application, makes sure that everything is in order -- in other

15   words, that beauty salon operator does not require a law

16   degree.  That would be a little odd, obviously -- and that it

17   meets certain regulatory criteria; that if indeed it's a

18   professional job, they did the professional recruitment, if it

19   is nonprofessional, that they did the nonprofessional

20   recruitment; that the prevailing wage was indeed obtained from

21   either the state work force agency up until 2010, or, after

22   2010, from our prevailing wage center; and that essentially all

23   the regulatory obligations had been met before processing the

24   case.

25             As I said, some cases then are audited because there's

1    insufficient information to be able to finish adjudicating the

2    case.

3    Q.  And what happens when a case is audited?

4    A.  When a case is audited a letter goes out to the employer

5    contact asking for certain basic information.  We need to see a

6    copy of the signed application, has to be signed by both the

7    employer and the agent or attorney, if there is one, plus the

8    alien.

9              It also, we also request basic information.  Give us a

10   copy of everything you did, give us a copy of the recruitment,

11   give us a copy of the job order, give us a copy of any resumes

12   that you may have received as a result of your recruitment.

13   Did you consider any of those workers?  Were any minimally

14   qualified?  We ask certain questions.  Sometimes we'll ask very

15   specific questions based on the nature of the job.

16   Q.  So for a case that's not audited, does the Department of

17   Labor require a signed application?

18   A.  No.

19   Q.  And for a case that's not audited, does the Department of

20   Labor require the documents you were just mentioning, tax

21   records, and other backup documentation of what's included in

22   the application?

23   A.  No, we do not.

24   Q.  And if the application meets all of the Department of

25   Labor's requirements, what happens next?

D1GLCHI2                      McGovern - direct

1    A.  The application is certified and it is sent back to either

2    the employer contact or to an agent or attorney if that

3    employer is represented.

4    Q.  And what does that certification look like?

5    A.  The certification is a copy of the application.  So it

6    looks very similar to what was submitted, but the difference is

7    that it will have a signature of the certifying officer on the

8    application demonstrating that it has been certified.  It also

9    comes back on what we refer to as blue security paper.

10   Q.  What is blue security paper?

11   A.  It is a special paper we buy from the same people who

12   supply the U.S. Mint.  It is secure in some way that the color

13   is a way, that the threads in the paper are a certain way.

14   It's kept under lock and key in our processing centers, and it

15   is used only with the printers that are allowed to be used for

16   certification.

17            And it is something that USCIS will look for because

18   the next step in the process is for that certification to be

19   filed in support of an immigrant petition for a foreign worker.

20   Again, the employer files a petition using that certification

21   as the demonstration that the Secretary has certified that that

22   job will not adversely affect wages, working conditions of U.S.

23   workers who are similarly employed, and that there's no U.S.

24   worker who's minimally qualified for that job.

25   Q.  Do you know what that immigration petition is called?

D1GLCHI2                    McGovern - direct

1    A.  Well, it's called immigrant petition for alien worker or an

2    I-140.

3    Q.  And for each application, how many original certifications

4    on that secure blue paper exist?

5    A.  One.

6            MS. ECHENBERG:  Your Honor, may I approach?

7            THE COURT:  You don't have to ask unless you were

8    planning on attacking the witness.

9            MS. ECHENBERG:  I do not plan on attacking the

10   witness.

11           THE COURT:  Then just come up.

12           MS. ECHENBERG:  And, your Honor, I'm showing the

13   witness Government Exhibits 101 through 115.  I believe you

14   have a copy at the bench.

15   Q.  Ms. McGovern, do you recognize these documents?

16   A.  Yes, I do.

17   Q.  How do you recognize them?

18   A.  They are copies of our case events logs for certain

19   employers.

20   Q.  And what do you mean by that?

21   A.  They appear to be copies from our case management system

22   listing certain employers and their cases probably done -- it's

23   a case, looks like a case search from all of a particular

24   employer with the case number, the date received, the type of

25   submission it was, what its status is, and the name of the

D1GLCHI2                        McGovern - direct

1    alien.

2    Q.  And is that information reflected, for each employer, is

3    that information put into your system at or near the time

4    that's reflected on the document?

5    A.  Yes, it is.

6    Q.  And is it put into the system by people with knowledge of

7    those events?

8    A.  Yes, it is.

9    Q.  And are those records in that database kept in the course

10   of regularly conducted business of the Department of Labor?

11   A.  Yes, they are.

12   Q.  And are they made and relied on in the regular course of

13   business at the Department of Labor?

14   A.  Yes, they are.

15           MS. ECHENBERG:  The government moves to admit

16   Government Exhibits 101 through 115.

17           MR. GREENFIELD:  No objection.

18           MR. GERZOG:  No objection.

19           THE COURT:  Received.

20           (Government's Exhibits 101-115 received in evidence)

21           MS. ECHENBERG:  Your Honor, may we publish Government

22   Exhibit 101 to the jury?

23           THE COURT:  Sure.

24   Q.  So beginning with Government Exhibit 101, in general what

25   is reflected in this document?

D1GLCHI2                        McGovern - direct

1   A.  This document appears to be a -- the result of a search for

2   all cases filed by the employer CFI Framing and Developers.

3   Q.  And approximately how many applications are contained in

4   this document?

5   A.  This document looks like it has 35 records.

6   Q.  And are you familiar with the system that would produce the

7   results of a search like this?

8   A.  Yes, I am.

9   Q.  How does this work in general?

10  A.  It's a fairly simple system.  To get a search like this,

11  you'd have to plug in the name of the employer and it would

12  pull up every case that was filed by that particular employer.

13  Q.  And if we could just go through the columns, what is the

14  first column?

15  A.  The first column is the case number.  The case number is

16  created at the time of filing.  The A number tells me it was

17  filed and received in our Atlanta office.

18          Currently all permanent cases go to Atlanta.  Prior to

19  June of 2008, some cases went to our Chicago office.  Our

20  Chicago office now handles only temporary cases.  Looks like

21  these cases would have all been filed in Atlanta.  Atlanta

22  handled, prior to June of 2008, Atlanta handled cases east of

23  the Mississippi, for jobs that were located east of the

24  Mississippi.

25  Q.  And how is the number that follows the letter generated?

D1GLCHI2                    McGovern - direct

A.  It's generated by the system.  If you look, for example,

the first number, you can see that it was generated in 2007 and

it's based on the Julian calendar.  So it's 305, which is the

305th day of 2007, and it was received on 11/1/2007.  So the

column, for example, that says date received, those are all the

dates that the cases were submitted into the system.

Q.  And you already explained that the employer for these

applications was CFI Framing and Developers.

        What are the columns submission type and status?

A.  Submission type is whether the case was submitted online or

it was mailed in.  A small percentage of our cases are through

mail.  But the majority of them, I think it's something like

89 percent at this point, are submitted online.

        The status would tell me whether it was certified or

denied or withdrawn.

        And the alien name would be the entry of whatever

alien that or foreign worker that application was filed on

behalf of.

Q.  And what does certified mean?

A.  Certified means that the department had reviewed the

application and found that the employer had met the basic

regulatory requirements and the case, whether it was audited or

not, was approved.

Q.  And one of those blue certifications would have been

generated?

1    A.   Right, a blue certification would have been generated for

2    each case.

3    Q.   And what does denied or withdrawn mean?

4    A.   Case is withdrawn is typically withdrawn by the employer

5    for whatever reason after filing.  The most common reason for

6    withdrawing an application is when we've got multiple

7    applications because we can only process one application for

8    one employer with one foreign worker.

9             Denied means that for whatever reason we found that

10   the case did not meet the regulatory requirements and the case

11   was denied and a certification was not issued.

12   Q.   If you could now just briefly go through the remaining

13   exhibits starting with 102 and if could you tell me for each

14   exhibit the number of records, the company name, the date

15   range, the submission type, and if you could tell me the number

16   of records first and the company that that exhibit refers to

17   and then the date range, the earliest record to the latest

18   record.

19   A.   Sure.  For 102, the employer is Contour Framing, Inc.  It

20   looks like 36 case records are visible, and the date range is

21   roughly from July 6, 2006, through May 12 of 2008.

22   Q.   And are there certified records in this set?

23   A.   Yes, there are, and denied records as well.

24   Q.   And if you could just go back to Government Exhibit 101,

25   please.

D1GLCHI2                          McGovern - direct

1  A.  Sure.

2  Q.  What was the date range for the CFI Framing and Developers

3  records?

4  A.  It looks like the first application was filed on

5  November 1, 2007, and the last application was filed on

6  November 4, 2008.

7  Q.  And moving on to Government Exhibit 103 -- if it's helpful

8  if you want to take the clip off and you can just turn them as

9  you go.

10  A.  Probably.

11  Q.  Okay.  Looking at Government Exhibit 103, how many records

12  are there?

13  A.  Sixty records.

14  Q.  And what is the date range for those records?

15  A.  Okay.  This is for Olympia York Builders and Developers,

16  Inc., and the date range is from November 19 of 2007, through

17  January 13, 2009.

18                  (Continued on next page)

19

20

21

22

23

24

25

D1g1cib3                        McGovern - direct

 1  BY MS. ECHENBERG:

 2  Q.  And are there any certified applications in this set?

 3  A.  There are.

 4  Q.  Can you go down to Government Exhibit 104.

 5  A.  Okay.  This is for Bliss 9 Limited.

 6  Q.  How many records are here?

 7  A.  14 records.

 8  Q.  What is the date range?

 9  A.  Date range is from July 28th of 2008 to August 28th of

10  2008.

11  Q.  Are there any certified records in this set?

12  A.  There are not.

13  Q.  Moving on to Government Exhibit 105.

14  A.  Mm-hmm.  This is for the Sharp Shopper, Inc.

15  Q.  And what is the date range of these records?

16  A.  These range from July 3rd, 2008 to December 9th, 2008.

17  There are ten records on the page.

18  Q.  And are there any certified records in this set?

19  A.  No, there are not.

20  Q.  Moving on to Government Exhibit 106.

21  A.  This is for Citi Car Van and Truck Rental, Inc.  This

22  employer submitted applications from 10 -- October 23rd, 2007

23  through February 25th of 2008.  There are 39 records in this

24  exhibit, and there are cases that are both certified and

25  denied.

D1g1cib3                        McGovern - direct

1    Q.  Moving on to the next exhibit, which is Government

2    Exhibit 107, I believe.

3    A.  The employer's name is 5318 16th Avenue Enterprises, LLC.

4    The date range is from April 30th of 2008 to August 21st,

5    2008.  No, I take that back.  I'm sorry.  There's a second

6    page.  November 11th, 2008.  There are 25 records, and there

7    are cases that were both certified and denied.

8    Q.  Moving on to Government Exhibit 108.

9    A.  This shows the records of the employer State to State

10   Distribution, Incorporated.  The applications -- there are nine

11   records.  The date range is from November 11th of 2008 to

12   November 20th of 2008.  And these cases were either withdrawn

13   or denied.

14   Q.  And moving on to the next exhibit, 110.

15   A.  110 shows the cases that were submitted for -- oops, sorry.

16   Wrong one.

17        110 is for Vintage Partners.  This date range goes

18   from January 9th of 2006 through July 24th, 2008.  There

19   are approximate -- there are 60 -- sorry -- 50 records on

20   these -- on this exhibit, and the cases were both denied and

21   certified.

22   Q.  Moving on to Government Exhibit 111.

23   A.  These are the records for the employer Fix Anything

24   Construction and Plumbing, Inc.  There are 43 records.  The

25   dates range from June 26 of 2006 through October 1st of 2006.

1    No, I take that back.  I'm sorry.  There's more pages.  I'm

2    sorry.  The date range ends at February 17th of 2008.  I'm

3    sorry.  There's still one more page.  March 27th of 2008 is

4    the end date of this date range.

5    Q.  And so you may have said it, but how many records are there

6    total for this company?

7    A.  43.

8    Q.  And are there certified applications in this set?

9    A.  There are certified and denied applications in this set.

10   Q.  Moving on to Government Exhibit 112.

11   A.  This shows the records for BSD Contracting Corporation.

12   The date range is from September 24th of 2008 through

13   January 13th, 2009.

14   Q.  I believe there may be a second page for this record.

15   A.  Oh, you're right.  I'm sorry.  21 records.  21 records.

16   That's an -- the last case is an incomplete case.

17   Q.  What does that mean?

18   A.  That means that the case was created but never submitted.

19   That's what the T means in front of that case.  So it has the

20   date it was created but not -- it was never received, so you're

21   going to have -- it's going to be an incomplete.

22   Q.  And were any applications certified in this set?

23   A.  No applications were certified in this set.

24   Q.  Moving on to -- I believe we're on Government Exhibit 113

25   now.

D1g1cib3                         McGovern - direct

1    A.  Yes, that's Millennium Developers and General Contractors,

2    Inc.  There are 10 records.  They range in date from

3    November 25th of 2008 to January 12th of 2009, and there is

4    both certified and denied cases.

5    Q.  And moving on to Government Exhibit 114.

6    A.  114, there are 27 records for Vintage Builders.  They range

7    in date from July 13th of 2005 through December 18th of

8    2005, and there are both certified and denied cases.

9    Q.  And moving on to the final exhibit in this set, Government

10   Exhibit 115.

11   A.  There are 26 records for L & T Realty, Incorporated.  They

12   range in date from May 7th, 2006 through June 24th of 2008,

13   and there are both certified and denied cases.

14   Q.  Ms. McGovern, directing your attention to the documents

15   that are contained in this cart, are you familiar with these

16   documents?

17   A.  Yes, I am.

18   Q.  What are they?

19   A.  Those are the case records that are the actual case copies

20   in our -- in our files from the cases that correspond to these

21   lists.

22   Q.  And how do you recognize these documents?

23   A.  Because I looked at them.

24   Q.  And did you indicate anywhere on them that you had reviewed

25   them?

1    A.  Yes, I did.

2    Q.  What did you do?

3    A.  I initialed them the date that I reviewed them.

4    Q.  Did you initial each document or just the folders?

5    A.  I initialed the folders.

6    Q.  And how did you verify that these printed out records are

7    the Department of Labor's records?

8    A.  I went through them, I compared them, I compared some of

9    them to our case management system enough to make sure that I

10   was looking at exactly what I thought I was looking at, and

11   I've seen hundreds of applications that come through our

12   system.

13   Q.  And are these records prepared at or near the time of the

14   dates reflected in these records?

15   A.  Yes, they are.

16   Q.  And are they prepared in the ordinary course of the

17   Department of Labor's business?

18   A.  Yes, they are.

19   Q.  And are they made and relied on by the Department of Labor

20   in their regular course of business?

21   A.  Yes, they are.

22          MS. ECHENBERG:  I have the exhibit numbers here, your

23   Honor.  I'd like to move to admit them all, but perhaps at a

24   break we can read off all the exhibit numbers, or I can do that

25   now, if you'd prefer.

1          THE COURT:  I'm sorry?  Are they by folder or --

2          MS. ECHENBERG:  They are -- within each folder, each

3    file has its own exhibit number.  I can read them in as sets,

4    if that makes sense.

5          THE COURT:  Okay.

6          MS. ECHENBERG:  Okay.  Let me do that.

7          Okay.  The government moves to admit Government

8    Exhibits 101-1 through 101-34, 102-1 through 102-42, 103-1

9    through 103-60, 104-1 through 104-14, 105-1 through 105-10,

10   106-1 through 106-39, 107-1 through 107-25, 108-1 through

11   108-9, 109-1 through 109-12 -- excuse me, there's an additional

12   109 -- 109-13 through 109-43, 101-1 through 101-50, 111-1 --

13         THE COURT:  Do you mean 110?

14         THE WITNESS:  I'm sorry.  Is that 110?

15         THE COURT:  The last one.

16         MS. ECHENBERG:  The last one was 110-1 through 110-50.

17         THE COURT:  Okay.

18         MS. ECHENBERG:  111-1 through 111-43, 112-1 through

19   112-20, 113-1 through 113-10, 114-1 through 114-27, and 115-1

20   through 115-26.

21         MR. BRILL:  Does that include the exhibits with the

22   -A?

23         MS. ECHENBERG:  No, it does not.  I'm going to do them

24   after.

25         The government moves to admit those exhibits I just

1    mentioned.

2                    MR. GERZOG:  Without objection.

3                    THE COURT:  They're received.

4                    (Government's Exhibits 101-1 through 101-34, 102-1

5    through 102-42, 103-1 through 103-60, 104-1 through 104-14,

6    105-1 through 105-10, 106-1 through 106-39, 107-1 through

7    107-25, 108-1 through 108-9, 109-1 through 109-12, 109-13

8    through 109-43, 110-1 through 110-50, 111-1 through 111-43,

9    112-1 through 112-20, 113-1 through 113-10, 114-1 through

10   114-27, and 115-1 through 115-26 received in evidence)

11                   THE COURT:  Let me also just tell the jury that you

12   don't have to memorize these because when you go to deliberate,

13   you will get a large stack of all the documents that have been

14   admitted into evidence.  So if you've already lost track, don't

15   worry about it.

16   BY MS. ECHENBERG:

17   Q.  Ms. McGovern, I'm showing you another set of exhibits.  Do

18   you recognize those documents?

19   A.  Yes, I do.

20   Q.  And what are they?

21   A.  These are case notes that, as I said before, we do when

22   certain actions are taken in cases.  We enter that into the

23   database.  The person who enters it is listed, the date that

24   they took the action and typed in the case note is entered, and

25   that becomes the record of those activities.

D1g1cib3                        McGovern - direct

1    Q.  And who enters those records?

2    A.  Typically it's the person who actually did it, so for

3    example, if it's a contract employee, for example, our help

4    desk is manned by contract employees.  If a help desk inquiry

5    comes in, that would go into the system, it would be marked HD,

6    but the individual who took the -- who did whatever the action

7    was, took the inquiry, responded to the inquiry, would be

8    listed, the federal employee who took certain actions would be

9    listed.

10   Q.  And are these records made at or around the time of the

11   dates reflected in these records?

12   A.  Yes, they are.

13   Q.  And are they kept in the course of regularly conducted

14   business at the Department of Labor?

15   A.  Yes, they are.

16   Q.  And are they made and relied on in the regular course of

17   the business of the Department of Labor?

18   A.  Yes, they are.

19           MS. ECHENBERG:  Your Honor, the government moves to

20   admit the following exhibits:  101-2-A, 101-19-A, 101-30-A,

21   101-31-A, 102-16-A, 104-11-A, 105-4-A, 107-3-A, 107-4-A,

22   107-6-A, 107-8-A, 107-16-A, 107-18-A, 107-20-A, 107-21-A,

23   110-15-A, 110-31-A, 112-6-A, 112-9-A, 112-11-A, 113-6-A, and

24   113-10-A.

25           MR. BRILL:  Voir dire, your Honor?

D1g1cib3                          McGovern - direct

1           THE COURT:  Sure.

2    VOIR DIRE EXAMINATION

3    BY MR. BRILL:

4    Q.  Good morning.

5    A.  Good morning.

6    Q.  Ms. McGovern, you just -- in response to Ms. Echenberg's

7    question, you said that the notes in these -- we've been

8    referring to them as phone logs.  Is that what you were

9    referring to them as well?

10   A.  They're not phone logs.

11   Q.  Okay.

12   A.  They do include phone logs, but they include essentially

13   activities taken on a case with respect to that case.  So if an

14   e-mail comes into our help desk, that should get reflected in

15   here.

16   Q.  I was just inquiring into what term you use to refer to

17   them.

18   A.  We use the term case notes.

19   Q.  Okay.  Thank you.  You used -- in your response to

20   Ms. Echenberg as to whether the individual who completes the

21   action is also the individual who completes the note, you said

22   typically they do.  Is it something that is true in all cases

23   that the person who does the action makes the note or is it

24   something that simply is what is supposed to happen?

25   A.  No.  What I meant was that it's supposed to happen that

D1g1cib3                         McGovern - direct

1    everyone who takes an action and types it in is the person who

2    took that action.

3    Q.  Okay.

4    A.  I don't stand over all their shoulders every minute of

5    every day so I can't say that in every case that has always

6    happened, but that is what is supposed to happen.

7    Q.  Okay.  So --

8    A.  And I have no reason to believe it does not.

9    Q.  All right.  So I guess the question I have is just -- I

10   don't mean to split hairs.  Is it that the person who takes the

11   action is supposed to take the note and sometimes they don't or

12   is it that the person who takes the action may have someone

13   else take the note for them?

14   A.  No, they're not supposed to do that.  They are supposed to

15   do it themselves.

16   Q.  All right.  So the names that are reflected in one of the

17   columns in the case notes --

18   A.  Mm-hmm.

19   Q.  -- are those always the person who took the action in the

20   column next to that?

21   A.  Yes.

22           MR. BRILL:  Okay.  And as for Mr. Schwartz, I would

23   have no objection but for, your Honor, the conversation we had

24   earlier with regard to redactions.  I don't know if that's been

25   done.

D1g1cib3                          McGovern - direct

1          MS. ECHENBERG:  That has been done.

2          THE COURT:  All right.  Are there any other objections

3    or voir dire on these exhibits?

4          MR. GREENFIELD:  No, your Honor.

5          MR. GERZOG:  No, your Honor.

6          MR. DONALDSON:  No, your Honor.

7          THE COURT:  Okay.  Then they're received.

8          (Government's Exhibits 101-2-A, 101-19-A, 101-30-A,

9    101-31-A, 102-16-A, 104-11-A, 105-4-A, 107-3-A, 107-4-A,

10   107-6-A, 107-8-A, 107-16-A, 107-18-A, 107-20-A, 107-21-A,

11   110-15-A, 110-31-A, 112-6-A, 112-9-A, 112-11-A, 113-6-A, and

12   113-10-A received in evidence)

13   BY MS. ECHENBERG:

14   Q.  Okay.  So I'm going to hand you some of these records now.

15   So, Ms. McGovern, do you recognize what I put in front of you?

16   A.  Yes, I do.

17   Q.  What are those documents?

18   A.  These are our case files with respect to CFI Framing &

19   Developers.

20   Q.  And that was the first set of records you looked at with

21   relation to Government Exhibit 101?

22   A.  That would be correct.  This is Government Exhibit 102

23   through -- 101-2 through 101-34.

24   Q.  Is there a 101-1 in there?

25   A.  There is.

D1g1cib3                      McGovern - direct

1    Q.  So it's Government Exhibits 101-1 --

2    A.  101-1.

3    Q.  -- through 101-34?

4    A.  Yes.

5    Q.  And just so we're clear, those are all of the Department of

6    Labor records that relate to the CFI Framing company; is that

7    correct?

8    A.  Yes.

9    Q.  And if I could direct your attention to Government

10   Exhibit 101-2.

11            MS. ECHENBERG:  And Mr. Dinet, if you could put that

12   up on the screen.

13            For counsel and the court's edification, all of these

14   documents are contained in binders, but we will also be putting

15   them up on the screen.

16   Q.  So what is the first page of this document?

17            MS. ECHENBERG:  And Mr. Dinet, if you could blow that

18   up.

19   A.  The first page of this document is a copy of the cover that

20   would be in our system that is the actual first piece of paper

21   that goes out to a certification, so this would actually be put

22   in the envelope literally like this.  This address is what is

23   shown in the envelope in the window, and that is where -- that

24   is where the certification would be mailed.

25   Q.  And what is the next page of this document?

D1g1cib3                        McGovern - direct

1    A.  I'm sorry?

2    Q.  What is the next page in this exhibit?

3    A.  The next page is the letter that accompanies the certified

4    application that says that the application, which the case --

5    the application number is the -- form number is the Form ETA

6    9089, it has been certified and is enclosed.

7    Q.  And what is an ETA Form 9089?

8    A.  It is an application for permanent employment

9    certification.  That is an application that is completed on

10   line by an employer.

11   Q.  That's the application we've been discussing this morning.

12   A.  That is correct.

13   Q.  And so according to these records, this letter was sent to

14   the address on this letter at the top?

15   A.  That is correct.

16   Q.  And what is that address?

17   A.  This address is CFI Framing & Developers, care of Nathan

18   Schwartz, 46 Main Street, Suite 226, Monsey, New York 10952.

19   Q.  If you could turn to the next page of this document.  What

20   is that?

21   A.  This is a copy of any cc's that go out of the letter

22   notifying anyone else involved in the application that the

23   application has been certified.

24   Q.  Okay.  So does this mean additional copies of that letter

25   were sent to the same address?

1   A.   Probably, yes.

2   Q.   And if you could go to the next page.

3   A.   That's the carbon copy that goes out.

4   Q.   And that's the same letter we looked at, just another copy

5   was sent --

6   A.   It is a copy of the letter, yes.

7   Q.   -- to that same address?

8   A.   Yes.

9   Q.   Okay.  And did anything accompany this letter when it was

10  sent?

11  A.   The -- the original certification would go to the first

12  address.

13  Q.   Okay.  So in this exhibit, the first letter we looked at

14  was accompanied by the original certification?

15  A.   That's correct.

16  Q.   And that was sent to CFI Framing & Developers care of

17  Nathan Schwartz, 46 Main Street, Suite 226, Monsey, New York?

18  A.   That would be correct.

19  Q.   I'm showing you what's been marked as Government

20  Exhibit 3102-A.

21          MR. BRILL:  Give me a second.

22          MS. ECHENBERG:  Sure.

23          THE COURT:  Let me explain to the jury, normally we

24  would break.  We did get started a little late.  But the reason

25  we're still here is because I've been told that an inadequate

D1g1cib3                      McGovern - direct

1  snack was provided, so we're just going to stay here until

2  there's a supplementation.

3  BY MS. ECHENBERG:

4  Q.  Okay.  What else is contained in this file?

5  A.  There's a copy of the certification.

6  Q.  And is there any other correspondence?

7  A.  Other than the courtesy copy that went to the same address,

8  no, it's just the certification.

9  Q.  And so for all of the files that we -- that are in this

10 cart, is it fair to say that there would be at least one piece

11 of correspondence -- actually, withdrawn.

12          Having gone through Exhibits -- the 101 set that you

13 have in front of you, which documents have correspondence

14 associated with them?

15 A.  Any document that was either certified or was audited or

16 was denied would have correspondence associated with it because

17 we send out everything.  Even though we receive the

18 applications electronically, we send out audit notifications as

19 well as denials by mail, in addition to the certifications.

20 Q.  So just looking through the documents, if you want to take

21 a moment to look at them -- actually, if you want to take a

22 moment to look at all of the 101 exhibits, looking through, how

23 many of them have correspondence associated with them?

24 A.  (Witness reviews exhibits.)  All of them have

25 correspondence associated with them.

1    Q.  So all 34 of those exhibits have at least one piece of

2    correspondence associated with them?

3    A.  Yes.

4    Q.  And where is that correspondence sent for those 34 records?

5    A.  All of them were sent to CFI Framing & Developers, care of

6    Nathan Schwartz, 46 Main Street, Suite 226, Monsey, New York

7    10952.

8    Q.  And do any of those records have multiple pieces of

9    correspondence in them?

10   A.  Some of them probably do, some of them will have audits,

11   and then probably -- I know of the files I all -- looked at,

12   some of them have audits and some of them have denials that

13   follow the audits, so some of them do have several pieces of

14   correspondence.

15   Q.  If you could look now, you have some of those case notes.

16   Actually, you don't have them in front of you.

17          MS. ECHENBERG:  If we could put up on the screen

18   Government Exhibit 101-2-A.

19   Q.  And do you still have Government Exhibit 101-2 in front of

20   you?

21   A.  Wrong folder.  Hold on.

22          MS. ECHENBERG:  Actually, Mr. Dinet, could we do

23   something a little different.  Could we put on 101-2.  And if

24   we could turn to the page where the application begins.

25   Q.  Ms. McGovern, do you have the page that's up on the screen

D1g1cib3                          McGovern – direct

1    in front of you?

2    A.  Yes, I do.

3    Q.  If you -- what is this?  What is this document?

4    A.  Okay.  This is page 1 of the application for permanent

5    employment certification.  As I said before, it's referred to

6    as ETA 9089.  That's the number it was given in the ETA

7    nomenclature.  ETA stands for Employment and Training

8    Administration, which is where the Office of Foreign Labor

9    Certification is located within the Department of Labor.  And

10   it is the first page of that application.

11   Q.  And how many pages is that application?

12   A.  It should be 10 pages.  Yup, page 10 of 9 would be the last

13   page.  Of course it's page 10 of 9.

14   Q.  And this is the application that is available online?

15   A.  This is.

16   Q.  This is the application that we've been discussing this

17   morning.

18   A.  Yes, it is.

19   Q.  If we could start with Section A.

20   A.  Sure.

21   Q.  What is Section A?

22   A.  Section A refers to a provision in the regulation that

23   allowed certain applications that -- as I said, we have this

24   tremendous backlog of applications that have been filed prior

25   to March 2005.  Under certain circumstances this application,

D1g1cib3                         McGovern - direct

1    the 9089, could be filed using -- linking it to a previous

2    application filed that were still pending.  That application

3    has to still be pending and it had to meet certain criteria.

4    It could not have begun recruitment.  You could do the

5    recruitment -- you, the employer, could do the recruitment and

6    seek to file using this refiling tool as long as the

7    applications were identical.

8    Q.  And why would an employer want to do that?

9    A.  Because the backlog was literally 400,000 applications by

10   March of 2005, and if the employer had not done recruitment

11   under that application, it was going to be sitting there for

12   quite a while.  If the employer wanted to get the case over

13   with, they could do the recruitment under the PERM program,

14   because those regulations had been published in December of

15   2004, December 27th, 2004.  They could then seek to file

16   using it -- using the old case and, most importantly, using the

17   old priority date that was filed along with that case.  A

18   priority date is the date that the labor certification was

19   filed, and for a foreign worker, a priority date is extremely

20   important.

21   Q.  Why is that?

22   A.  Because that gives them essentially their place in line

23   when waiting for an immigrant visa, or a permanent residence to

24   be made available to them.  Depending on the kind of job, it

25   can be years before that date comes up to the top of the line.

1    Q.   What is ETA 750?

2    A.   The ETA 750 was the form that was previously used in the

3    permanent labor certification program.  It was called an

4    application for permanent labor certification, to distinguish

5    it, of course, from this.

6    Q.   And what sorts of questions did that contain?

7    A.   Similar questions, but it was a much -- it was a different

8    form.  It was only -- it was only a few pages.  This one

9    obviously is many more pages.  The 750, which is actually still

10   used for applications that have nothing to do with PERM

11   anymore, it contains the name of the employer, what the

12   employer was seeking in the job, the occupation, the job

13   opportunity, where it was located, the requirements for that,

14   whether there was a bachelor's degree was required, what kind

15   of experience was required, and it also contained the option

16   of, as I said before, asking for a waiver of recruitment if

17   they'd done recruitment before they filed the application.

18   Q.   Turning back to the ETA 9089 that's on the screen, what is

19   Section B?

20   A.   Section B is the section that asks whether the application

21   is in support of either a Schedule A or sheepherder occupation.

22   Q.   And why is that question asked?

23   A.   That question is asked because in certain circumstances the

24   immigration laws have made certain assumptions with respect to

25   whether there are actually qualified workers in our country to

1   take those jobs, and so either by statute or by regulation, you

2   can skip the labor market test that is at the basis of the 9089

3   process, the permanent labor certification process.  Schedule A

4   is an application that fits within our regulatory criteria for

5   basically skipping this process.

6   Q.  And what jobs are associated with that?

7   A.  Right now the only jobs that are part of Schedule A, and

8   have been since 1990, are aliens of exceptional ability, which

9   is very similar to an existing CIS -- USCIS/Department of

10  Homeland Security category, so you get to skip and go straight

11  to them, or physical therapists or registered nurses, and

12  that's all that's available for Schedule A.

13  Q.  Or, of course, if you're a sheepherder.

14  A.  Or, of course, if you're a sheepherder.

15  Q.  All right.  So if you don't fall into one of those

16  categories, then you have to use this application and go

17  through the Department of Labor's process first; is that right?

18  A.  That's correct.  If you do fit into one of those

19  categories, you still fill out the application but you give it

20  to U.S. Citizenship and Immigration Services.

21  Q.  Okay.  So moving on to Section C.

22  A.  Okay.  Section C is the employer information.  This is

23  the -- this is where the employer types in information about

24  itself -- its address, its phone number, the number of

25  employees, the year it commenced business, its federal employer

1    identification number.  The next code is the industry code.

2    NAICS stands for North American Industry Classification System

3    code, and that's available -- it's a government coding system

4    for various industries.  And we ask a question about closely

5    held corporations, partnership or sole proprietorship or

6    familial relationship, because those are areas where we would

7    have particular concern.  If that question, for example, was

8    answered yes, we'd be auditing because we wouldn't have enough

9    information on the basis of the form itself to know whether the

10   foreign worker unduly influenced that job opportunity so that

11   it wasn't open to U.S. workers.

12   Q.  Turning back to numbers 1 through 4, why do you ask for

13   that information?

14   A.  Well, obviously we need basic information about the

15   employer, about the fact that it exists, about where it exists

16   so that we know with whom we are dealing with that we can then

17   address any correspondence that needs to go to the employer.

18   Q.  And does the location of the employer have other

19   implications to the Department of Labor other than just wanting

20   to know how to get in touch with the employer?

21   A.  Well, it gives us a frame of reference to know that the

22   employer actually physically exists.

23   Q.  And the number of employees, number 5, why is that question

24   asked?

25   A.  We would like to know, for purposes of filing, how many

D1g1cib3                        McGovern - direct

employees an employer has so that we can know that they have

the ability to pay the salary of this -- of this particular

foreign worker, because one of the elements is to be able to

pay a prevailing wage.  For example, if we were to have an

application in our system that says that there were 15 workers

and we had 30 labor certifications on file for that employer,

we might question whether they in fact had the ability to pay

all those foreign workers and whether those jobs were truly

open, whether those jobs in fact existed and they were bona

fide job opportunities.

Q.  And the FEIN, why do you ask for that information?

A.  Again, so we can -- we can make sure that that employer

actually exists as an employer in the United States.

Q.  And the NAICS code, why do you ask for that information?

A.  We're going to look again to see whether the employer is

in -- doing something -- whether the job opportunity is

reasonably related to the industry in which the employer says

it works.  So again, you know, if this were a code that was a

beauty parlor code and the job was for, you know, a building

engineer, we might audit that case because there's a

disconnect.

            THE COURT:  All right.  Maybe we should break.  I'm

promised that within 10 minutes the rest of the snack will be

here, but I suspect you need a break anyway, and so let's take

our break for half an hour, get back at 12:05.

D1g1cib3                          McGovern – direct

1              Remember the two rules:  Don't talk about the case;

2      keep an open mind.

3              (Jury excused)

4              (Recess)

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D1g1cib3                              McGovern – direct

1              (In open court; jury not present)

2              MS. ECHENBERG:  Your Honor, can I ask a question?

3              THE COURT:  Sure.

4              MS. ECHENBERG:  What is your practice with regard to

5      stipulations?  Read it into the record?

6              THE COURT:  Normally that's what happens.  Do you have

7      another idea?

8              MR. PASTORE:  Is there a particular time?  In other

9      words, can we do them in the middle of working with a witness

10     or do you like them read all at once or whatever the -- okay.

11     Thank you.

12             THE COURT:  That's fine.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

D1g1cib3                          McGovern - direct

1              (Jury present)

2              THE COURT:  Okay.  Everyone can be seated.

3              Please continue, Ms. Echenberg.

4              MS. ECHENBERG:  Thank you, your Honor.

5    BY MS. ECHENBERG:

6    Q.  Ms. McGovern, when we took the break, you were looking at

7    Government Exhibit 101-2.  Do you have that in front of you?

8    A.  Yes.  Yes, I do.

9              MS. ECHENBERG:  And can we bring it up on the screen

10   as well, please.

11             And if you could turn to -- I think it was the fifth

12   or sixth page, which was the application itself.

13   Q.  And I think we had gone through Section C, so we can move

14   now to Section D.  What is that section?

15   A.  That section is the employer contact information.  That's a

16   section that we absolutely have to have.  It also has to be

17   different from the agent or attorney information to make sure

18   this is not the agent or attorney who's filing the application.

19   This is the place from which we pull the information to send

20   correspondence to the employer of record if there is no agent

21   or attorney.

22   Q.  And when you say send correspondence, what do you mean?

23   A.  Anything that has to go out, whether it's a certification,

24   a denial letter, an audit request, additional information

25   request, would have to go to the attorney or agent of record

1    under our regulations.  If there is no agent or attorney of

2    record, then it goes to the employer, and this is where we get

3    that information from.

4    Q.  And earlier when you talked about verifying the employer

5    sponsorship through mailing address and phone number, where is

6    that found on this application?

7    A.  That's pulled right from this section.

8    Q.  So number 5 would be the e-mail address where that e-mail

9    you discussed is sent?

10   A.  It would be pulled from number 5 and used to send out the

11   sponsorship verification e-mail.

12   Q.  And number 4 would be the phone number that's called if the

13   e-mail was not responded to?

14   A.  If the e-mail is not responded to, that's the phone number

15   that would be used.

16   Q.  If we could move on to page 2, please.

17            If you could explain what Section E and F are.

18   A.  Well, E is the section by which we collect the information

19   regarding the agent or attorney.  Again, if the individual

20   employer is represented by an agent or attorney, that is where

21   they would list their information.  Again, it has to be

22   different than the employer contact information.

23            F is where we would pull -- we would request that they

24   provide us with the information that they receive regarding the

25   prevailing wage.  As I said, one of the tenets of the program

1    is they can't be paying the foreign worker less than U.S.

2    workers, so they have to obtain, through the course of the

3    application process, a prevailing wage.  At the time this

4    application was filed, it would have been obtained by -- from a

5    state workforce agency, the state where the job is located.

6    From January 2010, employers have received that information by

7    making a request directly to the Office of Foreign Labor

8    Certification, something called the National Prevailing Wage

9    Center, which is located in Washington, DC.

10   Q.  So let me just make sure I understand.  This is the

11   employer telling the Department of Labor this is the prevailing

12   wage for this occupation that they're intending to hire this

13   alien for.

14   A.  This is where they tell us this is the prevailing wage that

15   I got and where I got it from and what it was based upon.

16          In other words, whether it was based on -- the

17   prevailing wage source, number 6, whether it was based on the

18   Occupational Employment Statistical Wage Survey, which is

19   produced by the Bureau of Labor Statistics; or collective

20   bargaining agreement, that's what CBA stands for; or survey

21   that the employer actually provides, whether it's a commercial

22   survey or something that the employer actually provided to the

23   state workforce agency, saying, here, can you verify that this

24   is good, this is valid for these purposes; Davis-Bacon Act,

25   which is what DBA stands for, those are construction wages;

1    Service Contract Act, that stands for the McNamara-O'Hara

2    Service Contract Act, those are certain government contract

3    wages; and then a box for other, if there is some other survey

4    that was used.

5    Q.  And why did the Department of Labor need this information?

6    A.  Because, again, we have to make sure that this -- this

7    information is valid and correlates to what the prevailing wage

8    would be for the position.

9    Q.  Moving on to Section G.

10   A.  That's the actual wage that's going to be offered, so in

11   this particular example --

12           MS. ECHENBERG:  Mr. Dinet, if you could pull up

13   Section G, please.  And if you could leave Section F up as

14   well.  Thank you.

15   A.  So in this particular application, the occupation is

16   construction carpenter.  The prevailing wage that the employer

17   received from the state workforce agency in 2000 -- October of

18   2007 was $16.13 an hour.  The wage that is being offered is

19   $16.13 an hour.  So it is equal to the prevailing.

20   Q.  And what is the Department of Labor looking for in

21   comparing these two sections?

22   A.  That it would be equal to or above -- that Section G would

23   be equal to or above number 5 in Section F.

24   Q.  And why is that?

25   A.  Because we have to make sure that the individual foreign

D1g1cib3                          McGovern - direct

1    worker is being paid no less than his similarly situated U.S.

2    worker colleagues.

3    Q.  If we could move on to Section H, please.

4        What is this section?

5    A.  This is the job opportunity information.  This is

6    essentially the location where the work is going to be

7    performed, where -- what the minimum requirements are for the

8    position, what kind of training is required, if any, what kind

9    of experience, is there alternate experience that's acceptable;

10   essentially what are the minimum requirements for the job that

11   the employer is seeking to fill with a foreign worker.

12   Q.  We can move on to Section I, please.

13   A.  Section I is the information regarding the recruitment that

14   was done.  As I said before, we divide them into professional

15   and nonprofessional.  We do have the different standards for

16   college and university teachers because the statute says that

17   they could be equally qualified rather than minimally

18   qualified, so we have different standards for them.  But

19   essentially this tells us what kind of an application it is --

20   is it a professional, is it a college or university teacher, is

21   it a basic for professional occupations.  This gives us the

22   information as opposed to whether it was professional or

23   nonprofessional, and as you can see, we do ask them information

24   about the college and university.  This isn't one.

25   Q.  If we could go back to the prior page, I believe I skipped

D1g1cib3                         McGovern - direct

1   over some of Section H; is that right?

2   A.  You did a little bit.  Some of the additional information

3   that we seek, a description of the job duties.

4   Q.  And why do you seek that information?

5   A.  Again, because we have to make sure that this is a bona

6   fide job opportunity.  If the job title is industrial engineer

7   and the job duties say cut hair, obviously that's going to be

8   something that's going to trigger our concern.  It's got to --

9   it's got to match the job title, it's got to match the

10  training.  H.11 is also where --

11          THE COURT:  Can I just interrupt you for a second.

12  A.  Yeah, sure.

13          MS. ECHENBERG:  Mr. Dinet, if you could go back one

14  page.  I apologize.

15  Q.  Please continue with regard to Section 11.

16  A.  Sure.  The job duties -- Section 11 is where we list the

17  job duties.  We ask them to describe the job duties.  They can

18  give as much or as little as they wish to give.  We will look

19  at this and compare it against standard occupational

20  classifications to ensure that, again, it's not something that

21  is completely out of the ballpark with respect to what is

22  required for that job, it's reasonably related to the title and

23  to the minimum requirements.

24          MS. ECHENBERG:  And Mr. Dinet, if we could pull up

25  pages 4 and 5 of this application side by side.

1          Mr. Dinet, I was referring to the application itself,

2    pages 4 and 5, so it would be what followed what we were just

3    looking at.

4    Q.  So what is Section I?

5    A.  Section I is the recruitment information, what kind of

6    recruitment was required, and then what kind of recruitment was

7    actually done.  We're asking for the employer to tell us what

8    they did and when they did it.

9          MS. ECHENBERG:  Wait a moment.

10   Q.  So what sort of information are you asking for in this

11   recruitment information section?

12   A.  We are asking for what kind of recruitment was done, were

13   the two -- were the two ads placed, if so, when were they

14   placed, what newspaper were they placed in, we ask for

15   professional occupations, what was the additional required

16   recruitment that was done, what are the dates that they were

17   done.  Again, remember, I said it's a 180-day window that this

18   recruitment has to be done, so we're going to ask for the dates

19   to ensure that the recruitment that was conducted actually fell

20   within that 180 days.

21   Q.  Why is this information important to the Department of

22   Labor?

23   A.  Because we need to know that the employer has conducted the

24   recruitment to ensure that there is no minimally qualified U.S.

25   worker who is available and willing to take that job.  The only

1    way to do that is to require them to perform certain kinds of

2    recruitment, and we have given them options, but we have

3    certain mandatory minimum requirements, primarily in newspaper

4    and in advertising through the state departments of labor.

5            MS. ECHENBERG:  If we could turn now to Section J, and

6    again, if you could show this over two pages.  I don't think

7    you have -- and then the next page.

8    Q.  What is Section J?

9    A.  Section J is the alien information.  The statute uses the

10   word alien.  We use alien or foreign worker.  And it provides

11   us with certain basic information about the foreign worker --

12   address, country of citizenship, country of birth, their date

13   of birth.  We ask for the class of admission if they're in the

14   United States.  This one happens to be blank.  We ask for their

15   alien registration number, if they have one, or a I-94 number,

16   if they have one.  Again, that's if they've been admitted to

17   the United States.  They may have an alien number.  It's given

18   by the Department of Homeland Security.  They would certainly,

19   if they were admitted into the United States, have an I-94

20   number.

21   Q.  And am I correct that this application can relate to only

22   one alien at a time?

23   A.  It can only relate to one alien and it is only filed for

24   one alien foreign worker.  It can -- we require one for one.

25   Since July of 2007, the department has prohibited any

1    substitution of a foreign worker down the road.  Prior to that

2    date you could, as an employer, file an application for Joe

3    Smith and go through your recruitment for Joe Smith and

4    actually have a certified application.  After that you could

5    use that application for Jane Doe at -- at the next step of the

6    filing of the immigrant petition.  We prohibited that in July

7    2007.

8    Q.  And turning now to Section K of this application, what is

9    that section?

10   A.  That gives us the alien work experience.  The prior Section

11   J is, does the alien meet the minimum education requirements,

12   and K would give us their job experience so that we could

13   compare it to see if they actually met the minimum work

14   experience that was required by the employer.

15   Q.  And turning now to Sections L, M, and N, if you could just

16   walk through what those sections are.

17   A.  Okay.  These are the declarations that are made by --

18   Section L is the foreign worker and Section M is whoever

19   prepared the application has to actually sign that, sign that

20   section.  They are signed not when they are submitted to us

21   because we do not currently have the capability to collect

22   electronic signatures coming into the department.  Our

23   regulations require that the application be signed after it is

24   certified by, in Section L, the foreign worker, and, in Section

25   M, by the entity that prepared the document.

D1GLCIB4                            McGovern - direct

```
 1    BY MS. ECHENBERG:
 2    Q.  So just so we're clear, that blue final certification is
 3    sent out to the employer, it is not signed by the alien until
 4    after it is received by the employer?
 5    A.  That would be correct.
 6    Q.  So when it is submitted online to the Department of Labor,
 7    it is unsigned, it looks like this?
 8    A.  It looks just like this.
 9    Q.  And turning now to section N.
10    A.  Section N is the declaration of the employer.  This is
11    where they're certifying --
12    Q.  Can I stop you for one second.
13            MS. ECHENBERG:  Mr. Dinet, if you could enlarge from
14    section N, employer declaration, through the line above U.S.
15    government agency.
16    Q.  I'm sorry.  Continue.
17    A.  This is the employer declaration.  This is the employer's
18    obligations listed out that they have to meet in order to move
19    to the next step upon certification.
20            It also allows us to know that they've designated an
21    agent or attorney to represent them.  It also declares under
22    penalty of perjury that they are attesting that this
23    information is true and accurate.
24    Q.  Again, when the application is submitted online, this
25    portion of the application is unsigned; is that correct?
```

D1GLCIB4                    McGovern - direct

1  A.  That's correct.

2  Q.  And it's certified without being signed by the employer?

3  A.  That is correct.

4  Q.  And if we could go down now to section -- one more

5  question.

6          These points, points one through ten, are these

7  basically the statutory requirements that you discussed in the

8  beginning of your testimony?

9  A.  They are the statutory or they're either from the

10  immigration statute or they're from other statutes.  For

11  example, unlawful discrimination by race, creed, or color,

12  that's not in the immigration statute but it's in our federal

13  or state statutes.

14  Q.  Turning now to section O of this application.

15  A.  Section O is the certification itself.  This is where the

16  certifying officer signs the application.  The signature is

17  placed electronically, and the validity period is placed when

18  the application is certified.

19  Q.  If you could turn now to Government Exhibit 101-3.

20  Actually, before you go there, let's stay with 102, 101-2 for a

21  moment.

22          MS. ECHENBERG:  Mr. Dinet, if you could bring up

23  101-2-A, please.

24  Q.  What is this document?

25  A.  This document is the case notes for CFI Framing and

D1GLCIB4                    McGovern - direct

1    Developers, case No. A0804323125.

2    Q.  If you could refer back to 101-2 and let me know if that

3    case number corresponds?

4    A.  It does.

5    Q.  So these are the case notes for what case?

6    A.  For the case that was filed that is now Government

7    Exhibit 101-2.

8            MS. ECHENBERG:  And if you, Mr. Dinet, if you could

9    highlight numbers one and two.  I'm sorry, we're not -- just

10   leave it as it is.

11   Q.  Ms. McGovern, if you can you read from there --

12   A.  Sure.

13   Q.  -- Nos. 1 and 2?

14   A.  There are four records in the case notes.

15           The first record reads as follows:  Left voice message

16   for Nathan Schwartz to confirm sponsorship.  It was entered by

17   Nina Gillis on February 26, 2008.

18           Case note No. 2 is Nathan Schwartz returned my call

19   and confirmed sponsorship.  Also entered by Nina Gillis on

20   February 26, 2008.

21   Q.  And referring back to Government Exhibit 101-2, what number

22   would have been called?

23   A.  It would have been the number that is listed in section D,

24   the employer contact information, No. 4.

25   Q.  What is that phone number?

D1GLCIB4                          McGovern - direct

1    A.   (845)721-7445.

2              MS. ECHENBERG:   And turning now, Mr. Dinet, if you

3    could, to Government Exhibit 101-19-A.

4    Q.   And, Ms. McGovern, you've gone through all the 101 exhibits

5    in front of the jury to see what the employer name and address

6    was; is that correct?

7    A.   Yes, I have.

8    Q.   So if you could pull out 101-19-A, please.

9    A.   You mean 101-19?

10   Q.   101-19, yes.  And while you're there, if you see 30 and 31,

11   you might as well grab them too because we're going to come

12   back to them.

13             Looking at 101-19-A, does that case number correspond

14   to Government Exhibit 101-19?

15   A.   The case number on Government Exhibit 101-19 is

16   A0802818062.  That corresponds to case notes in 101-19-A.

17   Q.   And what is the phone number for the employer contact

18   information in that application?

19   A.   Eight, this is section D, No. 4, (845)721-7455.

20   Q.   And if you could again read numbers one and two.  You can

21   just read the text of the message.

22   A.   No. 1, left voice message for Nathan Schwartz to gie me a

23   call -- that's obviously a typo.

24             And No. 2, sponsorship confirmed.

25   Q.   If you could turn now to Government Exhibit 101-30, and if

D1GLCIB4                        McGovern - direct

1   you could bring up 101-30-A, and, again, if you could find the

2   case number and then the employer contact phone number.

3   A.   Okay.  The case numbers match.

4   Q.   And is it the same phone number in the employer contact

5   section that we had just read?

6   A.   Yes, (845)721-7455.

7   Q.   And turning to 101-31-A, again, can you match with 101-31?

8   Let me know if the case numbers match.

9   A.   Case numbers match and the number is the same as the number

10  that I just read.

11  Q.   The phone number is the same?

12  A.   Yes.

13  Q.   And can you read line 3, please?

14  A.   Nathan Schwartz called and verified sponsorship.

15  Q.   If you could turn now to Government Exhibit 101-3, please.

16  If we -- 101-3, please.  We'll come back to this.

17  A.   Okay.

18  Q.   If you could turn now to Government Exhibit -- I need to

19  bring you more exhibits.

20          So I handed you the Government Exhibits in the 102

21  series that had been admitted previously.

22  A.   Yes.

23  Q.   Do you recognize those documents?

24  A.   Yes, I do.  They are the applications in our records for

25  Contour Framing, Inc.

1   Q.  And starting with Government Exhibits 1012-1 to 102-16, do

2   you have those in front of you?

3   A.  Yes, I do.

4   Q.  And is there correspondence affiliated with all of those

5   applications?

6   A.  Yes, there is.

7   Q.  And where is that correspondence sent?

8   A.  The correspondence is all sent to Contour Framing, Inc.,

9   care of Nathan Schwartz, 214 Route 59, Suite 100, Suffern, New

10  York 10901.

11  Q.  And like the other set of exhibits we looked at, do some of

12  those files include more than one piece of correspondence?

13  A.  Yes, they do.

14  Q.  But all the files, all 16 of those files include at least

15  one piece of correspondence to 214 Route 59?

16  A.  Yes.  They include at least one piece of correspondence to

17  that address.

18  Q.  And if you could turn now Government Exhibit 101-16, excuse

19  me, 102-16 and if we could bring up on the screen 102-16-A,

20  please.

21          Before I get to this question, going back to 102-1 to

22  102-16, do those files include either the cover letter with the

23  certification that we had looked at earlier or audit letters or

24  other types of correspondence?

25  A.  They contain both letters of certification as well as

D1GLCIB4                          McGovern - direct

1    denials and audits.

2    Q.  Okay.  Turning to Government Exhibit 102-16 and looking at

3    that exhibit, can you compare the case number on that exhibit

4    to the call note that I put on the screen, 102-16-A?

5    A.  Yes.  They're identical case numbers.

6    Q.  And what is the phone number in the employer contact of

7    this application?

8    A.  (845)721-7455.

9    Q.  And can you read line 1, please?

10   A.  Left voice mail.

11   Q.  And line 2?

12   A.  Recommendation for certification.

13   Q.  And now if you could turn to the second folder there which

14   has, should have Government Exhibits 102-17 to 102-42.

15          Do you have those in front of you?

16   A.  I do.

17   Q.  And do those Department of Labor files indicate that

18   correspondence was sent in connection with those files?

19   A.  There is correspondence attached to every case here except

20   for the first case, 101-17.

21   Q.  Okay.  So putting -- you mean 102-17?

22   A.  I'm sorry, 102-17.

23   Q.  Putting that one aside, the remainder of the files, where

24   is the correspondence sent?

25   A.  There are a couple of different addresses in here.

1   Q.  And what are those addresses?

2   A.  Contour Framing, Inc., care of Jed David Philwin, 17

3   Battery Place, Suite 323, New York, New York 10004.

4           Contour Framing, Inc., care of Nathan Schwartz, 1274

5   49th Street, Suite 299, Brooklyn, New York 11219.

6           Sorry, same one.

7           Contour Framing, Inc., care of Zvi M. Samuels, 1301

8   47th Street, Brooklyn, New York, and that's it.

9   Q.  And in connection with those three addresses, is that -- is

10  any of that correspondence copied to any other addresses?

11  A.  102-18 was copied to Jed David Philwin.  102-19 was copied

12  to Nathan Schwartz.

13  Q.  At what address?

14  A.  1274 49th Street, Suite 299, Brooklyn, New York 11219.

15          102-20 was copied to Jed David Philwin, 17 Battery

16  Park Place, New York, New York.

17  Q.  And I'm actually going to move on.  We may come back to

18  this so you can put those to the side.

19          Going to move on now to the 103 series.  What are

20  those documents?

21  A.  These are copies of applications filed by Olympia York

22  Builders and Developers.

23  Q.  And is there correspondence contained in these files?

24  A.  Yes, there is.

25  Q.  Where is that correspondence sent?

 1   A.  It was sent to Olympia York Builders and Developers, care

 2   of Nathan Schwartz, 455 Route 306, Suite 119, Monsey, New York

 3   10952.

 4   Q.  And so for all or at least most of those 60 files,

 5   correspondence, at least one piece of correspondence is sent to

 6   that address?

 7   A.  Every piece of correspondence here was sent to that

 8   address.  Every piece here in the second binder was sent to

 9   that address, that's 103-25 through 46.  And every piece here

10   was sent to that address.

11   Q.  And like the other sets, do some of those files contain

12   multiple pieces of correspondence that were sent to that

13   address?

14   A.  Yes.

15   Q.  I'm showing you what's been the 104 series and the 105

16   series.

17           If we could start with the 104 series and, again, you

18   could look at those and let me know where they were sent.

19   A.  Okay.  This is Bliss 9 Limited.  And these were sent to 455

20   Route 306, Suite 119, Monsey, New York 10952.

21   Q.  Is that true for all 14 of the files in that set?

22   A.  Yes.  They were sent to that address care of Nathan

23   Schwartz.

24   Q.  And just let me ask you a general question so I don't have

25   to do it every time.  I may have covered this, but I want to

1    make sure the record is clear.

2              For all of these folders that are in the cart and the

3    ones that you have up in front of you, do they all contain

4    either denials or approvals or audit letters?

5    A.  Yes.  They contain either copies of denials or audits or

6    certifications.  In some cases multiple, will have an audit and

7    a denial, audit, and will have a certification in some cases,

8    or an audit letter and a denial letter in others.

9    Q.  So as you're going through each of those files and you're

10   referring to correspondence sent, that's generally what's being

11   sent?

12   A.  That's correct.

13   Q.  And if there is a certification in that file and there is

14   that cover page that we showed in the beginning with an

15   address, is that where the original certification is sent?

16   A.  Yes, that's correct.

17   Q.  So turning now to Government Exhibit 104-11-A, if you could

18   again compare the case number for that file with the case

19   number on the case notes that I put on the screen, which is

20   104-11-A?

21   A.  0821876048, it's identical.

22              MS. ECHENBERG:  And if you could, Mr. Dinet, if you

23   could go to the next page.

24   Q.  If you could read entries one, two, and three on this case

25   note.

1    A.  Sure.  No. 1, called Nathan Schwartz.  He was unavailable

2    so I left him a voice mail message on 6/19/2008.

3            8/21/2008, left Nathan Schwartz a voice mail message.

4            And on 8/28, return call from Nathan Schwartz and he

5    confirmed sponsorship for Cristina Udvarmelyl.  This case has

6    passed.  That means it has passed sponsorship.

7    Q.  And looking at Government Exhibit 104-11, what is the

8    employer contact number associated with this application?

9    A.  (845)354-0616.

10   Q.  And what is the indication under status in the top right

11   corner, sorry, on the case note?

12   A.  I'm sorry, thank you.  Bliss 9 Limited was denied.

13   Q.  And if it passed sponsorship, why would it have been

14   denied?

15   A.  There are many reasons why a case would be denied.

16   Q.  Can you tell by looking at the case note some indication of

17   why it might have been denied?  If you can.

18   A.  There are two pages.  Can I see the second page?

19   Q.  Sure.  Let me ask it a different way.

20           What is case note four?

21   A.  Case note four is the request to audit to verify the job

22   order with the SWA, meaning we would go and ask the state work

23   force agency, was this job in fact placed, and an affidavit

24   from the employer stating their knowledge of the application.

25   In other words, we were following up because we had some reason

1    to believe that there might have been insufficient information

2    regarding the sponsorship.

3    Q.  So am I correct that even after sponsorship was confirmed,

4    the case was then audited for another reason?

5    A.  Cases are audited for many reasons that have nothing to do

6    with sponsorship.

7    Q.  Okay.  I believe you have the Government Exhibit 105 set in

8    front of you?

9    A.  Yes, I do.  You asked me, by the way, why this case was

10   denied.  The reason for denial was that the employer failed to

11   respond to an issue, the audit notification letter.  There was

12   no response to the audit.

13   Q.  Okay.  If you could turn now to the 105 series, please.

14   A.  Okay.

15   Q.  And if you could look at Government Exhibit 105-4-A.  If

16   you could look at Government Exhibit 105-A.  No, if you could

17   look at 105-4.

18   A.  Okay.

19   Q.  And if you could bring up on the screen Government

20   Exhibit 105-4-A.

21        Okay.  Again, does the case number for the case file,

22   Government Exhibit 105-4, match the case number for this case

23   note?

24   A.  Yes.

25   Q.  And what is the phone number associated with employer

1    contact in that application?

2    A.   (845)354-0616.

3    Q.   If you can now read case notes one, two, and three, please?

4    A.   One, the telephone number for Nathan Schwartz, the Sharp

5    Shopper, Inc., is not in service at this time.  Checked the

6    989, which is an online application, verification for

7    sponsorship could not be confirmed.

8             No. 2, telephone number (845)354-0616 has been

9    disconnected at this time.  Could not verify sponsorship and

10   this is an online application.

11            Three days later, spoke with Mr. Nathan Schwartz at

12   (845)354-0616, who confirmed sponsorship.

13   Q.   I'm now handing you the 106 series.  Okay.  Looking at

14   these files, where is -- is there correspondence associated

15   with each file?

16   A.   With everything except for the first exhibit in the file,

17   106-1.

18   Q.   So putting that aside, the remainder of the file, which I

19   believe is 38 files; is that correct?

20   A.   Yes.

21   Q.   Is there correspondence, at least one piece of

22   correspondence affiliated with each of those files?

23   A.   Yes.

24   Q.   And where is that correspondence sent?

25   A.   Citi Car Van and Truck Rental, Inc., care of Arnold

D1GLCIB4                        McGovern - direct

1    Goldenberg, 455 Route 306, Suite 119, Monsey, New York 10952.

2    Q.  If you could now look at the 107 series and let me know if

3    there's correspondence affiliated with those files?

4    A.  Yes, there is.

5    Q.  And is there correspondence affiliated with all 25 of those

6    files?

7    A.  Yes.

8    Q.  And where does that correspondence go?

9    A.  This is 5318 16th Avenue Enterprises, care of Harold

10   Tischler, 4316 17th Avenue, Brooklyn, New York 11204.

11              MS. ECHENBERG:  Your Honor, if I could read in a

12   stipulation at this time.

13              THE COURT:  Sure.

14              MS. ECHENBERG:  This has been marked as Government

15   Exhibit S-9 and it has the caption of the case and the case

16   number.

17              "It is hereby stipulated and agreed by and between the

18   United States of America by Preet Bharara, United States

19   Attorney for the Southern District, James Pastore and Janis

20   Echenberg, assistant United States attorneys, of counsel, and

21   the below named defendants by and through their attorneys,

22   that:

23              "1.  During the time period from in or about 2003

24   through in or about 2009, Harold Tischler related at 4316

25   17th Avenue, Brooklyn, New York 11219.

1          "During the time period from in or about 2003 through

2    in or about 2009, Harold Tischler operated a business located

3    at 5318 16th Avenue, Brooklyn, New York 11204.

4          "And during the time period from in or about 2003

5    through in or about 2009, Harold Tischler sent and received

6    email using the email address harrythemn@aol.com.

7          "It is further stipulated and agreed that this

8    stipulation may be received in evidence at trial."

9          And it is signed by myself and all counsel.

10         I ask that this stipulation be admitted.

11         MR. DONALDSON:  No objection.

12         MR. GERZOG:  No objection.

13         THE COURT:  Received.

14         (Government's Exhibit S-9 received in evidence)

15         THE COURT:  Do we have a copy of it for us?

16         MS. ECHENBERG:  Can we publish it to the jury, your

17   Honor?

18         THE COURT:  Sure.

19   Q.  Okay.  So turning back to Government Exhibit 107, if you

20   could repeat the address.  If you could leave the stipulation

21   up for one moment, and just repeat the address that all that

22   correspondence was sent to.

23   A.  4316 17th Avenue, Brooklyn, New York 11204.

24   Q.  Okay.  And if we could turn to -- okay.  We can take that

25   down.

D1GLCIB4                          McGovern - direct

 1              If we could turn now to the case note which is

 2     107-3-A, and if you could look at Government Exhibit 107-3,

 3     please.

 4     A.  Yes.

 5     Q.  What -- and again compare the case note on this, the file

 6     name on this case note to that file that you have in front of

 7     you.

 8     A.  They are identical.

 9              THE COURT:  Could you make that a little clearer, is

10     it possible?

11     Q.  Is this 107-3-A?

12              If you could look at page 2 of three.  Okay.  If you

13     could read line 2, please.

14     A.  Sponsorship confirmed and passed.

15     Q.  And what is that notation, if you know?

16              MR. GREENFIELD:  Objection.  I object.  She didn't

17     make that entry.  It's admitted.

18              Is she asking her what the person who wrote that meant

19     to say by making that entry?

20              THE COURT:  Try again.

21     Q.  Ms. McGovern, are you familiar with what individuals who

22     make entries in these case notes are supposed to be recording?

23     A.  They are supposed to be recording activities, specifically

24     in this case, concerning verification of sponsorship.

25     Q.  And you've already discussed the verification process which

D1GLCIB4                         McGovern - direct

1    is first an email and then a phone call if the email is not

2    responded to, correct?

3    A.  That's correct.

4    Q.  And is response to an email reflected in these case notes?

5    A.  Not on this page.

6    Q.  And but in general, would response to that first email be

7    reflected in the case notes?

8    A.  Yes, especially if it was not.  In other words, if a live

9    body had to go forward if the email did not get a response, a

10   live body would have to make a phone call.  That phone call

11   would be reflected in these case notes.

12   Q.  So let me clarify.  The phone call would be reflected in

13   the case notes but the actual response to the email, yes or no,

14   would not be reflected in the case notes; is that correct?

15   A.  That's correct.

16   Q.  So based on your -- and you've trained people who enter

17   these case notes; is that correct?

18   A.  I have trained people in Atlanta, including those who enter

19   case notes.

20   Q.  And based on your own training and experience and the

21   training you've provided, what do you understand that case note

22   No. 2 to reflect?

23   A.  I understand this case note to reflect that someone made a

24   phone call and that they confirmed sponsorship.  The protocol

25   for them to confirm sponsorship would have been to call the

employer contact information listed on the application.

Q.  Okay.  If we could turn now to Government Exhibit 107-4-A

on the screen and, Ms. McGovern, you could look at Government

Exhibit 107-4.

      Again, please compare the case number in Government

Exhibit 107-4 to the case number on this case note on the

screen.

A.  They're identical.

Q.  And if you could read entry No. 1, please?

A.  Spoke with Harold Tischler and he confirmed sponsorship for

Marco Suplucha.  This case has passed.  Again, that means has

passed sponsorship.

Q.  And looking at Government Exhibit 107-4, what is the

employer contact phone number in that application?

A.  (718)288-7844.

Q.  Turning now to Government Exhibit 107-6-A, and if you could

look at Government Exhibit 107-6, Ms. McGovern.

A.  Okay.

Q.  If you could again read entry No. 1.  I'm sorry.  Before

you do that, if you could compare the case number at the top of

this case note to the case number of the exhibit you're looking

at?

A.  They are identical.

Q.  And what is the telephone number in that application?

A.  (718)288-7844.

D1GLCIB4                        McGovern - direct

1   Q.  If you could read case note No. 1, please.

2   A.  Spoke with Harold Tischler and he confirmed sponsorship for

3   Max Bermeo.  This case has passed.

4   Q.  If you could turn now to Government Exhibit 107-8, and if

5   we could pull up -8-A, please.

6           I think you know the routine by now, but if you could

7   compare the case number to the file you have in front of you?

8   A.  They are identical.

9   Q.  Let me know the employer contact number.

10  A.  (718)288-7844.

11  Q.  And read entry No. 1, please.

12  A.  Spoke with applicant Harold Tischler and he confirmed

13  sponsorship for Ruslin Malyetick.  This case has passed.

14  Q.  Turning now to Government Exhibit 107-16.  Compare the case

15  numbers and let us know the phone number.

16  A.  Case numbers are identical.  Telephone number,

17  (718)288-7844.

18  Q.  And, again, and I think the jury can read the case note.

19          MS. ECHENBERG:  And if you could leave it on the

20  screen, Mr. Dinet.

21  Q.  And, Ms. McGovern, if you could turn now to Government

22  Exhibit 107-18-A.  While you're there, if you want to just pull

23  out 107-18, 107-20 and 107-21-A?

24          MS. ECHENBERG:  And, Mr. Dinet, if it's possible to

25  put those up two or three at a time.  I don't know if that's

D1GLCIB4                          McGovern - direct

1   possible just to expedite this.

2   A.  Eighteen, 20, and 21?

3   Q.  Eighteen, 20, and 21, yes.

4   A.  Thank you.

5   Q.  So let's start with 18 and 20.  If you could just compare

6   the case numbers, if you're able to, 107-18-A and 107-20-A.

7   A.  Okay.  Eighteen is identical.  Twenty is identical.

8   Q.  Okay.  And --

9   A.  The telephone number on both is (718)288-7844.

10  Q.  And if we could just have 107-20-A on the screen.

11          Is that the phone number for both of them?

12  A.  Yes, it is.

13  Q.  And I would just refer the jury to line No. 1 on 107-20-A

14  which is up on the screen.

15          And turning now to 107-21-A.  If you could again

16  compare the case number and let us know the phone number.

17  A.  Case numbers are identical and the phone number is

18  (718)288-7844.

19  Q.  And refer the jury to line No. 1 on that case note.

20          I think you have Government Exhibit set 108 and 109 in

21  front of you; is that correct?

22  A.  Yes, I do.

23  Q.  When you're ready.  If you just flip through both of those

24  sets, again, just to expedite things, and let me know if those

25  files each contain correspondence and where the correspondence

1   was sent.

2   A.  Okay.  108, State to State Distribution, Inc., care of

3   Harold Tischler, 4316 17th Avenue, Brooklyn, New York 11204.

4   Q.  So all nine of those files contain correspondence that was

5   sent to that address?

6   A.  That is correct.

7   Q.  And the 12 exhibits in Government Exhibit 109 set -- sorry.

8   Let's focus on Government Exhibit 109-1 through 12.

9   A.  Mm-hmm.

10  Q.  Is there correspondence in those 12?

11  A.  There is correspondence in every case.

12  Q.  And where is that correspondence sent for those 12?

13  A.  387 Quincy Associates, care of Harold Tischler, 4316, 43-16

14  17th Avenue, Brooklyn, New York 11204.

15  Q.  And turning now to Government Exhibit 109-13 through 43.

16  In this set is there correspondence in each file?

17  A.  There is correspondence in most files, most applications.

18  There are some that are not.  Probably these are withdrawn

19  cases.

20  Q.  And are there various addresses that this correspondence is

21  sent to?

22  A.  Yes, there are.

23  Q.  What are those addresses?

24  A.  17 Battery Place, Suite 323, New York, New York.  110 Wall

25  Street, 21st floor, New York, New York.  And 1301 47th Street,

D1GLCIB4                        McGovern - direct

1    Brooklyn, New York.  Also 43-16 17th Avenue, Brooklyn, New

2    York.

3    Q.  And turning now to 109-22, if we could bring this up on the

4    screen if that's possible.  Let me ask you before we have it on

5    the screen -- now we have it on the screen.

6            So looking at the first page, what does this page

7    indicate?

8    A.  Again, this is the cover sheet for the letter that would

9    have gone out to this particular address.  This is where the

10   certification would have been mailed.

11   Q.  Is that the letter -- that's the letter that follows that

12   page?

13   A.  Yes.

14   Q.  If we could turn to that next page.  And was this letter

15   CCed to any other address?

16   A.  It was CCed to the same address, 110 Wall Street, 21st

17   floor.  And then a copy also went to Harold Tischler, c/o 387

18   Quincy Associates, 43-16 17th Avenue, Brooklyn, New York 11204.

19   Q.  Where are you seeing that?

20   A.  I'm seeing that on the copy.

21   Q.  On how many pages in?

22   A.  Page 3, fourth page in.

23   Q.  Bring the fourth page up, please.

24   A.  Right there.

25   Q.  So that's the address at the bottom.  That indicates in the

D1GLCIB4                         McGovern - direct

1    file that a copy of this letter was sent to that address?

2    A.   That's correct.

3    Q.   But the original certification was sent to the 110 Wall

     Street address?

5    A.   That would be correct, yes.

6    Q.   And in looking through this folder with various addresses,

7    did you see other indications with that CC address?

8    A.   Yes.

9    Q.   Do you have 110 in front of you?

10   A.   Not yet.

11   Q.   Okay.  Putting the 110 and 111 series in front of you, and

12   I will take these away.  You could start with pulling out the

13   110, that first.  That's the first set.

14   A.   Okay.

15   Q.   Okay.  Looking now at the Government Exhibit 110 set, let

16   me be more specific, 110-1 through 21, is there correspondence

17   in that set?

18   A.   Yes.

19   Q.   And where is there correspondence for every file?

20   A.   Wait a minute.  Hold on.  Okay, I have 22 through 50.

21   Q.   Do you have one through 21?

22   A.   No, I do not.

23   Q.   Okay.  Let's skip that for the moment and I'll look for it

24   and we'll come back to that.

25            So let's look now at 110-22 to 50.  Do you have that

D1GLCIB4                        McGovern - direct

1    in front of you?

2    A.  Yes, I do.

3    Q.  Okay.  And is there correspondence in each one of those

4    files?

5    A.  Yes.

6    Q.  And where is that correspondence sent?

7    A.  110 Wall Street, 21st floor, New York, New York 10005.

8    Q.  I would refer you now to 110-24 and if we could bring that

9    up on the screen, please.

10   A.  There are two addresses in here.  That's one of them.

11   Q.  What is --

12   A.  The other address is 17 Battery Place, Suite 323, 10004.

13   Q.  And in 110-24, are there any other CCs of the

14   correspondence?

15   A.  A CC was sent to Harold Tischler, care of Vintage Partners,

16   4316 17th Avenue, Brooklyn, New York 11204.

17   Q.  And in this set, the 110-22 to 50 set, did you see CCs of

18   other correspondence in other files to that same address, 4316

19   17th Avenue?  Refer you, for example, to 110-50.

20   A.  Yes, 38, 41, 42.

21   Q.  Okay.  That's fine.  We can move on to the 111 set which

22   should be in front of you.

23          So you should have in front of you 111-1 through 43,

24   all right?

25   A.  Yes.

D1GLCIB4                        McGovern - direct

1    Q.   Focusing first on 111-1 through 32, where does the

2    correspondence in that file go?

3    A.   It goes to Fix Anything Construction and Plumbing, Inc.,

4    care of Harold Tischler, 4316 17th Avenue, Brooklyn, New York

5    11219.

6    Q.   And 111-33 through 43, where does that correspondence go

7    and are there other CCs?

8    A.   It goes to a couple of addresses:  17 Battery Place, Suite

9    323.  It goes to 1301 47th Street, Brooklyn, New York 11219.

10   And I think those are the only two addresses in this file.

11   Q.   And I would refer you to 111-36.  Is that piece of

12   correspondence CCed to any other addresses?

13   A.   CC to Harold Tischler, care of Fix Anything Construction

14   and Plumbing, 4316 17th Avenue, Brooklyn, New York 11219.

15   Q.   If you could turn back now to 110-1 through 21 which I put

16   in front of you.  And, Mr. Dinet, if we could have 110-15-A and

17   110-31-A up on the screen.

18           Where is the correspondence in this set mailed in the

19   110-1 to 21?

20   A.   Vintage Partners, care of Harold Tischler, 4316

21   17th Avenue, Brooklyn, New York 11204.

22   Q.   And is that for all 32 of those files?

23   A.   I have --

24   Q.   I'm sorry, all 21, you're correct.

25   A.   Twenty-one files in front of me, yes.

1  Q.  In you could turn now to 101-15, excuse me, 110-15, please,

2  and compare the case note on that file to the case note on --

3  compare the case number on 110-15 to the case number on the

4  case note at the top of the screen.

5  A.  They are identical.

6  Q.  What is the phone number associated with that application?

7  A.  (718)854-6622.

8  Q.  If you could read case notes one and two, please?

9  A.  Left message with Isal to have Mr. Tischler call me back.

10  And the next day, verified with Mr. Tischler that he is

11  sponsoring the worker.

12  Q.  Turning now to Government Exhibit 110-31, and if could you

13  compare the case number on the case note at the bottom of the

14  screen with the case number for that file.

15  A.  Okay.  I don't have 31 in front of me.  I have 21.

16  Q.  Because I took it away I think.

17  A.  Wait.  There's more over here.

18  Q.  Okay.  It would be the 110 series.

19  A.  Yes, okay.  Thirty-one.

20            (Continued on next page)

21

22

23

24

25

 1   BY MS. ECHENBERG:

 2   Q.  If you could compare the case number for that file with the

 3   case number at the bottom of the screen on that page.

 4   A.  They're identical.

 5   Q.  And what is the phone number associated with that file?

 6   A.  718-854-6622.

 7   Q.  If you can read case note 1 there.

 8   A.  "Contact was made and yes was answered to all questions."

 9   Q.  Okay.  I'm directing your attention now to the 112 series.

10   Where was the correspondence in this set mailed?

11   A.  This was mailed to BSD Contracting Corporation, care of

12   Harold Tischler, 5318 16th Avenue, Brooklyn, New York 11204.

13   Q.  Is that true for all 20 of those files?

14   A.  Yes.

15   Q.  Moving on to -- turning now to Exhibit 112-6.

16          MS. ECHENBERG:  If we could put 112-6-A and 112-11-A

17   on the screen, please.

18   Q.  And Ms. McGovern, if you could pull out 112-6, 112-11, and

19   112-9.  It's slightly out of order.

20          MS. ECHENBERG:  If we could have 112-6 and 112-9 blown

21   up.  Thank you.

22   Q.  And Ms. McGovern, if you could compare the case number for

23   112-6 with the case note on the top and the case number with

24   112-11 with the case note on the bottom, let me know if those

25   match.

D1g1cib5                        McGovern - direct

1    A.  They do.

2    Q.  And let me know the phone number that is associated with

3    those two applications.

4    A.  788 -- I'm sorry -- 718-288-7844.

5    Q.  And if you could read, on 112-6, entry 4 and the date,

6    please.

7    A.  "Employer Harold Tischler stated that they are no longer

8    sponsoring the foreign worker.  Sponsorship failed."

9    Q.  Okay.  And if you could look now at 112-9-A.  And is there

10   a similar notation on the same date for that case note?

11   A.  Yes.

12   Q.  Okay.  Turning now to Government Exhibit 113, please, which

13   should be in front of you.  That's the 113 series.

14        If you could tell me if there is correspondence

15   associated with those ten files and where that correspondence

16   was sent.

17   A.  There's correspondence associated with all the files and

18   it's sent to Millennium Developers & General Contractors, Inc.,

19   care of Harold Tischler, 5318 16th Avenue, Brooklyn, New York

20   11204.

21        MS. ECHENBERG:  Okay.  And Mr. Dinet, if you could

22   pull up 113-6-A and below it, 113-10-A.

23   Q.  And Ms. McGovern, if you could look at those corresponding

24   exhibits, -6 and -10, and again, compare the case numbers to

25   the case notes.

D1g1cib5                        McGovern - direct

1    A.   They are identical in both cases.

2    Q.   And what is the phone number associated with that

3    application?

4    A.   718-871-0382.

5    Q.   And turning now to Government Exhibit 114, which I believe

6    the series is in front of you.  If you could look first at

7    114-1 through 20 -- actually, the whole set, 114-1 through 27,

8    and focus -- if you could pull out 114-10 and -- just tell me

9    generally where that correspondence goes and then focus on

10   114-10, please.

11   A.   Okay.  These were mailed to one -- to Vintage Builders, C/O

12   Jed Philwin, 110 Wall Street, 21st Floor, New York, New York

13   10005.

14   Q.   Is there any cc associated with 114-10?

15   A.   There's a cc to Harold Tischler, care of Vintage Builders,

16   4316 17th Avenue, Brooklyn, New York 11204.

17   Q.   And looking now at Government Exhibit 115.  What company is

18   that associated with?

19   A.   L & T -- I'm sorry -- L & T Realty, Inc.  The address is

20   care of Harold Tischler, 3422 Old Capitol Trail, Suite 694,

21   Wilmington, Delaware 19808.

22        Some of the L & T cases are care of Jed David Philwin,

23   17 Battery Place, Suite 323, New York, New York 10005.  Those

24   cases were cc'd to Harold Tischler, care of L & T Realty, Inc.,

25   3422 Old Capitol Trail, Suite 694, Wilmington, Delaware 19808.

D1g1cib5                          McGovern - direct

Q.   Okay.  I'm giving you back an exhibit that you looked at
earlier, Government Exhibit 101-3, and I'm giving you what's
been marked as 3120-A.

          Do you recognize Government Exhibit 312-A as you
compare it to Government Exhibit 101-3?
A.   Yes, I do.
Q.   What is it?
A.   This is the original or appears to be the original of the
copy that the Department of Labor has in its files of an
application for CFI Framing & Developers.
Q.   And why does it appear to be the original?
A.   Because it is on the blue security paper and --
Q.   How can you tell it's the blue security paper?
A.   Because I can see the blue, I can see the threads that
we're taught to look for, and it's been signed by the national
certifying officer, William R. Carlson, dated April 2nd,
2008.

          MS. ECHENBERG:  Your Honor, may I pass this document
to the jury so they can examine it?

          THE COURT:  Sure.

          MS. ECHENBERG:  I move to admit this exhibit, your
Honor.

          THE COURT:  Are there any objections?

          MR. BRILL:  3120-A?

          MS. ECHENBERG:  Yes.

1          MR. BRILL:  No objection.

2          THE COURT:  Received.

3          (Government's Exhibit 3120-A received in evidence)

4     Q.  So just to be clear, this is the original certification

5     that would have been sent to the address on the first page?

6     A.  Yes, that's correct.

7          MS. ECHENBERG:  Okay.  Just to be clear for the

8     record, your Honor, the exhibit that was just admitted was

9     3120-A, in case I misspoke.

10          THE COURT:  3120-A.

11          MS. ECHENBERG:  And I'm now passing the witness

12     1501-2.

13     Q.  Do you recognize that document?

14     A.  I do.  It's a copy of a labor certification that was

15     submitted.  The company is American Girl Fashion.  The contact

16     name for the employer is Avrom Rothenberg.

17     Q.  And how do you recognize that document?

18     A.  This is one that I actually looked at in the system.

19     Q.  And is it -- is that record kept in the regularly conducted

20     business of the Department of Labor?

21     A.  Yes, it would be.

22     Q.  And was it made at or around the time reflected on that

23     document?

24     A.  Yes.

25     Q.  And is it made and relied on by the Department of Labor in

D1g1cib5                          McGovern - direct

1    its regular course of business?

2    A.  Yes, it is.

3              MS. ECHENBERG:  Government moves to admit Government

4    Exhibit 1501-2.

5              MR. GERZOG:  No objection.

6              MR. DONALDSON:  No objection.

7              MR. GREENFIELD:  Can I see it?

8              MS. ECHENBERG:  Yes.

9              MR. DONALDSON:  Your Honor, after he looks at it, I

10   have one question, one voir dire question, if I can.

11             THE COURT:  Could I see a copy of this?  Or where

12   would I find a copy of this?

13             MS. ECHENBERG:  I apologize, your Honor.

14             THE COURT:  Is it in one of these books?

15             MR. GREENFIELD:  I have no objection.

16             MS. ECHENBERG:  Your Honor, I'll give you this for

17   now.

18             THE COURT:  Let me just take a look.

19             All right.  You can take it.

20             MS. ECHENBERG:  So the government moves to admit this

21   document.  And you had voir dire.  I apologize.

22   VOIR DIRE EXAMINATION

23   BY MR. DONALDSON:

24   Q.  Just one or two questions for you.  You said this was

25   made -- you're testifying that it was made at or about the time

1   it was received.  Do you know when that was?

2   A.  It was filed on May 2nd of 2006.

3   Q.  And this would be via e-mail, via computer?  How was it

4   filed?

5   A.  It was submitted online.

6   Q.  Do you have any way of knowing who submitted it?

7   A.  You mean like an ISP address?

8   Q.  Like can you -- the federal government agency or persons

9   you work for, do you have any way of determining who actually

10  submitted this particular --

11  A.  We can track it to an ISP address, meaning that someone on

12  a -- entity on some computer entered that case and submitted

13  that case through that computer, or that computer address.

14  That's as much as we can do.

15  Q.  Did you do that?

16  A.  I'm sure we did.

17             MS. ECHENBERG:  The government moves to admit 1501-2.

18             THE COURT:  No objection, so it's received.

19             (Government's Exhibit 1501-2 received in evidence)

20  BY MS. ECHENBERG:

21  Q.  Ms. McGovern, I'm going to ask you now a general question

22  about all of these files that you've looked through.  Not the

23  exhibit we just marked, putting that aside, but all of these

24  brown folders that we spent the afternoon going through.  In

25  going through these files, did you see any indication that any

1    of this mail was returned to the Department of Labor?

2    A.  No.

3            MS. ECHENBERG:  I have no further questions at this

4    point, your Honor.

5            MR. GERZOG:  May I?

6    CROSS-EXAMINATION

7    BY MR. GERZOG:

8    Q.  Ma'am, can you see this gentleman here in the white shirt

9    and black glasses?

10   A.  Yes.

11   Q.  Do you know him?

12   A.  No.

13   Q.  Have you had any dealings with him?

14   A.  No.

15   Q.  Let me ask you a couple of questions about your work.

16           Does the nationality of the alien play any role in

17   whether they get certified either by the Department of Labor or

18   get a green card from CIS?

19   A.  I can't speak to anything the CIS does.  We approve or deny

20   or audit cases based solely on the evidence in front of us.

21   The nationality has nothing to do with it.

22   Q.  Okay.  Does the person's ability to speak English play any

23   role?

24   A.  No, unless English is an absolute requirement for the job

25   and it is reasonably related to the job and it is deemed to be

D1g1cib5                         McGovern - cross

1    a requirement for the job.  That would be extremely unusual.

2    Usually we'll get jobs that require speaking Spanish or being a

3    translator of Chinese or things like that, but English --

4    Q.  Well, a baker or a plumber or a carpenter doesn't

5    necessarily require any language, right, so any of those

6    occupations, that person could be completely nonfluent in

7    English and still be approved; correct?

8    A.  That would be correct.

9    Q.  Does the number of related parties have a role?  In other

10   words, when a person is -- comes in, they bring in their family

11   with them, automatically the family gets green cards, so if you

12   have 15 children, your wife gets a green card and your 15

13   children get a green card.  Does that have any role in whether

14   the person gets approved?

15            MS. ECHENBERG:  Objection.

16            THE COURT:  By the Department of Labor?

17            MR. GERZOG:  By the Department of Labor or CIS, if she

18   knows.

19            THE COURT:  Well, I think she should only answer for

20   the Department of Labor.

21            MR. GERZOG:  All right.  For the Department of Labor.

22   A.  We don't have any knowledge whether the person is married.

23   Nowhere on the application is that question asked.  Nor does it

24   ask how many children they have.

25   Q.  Okay.  Does age play a role?

D1g1cib5                          McGovern - cross

1    A.  No.

2    Q.  So a 19-year-old can have sufficient experience if it's

3    documented, for example?

4    A.  If it's documented, yes.

5    Q.  And say an 80-year-old who was applying for this -- and

6    forgive me for saying this, but is likely to retire shortly

7    after arriving is also someone who can be approved?

8    A.  That would be correct, yes.

9    Q.  Okay.  Now with respect to the job offer, the job offer has

10   to be a legitimate job offer from a legitimate company;

11   correct?

12   A.  That is correct.

13   Q.  But the person does not have to go to work for the company;

14   correct?

15   A.  The Department of Labor would not know whether in fact that

16   person went to work for the employer after receiving the green

17   card.

18   Q.  But it's not a legal requirement that they do.

19   A.  I can't speak to whether it's a legal requirement because I

20   can only tell you what the Department of Labor requires.  We

21   require that the employer attest that they intend to hire that

22   person after -- and continue employing them after they receive

23   the green card.

24   Q.  Right.  And you have no knowledge of whether or not the

25   person is obligated in any way to take the job.

1   A.  I do not.

2   Q.  Okay.  Do you have any knowledge as to what happens if

3   during the process -- let's say a particular business applies

4   for a particular alien and they have a downturn then in their

5   business and can no longer afford to hire the alien.  Are they

6   supposed to notify you that things have changed and they can no

7   longer afford to hire the alien?

8   A.  Only if the application is still in process, because we

9   would expect that if they were no longer able to sponsor the

10  alien for permanent residence that they would withdraw the

11  application.

12  Q.  Okay.  If your -- if the application had been approved by

13  your agency and sent on to CIS and then the company found out

14  that they couldn't afford to hire the applicant anymore,

15  Department of Labor would have nothing to do with that.

16  A.  Not in the permanent program, that is correct.

17  Q.  And how specific does the skill have to be?  Let's say

18  somebody is a brilliant mechanic, auto mechanic, and can fix

19  anything wrong on a Chevrolet car.  Can they -- can someone

20  apply and say, "I run a garage that fixes -- that fix GM cars

21  in general"?  Can that transfer -- that skill transfer that way

22  or does it have to be specific to Chevrolets, for example?

23  A.  We would probably look at that case and audit it because we

24  would require that the knowledge of Chevrolets be reasonably

25  related to the performance of the duties and be necessary to

1    perform those duties in a reasonable manner.

2    Q.  Okay.  And you said that the process can sometimes take

3    years.  That depends primarily on the priority of the -- of

4    first, second, third, and then within priority date and so

5    forth; is that correct?

6    A.  The Department of Labor processes its applications without

7    regard to priorities.  The only thing we do is collect the

8    priority date.  That's the date of filing.  We don't look at

9    whether it's any particular preference.  We process them

10   without regard to any preferences.  That's a CIS function as to

11   making those determinations.  It is not our function.

12   Q.  Is there a typical or average time that you're aware of for

13   Department of Labor to process an application, assuming there's

14   not a whole lot of audits and so forth?

15   A.  It has varied.  Right now it is about six -- anywhere from

16   60 to 180 days for what we would consider a clean case, one

17   without audits.

18            MR. GERZOG:  Thank you, ma'am.

19   CROSS-EXAMINATION

20   BY MR. BRILL:

21   Q.  I'm going to go over to the podium.

22            Hello again.

23   A.  Hi.

24   Q.  I'm Peter Brill.  I represent Nathan Schwartz.  I assume

25   that other than seeing his name in certain documents, you've

1    never spoken to him directly; correct?

2    A.  That is correct.

3    Q.  Never met him before?

4    A.  No.

5    Q.  Let's just start up with a couple of straightforward

6    questions.

7            Are all of the documents in the binders that were

8    moved into evidence -- the documents you've been referring to

9    are the same documents -- are those all what you referred to as

10   reduction in recruitment cases?

11   A.  No.

12   Q.  So is there a way to differentiate which ones are reduction

13   in recruitment cases and which ones aren't?

14   A.  None of these are reduction in recruitment cases.  They're

15   all filed under the PERM program, which means they are similar

16   to reduction in recruitment cases.  They have all had the

17   recruitment done up front prior to filing.

18   Q.  Okay.  So they fall under the same concept that there's

19   somewhat less oversight of the program, that most of the

20   certification is left to the employer at the front end;

21   correct?

22   A.  The activity is left to the employer at the front end.

23   Q.  Right.

24   A.  The employer makes an attestation, a series of attestations

25   that say they've done the recruitment.  We look behind a number

1   of those to ensure that in fact that recruitment was done

2   and -- and either certify or deny based on that information.

3   Q.   Now as for the process that would have happened in the PERM

4   cases, unless there was some glaring issue or problem in the

5   case that would have led to a further audit, so long as the

6   employer responds to the e-mail, that essentially, the default

7   position of the Department of Labor would be to approve that or

8   certify that?

9   A.   No.

10  Q.   Okay.

11  A.   No, not necessarily.  We are very clear when we published

12  the 2004 regulation that we would select a certain number just

13  randomly to audit those cases even if they looked perfectly

14  normal and there was no issue that would cause us to audit it.

15  Q.   Okay.  So maybe by putting it this way:  If they weren't

16  subject to a random audit or if there weren't some glaring

17  error, generally the alien would be certified?

18  A.   I'm not sure what you mean by glaring error.

19  Q.   Well, error that would give rise to a further investigation

20  by the Department of Labor.

21  A.   Yes, that is correct.

22  Q.   Okay.  You mentioned a term and you used it two different

23  ways.  I just want to be clear.  You said "employer contact

24  information" and then you said "employer contact."  And so I

25  guess you could read that phrase two different ways.  When you

1  were using the phrase, did you mean to say that the information

2  is provided in the documents for a contact for the employer or

3  is it the employer contact information, if you follow me?

4  A.  The employer contact is the individual listed in the

5  employer contact information.

6  Q.  That's what I want.

7  A.  The employer contact information is the sum total of what's

8  contained in that Section D.

9  Q.  Exactly.  So the person who is -- well, who can certify for

10  an employer in these applications, does it have to be the

11  employer -- who signs these applications, the employer or the

12  employer contact?

13  A.  The employer signs the application.

14  Q.  So an attorney or representative of the --

15  A.  Cannot.

16  Q.  Cannot.  Okay.

17  A.  Except as a preparer.

18  Q.  And ultimately you would then at some point need an actual

19  signature from the employer, right, not just the preparer.

20  A.  We never get an actual signature from the employer unless

21  the case is audited.  One of the requirements that we ask for

22  with every audit, and it's actually in our regulation, is, we

23  get a signed copy, has to be signed by all three parties, if

24  there are three parties.

25  Q.  That's postaudit.

1    A.  That's -- yes, the response to the audit must contain that

2    signed application.

3    Q.  But normally, for example, in --

4             MR. BRILL:  If we could put Exhibit 101-2 up, please,

5    Section N.  Section N of the application.

6             N.  There we go.

7    Q.  So you have this section here, Employer Declaration.  "By

8    virtue of my signature below, I hereby certify the following

9    conditions."  There's obviously quite a few conditions.  And

10   then, "I declare under penalty of perjury" at the bottom.

11            MR. BRILL:  If you can scroll down to the bottom of

12   this section, please.

13   Q.  You never actually expect to have a signature here on the

14   signature line unless it's audited?

15   A.  We don't get the signature, but the USCIS does.  Our

16   regulations require that the employer sign it and send that

17   signed version to CIS.

18   Q.  And that's when you get the special -- the special blue

19   copy at the end.

20   A.  The special blue copy, yes.

21   Q.  Okay.  But that's actually -- the alien has already been

22   certified at that point; right?

23   A.  No.  The application has been certified.

24   Q.  The application.  So the application is certified, the

25   employer then gets the special blue copy, and the blue copy is

1   required to be sent back to not you guys but USCIS before what

2   happens?

3   A.  Well, it gets filed with the immigrant petition for a

4   foreign worker.

5   Q.  All right.  So it's only after it's sent back signed that

6   USCIS will then process the actual application -- well, pardon

7   me -- will actually allow the worker to work in this country;

8   correct?  Does that make sense?

9        MS. ECHENBERG:  Objection.  I'm not sure she has

10  personal knowledge of that part of the process.

11       MR. BRILL:  She could say.

12       THE COURT:  If you know.

13  A.  It is only at the conclusion of the three steps -- first,

14  the certification, second, the immigrant petition, and then

15  finally, either obtaining an immigrant visa or obtaining

16  adjustment of status from temporary to permanent immigrant --

17  that the -- that the end of the permanent resident process --

18  in other words, that's the admission of the foreign worker for

19  that job on a permanent basis.

20  Q.  Okay.  And that last part is handled by USCIS, not by

21  Department of Labor.

22  A.  It is not handled by the Department of Labor.  It's either

23  handled by the USCIS or by the Department of State.

24  Q.  So that depends on what type of application?

25  A.  It depends on whether that individual is outside the

D1g1cib5                        McGovern - cross

country and seeking to enter from outside or is in the country

seeking to adjust their status.

Q.  Got you.  Okay.  So if we could go -- if we could use the

same exhibit again.  If we could go to the first page of the

application.

          You testified on direct that you received this

information, I guess almost all of the applications, if not all

the applications, that you have in front of you in those

various folders online; correct?

A.  Yes.

Q.  And you testified that Department of Labor at this time and

even up to the present does not have the capacity to do any

sort of signature verification online, electronic signature;

right?

A.  That's correct.

Q.  But there is some process, at least there's an attempt to

verify the information that is provided; yes?

A.  Yes.

Q.  So the Department of Labor investigator or help center

personnel, whoever's doing this, do they look up the name of

the company somewhere?

A.  They will look up the name of the company.  We maintain a

database, for example, of FEINs, federal employment

identification numbers, where that would be looked up.

Q.  So they type in a federal -- the FEIN that's here on the

D1g1cib5                          McGovern - cross

1   bottom?

2   A.  To see if it matches against -- to see if it matches

3   against the name as listed there.

4   Q.  Okay.  Now in a situation where there is no such company as

5   CFI Framing & Developers that actually exists, you wouldn't

6   look up the name, you'd actually be looking up the EIN;

7   correct?  Let me rephrase that.  You don't look up the name,

8   you look up the EIN.

9   A.  We would look up the FEIN and look to see whether it in

10  fact matches CFI Framing & Developers.

11  Q.  Okay.  And what happens if you figure out that this FEIN

12  doesn't actually match up to any company that is called CFI

13  Framing & Developers?

14  A.  That's going to send off the bells and whistles and audit

15  the case, most likely.

16  Q.  Okay.  Now since we were -- since we were talking about

17  this specific case, that's 101-2, do you know if there was an

18  audit associated with this?

19  A.  I -- right now, just looking at this page, I can't tell.

20  I'd have to look at the exhibit to see whether there was an

21  audit.  I don't think there was.

22  Q.  Now to your knowledge -- and if this is outside of your,

23  you know, frame of knowledge, just let me know -- do employer

24  identification numbers get assigned to d/b/a's, that is,

25  companies that are doing business under a separate name?

D1g1cib5                          McGovern - cross

1   A.  I have no idea.  I'm sorry.

2   Q.  No, that's fine.  And do you know, is it a Department of

3   Labor database, I assume, that you use to reference these

4   employer identification numbers?

5   A.  Actually, it's a commercial database.

6   Q.  Oh.  A private --

7   A.  The IRS's own database is only available by statute.  Yeah.

8   Q.  So one part of the government can't use another part of the

9   government's data; you have to go and pay somebody else for it.

10  A.  You have to go and pay somebody else for it.

11  Q.  That's the government.

12  A.  That's right.

13  Q.  So you go to a commercial provider.

14  A.  Yes.

15  Q.  Do you know the name of that commercial provider?

16  A.  Right now --

17  Q.  Back then, I guess we should talk about.

18  A.  Unfortunately, I don't know the name back then.  Right now

19  we are purchasing it from a company called Experian.

20  Q.  The credit report company.

21  A.  Yes.

22  Q.  Okay.  And do you have any idea where they get their

23  information from?

24  A.  No, I do not.

25  Q.  But since the information that comes from the IRS is only

1    available by statute, can we assume that they're not getting it

2    from the IRS either?

3    A.   That I don't know.

4    Q.   Other than the fact that the Department of Labor uses this

5    database, is there any indication of reliability of the

6    information in the database?

7    A.   You mean in the Experian database.

8    Q.   The Experian database, right.  Does Experian guarantee the

9    accuracy of its information to the Department of Labor?

10             MS. ECHENBERG:  Objection.

11             THE COURT:  Well, I'm not sure why it matters.  If

12   there's a disconnect between the employer identification number

13   and the name of the employer, it simply triggers further

14   investigation; right?

15             MR. BRILL:  I don't necessarily want to mention it out

16   here.  If I could approach, just briefly.

17             THE COURT:  Okay.

18             MR. BRILL:  All right.

19             THE COURT:  By the way, before we do this little talk,

20   do you know the answer to his question?

21             THE WITNESS:  No.

22             THE COURT:  No.

23             MR. BRILL:  Okay.  Easy enough.

24   BY MR. BRILL:

25   Q.   What type of records does the Department of Labor keep with

D1g1cib5                          McGovern - cross

1    regard to that database check that they do?

2    A.  I don't know that I understand your question.

3    Q.  All right.  So on every file, on every application, it is

4    the practice of the Department of Labor to check the EIN of the

5    employer against this Experian database; right?

6    A.  Yes.

7    Q.  Is there any indication specifically on this one exhibit,

8    101-2, that that in fact was done?

9    A.  I don't know.

10   Q.  Is there any record kept by the Department of Labor in a

11   file, whether it's attached to this application or somewhere

12   else, to show that that's done for each application.  Well,

13   let's say specifically for this application, just to make it

14   simple.

15   A.  I don't know.

16   Q.  Based upon your experience, have you ever seen a record

17   that the Experian database was checked?

18   A.  No.

19   Q.  And you said these are contract employees who are doing

20   these initial screenings; correct?

21   A.  That's correct, they're contractor.  We have certain

22   administrative staff that are contracted to the Department of

23   Labor.

24   Q.  So it's not -- they're hired by an outside vendor as

25   opposed to hired directly by the government.

D1g1cib5                    McGovern - cross

1   A.  The federal government, yes.  They do the initial

2   screening, the phone calls are made by contract staff but then

3   are followed -- then are confirmed with federal staff.

4   Q.  Confirmed only if there are issues, though.

5   A.  Yes.

6   Q.  So the initial screening is done by nongovernment

7   employees, and that may be the only screening there is.

8   A.  That's correct.

9   Q.  Are you aware of or have you personally experienced the

10  training that is given to these contract employees in dealing

11  with these initial screening of the applications?

12  A.  No.

13  Q.  And is it the private contractor who maintains whatever

14  records are created in that first instance --

15  A.  No.

16  Q.  -- or the federal government?

17  A.  No, it's the federal government.  Those were our case notes

18  that we were looking at earlier.

19  Q.  So the absence of a record of the database check would

20  indicate that that was not in fact -- those records are not

21  actually kept by the government; right?  Do you follow me?

22  A.  I think so.  I --

23  Q.  So if the government maintains the records of the

24  application checks -- right?

25  A.  Yes.

D1g1cib5                              McGovern - cross

1    Q.  -- and there is no record of its database check in that

2    record, that would indicate that the government doesn't keep

3    those records; correct?  That doesn't mean they don't check the

4    database.  We don't know if they checked the database in this

5    case or not.  But that's at least an indication they didn't

6    keep a record of the check.

7    A.  I don't know where the record is kept.

8              MS. ECHENBERG:  Objection.

9    Q.  You don't know where it's kept or whether it's kept?

10   A.  I don't know where it is kept.

11   Q.  Okay.  Do you know if it is kept?

12   A.  You're talking about the check against the Experian

13   database.

14   Q.  Right.

15   A.  I believe that it's kept, but I couldn't point to you in a

16   case and say, oh, that's the check.

17   Q.  Okay.  And again, I'm sorry to beat a dead horse here, but

18   have you ever seen a note in any case note that says, "Checked

19   with the Experian database"?

20             THE COURT:  You want to know if there's a record of

21   whether it was done?

22             MR. BRILL:  Correct.

23   A.  It may be simply called by a different name, but I'm not --

24   I don't have knowledge whether that in fact --

25   Q.  You know what I mean.  I'm not saying do they have to say

D1g1cib5                          McGovern - cross

1    that they say specifically checked the Experian database.  Have

2    you seen a note that indicates that that database was checked?

3              THE COURT:  Or that the employer identification number

4    was checked.

5              MR. BRILL:  Right.  Thank you.

6    A.  We do.  It's called ICDAS.  I have no idea what ICDAS

7    stands for.  But that's the initial check of the FEIN.  So

8    you'll -- you'll see it in the case events log, or if I would

9    go into my account, I could see it in the case events log, over

10   and over and over again, that this has been performed.

11   Q.  Now as part of your preparation here before testifying,

12   were you asked to review the case notes for each and every one

13   of the applications that you have in front of you?

14   A.  No.

15   Q.  So when you were preparing, the government picked certain

16   case notes to review with you.

17   A.  Yes.

18   Q.  Did you see -- if you didn't review them, did you see a

19   collection of those case notes somewhere that you could have

20   looked at while you were preparing?

21   A.  No.

22   Q.  Are those case notes kept in perpetuity by the Department

23   of Labor?

24   A.  I don't know.

25             THE COURT:  Perpetuity is a long time.

D1g1cib5                        McGovern - cross

1   A.  Yeah, perpetuity is an awfully long time.

2   Q.  Let's say if this application was submitted in whatever

3   date it was submitted, 2006, 2008, whatever it was, would they

4   have been maintained up to the present day?

5   A.  All of the records in the permanent employment program from

6   March of 2005 are still preserved by the Department of Labor at

7   this time.

8   Q.  Okay.  So after the EIN is checked and there doesn't appear

9   to be a problem with that, the first contact with the employer

10  is by e-mail; right?

11  A.  That's correct.

12          MR. BRILL:  And if we could put that back up on the

13  screen, I'd appreciate it.  101-2, the first page of the

14  application.

15  Q.  You used the e-mail address that is --

16          MR. BRILL:  At the bottom, please.

17  Q.  You use the e-mail address here that's listed by the

18  applicant; correct?

19  A.  That's correct.

20  Q.  And there's no way to know who is registered to that e-mail

21  address other than, as you say, through a log of the IP?

22  A.  The IP.

23  Q.  You don't know who creates this e-mail address; right?

24  A.  No.

25  Q.  You don't know who has access to this e-mail address;

D1g1cib5                        McGovern - cross

1    right?

2    A.  No.

3    Q.  What you may be able to find out is who created -- what

4    computer was used to fill out this application so that you

5    could track it back using the IP address of that computer;

6    right?

7    A.  Correct.

8    Q.  Is there a record -- I'm going around too many circles.  Is

9    there a record that is kept of the IP address for these

10   applications?

11   A.  I don't know.

12   Q.  You haven't seen it in preparing for your testimony.

13   A.  Correct.

14           THE COURT:  Mr. Brill, it's 2:15.

15           MR. BRILL:  I can stop here.

16           THE COURT:  Okay.  All right.  I think we've had

17   enough for one day.

18           Just remember the rules.  Don't talk about the case,

19   keep an open mind, and --

20           MS. ECHENBERG:  May I just ask one thing, your Honor.

21   Just because this witness has traveled from Washington, DC, I

22   don't know how -- there may be a significant amount more of

23   cross-examination.  If that's the case, then probably makes

24   sense --

25           MR. GREENFIELD:  I'm sorry?

D1g1cib5

```
 1              MS. ECHENBERG:  -- to break, but if there's not very
 2    much more --
 3              MR. BRILL:  I imagine that I am less than a quarter of
 4    the way through.
 5              MS. ECHENBERG:  Okay.
 6              THE COURT:  Okay.  The witness can enjoy an evening in
 7    the Big Apple.  Not too much enjoyment, though.  You have to
 8    come back.
 9              All right.  So remember, tomorrow, try really hard to
10    be here early so we can get started on time.  Have a nice
11    night.
12              THE JURORS:  Thank you.
13              (Jury excused)
14              (Continued on next page)
15
16
17
18
19
20
21
22
23
24
25
```

D1g1cib5

1          (In open court; jury not present)

2          MR. BRILL:  Your Honor, I don't know what the court's

3     position is on the prosecution speaking with the witness

4     between today and tomorrow.

5          THE COURT:  I just reminded the witness that she

6     shouldn't do that.

7          MR. BRILL:  Oh.  Well, I'm way back here.

8          THE COURT:  That's okay.  I didn't say it that loud.

9          I know Brett mentioned to me some concern about Friday

10    afternoon.  I used some of my time on the bench to find out

11    that travel time between here and Spring Valley and here and

12    Monsey, according to Google Maps, is about an hour or under,

13    and candle lighting, according to the Chabad website, is at

14    4:36, so I don't think we have any problem getting our

15    defendants back home.

16         Did the government give any more thought to the mail

17    fraud issue?

18         MS. ECHENBERG:  We have, your Honor.  We would like to

19    speak with our supervisors about that, and we have not had an

20    opportunity to do that.

21         THE COURT:  Okay.  All right.  Anything else?

22         MR. PASTORE:  Your Honor, there is one issue with a

23    witness that we anticipate for calling tomorrow.

24         THE COURT:  Okay.  Why don't we let this witness go on

25    out and make sure she has a room, and have a nice night.

D1g1cib5

| | |
|---|---|
| 1 | THE WITNESS:  Thank you. |
| 2 | (Witness excused) |
| 3 | THE COURT:  Everybody can sit down.  Unless you want |
| 4 | to stand, if you've had enough sitting.  I can understand that. |
| 5 | MR. PASTORE:  Your Honor, the issue relates with |
| 6 | respect to Mr. Altintas.  He's been provided a nonprosecution |
| 7 | agreement, and in the course of meeting with the government, he |
| 8 | identified for us that in the early '90s, when he was first |
| 9 | smuggled into the United States, he purchased a Social Security |
| 10 | number, and he used that Social Security number in an attempt |
| 11 | to get a driver's license.  The Department of Motor Vehicles |
| 12 | essentially caught that conduct and fined him $50.  We think |
| 13 | it's essentially consistent with your Honor's prior ruling with |
| 14 | respect to Mr. Grynsztajn.  As you may remember, he had a |
| 15 | similar issue.  And so given the age of the behavior, given |
| 16 | that there is no formal criminal conviction when we looked on |
| 17 | his rap sheet, we would ask that cross-examination on this |
| 18 | issue be precluded, essentially for the reasons that we set out |
| 19 | when seeking to preclude cross-examination of a virtually |
| 20 | identical issue for Mr. Grynsztajn.  It was in the early '90s. |
| 21 | He was smuggled into the United States 19 years ago by ship. |
| 22 | THE COURT:  How old a fellow is he, or how old was he |
| 23 | then?  If you do the math.  We need one piece of information. |
| 24 | MR. PASTORE:  Right.  I'm trying to do the math.  He |
| 25 | is I believe 49 years old now and he was smuggled 19 years ago |

D1g1cib5

so 20?  49 minus 19 is 20?  This is why I'm an attorney.

THE COURT:  That was the joke I was about to use.

MR. PASTORE:  30.  30.

MR. DONALDSON:  Your Honor, Mr. Pastore brought that up to me last week, I believe.  Am I right?

MR. PASTORE:  Yeah.

MR. DONALDSON:  Last week.  I informed him that I would, of course, ask the court to allow me to get into that briefly.  I believe it goes towards his credibility, his truthfulness.  It's relates to some prior conduct.

THE COURT:  He's going to admit to a lot of other conduct, I'm sure.

MR. DONALDSON:  I'm hoping so.  I don't know if he is, but I know the other witness is, but --

MR. PASTORE:  Mr. Altintas is going to admit that he knew that the sponsor who was provided to him by Ms. Cibik was fraudulent, that she previously offered a fraudulent sponsor to his wife, and that he went forward with the application.

MR. BRILL:  The fine of $50 ultimately is irrelevant.  The question is, the conduct could be felonious.  I'm glad for him he only had to pay 50 bucks, but he could have been charged with a felony, and the conduct itself in New York State would have led to a felony conviction if they had chosen to prosecute him.

THE COURT:  Well, in the other ruling I did consider

D1g1cib5

what the criminal consequences were.  Here, it's even less than

the earlier criminal consequences, which I didn't permit cross

on that.  I'll be consistent.  I don't know whether it's

incorrectly consistent, but it's consistent.

MR. DONALDSON:  Your consistency is that we're

precluded from asking?

THE COURT:  Yes.

MR. DONALDSON:  Okay.  Thank you.

THE COURT:  I didn't answer in the morning, but I just

want to make sure, I reread the transcript from yesterday, and

I just want to be sure that I have the philandering information

right.  The original discussion was that there was an affair

between Mr. Schwartz and Mr. Salamon's wife.  That's what he

said.  This is an off-the-table topic.  You're not interested

in raising it.

MR. BRILL:  It's off the table for me, Judge, but what

other counsel want to do with it, I can't control, unless the

court is making a ruling.

MR. GERZOG:  I have no interest in that particular

piece of information.  I do want to speak to you about other

things that Salamon may or may not have done.

THE COURT:  Is anybody pressing that specific --

MR. GREENFIELD:  I didn't know about that until

Tuesday morning, so --

MR. DONALDSON:  Neither did I.

D1g1cib5

1          THE COURT:  Well, I think it was because you weren't

2     at the conference where it was discussed.  It was on the

3     record.  No one hid it.

4          MR. BRILL:  I believe it was when Mr. Schwartz was

5     arraigned.

6          THE COURT:  First, let's just clarify.  Is anybody

7     seeking for any reason to get into those allegations of the

8     affair?  In which case, you would need some basis for it other

9     than, you know, the conversation on the record.

10          MR. BRILL:  It's kind of against the grain, but it

11     would be our position that there is no good faith basis to ask

12     about it.  Mr. Schwartz denies it ever happened.

13          THE COURT:  So I think that for anybody else as to

14     that, there has to be some basis, and I don't think I've heard

15     a basis.

16          MS. ECHENBERG:  Well, the government may want to get

17     into it to the extent that Mr. Greenfield is going to argue

18     that Mr. Salamon was a philanderer because Mr. Salamon will say

19     that at a certain point, after his wife had cheated on him,

20     he -- the marriage was over and the marriage ultimately ended

21     in divorce, and I think once we go down that road, we're

22     getting into all sorts of things that are completely unrelated

23     to this trial and there's just going to be a complete

24     distraction to the jury.

25          MR. GREENFIELD:  What I had in mind, Judge, was a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D1g1cib5

1    posting on sugardaddyforme.com, where Mr. Salamon is trolling

2    for young women looking for sugar daddies, and he alleged -- he

3    claimed in that posting that he's a successful attorney making

4    a half million dollars a year.  So I mean, I didn't -- if he

5    put it on Facebook, I would use Facebook.  He put it on

6    sugardaddyforme.com.  I don't think I ought to be prevented

7    from pointing out to him or asking him where did he put it and

8    what did he say in there.

9              MS. ECHENBERG:  And your Honor, the government intends

10    to ask Mr. Salamon if he's ever posed as an attorney, and I

11    expect his answer will be yes, to meet women, he pretended he

12    was an attorney to impress them, so we would certainly get into

13    that, but to the extent that we need to get into this sexual

14    activity that he's engaging in or put any of these postings in

15    or get into the fact that he's a liar because he's a

16    philanderer, I think that goes off in a --

17              THE COURT:  Isn't the defense theory relatively

18    simple:  If you're prepared to break one of the Ten

19    Commandments, you have willingness to break one of the others?

20              MR. GERZOG:  That's reasonable.

21              MR. GREENFIELD:  That's reasonable.

22              MR. GERZOG:  But if you're a Hasidic Jew and you don't

23    follow the laws of the state or of god, you're really not a

24    reliable person.

25              MS. ECHENBERG:  And your Honor, if that's the argument

D1g1cib5

that's going to be made, then I think Mr. Salamon will be

forced to explain why he lost touch with Mr. Schwartz, as was

discussed in the opening.  He lost touch with him because

Mr. Schwartz had an affair with his wife, and that was part of

the unraveling of his marriage.  And so --

THE COURT:  It's getting better by the minute.

MS. ECHENBERG:  So we can certainly get into all that,

but I think that is a tremendous distraction, and there is a

large volume of material to cross-examine Mr. Salamon about,

the fact that he's been untruthful in many ways, and I don't

think we need to get -- Mr. Greenfield said yesterday he wants

to talk about the piousness of Orthodox Jews and --

MR. GREENFIELD:  I never said that.

MS. ECHENBERG:  -- and if we're going to get into

that, I think it's important that the jury know that there's an

allegation that Mr. Schwartz has broken his vows as well and is

a liar in that sense as well.

So I think it cuts both ways.  Either we're going to

get into the sexual life of all of the defendants and the

cooperators or we're not.  And our preference would be that we

not because we think that's a tremendous distraction and it's

not probative of anything, and there is plenty to cover here

with these witnesses about their truthfulness.

MR. GERZOG:  Let me mention this, your Honor.

Mr. Grynsztajn, who I expect will testify tomorrow, in his 3500

D1g1cib5

1  material he definitively says that Mr. Salamon brought

2  prostitutes and controlled substances to the office and used

3  them both there.  Mr. Salamon, on the other hand, completely

4  denies that.  The fact that the government's two main witnesses

5  are in total conflict as to an important issue surrounding

6  credibility is I think invaluable to me as far as telling the

7  jury, how can you believe, you know -- the government is

8  putting these people on the stand who are saying different

9  things about, you know -- one of them is lying.  I don't know

10  which one is.  I wasn't there.  But one of them is lying.  And

11  I think I need -- I have an absolute right to be able to tell

12  the jury that the government's own witnesses -- *ipso facto*, one

13  of them is lying about that.

14       MS. ECHENBERG:  Your Honor, Mr. Salamon does not deny

15  that in its entirety, and that was briefed in our papers, and

16  as is reflected in the 3500 materials --

17       MR. GERZOG:  It's reflected in the 3500 materials that

18  he got massages with some sexual aspect to it, and believe me,

19  I don't want to get into, "I did this action with this woman."

20  I mean, I have no interest in that, but --

21       MS. ECHENBERG:  I think we would have to get into that

22  if you want them tarred -- what Mr. Grynsztajn says and what

23  Mr. Salamon says, because if you break it down, they're not

24  really in conflict.  Mr. Salamon admits to certain

25  inappropriate activity in the office.  He does.

D1g1cib5

1          MR. BRILL:  As I raised, Judge, then I would have to

2     subpoena Mr. Salamon's ex-wife to refute these allegations.

3          THE COURT:  Mr. Donaldson?

4          MS. ECHENBERG:  Yeah.  I mean, my colleague just

5     reminded me, Mr. Gerzog joined this case late, after we

6     submitted our motions and we briefed them.  All of the conduct

7     that Mr. -- that Witness 2, as he was referred to in the

8     briefing, admitted to is in the brief.  It was disclosed to

9     counsel in that way as well as in the 3500, but in much more

10    detail in that briefing, which was I think a month ago.  So

11    there's no question that this has been disclosed and that

12    Mr. Salamon has admitted to certain of his conduct, and that's

13    why we made this motion to exclude it.

14         MR. GERZOG:  The fact of the matter is, Judge, that

15    Grynsztajn and Salamon hate each other, and I intend to exploit

16    that to the maximum possible degree, and this is one of those

17    areas where they -- where Grynsztajn insists that Salamon is a

18    horrible, despicable, disgusting person who did this stuff, and

19    I think Salamon is going to say, "I'm not nearly so horrible as

20    that."  He may say, "I've done some wrong things," but I don't

21    think he has -- I don't think he's going to admit to anything

22    nearly as bad as Mr. Grynsztajn says, and I'm going to -- I

23    intend to exploit everything I can find, every point of

24    disagreement.  Grynsztajn and Salamon are constantly on each

25    other's back.  "You cheated me."  "No, you cheated me."  "No,

D1g1cib5

1    you're a liar."  "No, you're a thief."  You know, and I'm

2    entitled to show the jury that the government's two main

3    witnesses, really the only evidence they have against my

4    client, are in conflict on very many issues.

5              THE COURT:  Mr. Donaldson?

6              MR. DONALDSON:  Thank you.  Otherwise we would really

7    enjoy hearing all of that stuff, but just for my client's

8    position, I think in my papers I spoke about the prostitution

9    issues, and I maintain that position.  With regard to my

10   colleague's position regarding the -- what's it called?

11             MR. GREENFIELD:  Sugardaddyforme.com.

12             MR. DONALDSON:  Sugardaddyforme.com.  Our position is,

13   if Mr. Salamon is not an attorney, and he's not, and he placed

14   out in the public eye that he is an attorney, then that should

15   be brought out.  Now what the government wants to do, I guess,

16   is to allow that part out because they're going to say it but

17   then separate where it comes from, or the actual place where it

18   comes from, so I would make a suggestion that I don't see

19   why -- if that's where it comes from, that's where it comes

20   from.  I don't know if we have to get into the details about it

21   or what sugar daddy is, about where it is located, where that

22   inconsistency is located, from the government.

23             (Continued on next page)

24

25

D1GLCIB6

1          MR. GREENFIELD:  Not only is that where it comes from.

2     That's where it is as of two days ago.

3          MR. DONALDSON:  That's where it is as of two days ago.

4          MR. GREENFIELD:  He's still got it up on the internet.

5          MR. DONALDSON:  Then it really clearly still is that's

6     just relevant.

7          Now, the part about the inconsistency between

8     Mr. Grynsztajn says Mr. Salamon did one thing -- I read the

9     3500 material four times, unfortunately for me.

10         THE COURT:  Probably going to be blocked.  No, it's

11    not blocked.

12         MR. DONALDSON:  Can I see it too?

13         THE COURT:  Yeah, sure.

14         MR. DONALDSON:  Are you looking at it?

15         THE COURT:  So we have I am a sugar daddy or I'm

16    seeking a sugar daddy.

17         MR. DONALDSON:  This is great.

18         MR. GERZOG:  Your Honor, Page 6's ears are burning.

19         THE COURT:  So you --

20         MR. DONALDSON:  If it's still up there now, Judge, I

21    thought I read someplace in the 3500 material where, well, one

22    of the government witnesses, Earl David, and not the witness

23    but Earl David and someone else got mad at Mr. Salamon because

24    he put up that he was a lawyer on the website and they said to

25    take it down right away, etc.  He said he did.  Well, if it's

D1GLCIB6

1    still up there, then it means that's a lie on top of a lie.  He

2    told them he took it down.  It's still up there, I think that

3    makes it even more relevant.  That means he's still holding

4    himself out as an attorney or at least that maybe he forgot to

5    take it down.  I don't know.  But that, in my opinion,

6    shouldn't be allowed, maybe in a very limited way, but that

7    should come out.

8           I would stand by my position in my briefing about the

9    prostitution issue.  I think it should come in as a crime.  He

10   did it several times obviously.

11          THE COURT:  I'm not sure how you search it.

12          MS. ECHENBERG:  And, your Honor, I'm not sure, if it

13   even exists, when it was last accessed.

14          MR. GREENFIELD:  My client printed it out for me two

15   days ago.

16          MS. ECHENBERG:  I'm saying if it was up there at some

17   point, things can remain up and people don't know they're up.

18          THE COURT:  I don't know that matters.  I don't think

19   that's the issue.

20          MS. ECHENBERG:  And like I said, Mr. Salamon will

21   admit that he has posed as a lawyer to meet women.

22          MR. PASTORE:  Judge, there's just one factual

23   inconsistency in the record as it relates to Mr. Grynsztajn.  I

24   apologize for jumping in.

25          Mr. Grynsztajn did not say it was on sugardaddy.com.

D1GLCIB6

1   He was on the Earl David law firm website.  So it didn't have

2   to do with sugardaddy.com.

3          And so the point that I think is significant is really

4   a salacious detail that's unnecessary to the fundamental point.

5   And what Mr. Gerzog says he's hoping to exploit, sort of the

6   hatred or dislike between these two defendants, that has

7   nothing to do with their credibility.

8          THE COURT:  If someone hates somebody else, isn't that

9   a motive to lie about them?

10         MR. PASTORE:  With respect to Mr. Salamon and

11  Mr. Grynsztajn, I don't see how that would be relevant.  In

12  other words, it doesn't go to the credibility of what they're

13  saying about these defendants.

14         MR. GERZOG:  I expect Salamon will say you can't

15  believe a word Grynsztajn says.  I believe Grynsztajn will say

16  you can't believe a world Salamon says.  And if they don't say

17  that, I have the 3500 material to suggest that it's a very

18  recent change of heart on their part, which is also would be

19  quite interesting.

20         So I am entitled to show the jury that Grynsztajn, who

21  has been sponsored by the government as a truth teller, says

22  that Salamon is a total liar.  And Salamon, who is being

23  sponsored by the government as a truth teller, says Grynsztajn

24  is a total liar.

25         MS. ECHENBERG:  I would love to see this 3500 because

D1GLCIB6

1    I'm not familiar with either of them --

2            MR. GERZOG:  Quote/unquote total liar, no.  But in

3    substance, yes.

4            MS. ECHENBERG:  They certainly had disputes over money

5    and the jury will learn that everyone at this law firm was

6    cheating everybody out of everything.  So, yes, they certainly

7    will say that they cheated each other, they cheated other

8    people.  That will all be out in the open and there will be I'm

9    sure substantial cross about that.

10           THE COURT:  So the one thing you want to protect him

11   from is that the posted himself on the sugar daddy website.

12           MR. BRILL:  Judge, one thing I want to protect

13   Mr. Schwartz from is the public embarrassment, which we did it

14   once in court privately with a few people.  Now we're doing it

15   in court with a bunch more people.  Now, he's -- you can't

16   tell.

17           THE COURT:  Let me ask you this.  Even why is it

18   necessary to deal with allegations of a specific affair when

19   the point could be made from the sugar daddy website alone?

20           MR. GREENFIELD:  That was my point.  I didn't even

21   have the affair in mind.  I didn't know about it when I said --

22   it just seems so basic to me.  The guy's got an ad out on sugar

23   daddy, whatever it is, and where he says he's a lawyer and it's

24   still running now and it was running three years ago.

25           And I mean I appreciate the government saying we're

D1GLCIB6

1    going to ask him did you ever say you were a lawyer.  He said

2    he was a lawyer a million times for a million people.  He held

3    himself out as a lawyer to the world and a successful lawyer.

4    I shouldn't be precluded from that.  I can't imagine the

5    connection.  I say didn't you run an ad an sugardaddy.com and

6    it's still running?  And he'll say I only did that because

7    Mr. Schwartz had an affair with my wife.  I don't see that.

8         THE COURT:  I don't see why that gives you like some

9    moral excuse anyway.  In other words, the behavior is the

10   behavior but, you know.

11        MR. GERZOG:  The fact he was cuckolded doesn't mean he

12   has an excuse to run rampant, roughshod, and call himself a

13   lawyer and philander around.  He either did or didn't have the

14   affair, but that doesn't excuse the rest of his behavior.

15        THE COURT:  So are you on the same page that I was

16   suggesting that you can bring out his posting without getting

17   into the specific affair because --

18        MR. GERZOG:  The government just has to instruct him

19   not to say, yes, I did post on sugardaddy.com, but the reason I

20   did it was because I was cuckolded by Mr. Schwartz.

21        MS. ECHENBERG:  Your Honor, we've gone on sort of

22   three different tracks here so let's just focus on what people

23   are asking to come in and not come in.

24        Yesterday Mr. Tischler, excuse me, Mr. Greenfield was

25   marking the argument that he wanted to argue that Mr. Salamon

D1GLCIB6

1    was a liar because he had had affairs, he had cheated on his

2    wife.  That's what he argued yesterday.

3            Now the argument is a little bit different.  The

4    argument is about whether he's ever posed as an attorney, and

5    we have no problem with that coming in.  That should absolutely

6    come in and absolutely goes to his credibility.  But if he's

7    going to be questioned --

8            THE COURT:  I think he just called him a philanderer.

9            MS. ECHENBERG:  And if he's going to be accused of

10   being a philanderer, I think his response and his appropriate

11   response is going to be --

12           THE COURT:  Someone else did it first.

13           MS. ECHENBERG:  That his marriage had ended for all

14   intents and purposes.

15           THE COURT:  Not --

16           MR. BRILL:  He didn't get divorced for another ten

17   years after this alleged affair.

18           MS. ECHENBERG:  Right.  But the conduct that

19   Mr. Greenfield was talking about was post in the mid-2000s,

20   which is around when he got divorced, when he was in the

21   process of getting divorced.

22           THE COURT:  As a Jewish male in a religious community,

23   he has a remedy.  He can get a Jewish divorce even if it's a

24   legal -- the civil stuff takes longer.  I guess maybe that's

25   just my own sense of morality, but I don't see why.

D1GLCIB6

          MS. ECHENBERG:  Your Honor, can I say one thing.  I think the fact we're talking about morality, if we're going to get into the jury about faithfulness to spouses, I just don't think that's an area that's appropriate to be getting into.

          THE COURT:  Is it true or not -- wait a second.  When he posted on the sugar daddy website, was he married or was he divorced?

          MS. ECHENBERG:  I don't think that's right, but I haven't seen the particular post they're talking about.

          I think this has a tendency to inflame the jury in a way that is extremely prejudicial and not as probative as counsel are arguing it is, especially since there is tremendous grounds for cross-examination here.

          MR. GERZOG:  Judge, this is 2013.  No one wants to get into the salacious specific details of what they did.  No one is 2013 is shocked that people have adulterous affairs.  It's just not that salacious these days.  It goes to your credibility.  It goes to whether you're an honorable person, but it's not all that salacious.  It's not like you're having some wild and kinky thing that nobody else does or that everyone thinks is bizarre.  People have affairs all the time.

          THE COURT:  But doesn't it matter whether he's married at the time?  If he's not married, there's a whole host of activity that is, you know, more acceptable than if you are married.

D1GLCIB6

1          MR. GERZOG:  Certainly when he was bringing the

2     prostitutes and the cocaine to the office he was married.

3          MS. ECHENBERG:  First of all, there was never any

4     cocaine in the office.  Second of all, there weren't

5     prostitutes.

6          MR. GERZOG:  That's not what Mr. Grynsztajn says.

7          MS. ECHENBERG:  That's not what Mr. Grynsztajn says.

8          MR. GERZOG:  If I ask Mr. Grynsztajn and I have it

9     stuck up my nose and he says I never said that, then I look

10    like a fool.

11         MS. ECHENBERG:  I think putting that out in front of

12    the jury is inflammatory when there's no basis to ask that

13    question.

14         MR. GREENFIELD:  What are we talking about?  It's a

15    fact that he went on a website, public website called

16    sugardaddyforme.com, and alleged that he was a lawyer.

17         MS. ECHENBERG:  Right, and I have no problem with the

18    fact that he went on a website to meet women and claimed to be

19    a lawyer.  That should absolutely be asked about.  We are not

20    arguing about that.

21         To get into the fact of it sugardaddy.com and to delve

22    whether there was massages and this is the stuff we're talking

23    about and this is where we're going to go if we go down this

24    road.

25         THE COURT:  I guess we have three topics.  Just I know

D1GLCIB6

1    so I can give you rulings.

2         We have can there be a reference at all to the sugar

3    daddy website or does that have to be sanitized.  Then there's

4    the issue of whether Mr. Salamon will be gagged about his

5    excuse for his activity.

6         MR. BRILL:  Judge, if I could put one minor point.  In

7    all of the 3500 material, he never says, at least it's Janis's

8    lovely handwriting, there's never an affair.  It just says

9    kissing, kissing, kissing all over the place.  So I don't know

10   if there is a separate conversation the government has had with

11   him about an affair, but I just needed to make that clear.

12        MS. ECHENBERG:  Your Honor, there's references in the

13   notes to his wife and Mr. Schwartz going to hotels and

14   traveling together.  And then there's another reference to

15   Mr. Schwartz coming to his wife with a knife to his throat and

16   saying I'm going to commit suicide if you don't marry me in the

17   3500.

18        THE COURT:  Mr. Schwartz?  It says in the 3500

19   material that Mr. Schwartz approached Mr. Salamon's wife and

20   said if you don't marry me, I'm going to kill myself?

21        MS. ECHENBERG:  Yes.

22        MR. BRILL:  Mr. Salamon says.

23        MR. GERZOG:  And Mr. Salamon apparently says,

24   according to the 3500 material you gave today, that Mr. Cohen's

25   wife propositioned him.

D1GLCIB6

1          THE COURT:  Whose wife?

2          MR. GERZOG:  Mr. Cohen.  Isn't there in the 3500?

3          MS. ECHENBERG:  Several days ago there was a reference

4     to Schwartz's wife propositioning Mr. Salamon.

5          MR. GERZOG:  That's what I mean.

6          MS. ECHENBERG:  I'm telling you this is quite a mess.

7     And so what concerned me yesterday was this idea that there's

8     going to be arguments about morality and piousness.  And

9     Mr. Brill himself told me when we were talking, he referred to

10    his client and Mr. Salamon as hippie Hasids.  This is not --

11    we're going to get into morality, we can go there, but I think

12    it's going to be ugly and distracting and it's not what this

13    case is about.

14         MR. DONALDSON:  Not for my client.  Won't be ugly at

15    all for us.

16         MR. BRILL:  I'm copywriting that term.

17         MR. GERZOG:  And for my client, it goes directly.  The

18    only evidence they have essentially against my client is the

19    testimony of these two guys.  And the testimony of these two

20    guys is going to be that each of the other is a liar and a

21    cheat and can't be trusted.  And I believe I'm completely

22    entitled to get that out, that their own two witnesses don't

23    trust, will tell the jury that you can't rely on a word of the

24    other.

25         MR. PASTORE:  Your Honor, just for the record, in

D1GLCIB6

terms of the evidence against Mr. Brodjik, and I only state

this very briefly, the two witnesses are not going to be the

only evidence.  Some of the most devastating evidence is

Mr. Brodjik's own emails to Earl David describing in detail his

role in the fraud as well as emails between him and other

coconspirators in which he's complaining they were cutting him

out and not paying.

           MR. GERZOG:  Your Honor --

           THE COURT:  As I recall.

           MR. GERZOG:  I had mentioned earlier that we have to

discuss that.  We don't believe any of that comes in.  We

believe none of that is admissible evidence.

           THE COURT:  Why not?

           MR. GERZOG:  Because no way to authenticate it.

           THE COURT:  I sort of do recall other cases that it's

not really a proper question to ask a witness do you think this

other witness is a liar, that that is ultimately the role of

the jury to decide who's telling the truth and not to have

witnesses opining on the credibility of other witnesses.  So

I'm not sure, Mr. Gerzog.

           MR. GUTMAN:  Your Honor, actually Rule 608 of the

Federal Rules of Evidence specifically says the credibility of

a witness may be attacked or supported by evidence in the form

of opinion or reputation relating to character for

truthfulness.

D1GLCIB6

1          THE COURT:  But doesn't that involve character

2   witnesses?

3          MR. GERZOG:  Normally think of that as people coming

4   in to say he's a good guy, but the rule also says you can say

5   he's a bad guy.

6          MR. GUTMAN:  It's character of a witness, Rule 608.

7          THE COURT:  All right.  I'm not sure that's responsive

8   to what I said, but I'll look that up too.

9          MR. DONALDSON:  I don't want to steal Mr. Gerzog's

10  thunder here, but I agree from reading both persons' 3500

11  material that there clearly was some history between the two

12  that would call into question the other person's credibility.

13  So I think not to tell him what I was going to do, but the way

14  I thought the proper way to do that, I think you can do it

15  through argument.  I've never seen one witness opining about

16  the other, but I have seen and have done a development of one

17  witness saying what happened between him and the other witness

18  and the other witness saying what happened between him and the

19  other witness and then arguing that they both have X,Y Z.

20         MR. GERZOG:  I wasn't suggesting to have the witness

21  say what is your opinion of Mr. Salamon's credibility.  I was

22  going to do it by saying when you were dealing with

23  Mr. Salamon, was he honest with you, did he lie to you, did he

24  steal from you.  And I expect Mr. Grynsztajn to say he was

25  dishonest to me, he lied to me, he stole from me.  But

D1GLCIB6

1    Mr. Gutman's point is a good one that apparently I have more

2    leeway than I thought I did.

3            THE COURT:  We'll find out.

4            MS. ECHENBERG:  The government has no issue and could

5    have no issue with that line of questioning.  It's when he

6    crosses into allegations of prostitutes and cocaine, which

7    first of all the cocaine is unsubstantiated.  I don't think

8    there's any basis for that.

9            THE COURT:  Wasn't the reason that someone wanted to

10   get into the activity at the law firm not just for the

11   salacious interest in it, but wasn't that supposed to be an

12   explanation for why they had to leave one office space and go

13   to another and one defendant was going to claim that that's why

14   he was the person that had to sign a new lease?  It wasn't in

15   the abstract.  In the abstract, I really don't care.

16           MR. GREENFIELD:  That was me, Judge.  At the time I

17   was under the impression that it was that it was Maiden Lane,

18   which my client I think the government concedes had nothing to

19   do with.  That's the third office.

20           THE COURT:  Okay.

21           MR. GREENFIELD:  So if that's accurate, then I thought

22   that was what -- I thought I was confused when I raised it.  It

23   was brought out that I was thinking of something else and if

24   that's the case --

25           THE COURT:  That activity has no substantive.

D1GLCIB6

1          MR. GERZOG:  No, Judge, may I?  In fact, after

2     Mr. David goes to Canada, what you're left with is Mr. Salamon

3     and Mr. Grynsztajn in I don't remember which office and they

4     can't -- and they split up.  They can't work together.  I don't

5     remember if it's Salamon quote/unquote fires Grynsztajn or

6     exactly how.  Refresh my recollection tonight as I go over the

7     3500 material, but it was the cause of a blowup.  The blowup

8     was coming and coming and coming it was coming to a boil.  You

9     can see it all through the 3500 and then it blows up entirely.

10          MS. ECHENBERG:  Your Honor, I can clarify this.

11          THE COURT:  Sure.

12          MS. ECHENBERG:  Earl David leaves in 2004, 2005.  The

13     firm remains at 110 Wall Street until about 2006 when their

14     lease is up.  The lease is in the name of Michael David, Earl

15     David's brother.  So they need to find a new space.  At around

16     that time in 2006, David Grynsztajn is approached by the United

17     States government in connection with this investigation.  So in

18     part he wants nothing to do with this because he's now been

19     approached by the government.  There is a dispute between

20     Salamon and Grynsztajn at that time, and that will certainly

21     come out and there can be tremendous questioning about that.

22          But I don't think there's any basis to believe that

23     they split up at that time because they cannot stand each

24     other, they cannot work together anymore.  They certainly have

25     had disputes, but it is in large part because Mr. Grynsztajn is

D1GLCIB6

1    now being investigated.

2            MR. GERZOG:  In fact, your Honor, we just got again

3    3500 material a day or two ago that shows Mr. Grynsztajn went

4    right back into business even after he had taken a guilty plea

5    and signed cooperation agreement and that on Monday, the day

6    before trial, the government had him plead guilty to another

7    count to punish him for the fact that he broke the first

8    cooperation agreement and didn't just rip up the agreement but

9    said, you know, come ahead, it's okay.

10           THE COURT:  But that doesn't, none of that really goes

11   to whether they were prostitutes or just getting massages or

12   something else and that doesn't seem to have any real substance

13   in the case.

14           So we're down to, if I'm right, the sugar daddy, the

15   alleged affair, and this office activities.  I'll give you

16   either rulings this afternoon by letter or first thing in the

17   morning.

18           MR. BRILL:  I think as to the sugar daddy, it's

19   whether they can mention the name of the website or whether

20   they we can ask at all about it.

21           THE COURT:  Well.

22           MR. DONALDSON:  I thought the government conceded we

23   could ask, I think they tried to sanitize and say they didn't

24   mind if we asked about him putting up as a lawyer on a website

25   related to -- I think her words were related to meeting women.

D1GLCIB6

```
 1        So they said they don't mind.

 2                THE COURT:  Does the name bother you?

 3                MS. ECHENBERG:  Look.

 4                THE COURT:  Particularly?

 5                MR. GREENFIELD:  It could be online candy store.

 6                MS. ECHENBERG:  It's salacious.  It's a distraction.

 7        They're going to wonder what sugar daddy is.

 8                THE COURT:  I think they know.

 9                MR. DONALDSON:  Just so I can finish my record.

10                MS. ECHENBERG:  I don't think it's necessary is what

11        I'm saying.

12                MR. GREENFIELD:  They certainly.

13                THE COURT:  Remember, folks.  It really is 2013.

14                MR. DONALDSON:  Does that mean I can do what I want?

15                THE COURT:  It's between you and your spouse.

16                MR. DONALDSON:  Talk to her about that tonight.

17                THE COURT:  And whatever she says goes.

18                MR. DONALDSON:  Absolutely.

19                MS. ECHENBERG:  I think, your Honor, also, if they're

20        going to ask if he was married at the time when he made those

21        postings, then that bears on what we can get into with respect

22        to the affair.

23                THE COURT:  That may be really part of the problem,

24        that it's hard to stop it once you start it.

25                MS. ECHENBERG:  Right.
```

D1GLCIB6

1          THE COURT:  And make it beyond anything that makes

2     sense.

3          MS. ECHENBERG:  And I assure you, it can get quite

4     ugly.

5          THE COURT:  Okay, guys.  See you promptly in the

6     morning.

7          (Pause)

8          THE COURT:  Wind back.  Who is Mr. Mirandona?

9          MR. BRILL:  I don't know if this affects Mr. Tischler

10    and Mr. Schwartz.

11         THE COURT:  I have no idea.

12         MS. ECHENBERG:  There are emails that came from the

13    same set.

14         MR. PASTORE:  So I can very briefly describe the

15    issue.

16         There was a search conducted at 125 Maiden Lane on

17    January 15, 2009.  Pursuant to that search, several computers

18    were imaged on-site.  They were imaged by John Mirandona.

19    That's where the name comes from.  He then extracted certain

20    emails that we looked through from those computers.

21         And in preparation for this trial, he's reduced that

22    to I think less than 15 emails that have been provided

23    separately, and we intend to call him to testify about how

24    those emails were recovered.  And then we would move them into

25    evidence as being seized pursuant to the search and the email

D1GLCIB6b

addresses that are associated or in those emails can be

identified by various witnesses as well as various documents.

For instance, Mr. Brodjik's email address is going to

be confirmed by a public storage unit that he rented as well as

witness testimony.  And I believe Mr. Schwartz's email address

is going to be confirmed by witness testimony.

MS. ECHENBERG:  There's an email that Mr. Tischler

forwarded to Mr. Salamon, and I think Mr. Tischler has

stipulated to the email address for that email.

MR. PASTORE:  And then there's also email references

to from a G Cibik.

THE COURT:  The bottom line is this guy downloaded

these emails from computers that were the subject of a search

and there has never been a motion to suppress.

MR. PASTORE:  Correct, your Honor.

MR. GERZOG:  It's not about suppressing, your Honor.

They didn't seize them illegally.  The problem is they're not

authentic.  Mr. David is not here to say I got this from Mr. --

then the fact it simply says an email address, I use my wife's

email.  I correspond on my wife's email and she corresponds on

my email and it doesn't mean that it came from me.  An email

address is simply someone who has access to your password.  It

is not like a letter which you can say this is in the

handwriting of the person who purports to be from.  It's just

typed words coming from an email address.  That's all it is and

D1GLCIB6b

1    it's not authentic.  There's no way the government can show

2    that Mr. Brodjik sent those emails or that Mr. David sent those

3    emails.

4           MR. BRILL:  As to Mr. Schwartz, the two emails we've

5    been provided -- there's only two -- are both in the sent

6    folder of that computer.  Mr. Schwartz has no memory or

7    knowledge of having received those.  There's a different issue

8    for that.

9           THE COURT:  I think you're welcome to cross on that.

10          MR. GERZOG:  How can you cross the man who just merely

11   discovered them on the computer?

12          THE COURT:  Same way you do when you have phone

13   records.  You don't know if -- you can say this is a phone

14   registered in somebody's name.  Doesn't mean that someone else

15   couldn't have borrowed the phone and placed the call.  Same

16   principle.

17          MR. GERZOG:  Your Honor, it isn't because it's an

18   explicit statement, essentially, indirectly anyway, of guilt

19   that Mr. Brodjik says, you know, I did all this stuff for you

20   and now you're cheating me out of the money I earned.  And

21   there's no way for you or me or anyone else to know whether

22   Mr. Brodjik actually sent that or not.

23          If they wanted to seize Mr. Brodjik's computer and

24   check the IPO addresses and go into it, there is a way to make

25   more of a link.  But they didn't do that.  They just assumed

D1GLCIB6b

1    because it says it comes from his email address, it comes from

2    him and that's improper.

3          MR. GUTMAN:  Your Honor, just to complete the thought,

4    it's something as to which we're entitled in the first instance

5    to a ruling by the Court on whether there's sufficient support

6    for the government's position that this is what they say it is,

7    which is a writing by the defendant.  It's not defendant's own

8    writing.  It's not admissible as anything.  It's not relevant.

9          It's only admissible if they can get passed the hurdle

10   of saying this is authentically or there's at least enough to

11   go to the jury and it's a question first for the Court whether

12   it is they have shown -- if this were a voice recording, for

13   example, we could ask the Court to rule on is there a

14   sufficient basis for saying that's the voice of the defendant

15   on the recording and it's basically the same thing.

16         Under the rules of evidence, it is initially a

17   determination to be made by the Court.  If it comes in, we can

18   still make arguments to the jury, but first we're entitled to

19   the Court's ruling on whether they have and especially because

20   as Mr. Pastore makes clear this is central part of their case.

21         THE COURT:  That Mr. Brodjik worked there.  He was

22   there, right?  That's going to come in.  That's going to be

23   established.

24         MR. GERZOG:  We don't deny he worked there.

25         MR. GUTMAN:  They're relying on his emails on the

D1GLCIB6b

1  theory that they are his words, that he typed them.  And if

2  they can't authenticate that, they shouldn't be permitted to --

3         THE COURT:  Under your theory that would be

4  impossible.

5         MR. GERZOG:  No.

6         MR. GUTMAN:  They have an opportunity to show the

7  Court how they're going to do it.

8         THE COURT:  What exactly, since you could come up and

9  take my computer if it was open and type an email on it.

10         MR. GERZOG:  If we knew your password.

11         THE COURT:  It's open right now.  Assume it was open.

12  Then your theory it's impossible to ever know whether the

13  person who apparently, because it's their email address is

14  used, actually sent the email.  How would you prove?

15         MR. GUTMAN:  We're not saying it's impossible.

16         MR. GERZOG:  Not only sent but wrote, and your Honor

17  just put your finger on it.  If I wrote the email, could it

18  come into evidence against Judge Buchwald if she was on trial?

19  How could it?

20         THE COURT:  The whole point.

21         MR. GERZOG:  Judge Buchwald didn't write it.

22         THE COURT:  But you still work off of the basic

23  presumptions that the person listed as the author is the author

24  because if you don't, my point is that if you don't work from

25  that presumption, how would you ever establish?

D1GLCIB6b

1          MR. GERZOG:  You could establish it by showing there

2     was something in the email that only Mr. Brodjik knew about,

3     that Mr. Brodjik or that Mr. Brodjik referenced my daughter and

4     then gave his daughter's name is sick and such and such and

5     such happened.  There's no way unless there's something else,

6     and there are lots of other things that can be used to

7     authenticate it, but they have nothing.  And if they are

8     allowed to put in front of the jury these emails, which in fact

9     I will tell you it is our understanding that at least some of

10     them Mr. Brodjik did not in fact write.

11          THE COURT:  And you have some theory by what, someone

12     else did?

13          MR. GERZOG:  Yes.

14          THE COURT:  I know you don't have a burden, but still.

15          MR. PASTORE:  Judge, if I may, this is sort of

16     academic because one of the emails that's contained in the

17     electronic files, Mr. Brodjik himself provided a printed copy

18     to an agent when they searched his house, the same email, and

19     it's an email chain.  So the same email that Mr. Brodjik

20     personally provided to agents appears in the electronic

21     records.  That's No. 1.

22          No. 2, the email account from which the emails were

23     sent, to which they were received, is the same email account

24     that Mr. Brodjik used to open to rent a public storage unit.

25          No. 3, the content of the email explicitly refers to

D1GLCIB6b

1    Mr. Brodjik's wife and how he and his wife assisted Mr. David

2    in packing up the law firm office and moving it.

3            So even if Mr. Gerzog and Mr. Gutman were correct as a

4    legal matter, the government could still as a factual matter

5    prevail.  But I still believe your Honor is correct that all of

6    these arguments go to weight, not admissibility.

7            MR. GUTMAN:  Your Honor, on admissibility, it's a

8    question of who -- it is the prosecution's burden.

9            THE COURT:  Don't you think they've just met it as a

10   threshold matter?

11           MR. GUTMAN:  I don't.  This is analogous to if they

12   had a tape recording of a conversation made from the

13   defendant's telephone, they could offer into evidence a call

14   was made from this phone to this phone and you can draw

15   whatever inference you want.  But before they could introduce

16   the tape recording and say this is the defendant's voice --

17           THE COURT:  They just told me.

18           MR. GUTMAN:  -- need somebody to identify his voice.

19           THE COURT:  They just told me he physically provided

20   from his own home to an agent one of the emails in the chain.

21           MR. GUTMAN:  A, that's not admissible.  That's not in

22   a form that was --

23           THE COURT:  Excuse me.

24           MR. GUTMAN:  I don't believe it's admissible.  I

25   believe that was in a proffer statement.  We aren't -- I think

D1GLCIB6b

1    they can't meet their burden if it's an initial burden on the

2    prosecution, they can't meet it by offering this statement.

3              THE COURT:  It's not a statement.  It's he provided a

4    document which authenticates the email chain.

5              MR. GUTMAN:  How is that admissible?

6              MR. PASTORE:  Your Honor.

7              THE COURT:  Because you're saying that I have to make

8    some initial finding.  That's enough for me.

9              MR. GUTMAN:  You have to say that the evidence that

10   will be presented and admissible before the jury is enough for

11   a reasonable juror to decide, to believe that it's his words,

12   that he's the author.

13             THE COURT:  I think that what the government just

14   argued was good enough for a reasonable juror.

15             MR. PASTORE:  One statement for the record.  It was

16   the email was obtained pursuant to we got a search warrant to

17   cover it.  Initially given on consent, we got a search warrant

18   to cover it, so it would be admissible in any event.

19             MR. GERZOG:  You can't put in that Mr. Brodjik gave

20   you something.  You can certainly put in that you got it off

21   the computer.

22             THE COURT:  They are not proposing that any of this be

23   told the jury.  They are putting on a witness who extracted

24   certain emails from a computer.  You are simply the ones that

25   are challenging that.  They are not going to ask this witness,

D1GLCIB6b

1    hey, did we also get another copy of one of these pursuant to a

2    search warrant?  This is your argument.  It has nothing to

3    do --

4            MR. GERZOG:  That is.  He will testify in fact that

5    that's how he got them, pursuant to the search warrant.

6            THE COURT:  No, it's separate.  There's a search

7    warrant at the office and there's a search warrant from his

8    home.  Correct?

9            MR. PASTORE:  That's correct, your Honor.

10           THE COURT:  Okay.  All right.  The witness can go

11   forward tomorrow.

12           MR. PASTORE:  Thank you, Judge.

13           (Adjourned to January 17, 2013 at 9 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

FAITH CAMPBELL

Direct By Mr. Pastore . . . . . . . . . . . . .80

Cross By Mr. Donaldson . . . . . . . . . . . 109

Cross By Mr. Gerzog . . . . . . . . . . . . 112

Cross By Mr. Brill . . . . . . . . . . . . . 113

Cross By Mr. Greenfield . . . . . . . . . . 115

Redirect By Mr. Pastore . . . . . . . . . . 116

Recross By Mr. Greenfield . . . . . . . . . 118

Redirect By Mr. Pastore . . . . . . . . . . 120

ELISSA McGOVERN

Direct By Ms. Echenberg . . . . . . . . . . 120

Cross By Mr. Gerzog . . . . . . . . . . . . 207

Cross By Mr. Brill . . . . . . . . . . . . . 211

                    GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 101-115  . . . . . . . . . . . . . . . . . 136

 101-1 through 101-34, 102-1 through . . . . 147

           102-42, 103-1 through 103-60,

           104-1 through 104-14, 105-1

           through 105-10, 106-1 through

           106-39, 107-1 through 107-25,

           108-1 through 108-9, 109-1

           through 109-12, 109-13 through

1                    109-43, 110-1 through 110-50,

2                    111-1 through 111-43, 112-1

3                    through 112-20, 113-1 through

4                    113-10, 114-1 through 114-27,

5                    and 115-1 through 115-26

6       101-2-A, 101-19-A, 101-30-A, 101-31-A,  . . . 151

7                    102-16-A, 104-11-A, 105-4-A,

8                    107-3-A, 107-4-A, 107-6-A,

9                    107-8-A, 107-16-A, 107-18-A,

10                   107-20-A, 107-21-A, 110-15-A,

11                   110-31-A, 112-6-A, 112-9-A,

12                   112-11-A, 113-6-A, and

13                   113-10-A

14      S-9   . . . . . . . . . . . . . . .188

15      801   . . . . . . . . . . . . . . .104

16      802   . . . . . . . . . . . . . . .100

17      803   . . . . . . . . . . . . . . . 83

18      805   . . . . . . . . . . . . . . . 96

19      806   . . . . . . . . . . . . . . .102

20      1501-2   . . . . . . . . . . . . . .206

21      3120-A   . . . . . . . . . . . . . .204

22

23

24

25