D1HLCIB1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4               v.                        11-CR-424 (NRB)

 5   GULAY CIBIK, REFAEL BRODJIK,
     a/k/a "Rafi," NATHAN SCHWARTZ,
 6   HAROLD TISCHLER, a/k/a
     "Hershy,",
 7
                 Defendants.               Jury Trial
 8
     ------------------------------x
 9
                                           New York, N.Y.
10                                         January 17, 2013
                                           9:08 a.m.
11

12   Before:

13                  HON. NAOMI REICE BUCHWALD,

14                                           District Judge

15                           APPEARANCES

16
     PREET BHARARA
17        United States Attorney for the
          Southern District of New York
18   JANIS ECHENBERG
     JAMES J. PASTORE, JR.
19        Assistant United States Attorneys
     MICHAEL DINET, Paralegal Specialist
20
     DONALDSON CHILLIEST LLP
21        Attorneys for Defendant Gulay Cibik
     BY:  XAVIER R. DONALDSON, ESQ.
22
     LAWRENCE D. GERZOG, ESQ.
23   JEREMY L. GUTMAN, ESQ.
          Attorneys for Defendant Refeal Brodjik
24

25
```

D1HLCIB1

1                              APPEARANCES
                              (Continued)
2
  BRILL LEGAL GROUP, P.C.
3      Attorneys for Defendant Nathan Schwartz
  BY:  PETER E. BRILL, ESQ.
4
  PAUL GREENFIELD, ESQ.
5      Attorney for Defendant Harold Tischler

6  ALSO PRESENT:  DEIDRE GORDON, Special Agent, Homeland Security
                  RYAN GIBBS, Special Agent, U.S. Dept. of Labor
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D1HLCIB1

1          (Trial resumed)

2          (Jury not present)

3          THE COURT:  Any reason we can't bring the jury out?

4    Bring the witness back in the box.

5          MR. PASTORE:  Your Honor, there is one issue that we

6    can very, very briefly cover.  It just needs to be put on the

7    record.

8          I've disclosed to Mr. Donaldson the basis for which

9    the government believes that the GCibik@gmail address is in

10   fact Ms. Cibik.  We've gone over the emails together.  Among

11   other things, in one of the emails it says it's from Gulay

12   Cibik in the from line and it's signed Gulay and it discusses

13   substituting one alien for another in connection with a

14   particular case.

15         The second email is an email to Earl David and it

16   discusses, identifies two of the coconspirators, specifically,

17   two accountants who prepared fake tax returns in connection

18   with this fraud, and indicates that they disappeared from their

19   market.  The timing of the email is significant because the

20   agents had by that time already interviewed one of the

21   accountants, who we understand pretty promptly left the firm.

22   So that also shows that the email is in fact from Ms. Cibik.

23   It is signed, sincerely yours, Gulay.

24         MR. DONALDSON:  Your Honor, briefly, I brought that up

25   to Mr. Pastore last night after I received the Court's order,

D1HLCIB1

1    and I informed him that in the interest of proof --

2              (Pause)

3              THE COURT:  Just hold them one minute.

4              Is that counsel's personal computer?

5              MR. GERZOG:  It's my personal computer, Judge.

6    Unfortunately, that means I'm going to run out of battery but

7    that's my problem.

8              THE COURT:  I don't have my electrical tape with me.

9              MR. DONALDSON:  So what I was saying, your Honor, was

10   in the interest of prudence, I asked Mr. Pastore to put up a

11   proffer, an offer as to meet the standard the Court set out

12   yesterday in its order.  I read what Mr. Pastore said.  For

13   record purposes, I note that I'm bringing that up.  I believe

14   he's met his standard.

15             THE COURT:  I think you're wise not to pursue it.

16             MR. DONALDSON:  Right.

17             THE COURT:  Do you know whatever you blew, you blew

18   some other stuff here because this was on and I can't put it

19   back on.  Does anybody else have an electrical issue?  Do we

20   still have the main screen?

21             MS. ECHENBERG:  Your Honor, I'm going to call our

22   computer person.

23             MR. GERZOG:  I apologize, your Honor.

24             THE COURT:  That wire looked pretty frayed.

25             MR. GERZOG:  It was in fact frayed but I had no idea

D1HLCIB1

1          it was.

2                    THE COURT:  You should have asked me for electrical

3          tape.  I would have helped you out.  You don't realize how many

4          talents I have.

5                    MR. GERZOG:  I'm learning every day, Judge.

6                    THE COURT:  Mr. Pastore, can I just ask defense

7          counsel, is there any reason we can't continue with cross even

8          if we don't have the docs on the --

9                    MR. BRILL:  Let me take a look at my notes, see what I

10         was going to be doing.

11                   THE COURT:  Just explain to them why they're standing

12         there.

13                   THE LAW CLERK:  I did, actually.

14                   THE COURT:  We won't tell them which defense lawyer

15         broke the frayed wire.

16                   MR. PASTORE:  Were there in fact trials before

17         computers?

18                   THE COURT:  I believe so.

19                   MR. BRILL:  I could do it, Judge, but it will be a

20         little more difficult.

21                   THE COURT:  I'd rather we do something than nothing.

22                   MR. BRILL:  Sure.

23                   THE COURT:  We'll come back to something if you need.

24                   MR. BRILL:  I can skip around.  I should just get a

25         pen with a different color.

D1HLCIB1

1          MR. PASTORE:  The government's first witness can

2     probably be done, although not as effectively, but there's not

3     a whole lot of documents with respect to that witness.  So we

4     probably can do that without.

5          THE COURT:  I think we also ought to call the courts.

6          MS. ECHENBERG:  I think that's right.

7          THE COURT:  I don't think is really personal to the

8     government exactly.

9          MS. ECHENBERG:  He's coming but it may be that a

10     breaker needs to be reset.

11          THE COURT:  Ask Karen to call down and tell them we

12     seem to have blown a circuit.

13          I found where they are.  They're behind locked doors.

14          MR. BRILL:  I can jump around, Judge, if you need me

15     to.

16          THE COURT:  I'm just one of the issues Brett and I

17     were discussing this morning was the marking of all these gobs

18     of paper so I wondered if it would be agreeable to defense

19     counsel that we mark the folders and deem the pages

20     individually marked?  It sort of seems to me there will be no

21     incentive on the part of anybody to mix up the documents

22     because they become meaningless then.  It's just I assume this

23     is not the only cart.

24          MS. ECHENBERG:  This is the bulk, most witnesses that

25     will follow.  No, your Honor, that's not true.  We're going to

D1HLCIB1

 1    have a significant number of A files and a significant number

 2    of client files as well.

 3              THE COURT:  I don't know what the content of the other

 4    files are and then maybe it may be perfectly appropriate to

 5    mark the pages, but that's an awful lot of pages.  So I just I

 6    don't want to forget that we have to mark stuff and I just

 7    wonder how counsel feel about marking the outside of the folder

 8    and then deeming the contents marked.  Do they have some kind

 9    of numbers on them like Bates numbers?

10              MS. ECHENBERG:  I mean each set has its own exhibit

11    number but within each set they are not.  They don't have Bates

12    numbers.

13              THE COURT:  When you say each set has its own exhibit

14    number, what you mean is the folder?

15              MS. ECHENBERG:  So within each folder there are files

16    for each case.  Each file has its own sub number like 101-17.

17    There are, you know.

18              THE COURT:  What would you estimate are the number?

19              THE LAW CLERK:  Are the folders grouped by the 101

20    number?

21              MS. ECHENBERG:  They are.  There's more than one

22    folder for some series because some series are bigger than

23    others, but I would estimate there are 250, maybe 300.  The

24    concern would be that we would stick another exhibit in the

25    folder or something.

D1HLCIB1

1          THE COURT:  I'm not concerned.  So the only issue is

2     if defense counsel are concerned, I think.

3          MR. GREENFIELD:  I don't have an issue.

4          MR. DONALDSON:  Neither do I.

5          MS. ECHENBERG:  We'll just make sure before.

6          THE COURT:  Mr. Gerzog, any problem with deeming the

7     internal contents marked?  They all have numbers on them.  The

8     issue is just whether we initial every one of them and put, you

9     know, a date on them essentially.

10          MS. ECHENBERG:  Right.

11          THE COURT:  We'll see if we've got nothing better to

12     do.  Can we go?  We're all right?  Okay.  Great.

13          MR. BRILL:  These are still not going to be working

14     for now?  Now they are.  Never mind.  Perfect.  Thank you.

15          THE COURT:  Mine up here which I don't really use very

16     much has a little green light.  We got the stuff on the bottom.

17          (Witness present)

18          (Continued on next page)

19

20

21

22

23

24

25

D1HLCIB1

1            (Jury present)

2            THE COURT:  So, ladies and gentlemen, as I hope Brett

3    explained to you, the reason for the delay was that a counsel

4    to remain nameless had a frayed wire on his computer which blew

5    a whole bunch of the other, blew a circuit.  Fortunately, we

6    are miraculously up and running.  So if everyone will just sit

7    down.  We will pick up where we left off yesterday which is

8    Mr. Brill's cross-examination.

9            THE LAW CLERK:  Ms. McGovern, I remind you you're

10   still under oath.

11           THE WITNESS:  Yes, thank you.

12    ELISSA McGOVERN, resumed.

13   CROSS-EXAMINATION (cont'd)

14   BY MR. BRILL:

15   Q.  Good morning.

16   A.  Good morning.

17   Q.  How was your night?

18           THE COURT:  None of your business.

19           THE WITNESS:  Relaxing.

20   Q.  All right.  So yesterday I think we left off we were

21   talking about the verification procedure that you guys go

22   through when you receive the employer applications.

23           Do you recall?

24   A.  Yes.

25   Q.  The last, I was trying to remember and I apologize, the

1     last thing we mentioned was that there may be a place where the

2     IP addresses of the computers that prepare or forward these

3     applications into Department of Labor are stored, but you

4     weren't sure of that, correct?

5     A.  I don't know.

6     Q.  Okay.  So after the person at the help desk goes through

7     these steps that we talked about yesterday, the next step was

8     to then send an email verification to the email contact

9     provided, as long as it's an online application, right?

10          You're looking at me funny.

11    A.  I'm looking at you funny because I want to make sure that I

12    understand your question.

13    Q.  Okay.  The application comes in online, right?

14    A.  Correct.

15    Q.  The person working at the help desk starts going through

16    the steps that we spoke about yesterday to verify employer

17    identification number, employer name?

18    A.  Okay.  I'd like to clarify that because I think --

19    Q.  By all means.

20    A.  The verification of the employer identification number is

21    done at the account setting.  In other words, when an employer

22    establishes an online account, that's when the EIN is checked.

23    So anything that comes through that account has already been

24    checked.

25    Q.  Go ahead.

D1HLCIB1                    McGovern - cross

1   A.  There is something, there is when an application is mailed

2   in, it's checked at the submission of the application.

3   Q.  I see.  Okay.  So it's not like, you know, when you go and

4   make a gmail account or something, you just sign up and all of

5   a sudden, congratulations, you're signed up.  There's an

6   intermediate step where the application is checked before it's

7   established?

8   A.  Where the account is checked, yes.

9   Q.  So it's not instantaneous like when you sign up for some

10  other website.  You have to submit your application and wait

11  some period of time for it to be approved.  Is that accurate?

12  A.  I can only speak to our account system and not to anybody

13  else's.  If you establish an online account with our CMS

14  system, it will go through business existence verification

15  prior to establishing the account.

16  Q.  And that's not instantaneous or quick.  That takes some

17  time before the account is approved?

18  A.  That is correct.

19  Q.  Okay.  Now we're on track.  So once the application comes

20  in --

21          THE COURT:  Do you do anything beyond learn if that

22  company has a federal employee identification number in this

23  business verification, business existence verification process?

24          THE WITNESS:  First of all, we're going to look to

25  make sure that it's that company's verification number.

D1HLCIB1                          McGovern - cross

1            THE COURT:  You're connecting a number to a name.

2            THE WITNESS:  Connecting a number to a name.  If

3    there's any question as to whether that name truly connects to

4    that number, yes, there will be additional checks involved.

5    Look at white pages and other internet sites, including

6    American business directory, to establish whether that company

7    matches that name and employer identification number.

8    Q.  Circle back.  Sorry.  So now going back to the

9    Exhibit 102-1 that we were talking about yesterday, the name on

10   that business -- we are up and running.  We can pull it up just

11   so we have a visual aide.  You can leave it on that first page.

12           So this Contour Framing, Inc. -- could we open the

13   first page of the application?  Sorry.  Makes more sense if we

14   look at the actual document.

15           Contour Framing, Inc., would get matched up with the

16   employer identification number, which I believe is slightly

17   farther down the page, this 020745332, at that first intake

18   stage, right?

19   A.  That is correct.

20   Q.  Now, when this application comes in then, is it checked by

21   the people who check the application to make sure that the EIN

22   number matches up with the employer name that was submitted at

23   registration?

24   A.  Yes.

25           MR. BRILL:  Okay.  Can we pull up Exhibit 101, please.

D1HLCIB1                    McGovern - cross

1    Q.  You can see in front of you these are the A files that you

2    referred to earlier with a company name or employer name of CFI

3    Framing and Developers, correct?

4    A.  Correct.

5    Q.  How much wiggle room, if any, is allowed between the legal

6    name of a corporation and the name that's submitted to DOL?

7    Say if the legal name, for example, was simply CFI, and you

8    received a CFI Framing and Developers application, would that

9    still be accepted or would it have to be an exact match?

10   A.  Can you clarify the question?

11   Q.  Sure.  In a situation where the employer submits or someone

12   submits on behalf of the employer a name CFI Framing and

13   Developers, you submitted, you just testified that there was a

14   check that went on to determine if there's an actual business

15   named CFI Framing and Developers, right?

16   A.  That's correct.

17   Q.  Now, say the check comes back and says there is no business

18   name CFI Framing and Developers but there is a business name

19   CFI that matches up to some of the information provided.  Would

20   the name CFI Framing and Developers be accepted even though the

21   actual business name was CFI?

22   A.  If the EIN on the application matched the EIN in the system

23   for CFI Framing and Developers and the application said only

24   CFI, we would probably accept the application for processing

25   but we might audit that application to determine whether in

D1HLCIB1                          McGovern – cross

 1   fact it was submitted.  We may look further into the

 2   application to see if it was submitted with all the obligations

 3   and requirements established.

 4   Q.  That's a "may" but not a "would"?

 5   A.  Correct.

 6   Q.  Now, this CFI Framing and Developers would have to match up

 7   to an EIN that is held by, in my hypothetical example, CFI,

 8   correct?

 9   A.  Correct, if that's your hypothetical.

10   Q.  Yes, it's mine.  Okay.

11          MR. BRILL:  So if we can go back to 102-1, please, to

12   the application page.  You can just leave it big.  This view is

13   fine.

14   Q.  So once the registration process is done and the

15   application starts being reviewed, the first step in the review

16   process is an email to the email address provided in the

17   application, correct?

18   A.  Yes.

19   Q.  As we said, there's no specific verification as to who

20   created or who was receiving the emails for this address,

21   right?

22   A.  Correct.

23   Q.  And we spoke about other possible reasons that could lead

24   to auditing of this application, but in many if not most cases,

25   if the email is responded to appropriately, then except in

D1HLCIB1                      McGovern - cross

1    certain exceptional cases, these applications are approved,

2    correct, or is that wrong?

3    A.  I wouldn't say that's completely correct.

4    Q.  Can you explain?

5    A.  There may be other, there may be significant reasons why

6    the application would not be approved.

7    Q.  For other reasons aside from the employer verification?

8    A.  Absolutely other reasons aside from the employer

9    verification.

10   Q.  If there are no other problems with the application and the

11   employer verifies via email, that's the end of the inquiry?

12   A.  Correct.

13   Q.  Is there a specific script that is followed or a form email

14   that is sent to the email address on the application?

15   A.  I believe so.

16   Q.  Do you know what that says?

17   A.  Not the exact words.

18   Q.  The gist of it?

19   A.  There are I believe four questions that have to do with

20   verifying the, No. 1, are you in fact an employee of the

21   employer or are you the employer?  In other words, you who are

22   responding to this email, are you, do you actually work for the

23   employer?  You said you were the employer contact, are you?

24           No. 2 is I think something along the lines of are you

25   aware that an application was filed by your company?

1              No. 3, is this job open and available to U.S. workers?

2              And No. 4 I think is something along the lines of are

3       you in fact sponsoring name of foreign worker for U.S.

4       permanent residence?

5       Q.  Now, again, not holding you to the exact language, but

6       assuming that's the gist of the questions that are asked, if

7       you get four yeses back, we're moving on, right?

8       A.  That is correct.

9       Q.  Now, if you don't get a response back, you said that back

10      in 2006 or so there was possibly a seven- or ten-day window in

11      which DOL was waiting for a response to the email, correct?

12      A.  Correct.

13      Q.  And after those seven or ten days go past, then the person

14      at the help desk is supposed to make a phone call, right?

15      A.  They are supposed to make a minimum of one and typically

16      three or possibly four phone calls to reach the employer

17      contact.

18      Q.  It's one if they get in touch, three or four if they don't

19      get in touch?

20      A.  Correct.

21      Q.  You're not calling him twice if they get in touch?

22      A.  Correct.

23      Q.  And, again, is there some sort of script that is employed

24      by the help desk people as to what they're supposed to ask in

25      this phone call?

D1HLCIB1                    McGovern - cross

1   A.  It would probably -- I don't know if there is an exact

2   script.  If there is, it would run along the same lines as the

3   employer verification email.

4   Q.  I imagine there's got to be a couple more questions, such

5   as, are you this person, because they're supposed to actually

6   call the contact, right?

7           In this case, if you're looking at this exhibit,

8   Nathan Schwartz is at the bottom of the page?

9   A.  That is correct.

10  Q.  So there's an email that says, are you the employer or the

11  employer's representative, just in the normal course of a phone

12  conversation, hi, this is so and so from the Department of

13  Labor, am I speaking to Nathan Schwartz or may I talk to Nathan

14  Schwartz?

15  A.  I don't know how that part of the script goes.

16  Q.  But you don't know if it's standardized across the help

17  desk employees or not?

18  A.  I don't know.

19  Q.  Okay.  So you don't know, and correct me if I'm wrong,

20  maybe you do know, but I'm assuming you don't know what

21  verification steps are taken to determine who in fact is

22  identifying themselves on the other end of the phone?

23  A.  I do know that they are required to get in touch with the

24  actual employer contact, so I know that they have to ask for

25  that person and speak to that person.

D1HLCIB1                              McGovern - cross

1    Q.  But it's not like when your bank calls you up or you call

2    your bank up and your bank says, well, what's your mother's

3    maiden name or what's the last four of your social security

4    number.  They don't go through a specific verification process,

5    if you know?

6    A.  I don't know.

7    Q.  Okay.  As far as we know, the person who says, yes, I'm

8    Nathan Schwartz, is assumed to be Nathan Schwartz?

9    A.  I don't know.

10   Q.  Again, similar to when you call your bank you hear that

11   message on the phone when you're calling, this phone call may

12   be recorded for quality assurance purposes or to fire the

13   employee we don't like, is there something done like that on

14   the phone line for DOL?

15   A.  That I don't know.

16   Q.  So you don't know if any of these phone record, excuse me,

17   phone calls are recorded and saved so that they can be reviewed

18   later?

19   A.  I don't know.

20   Q.  I think you testified yesterday about the case notes that

21   accompany the files and that they're supposed to be a summary

22   of the actions that the DOL or help desk employees take,

23   correct?

24   A.  That's correct.

25   Q.  And, again, is there any specific training that you know of

1   as to what is supposed to be put into those case notes?

2   A.  I know that they are trained in what is supposed to be put

3   in those case notes.  I know over the six years that I have

4   worked for the Department of Labor, we've actually had many

5   discussions about doing more and more into case notes to ensure

6   better record, recording of actions.

7   Q.  And that's as a result of reviews of previous case notes

8   that show a lack of clarity, I would assume?

9   A.  The program was initiated in March of 2005 and it was

10  brand-new.  Like any program that I'm affiliated with or seen

11  in the federal government, you're always trying to make it

12  better and better.

13  Q.  Hey, there's nothing wrong with that.  I'm not disparaging

14  your efforts.  I'm just the fact is as time went on, it

15  appeared there needed improvement in the clarity in the case

16  notes, right?

17  A.  I don't know that.

18  Q.  Okay.  But there were discussions that there should be more

19  detail placed in there?

20  A.  There were certainly discussions that there should be more

21  detail.

22  Q.  Now, can we go back to the first page of this exhibit.

23          Is this actually the piece of paper or copy of the

24  piece of paper that is folded up and placed in the envelope?

25  A.  It is not folded.  The envelope is a letter-sized envelope

D1HLCIB1                          McGovern - cross

1    with a window, and that's the piece of paper that goes on top.

2    It's a copy of the piece of paper.

3    Q.  This is, at least through the window, this is what the

4    person sees when they get the mail, right?

5    A.  Yes.

6    Q.  Okay.  It doesn't say the applicant's or the immigrant

7    worker's name anywhere, right?

8    A.  No, it does not.

9    Q.  And what else does the -- what does the return address look

10   like on the envelope?

11   A.  It would be the Atlanta processing center's return address.

12   Q.  Does it say Department of Labor on it or does it just say

13   Atlanta --

14   A.  It's going to say U.S. Department of Labor, Employment and

15   Training Administration, Office of Foreign Labor Certification,

16   Atlanta National Processing Center.

17   Q.  Can we go to page 2 of this exhibit or page 3, I'm sorry.

18            These you said are the CC addresses?

19   A.  Correct.

20   Q.  So for each one of these applications, there would be

21   possibly three separate envelopes being sent to the same

22   person?

23   A.  I think if it's the same person, they don't send out

24   additional envelopes.

25   Q.  Is that you think or do you know?

D1HLCIB1                           McGovern - cross

1    A.  I think.

2    Q.  Is it possible they do send out three envelopes if there's

3    a CC to the same person?

4    A.  Probably not.

5    Q.  Do they send two or just the one, if there's let's say the

6    top one was the same person, the second one was a different CC?

7    A.  If it's a different person that's listed here, it would go

8    out to that person.

9    Q.  Right, but not if it was the same person once and then a

10   different person the second time?

11   A.  I don't know.

12   Q.  Okay.  Is this the mailing that has the special blue paper

13   in it?

14   A.  The only one that goes out on blue paper is the first one.

15   Q.  The one on the --

16   A.  The very first page.

17   Q.  So we can go back to the first page, please.

18           So the original of this would be blue?

19   A.  The paper is white.  This page is white.  Every one that

20   follows is blue.  We don't waste the blue paper.  It costs too

21   much.

22   Q.  So unless you open the envelope, the person wouldn't know

23   that the special blue paper is in the envelope, right?

24   A.  No.

25   Q.  Just so the record is clear, I said right and you said no.

D1HLCIB1                    McGovern - cross

1   You were agreeing with me?

2   A.  Yes, I was agreeing with you, you would not know whether or

3   not there was a certification in this envelope or a denial.

4   Q.  It doesn't say denied or approved, as you said, on the

5   front of the envelope, right?

6   A.  That is correct.

7   Q.  I'm sorry, I forgot to ask you, when the person sets up the

8   email -- excuse me -- the online registration, do they set up

9   like a user name and password as well?

10  A.  Yes.

11  Q.  Does that allow the person making the online application to

12  go online and check the status of the application?

13  A.  Yes, it does.

14  Q.  So a person who set up the online account would be able to

15  tell without receiving this approval as to whether the person

16  was approved or denied, right?

17  A.  Correct, that is correct.

18  Q.  Would you also be able to withdraw applications online?

19  A.  You can withdraw applications online.

20          MR. BRILL:  Can we pull up 102-21.  Do we have 102-42?

21  Sorry.  This is 102.  One second I just have to pull up my

22  copies.

23  Q.  Ms. McGovern, did you in preparing for the case go through

24  all of the exhibits that you testified yesterday individually?

25  A.  Yes, I did.

D1HLCIB1                          McGovern - cross

1    Q.  So in this 102 series, there comes a time that the Contour

2    Framing mail starts going to multiple different addresses,

3    correct?

4    A.  That's correct.

5    Q.  And looking at 102-21, that's one example, correct?

6    A.  Well, hold on, I haven't looked at.  102-21.

7    Q.  Maybe, I'm not sure if it's in the one that I already took

8    out.

9    A.  Okay.

10   Q.  So 102-21 is addressed to Contour Framing, but it's

11   addressed to care of Jed David Philwin, 82 Wall Street, Room

12   610, New York, New York 10005?

13   A.  That's correct.

14   Q.  And how does one change an address with the Department of

15   Labor for a pending application?

16   A.  For a pending application?

17   Q.  Is it possible to change an address for a pending

18   application?

19   A.  No, it is not.

20   Q.  So once the application goes in, you can't go online and

21   change the address?

22   A.  No.

23   Q.  Is there an application in this packet?

24   A.  There is.

25   Q.  And what is the employer information on the application?

D1HLCIB1                    McGovern - cross

1    A.  Employer information on the application is Nathan Schwartz,

2    1274 49th Street, Suite 299, Brooklyn, New York, 11219.

3    Q.  Yet the mail is going to 82 Wall Street?

4    A.  That is correct.

5    Q.  That's the employer contact in the application as well?

6    A.  No, I just read you the employer contact.

7    Q.  The Brooklyn address?

8    A.  That's correct.

9    Q.  Not the address in Monsey that was on the previous Contour

10   Framing applications, right?

11   A.  That's correct.

12   Q.  So, again, probably just my confusion.  How does the mail

13   go to -- if you look at the top of this application, the

14   employer information, I'm sorry, it's not -- we don't have this

15   up on the computer.

16        Why don't we so the jury can also look at, you'll be

17   able to see it on the big screen if we pull it up on the Elmo?

18   A.  Yes.

19   Q.  So is the employer information indicates Contour Framing,

20   46 Main Street, Suite 226, in Monsey?

21   A.  Correct.

22   Q.  Consistent with the mailing addresses of the other

23   applications that had come from Contour Framing previous to

24   this?

25   A.  Correct.

D1HLCIB1                        McGovern - cross

1    Q.  And then, as you said, the contact information indicates

2    Nathan Schwartz with an address in Brooklyn, right?

3    A.  Correct.

4    Q.  And did you know or have you come to know whose address

5    that actually is?

6    A.  It was mentioned yesterday that it was someone else's

7    address.  I don't remember the name.

8    Q.  And then the mailing, as we said, goes to Jed David

9    Philwin, 82 Wall Street, right?

10   A.  That's correct.

11   Q.  How does the mail go to Jed David Philwin?

12   A.  Because on the application in the agent or attorney

13   information --

14   Q.  That's on a separate page?

15   A.  -- which is on the next page from the employer information.

16   Q.  At the top here.

17   A.  There's a Jed D. Philwin listed as an agent or attorney.

18   Q.  Okay.

19   A.  Our regulation is clear that if we are dealing with an

20   agent or attorney, a certification, documentation,

21   correspondence goes to the agent or attorney.

22   Q.  Okay.  Under these circumstances, would there have been a

23   CC to the other addresses on the application?

24   A.  There should have been.  There should have been a CC to the

25   employer contact.

D1HLCIB1                          McGovern - cross

1    Q.  Okay.  So this is the CC page, right?

2    A.  Keep going.

3    Q.  Okay.  This is a CC page or not?

4    A.  This, these are some of the addresses, but keep going

5    because there's another CC on the letter itself.

6    Q.  Okay.  And this is another CC page, right?

7    A.  Yes.

8    Q.  So this goes to the Brooklyn and the Wall Street address.

9    And there's another CC page that goes to the Wall Street

10   address, right?

11   A.  Correct.  Actually looks like a copy of the original top.

12   Q.  Okay.  And, again, these may be copies.  I'm not sure.

13   A.  They're probably copies, yes.

14   Q.  Again, two more Wall Street CCs.  Right?

15          I can't give evidence so those were two more Wall

16   Street CCs?

17   A.  They look like copies of the first ones.

18   Q.  Okay.  And on this was a denial it looks like.  So on the

19   denial page -- that is a denial page, right?

20   A.  That is the supplement to the denial page.  The first page

21   would be the actual denial.

22   Q.  Okay.

23   A.  So the page before that is the denial.

24   Q.  That page?

25   A.  That page.

D1HLCIB1                    McGovern - cross

1    Q.  So it was mailed again to Jed Philwin at 82 Wall Street,
2    correct?
3    A.   Correct.
4    Q.  CCed to an address in -- the same address in Brooklyn, and
5    again potentially to Jed Philwin at the Wall Street address,
6    right?
7    A.   That is correct.
8    Q.  I want to make sure I'm not missing anymore CC pages.  I'm
9    going to hand this back to you.  And at least on
10   Exhibit 102-21, there doesn't appear to be any CCs directly to
11   the address given as Nathan Schwartz's address in Monsey,
12   right?
13   A.   No.  It's given to Nathan Schwartz's address in Brooklyn.
14   Q.   In Brooklyn, okay.  I'm not going to make you go through
15   all of the other exhibits, but that's not the only application
16   that has the same situation in these Contour Framing folders,
17   right?
18   A.   I don't know.  I mean I didn't look at them in terms of
19   whether the address was Brooklyn or Monsey.
20   Q.   Okay.  Why don't we look at, just for one other example,
21   102-42.
22   A.   Okay.
23   Q.   And I won't put it up on the screen this time, but if you
24   can look through and see if that's a similar situation.
25   A.   If by similar you mean that the employer contact

D1HLCIB1                           McGovern - cross

1    information for Nathan Schwartz on this application is 1274

2    49th Street, Suite 299, Brooklyn, New York 11219, that is

3    correct.

4    Q.   Okay.  It gives employer information as the Monsey address,

5    but the employer contact information as Brooklyn address,

6    right?

7    A.   That is correct.

8    Q.   Is that also mailed to Jed Philwin or is that mailed

9    directly to Brooklyn?

10   A.   This one was mailed directly to Brooklyn.

11   Q.   Are there any CCs to a Monsey address?

12   A.   No.

13   Q.   If we could put 102 up, please.  These are the -- you

14   testified earlier were the applications filed by -- allegedly

15   by employer Contour Framing, Inc., right?

16   A.   Correct.

17   Q.   And, again, we saw they're all online applications, right?

18   A.   That is correct.

19   Q.   Now, these come in in apparently in batches.  Some came in

20   July 6, 2006.  Some came in July 10, 2006.  July 12, etc.,

21   etc., right?

22   A.   They were submitted on those dates.

23   Q.   That's the first time DOL would see them?

24   A.   That's correct.

25   Q.   But they're looked at individually, that is, I'll ask that

D1HLCIB1                         McGovern - cross

1    question first.

2            They're not looked at in batches, they're looked at

3    individually?

4    A.   Correct.

5    Q.   So the fact that say one application is filed from a Monsey

6    address, one application is filed from a Brooklyn address, one

7    application is filed from a Wall Street address wouldn't

8    necessarily be caught by the people examining the applications?

9    A.   No, it would not.

10            (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D1h1cib2                    McGovern - cross

1    BY MR. BRILL:

2    Q.  Looking at 102-16-A, please.

3            There we go.  I thought my glasses weren't working.

4            I believe you testified when the government asked you

5    that the logical conclusion here is that somebody called --

6    Wanda Sanders; right?  Well, let me ask you, Wanda Sanders is

7    one of these help desk employees?

8    A.  She's not a help desk employee but she's a contract

9    employee who would have been tasked with doing the

10   verification.

11   Q.  Oh.  And does Wanda Sanders still work for the contractor

12   that's hired by the government?

13   A.  I have no idea.

14   Q.  Do you know if any effort was made to locate Ms. Sanders

15   for trial?

16   A.  I don't know.

17   Q.  Have you ever spoken directly to Ms. Sanders about this

18   case?

19   A.  No, I have not.

20   Q.  So we're assuming then that when Ms. -- well, we don't know

21   if Ms. Sanders -- withdrawn.

22           Do we know if Ms. Sanders actually left the voice mail

23   that is indicated by this note or is it just that Ms. Sanders

24   wrote the note?

25           Let me take a step back.  You testified yesterday that

D1h1cib2                    McGovern - cross

1  it was expected that the person who made the note was the

2  person who did the action; right?

3  A.  That's correct.

4  Q.  But without actually speaking to Ms. Sanders, you don't

5  know if Ms. Sanders was the one who left the voice mail or

6  merely made the note; correct?

7  A.  The way that -- well, take that back.

8  Q.  That's the way they're supposed to do it, but without

9  speaking to Ms. Sanders, we don't know if that's the way it was

10  actually done.

11  A.  Correct.

12  Q.  So assuming Ms. Sanders did what she was supposed to do,

13  "Left voice mail" would indicate to you, in a perfect world,

14  that she left a voice mail with the employer contact; right?

15  A.  Correct.

16  Q.  And again, in a perfect world, she would have called the

17  number on the employer contact information part of the

18  application; right?

19  A.  Correct.

20  Q.  But there's nothing in the system that indicates that she

21  in fact called that number or left that voice mail other than a

22  note that says, "Left voice mail."  Right?

23  A.  There's nothing in the case notes that would indicate

24  whether she in fact left that voice mail other than the fact

25  that she said she left the voice mail.

D1h1cib2                          McGovern – cross

1  Q.  She doesn't even say she left the voice mail.  She says,

2  "Left voice mail."  Could have been my brother left the voice

3  mail.

4  A.  I think that would be highly irregular.

5  Q.  Well, of course it would be highly irregular, but the point

6  is, nobody knows; right?

7  A.  Well, they're supposed to put in what they did.

8  Q.  But we have three layers of bureaucracy here; right?  We

9  have the contractor who works for the contracting company who

10  contracts with the Department of Labor; correct?

11  A.  That is correct.

12  Q.  We don't know what the training is that is given to the

13  contract employee; correct?  At least you don't.

14  A.  Personally I do not.

15  Q.  And we don't know what type of oversight is given to the

16  contract employee; right?  Again, based upon your testimony.

17  That is, based upon the evidence we have right now.

18  A.  I know that they get fired when they don't do it right.

19  Q.  You would hope that they would get fired if they don't do

20  it right, but we don't -- and at what level is that considered

21  not doing it right?  Is it not -- clearly not just writing,

22  "Left voice mail."  Ms. Sanders didn't get fired for just

23  writing, "Left voice mail."  Right?

24  A.  I don't know.

25  Q.  Well, basically everything we have to take from this page

1  is an assumption, because we don't have any direct information

2  as to what actually happened.

3  A.   These notes are made in the regular course of business of

4  the Department of Labor.

5  Q.   Sure.  Absolutely.  Ms. Sanders wrote a note in the regular

6  course of business.  And I am happy to acknowledge -- we didn't

7  object to it -- that the note comes into evidence, but the

8  actions that are underlying the note are something completely

9  different; correct?

10            MS. ECHENBERG:  Objection.

11            THE COURT:  Sustained.  That's a legal argument.

12  Q.   We can hope that Ms. Sanders was being accurate; right?

13            MS. ECHENBERG:  Objection.

14            THE COURT:  Yes.  Sustained.

15  Q.   Is there a phone log that accompanies this case note?

16  A.   I don't know.

17  Q.   Is there a phone record, as you said -- withdrawn.

18            As you said, there's no recording that you know of;

19  correct?

20  A.   That's correct.

21  Q.   This is 102-16, so if you look at 102 -- I'm sorry.  This

22  is 102-16-A, so if you look at 102-16, assuming that everything

23  went right, what is the number that Ms. Sanders supposedly

24  called?

25  A.   She would have called the employer contact information

D1h1cib2                              McGovern - cross

1    number, which on this application is 845-721-7455.

2    Q.  Now we don't have a note in evidence for 102-21, but if you

3    look at 102-21 as -- well, just tell me what the phone number

4    was on that.

5    A.  Sorry.  102-21?

6    Q.  Yes, please.

7    A.  718-219-6800.

8    Q.  So a different phone number than was in 102-16.  The 845

9    number you just testified to was 16; correct?

10   A.  Correct.

11   Q.  This is a 718 number?

12   A.  Correct.

13   Q.  And again, because these applications are reviewed

14   individually, that wouldn't necessarily be picked up by the

15   Department of Labor; right?

16   A.  Correct, because it's reviewed at an application level.

17   Q.  Correct.  One at a time.

18   A.  Yes.

19   Q.  Now are there case notes in every case, or are there

20   supposed to be case notes in every case, or accompanying every

21   application, to be clearer?

22   A.  There should be.  I can't say that every single case has a

23   case note, but there should be.

24   Q.  Well, let's go back to this one, 102-16-A.  After the voice

25   mail is left, the next note that's in the note is,

D1h1cib2                         McGovern - cross

1    "Recommendation for certification."  Right?

2    A.  Correct.

3    Q.  All right.  Now I think, based on your testimony yesterday,

4    the assumption was that somehow there was contact made with

5    someone who then verified the information; right?

6    A.  That would be correct.

7    Q.  Because at least based upon the policy, there would be no

8    other way to certify the application other than to verify the

9    information in some form; right?

10   A.  Correct.

11   Q.  Now technically, because there's no intermediate note

12   between "Left voice mail" and "Recommendation for

13   certification," it could have been that an e-mail came in

14   between step 1 and step 2 to verify; correct?

15   A.  That's correct.

16   Q.  Okay.  There may never have been a phone call on this one.

17   A.  Well, there may never have been a return phone call on this

18   one.

19   Q.  That's what I meant.  One second.

20          Look at 101-2-A, please.  You testified yesterday with

21   the government that -- I think yesterday you simply read from

22   this, "Left voice message for Nathan Schwartz to confirm

23   sponsorship.  Nathan Schwartz returned my call and confirmed

24   sponsorship."  Not to beat a dead horse, but is there any way

25   to confirm that the person on the other end of the phone from

D1h1cib2                          McGovern - cross

1    Ms. Gillis was Nathan Schwartz, other than the fact that the

2    person on the other end -- withdrawn.

3            Assumedly, Ms. Gillis called up and said, "May I speak

4    to Nathan Schwartz."  Right?

5    A.  Correct.

6    Q.  And the person on the other end of the phone either says,

7    "I'm not Nathan Schwartz," or, "I am Nathan Schwartz."

8    Correct?

9    A.  Correct.

10   Q.  We don't know if there was any other verification steps

11   taken to determine if in fact Nathan Schwartz was the person on

12   that phone; right?

13   A.  Correct.

14   Q.  Looking at 101-19-A, please.

15           In this situation we don't know whether it was in fact

16   someone calling back after Ms. Lawood called -- allegedly

17   called Mr. Schwartz or if an e-mail came in in between or

18   someone called back; right?

19   A.  It wouldn't be an e-mail because sponsorship confirmed

20   would involve a human, in this case Theresa Lawood.

21   Q.  I see.  So the other one that we had looked at, I think it

22   was 101-2-A, where it simply said, "Left voice message for

23   Nathan Schwartz," and then it said, "Recommend certification,"

24   that one we couldn't tell if it was e-mail or voice contact;

25   right?

D1h1cib2                          McGovern - cross

1   A.  Correct.  But this one would be a return phone call.

2   Q.  Okay.  The only way to actually confirm sponsorship using

3   that language is through a phone call.

4   A.  It should be, yes.

5   Q.  Okay.  Should be or is?

6   A.  Well, again, I can't say every single case that they're

7   doing it according to -- like robots.  They are supposed to put

8   into the system if they spoke with, you know, so when I see

9   sponsorship confirmed, that tells me that they actually talked

10  to someone.

11  Q.  If you look at 101-30-A.  This one's different.  This is,

12  "Left message with David to have Nathan Schwartz give me a

13  call."  And this is again Ms. Lawood who we saw in the previous

14  exhibit; right?

15  A.  Correct.

16  Q.  And who's David?

17  A.  Someone who answered the phone on the other side,

18  presumably someone who answered the phone and said, "No, this

19  is David."

20  Q.  And then ID 3, there's a Leo who called back and confirmed

21  sponsorship.

22  A.  That's correct.

23  Q.  Who's Leo?

24  A.  I don't know.

25  Q.  How is Leo able to confirm the sponsorship for Nathan

D1h1cib2                        McGovern - cross

1    Schwartz's company?

2    A.  I can tell you he shouldn't have.

3         MR. BRILL:  I have nothing further.  Thank you.

4         MR. DONALDSON:  Your Honor, I have just a few

5    questions, if I may.

6         THE COURT:  Okay.

7    CROSS-EXAMINATION

8    BY MR. DONALDSON:

9    Q.  Good morning.

10   A.  Good morning.

11   Q.  I just have one or two questions.

12        According to Department of Labor regulations, prior to

13   2007, was it authorized or allowable for an employer to

14   substitute an alien?

15   A.  That is correct, prior to July of 2007.

16   Q.  Substitution was allowable.

17   A.  Correct.  Although it didn't happen at the Department of

18   Labor, we would not substitute an alien, but they would be

19   allowed to use a certified labor certification for another

20   foreign worker, filing an immigrant petition, as long as the

21   job is identical.

22        MR. DONALDSON:  Thank you.  No further questions.

23        MR. GREENFIELD:  I have a few questions.

24   CROSS-EXAMINATION

25   BY MR. GREENFIELD:

D1h1cib2                        McGovern – cross

1   Q.  Good morning.

2   A.  Good morning.

3   Q.  My name is Paul Greenfield.  I represent Mr. Tischler.

4            Do you recall coming across Mr. Tischler's name as you

5   prepared for your testimony in this case?

6   A.  Yes.

7   Q.  Okay.  And do you recall that you saw his name in

8   connection with applications for more than one company?  Do you

9   recall that?

10  A.  Yes.

11  Q.  Do you recall at any time coming across his name with

12  regard to a company by the name of Olympia York Builders and

13  Developers?

14  A.  I don't recall if his name was attached to that company.

15  Q.  Okay.  I'm going to show you what's been marked as

16  Government's Exhibit 3103-A.  I ask you to take a look at

17  that --

18  A.  Sure.

19  Q.  -- and tell me if that refreshes your recollection as to

20  whose name is associated with Olympia York.

21  A.  The employer contact information is Nathan Schwartz, the

22  address is 455 Route 306, Suite 119, Monsey, New York 10952.

23  Q.  Do you recall whether that -- whether that address was

24  associated at any time with Mr. Tischler?

25  A.  I don't recall.  There was a lot of addresses.

D1h1cib2                         McGovern – cross

1   Q.   Sure.  Now I want you to take a look at the back page,

2   page 9 of this exhibit, and tell me if you know what that page

3   is.

4         MS. ECHENBERG:  Objection, your Honor.  This document

5   is not in evidence.

6   Q.  Do you recall --

7         MR. GREENFIELD:  Well, I'm asking if she can identify

8   it, tell me what it is.

9         MS. ECHENBERG:  Okay.

10  A.  Yes, I can.

11  Q.  Do you know what that back page is?

12  A.  Yes, I do.  It's a certification page.

13  Q.  Okay.  That's the page you testified is not signed by the

14  employer until after the certification is granted; is that

15  correct?

16  A.  It is required by our regulations to be signed upon

17  certification --

18  Q.  Okay.

19  A.  -- unless the application is filed by mail, in which case

20  it must be signed prior to submission.

21  Q.  Can you tell from that application, from that exhibit,

22  whether this was filed by mail or --

23  A.  No, I cannot tell.

24  Q.  Okay.  Can you -- do you recall who signed this application

25  after it was certified?

D1h1cib2                        McGovern - cross

1    A.  It has a signature on it.

2    Q.  And do you know whose signature that is?

3    A.  No, I don't.

4    Q.  Can you read it?

5    A.  No, I can't.

6          MS. ECHENBERG:  Objection.  Again, the document is not

7    in evidence.

8    Q.  Okay.

9    A.  There's a name there and a signature there.

10   Q.  Okay.  And does the name strike a bell to you?  Do you

11   recognize that name?

12   A.  The name is Harold Tischler.

13   Q.  Okay.  Now you don't know whether Mr. Tischler signed this

14   document or not, but you do know from your recollection that

15   Mr. Tischler, in the records you looked at, had no connection

16   to Olympia York Builders; is that correct?

17   A.  I would need to look.  You showed me a single file.  I

18   would need to look through the Olympia York file again to be

19   sure that he does not have any connection there.

20   Q.  Do you recall whether he does or not?

21   A.  I do not recall.

22   Q.  Now as I understood your testimony -- I'm going to try not

23   to go over everything that you've just answered, but as I

24   recall your testimony, a telephone call -- withdrawn.

25          As I understand your testimony, a telephone call to

D1h1cib2                        McGovern - cross

1   confirm an application is not made in every case; is that

2   right?

3   A.   That is correct.

4   Q.   And indeed, if an application is filed online and is

5   confirmed in response to a return e-mail satisfactorily, it is

6   highly likely that there won't be a phone call; is that right?

7   A.   That's correct.

8   Q.   Unless there's an audit.

9   A.   There are not necessarily phone calls in audits either.  As

10  a matter of fact, there's rarely a phone call in connection

11  with an audit.

12  Q.   Okay.  Now by my rough count there's about 375 files in

13  evidence in the series 100 through 115.

14  A.   That's correct.

15  Q.   And not only are they capable of being put on the screen

16  but they're physically here in those binders; is that correct?

17  A.   I don't know anything about the binders.  I looked through

18  these folders.

19  Q.   Those are the only files you looked at, you didn't look at

20  the other 300 or so?

21  A.   I did not look at the binders.

22  Q.   Right.  Okay.  But you looked through -- what you have in

23  front of you is the same as what's -- the whole 300 files;

24  right?

25  A.   I believe so.

D1h1cib2                          McGovern - cross

1   Q.  Okay.  And you identified some case notes that had phone

2   calls made.  Were there other files that had notes that

3   indicated phone calls were made that you didn't testify to?

4   A.  There may have been some case notes I looked at that I

5   didn't testify to.

6   Q.  I'm talking about case notes that had an indication of a

7   phone call.

8   A.  That I don't know.

9   Q.  So as you sit here now, is it your belief that every case

10  note that related to a phone call has been testified to --

11  testified about by you in the last two days?

12          MS. ECHENBERG:  Objection.

13          THE COURT:  She can answer if she knows.

14  A.  Can you repeat the question?

15  Q.  There are about 375 files in all.  You looked at every one

16  of them; correct?

17  A.  Yes.

18  Q.  And I think your testimony is that most but not all have

19  case notes in them; is that right?

20  A.  No.

21  Q.  Some have case notes.

22  A.  Some have case notes.

23  Q.  Can you tell me how many of the 375?

24  A.  No, I'm sorry, I can't.

25  Q.  Did you look at every case note that was in a file?

D1h1cib2                         McGovern - cross

1   Withdrawn.

2            If a file had a case note in it, did you look at it in

3   preparation for your testimony here?

4   A.  I believe so, yes.

5   Q.  Okay.  And did you pull out the ones that indicated phone

6   calls?

7   A.  I did not pull out the ones that had phone calls.

8   Q.  Did you make any kind of notes about the ones that had

9   phone calls?

10  A.  No.

11  Q.  Did anybody discuss with you the ones that had phone calls

12  in your preparation for your testimony here?

13  A.  Yes.

14  Q.  Okay.  As to the ones that were discussed that had phone

15  calls, have you testified to every one of them?

16  A.  I don't know.

17  Q.  So you think there may be other notes in files that show

18  phone calls being made that you haven't been asked about or

19  testified to?

20  A.  I don't know.

21  Q.  You don't know --

22  A.  I'm sorry.

23  Q.  -- whether you did or not.

24  A.  That's correct.

25  Q.  Okay.  Do you have any idea what the percentage is of cases

D1h1cib2                        McGovern - cross

1    that have notes?  In other words, do you think the notes are in

2    half the cases, a third of the cases, or 10 percent?

3    A.  I don't know.  I don't know.  I'm sorry.

4    Q.  Now in every one of these applications the first page that

5    we see is the address.  It's on a single page.  You testified

6    that that's where the mail goes; is that right?

7    A.  That's correct.  That's where the -- that's where the

8    certification or the denial will go.

9    Q.  Okay.  So if the certification -- now you also testified

10   that if an applicant was represented by an agent or an

11   attorney, your regulations require that you mail things to the

12   applicant -- or to the agent or attorney; is that right?

13   A.  That's correct.

14   Q.  But that doesn't apply for certifications?

15   A.  No, it applies for correspondence in general --

16   certifications, denials, audit notifications.

17   Q.  So if there was an application in this case in which it

18   said Vintage Builders care of Jed David Philwin --

19   A.  Yes.

20   Q.  -- 110 Wall Street, or 17 Battery Place or some Maiden Lane

21   address in New York City, but Mr. Jed David Philwin or Earl

22   David, or Zvi Samuels -- do you recall seeing those names?

23   A.  Yes, I do.

24   Q.  If that was the name in the window of the envelope because

25   it was on that first page, is that where this blue

D1h1cib2                           McGovern - cross

1    certification would have been sent to?

2    A.  Yes, it would.

3    Q.  Okay.  So if Vintage Builders, for example, was listed as a

4    cc on that correspondence, would Vintage Builders have gotten a

5    useable certification?

6    A.  No.

7    Q.  What would they have gotten?

8    A.  They would have gotten a copy of the certification letter.

9    Q.  Which would have been of no value in connection with filing

10   an application with the immigration service; is that correct?

11           MS. ECHENBERG:  Objection.

12           THE COURT:  Yeah, I don't think I follow.  There's

13   only one employer with regard to a certain alien.

14           MR. GREENFIELD:  Let me just make sure that I've got

15   it clear.

16           THE COURT:  Okay.

17   Q.  There's only one blue paper certification that's of any

18   value in the ultimate process of being filed with the

19   immigration service so that someone can actually get a green

20   card; is that right?

21   A.  It is correct that there's only one labor certification

22   issued, but we also have a process that if an employer has not

23   received a labor certification in the mail -- because we

24   understand that occasionally, rarely, hopefully, something

25   might get lost, we do have a process by which, if the employer

D1h1cib2                        McGovern - cross

1   goes into their account online and says, "Oh, look, it got

2   certified but it's been three weeks, I haven't gotten it," they

3   can notify us.  But we will not issue a new certification.

4   Instead, we have told them, apply with USCIS, file the

5   immigrant petition, have USCIS come to us and ask us for

6   verification and, if necessary, a copy of that certification.

7   Q.   Okay.  That's a rare event, right, relatively speaking?

8   A.   I can't give you a percentage, unfortunately.

9   Q.   In the majority of cases, the reason you use this blue

10  paper is the same reason that I can't photocopy a $20 bill and

11  go buy --

12  A.   Yes, that's correct.

13  Q.   -- too much food; right?

14  A.   Correct.

15  Q.   So the reason that you have to send out only one of these

16  blue things is so that they can't be duplicated and they can

17  only be used by the person intended to receive it for the

18  purpose for which it's intended; is that right?

19  A.   That is right.

20  Q.   Okay.  And in the case where the -- that first piece of

21  paper lists Jed David Philwin or Vintage Builders or Fix

22  Anything or whatever other companies there may have been, care

23  of Jed David Philwin, 110 Wall Street or 17 Battery Place, in

24  the event of a certification, that's where that blue piece of

25  paper is going; correct?

D1h1cib2                        McGovern - cross

1    A.  Correct.

2    Q.  Okay.  And would there be any need for Mr. Philwin, after

3    receiving that -- let's assume the post office does its job,

4    which, frankly, is my experience.  Would there be any need for

5    someone at 110 Wall Street to open that envelope, to go to

6    Mr. Tischler or to have Mr. Tischler come to them and say,

7    "Bring us that certification"?

8    A.  In other words -- I'm sorry.  In your hypothetical, for

9    Mr. Tischler to be asked to produce the certification?

10   Q.  The copy that he got, the cc, would there be any need --

11   any value to anyone for that cc?

12           MS. ECHENBERG:  Objection.

13   Q.  Let me rephrase it.  Would there be any value within the

14   process of ultimately obtaining a green card for someone to

15   need that cc?

16           MS. ECHENBERG:  Objection.

17           THE COURT:  You can answer.

18   A.  I'm not sure what you mean by value.

19   Q.  Can anybody take that cc and use it within the immigration

20   system to get a green card?

21   A.  As I said, they could take that cc and go to the

22   immigration service and file the I-140 and say, "We never got

23   our cert and can you go to DOL and get it for us, please."

24   Q.  Aside from that.  Aside from the times when the post office

25   doesn't deliver, would anybody have any use of the physical

D1h1cib2                        McGovern - cross

1    white piece of paper, the cc item that they got?

2              MS. ECHENBERG:  Objection.  Did anyone have any use of

3    that paper?  I'm not sure she can testify to any use.

4              THE COURT:  You said any use to further the obtaining

5    of a green card from the immigration authorities --

6              MR. GREENFIELD:  Right.

7              THE COURT:  -- would the white piece of paper help

8    advance the immigration part of this process.

9              MR. GREENFIELD:  Right.

10   Q.  Setting aside that event where the post office doesn't

11   deliver it, in the normal course, when the blue copy went out

12   to Mr. Philwin at 110 Wall Street and a copy, just a regular

13   white copy of that blue piece of paper, went to Vintage

14   Builders in care of Harold Tischler, could anybody make any

15   immigration use of that white piece of paper?

16   A.  Again, the only time is they can go -- anybody can go to

17   CIS and say, "I didn't get it, here's a copy, go to DOL,

18   please."

19   Q.  If that happens, would there be a record in the Department

20   of Labor file that that occurred?

21   A.  There should be, yes.

22   Q.  Did you see any -- did you see one of those in the 375

23   files you looked at?

24   A.  They wouldn't necessarily be in these -- in these files.

25   We would have a record someplace else.

D1h1cib2                              McGovern - cross

1   Q.  So the answer is, you didn't see any in these 375 files.

2   A.  I did not see any in these files.

3   Q.  Did you have the opportunity to see any of them in any

4   Department of Labor files, as those files relate in some way to

5   these 375 files?

6   A.  No.

7   Q.  Now could we take a look at 110-22.

8           (Counsel conferring)

9           MR. GREENFIELD:  I apologize, Judge, but what I know

10  about technology, you could put on the head of a pin.

11  Q.  Do you see that?

12  A.  Yes, I can.

13  Q.  Okay.  That's an application on behalf of Vintage

14  Partners -- actually, on behalf of a prospective employee of

15  Vintage Partners with the address Jed David Philwin; right?

16  A.  That is correct.

17  Q.  Now I believe we'll see in a moment that this case was in

18  fact certified.  Where would the certification have been sent,

19  the blue piece of paper?

20  A.  The certification would have been sent to this address.

21          MR. GREENFIELD:  Can we go to the application.

22  Q.  Do you see the --

23          MR. GREENFIELD:  Could we go to Section D, the case

24  information.

25  Q.  Do you see line 5, the e-mail address?

D1h1cib2                           McGovern - cross

A.  Vintagepartners@yahoo.com.

Q.  Would that be the e-mail address that was established by
Vintage Partners when it opened the account with the Department
of Labor?

A.  Yes.

Q.  And do you know -- withdrawn.

        Is there any record within the Department of Labor as
to who opened that account, who controlled that account, where
it was opened, and whether Mr. Tischler was even aware of it?

A.  I don't know.

Q.  You don't know if there's any such record.

A.  I don't know if there's any such record.

Q.  Now in the event that there was no -- that this --
withdrawn.

        If this file was opened, this application was made by
e-mail, a return --

A.  I'm sorry.  The application is not made by e-mail.  The
application is submitted electronically through an operating
system.

Q.  It's all the same to me, but okay.  I understand what
you're saying.  Somebody, through this account, electronically
filed this application.

A.  That is correct.

Q.  And listed this vintagepartners@yahoo.com as the return
e-mail address, if you will.

D1h1cib2                          McGovern - cross

1    A.   That is correct.

2    Q.   And someone at the Department of Labor sent a responding --

3    a response to this vintagepartners@yahoo.com e-mail address and

4    asked four questions, as I understood.

5    A.   It is not a response.  It is an e-mail that goes out to

6    that address asking those four questions.

7    Q.   Well, it's in a response to --

8    A.   Submission of an application.

9    Q.   Right.  Okay.  And if those four questions were answered

10   correctly, satisfactorily, there would not have been any phone

11   call follow-up; is that correct?

12   A.   That is correct.

13   Q.   And if we can go down further to -- I believe there's a

14   certification letter in this application.

15            (Counsel conferring)

16            MR. GREENFIELD:  Can we look at 27.

17            (Counsel conferring)

18            MR. GREENFIELD:  For the record, I've asked

19   Ms. Echenberg to let the witness have the 110 series to look

20   at.

21   Q.   I want you to take a minute and -- well, first of all, are

22   there 50 separate files in that 110 series?

23   A.   Hang on.

24   Q.   I guess there should be 49, including the one that's still

25   on the board there.

D1h1cib2                          McGovern - cross

1    A.  (Witness reviews exhibits.)  There should be a total of 50

2    records in the series.

3    Q.  Okay.  Now you've already looked at number 22 on the screen

4    there.  I want you to take a look at 23, 24, and 25, if you

5    will, just on the application page -- on the top page, to tell

6    me who the person who would have gotten the correspondence

7    would have been.

8    A.  Okay.  Jed David Philwin, 17 Battery Place, Suite 323, New

9    York, New York 10004, or Jed D. Philwin, 110 Wall Street,

10   21st Floor, New York, New York 10005.

11   Q.  Okay.  That's for 23?

12   A.  23 went to Battery Place, 24 and 25 went to Wall Street.

13   Q.  All Mr. Philwin.

14   A.  Yes, that is correct.

15   Q.  Okay.  Take a look at 26, 27, and 28.

16   A.  Okay.

17   Q.  Same question.

18   A.  All of them went to Vintage Partners, care of Jed David

19   Philwin, 110 Wall Street, 21st Floor, New York, New York

20   10005.

21   Q.  Take a look at 29.

22   A.  Okay.

23   Q.  Where does that go?

24   A.  Vintage Partners, care of Jed David Philwin, 110 Wall

25   Street, 21st Floor, New York, New York 10005.

D1h1cib2                          McGovern - cross

1    Q.  Take a look at number 31.  Is that a file that was

2    certified?

3    A.  Yes.

4    Q.  And who was the top addressee on that?

5    A.  Vintage Partners, care of Jed David Philwin, 110 Wall

6    Street.

7    Q.  Okay.  And are there cc's listed there?

8    A.  Cc Vintage Partners.

9    Q.  Does it have an address?

10   A.  Yes, it does.  Harold Tischler, care of Vintage Partners,

11   4316 17th Avenue, Brooklyn, New York 11204.

12   Q.  So that would have been an envelope that contained a white

13   copy that you testified to before; right?

14   A.  Correct.

15   Q.  Take a look at 35 through 40 and tell me if -- where those

16   go.

17   A.  Where what goes?

18   Q.  Well, where that top address is.  Who's listed as the

19   person where all of the communications are mailed?

20   A.  I'm sorry.  35 through 40?

21   Q.  Yes.

22   A.  Okay.  Vintage Partners, care of Jed David Philwin, 110

23   Wall Street, New York, New York 10005.

24   Q.  Every one of them.

25   A.  Every one.

D1h1cib2                        McGovern - cross

1    Q.  Now would that be -- your answer would be the same for 41,

2    42, and 43?

3    A.  Yes.

4    Q.  And if you look at number 44, tell me who the person is

5    there.

6    A.  Vintage Partners, care of Zvi M. Samuels, 1301 47th

7    Street, Brooklyn, New York 11219.

8    Q.  Do you know who Mr. Samuels is?

9    A.  No, I do not.

10   Q.  Take a look at the rest of them, 45 through 50, and tell me

11   whether or not Mr. Samuels is listed as the top addressee on

12   every one of those.

13   A.  Yes, that is correct.

14   Q.  Let me take those back.

15   A.  Sure.  Uh-oh.  I'm not sure which number is which.

16          MR. GREENFIELD:  The witness doesn't know which goes

17   into which.

18          MS. ECHENBERG:  Sure.

19          THE WITNESS:  I think that one goes there, I think

20   this one goes there.

21          (Pause)

22   Q.  I put in front of you the physical exhibits for 111.

23   That's Fix Anything.  Do you recall that, that name?

24   A.  Yes, I do.

25   Q.  Take a look at number 36.  I'm going to ask you who that

D1h1cib2                    McGovern - cross

1    top main addressee is in that exhibit.

2    A.  Fix Anything Construction and Plumbing, Inc., care of Jed

3    David Philwin, 17 Battery Park Place, Suite 323, New York, New

4    York 10004.

5    Q.  And if I asked you the same questions about who would get

6    the mail and that certified blue copy, your answers would be

7    the same; right?

8    A.  Yes.

9            MR. GREENFIELD:  All right.  Now could I have 115.

10            For the record, I'm handing the witness the hard copy

11    files for Exhibit 115.

12    Q.  What company corresponds to Exhibit 115?

13    A.  L & T Realty, Inc., care of Harold Tischler.

14    Q.  The address that corresponds is what?

15    A.  I'm sorry.  L & T Realty, Inc., care of Harold Tischler,

16    3422 Old Capitol Trail, Suite 694, Wilmington, Delaware 19808.

17    Q.  Okay.  And take a look at 115-1.

18    A.  Okay.

19    Q.  Who's the main addressee there, that top addressee?

20    A.  There is no top addressee on 115-1.

21    Q.  Okay.  Is there a contact listed?

22    A.  Yes, there is.  Harold Tischler, 3422 Old Capitol Trail,

23    Suite 694, Wilmington, Delaware 19808.

24    Q.  The mail and the communication on that application would

25    have gone to Delaware?

1    A.  Yes, because there's no agent or attorney.

2    Q.  Right.  And is there any indication in there of any address

3    for L & T or Mr. Tischler in Brooklyn?

4    A.  No, there is not.

5    Q.  Okay.  Take a look at 115-2.  Tell me if there's a main

6    addressee there.

7    A.  There is no main address on here.

8    Q.  Okay.  Is there a contact listed?

9    A.  Harold Tischler, 3422 Old Capitol Trail, Suite 694,

10   Wilmington, Delaware.

11   Q.  Is there any cc indicating there anywhere where -- with a

12   Brooklyn address?

13   A.  No.

14   Q.  Okay.  How about number 3; does that have a main addressee

15   cover sheet?

16   A.  Yes, it does.

17   Q.  And who is that?

18   A.  L & T Realty, Inc., care of Harold Tischler, 3422 Old

19   Capitol Trail, Suite 694, Wilmington, Delaware 19808.

20   Q.  And anywhere in there is there an indication of who the

21   contact is?

22   A.  Harold Tischler, same address in Wilmington, Delaware.

23   Q.  Any cc for Mr. Tischler or L & T in Brooklyn?

24   A.  For L & T in Brooklyn, no.

25   Q.  Or Mr. Tischler in Brooklyn.  Any reference to a Brooklyn

D1h1cib2                          McGovern - cross

1   address in that folder at all?

2   A.  No.

3   Q.  Okay.  I'm not going to make you go through every one, but

4   I would like you to look at number 17.

5   A.  Okay.

6   Q.  Who's the main addressee there?

7   A.  L & T Realty, care of Jed David Philwin, 17 Battery Place,

8   Suite 323, New York, New York 10005.

9   Q.  Is there a cc anywhere there?

10  A.  Cc for L & T Realty.

11  Q.  At what address?

12  A.  C/O Jed David Philwin, 17 Battery Park Place.

13  Q.  So in that case, the main addressee and the --

14  A.  I'm sorry.  There's also one other cc, for Harold Tischler,

15  L & T Realty, at the Wilmington address I stated earlier.

16  Q.  So there's a main addressee and two cc's and two addresses,

17  Battery Place for Mr. Philwin -- for L & T, Battery Place care

18  of Mr. Philwin, and L & T care of Mr. Tischler in Delaware.

19  A.  Correct.

20  Q.  No Brooklyn address there anywhere; correct?

21  A.  Let me look.

22          Correct.

23  Q.  Take a look at number 25, please.

24  A.  Okay.

25  Q.  Who's the main addressee there?

D1h1cib2                          McGovern - cross

1   A.  L & T Realty, care of Jed David Philwin, 82 Wall Street,

2   Room 610, 10005.

3   Q.  Is there a Brooklyn reference there anywhere?

4   A.  The only reference to Brooklyn is the address of the alien,

5   who --

6   Q.  Besides that.  Well, all right.  That's not Mr. Tischler;

7   right?

8   A.  No, it is not.

9   Q.  And is it any address that you associate with Mr. Tischler,

10  from your preparation in this case?

11  A.  The address associated with Mr. Tischler listed here is the

12  Wilmington address I stated earlier, 3422 Old Capitol Trail,

13  Suite --

14  Q.  And what is the Brooklyn address that you found, for the

15  alien?

16  A.  951 45th Street, Brooklyn, New York, no zip code.

17          MR. GREENFIELD:  Okay.  I just need a moment, Judge.

18          Could we put up 107-21-A.

19  Q.  I direct your attention to the line number 1.  It says,

20  "Verified information with contact."  Does that indicate to you

21  whether that was done by e-mail or telephone?

22  A.  That indicates to me that it was done with telephone, that

23  the entry --

24  Q.  What is it about --

25  A.  -- was made by Wanda Morris saying she verified the

D1h1cib2                        McGovern - cross

1    information with contact.

2    Q.  How do you know that she didn't send the contact an e-mail?

3    A.  Because she doesn't actually send the contact an e-mail.

4    It's done through the computer.

5    Q.  You mean she doesn't have access to her computer to send an

6    e-mail?

7    A.  No, she does, but it's done even before it gets to Wanda

8    Morris.

9    Q.  So no one in Ms. Morris' position at the help desk ever has

10   occasion to send an e-mail to anybody in relation to an

11   application?

12   A.  I don't believe that they do that.  In other words, that it

13   goes out through the computer and comes back, she will --

14   someone will review that e-mail, but she doesn't actually

15   physically send the e-mail.

16   Q.  Is there anything here that indicates that a phone call was

17   required because an employer didn't respond to a letter or to

18   the e-mail that you discussed earlier?

19   A.  Yes, it tells me that she had made the phone call because

20   she entered a case note.

21   Q.  So there's a case note that doesn't say it was a phone call

22   that you believe indicates it was a phone call.

23   A.  Yes.

24   Q.  But we've seen other case notes, have we not, that say

25   employer didn't respond to e-mail or letter and then an

D1h1cib2                          McGovern - cross

1     indication that there was a phone call made; correct?

2     A.   There may be some case notes where they say we made the

3     phone call because the employer didn't respond to the e-mail.

4     Q.   Well, didn't you say -- Mr. Brill can confirmed to me --

5     that the protocol is that if an e-mail is responded to, there's

6     no need for a phone call?

7     A.   That's correct.

8     Q.   So the fact that an e-mail is not responded to or letter is

9     not responded to is not reflected on the case note.

10    A.   It's reflected in the case note by virtue of the fact that

11    a phone call had to be made.

12    Q.   And you can tell there was a phone call made because it

13    says that there was information verified.

14    A.   Verified information with contact.

15    Q.   Okay.  So it couldn't be that the e-mail was responded to,

16    it was considered verified because of that e-mail, therefore,

17    no phone call was necessary, and the only other entry is the

18    review is completed and certified or approved.  You don't think

19    that that's possible under the -- from what you're looking at.

20    A.   I'm sorry.  I don't think what's possible?

21    Q.   That no phone call was made, that the person who filled out

22    this case note said, I've got an e-mail response that verifies

23    the information, and then passed it on, and a month later

24    Mr. Woodrow said the review was completed and approved it.

25    A.   No, because if it had been completed through the e-mail, it

D1h1cib2                          McGovern - cross

1   would have gone into production, so it would have gone to a

2   federal analyst --

3   Q.  Who's Mr. Woodrow?

4   A.  -- and -- Mr. Woodrow is a federal analyst.

5               (Continued on next page)

D1HLCIB3                    McGovern - cross

1    BY MR. GREENFIELD:

2    Q.  It did go to him?

3    A.  It went to him after it went to Wanda Morris who verified

4    the information with contact.

5    Q.  And Wanda Morris is who?

6    A.  Wanda Morris would have been one of our contract employees.

7    I don't know if she's still employed with us.

8    Q.  Have you ever spoken to her about this case?

9    A.  No, I have not.

10   Q.  Have you made any effort to determine whether she's still

11   employed by the Department of Labor?

12   A.  No, I have not.

13   Q.  Do you know whether anyone that you've spoken to in

14   connection with this case has made any such attempt to locate

15   Wanda Morris or speak to her or confirm what she did?

16   A.  I do not know.

17   Q.  Okay.  Does there ever come a time when the help desk

18   receives an inquiry from an employer who's filed an application

19   either by telephone or email?

20   A.  Yes.

21   Q.  So it's not only the Department of Labor calling out, it

22   could be the employer calling in; is that correct?

23   A.  That is correct.

24   Q.  And if someone called in and said I'm Mr. Tischler and I

25   want to know what's taking so long and I want to verify that

D1HLCIB3                         McGovern – cross

1  everything I said is true, would that be satisfactory to

2  someone who was working on the file?

3  A.  No.

4  Q.  When you say no, you mean they're not supposed to do that,

5  is that right, they're not supposed to take a call from an

6  employer?

7  A.  They take calls from employers.

8  Q.  Right.

9  A.  But you said you said two things.

10 Q.  Okay.

11 A.  You said I'm calling to find out what's taking so long and

12 I'm calling to verify.  Those are two separate issues.  Calling

13 to find out what's taking so long is a status request.  We

14 consider that to be simply a status request.  They would get a

15 standard response.

16 Q.  Which is?

17 A.  Your case is in process.

18 Q.  And every time?

19 A.  Depending on where the case is in process, there might be

20 more information.

21 Q.  And do you tell them that every time they call, they delay

22 the process?

23 A.  That's not true.

24        But the verification process is separate and what

25 you're describing is a cold call.  John Doe filed a case and

1    says, hey, I filed a case yesterday, I want to make sure you

2    guys know I really filed it, that's not the verification

3    process.  That would not be considered to be a verification.

4    Q.  Does the verification process ever involve sending the

5    employer an email saying please call, we've tried to call you,

6    we haven't heard from you --

7    A.  No.

8    Q.  -- you haven't responded, they never send an email asking

9    somebody to call?

10   A.  No.  They send the email asking to verify.  If there is no

11   verification of that, then it goes to a phone call.  After

12   three or four phone calls, the application is denied for

13   failure to verify sponsorship.

14           MR. GREENFIELD:  I have no further questions.  Thank

15   you.

16           THE COURT:  Any redirect?

17           MS. ECHENBERG:  Yes, your Honor.

18   REDIRECT EXAMINATION

19   BY MS. ECHENBERG:

20   Q.  Good morning, Ms. McGovern.

21   A.  Good morning.

22   Q.  So if you could start with the stack of files that are

23   directly in front of you.  If you could just for each file,

24   just note for the record what series that is.  It should be

25   written on the front of the file.

1    A.   Okay.  I have 387 Quincy Associates, series 109.

2    Q.   So starting with series 109, what you should have in that

3    folder is 109-13 to 109-43, is that right, or actually 109-1 --

4    yeah, 103-13 through 43?

5    A.   Yes.

6    Q.   And in those files, are there CCs to the 4316 17th Avenue

7    address?

8    A.   Yes.

9    Q.   You don't need to check all of them; just check a few.

10           So if there's a CC, that means that if the

11   correspondence was sent to those other individuals, it was CCed

12   to 4316 17th Avenue?

13   A.   That is correct.

14   Q.   Moving on to the next folder that's directly in front of

15   you, if you could just do the same thing.  Just note for the

16   record what the series number is.

17   A.   This is series 114, Vintage Builders.

18   Q.   So that should be 114-1 through 27?

19   A.   Correct.

20   Q.   If you could, just let me know if there are any CCs in

21   there to either 4316 17th Avenue or 5318 -- sorry -- 4316

22   17th Avenue or 5318 16th Avenue?

23   A.   There's definitely CCs to 4316 17th Avenue.

24   Q.   Okay.  You can move on to the next set that's directly in

25   front of you.

D1HLCIB3                        McGovern – redirect

1   A.  This is series 110.

2   Q.  Okay.  For 110, I believe that would be 110-22 through 50?

3   A.  That is correct.  I have 110-43 through 50.

4   Q.  And I think you covered this in the cross-examination.  I

5   think you confirmed in this set that there were CCs to 4316

6   17th Avenue.  If you wouldn't mind just confirming that for me?

7   A.  There is definitely CCs to 4316 17th Avenue.

8   Q.  You can move on to the next set.

9   A.  Yes.  This is Fix Anything Construction, series 111.

10  Q.  And that's 111 what through what?

11  A.  Thirty-three through 42.

12  Q.  And are there CCs to either 4316 17th Avenue or 5318

13  16th Avenue?

14  A.  To 4316 17th Avenue.

15  Q.  Okay.  Take those.  And then if you could just look through

16  what remains and confirm to me that the primary recipient of

17  this correspondence is either 4316 17th Avenue or 5318

18  16th Avenue?

19  A.  5318 16th Avenue.

20  Q.  Okay.

21  A.  5318 16th Avenue, this is series 113.

22  Q.  And that first one you just looked at?

23  A.  The first one was BSD Contracting, series 112.

24          This next one is series 109, 387 Quincy Associates,

25  all sent to Harold Tischler at 4316 17th Avenue, Brooklyn.

D1HLCIB3                    McGovern - redirect

1    Q.  Okay.  Next one.

2    A.  This is series 108.  State to State Distribution, Harold

3    Tischler, 4316 17th Avenue, Brooklyn 11204.

4            This is 5318 16th Avenue Enterprises, series 107, all

5    sent to Harold Tischler, 4316 17th Avenue, Brooklyn, New York

6    11204.

7    Q.  You don't need to worry about reorganizing them.

8    A.  Just trying to get them in the envelope.

9    Q.  That's okay.  You can put them to the side and move on to

10   the next set and I'll deal with them.

11   A.  I can't because they're going to fall on the floor.

12           This is series 110.  And it looks like the address on

13   all of these is Vintage Partners C/O Harold Tischler, 4316

14   17th Avenue, Brooklyn, New York 11204.

15   Q.  Okay.

16   A.  This is series 111, Fix Anything Construction.  And the

17   address on all of these is Fix Anything Construction and

18   Plumbing, Inc., care of Harold Tischler, 4316 17th Avenue,

19   Brooklyn 11219.

20   Q.  Okay.  So am I correct that this stack that is on the front

21   of the podium plus the stack that you just put on the front of

22   the podium, that is all correspondence that went, the original

23   primary recipient was either 4316 17th Avenue or 5318

24   16th Avenue in Brooklyn; is that correct?

25   A.  That is correct.

D1HLCIB3                          McGovern - redirect

1    Q.  Okay.  And to the extent that an original certification was

2    sent that the applicant was certified in any of those cases,

3    that original certification would have gone to one of those two

4    addresses; is that correct?

5    A.  That is correct.

6    Q.  I'm giving you what was previously admitted as 3120A.

7    A.  Thank you.

8    Q.  Now, if you could just explain to the jury again what that

9    is?

10   A.  Okay.  This is an actual certification, application for

11   permanent employment certification that has been certified by

12   the Department of Labor, printed on the secure paper, and sent

13   to the employer of record.

14   Q.  And who is the employer of record?

15   A.  CFI Framing and Developers, care of Nathan Schwartz, 46

16   Main Street, Suite 226, Monsey, New York 10952.

17   Q.  Is that the actual package that would have gone in the

18   Department of Labor envelope?

19   A.  Yes, it is.

20   Q.  So the first page is the cover page, the second page is the

21   letter saying you've been certified and then the blue

22   certification is attached?

23   A.  Yes.

24   Q.  Okay.  And when that is sent directly to the employer, are

25   there any signatures on it?

1   A.   The only signature on it is the signature of the national

2   certifying officer, William Carson.

3   Q.   The employer and the alien sign that form after it's sent

4   to either the employer contact or the agent?

5   A.   Correct.  The employer, the preparer, and the alien all

6   have to sign this.

7   Q.   And then it's the signed version that goes to CIS?

8   A.   CIS, correct.

9   Q.   One other thing I wanted to clarify.

10          When an employer wants to file an application, the

11   employer, an account needs to be set up for the employer,

12   correct?

13   A.   That is correct, if they wish to file the application

14   online.

15   Q.   And that's separate from the individual applications that

16   are filed online?

17   A.   That is correct.  All the account does is give them the

18   ability to file an application online.

19   Q.   And then when they file the application online, explain to

20   us how that works.  Put yourself in the position of the person

21   applying.  Do you go to a website, how does it work?

22   A.   You go to the Department of Labor's website.  We have a

23   link on our website, DOLOFLC, Office of Foreign Labor

24   Certification website.  If you have an account already, you can

25   get into your account.  You can prepare the application.  Some

people prepare it outside of our application system and then

they have to transfer it in.  You can use software, various

kinds of commercial software, but they still have to put it

into our system and then they basically push "submit."

Q.  And then it's at that point that the Department of Labor

receives it and begins processing it?

A.  That is correct.

Q.  And who's the first person or position at the Department of

Labor who begins processing it?

A.  It's going to be --

Q.  If you know.

A.  Yeah, I mean it's difficult to say.  It depends on the type

of application it is.  For example, if it's filed online, it's

going to be someone who checks to make sure that the

verification, that it has cleared, and then it goes into a

production queue and then an employee, a federal employee will

review the application if it -- that's if it has passed the

sponsorship verification.  If it has not, then it goes to the

contract employee to verify sponsorship.

Q.  And when you say if it has passed the sponsorship

verification, you're talking about that email step?

A.  I'm talking about the email that goes out from our system

to the address listed on the application that says are you

sponsoring this individual and are you aware that this has been

filed, etc., the four questions that I testified to before.

1    Q.  And if that email is not responded to, then it gets

2    assigned to someone to make a phone call?

3    A.  That is correct.

4    Q.  But that's a different person or different department than

5    that initial verification through email or is it not?

6    A.  We're all the same department.  I'm sorry.

7    Q.  Excuse me.  A different group of people at the Department

8    of Labor who decide whether that first verification has

9    happened from the people who make the calls or is it the same

10   group of people?

11   A.  It's the same group of people.

12   Q.  Are they, the people who make the phone call, do they

13   personally receive the emails verifying or not verifying?

14   A.  I don't know but I believe they do.  It would go into the

15   account, the internal account, and they would be able to access

16   that.  It doesn't go to them.  It doesn't go to, you know, any

17   of the employees.  It wouldn't go straight to them.  It would

18   go into the account associated with that case, with that

19   application.

20   Q.  And then if they see it hasn't been verified, they know

21   they need to make a phone call?

22   A.  It would go to them and say this has to -- a phone call has

23   to be made.

24   Q.  And there's been some reference to the help desk.  But the

25   people who make the phone calls, are they the help desk or is

1    that something different?

2    A.  No, that is not correct.  The help desk is a function --

3    the help desk is an electronic set of mailboxes that we

4    maintain for various purposes.  For example, as I talked

5    earlier, we talked about duplicates.  Communication with USCIS,

6    we have a dedicated mailbox between USCIS and the Department of

7    Labor for those kinds of cases.  We have dedicated mailboxes, a

8    series of them.

9            For example, when Hurricane Sandy hit and people

10   couldn't file cases or couldn't get their certifications

11   because their mailboxes were flooded, we had an established

12   mailbox to help them to at least communicate with us

13   specifically about those issues.

14           So we have series of mailboxes and that is the help

15   desk.  That is staffed by contract employees who are overseen

16   by federal employees.  But the people who do this -- meaning,

17   when I say this, sponsorship verification -- they are employed

18   by the same contract employer, but both of them are under

19   federal supervision.

20   Q.  But the people making phone calls have a different job than

21   the people who deal with the help desk?

22   A.  That is correct.  We have separate group that just does

23   business existence and a separate group who does sponsorship

24   verification.

25           MS. ECHENBERG:  If I could have one moment, your

D1HLCIB3                          McGovern – redirect

1     Honor.

2     Q.  And I believe you testified during your direct that you've

3     been at the Atlanta -- let me take a step back.

4            The call notes that we looked at today and yesterday,

5     those all came out of the Atlanta processing center; is that

6     right?

7     A.  Yes.  All of these case notes were out of Atlanta.

8     Q.  And you've been to the Atlanta processing center, right?

9     A.  Yes, I have.

10    Q.  And you've overheard people actually making these calls,

11    right?

12    A.  Yes, I have.

13    Q.  And when you overheard those calls, was what you heard

14    consistent with what you've described as the process today?

15            MR. BRILL:  Objection.

16            THE COURT:  I'll allow it.  Finish it.

17    Q.  When you overheard --

18    A.  Yes.

19    Q.  Let me make sure the whole question is on the record.

20            When you overheard those calls being made, was what

21    you overheard consistent with the way you've described the

22    process during your testimony yesterday and today?

23    A.  Yes.

24            MS. ECHENBERG:  Nothing further.

25            THE COURT:  All right.  Any recross?  I think we can

D1HLCIB3                    McGovern – redirect

1    send you back to Washington.  Excuse our jury.

2            Thank you for coming.

3            Excuse our jury.  Remember the two rules:  Don't talk

4    about the case and keep an open mind.  See you five to 12.

5            (Witness excused)

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D1HLCIB3

```
 1                (Jury not present)
 2                THE COURT:  Who's your next witness?
 3                MR. PASTORE:  Ilhan Altintas.
 4                THE COURT:  He is a?
 5                MR. PASTORE:  He is a lay witness who was a client of
 6      the law firm.
 7                THE COURT:  Okay.  Thank you.
 8                MR. DONALDSON:  Ten minutes, five minutes?
 9                THE COURT:  Excuse me?  Five of.
10                MR. GUTMAN:  Your Honor, there are two matters I
11      wanted to bring up if this is a good time to do it.  One is
12      really procedural which is for objections to coconspirator --
13      statements that the government is going to offer as
14      coconspirator statements, can we, rather than objecting every
15      time it happens, have an understanding that we object to any
16      such statements coming in other than subject to connection,
17      which I think is the procedure contemplated by the Bourjaily
18      case, and later in the trial the Court would have to rule on
19      whether the connection has been made.
20                MR. DONALDSON:  I'll join that.
21                THE COURT:  I'm sorry?
22                MR. DONALDSON:  I said I'll join that.
23                THE COURT:  Okay.  Fine.
24                MR. PASTORE:  Just so I understand procedurally what's
25      going on, basically they're making a blanket -- they're
```

D1HLCIB3

1   reserving right to later object.

2          THE COURT:  That there was not sufficient showing of

3   the existence of a conspiracy to permit coconspirator

4   testimony.

5          MR. PASTORE:  And at that point the particular

6   statements would be stricken from the record.

7          THE COURT:  Well, you're not assuming that they're

8   going to be stricken, right, just the opposite.

9          MR. GUTMAN:  Your Honor, the other thing relates to an

10  earlier issue that the Court ruled on concerning

11  Mr. Grynsztajn -- I'm sure I'm mispronouncing it -- his 30 year

12  old falsification of documents based on social security

13  information.  Since the time of that ruling, actually, on

14  January 4, his 3500-174, I'm sorry, 3501-74, which is the plea

15  agreement entered, the plea and cooperation agreement entered

16  by the government with Mr. Grynsztajn on January 4, which

17  specifically references that incident and is given as part of

18  the consideration for his agreement the benefit that that will

19  not be, that he will not be prosecuted for that.

20         THE COURT:  Wouldn't we think the statute of

21  limitations has run out?

22         MR. GUTMAN:  Someone must not because it was included.

23         THE COURT:  Maybe someone is extra careful.

24         MR. GUTMAN:  Also, it specifically notes that that can

25  be treated as relevant conduct for sentencing purposes.  So the

D1HLCIB3

1    government having made that part of its agreement with the

2    witness I think makes it, first of all, there's a good chance

3    that this agreement may come into evidence.  I don't know if it

4    will or it won't.  But in any event, it seems that has returned

5    this to being something that's relevant for the jury to

6    consider.

7            MR. PASTORE:  Your Honor points out correctly that the

8    statute of limitations has passed.  It's in the agreement

9    because it's one of the things that's going to be mentioned in

10   Mr. Grynsztajn's sentencing submission by the government.  And

11   the paragraph, as I'm sure your Honor is familiar with,

12   indicates that basically puts the defendant on notice that this

13   is going to be included in the 5K letter, if any, that's filed

14   with the Court.

15           So that was the purpose of putting it in there so that

16   the defendant wouldn't later, defense counsel for the

17   defendant, I'm sorry, for the witness/defendant wouldn't later

18   object to us raising it when we put it in the 5K letter as part

19   of his history.  So it's actually a negative for him.  It's not

20   a benefit for him to the extent that, yes, there is immunity.

21   Your Honor points out it's not a benefit in the sense of the

22   statute of limitations has already run.  So it's in there

23   because it's relevant conduct, so.

24           THE COURT:  I'm not changing my ruling.

25           (Luncheon recess)

D1HLCIB3

                         AFTERNOON SESSION

                              12:04 p.m.

1

2

3          (Jury present)

4          THE COURT:  The government can call its next witness.

5          MS. ECHENBERG:  The government calls Nicholas Cycyk.

6     NICHOLAS CYCYK,

7          called as a witness by the Government,

8          having been duly sworn, testified as follows:

9     DIRECT EXAMINATION

10    BY MS. ECHENBERG:

11         MS. ECHENBERG:  May I proceed, your Honor?

12         THE COURT:  Yes.

13    Q.  Mr. Cycyk, where do you work?

14    A.  I work for the Department of Homeland Security with United

15    States Citizenship and Immigration Services.

16    Q.  What is your title?

17    A.  Immigration services officer.

18    Q.  What are your current job responsibilities?

19    A.  I interview applicants who apply petitions and applications

20    for immigration benefits.

21    Q.  And have you had any other jobs at Citizenship and

22    Immigration Services?

23    A.  Yes.  I also worked in New York for Naturalization

24    Department.

25    Q.  During what time period did you work in New York for the

D1HLCIB3                       Cycyk - direct

1    Naturalization Department?

2    A.  From May 2008 until October 2012.

3    Q.  And what were your job responsibilities during that period?

4    A.  I would interview applicants who had applied for

5    naturalization.

6    Q.  Where would those interviews occur?

7    A.  At 26 Federal Plaza.

8    Q.  And where is that located?

9    A.  Across the street from here.

10   Q.  In Manhattan?

11   A.  Yes.

12   Q.  And other than interviewing applicants, did you have any

13   other job responsibilities?

14   A.  I was also responsible for conducting naturalization

15   ceremonies in and around New York City.

16   Q.  And when you interviewed applicants, in general -- let me

17   take a step back.

18            How does one apply for naturalization?

19   A.  There are several sections of law under which you can apply

20   under.  Generally most people apply after being a permanent

21   resident for five years.  You can apply on a standardized form

22   that we have.  It's called the application for naturalization.

23   Q.  Does it have a number assigned by CIS?

24   A.  Yes.  The form is N-400.

25   Q.  And where does that application go if someone fills it out?

1    A.  When someone fills out the application, they mail it along

2    with the appropriate fee to our national service center.  They

3    process the application and forward it to the local field

4    office for interview.

5    Q.  And so in your case, applications would be forwarded to the

6    New York field office and then would you conduct some of those

7    interviews?

8    A.  Correct.

9    Q.  And how is it determined what interviews you would conduct?

10   A.  It was on a random basis.

11   Q.  So you would be assigned interviews to conduct?

12   A.  Yeah, usually about 12 to 14 cases per day.

13   Q.  And approximately how long would each interview last?

14   A.  Roughly half an hour.

15   Q.  I'm showing you what's been marked as Government

16   Exhibit 410.  Do you recognize that document?

17   A.  Yes, I do.  This is the N-400 application for

18   naturalization.

19   Q.  And do you recognize that particular N-400?

20   A.  Yes, I do.  It has my handwriting here on the first page.

21   Q.  Is that how you recognize it?

22   A.  Yes.  It's also the standardized form on which we interview

23   every applicant.

24   Q.  And is that form, Government Exhibit 410, is it in the same

25   or substantially the same condition as the last time that you

D1HLCIB3                          Cycyk - direct

1    saw it?

2    A.  Yes.

3         MS. ECHENBERG:  The government moves to admit

4    Government Exhibit 410.

5         MR. GERZOG:  Subject to connection, your Honor.

6    Q.  Whose application is this in regards to?

7    A.  This is for Refeal Arie Noach Brodjik.

8         MR. GERZOG:  No objection.

9         MS. ECHENBERG:  May we publish it, your Honor?

10        THE COURT:  Yes.

11        (Government's Exhibit 410 received in evidence)

12   Q.  When you would conduct interviews, generally what questions

13   would you ask?  Just very generally.

14   A.  We would go over the application page by page.  We'd ask

15   you basically biographical information, information related to

16   their past history, whether it be residence, presence, good

17   moral character, all the sections which they have to meet under

18   the law.

19   Q.  And when you receive the application for an interview, does

20   it have those marks through it?

21   A.  No, it doesn't.

22   Q.  Who makes those marks?

23   A.  I make those marks in red ink.

24   Q.  And in the version you're looking at, does it have your red

25   mark inks on it?

D1HLCIB3                          Cycyk - direct

1    A.   Yes.

2    Q.   Your red ink marks?

3    A.   Yes.

4    Q.   So turning to Government Exhibit 410, if you could just

5    very briefly summarize what's contained in parts one through

6    five of this application?

7    A.   Certainly.  Part 1 we ask what is your complete current

8    legal name.

9            Section B we ask, we want to see what name appears on

10   the resident card.

11           Part C, we want to see if the person has used any

12   other names, whether it be a nickname or maiden name.

13           And as part of the application process in part D, we

14   do allow the applicant to legally change their name if they

15   decide to do so.

16   Q.   Did Refeal Brodjik do that in case?

17   A.   Yes.  He changed a portion of his middle name.

18   Q.   And, again, if you could just summarize briefly parts two,

19   three, four, and five?

20   A.   Sure.  Part 2 is the section of law in which the applicant

21   is applying under.  In this case it would be under the

22   five-year permanent resident rule.

23           And Part 3 is also biographical information.  We want

24   to know the applicant's social security number, date of birth,

25   the date that they became a permanent resident, which is green

D1HLCIB3                          Cycyk - direct

1    card holder, their country of birth and their country of

2    citizenship or nationality.  We want to determine whether or

3    not either of the parents are U.S. citizen and their current

4    marital status.

5            H and I refers to applicant who is requesting some

6    sort of accommodation for the interview process or the testing

7    process due to a disability.

8            Part 4 we want to know the applicant's current address

9    and their current phone number.

10           Part 5 is also biographical information.  We want to

11   know race, gender, height, weight.  This is basically used as

12   part of the background check process.

13           Part 6 we want to see where the person has been

14   residing for the five years preceding the application.

15   Q.  If you could stop through for a moment.

16   A.  Sure.

17   Q.  So part 6B, what is that section?

18   A.  Part 6B is the section related to their employment or

19   school for the past five years.

20   Q.  And why do you ask that question?

21   A.  We just want to make sure that the person is involved in

22   good employment, and if they are not employed, how are they

23   supporting themselves financially.

24   Q.  And looking at this document, can you tell if you -- let me

25   take one step back.

1          Did you interview Refeal Brodjik in connection with

2     this application?

3     A.  Yes, I did.

4     Q.  And how do you know that?

5     A.  Because my handwriting is on the pages and the numbers, the

6     circle numbers, you see three and four here in the right-hand

7     side, those are also my corrections.

8     Q.  And looking at your notations, do you know whether you

9     discussed this particular section with Refeal Brodjik?

10    A.  Yes, I did.  I asked him what is his current employment at

11    the time that I did the interview, and he indicated to me that

12    he is the owner of Nini Eyewear at 40 McNamara Road in Spring

13    Valley.

14    Q.  And did you also review the other employment listed on this

15    page?

16    A.  I cannot say for sure.  We do review all portions of the

17    application.  But due to time constraints, we would not always

18    be able to ask every single portion of the application.

19    Q.  And if someone is untruthful in this portion of the

20    application, would that be material to your determination about

21    whether they should naturalize?

22             MR. GERZOG:  Objection.

23             THE WITNESS:  Yes.  Should I answer?

24             THE COURT:  Overruled.

25    Q.  Let me ask the question one more time.

D1HLCIB3                          Cycyk - direct

1              If someone is untruthful in the Section 6B about their

2      current or former employment, is that material to your

3      determination about whether they should be naturalized,

4      meaning, does that matter, is that an important consideration

5      about whether or not they should be naturalized?

6              MR. GERZOG:  Objection again, Judge.  Changed the

7      question -- I think it's even more objectionable now.

8              MS. ECHENBERG:  We can read back the original question

9      if that's necessary.

10             THE COURT:  The other way to ask it is if you

11     determine that someone lied in this section of the application,

12     what would the impact be, if any, on your granting the

13     application?

14     Q.  Did you hear that question?

15     A.  Yes, I did.  If the person was engaged in activity that

16     wasn't what they state that they were on the application, it

17     can affect their eligibility.

18     Q.  In what way?

19     A.  It could be an issue of their good moral character which

20     they have to establish as part of the naturalization process.

21     Q.  If you could turn now to just briefly review parts seven,

22     eight, and nine?

23     A.  Part 7 is related to all trips outside the United States

24     within the five-year statutory period.

25             Part 8 relates to the applicant's marital history, how

D1HLCIB3                          Cycyk – direct

1    many times they have been married, who are they currently

2    married to, and the address and biographical information of

3    their spouse.

4              Part 8 is also related to any marital history, whether

5    it be for the applicant or the applicant's spouse.

6    Q.  And turning now to Part 9?

7    A.  Part 9 we want to know how many children the applicant has,

8    what is their current resident status, whether they're a

9    citizen, whether they have a green card, where were they born,

10   and where do they live.

11   Q.  And turning now to Part 10 of the application.  What is the

12   purpose, what is this section?

13   A.  Part 10 are what we call the yes/no questions.  These are

14   questions that are standardized questions that we ask every

15   applicant.

16   Q.  And do you orally go over these questions during every

17   interview?

18   A.  Yes.

19   Q.  Turning to Section 10D, what is this section?

20   A.  This is the good moral character section.

21   Q.  What is the purpose of this section?

22   A.  To establish whether the applicant meets the good moral

23   character requirements under the law.

24   Q.  And if an applicant is untruthful in this section, what

25   consequences, if any, would that have on their naturalization

1    application?

2    A.  It can severely affect their application.  It can result in

3    a denial of their application if they give any false testimony

4    or false information different than what they indicated during

5    the interview or on the application.

6    Q.  And in your interviews, do you ask every single one of

7    questions 15 through 21 orally?

8    A.  I always ask 15 and 16 and 17 orally.  If the person

9    indicates "no" during the interview, then I usually skip 18

10   through 21, as it usually generally does not apply.

11   Q.  If we could blow up questions 15 through 17, please.

12            So you read those questions out loud?

13   A.  Yes, I do.

14   Q.  And do you ask any other questions related to these

15   questions as a practice?

16   A.  I do.  They always encourage us just because there could

17   be -- people can be confused.  But I always ask the applicant

18   have they ever had any problems with law enforcement, have they

19   ever had any issues with the police, because some people don't

20   always necessarily consider certain actions to be an arrest.

21   Q.  And if you could read question 15, please?

22   A.  Yes.  I always ask this question:  Have you ever committed

23   any crime or offense for which you were not arrested?

24   Q.  Okay.  And if you could turn -- and that notation, if we

25   could go back to the regular size, please, that notation in the

D1HLCIB3                          Cycyk - direct

1    box, what does that say in the handwriting?

2    A.  I wrote "claims no arrests."

3    Q.  And why did you write that?

4    A.  I wrote that because that's part of the testimony that the

5    applicant gave.

6    Q.  Okay.  If you could turn now to still in Part 10, Section

7    D, questions 23 and 24, do you always ask those -- if you could

8    read those questions first, please.

9    A.  Yes.  The first question 23:  Have you ever given any false

10   or misleading information to any U.S. government official while

11   applying for any immigration benefit or to prevent deportation,

12   exclusion, or removal?

13             And question 24:  Have you ever lied to any U.S.

14   government official to gain entry or admission into the United

15   States?

16   Q.  Do you read both of those questions when you conduct your

17   interviews?

18   A.  Yes.

19   Q.  And so the fact that you have a line over "no," what does

20   that indicate?

21   A.  That indicates that the applicant testified "no" on that

22   portion.

23   Q.  And is that true of the other questions we just discussed,

24   15, 16, and 17?

25   A.  Yes.

1              MS. ECHENBERG:  Can I have one moment, your Honor.

2    Q.  Are there questions in this application about a filing of

3    taxes?

4    A.  Yes.

5    Q.  Where are those questions?

6    A.  Questions -- if you could go back up to Part 10, a few

7    pages forward, it says Part 10A, there is question No. 4 and

8    question No. 5, and I always ask these questions.

9    Q.  So, again, the line over "no" indicates that you asked the

10   question and the answer was no?

11   A.  Correct.

12   Q.  And if we could turn now to Part 11, which is on the second

13   to last page.

14   A.  Part 11 is the applicant's signature when they file the

15   application.

16   Q.  So when you receive the document in advance of your

17   interview, this section has already been signed?

18   A.  Correct.

19   Q.  And then moving on to Part 12.

20   A.  Part 12 is if the applicant used a preparer or a attorney

21   to help them file the application, they would indicate their

22   information here.

23   Q.  So if there's nothing here, what does that mean to you?

24   A.  That means the applicant most likely filled out the

25   application on their own.

1    Q.  Are they required to put preparer information down if

2    someone else prepared the application?

3    A.  Absolutely.

4    Q.  Turning to Section 13, what is that section?

5    A.  Section 13 is where I number the corrections and the

6    attachments as part of the application.  I print and sign my

7    name and put the date of the interview.  The applicant also

8    prints their name or signs their name.

9    Q.  And why do you ask the applicant to print or sign their

10   name there?

11   A.  They're testifying that everything on the application and

12   during their testimony was truthful.

13   Q.  And is that that language above, I swear, affirm, and

14   certify under penalty of perjury, that language?

15   A.  Correct.

16   Q.  So the date next to your name is the date you conducted

17   this interview?

18   A.  Yes, August 17, 2011.

19           MS. ECHENBERG:  I have nothing further.  I have one

20   more question.

21   Q.  Going back to the tax section on the application, that was

22   Part 10, questions 5 and 6, if an applicant is not truthful in

23   that section, how if at all does that affect their application?

24   A.  It would affect their application.

25   Q.  In what way?

D1HLCIB3                         Cycyk - direct

1    A.  It would be a matter of good moral character.  There's also

2    issues of their residency.  You know, we want to make sure that

3    everyone is paying their taxes and they're being honest about

4    their taxes.

5           MS. ECHENBERG:  Okay.  Nothing further at this time,

6    your Honor.

7           MR. DONALDSON:  No questions.

8    CROSS-EXAMINATION

9    BY MR. GERZOG:

10   Q.  Mr. -- is it Cycyk?

11   A.  Yes, sir.

12   Q.  You conducted this interview in August of 2011?

13   A.  Correct.

14   Q.  You specifically remember conducting this interview?

15   A.  No.

16   Q.  How many interviews did you conduct that day?

17   A.  I would say approximately 12 to 14.

18   Q.  And the 12 to 14 pretty much every day?

19   A.  Yes.

20   Q.  So that's a lot of interviews?

21   A.  Correct.

22   Q.  And it's very hard to remember any specific interview,

23   correct?

24   A.  Correct.

25   Q.  So what you're testifying about really is what you

D1HLCIB3                           Cycyk - cross

```
 1    generally do.  You're not testifying about what you
 2    specifically did in this interview.  Correct?
 3              MS. ECHENBERG:  Objection.
 4              THE COURT:  Sustained.
 5    Q.  Ms. Echenberg said it is your practice to, but you -- and
 6    you answered in a certain way.  You do not remember whether
 7    during this particular interview you asked any of these
 8    questions during this particular interview?
 9    A.  There are standardized questions that I would always ask
10    for every single interview.
11    Q.  But you don't remember with respect to this particular
12    interview whether you asked one question or forgot to ask a
13    question or asked a different question or did it the same way
14    you normally do, you don't have a specific recollection of what
15    you did?
16    A.  No.
17    Q.  On this interview, correct?
18    A.  Correct.
19    Q.  Now, for example, you said that when you are -- if we could
20    look at ten part, Part 10, Section D, good moral character.
21              Ms. Echenberg asked you if you normally ask 15 and 16,
22    and then you said if I get a "no" answer to 15 and 16, I
23    normally don't ask the rest of the questions.  Isn't that what
24    you said?
25              MS. ECHENBERG:  Objection.  Mischaracterizes.
```

D1HLCIB3                        Cycyk - cross

1   Q.  What did you say?

2           THE WITNESS:  Do I answer the question?

3           THE COURT:  Yes, please.

4   A.  I always ask questions 15, 16, and 17, and that's standard

5   practice that we are required to do.

6   Q.  And if you get "no" answers to those questions, you

7   typically don't ask 18 through 21, correct?

8   A.  Correct.

9   Q.  Yet you have a slash mark through 18 through 21, correct?

10  A.  Correct.

11  Q.  So you didn't -- you probably didn't ask those questions,

12  but you slashed through them anyway?

13  A.  Right, because it's part of the review process.

14  Q.  Right.  So it does -- so a slash mark doesn't necessarily

15  mean you asked the question because you just said that you

16  never ask 18, 19, 20, and 21 if you get a "no" answer to 15

17  through 17, correct?

18  A.  Correct.

19          MR. GERZOG:  I have no further questions.

20          MS. ECHENBERG:  Briefly, your Honor.

21          THE COURT:  I assume no other defense counsel wanted

22  to ask a question.

23  REDIRECT EXAMINATION

24  BY MS. ECHENBERG:

25  Q.  Mr. Cycyk, am I correct that in every interview you ask the

D1HLCIB3                        Cycyk - redirect

1    question:  Have you ever committed a crime or offense for which

2    you were not arrested?

3    A.  Yes.

4    Q.  And in every interview you always ask the question:  Have

5    you ever been arrested, cited, or detained by any law

6    enforcement officer, including USCIS or former NIS and military

7    officers, for any reason?

8    A.  Yes.

9    Q.  And you also ask the question:  Have you ever been charged

10   with committing any crime or offense?

11   A.  Yes.

12   Q.  You always ask those three questions?

13   A.  Yes.

14   Q.  And you put a red slash through it when you've gotten the

15   answer to that question?

16   A.  Correct.

17   Q.  And if we could pull up that page from the original on the

18   Elmo.  That's page 8.  And then you don't need to ask the

19   remainder of the questions after that?

20   A.  Correct, they do not apply.

21   Q.  So what do your red slashes indicate after that?

22   A.  Red slashes indicate that there was no further needed

23   information for that.  The review of the case had been

24   completed in that part.

25   Q.  For questions 23 and 24 at the bottom of that page, it was

D1HLCIB3                    Cycyk – redirect

1    your practice to always ask those two questions; is that

2    correct?

3    A.   Absolutely.

4    Q.   And on the back page, the signature page, before you and

5    the applicant signed section Part 13, do you say anything to

6    the applicant or ask the applicant to read anything?

7              MR. GERZOG:   Objection.   In this interview or in any

8    interview?

9    Q.   What is your practice with regard to Part 13?

10             MR. GERZOG:   Objection, beyond the scope.

11             THE COURT:   Overruled.

12   Q.   What is your practice with regard to Part 13, what if

13   anything do you say or do before you and the applicant sign the

14   application in your presence?

15   A.   I mark the corrections and I mark the number of

16   attachments.   I sign and date and I ask the applicant to sign.

17             (Continued on next page)

18

19

20

21

22

23

24

25

D1h1cib4                          Cycyk - direct

1   BY MS. ECHENBERG:

2   Q.  Do you say anything to the applicant or read anything to

3   the applicant before you do that?

4   A.  No.

5   Q.  Or point anything to them?

6   A.  No.

7   Q.  And again, do you always ask the question about taxes,

8   question 5 and 6?  Do you always ask those questions?

9   A.  Yes.

10         MS. ECHENBERG:  Nothing further, your Honor.

11  CROSS-EXAMINATION

12  BY MR. GERZOG:

13  Q.  Sir, when Ms. Echenberg asked you if it's your practice to

14  do something, you understand that being what you're supposed to

15  do, that's what your job is; right?

16  A.  Correct.

17  Q.  But you do not remember interviewing Refeal Brodjik or

18  asking him those questions specifically; correct?

19  A.  I ask every applicant the same exact questions.

20  Q.  Your testimony under oath is that you know for fact certain

21  that you always ask every applicant each of those questions.

22  A.  Yes.  The questions that were assigned, yes.

23  Q.  And it's not possible that you never made a mistake or

24  never did something a little bit differently than you're

25  supposed to.

D1h1cib4                         Cycyk – cross

1    A.  Yes.

2    Q.  And you don't specifically remember interviewing

3    Mr. Brodjik.

4    A.  Correct.

5            MR. GERZOG:  No further questions.

6            THE COURT:  Okay.  Thank you very much for coming.

7            THE WITNESS:  Thank you.

8            (Witness excused)

9            MS. ECHENBERG:  The government calls Lorena Alava.

10           (Witness sworn)

11           THE CLERK:  Please state and spell your full name for

12   the record.

13           THE WITNESS:  Lorena Alava, L-O-R-E-N-A, A-L-A-V-A.

14           MS. ECHENBERG:  You can be seated.

15           May I proceed, your Honor?

16           THE COURT:  Yes.

17    LORENA ALAVA,

18        called as a witness by the Government,

19        having been duly sworn, testified as follows:

20   DIRECT EXAMINATION

21   BY MS. ECHENBERG:

22   Q.  Good afternoon, Ms. Alava.  Where do you work?

23   A.  I work for Public Storage.

24   Q.  And what is your title?

25   A.  I'm a district manager.

D1h1cib4                              Alava - direct

1   Q.  What are your job responsibilities as a district manager?

2   A.  I have nine properties under my jurisdiction, and I

3   basically manage the properties that have managers and to

4   ensure that we rent space, keep property clean, free of

5   liability, promote customer service.

6   Q.  And what is Public Storage?

7   A.  Public Storage is where you come in and you rent space.

8   Q.  To store your belongings?

9   A.  Storage, it's a storage place, yes.

10  Q.  And where are the nine properties that you manage located,

11  generally?

12  A.  There's three that I have in Rockland County.  It's Spring

13  Valley 1 on Clarkstown Avenue -- Pascack Avenue, actually;

14  there's Spring Valley 2, which is on Clarkstown Avenue; and

15  then there's Monsey.

16       And the other ones are in Ledgewood, Dover, Wayne,

17  Rockaway, and Hawthorne.

18  Q.  And do the properties you manage include a property at

19  185 Route 59 in Monsey?

20  A.  Yes, correct.

21  Q.  As part of your job, are you familiar with the

22  recordkeeping practices of those nine properties that you

23  manage?

24  A.  Yes.

25  Q.  And are communications with clients recorded in any way as

D1h1cib4                          Alava - direct

1    part of those recordkeeping procedures?

2    A.   Yes.

3    Q.   What is the procedure with regard to that?

4    A.   So a client will come in interested in renting space, we

5    show them the space.  Once they're ready to rent, we go back to

6    the office, they give us a license in order to rent space, we

7    proceed by -- by typing in a lease with all the information

8    that we gather from the license, and first a -- an occupancy

9    form prints out in where you hand it to the customer, letting

10   them know to confirm that all the information that we input

11   there from the license is accurate.  And so they sign that

12   form.  And once they sign the form, we proceed into completing

13   the lease.

14   Q.   And once the lease is completed and someone has rented a

15   space, are there any procedures regarding further

16   communications with the client?

17   A.   Yes.  So they have to sign the lease agreeing to the terms

18   and conditions in renting the space, policies, and then they

19   rent the space.

20   Q.   And then if they communicate with Public Storage after

21   that, after they've already rented the space and/or while

22   they're renting the space, are those records -- are there any

23   records of those communications?

24   A.   So when a cus -- customers usually come in to find out, you

25   know, any questions that they might have on their space gets

D1h1cib4                          Alava - direct

1    recorded, whether it's face to face or over the phone, in what

2    we call a ledger.

3    Q.    Showing you what's been marked as Government Exhibit 412.

4    Take a moment and look at that and let me know if you recognize

5    it.

6    A.    Yes, I do.

7    Q.    What is that document?

8    A.    This is basically the notations that we -- we document

9    whenever we have any communication with the customer, or anyone

10   calling in regards to that account.

11   Q.    And is there anything in that other than the ledger notes?

12   A.    Yes, we also have the -- basically the --

13   Q.    If you can just tell me, very briefly, just what's

14   contained in the document.

15   A.    It's the web page that shows the customer who rented, their

16   address, how much they paid, and their phone number and all

17   their personal information.

18   Q.    And so are these records made contemporaneous with the

19   dates that are listed in this document?

20   A.    Yes.

21   Q.    And are they kept in the course of regularly conducted

22   business of Public Storage?

23   A.    Yes.

24   Q.    And are they made and relied on in the regular course of

25   your business?

D1h1cib4                              Alava - direct

1    A.  Yes.

2              MS. ECHENBERG:  Government moves to admit Government

3    Exhibit 412.

4              MR. GERZOG:  Without objection.

5              MR. DONALDSON:  No objection.

6              THE COURT:  Received.

7              (Government's Exhibit 412 received in evidence)

8              MS. ECHENBERG:  If we could publish that, please.

9    Q.  And when you said that -- well, when you said that someone

10   wanting to rent space has to show a license, were you referring

11   to a driver's license?

12   A.  Correct.

13   Q.  Okay.  So let's start with this first page.  You can either

14   look at it on the screen or on the document, whatever you

15   prefer.  What is this document?

16   A.  This is basically where we keep our notes.

17   Q.  Those are the ledger notes that you referred to?

18   A.  Correct, ledger notes.

19   Q.  Okay.  And if you could flip the -- where do the ledger

20   notes begin?

21   A.  Ledger notes begin from the second page -- on the first

22   page, actually.

23   Q.  Is it in -- are these in chronological order or reverse

24   chronological order?

25   A.  They start from -- they go backwards.

D1h1cib4                    Alava - direct

1    Q.   Okay.  So if we can start with page 3 then.

2    A.   Mm-hmm.

3    Q.   So is this note on December 12th, 2005, is that the first

4    ledger note?

5    A.   Correct, yes.

6    Q.   Okay.  And what does that mean?

7    A.   Per tenant Tuesday payment.

8    Q.   Do you understand that note, based on your experience at

9    the company?

10   A.   Basically saying that the tenant understands that the

11   payment is due on Tuesday.

12   Q.   Okay.  And if you could look -- go to the prior page,

13   page 2.  Look at the note on April 30th, 2006, at 3:14.

14   A.   Mm-hmm.

15   Q.   What is that note?

16   A.   It's basically saying that an employee called that number,

17   spoke with Refeal, who said and agreed that they will be in

18   before 4 p.m. today to make a payment.

19   Q.   Okay.  And if you could go to the next page, May 26, 2006.

20   A.   Yes.

21   Q.   What is that notation?

22   A.   It's basically saying that an Earl David called stating

23   that the stuff belongs to him, the person who rented was an

24   employee, and basically it seems like Earl David is stating

25   what's in the unit.

D1h1cib4                        Alava - direct

1    Q.  And going to the end of these notes, is it clear to you

2    from these notes how the relationship with the tenant ended?

3    A.  Yes.  He's basically saying that he is going to pay if

4    necessary -- it seems like he's arguing something.

5    Q.  You can look at the August 14, 2006 notation.

6    A.  Mm-hmm.  Okay.

7    Q.  What's that notation about?

8    A.  It's basically saying that the employee walked the

9    property, found this one vacant, and only wood pallets were in

10   the unit.

11   Q.  And who rented this unit?

12   A.  Refeal Brodjik.

13   Q.  If you could turn now to page 5 of this set, the occupant

14   information sheet is the title of that page.

15   A.  Mm-hmm.

16   Q.  What is that document?

17   A.  This is the document that we give -- we hand to the

18   potential customer before the lease is actually completed, to

19   make sure that all the personal information that we have

20   inputted that we gather from the driver's license is accurate.

21   Q.  And so the information that's in this document is provided

22   by the person applying?

23   A.  Correct.

24   Q.  And how do you confirm that the person applying is actually

25   the same person as the information reflected on this document?

1    A.  We look at their driver's license.

2    Q.  And how do you know that was done in this case?

3    A.  They sign it.

4    Q.  They sign what?

5    A.  They sign the occupant information sheet.

6    Q.  Okay.  What does that ID Type section mean?

7    A.  Driver's license was given at the moment.

8    Q.  And the phone number, the address, the e-mail address,

9    that's all provided by the client or clients for the space?

10   A.  Correct.

11          MS. ECHENBERG:  If we could just enlarge that personal

12   information so the jury can see.

13   Q.  And can you tell from this application when that

14   information was provided?

15   A.  On the 23rd, 2006, May.

16   Q.  And there's some other information after this occupant

17   information history.  What's that?

18   A.  We ask our customers if they would like an alternate

19   contact or someone to have access to their unit, and this is

20   what they supplied us with, this information.

21          MS. ECHENBERG:  Okay.  So if we could see all of the

22   alternate contact information on the next page.  Can you blow

23   that up.

24   Q.  So this is also information that was provided by the

25   applicant?

D1h1cib4                           Alava - direct

1    A.  That's correct.

2    Q.  If you could read what the alternate contact and address

3    is.

4    A.  280 Rector Place, Apartment 3G, New York, New York 10280,

5    United States.

6    Q.  And who is the alternate contact?

7    A.  The alternate contact is Earl David.

8    Q.  And do you know when that information was provided?

9    A.  That information was provided on 5/23/2006, and it was

10   actually provided on the website.

11   Q.  And how do you know that?

12   A.  Because the updated IP says website.

13           MS. ECHENBERG:  One moment.

14           Okay.  I have nothing further for this witness.

15           MR. DONALDSON:  No questions.

16   CROSS-EXAMINATION

17   BY MR. GERZOG:

18   Q.  Could you please go up to the first contact information.

19   This information was provided on 5/23/2006 at 11:49:40 a.m.;

20   correct?

21   A.  Correct.

22   Q.  Would you go to the part that says Earl David.  It's the

23   third -- third alternate contact, or the second alternate, I

24   guess.

25           And that says that the information about Earl David

D1h1cib4                          Alava - cross

1    was also supplied on May 23rd, 2006, at 11:49:40 a.m.,

2    exactly the same time as the first two names, Refeal and Rachel

3    Brodjik; right?

4    A.  Correct.

5    Q.  So that's when all that information was provided, exactly

6    the same time; correct?

7    A.  Yes.

8    Q.  Now would you go to -- I believe it's the entry for

9    May 26 -- I don't remember the date -- in the sort of comments

10   section.  May 26, 2006.  That's three days after that material

11   was checked in; is that right?

12   A.  Yes.

13   Q.  And Earl David, the third contact, called and said that the

14   stuff in the unit belonged to him and that the person who

15   rented it was an employee and that the property in the unit

16   consists of his books, Torah codes, and Reflections of Our

17   Faith.  Is that what it says?

18   A.  Yes.

19   Q.  Okay.  Do you know -- you know the Torah is the Jewish

20   bible?  Do you happen to know that?

21   A.  Yes.

22   Q.  Okay.  And Reflections of Our Faith is the name of another

23   book; do you happen to know that?

24   A.  I didn't know that.

25            MR. GERZOG:  Okay.  Nothing further.

1           MS. ECHENBERG:  Very briefly, your Honor.

2    REDIRECT EXAMINATION

3    BY MS. ECHENBERG:

4    Q.  If you could go back to the ledger notes, the third page.

5    The first ledger note here is dated December 12th, 2005; is

6    that right?

7    A.  Yes.

8    Q.  So that means that -- what does that mean about the timing

9    of when this unit was rented?

10   A.  I don't understand.

11   Q.  Well, turning back to the occupant information sheet, I

12   think that you testified that the 5/23/2006 date below the

13   occupant information was the date that this unit was rented.

14   And is that possible, given that there's a ledger note on

15   December -- in December of 2005?

16   A.  No, that's not possible.

17   Q.  So the date there, could that just be an update date as

18   opposed to the actual day that it was rented?

19   A.  Yes, that's what it looks like.

20   Q.  So looking back at the ledger notes, around when does it

21   appear that this unit was rented?

22   A.  This unit was rented on 11/21 of 2005.

23   Q.  And where do you see that?

24   A.  And I see that on the -- on the ledger, the main ledger,

25   with the person's information on the top.

D1h1cib4                         Alava - redirect

1    Q.  Can you just tell me which page you're looking at.

2    A.  That page right there on the screen, on the top, where it

3    says move-in.  The move-in day was 11/21/2005.

4    Q.  So the unit was rented from at least that date.

5    A.  For sure, yes.

6    Q.  And is it possible to rent a unit online without coming in

7    in person?

8    A.  We now have what we call express check-in where you can

9    start it, but you --

10   Q.  Did you have that process in November of 2005?

11   A.  No.  I believe we did not.  We started that process about a

12   year ago.

13   Q.  And the indication, going back to the occupant information

14   sheet, the ID Type, is that required to be shown in person?

15   A.  Absolutely.

16          MS. ECHENBERG:  Nothing further.

17          MR. GERZOG:  Could you go back up to the very first --

18   the very first part, talking about November.  Could you make

19   that larger, please.

20   RECROSS EXAMINATION

21   BY MR. GERZOG:

22   Q.  Now that says that the move-in date is 11/21/2005; correct?

23   A.  Correct.

24   Q.  And originally on direct, your direct testimony, you said

25   the move-in date was May of '06, but you were wrong about that;

D1h1cib4                       Alava - recross

1   is that correct?

2            MS. ECHENBERG:  Objection.

3   A.  That's correct.  That's correct.

4   Q.  And it also says that rent was paid in advance through

5   July 31st, 2006.  Do you see that?

6   A.  Where?

7   Q.  Right under Move-in.  Pay Type and Paid Through.

8   A.  Oh, yes.

9   Q.  It says in advance, through July 31st of 2006; correct?

10  A.  Correct.

11  Q.  Now what that means is that the person who rented it out

12  November 21st, 2005 -- if your business records are correct,

13  what that means is that the person who rented it on

14  November 21st, 2005 paid in advance through July 31st,

15  2006, if your business records are correct.  Am I right?

16  A.  Correct.

17           MR. GERZOG:  Nothing further.

18           MS. ECHENBERG:  I have nothing further, your Honor.

19           THE COURT:  Okay.  Thank you for coming in.

20           (Witness excused)

21           MR. BRILL:  Judge, may we approach briefly about the

22  government's next witness.  Something Ms. Echenberg and I spoke

23  about very briefly.  It should take about two seconds with the

24  court.

25           THE COURT:  Okay.

D1h1cib4                         Alava - recross

1              (At the sidebar)

2              MR. BRILL:  I'm sorry.  I was looking at a different

3    record.  I'm done.  Sorry about that.

4              (In open court)

5              MS. ECHENBERG:  The government calls Moishe Eisenbach.

6              THE CLERK:  Please raise your right hand.

7              (Witness sworn)

8              THE CLERK:  Would you just state and spell your name

9    for the record, please.

10             THE WITNESS:  First name is Moishe, M-O-I-S-H-E --

11             MR. GERZOG:  No chance I can hear this witness, your

12   Honor.

13             THE COURT:  You need to speak up, sir.

14             THE WITNESS:  First name Moishe, M-O-I-S-H-E, last

15   name Eisenbach, E-I-S-E-N-B-A-C-H.

16             THE CLERK:  You may be seated.

17    MOISHE EISENBACH,

18        called as a witness by the Government,

19        having been duly sworn, testified as follows:

20   DIRECT EXAMINATION

21   BY MS. ECHENBERG:

22   Q.  Good afternoon, Mr. Eisenbach.  Where do you -- what do you

23   do for a living, sir?

24   A.  I drive a school bus.

25   Q.  If you could move the microphone as close to you as

D1h1cib4                         Eisenbach – direct

1   possible so we can all hear you.

2   A.  I drive a school bus.

3   Q.  And are you familiar with a store called Ship N Save that's

4   located at 455 Route 306 in Monsey, New York?

5   A.  Yes.

6   Q.  How are you familiar with that store?

7   A.  I owned that store for about a year.

8   Q.  Were you the sole owner of that store?

9   A.  Yes.

10  Q.  And the year that you owned it, what were the dates?

11  A.  Pardon?

12  Q.  What were the dates when you owned it, what year?

13  A.  I started in the middle of '09 and I had it till by then

14  middle of -- end of 2010.

15  Q.  And did you own that store in your own name or in some

16  other name?

17  A.  Corporation.

18  Q.  What was the name of that corporation?

19  A.  Service U Deserve.

20  Q.  Can you spell that for the jury, please.

21  A.  S-E-R-V-I-C-E, the letter U, Deserve.

22  Q.  And I'm showing you what's been marked as Government

23  Exhibit 54.  Do you recognize that photograph?

24  A.  Yes.

25  Q.  How do you recognize it?

D1h1cib4                          Eisenbach - direct

1   A.  I had the store for about a year.

2   Q.  Does that clearly and accurately represent what's depicted

3   in the photograph as it appeared between mid 2009 and 2010?

4   A.  Everything looks the same besides the windows.  That wasn't

5   covered.

6           MS. ECHENBERG:  The government moves to admit

7   Government Exhibit 54.

8           MR. GERZOG:  No objection.

9           MR. DONALDSON:  No objection.

10          THE COURT:  Received.

11          (Government's Exhibit 54 received in evidence)

12          MS. ECHENBERG:  Thank you, your Honor.  May we publish

13  it?

14          THE COURT:  Sure.

15  Q.  So this was the store that you owned --

16  A.  Yes.

17  Q.  -- at 455 Route 306 in Monsey?

18  A.  Yes.

19  Q.  And you said that's what it looked like except, of course,

20  it wasn't boarded up with the For Lease sign; is that right?

21  A.  Right.

22  Q.  What happened to your business?

23  A.  I went out of business.

24  Q.  And what services did you provide at this Ship N Save when

25  you owned it?

D1h1cib4                      Eisenbach - direct

1   A.  Mainly it was shipping, then I had mailboxes there,

2   passport photos, fax services.

3   Q.  When you say you had mailboxes, do you mean you had

4   mailboxes for rent?

5   A.  Yes.

6   Q.  How many mailboxes did you have?

7   A.  I had about 92.

8   Q.  And how many of them were rented during the time that you

9   owned the store?

10  A.  Approximate half.

11  Q.  And did you maintain any records from the store after it

12  closed?

13  A.  I don't have any records, no.

14  Q.  What happened to the records?

15  A.  I destroyed it.

16  Q.  Why did you do that?

17  A.  I didn't want to keep nobody's personal information.

18  Q.  And did you allow customers to use credit cards or debit

19  cards at your store?

20  A.  Yes.

21  Q.  And do you know how a credit card or a debit card charge

22  would show up on a statement?

23  A.  As Service U Deserve.

24          MS. ECHENBERG:  Your Honor, I'd like to read a

25  stipulation into evidence?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D1h1cib4                              Eisenbach – direct

1          THE COURT:  Okay.

2          MS. ECHENBERG:  The stipulation has the caption of the

3    case and the case number, and this is Government Exhibit S2.

4          "It is hereby stipulated and agreed by and between the

5    United States of America, by Preet Bharara, United States

6    Attorney for the Southern District of New York, James Pastore

7    and Janis Echenberg, assistant United States attorneys, of

8    counsel, and the below named defendants, by their attorneys,

9    that:

10          "1.  If called as a witness, a custodian of records of

11    Citizens Bank would testify that Government Exhibits 301 and

12    302 consist of bank records of Citizens Bank which were:

13          "a. made at or near the time of occurrence of the

14    matters set forth in the records, by or from information

15    transmitted by a person with knowledge of those matters;

16          "b. kept in the course of regularly conducted business

17    activity; and

18          "c. made by the regularly conducted business activity

19    as a regular practice."

20          And it's dated January 15th, 2013, and it's signed

21    by all counsel in this case.  And the government moves to admit

22    Government Exhibits 301 and 302.

23          MR. GERZOG:  No objection.

24          THE COURT:  Received.

25          (Government's Exhibits S2, 301 and 302 received in

D1h1cib4                          Eisenbach - direct

1    evidence)

2              MS. ECHENBERG:  If we could publish page 19 of

3    Government Exhibit 301, please.

4              If you could enlarge that.

5    BY MS. ECHENBERG:

6    Q.  And Mr. Eisenbach, if you could just look at the entry in

7    the middle that's been highlighted.  Do you see where it says

8    $207.95 and Service U Deserve?

9    A.  Correct.

10   Q.  Is that how you understand a charge at your business would

11   show up on a statement?

12   A.  Yes.

13             MS. ECHENBERG:  I have nothing further.

14   CROSS-EXAMINATION

15   BY MR. BRILL:

16   Q.  Good afternoon, Mr. Eisenbach.

17             Mr. Eisenbach, what would $207.95 have bought you in

18   terms of box renting at that time?

19   A.  I don't remember.

20   Q.  No concept?

21   A.  No.

22   Q.  You don't know if it's six months or a year or a month?

23   A.  I don't remember.

24             MR. BRILL:  Do you have more than that one page

25   available?  Could you just go to the top of this page first.

D1h1cib4                        Eisenbach - cross

1   Q.  This is the bank statement for Nathan Schwartz, as you can

2   see on your screen there, Mr. Eisenbach, and this is the

3   address of your business, right, 455 Route 306, Suite 119,

4   Monsey, New York 10952; right?

5   A.  Correct.

6   Q.  And your business was open between March 13th, 2010 and

7   April 14th, 2010?

8   A.  Yes.

9   Q.  When did your business close?

10  A.  I don't remember exact date.  I would say the middle or end

11  of 2010.

12  Q.  Approximately how many times have you been interviewed by

13  various people who work for the government?

14  A.  Say it again?

15  Q.  I said approximately how many times have you worked for the

16  various people who work for the --

17          THE COURT:  Interviewed.  You doubled it.  How many

18  times have you been interviewed by --

19          MR. BRILL:  I'll do it again.

20          THE COURT:  -- by individuals working for the

21  government.

22          MR. BRILL:  Right.  Like she said.

23  A.  How many times I was interviewed by the government?

24  Q.  About the -- about this issue, about your mailbox company.

25  At some point you were approached by a federal agent to ask you

D1h1cib4                          Eisenbach - cross

 1   about this issue; right?

 2   A.  I would say twice or three times.

 3   Q.  Okay.  And that was by the agents and the US attorneys

 4   combined, or just by the agents?

 5   A.  I don't know how to call -- what do you mean?

 6   Q.  Mr. -- you know Ms. Echenberg and Mr. Pastore; right?

 7   A.  Right.

 8   Q.  How many times did you speak with them?

 9   A.  I spoke with them twice on the phone and then today in the

10   office.

11   Q.  And how many times have you spoken to other government

12   agents about the same issues?

13   A.  Never.

14   Q.  Pardon me?

15   A.  Never.

16   Q.  You were never approached by a government agent doing an

17   investigation into this case?

18   A.  No.

19   Q.  How did you come to find out that there was an

20   investigation in this case?

21   A.  I got served by a subpoena.

22   Q.  Who served you with a subpoena?

23   A.  Michael Gibbs.

24   Q.  Who is a -- what is he?

25   A.  An agent.

D1h1cib4                          Eisenbach - cross

1    Q.  Aha.  So you were approached by an agent.

2    A.  I said I spoke to him on the phone.  I mean, I didn't -- I

3    didn't -- he didn't approach me.  He left me the subpoena at

4    home.

5    Q.  Okay.  So at some point, let's say back in -- on

6    January 13th, you and Mr. Gibbs and Ms. Echenberg got

7    together to talk about the case; right?

8    A.  When?

9    Q.  On January 13th, two days ago?

10   A.  I spoke on the phone Sunday night.

11   Q.  Okay.  So that was a phone conversation you had?

12   A.  Yes.

13   Q.  And in that phone conversation did you tell them that your

14   business was open from June 2009 to June 2010?

15   A.  Right.

16   Q.  So is that an accurate reflection of when your business was

17   in fact open?

18   A.  No.  I didn't tell them accurate.  I said approximate.

19   Q.  Okay.  So was it longer than -- was it open longer than

20   June of 2010 or less than June 2010?

21   A.  I don't remember the exact dates.

22   Q.  Oh.  Now you see the address up here, Suite 119?

23   A.  Right.

24   Q.  What does that refer to, or what did that refer to in your

25   business?

D1h1cib4                         Eisenbach - cross

1    A.  To mailbox 119.

2    Q.  So it was okay if someone said they had a suite, when it

3    got delivered to your business, you would know that that

4    referred to a mailbox; right?

5    A.  I mean, actually, doesn't supposed to write suite.  They

6    had to write 455 Route 306, number or whatever 119, not suite.

7    Q.  Okay.  But this wasn't the only person who did that; right?

8    A.  When I took over the store, it was a few people like that.

9    I was trying to straighten it out, but by the time I closed, I

10   couldn't straighten anything out.

11   Q.  So as I said, if you received mail for Suite 119, you knew

12   that that was Mailbox 119; right?

13   A.  Right.

14   Q.  And if we can look at --

15            MR. BRILL:  Do you have the earlier statements in this

16   exhibit?  Could you just put up a couple of months earlier.

17   One more, please.  Yeah, with the address page.

18            I'm sorry.  The previous address page.

19            Yeah, there we go.

20   Q.  Do you have it there?  Now you see this one from December

21   of '09 through January 15th of '10, this indicates 455

22   Route 59, Suite 119; right?  Do you see that?

23   A.  Yes.

24   Q.  Now that's -- Route 59 is a completely different street;

25   yes?

D1h1cib4                        Eisenbach – cross

1    A.  Completely, yes.

2    Q.  And you wouldn't -- I mean, to the best of your knowledge

3    you wouldn't get mail delivered if it was sent to 455 Route 59;

4    right?

5    A.  To my knowledge I wouldn't get it.  The mailman would take

6    it back.

7    Q.  To the best of your recollection did you have anything to

8    do with changing the address from 455 Route 59 to

9    455 Route 306?

10   A.  No.

11   Q.  Do you know if there is in fact a 455 Route 59?

12   A.  I have no idea.

13   Q.  So when someone came into the store, to the best of your

14   recollection, to open up a mailbox, what would the process be

15   that you would have gone through?

16   A.  Ask to bring two pieces of ID and fill out a form.

17   Q.  Okay.  And you assigned that person a specific mailbox;

18   right?

19   A.  Yes.

20   Q.  And these are mailboxes that are -- were at the time

21   publicly accessible, that is, they didn't have to come up to

22   you or someone else who worked there and say, I need to get

23   into my mailbox; correct?

24   A.  Say that again?

25   Q.  The mailboxes were open and available to someone walking

D1h1cib4                    Eisenbach - cross

1    into the store, they could open up their own mailbox, they

2    wouldn't have to ask an employee to open up their mailbox;

3    right?

4    A.  Right, right.

5    Q.  And I believe your store was open 24 hours at the time;

6    right?

7    A.  The mailboxes was open 24 hours.

8    Q.  Okay.  And so someone could come in at any time, even if

9    there was no employee working at the store; correct?

10   A.  Right.

11   Q.  Now were you the only employee of the store or did you work

12   with someone else as well?

13   A.  I was the only one.  I had help there, but not constantly.

14   They came and went.

15   Q.  So do you have any specific recollection of opening up

16   mailbox 119 for Nathan Schwartz?

17   A.  No, I don't remember.

18   Q.  And do you know, other than that was your general practice,

19   that Nathan Schwartz was the one who opened up that mailbox?

20   A.  I don't remember.  Could be that he opened it before I came

21   or when I came, but I don't remember customer.

22   Q.  Okay.  And as you say, you destroyed all of the records

23   that would have had the forms of ID and the mailbox opening

24   form, things like that; right?

25   A.  Right.

D1h1cib4                          Eisenbach - cross

1    Q.  That being said, you wouldn't know, for example, who opened

2    up mailbox 129; right?

3    A.  No.

4    Q.  Or 139 or 149, for that matter.

5    A.  No.

6    Q.  Do you know an individual named Lipa Teitelbaum, otherwise

7    known as Leo?

8    A.  No.

9    Q.  Do you know an individual named Sam Salamon, otherwise

10   known as Robert Salamon?

11   A.  No.

12   Q.  When you -- were there times when you were dealing with the

13   mailboxes that people would stop paying their bills?  Over the

14   course of the year or so that you had this mailbox company,

15   were there times when people stopped paying their bills but

16   mail kept coming for that address?

17   A.  I don't remember.

18   Q.  Did you have a specific practice -- well, withdrawn.

19          When you bought the business, was there mail coming --

20   was there still mail coming for boxes that were no longer

21   rented by those addressees?

22   A.  Yes.

23   Q.  And what would you do with that mail?  Was there a policy

24   that you had in place?

25   A.  Returned to sender.

D1h1cib4                    Eisenbach - cross

1    Q.  So you would just basically mark it for the post office to

2    return?

3    A.  Yes.

4    Q.  And would that simply be that when the mailman came for the

5    day, you would say, this is not the right mail?

6    A.  Right.

7    Q.  When your business closed, did you have any specific

8    responsibilities to the post office as to what to do with the

9    mail since you couldn't receive it any longer?

10    A.  I received for -- I think for a half a year.  I had to --

11    they delivered it to the post office and I picked it up there

12    and I handed over to -- to the people I know.  The people I

13    didn't know, I gave it back to the post office and they handled

14    it.

15    Q.  And did you know Nathan Schwartz?

16    A.  I don't remember.

17    Q.  Do you know what happened to Mr. Schwartz's mail after your

18    business closed?

19    A.  I don't remember.

20            MR. BRILL:  Thank you, Mr. Eisenbach.  Nothing

21    further.

22            MS. ECHENBERG:  No redirect, your Honor.

23            THE COURT:  Thank you very much, Mr. Eisenbach.

24            (Witness excused)

25            MS. ECHENBERG:  The government calls Harry Dreizen.

D1h1cib4                          Dreizen - direct

1                (Witness sworn)

2                THE CLERK:  Could you please say your name and spell

3      your last name for the record.

4                THE WITNESS:  Harry Dreizen, D-R-E-I-Z-E-N.

5       HARRY DREIZEN,

6           called as a witness by the Government,

7           having been duly sworn, testified as follows:

8      DIRECT EXAMINATION

9      BY MS. ECHENBERG:

10     Q.  Good afternoon, Mr. Dreizen.

11     A.  Hi.

12     Q.  Where do you work?

13     A.  For a company called the Moinian Group.

14     Q.  What's the Moinian Group?

15     A.  It's a real estate development company.

16     Q.  And what do you do for the Moinian Group?

17     A.  I'm general counsel.

18     Q.  What are your responsibilities as general counsel?

19     A.  I oversee all of the legal affairs for the company from

20     leasing, litigation, insurance matters, things like that.

21     Q.  Are you familiar with Battery Commercial Associates?

22     A.  Yes, I am.

23     Q.  What is Battery Commercial Associates?

24     A.  It's a limited liability company which owns a property

25     called 17 Battery South.

D1h1cib4                          Dreizen - direct

1    Q.   How are you familiar with that entity?

2    A.   It's one of the properties which the Moinian Group manages

3    for the ownership of that property.

4    Q.   And do you have responsibilities for the leases associated

5    with Battery Commercial Associates?

6    A.   Yes, I do.

7    Q.   Are you familiar with a lease between Battery Commercial

8    Associates and Fix Anything Construction that was signed in or

9    around mid 2006?

10   A.   Yes.

11   Q.   Showing you what's been marked as Government Exhibit 200.

12   Take a moment to look at that and let me know if you recognize

13   it.

14   A.   (Witness reviews exhibit.)  Yes, I do.

15   Q.   What is that document?

16   A.   This is a lease for office space at 17 Battery South

17   between Battery Commercial Associates and a tenant called Fix

18   Anything Construction and Plumbing, Inc.

19   Q.   And how do you recognize that document?

20   A.   Because this is a document that we have -- we maintain a

21   file on in my office.

22   Q.   And is that document -- was it prepared at a time

23   consistent with the dates in the document?

24   A.   Yes.

25   Q.   And is the document kept in the regular course of your

D1h1cib4                         Dreizen - direct

1  business?

2  A.  Oh, yes.  Yes, it is.

3  Q.  And is it your regular practice to keep these records at

4  the time these leases are signed?

5  A.  It is.

6         MS. ECHENBERG:  The government moves to admit

7  Government Exhibit 200.

8         MR. GREENFIELD:  Can I have a brief voir dire.

9  VOIR DIRE EXAMINATION

10 BY MR. GREENFIELD:

11 Q.  Mr. Dreizen, did your company manage 17 Battery at or

12 around the time that lease was signed?

13 A.  We don't directly property manage the property.  We -- I

14 would say we asset manage it, which means there's a day-to-day

15 management company and then we supervise the management

16 company, but we were the -- we were ultimately managing this

17 property at the time that this lease was prepared, yes.

18 Q.  But there was a management company that you managed; is

19 that what I understand?

20 A.  Third-party property management company, not responsible

21 for leasing, responsible for -- just for the, you know, making

22 sure that the elevator worked and the toilet paper was refilled

23 in the bathrooms.

24 Q.  So who was it that took care of the execution of that lease

25 on behalf of the landlord?

D1h1cib4                      Dreizen - direct

1   A.  The Moinian Group.

2   Q.  Okay.  Were you a member of -- an attorney for the Moinian

3   Group then?

4   A.  Yes.

5   Q.  And you say you recognized that lease because you have a

6   copy of it in your file?

7   A.  Yes.

8   Q.  Do you have the original lease in your file?

9   A.  No.

10  Q.  Have you ever seen the original lease?

11  A.  I think I must have when it was executed.

12  Q.  I'm not asking you what you must have.  I'm asking you if

13  you can recall ever seeing the original lease.

14  A.  I don't specifically recall seeing the original lease.

15  Q.  Do you know what happened to the original lease?

16  A.  Yeah, after this document was signed, the original copies

17  were distributed to the tenant and to the managing agent.

18  Q.  You're testifying to that because that's your practice or

19  because you recall that's what took place?

20  A.  Because that's our practice.

21  Q.  And so there were two -- there would have been two original

22  copies?

23  A.  I don't -- there would have been anywhere from two to four

24  executed copies.  I don't know in this specific case how many I

25  made.

D1h1cib4                        Dreizen - direct

1   Q.   What you have in your files, is that a photocopy?

2   A.   Yes, it's a photocopy.

3   Q.   Where is the original that was photocopied into your files?

4   A.   The original would have been given to the management

5   company, the third-party management company, who would have

6   been responsible for the day-to-day administration of lease

7   obligations, and when I was looking into this, I was advised by

8   the management company --

9                MR. GREENFIELD:   Objection as to what you were

10  advised.   I don't want any hearsay.

11  Q.   Is it the same management company today as it was back

12  then?

13  A.   Yes.

14  Q.   Without telling me what they said, did you attempt to

15  obtain the lease from the management company?

16  A.   Yes.

17  Q.   What's the name of that management company?

18  A.   Newmark & Company Real Estate.

19  Q.   They manage a lot of buildings in the city, right, Newmark

20  & Company?

21  A.   I believe they do.

22  Q.   I changed my mind.   Tell me what -- what you found out when

23  you tried to get the original lease.

24  A.   That because this was an old tenancy that they had no --

25  that they had not retained the original files.   They purged

D1h1cib4                          Dreizen - direct

1    them.

2    Q.  Purged them?

3    A.  Mm-hmm.  Yes.

4    Q.  Meaning they threw it out, they destroyed it, doesn't exist

5    anymore?

6    A.  That's what I understood.

7    Q.  Were you present when this lease was executed?

8    A.  I was present when it was signed by the landlord.  I wasn't

9    present when it was signed by the tenant.

10   Q.  That was my question.  You --

11              MS. ECHENBERG:  Your Honor, I think this has gone

12   beyond voir dire.  He'll have an opportunity to get into all of

13   this on cross.

14              MR. GREENFIELD:  I object to the introduction of the

15   document.

16              THE COURT:  Overruled.

17              (Government's Exhibit 200 received in evidence)

18              MS. ECHENBERG:  So Government Exhibit 200 has been

19   admitted, your Honor?

20              THE COURT:  Yes.

21              MS. ECHENBERG:  Can we publish it, please.

22              THE COURT:  All of it?

23              MS. ECHENBERG:  We're going to start out with page 1.

24   We're not going to go through every page.  Don't worry.

25              THE COURT:  When you see the size of this, you'll know

D1h1cib4                         Dreizen - direct

1    why I asked.

2    BY MS. ECHENBERG:

3    Q.   Who are the parties to this, please?

4    A.   The landlord is Battery Commercial Associates, LLC, and the

5    tenant is Fix Anything Construction and Plumbing, Incorporated.

6    Q.   And what was the term of this lease?

7    A.   It was a seven-year lease.

8    Q.   If you could turn -- there's a flagged page in your

9    document.  If you could turn to that page, please.

10   A.   Yes.

11   Q.   And if you could pull up page 31, please -- excuse me --

12   page 32, but it does not have a page number on it.  What is

13   this page?

14   A.   This is the signature page of the lease.

15   Q.   And the person listed as the managing member, who is that?

16   A.   Joseph Moinian.

17   Q.   Who is he in relation to the Moinian Group?

18   A.   He's the principal, the owner and president of the Moinian

19   Group.

20   Q.   And if we could go to the --

21   A.   I'm sorry.  I meant to say and is also the managing member

22   of Battery Commercial Associates.

23   Q.   Okay.  If you could go to the last page of this document.

24   A.   Okay.

25            MR. GREENFIELD:  If you can just show the whole

D1h1cib4                    Dreizen - direct

1    document, please.

2    Q.   What is that document?

3    A.   This is a guaranty, which in this case we asked the tenant

4    to provide a guaranty from one of its principals.  In addition

5    to having the Fix Anything be the tenant, we wanted one of the

6    principals as well to guarantee the obligations under the

7    lease.

8           MS. ECHENBERG:  If we could go back to page 33.

9    Q.   At the time what was the practice with regard to having --

10          MS. ECHENBERG:  32.  I'm sorry.

11   Q.   -- what was the practice with regard to having a lease and

12   a guaranty, if you needed a guaranty signed?  Just walk us

13   through the process of how you went from the negotiation with

14   the tenant to having the final executed copy like this.

15   A.   Sure.  The process would start with an attorney in my

16   office preparing a draft lease, which would then be sent to the

17   attorney for the tenant.  The two attorneys, my attorney and

18   the tenant's attorney, would then negotiate over time a final

19   form of lease, and when they had reached a mutually acceptable

20   final version, the attorney in my office would send the

21   execution copy, usually by e-mail, with an attached, you

22   know -- the lease as an attachment, to the attorney for the

23   tenant.  The attorney for the tenant would print out a number

24   of copies, have his client execute, and then forward the

25   executed copies to our office, where they would come to me for

D1h1cib4                    Dreizen - direct

1    final approval, and then I would bring them to Mr. Moinian, if

2    I approved them, for signature, and then after they were fully

3    executed, they would be distributed by my assistant to the

4    managing agent and then also to the tenant's attorney.

5    Q.  And in the case of this lease, did these tenants stay for

6    the full term of their lease?

7    A.  No, they did not.

8    Q.  Why not?

9    A.  During the course of their tenancy, after they had moved

10   into the office space, our building manager had notified us

11   that the tenant wasn't operating a plumbing and construction

12   company out of the office but seemed to be running some kind of

13   like immigration services company and that there were many

14   families that were camped out in the hallway outside of their

15   offices and that there were children running around in the

16   hallway and food being eaten and babies being diapered and that

17   there was -- something was going on which wasn't provided for

18   under this lease.  So we commenced a -- an eviction proceeding,

19   and ultimately that was litigated.  I think there was a

20   settlement where the tenant agreed to move out, and they moved

21   out I think after -- somewhere in like the first year of their

22   tenancy, so they did not stay the entire term of their tenancy,

23   the seven years.

24   Q.  And this lease was for what property exactly?

25   A.  It's a property -- it's a --

D1h1cib4                          Dreizen - direct

1   Q.   What was the address of the property?

2   A.   The address of the property is 17 Battery Place South,

3   which --

4   Q.   And approximately how large was this space that was rented,

5   if you know?  Was it one floor, part of a floor?

6   A.   Oh, it was -- it was just part -- it was an office on part

7   of a floor.  It wasn't a full floor tenant.

8   Q.   And if you look at Section A(iiii), is that a description

9   of the premises?  It's on page 1.  Sorry 1.A(iiii) on page 1.

10  A.   Yeah.  It says -- right, Suite 323.  So it was just an

11  office space on the -- on the third floor of the building.

12  Q.   In 17 Battery Place.

13  A.   In 17 Battery Place, which is about a 13-story building, so

14  just one space.

15          MS. ECHENBERG:  Nothing further.

16          Wait.  One thing further.  I apologize, your Honor.

17  Q.   Where is 17 Battery Place?

18  A.   It's all the way south on West Street.  It's basically at

19  the -- at the tip of Manhattan, at the southern tip.  It's a --

20  it's a -- about a -- a very large building, office building

21  down like right next to Battery Park in southern Manhattan.

22          MS. ECHENBERG:  Thank you.

23  CROSS-EXAMINATION

24  BY MR. GREENFIELD:

25  Q.   Good afternoon.

D1h1cib4                           Dreizen - cross

1            MR. GREENFIELD:  Stand up.

2    Q.  I represent Harold Tischler.  This is Mr. Tischler.  Have

3    you ever seen him before?

4    A.  I don't think so.

5    Q.  You said that there was an attorney in your office who

6    would have negotiated the lease with the attorney for the

7    tenant; is that correct?

8    A.  Yes.

9    Q.  Who was the attorney for the tenant?

10   A.  There's a name listed in the lease as the tenant's counsel,

11   but I wasn't involved in the day-to-day negotiations so I

12   don't --

13   Q.  The lease is in evidence.  You can look and tell me who it

14   was that was the tenant -- the landlord -- the tenant's

15   attorney.

16           MS. ECHENBERG:  Objection.  The witness can read from

17   the document, but I think he testified he didn't have direct

18   knowledge of who the attorney was.

19           THE COURT:  Well, he can still answer who was listed

20   as being the attorney for the tenant.

21           MR. GREENFIELD:  Precisely.

22   Q.  That is, you don't know independently who the tenant for

23   the -- the attorney for the tenant was, do you?

24   A.  No.  I -- I didn't deal with them.  I -- another attorney

25   in my office did.  I know -- I remember the name Wohlgemuth

D1h1cib4                          Dreizen - cross

1    just from --

2    Q.  Who?

3    A.  Wohlgemuth, I think.  I can look it up.  But I had no

4    independent contact with him.

5           THE COURT:  Is there any place in this document that

6    has the attorney's signature?

7           MR. GREENFIELD:  The witness indicated that there is.

8           THE COURT:  Well, you guys looked at it.

9    Q.  What was the name that you recall?

10   A.  Yeah, there's a notice provision, Article 27 on page 21 --

11   Q.  Okay.

12   A.  -- says that a copy of notices should go to Kunstlinger &

13   Wohlgemuth, and that's all the information I have.  That's

14   listed as --

15   Q.  Is that a law firm?

16   A.  I assume that's a law firm, yes.

17   Q.  And in your normal experience, the tenant's lawyer would be

18   listed at that paragraph and that space; is that correct?

19   A.  That is correct.

20   Q.  Who was the lawyer for your company in your office who

21   handled this lease?

22   A.  You know, I don't recall specifically.  It could have been

23   one of a couple of young attorneys, and I'm not sure which one

24   handled it.

25   Q.  Are any of those attorneys that you're thinking of still

D1h1cib4                        Dreizen - cross

1    employed by your company?

2    A.   No.

3    Q.   You never met the -- withdrawn.

4         You said you saw the landlord sign the lease?

5    A.   Yes.

6    Q.   And what happened to the lease after the landlord signed

7    it?

8    A.   I took them with me, I gave them to my assistant, and I

9    asked her to distribute them to the managing agent, which was

10   Newmark, and to the tenant's counsel.

11   Q.   So they were already signed by the tenant; is that correct?

12   A.   That's correct.

13   Q.   All right.  And you've got two -- two separate signatures

14   there.  You've got the lease and the guaranty; is that correct?

15   A.   Yes.

16   Q.   Are they dated?

17   A.   Well, on the signature page, it's -- the recital is that

18   this is executed as of the day and year first above written,

19   which would be on the first page of the lease.

20   Q.   Take a look at the first page of the lease.

21   A.   So that's just the blank day of April 2006.

22   Q.   So there's no date for this lease; is that correct?

23   A.   I don't know how to answer that question.  It is what it

24   is.

25        (Continued on next page)

D1HLCIB5                        Dreizen - cross

1    BY MR. GREENFIELD:

2    Q.  That's true of most things.  What I'm asking you is whether

3    this lease is dated and the only date that appears is April; is

4    that correct?

5    A.  On the signature page there's a reference to the April

6    date, right.

7    Q.  But there's no date in April; is that correct?

8    A.  That's correct.

9    Q.  And what about the guaranty, is there a date for the

10   guaranty?

11   A.  I think it's the same answer.  There's a line which recites

12   the blank day of April 2006.

13   Q.  Okay.  So you can't say when this lease was signed or when

14   the guaranty was signed; is that correct?

15   A.  That's true.

16   Q.  And is it further correct that you can't state where it was

17   when the tenant signed it, under what circumstances --

18   withdrawn.

19          You don't have any idea where the tenant was or the

20   person who signed on behalf of the tenant was physically when

21   the lease was signed; is that correct?

22   A.  That's true.

23   Q.  And you have no idea what was said to that person at or

24   about the time that they signed the lease; is that correct?

25   A.  That's correct.

D1HLCIB5                          Dreizen - cross

1   Q.   You have no idea under what circumstances that person

2   thought they were signing their name to this lease; is that

3   correct?

4   A.   I don't know how to answer that question.  I don't know

5   what other people are thinking in general, so I don't know how

6   to answer that question.

7   Q.   So you have no idea about anything related to the

8   circumstances of the execution of the lease or the guaranty on

9   behalf of the tenant; is that accurate?

10        MS. ECHENBERG:  Objection.  We've covered this.

11        THE COURT:  You can try to answer.

12  A.   I wasn't -- the answer is you're right.  I have no idea.

13  Q.   Now, one last question.  There's a social security number

14  listed on the guaranty.  Do you see that?

15  A.   I did note it, yes.

16  Q.   And do you know why a social security number, presumably of

17  the guarantor, is that correct, would be placed on the

18  guaranty?

19  A.   I think that it's placed there in case there's an effort

20  made to enforce an obligation against the guarantor, that it's

21  easier to locate assets of the guarantor.

22  Q.   So do you -- is that something that you in your experience

23  as general counsel is something that you want to see on

24  guaranties for leases that you're responsible for?

25  A.   Yes.

D1HLCIB5                          Dreizen - cross

1    Q.  Do you have any protocols that you instruct your attorneys

2    to follow with reference to ensuring, for example, that the

3    social security number listed is an accurate one?

4    A.  No.  We have, A, we don't have a protocol for that; and, B,

5    we don't have the ability to monitor that.

6    Q.  So somebody could sign -- as a matter of fact, you don't

7    know whether the social security number was put in at the time

8    that the guaranty was signed; is that right?

9    A.  No.  I have no idea.

10   Q.  So it could have been put in a day later or a week later, a

11   month later, any time before you got it back; is that right?

12   A.  That's true.

13   Q.  Same with the address?

14   A.  Yes.

15   Q.  Do you see the place in the guaranty where the name of the

16   landlord and the name of the tenant are put in what would

17   otherwise be blank spaces?

18          Take a look at the guaranty, schedule E, guaranty, top

19   line, in order to induce the above landlord, and then in

20   parentheses it says Battery Promotional Associates LLC.

21          Do you see that?

22   A.  Yes, I do.

23   Q.  That's -- is this a form that is filled in at your office,

24   is this sort of a template?

25   A.  I think it's just part of the overall lease document.

D1HLCIB5                          Dreizen - cross

1    Q.  What I'm saying is does this language for the guaranty

2    exist in your office electronically, perhaps in a computer

3    base, without the name of Battery Commercial Associates, LLC,

4    so that some other company that you're involved in, that you

5    manage their property for, their name can be typed in there as

6    well?

7    A.  No, I don't think.  I think there's a form which already

8    has Battery Commercial Associates in that place and the name of

9    the guarantor is a blank.

10   Q.  It appears to be a different typeface, does it not?

11              MS. ECHENBERG:  Objection.

12   A.  I don't have an opinion as to the typeface.

13   Q.  Look at the guaranty.  Do you have the guaranty in front of

14   you?

15              THE COURT:  What page are we on?

16              MR. GREENFIELD:  It's a one-page document.

17              THE COURT:  Where in the sequence?

18              MS. ECHENBERG:  It's the last page, your Honor.

19              MR. GREENFIELD:  Last page.

20   Q.  Do you see the guaranty?

21   A.  I'm looking at it.

22   Q.  So do you see it?

23              THE COURT:  What are you saying is the different type?

24   Q.  The word "Battery Commercial Associates LLC," and a few

25   lines down, the words "Fix Anything Construction and Plumbing,

D1HLCIB5                        Dreizen - cross

1    Inc."

2              That's a different typeface than the rest of the

3    document, is it not?

4              MS. ECHENBERG:  Objection.

5    A.  I don't think so.  I think it's just the same typeface in

6    all caps.  Maybe a different font size, but I think it's the

7    same typeface.

8    Q.  Maybe that's what I meant.

9              Is that something that's filled in by the attorney in

10   your office in a case sensitive manner, that is, if you're

11   representing Battery Commercial Associates you fill in those

12   parentheses with that name, and if you're representing 110 Wall

13   Street Associates, for example, you would fill in that name

14   there?

15   A.  No.  That's not how it would work.

16   Q.  How does it work?

17   A.  There's a set of lease documents specific to Battery

18   Commercial Associates which would already have that name as

19   part of the template.  The only part that would need to be

20   filled in would be the name of the guarantor.

21   Q.  So there's never any negotiation?  Every one of Battery

22   Commercial Associates leases are exactly the same?

23             MS. ECHENBERG:  Objection.

24             THE COURT:  What's the relevance of that?

25             MR. GREENFIELD:  Well, the -- let me ask one different

D1HLCIB5                         Dreizen - cross

1    question and maybe the relevance.

2    Q.  You said this lease was created in your office by one of

3    your lawyers; is that correct?

4    A.  That's true.

5    Q.  And then emailed to the tenant's attorney in most likely;

6    is that correct?

7            MS. ECHENBERG:  Objection.

8            MR. GREENFIELD:  It's what he testified to on direct

9    examination.

10           MS. ECHENBERG:  I don't believe he testified this

11   specific document was emailed.

12           THE COURT:  At some point -- a lease is a contract

13   between two parties, so presumably at some time it got to the

14   other party.  So go ahead.

15   Q.  And the way it got to the other party was, in your

16   experience in your office, as an attachment to an email; is

17   that correct?

18   A.  That's the normal practice.  I couldn't say in this

19   specific case how it arrived there.  But the normal practice

20   nowadays is nowadays -- and I mean by nowadays including

21   2006 -- for it to go as an email attachment.

22   Q.  So that's the way it should have happened if it happened

23   the way you wanted it to happen; is that correct?

24           MS. ECHENBERG:  Objection.  That's not what the

25   witness just said.

D1HLCIB5                          Dreizen - cross

1          THE COURT:  Just look at the top, the first page, the

2    very top line.  What does that tell you, if anything?

3          THE WITNESS:  Your Honor, that tells me at some point

4    it was faxed, but it wouldn't have been faxed by my office.  We

5    don't transmit documents that way.

6    Q.  It appears it was faxed, if this is accurate, in May, is

7    that right, as far as you can tell it was executed some time in

8    April; is that right?

9    A.  The fax header seems to indicate transmission in May, yes.

10   Q.  And who's the Lawrence Group LLC?

11   A.  I don't know.

12   Q.  And I take it you're not familiar with that phone number

13   there; is that correct?

14   A.  That is true.

15   Q.  And if this was transmitted by email to the tenant's

16   attorney, would it have been an attachment to the email?

17   A.  Yes.

18   Q.  And in what format would it have been attached?

19   A.  Word.

20   Q.  Not PDF, but Word; is that right?

21   A.  Not as a PDF.

22   Q.  Which is it, Word?

23   A.  I take it back.  Either one would have been possible.

24   Q.  Now, if it was in a PDF format, then it couldn't be

25   changed; is that correct?

D1HLCIB5                        Dreizen - cross

1   A.  That's right.

2   Q.  But if it was in a Word format, it could have been changed,

3   right?

4   A.  Yes, that's true.

5           MR. GREENFIELD:  No further questions.

6           MS. ECHENBERG:  Nothing further for this witness, your

7   Honor.

8           THE COURT:  Thank you very much.

9           (Witness excused)

10          THE COURT:  Government call its next witness.

11          MR. PASTORE:  The United States calls special agent

12  John Mirandona.

13   JOHN MIRANDONA,

14      called as a witness by the Government,

15      having been duly sworn, testified as follows:

16  DIRECT EXAMINATION

17  BY MR. PASTORE:

18          MR. PASTORE:  May I inquire, your Honor?

19          THE COURT:  Yes.

20  Q.  Mr. Mirandona, how you are currently employed?

21  A.  As a special agent with the Department of Homeland

22  Security.

23  Q.  And how long have you been a special agent with the

24  Department of Homeland Security?

25  A.  Approximately 11 years.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D1HLCIB5                          Mirandona – direct

1  Q.  Are you assigned to a particular unit or squad?

2  A.  I am assigned to the computer forensics unit.

3  Q.  How long have you been assigned to the computer forensics

4  unit?

5  A.  I've been assigned full-time to the computer forensics unit

6  since June of 2009.

7  Q.  What are your duties and responsibilities as a special

8  agent with the computer forensics unit?

9  A.  To preserve, collect, process, and analyze data from

10  electronic devices such as computers, mobile devices.

11  Q.  Prior to being full-time with the computer forensics unit,

12  what group were you assigned to?

13  A.  I was assigned to the joint terrorism task force.

14  Q.  Did you also do computer related -- did your duties include

15  computer forensics related activities?

16  A.  Yes.  Approximately 40 percent of the time I was doing

17  computer forensics.

18  Q.  What's your educational background?

19  A.  I have bachelor of science in geology from Stony Brook

20  University.

21  Q.  Do you have any special training in computers?

22  A.  I took some computer science classes in college, and I

23  received extensive training in computer forensics and computer

24  operations from my current position.

25  Q.  Describe some of the training that you received.

D1HLCIB5                          Mirandona – direct

1    A.  I was certified as a IT technician, IT professional.  I

2    hold certifications with the current tools that I use to

3    perform my job.

4    Q.  Specifically what certifications do you hold?

5    A.  I hold basic and advanced certificates in Guidance

6    software, EnCase, and AccessData, Forensic Toolkit, also known

7    as FTK, and with Cellebrite, which is program and hardware that

8    allows you to interrogate mobile devices such as phones, smart

9    phones, and tablets.

10   Q.  And you said you're certified in each of those?

11   A.  Yes.

12   Q.  In general, what does the certification process involve?

13   A.  To start it's approximately six weeks of training, and then

14   two weeks of training for each individual certificate, for each

15   certification.  And each certification also comes with

16   practical exams where you demonstrate your proficiency with the

17   tools and you have months to a year to complete them.  They're

18   very long, drawn out certifications.  And every year I go for

19   approximately a week of refresher training and every three

20   years I recertify with the tools.

21   Q.  So have you recently recertified for each of the

22   AccessData, Guidance, and Cellebrite that you just described?

23   A.  I certified with Cellebrite this past year.  I recertified

24   with AccessData in 2011.  And I will recertify with Guidance in

25   2013, this year.

D1HLCIB5                          Mirandona - direct

1  Q.  What is -- you mentioned Forensic Toolkit from AccessData.

2  What is that?

3  A.  It is a forensic tool that allows you to capture data,

4  process data, and analyze data.  And it categorizes all the

5  files on the computer and it indexes all the words in the file

6  so you can search for any type of document, you can search for

7  any words, and it allows it to be organized in such a way that

8  you know where to start with organization.

9  Q.  Is that tool sometimes called FTK?

10  A.  Yes.

11  Q.  And Guidance and Cellebrite, are they essentially different

12  types of tools that also do computer forensics?

13  A.  Guidance, EnCase, and AccessData FTK are very similar

14  tools.  Cellebrite is specifically for mobile devices and

15  tablets.

16  Q.  I want to draw your attention to January 15, 2009.  Were

17  you working an a special agent that day?

18  A.  Yes.

19  Q.  What were you doing?

20  A.  I participated in a search warrant.

21  Q.  Where did you participate in a search warrant?

22  A.  At 125 Maiden Lane in Manhattan.

23  Q.  What was your role in connection with the search warrant?

24  A.  I was in my capacity as a computer forensics agent to

25  identify and preserve any electronic evidence.

1    Q.  Tell us what you did on the day of the search.

2    A.  I located computers that were at the location.  I isolated

3    the hard drives of the computers, connected them to write

4    blockers so that prevents me from writing any data to the

5    drive, connected it to my equipment and take an image of the

6    hard drive and then return the hard drive back to the computer.

7    Q.  So do I understand correctly the physical computers weren't

8    removed from 125 Maiden Lane?

9    A.  That is correct.

10   Q.  So when you make the image, where do you make it?

11   A.  The image is a bit-for-bit copy of the original that is

12   placed on to my hard drive, my equipment.  And there is it's

13   called a hash file, a signature.  It's a digital signature that

14   tells me the original and the copy are identical.  And I take

15   the copy with me.

16   Q.  For the record, I'm handing the witness an item.  Do you

17   recognize that?

18   A.  Yes.

19   Q.  What is it?

20   A.  It's a box containing the hard drives that I placed the

21   images on.

22   Q.  And when you say placed the images on, are you referring to

23   the data search January 15, 2009?

24   A.  Yes.

25   Q.  I want to draw your attention to what's been marked as

D1HLCIB5                          Mirandona – direct

1  Government Exhibit 3402.  Can you tell us what that is?

2  A.  It is a computer hard drive.

3  Q.  And can you tell anything else about this particular

4  computer hard drive?

5  A.  It has writing on it.  I recognize my initials and the date

6  of the search and locations in the search written on it.

7  Q.  So based on your review of the drive, as well as your

8  handwriting, can you tell us what that is?

9  A.  That is a hard drive containing images from room C, room D,

10 room F.

11 Q.  And when was it made?

12 A.  On January 15, 2009.

13 Q.  Is it in the same or substantially the same condition as

14 when you initially made the copy?

15 A.  Yes.

16        MS. ECHENBERG:  Government offers Government

17 Exhibit 3402.

18        MR. GERZOG:  No objection.

19        MR. DONALDSON:  No objection.

20        THE COURT:  Received.

21        (Government's Exhibit 3402 received in evidence)

22        MR. PASTORE:  Your Honor, may I publish it just by

23 having the witness show it to the jury from where he's sitting

24 there?  Hold it up.  I don't know that we should pass it

25 around.

D1HLCIB5                        Mirandona - direct

1    Q.  I'm handing the witness what's been identified as

2    Government Exhibit 3616.  Do you recognize that?

3    A.  Yes.

4    Q.  What is it?

5    A.  It's a sketch of the location that the search warrant was

6    conducted at.

7    Q.  I'm sorry?

8    A.  A sketch of the location that the search warrant was

9    conducted at.

10   Q.  And is it a true and accurate representation of the layout

11   of 125 Maiden Lane, the area that you searched?

12   A.  It's my recollection it is.

13            MR. PASTORE:  Government offers 3616.

14            MR. GERZOG:  No objection.

15            MR. DONALDSON:  No objection.

16            THE COURT:  Received.

17            (Government's Exhibit 3616 received in evidence)

18            MR. PASTORE:  If we could publish that, please, to the

19   jury.

20   Q.  You mentioned some letters before.  You said I think room

21   C, room D, room F.  What did you mean by that?

22   A.  During the search warrant, each room is labeled.  Each

23   area, each desk that's pertinent to the area is labeled.

24            And in this case on the disk there are three things

25   written:  C13, which corresponds with room C, 13 was the table;

D1HLCIB5                        Mirandona - direct

1  D1D, which would be D is the room, desk one; and F1 would be

2  the desk in room F.

3  Q.  After you made these images, did you ever conduct any

4  analysis on the images that you created?

5  A.  Yes.

6  Q.  And just to be clear, I think you mentioned three

7  locations.  Do you have another hard drive that contains

8  additional computer images?

9  A.  Yes.

10  Q.  And did you provide or conduct analysis on all those

11  images?

12  A.  Yes.

13  Q.  Tell us what you did.

14  A.  I took the images and processed them with my forensic tools

15  and searched through them.

16  Q.  What forensic tools did you use?

17  A.  FTK, Forensic Toolkit.

18  Q.  Why did you do this?

19  A.  To uncover evidence and retrieve evidence in the case.

20  Q.  And did anyone request you to do that?

21  A.  The government.

22  Q.  And when you use FTK, does that in any way change the data

23  that's stored on the computer image?

24  A.  No, it does not.

25  Q.  Handing you what's been marked for identification as

D1HLCIB5                          Mirandona - direct

1    Government Exhibit 3601.  Do you recognize that?

2    A.  Yes.

3    Q.  What is it?

4    A.  It's a disk containing emails that were retrieved from one

5    of the images on the hard drive.

6    Q.  Is it just one of the images?

7    A.  All of these emails came off of one image.

8    Q.  Are you sure about that?

9            MR. DONALDSON:  Objection, your Honor.

10           THE COURT:  Okay.  Do you want to hear the question

11   again?

12           THE WITNESS:  Yes.

13   Q.  Okay.  Directing your attention to August 2011, what did

14   you do at that time period?

15   A.  I pulled, I collected emails from every computer that was

16   processed.  I was mistaken.  I thought this was a different

17   disk.

18   Q.  So just to clarify --

19   A.  I identified all emails on all images and retrieved all of

20   them in a batch and presented them for review.

21   Q.  Okay.  And what did you actually physically do with those

22   emails?

23   A.  I put them on a disk.

24   Q.  And did putting them on a disk in any way affect the

25   integrity of the data that was on the computer image?

D1HLCIB5                         Mirandona – direct

1    A.  No.

2    Q.  What did you wind up doing with that disk?

3    A.  I turned it over to the government for review.

4    Q.  At some point did you conduct further analysis of the

5    emails?

6    A.  Yes.

7    Q.  Specifically what did you do?

8    A.  I was specifically searching for file properties and

9    information about a smaller set of emails.

10   Q.  And, again, was that at the request of the prosecution

11   team?

12   A.  Yes.

13   Q.  I'm handing you what's been marked for identification as

14   3602.  Do you recognize that?

15   A.  Yes.

16   Q.  What is it?

17   A.  It's a report that I did on a small subset of emails.

18   Q.  And how is that report generated?

19   A.  It was generated by my manipulation of the program to

20   narrow down to just a certain few emails and kick back

21   information in an organized manner so as to be easily

22   understood.

23   Q.  And which program are we talking about?

24   A.  Forensic Toolkit, FTK.

25   Q.  And what is contained on Government Exhibit 3602?

D1HLCIB5                         Mirandona – direct

A.   A webpage-based report showing the emails in question and
all their properties and their file path, where on the computer
they were located, their name, how big they are, what type of
file, when it was created.

Q.   Okay.  And did you do anything to make those emails more
readable?

A.   I did.  I took each individual one and made it its own
little webpage, and its properties I put on a document so they
could be easily read without having to manipulate the report.

Q.   Handing you what's been marked for identification as
Government Exhibit 3603.  Do you recognize that?

A.   Yes.

Q.   What is that?

A.   These are the subset of emails that were exported from the
software by themselves so they could be looked at individually,
and also the properties of each one were exported in a legible
format so it could be easily read.

Q.   And how do you recognize this disk as containing that
information?

A.   I wrote email and file properties.  It has my initials and
it has the date.

Q.   And is it in the same or substantially the same condition
as when you last saw the disk?

A.   Yes.

          MR. PASTORE:  The government offers 3603.

1          MR. GERZOG:  Brief voir dire.

2     VOIR DIRE EXAMINATION

3     BY MR. GERZOG:

4     Q.  Do the exhibits that were just discussed by you, the disks,

5     contain emails from all the computers in the office at Maiden

6     Lane that was searched?

7     A.  Only the first disk.

8     Q.  Okay.  And then the other two are subsets of what's on the

9     first disk?

10    A.  The second disk is a subset and a report.  The third disk

11    is just the emails from the report without all of the web page

12    around it.  It's just the exported emails.

13    Q.  And those emails were chosen by an assistant U.S. attorney

14    who asked you to isolate them in that way?

15    A.  Yes.

16          MR. GERZOG:  Subject to the previous discussion and

17    objection, your Honor.

18          MR. PASTORE:  I think Mr. Gerzog is merely preserving

19    the objection that the Court had already overruled.

20          MR. GERZOG:  That's correct.

21    Q.  Okay.  I'm handing you what's been marked for

22    identification as Government Exhibit 3604 through 3614, a copy

23    of which has already been provided to the Court.

24          Do you recognize each of 3604 through 3614?

25    A.  Yes.

D1HLCIB5                              Mirandona – direct

1   Q.  What are they?

2   A.  They are the emails from the third disk printed out, as

3   well as the file properties of the specific emails.

4   Q.  Okay.  So, for example, 3604, do I understand it consists

5   of two pages?

6   A.  Yes.

7   Q.  And what is the first page?

8   A.  The first page is the actual email.

9   Q.  And what is the second page?

10  A.  It is the file properties of the email.

11  Q.  And how were these documents created?

12  A.  I exported them from the software.

13  Q.  And were they printed out?

14  A.  Yes.

15  Q.  And are they in the same or essentially the same condition

16  as when you last saw them?

17  A.  Yes.

18  Q.  What tells you that?

19  A.  Each one is marked with an exhibit sticker which I

20  initialed and dated upon review.

21            MR. PASTORE:  Government offers 3604 through 3614.

22            MR. GERZOG:  Subject to the previously overruled

23  objection.

24            THE COURT:  Received.

25            (Government's Exhibits 3604–3614 received in evidence)

1    Q.  If we can bring up government's 3605 and publish that to

2    the jury by displaying it on the overhead, please, and if you

3    wouldn't mind turning to it.  Let's start with the top part of

4    this message, and we may have to zoom in a bit.

5          Okay.  Where it says -- well, tell us in general terms

6    what is the first part, where it says message 2727, what does

7    that mean?

8    A.  It's identified as message 2727 in the folder where it was

9    retrieved from.

10   Q.  So is that something that resided on the computer itself or

11   something that FTK, a number that FTK assigns?

12   A.  On the computer.

13   Q.  And subject field, from field, date field, to field, what

14   are we dealing with here?

15   A.  All that information is contained within the email itself.

16   Q.  Okay.  And if we can focus in now on the message body, can

17   you please just read what it says there?

18   A.  "Sam, as you know, I have decided to terminate my

19   relationship with you and the office.  The time has come for me

20   to worry about myself and my family.  Based on my calculations,

21   over the past year, you and your partner have directly and

22   indirectly swindled me personally (not to mention Earl) out of

23   at least 1,000 to $2,000 a week.  You do the math.  My

24   conservative estimate is at least 50,000 to $75,000."

25   Q.  Now let me stop you there.  According to this email, what

D1HLCIB5                          Mirandona - direct

1   email address was it sent from?

2   A.  The from address is ARYE1998@yahoo.com.

3   Q.  Now let's go to the second paragraph.  And what does say in

4   the second paragraph of the body?

5   A.  "As I now am faced with the responsibility to find another

6   source of income or perhaps relocate, I am presenting you with

7   a simple question which I need the answer for ASAP.  No

8   bullshit, no stories, no excuses.  I need to know point-blank

9   whether you have any intention of paying me what you owe.  This

10  is a yes or no answer.  Tell me yes, how much, and when.  Tell

11  me no and to get lost.  Either way, it is your decision, the

12  consequences of which shall be of your own making.  I need to

13  know where I stand and I need to know now."

14  Q.  Okay.  Let's stop there.  Do you know who in fact sent this

15  email?

16  A.  No.

17  Q.  Next paragraph.

18  A.  "Don't get me wrong.  I am not unsympathetic to whatever

19  issues you have.  I have no desire to cause you any problems,

20  but you keep suggesting that I come work with you and we can

21  make money.  I'm sorry, Sam, but that is no longer an option.

22  I have to move on.  I am not asking for anything that is not

23  rightfully mine.  I have sat back for long enough watching

24  everyone look at themselves and line their own pockets at my

25  expense and the expense of early.  This is not an environment

D1HLCIB5                         Mirandona – direct

1   that I feel comfortable working in.  I want out.  And I want

2   what is mine, what you deduct from my packet.

3           "This is not an issue of making peace.  I hold no

4   grudges, but I am entitled to what I am entitled and it is

5   entirely your decision whether you will do what is right.  We

6   can part ways as friends or not.  I have my responsibilities to

7   do what I have to do and you have yours, but I need to know now

8   what your decision is.  My future option depend on this, and I

9   will appreciate the courtesy of an answer."

10  Q.  Do you have any idea who Sam is?

11  A.  No.

12  Q.  And do you know to whom this email, the actual individual

13  to whom this email was sent?

14  A.  No.

15  Q.  Let's turn to the second page of this exhibit where it says

16  item number 368989.  Where did that number come from?

17  A.  Every single file on the computer is given its own unique

18  number.  It's called the item number.

19  Q.  And what gives that item number?

20  A.  The Forensic Toolkit.  So even if there are duplicate files

21  that are identical, each one of them is given its own number.

22  In this case, this particular file, this particular email was

23  given the number 368989 and I exported it from the computer

24  with that number and the file properties for that number so

25  it's easily matched and there's no ambiguity.

D1HLCIB5                          Mirandona - direct

1    Q.  So let's look at where it says file message 2727, where is

2    that information being drawn from?

3    A.  From the mailbox that it was retrieved from on the

4    computer.

5    Q.  Okay.  So that's the same as the message number that

6    appears on the very first page of 3605 at the top of the page?

7    A.  That is the actual file name.

8    Q.  What about full path?  In general terms, what is a path?

9    A.  The path is where on the computer it resides.

10   Q.  So by reviewing this, where was this email actually stored?

11   A.  The first part, F1NY23, is my computer when I exported it.

12   Part two --

13   Q.  Can I stop you right there.  What does F1 refer to?

14   A.  F1 is the room, and NY23 is the very first part of the case

15   number.  That's the name of the folder that I had the emails in

16   that where the image was.

17   Q.  Okay.  So F1, what if anything does that indicate to you?

18   A.  That the image was from the computer in room F, desk one.

19   Q.  And I see you just gestured to the sketch that we

20   previously were discussing; is that right?

21   A.  Yes.

22   Q.  So this tells you that this particular email came from the

23   computer in room F on the desk labeled No. 1?

24   A.  Yes.

25   Q.  Just as a general matter, having -- did you have a chance

D1HLCIB5                          Mirandona - direct

1    to review each of these emails before you testified today?

2    A.  The -- yes.

3    Q.  And do you know what computer or computers each of these

4    emails came from?

5    A.  Yes.

6    Q.  What computer did they come from?

7    A.  They all came from the computer in room F, desk one.

8    Q.  Okay.  Let's continue now with the file path and tell us

9    what else it indicates?

10   A.  So the part two is the second partition on the hard drive.

11   No name NTFS, the partition doesn't have a name and it's

12   formatted as NTFS which is a type of formatting which is...

13             And then the next one is documents and settings, which

14   everybody who uses a computer is familiar with when you go to

15   the C drive, documents and settings.  The folder all users

16   inside documents and settings folder, application data, inside

17   that folder, AOL, inside that folder.  American Online 9.0 is

18   the program that was installed on the computer.  The folder

19   inside that is backup.  Inside that is Sammy110wall, which

20   would be the user name of the mailbox and so on and so forth.

21   Mail, incoming/saved mail, message 2727.

22   Q.  So let's just work backwords.  Message 2727 refers to, do I

23   take it correctly, the actual message itself that we've been

24   discussing?

25   A.  Yes.

1    Q.   And then next up incoming/saved mail refers to what?

2    A.   The folder that that email was contained in.

3    Q.   Based on your review of these emails, were some of them

4    stored in other folders?

5    A.   Yes.

6    Q.   For example, what would be another folder?

7    A.   On this particular computer, back when people used AOL and

8    installed it as a program, you get the disk in the mail.  And

9    this computer has AOL9.0 and 9.1 on it.  And there are

10   duplicates alone just between the two programs where it was

11   pulling in the same email.  There are backup folders where in

12   this case it's a backup.  So there is an original and a backup.

13   So you can have a an email that's stored in the incoming and in

14   the sent and in the deleted depending.  You can just move

15   emails to any folder that you want or copy them to folder.

16   Q.   Okay.  So you just mentioned inbox, sent, saved -- well,

17   I'm not sure if you mentioned saved so I apologize.

18        Inbox and sent, is that when we, for example, log on

19   to an email account and you see the inbox and you see the sent

20   mail?

21   A.   Yes.  You have all your folders on the left-hand side.

22   Q.   And this file path is telling us where exactly on the

23   computer?

24   A.   Exactly.  You could go on to the computer and drill down.

25   If you wanted a picture, you go to user folder, documents, my

D1HLCIB5                         Mirandona - direct

1    pictures, to get here.  You could actually hit the C drive, go

2    to the documents and settings folders, all user, and work your

3    way down until you get to that message.

4    Q.  Now, let's turn to Government Exhibit 3606 and if we could

5    bring that up on the screen as well.  Actually, if we can start

6    on the second page of the document and focusing in on the top

7    portion of it.

8             What do we have here in general terms?

9    A.  Would you like me to read it?

10   Q.  Just if you want to describe what this first portion is

11   that we're looking at?

12   A.  It's a paragraph written as part of the email.

13   Q.  And is it -- have you had a chance to compare it to the

14   language in 3605?

15   A.  Yes.

16   Q.  And how do they compare?

17   A.  Very similar, identical even.  I'm sorry.  No, this is not.

18   Very similar.

19   Q.  In fact, does it appear identical to you?

20             MR. GERZOG:  Objection, your Honor.  It's not

21   identical.  There's a couple lines --

22   A.  It's very similar.

23   Q.  Okay, very similar.  Now let's move to the first page of

24   this document, and in the middle of the page where it says note

25   forwarded message attached.  We're bringing it up on the

D1HLCIB5                          Mirandona - direct

1    screen.  Can you see that?

2    A.  Yes.

3    Q.  So based on your review of this document, what's going on

4    here, what is this?

5    A.  It appears that the message was forwarded.

6    Q.  Can you tell what email address it was forwarded to?

7    A.  To EarlSDavid@yahoo.com.

8    Q.  And can you tell what email address it was forwarded from?

9    A.  Sammy110wall@aol.com.

10   Q.  Do you have any idea who was using the email address Earl

11   David or Sammy110wall?

12   A.  No.

13   Q.  Let's go up to final paragraph, which is actually the first

14   paragraph.  Tell us what we're looking at first starting where

15   it says subject.

16   A.  It's the subject of the email but it's no subject.

17   Q.  Instead, what's there?

18   A.  It says no subject.

19   Q.  And right before it says no subject, do you see the letters

20   FWD?

21   A.  Yes.  That indicates it was a forwarded email.

22   Q.  And from what email address was it forwarded?

23   A.  From ARYE1998@yahoo.com.

24   Q.  And the substance of the message, where does it appear if

25   at all in this exhibit?

D1HLCIB5                         Mirandona – direct

1  A.  At least two or three -- the substance of this exact email

2  that was sent would be that small two lines or that one line,

3  "this is not a yes or no answer."

4  Q.  So that's the email that was forwarded from

5  ARYE1998@yahoo.com?

6  A.  Yes.

7  Q.  And if we flip to the third page of this, again we see an

8  item number 368982.  That's the FTK number we were just talking

9  about?

10  A.  This is the ID number for FTK so it knows which file this

11  is.

12  Q.  And just drilling all the way down on the file path to the

13  particular mailbox from which this was recovered, can you tell

14  us which one?

15  A.  From the incoming saved mail.

16  Q.  Of what email account?

17  A.  Sammy110wall.

18  Q.  Okay.  Let's go on to Government Exhibit 3607.  And if we

19  could start at the part of the page where it says, it's about

20  halfway down -- I know the type is small -- it says Rafi Bar

21  and then it's got little carets, ARYE1998@yahoo.com.

22          Do you see that?

23  A.  Yes.

24  Q.  Let me ask you, what do the little carets surrounding the

25  email address indicate if anything to you?

D1HLCIB5                          Mirandona - direct

1    A.   That the email is in the address book, that it recognizes

2    the email.

3    Q.   Okay.  And to the left where it says Rafi Bar, what if

4    anything does that mean to you?

5    A.   That would be the name associated with the address book

6    entry.

7    Q.   And then if we read the first paragraph, what does that

8    say?

9    A.   Below Rafi Bar?

10   Q.   Yes.

11   A.   "My first reaction after I received your email was simply

12   not to answer at all and just ignore you.  But when I read your

13   pathetic accusations, I decided to follow the words of the

14   passuk --"

15   Q.   Then there are some words that appear to be in another

16   language?

17   A.   Yes.

18   Q.   And then it picks up.  Do you see where it says "and will

19   go on record and defend myself"?

20   A.   Yes.

21   Q.   If we go down to the next paragraph --

22           MR. GERZOG:  Your Honor, can I just, I just don't know

23   where.  You're at the top.  There's a different -- I'm just

24   confused as to where we are and what.

25           MR. PASTORE:  Sure.  It's displayed on the screen and

D1HLCIB5                         Mirandona - direct

1   I believe there are screens in front of defense counsel as

2   well.  I'm happy --

3           MR. GERZOG:  And it's in the middle of the page,

4   right?

5           MR. PASTORE:  And so we're at the middle of the page

6   where it begins "let's get to the point" and if we can perhaps

7   focus in on that.

8           MR. GERZOG:  That's not the top.  That's the middle of

9   the page.

10          THE COURT:  Okay.  In any event, it's after 2:15.  So

11  since apparently you're going to have more for this witness

12  tomorrow, I think it's a good time to break.  Okay.  And

13  counsel can clarify where they are.

14          So remember the rules.  Keep an open mind.  Don't talk

15  about the case.  And see you in the morning first thing.

16          Be careful of the wires.

17          (Continued on next page)

18

19

20

21

22

23

24

25

D1HLCIB5

1          (Jury not present)

2          MR. DONALDSON:  Your Honor, are we finished for the

3     day?

4          THE COURT:  I don't know.  You guys tell me actually.

5          MR. PASTORE:  One point of logistical concern that I

6     want to raise with the Court.  We have a lay witness coming.  I

7     don't know if Agent Mirandona should can hear this or not.

8          THE COURT:  You can step out.

9          (Witness not present)

10          MR. PASTORE:  We have a lay witness who we had been

11     hoping to get to today and obviously did not.  He is scheduled

12     to arrive here very early tomorrow morning.  And if it's okay

13     with the Court, what we would propose to do because of his work

14     schedule is to have him take the stand, testify, complete his

15     cross, and then we can pick up with Agent Mirandona as long as

16     that's agreement to the Court and the parties.

17          THE COURT:  Just who the witness is?

18          MR. PASTORE:  It's Ilhan Altintas, who we had hoped to

19     call today.

20          THE COURT:  I have no problem with that.

21          MR. GERZOG:  That witness I believe affects primarily

22     on Mr. Donaldson's time, so I'll follow his lead as to whether

23     that's acceptable.

24          MR. DONALDSON:  I've been waiting for him for two

25     days.  Please put him on as soon as possible.

D1HLCIB5

1           THE COURT:  Okay.  Something to look forward to.

2           MR. BRILL:  Who else do we have for tomorrow?

3           MR. DONALDSON:  I have a nice suit on.  I'm ready to

4      go.

5           THE COURT:  I'm sure you have a second.

6           MR. GERZOG:  We'll finish this witness.  And if we

7      have time we'll do what?

8           MR. PASTORE:  Your Honor, if we can have one moment.

9           We anticipate that we would then put on, not

10     necessarily in this order, Isaac Srugo, who is also a lay

11     witness.  We anticipate he'll be brief.  And then two special

12     agents who would testify simply regarding their participation

13     in certain searches.  Again, we would anticipate that would be

14     quick.  We would finish up with Agent Mirandona, as well.  And

15     if we get to it, we would start with David Grynsztajn.

16          THE COURT:  And then does that mean that next week, we

17     have down to the two cooperating witnesses?

18          MR. PASTORE:  As well as the case agent, agent Gordon,

19     regarding, among other things, certain statements of the

20     defendants, the proffer statements, as you know, depending on

21     whether anyone has opened the door, and potentially some

22     additional search evidence.  Actually, definitely some

23     additional search evidence.

24          MR. BRILL:  Based upon that representation, your

25     Honor, then Mr. Greenfield and I were talking and might as well

D1HLCIB5

1    just put it out there for everybody.  We're going to be seeking

2    the production for at least the contact information from the

3    government of John Albert Nolan, who was the cooperating.  We

4    don't know if he's cooperating as of right now.  He was the

5    government employee who was indicted for corruption in dealing

6    with Leo Teitelbaum, one of the law firm employees.  We believe

7    he has some bearing on our client's cases.

8             THE COURT:  He's someone who was indicted?

9             MS. ECHENBERG:  He's been charged and convicted, your

10    Honor.

11             THE COURT:  So assuming he has a lawyer.

12             MR. BRILL:  Yeah, and we'll just be seeking that

13    information from the government.

14             THE COURT:  That's not public record?

15             MR. BRILL:  It may be.  I haven't looked.  So now I

16    sound stupid.

17             THE COURT:  That's harsh.  But I think it's assuming

18    he was indicted in this district, check your ECF.

19             MR. BRILL:  I will.  Thank you.

20             MR. PASTORE:  Your Honor had also asked about Count

21    Seven, the conspiracy.  And in an effort to provide things, we

22    are not going to proceed, we are not going to proceed on Count

23    Seven.

24             THE COURT:  Good.

25             MR. DONALDSON:  Just Count Seven?

D1HLCIB5

1             THE COURT:  Mail and wire fraud.

2             MR. DONALDSON:  What about one through six?

3             MR. GUTMAN:  Does that count as a win for the defense?

4             MR. GERZOG:  Do we get to object?

5             MR. PASTORE:  I think it counts as a win for everyone.

6             (Adjourned to January 18, 2013, at 9 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                              Page

ELISSA McGOVERN

Cross By Mr. Brill . . . . . . . . . . . . . 273

Cross By Mr. Donaldson . . . . . . . . . . . 302

Cross By Mr. Greenfield . . . . . . . . . . 302

Redirect By Ms. Echenberg . . . . . . . . . 329

NICHOLAS CYCYK

Direct By Ms. Echenberg . . . . . . . . . . 343

Cross By Mr. Gerzog . . . . . . . . . . . . 356

Redirect By Ms. Echenberg . . . . . . . . . 358

Cross By Mr. Gerzog . . . . . . . . . . . . 361

LORENA ALAVA

Direct By Ms. Echenberg . . . . . . . . . . 362

Cross By Mr. Gerzog . . . . . . . . . . . . 370

Redirect By Ms. Echenberg . . . . . . . . . 372

Recross By Mr. Gerzog . . . . . . . . . . . 373

MOISHE EISENBACH

Direct By Ms. Echenberg . . . . . . . . . . 375

Cross By Mr. Brill . . . . . . . . . . . . . 380

HARRY DREIZEN

Direct By Ms. Echenberg . . . . . . . . . . 389

Cross By Mr. Greenfield . . . . . . . . . . 398

JOHN MIRANDONA

```
 1   Direct By Mr. Pastore  . . . . . . . . . . . . 409

 2                      GOVERNMENT EXHIBITS

 3   Exhibit No.                              Received

 4    S2, 301 and 302  . . . . . . . . . . . . . 379

 5    3604-3614  . . . . . . . . . . . . . . . 421

 6    54   . . . . . . . . . . . . . . . .377

 7    200  . . . . . . . . . . . . . . . .394

 8    410  . . . . . . . . . . . . . . . .346

 9    412  . . . . . . . . . . . . . . . .366

10    3402  . . . . . . . . . . . . . . . .414

11    3616  . . . . . . . . . . . . . . . .415

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```