D1i1cib1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4                    v.                        11-CR-424 (NRB)

5    GULAY CIBIK, REFAEL BRODJIK,
     a/k/a "Rafi," NATHAN SCHWARTZ,
6    HAROLD TISCHLER, a/k/a
     "Hershy,",
7
                     Defendants.               Jury Trial
8
     ------------------------------x
9
                                               New York, N.Y.
10                                             January 18, 2013
                                               9:16 a.m.
11

12   Before:

13                   HON. NAOMI REICE BUCHWALD,

14                                             District Judge

15
                          APPEARANCES
16
     PREET BHARARA
17       United States Attorney for the
         Southern District of New York
18   JANIS ECHENBERG
     JAMES J. PASTORE, JR.
19       Assistant United States Attorneys
     MICHAEL DINET, Paralegal Specialist
20
     DONALDSON CHILLIEST LLP
21       Attorneys for Defendant Gulay Cibik
     BY:  XAVIER R. DONALDSON, ESQ.
22
     LAWRENCE D. GERZOG, ESQ.
23   JEREMY L. GUTMAN, ESQ.
         Attorneys for Defendant Refeal Brodjik
24

25

D1i1cib1

1                              APPEARANCES
                                (Continued)
2

3    BRILL LEGAL GROUP, P.C.
          Attorneys for Defendant Nathan Schwartz
     BY:   PETER E. BRILL, ESQ.
4

5    PAUL GREENFIELD, ESQ.
          Attorney for Defendant Harold Tischler

6    ALSO PRESENT:   DEIDRE GORDON, Special Agent, Homeland Security
                     RYAN GIBBS, Special Agent, U.S. Dept. of Labor
7                    M. TEKIN ESANDAL, Turkish Language Interpreter
                     ANNA MARIA RISO, Spanish Language Interpreter
8                    ELIZABETH CARUSO, Spanish Language Interpreter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D1i1cib1

1              (Trial resumed)

2              (In open court; jury not present)

3              THE COURT:  All right.  Has the interpreter arrived?

4              MR. PASTORE:  Yes, your Honor.

5              THE COURT:  Okay.  So we can bring the jury out?

6              MR. PASTORE:  Yes.

7              THE COURT:  While we get the jury, I have a question

8    for the government.  Something else about the charge.  You

9    don't have to answer me right away, but I don't think I

10   understand why, on Count Four, there's an aiding and abetting

11   request, and also, I think you asked for something about

12   wilfully causing, both of which suggest that there's somebody

13   else involved in that application, and I'm not aware of who the

14   other person is.  I thought that was Mr. Brodjik or somebody

15   else.

16             MS. ECHENBERG:  We'll take a look at that.

17             THE COURT:  Okay.  I appreciate that.

18             MR. PASTORE:  I can say also, your Honor, Mrs. Brodjik

19   filed an N-400, which is the thought behind the aiding and

20   abetting.

21             THE COURT:  He aided and abetted her, so she got a

22   benefit?  Is that --

23             MR. PASTORE:  She attempted to get a benefit.  She

24   attempted to naturalize.  But we'll look into it because --

25             THE COURT:  I mean, factually, I didn't know what you

D1i1cib1

1    had in mind.

2              MR. PASTORE:  Yeah.  In terms of how the trial has

3    played out, perhaps it makes sense to focus it narrowly just on

4    Mr. Brodjik himself.

5              THE COURT:  Okay.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D1i1cib1

1          (Jury present)

2          THE COURT:  Good morning, everyone.

3          We're going to take a witness out of turn; correct?

4  Just to accommodate the witness' work schedule.  And we'll then

5  pick up I think with Mr. Mirandona afterwards.  Or are we

6  taking more witnesses?

7          MS. ECHENBERG:  We'll take more witnesses out of

8  order.

9          THE COURT:  We try, with what we call civilian

10 witnesses, those not employed by the government, to accommodate

11 their schedule.  We appreciate everybody's doing so.

12         Do you want to call your next witness.

13         MR. PASTORE:  The United States calls Ilhan Altintas.

14         (Witness sworn)

15         THE CLERK:  Please state your name and spell your last

16 name for the record.

17         THE WITNESS:  I-L-H-A-N, and last name is

18 A-L-T-I-N-T-A-S.

19         THE CLERK:  Would the interpreter just raise your

20 right hand for me.

21         (Turkish language interpreter M. Tekin Esendal sworn)

22         THE COURT:  Ladies and gentlemen, you should ignore

23 the fact that the witness has requested to have the interpreter

24 and treat his testimony like anybody else.

25         MR. PASTORE:  Your Honor, may I inquire?

D1i1cib1                              Altintas – direct

1          THE COURT:  Yes.

2     ILHAN ALTINTAS,

3          called as a witness by the Government,

4          having been duly sworn, testified as follows:

5    DIRECT EXAMINATION

6    BY MR. PASTORE:

7    Q.  Good morning, Mr. Altintas.

8    A.  Good morning.

9    Q.  Mr. Altintas, how old are you?

10   A.  49.

11   Q.  Do you speak any English?

12   A.  Yes.

13   Q.  Are you more comfortable testifying through a translator?

14   A.  Yes.

15   Q.  Okay.  If at any time you don't understand any of my

16   questions, just let me know, okay?

17   A.  Yes.

18   Q.  Mr. Altintas, what do you do for a living?

19   A.  I do floors.

20   Q.  When you say you do floors, what do you mean by that?

21   A.  Wooden floors, parquet floors, all kinds of flooring.

22   Q.  And what specifically do you do?

23   A.  (In English)  Installation, install floors.  There's no

24   Turkish for that.

25   Q.  And Mr. Altintas, as best you can, I understand that you

D1i1cib1                         Altintas - direct

1    understand English pretty well.  As best you can, if you can

2    rely on the interpreter.

3    A.   Okay.

4             THE COURT:  He answers first in English.

5             MR. PASTORE:  Oh, he does?  I'm sorry.  I figured that

6    might be difficult for the record.  I apologize.

7             THE COURT:  It's on the record.  She takes it down.

8    She can only take down the English.  Unless she has some secret

9    skills that we don't know about.

10   BY MR. PASTORE:

11   Q.   Mr. Altintas, where were you born?

12   A.   In Turkey.

13   Q.   And what country are you a citizen of?

14   A.   Turkish citizen.

15   Q.   When did you first come to the United States?

16   A.   In the year 1991.

17   Q.   And how did you first come to the United States?

18   A.   I came by ship as a stowaway.

19   Q.   When you say that you were a stowaway, what do you mean by

20   that?

21   A.   They hid me somewhere in the ship to smuggle me into this

22   country.

23   Q.   And where was it that you first arrived?

24   A.   Texas.

25   Q.   After Texas, where did you go?

D1i1cib1                           Altintas - direct

1    A.  To New York.

2    Q.  What is your current immigration status in the United

3    States?

4    A.  I have a green card.

5    Q.  So at some point you applied to adjust your status?

6    A.  Yes.

7    Q.  When was the first time you applied to adjust your status?

8    A.  In the year 2001.

9    Q.  And did you at some point file another application to just

10   your status?

11   A.  Yes, I did.

12   Q.  When was that?

13   A.  In 2005.

14   Q.  Are you testifying here today pursuant to an agreement with

15   the government?

16   A.  Yes.

17   Q.  Under the terms of that agreement, what do you understand

18   your obligations to be?

19   A.  As long as I tell the truth and the truth only, there will

20   be no case against me.

21   Q.  And when you say that there will be no case against you,

22   specifically, what do you mean by that?

23   A.  Regarding those immigration applications.

24   Q.  So the one in 2001 and the one in 2005?

25   A.  Yes.

D1i1cib1                        Altintas - direct

1   Q.  I want to talk first about the 2001 application.  What type

2   of application was filed?

3   A.  It was a sponsorship application through my boss.

4   Q.  And when you say sponsorship application, what do you mean

5   by that?

6   A.  I was working in this floor installation business and I

7   needed somebody to sponsor me to get a green card, and my boss

8   agreed to do that.

9   Q.  What was the name of the company?

10  A.  Long Island Floor Sanding.

11  Q.  And were you in fact working for Long Island Floor Sanding?

12  A.  Yes, of course.

13  Q.  And what was the nature of your employment?  Specifically,

14  how many hours a week were you working?

15  A.  We were working more or less 40 hours.  And most of the

16  time it was past that, more than 40 hours.

17  Q.  When you say more or less, what do you mean by that?

18  A.  The jobs that we went to do, sometimes we will finish them

19  by 3 p.m., sometimes it will go by 7 p.m., so the short ones

20  covered the longer ones, and on average, it would work like 40

21  hours.

22  Q.  Okay.  And how were you paid?  Were you paid a salary or

23  was there some other arrangement?

24  A.  I was paid weekly.

25  Q.  What happened after you filed your first application?

D1i1cib1                    Altintas - direct

1    A.  Long time passed, I couldn't hear anything.  First they

2    sent my file to Texas, then they sent it to Philadelphia

3    backlog elimination center.  We were fed up with waiting and we

4    said we should do something, so we decided to fill another

5    application.

6    Q.  Okay.  Tell us how that came about.

7    A.  I didn't understand.  What do you mean?

8    Q.  Sure.  Tell us the circumstances surrounding the second

9    application you made.

10   A.  Okay.  A friend of mine recommended Earl David's office.

11   That person was an immigration lawyer.

12   Q.  Who was an immigration lawyer, your friend or Earl David?

13   A.  No, no, Earl David was an immigration lawyer.  My friend

14   received a green card through them.

15   Q.  Did you in fact go to Earl David's law office?

16   A.  Yes, I did.

17   Q.  Where was it located?

18   A.  110 Wall Street.  1010 Wall Street.

19   Q.  Describe what it looked like when you arrived at the

20   office.

21   A.  You go up an elevator.  I cannot remember what floor it

22   was.  There was a waiting area, there were smaller offices

23   inside.  Different people from different nationalities work

24   inside those small offices, like Turkish, Spanish, etc.

25   Q.  And when you said Spanish, with respect to the people of

1   different nationalities, how did they take care of different

2   clients?

3   A.   Okay.   Normally the Turks go to the Turkish-speaking people

4   and the Spanish go to Spanish-speaking people, so they go to

5   their own like nationality.

6   Q.   Who did you see?

7   A.   Gulay Cibik.

8   Q.   Do you think that you'd recognize Ms. Cibik if you saw her

9   again?

10  A.   Yes, yes.

11  Q.   Please take a look around the courtroom and tell us if you

12  see her here today.

13  A.   Yes, I see her.

14  Q.   Can you please point to where you see her and describe an

15  article of clothing she's wearing.

16  A.   (In English)  Next to the black man right there, black

17  striped jacket.

18          MR. PASTORE:  May the record reflect that the witness

19  has indicated the defendant Gulay Cibik.

20          THE COURT:  Yes.

21  Q.   When you first went to see Ms. Cibik, who was with you?

22  A.   My wife.

23  Q.   Tell us what happened when you and your wife went to visit

24  the defendant.

25  A.   We explained to her the situation, that our green card is

D1i1cib1                              Altintas - direct

1    nowhere in sight so what can we do to get a green card.  We

2    spoke all about that.

3    Q.  What, if anything, did you tell her about your application

4    that had already been filed?

5    A.  Because I had a prior application, we decided to make the

6    second application in the name of my wife.

7    Q.  And who decided that the second application should be made

8    in the name of your wife?

9    A.  We decided all together.  Ms. Gulay helped us with this

10   decision.

11   Q.  And what, if anything, did the defendant tell you about

12   your wife's application?

13   A.  That they will find a sponsor for her and she will make an

14   application together with that sponsor.

15   Q.  What type of sponsor did the defendant find for your wife?

16          MR. DONALDSON:  Objection.

17          THE COURT:  You said what kind?  Did they find a

18   sponsor, instead of who?

19   Q.  Did Ms. Cibik find a sponsor?

20   A.  She said that there is a sponsor.

21   Q.  And what type of sponsor was it?

22   A.  (In English)  Nursing home.

23          (Through interpreter)  It may be also in Connecticut,

24   that sponsor.

25   Q.  Did your wife work at a nursing home at the time?

D1i1cib1                        Altintas - direct

1   A.  No.

2   Q.  What did your wife do at the time?

3   A.  She was a housewife.

4   Q.  So what was your understanding of whether there was

5   actually a job offer at the nursing home?

6   A.  We talked about doing this application just for the sake of

7   getting a green card and because they are finding a sponsor,

8   that's it.

9   Q.  Did you pay the defendant at some point?

10  A.  Yes.

11  Q.  How did you pay the defendant?

12  A.  (In English)  Check.

13  Q.  I'm handing you what's been marked for identification

14  Government's 704.  Do you recognize that document?

15  A.  Yes, that's the first check I gave.

16  Q.  How do you recognize it as the first check that you gave?

17  A.  This is my check.  My address and name is indicated on top.

18  Q.  And is this a true and accurate copy of the check that you

19  provided to the defendant?

20  A.  The amount and the writings on the memo line and the

21  signature is mine.  Other than that, the other writings on the

22  check are not with my handwriting.

23  Q.  Okay.  So does this appear otherwise to be an accurate copy

24  of the check that you provided the defendant?

25  A.  Yes.

D1i1cib1                              Altintas - direct

1           THE COURT:  I'm sorry.  Could you clarify what part of

2    the check is not in his handwriting.

3           MR. PASTORE:  Sure.

4    Q.  So you mentioned that the numbers, the memo line, and the

5    signature were all yours.  What portions of this check do not

6    contain your handwriting?

7    A.  Pay to the order of, the line that says pay to the order

8    of, then the amount written by letters, which says three

9    thousand five hundred, this is not my handwriting also.

10   Q.  And what about the date; is that your handwriting?

11   A.  That is not mine, no.

12          MR. PASTORE:  The government offers 704.

13          MR. DONALDSON:  No objection.

14          THE COURT:  Received.

15          (Government's Exhibit 704 received in evidence)

16          MR. PASTORE:  Let's publish it by putting it up on the

17   screen.

18   Q.  Okay.  So just to clarify, do you see where it says Y.M.

19   Pollack?

20   A.  Yes, I see that.

21   Q.  Did you write that?

22   A.  That's not my handwriting.

23   Q.  If you were paying Gulay Cibik, why is Y.M. Pollack there?

24   A.  My guess is this is the --

25          MR. DONALDSON:  Objection.

D1i1cib1                         Altintas - direct

1                 THE COURT:  Don't guess.

2   Q.  Mr. Altintas, do you know why Y.M. Pollack is in there?

3   A.   I knew that that is the name of the company because when

4   you go to a lawyer, they always have their name on one side and

5   they have a company name other than that, so that's what I

6   know.

7                 MR. DONALDSON:  Object.  May we approach, your Honor.

8                 THE COURT:  Sure.

9                 (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D1i1cib1                              Altintas - direct

1              (At the sidebar)

2              MR. DONALDSON:  It's my opinion that the

3     interpreter -- or that the witness is saying that he thinks or

4     finishing that with he thinks, and I believe the interpreter,

5     by his gesture, was about to say that, so I don't think what --

6     the answer he just gave was responsive to what the court said

7     about not thinking.  I think he said it again, "I think,"

8     and --

9              MR. PASTORE:  I agree with that.

10             MR. DONALDSON:  -- I would like to have it stricken.

11             THE COURT:  Okay.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

D1i1cib1                        Altintas - direct

1              (In open court)

2              THE COURT:  I'm going to strike the last answer of the

3    witness.  And Mr. Altintas, let me caution you, please, don't

4    guess, don't speculate, don't assume.  Only tell us what you

5    actually know.

6              THE WITNESS:  Okay.

7    BY MR. PASTORE:

8    Q.  Do you see in the memo line where there's a name written

9    there?

10   A.  I see that.

11   Q.  Okay.  Whose name is that?

12   A.  My wife's name.

13   Q.  And do you see the date that's written on this check?

14   A.  I see.

15   Q.  Looking at that, can you tell approximately when you first

16   met with the defendant.

17   A.  We met one or two weeks before the date on this check.

18   Q.  So you think you met approximately around April of 2005; is

19   that right?

20   A.  Yes.

21   Q.  When you visited the office, you mentioned that there were

22   different nationalities, the workers were of different

23   nationalities.

24   A.  Yes.

25   Q.  Approximately how many clients did you see in the office?

1              MR. DONALDSON:  Objection.  Objection.

2              THE COURT:  Well, I think you need a time frame.

3              MR. DONALDSON:  And also, I don't think this witness

4    can determine who was a client and who was not in this office,

5    about their business and what they were doing there.

6              THE COURT:  You're asking if he saw people in the

7    waiting room?

8    Q.  Describe what you saw when you arrived at the law office.

9    A.  There's a waiting area, you go in first and you announce

10   your name and saying that I came, then they tell you to wait

11   and you wait.  When your time comes, you go inside, but in the

12   meantime, people are walking around, it's like a free --

13             MR. PASTORE:  I'm sorry.  I just couldn't hear the

14   interpreter.

15             THE INTERPRETER:  Free.  Free.

16   A.  (In English)  You can walk into the room sometimes just

17   like out, when they're working on something, other cases.  You

18   can walk in the rooms outside.

19   Q.  And how many people did you see in the waiting room?

20             MR. DONALDSON:  Objection.

21   A.  Ten or --

22             MR. DONALDSON:  Objection.

23             THE COURT:  Yes.  If you could lay a little more

24   foundation, how many times was he there, etc.

25   Q.  Approximately how many times did you visit the office?

D1i1cib1                          Altintas - direct

1    A.  We had to go all the time, sometimes two times a week,

2    sometimes one time in a week, so we had to go there.  Sometimes

3    we would go there two times in a month.

4    Q.  Approximately what time period are you talking?  Starting

5    in April 2005, how long did you visit the law office?

6    A.  I think by the end of 2006.

7    Q.  And approximately how many times did you meet with the

8    defendant?

9    A.  I would say around 40 times.

10   Q.  And each of the 40 times you met with the defendant, how

11   crowded was the law office?

12   A.  There were always like 10 to 20 people.  It's not only

13   Ms. Gulay who works there.  There are other people who work

14   there, other offices, as I told you.

15   Q.  And typically what time of day did you go visit the

16   defendant?

17   A.  Evening hours, not during daytime -- I mean, not during

18   early hours.  Evening hours.

19   Q.  At some point after you paid Ms. Cibik $3500, did you visit

20   her again?

21   A.  Yes.

22   Q.  Who was with you during your next visit?

23   A.  (In English)  My wife.

24   Q.  What did you and your wife discuss, if anything, with

25   Ms. Cibik during that meeting?

D1i1cib1                          Altintas - direct

1   A.  In our second visit -- in our first visit something named

2   ETA was filled out, a form, to give to the labor department.

3            THE INTERPRETER:  Oh, I'm sorry.  It was not the first

4   visit.

5   A.  So in the first visit, we went there, we spoke, we didn't

6   do anything.  We spoke about the money in our first visit.

7            In the second visit we made a decision saying that I

8   already have an application so let's make another application

9   in the name of my wife.  So they decided to fill out an

10  application for a nursing home.  Something called ETA was

11  filled out.  I think it was filed electronically, but I'm not

12  sure.

13  Q.  Now how do you know that something called an ETA was filled

14  out?

15  A.  She was filling it out in her computer, and I could see the

16  screen.

17  Q.  When you say she was filling it out, who are you referring

18  to?

19  A.  Ms. Gulay.

20  Q.  How could you see the computer screen if she was filling it

21  out?

22  A.  She was turning the screen around for us to see to

23  determine whether the name and the last name are spelled

24  correctly and the date of birth, etc.

25  Q.  Did she ask you any questions?

D1i1cib1                           Altintas - direct

1    A.   Yeah, many questions, yes.

2    Q.   What types of questions?

3    A.   Generally name, last name, and date of birth, address kind

4    of thing.

5    Q.   Did you see Ms. Cibik make any phone calls while she was

6    filling out the form?

7    A.   Frequently, yes.

8    Q.   What did you hear her say during these phone calls?

9    A.   She was -- she was calling Earl David and she was

10   consulting with him before --

11   Q.   What makes you say that she was calling Earl David and

12   consulting with him?

13   A.   Because she was saying Earl on the phone and she was

14   telling us that, "I will call Earl."

15   Q.   And did you in fact ever meet Earl David?

16   A.   One time he came into the -- into the office and then went

17   out right away.  I did not have a chance of speaking with him,

18   but after he left, they said this is Earl David.

19   Q.   Who said this is Earl David?

20   A.   Gulay.

21   Q.   So of the 40 or so times that you met with the defendant,

22   how many times did you actually sit down with Earl David?

23   A.   Never, none.  We were filling out the papers and Earl David

24   was signing them the next day, he's checking them out to --

25   Q.   So between 2005 and 2006 who was the only person you met

D1i1cib1                          Altintas - direct

1   with at the law firm?

2   A.  With Ms. Gulay, and then Sharoni.

3   Q.  What occasioned your meetings with Sharoni?

4   A.  Okay.  For a period of time Ms. Gulay disappeared and

5   Sharoni took over our case and our files, so -- and Sharoni

6   told us that, "Gulay is not working for us anymore."

7   Q.  Okay.  So I want to go back to your wife's application, the

8   meeting in which you discussed filing an application with a

9   nursing home sponsor.

10  A.  Yes.

11  Q.  At some point did you decide to file a different type of

12  application?

13  A.  Yes, we did.

14  Q.  What type of application did you decide to file?

15  A.  Because my wife didn't speak English, we thought that she

16  won't be able to pursue this to the end, so we decided to make

17  an application -- change the application in my name.  And we

18  decided to use this money, indicating the check, to use for my

19  application.

20  Q.  Where were you when you decided to file an application in

21  your name?

22  A.  We were in Gulay's office.

23  Q.  Whose idea was it to file the application in your name

24  instead of your wife's name?

25  A.  It was Gulay's idea.

D1i1cib1                          Altintas - direct

1    Q.  What, if anything, did Gulay tell you about filing the

2    application in your own name instead of your wife's name?

3    A.  She said, "There's another sponsor called American Girl

4    Fashion and they're paying very good taxes, so if we make an

5    application in your name, it will be easy."

6    Q.  When you say paying good -- paying very good taxes, what do

7    you mean by that?

8    A.  She showed me a piece of paper with a letterhead of

9    American Girl Fashion and there was a list underneath and there

10   were big numbers, like six figures, millions.

11   Q.  I'm handing you what's been marked for identification as

12   Government's 1501-9.  It's in a plastic sleeve, so if you could

13   just take it out and review each page of the document and tell

14   us if you recognize it.

15   A.  I looked at a lot of papers.  I may not remember

16   everything.

17            I saw a paper like this.

18   Q.  When you say a paper like this, is that --

19   A.  Numbers were like this.

20   Q.  Is that what's been marked as Government's 1501-9-A?

21   A.  Yes.

22   Q.  And how do you recognize that document?

23            MR. DONALDSON:  Objection.  Objection.

24            THE COURT:  Wait.  Hold on.

25            MR. DONALDSON:  One, foundation, and two, I don't

D1i1cib1                          Altintas - direct

1    believe the witness testified that he recognized that document.

2    His testimony is he saw something that looked like that, so --

3            THE COURT:  Can you clarify that.

4    Q.  Mr. Altintas, you're holding in your hand 1501-9-A.  Have

5    you seen that document before?

6    A.  It's not possible for me to be 100 percent sure because I

7    saw a lot of papers, but the paper -- the paper that I saw had

8    the same letterhead, American Girl Fashion, and the numbers

9    were like this.  There were millions indicated on that piece of

10   paper.

11   Q.  So I understand correctly, you're not sure if you saw this

12   exact piece of paper but you saw something that looks

13   identical.

14   A.  I saw a paper just like this.

15   Q.  Okay.  And who showed you that paper?

16   A.  But I cannot say this was that paper.

17   Q.  Right.  I understand that.  So who showed you a paper that

18   looked exactly like that?

19   A.  Gulay, Gulay.

20   Q.  Where were you when she showed you that paper?

21   A.  In Gulay's office.

22   Q.  What did she tell you as she showed you that paper?

23   A.  She said, "This is a very good company and they are paying

24   very good taxes so if you fill out an application to these,

25   hopefully we will get it."

D1i1cib1                          Altintas - direct

1          MR. PASTORE:  Government offers 1501-9-A.

2          MR. DONALDSON:  Objection to proper foundation.

3          THE COURT:  Sustained.

4    Q.  Is 1501-9-A a true and accurate copy of the document that

5    Gulay Cibik showed you while she described American Girl

6    Fashion?

7          MR. DONALDSON:  Objection.

8          THE COURT:  He can't answer that.

9    Q.  What else, if anything, did Ms. Cibik tell you about

10   American Girl Fashion?

11   A.  Let's fill the application to this company in my name and

12   it will be easy.

13   Q.  Did Ms. Cibik tell you what kind of company it was?

14   A.  Yes, she did.

15   Q.  What did she tell you?

16   A.  It's a clothing company.  They are cutting and sewing the

17   fabrics.

18   Q.  Were you working in the clothing industry at the time?

19   A.  No.

20   Q.  What else, if anything, did Ms. Cibik tell you you would

21   need for your application?

22   A.  She said you need two years of experience letters.

23   Q.  Did she explain to you how you were to get those experience

24   letters?

25   A.  She showed me sample letters from another case and she

D1i1cib1                        Altintas - direct

1    indicated that we can do something that's similar to this and

2    she asked me to do these.

3    Q.  What did you do after the defendant asked you to get

4    experience letters?

5    A.  So I called my older sister and she prepared those

6    experience letters and she sent them in, from another company

7    in Turkey.  It was sealed and signed and everything.

8    Q.  Handing you what's been marked for identification as

9    Government's 1501-10.

10            MR. DONALDSON:  Can I see those, please.

11            MR. PASTORE:  They had previously been provided to

12   defense counsel.  It's 1501-10, the copies I provided you in

13   the binder, but I can show them to you again.

14            Your Honor, if I may have a moment.

15            Just for the record, they have also been provided on a

16   CD to defense counsel approximately a week and a half ago.

17            (Pause)

18   Q.  Do you recognize these documents?

19   A.  Yes.

20   Q.  What are they?

21   A.  These are experience letters.

22   Q.  What experience letters are they?

23   A.  These indicate that I used to work in a clothing company.

24   Q.  And how were these experience letters prepared?

25   A.  My older sister prepared all those.  This is from a company

D1i1cib1                          Altintas - direct

1    in Turkey and signed by the ex-husband of my older sister.

2    Q.  So you personally obtained these experience letters?

3    A.  Yes.

4    Q.  And are these true and accurate copies of the experience

5    letters you obtained?

6    A.  Yes.

7              MR. PASTORE:  Government offers 1501-10.

8              MR. DONALDSON:  No objection.

9              THE COURT:  Received.

10             (Government's Exhibit 1501-10 received in evidence)

11             MR. PASTORE:  Okay.  Could you bring up 1501-10.

12   Q.  And if you could tell us --

13             THE COURT:  How many pages are in that exhibit?

14             MR. PASTORE:  I don't know.  I was actually going to

15   flip through the pages now with the witness.

16             THE COURT:  All right.

17   Q.  Okay.  So if we look at the first few pages of 1501-10, the

18   first three pages of it, could you tell us what we're looking

19   at here.

20   A.  This is the translation company's certification letter.

21   Q.  And what's the next page?

22             THE INTERPRETER:  This is upside down.

23             MR. PASTORE:  There we go.  I think we've righted the

24   ship.

25   Q.  What is this now?

D1i1cib1                        Altintas - direct

1    A.  This is the translation of the original in English.

2    Q.  Okay.  And the next page?

3    A.  This is the letter that we fabricated.

4             MR. PASTORE:  Let's go to the next page.

5    Q.  Okay.  We see another certificate here.  Does this indicate

6    another -- that there's a new document behind it?

7    A.  Yes.

8             MR. PASTORE:  All right.  Let's go to the next page.

9    Q.  What do we have here?

10   A.  This is the English version of the letter, another letter.

11   Q.  Another letter?  Okay.

12            MR. PASTORE:  And if we could go to the next page.

13   Q.  What is this?

14   A.  This is a certificate of achievement indicating that I am

15   such a successful person and I do a very good job.

16   Q.  Okay.  And so the previous page, the English, is that the

17   English translation of this?

18   A.  Yes.

19            MR. PASTORE:  If we could continue on beyond the

20   certificate.

21   Q.  Okay.  Another certification.  So is there another document

22   behind this?

23   A.  Yes.

24   Q.  What is it?

25   A.  Can we see the document?

D1i1cib1                              Altintas - direct

```
 1              MR. PASTORE:  If we could keep going.  And one more
 2   page.
 3   Q.  So what are we looking at as we scroll through these pages?
 4   A.  This is a booklet of proof of work.
 5   Q.  Okay.  And if we could go to the next page, please.
 6   A.  This is the cover and the first page of the same booklet.
 7   Q.  And where did you get this document from?
 8   A.  From Turkey.
 9   Q.  If we could just scroll through the final couple of pages
10   of the exhibit.
11   A.  This is also from Turkey, same booklet.
12   Q.  And that's it.
13   A.  Same -- different pages of the same booklet.
14   Q.  After you obtained these, after you obtained these pages or
15   these documents, what did you do with them?
16   A.  I gave them to Gulay.
17   Q.  What did Ms. Cibik do with them?
18   A.  She added them to the immigration application.
19   Q.  How do you know that?
20   A.  That was the purpose why she got them.
21   Q.  Okay.  And did you in fact see her preparing the
22   application?
23   A.  Yes, I did.
24   Q.  Handing you what's been marked for identification as
25   Government's 1501-2.
```

D1i1cib1                          Altintas - direct

1              MR. PASTORE:  You can go ahead and remove that from

2      the screen.

3      Q.  And please tell us if you recognize that document.

4      A.  I have seen a lot of papers similar to this.  I cannot say

5      that I specifically remember this one.

6      Q.  Okay.  And where did you see papers similar to this?

7      A.  In the office.  She fills them out in the computer.

8      Q.  Who fills them out?

9      A.  Gulay Cibik.

10     Q.  After Ms. Cibik filled out the papers on the computer, what

11     did she do?

12     A.  She's printing them.

13     Q.  After she printed them what did she do?

14     A.  She puts them on top of each other and fills out a file

15     kind of thing, with the pictures and everything, and then she

16     sends them to the immigration.  Not only these --

17             MR. DONALDSON:  Objection.  Objection.

18             THE COURT:  What?

19             MR. DONALDSON:  May we approach?

20             THE COURT:  Yes.

21             (Continued on next page)

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D1i1cib1                        Altintas - direct

1              (At the sidebar)

2              MR. DONALDSON:  Again, I think counsel -- I'm hoping

3      because of the translator, the intermediary, I think the

4      witness was beginning to speculate again.  He's saying that

5      she's -- well, he just said that she prints them out, does

6      something else and sends them off to immigration, but I don't

7      know that he has any information that she's sending anything

8      off unless they know that she took them in and took them down

9      to the mailbox and whatever.  I don't know if that's --

10             MR. PASTORE:  Your Honor, she told him that she was

11     preparing these immigration applications and so --

12             MR. DONALDSON:  That's the difference between

13     preparing them -- it's one thing to say she's preparing them,

14     it's another thing to say she's sending them off.  He can't

15     testify, as he just did, that she prepared them, printed them

16     out, and then sent them to immigration.  He can't testify to

17     what she did.

18             MR. PASTORE:  I think I understand the objection and I

19     can rephrase.

20             Your Honor, on 1501-9-A, if I can be heard briefly,

21     the defendant is testifying that he saw a document that was

22     just like that in Ms. Cibik's office.  He said it looked

23     essentially the same, and I think what he is saying is that he

24     can't be sure that the piece of paper he's holding is in fact

25     the identical document that Ms. Cibik showed him but --

D1i1cib1                              Altintas - direct

1          THE COURT:  That's the problem.

2          MR. PASTORE:  But identity of course is not required.

3    It merely goes to the weight, not the admissibility.  In other

4    words, if it appears to be a copy, I think he --

5          THE COURT:  He's not saying that.  I think the point

6    is, it doesn't really matter.  You have the testimony that she

7    gave him a piece of paper with the title American Girl

8    Fashions, showing huge numbers of earnings.  It may be better

9    to have the piece of paper, a little easier, but it's not

10   really keeping you from, you know, performing your work.

11         MR. PASTORE:  In any event, we do think it will come

12   in as a business record when the appropriate foundation has

13   been laid by the CIS witness.  In other words, this witness

14   obviously can't identify it as a business record because he

15   doesn't know it came from the A file, he only knows it came

16   from Ms. Cibik, but --

17         THE COURT:  If it's a part of a file, you know, that

18   immigration has, you're going to get it in.

19         MR. PASTORE:  Okay.  Thank you.

20         (Continued on next page)

21

22

23

24

25

1              (In open court)

2              THE COURT:  You may continue.

3              MR. PASTORE:  Thank you, your Honor.

4    BY MR. PASTORE:

5    Q.  Mr. Altintas, what was the purpose of providing Ms. Cibik

6    with these experience letters?

7    A.  Immigration was asking for -- immigration was asking for

8    two years of experience to be able to get a green card.

9    Q.  And who told you about the two-year experience requirement?

10   A.  Gulay.

11   Q.  Earlier you mentioned that you changed the application to

12   your name because you speak better English; is that right?

13   A.  Yes.

14   Q.  Why was that important?

15   A.  I didn't understand.

16   Q.  Sure.  Why was it important that you be able to speak

17   English, why would that matter to your application?

18   A.  Before you can get your green card, they are calling you

19   for an interview.

20   Q.  How do you know that before you get a green card you can be

21   called for an interview?

22   A.  Gulay told me that but I knew that before.

23   Q.  And so you both knew it beforehand and the defendant told

24   you?

25   A.  Yes, yes.

1   Q.  Aside from the $3,500 check that we've already discussed,

2   have you provided -- did you provide Ms. Cibik with any other

3   payment?

4   A.  Yes.

5   Q.  How did you typically pay Ms. Cibik?

6   A.  Sometimes by check, sometimes by cash.

7   Q.  Who determined how much you paid each time you visited?

8           THE COURT:  There's no foundation for he paid each

9   time.

10          MR. PASTORE:  I'm sorry.

11  Q.  Mr. Altintas, approximately how many occasions did you pay

12  Ms. Cibik?

13  A.  I was not paying money each time I visited her.  But when

14  there are some advancements in the case, such as they're

15  calling for fingerprinting, they're sending an answer to

16  something, those visits we had made a contract with them

17  before.

18  Q.  Who did you make the contract with?

19  A.  With Gulay.

20  Q.  You mentioned before that as Ms. Cibik prepared

21  applications, she would sometimes call Earl David; is that

22  right?

23  A.  Yeah, frequently, yes.

24  Q.  When you were paying Ms. Cibik, was Earl David present?

25  A.  No.

D1ILCIB2                            Altintas - direct

1    Q.  Did you ever negotiate with Ms. Cibik about how much she

2    wanted to pay?

3    A.  Yes.  We made money negotiations with Gulay.

4    Q.  Did you negotiate with Mr. David?

5    A.  No.  I never spoke with him, never.

6    Q.  And you said on the occasions that you paid money,

7    sometimes it was in cash and sometimes it was by check; is that

8    right?

9    A.  Yes.

10   Q.  I'm handing you what's been marked for identification as

11   Government Exhibit 705, 706, 707, copy of which have previously

12   been provided to defense counsel and which were just shown as

13   well.

14          Do you recognize 705, 706, and 707?

15   A.  These are my checks.

16   Q.  How do you recognize them as your checks?

17   A.  My name, last name, and home address are printed on top.

18   Q.  Are each of the checks signed?

19   A.  Yes, my signatures.

20   Q.  Where were you when you signed each of these checks?

21   A.  In Gulay's office.

22   Q.  Are these true and accurate copies of your checks as you

23   signed them in Gulay Cibik's office?

24   A.  Yes.  These are my checks and the moneys that I paid.

25          MR. PASTORE:  Government offers 705, 706, and 707.

D1ILCIB2                            Altintas - direct

1              MR. DONALDSON:  No objection.

2              THE COURT:  Received.

3              (Government's Exhibits 705, 706, 707 received in

4     evidence)

5     Q.  If we could take a look at government 705, please.

6              Okay.  Mr. Altintas, on this check I want to focus

7     first on the pay to the order of.  Do you see where it says Y.

8     M. Pollack?

9     A.  Yes, I see that.

10    Q.  Did you write that?

11    A.  No.  That's not my handwriting.

12    Q.  What about where it says 1,000 in words, did you write

13    that?

14    A.  That's my handwriting.

15    Q.  And where it says the numbers 1,000, who wrote that?

16    A.  That's mine.

17    Q.  What about the date 5/1/05, whose handwriting is that?

18    A.  The date is also mine, yes.

19    Q.  And in the memo line there's a name there.  Do you see

20    that?

21    A.  Yes, I see that.

22    Q.  Whose name is that?

23    A.  That's my nephew's name.

24    Q.  Why is your nephew's name in a check that you wrote out for

25    Gulay Cibik?

1    A.   Ozgur came with me to the office and his intention was to

2    start an application for himself.  So he asked for a check from

3    me, and that's why the check was written.

4    Q.   How do you know that his intention was to start a green

5    card application?

6    A.   Because I had started with my application and he was with

7    me and he wanted to do something about his position also.

8    Q.   When you say he was with you, where physically were you?

9    A.   We came together to the office.  My wife was also with us.

10   Q.   Whose office were you in?

11   A.   Gulay's office.

12   Q.   So in total, do I understand that you were in the office,

13   your wife was in the office, and your relative was in the

14   office?

15   A.   Yes.

16   Q.   And you were all with Ms. Cibik?

17   A.   Yes.

18   Q.   What type of application, if any, was discussed?

19   A.   I think it was something similar to my application.

20   Q.   What makes you say that?

21   A.   Because you know that I started and he wanted to get a

22   green card also.

23   Q.   Were you present for conversations between your relative

24   and Ms. Cibik?

25   A.   I don't remember what they spoke about, but he asked for

1    the check and I gave him the check to give to Gulay.

2    Q.  I'm handing you what's been marked for identification as

3    Government Exhibit 701.  Do you recognize that?

4    A.  That's the carbon copy all my checks.

5    Q.  How do you recognize it as carbon copies of your checks?

6    A.  I see that.  This is mine.

7    Q.  What makes you say it's yours?

8    A.  My name and last name are printed on top.

9    Q.  Okay.

10             MR. DONALDSON:  I have no objection.

11             MR. PASTORE:  Government offers 701.

12             THE COURT:  Received.

13             (Government's Exhibit 701 received in evidence)

14   Q.  If you could turn to the second check in that carbon copy,

15   and if we could display it on the overhead.

16             Do you recognize this second check?

17   A.  Yes, that's my check.

18   Q.  Okay.  And, specifically, is this the carbon copy of your

19   check?

20   A.  Yes.

21   Q.  Before you testified, did you have an opportunity to

22   compare this carbon copy with government's 705, the check we

23   were just discussing?

24   A.  This does not have the pay to the order writing.

25   Q.  If we could put 705 up side by side.

1          Okay.  Why is the pay to the order missing?

2     A.  Because I wrote the check and without writing the name to

3     be paid to, I tear it out and gave it to Ozgur.

4     Q.  And do you know what he did with the check?

5     A.  Gave it to Gulay.

6     Q.  I now want to talk to government 706.  Taking a look at

7     this check starting at the top, whose handwriting appears in

8     the date and field?

9          I'm sorry, Mr. Altintas.  If you want to take a look

10    at the physical copy of 706 or you can look on your screen.

11    A.  Your question was?

12    Q.  Looking at the date field, whose handwriting appears there?

13    A.  Yes, that's my handwriting.

14    Q.  And where it says pay to the order of and then there's some

15    writing, it looks like Mazal and Bruicha Publishing, is that

16    your handwriting?

17    A.  Entirety of the check is in my handwriting.

18    Q.  What is Mazal and Bruicha Publishing?

19    A.  Okay.  I don't know what Mazal and Bruicha Publishing is,

20    but I know that they put out classified ad in the newspaper

21    when you make a job, I mean like a green card sponsorship

22    application, and that's why he got that check from me.

23    Q.  Okay.  How do you know that there was advertising in

24    connection with the application?

25    A.  Because Gulay told us that you have to pay money for us to

1    be able to put a classified ad in the newspaper.

2    Q.  With respect to this check, do you see in the memo line

3    there's a name?

4    A.  That's my brother-in-law.

5    Q.  Why does your brother-in-law's name appear on a check you

6    filled out?

7    A.  He's my relative and he also was making an application for

8    green card.

9    Q.  Were you ever present for any discussions concerning your

10   brother-in-law's application for a green card?

11   A.  Yeah.  When they were speaking, most of the time I was in

12   the room.

13           MR. DONALDSON:  Objection.  I don't believe there was

14   any testimony that, first of all, I don't know who "they" is

15   referring to.  Second, I don't believe there's any testimony

16   regarding my client speaking to his brother-in-law about

17   anything.

18           THE COURT:  You can clean this up if you can.

19           MR. PASTORE:  That's exactly right.  I intended to,

20   your Honor.

21   Q.  So when you refer to "they," who are you referring to?

22   A.  Gulay and my brother-in-law.

23   Q.  And do you know that Gulay and your brother-in-law had

24   conversations about an application for a green card?

25   A.  I was in the room and I recommended that he makes an

D1ILCIB2                          Altintas - direct

1    application to get a green card.

2    Q.  So when you say "the room," what room are you referring to?

3    A.  Inside Gulay's office.

4    Q.  And while you were physically present inside Gulay's office

5    with your brother-in-law, did you overhear conversations

6    between Ms. Cibik and your brother-in-law?

7    A.  I heard conversation, but it's been seven years now and I

8    cannot remember every detail.

9    Q.  Do you remember generally what the conversations were

10   about?

11   A.  Yes, yes.

12   Q.  In general terms, what were the conversations about?

13            MR. DONALDSON:  Objection.

14   A.  They were about green card application.

15            MR. DONALDSON:  Objection.

16            THE COURT:  Overruled.

17   Q.  So in general terms, do you remember what the conversations

18   were about?

19   A.  The conversations were to start a green card application

20   and it was started.

21   Q.  Do you remember anything about what Ms. Cibik told your

22   brother-in-law?

23   A.  I cannot remember those in detail because I could not pay

24   much attention to those.

25   Q.  Okay.  Do you remember whether they discussed what type of

D1ILCIB2                          Altintas - direct

1  application would be filed?

2  A.  Again to a sponsor.

3  Q.  Who said that there was going to be a sponsor?

4  A.  Gulay found, but I don't know who she found.

5  Q.  How do you know that Gulay found a sponsor for your

6  brother-in-law?

7  A.  We were in Earl David's office and she started the

8  application.  I know that.

9  Q.  When you say Earl David's office, do you mean generally the

10 law firm or you mean his office specifically?

11 A.  Generally that law firm because Gulay is his assistant and

12 she works there.

13 Q.  I want to take a look now at Government's 707.  Whose

14 handwriting appears in the date field?

15 A.  Entirety of this check is my handwriting.

16 Q.  And why did you write Gulay Cibik in the pay to the order

17 field?

18 A.  That's how she asked for.

19 Q.  Do you know what happened to this check?

20 A.  I gave it to Gulay.

21 Q.  And after you gave to it to Gulay, what did you do?

22 A.  So we were sorry about all the moneys that we have paid, so

23 we thought about it, and the next day I called the bank and I

24 stopped this check.

25 Q.  What if anything happened after you stopped the check?

1   A.  Gulay could not get this money.

2   Q.  Shortly after you wrote out this check, did you see

3   Ms. Cibik again?

4   A.  I have never seen -- I have not seen Ms. Cibik after I

5   wrote this check.  But on one occasion in the Turkish embassy

6   we came face to face.  I could not recognize her.  My wife was

7   with me and she recognized her.

8   Q.  Did you continue to visit the law office of Earl David?

9   A.  Yes, but they had moved.

10  Q.  Where did they move to?

11  A.  I don't know the exact address, but it was in Battery Park

12  or Battery Place, something like that.

13  Q.  When you visited Battery Park or Battery Place, who helped

14  you, if anyone, with your application at that point?

15  A.  Sharoni.

16  Q.  Did anyone else associated with the law firm help you with

17  your application?

18  A.  After that I always spoke with Sharoni because she told me

19  that Gulay --

20          THE INTERPRETER:  I'm sorry.  There's no gender in

21  Turkish.

22  A.  He told me that Gulay is not -- no more working with us so

23  I'm going to be taking care of your file and your application.

24  So it's customary that you always go to the same person because

25  he or she knows your case, that's how it's done.  There are

D1ILCIB2                        Altintas - direct

1    offices there again and there were a lot of people working

2    there.

3    Q.  At some point did you also meet with an attorney?

4    A.  My files were lost.  In Sharoni's office, they couldn't

5    find it anywhere.  I have their copies but the originals were

6    just gone.

7    Q.  At some point did you travel to a law office in the Bronx?

8    A.  I went to Jed David Philwin's office.

9    Q.  And did you continue to pursue the application?

10   A.  Okay.  So when I went there, I think there was some

11   paperwork that was supposed to be sent to the immigration.

12   Now, my file had completely disappeared.  So there was no file

13   and they took my copies to fabricate --

14           MR. DONALDSON:  Objection.

15           THE COURT:  I don't think he means fabricate.

16           Do you mean copy?

17           MR. DONALDSON:  I don't know what he means, Judge.

18   Sorry.

19           MR. PASTORE:  We can clarify.

20   Q.  When you say -- I don't know if this is the interpretation,

21   but what did they do with your application?

22           THE COURT:  His copies.

23   Q.  With your copies.

24   A.  Okay.  They filled another application.  It's the same

25   application.  So immigration asked for some information or

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D1ILCIB2                        Altintas - direct

1    something, and they looked at my copies to prepare that

2    whatever is needed and they sent it to immigration.

3    Q.  And what ultimately happened to your application?

4    A.  Nothing happened.  I received no information.  There was

5    long time passed.  So I had it closed.  I went to another

6    lawyer.  And I --

7    Q.  Let me stop you right there before you talk about the

8    lawyer.

9           I'm handing you what's been marked for identification

10   as Government's 1501-1.  What is 1501-1?

11   A.  So waiting long time, nothing is happening.  Nothing is

12   happening with my application and with Ismet's application.  So

13   in the meantime I learn that my original application came back

14   to New York, and when we heard that we were happy because it

15   was a good application and then we went and closed the other

16   application.

17   Q.  When you say closed the other application, you're referring

18   to the one in 2001 or the one in 2005?

19   A.  He wants me to read this?

20           THE COURT:  He can read it to himself, but he can't

21   read it out loud if it's not in evidence.

22   Q.  Mr. Altintas, what is 1501-1?

23   A.  This is my letter to close an application.

24   Q.  And how do you recognize it?

25   A.  Excuse me?

D1ILCIB2                         Altintas - direct

1   Q.  How do you recognize it as a letter to close your other

2   application?

3   A.  My signature is at the bottom.

4          MR. PASTORE:  Government offers the first page of

5   1501-1.

6          MR. DONALDSON:  No objection.

7          THE COURT:  Received.

8          (Government's Exhibit 1501-1, first page received in

9   evidence)

10  Q.  So do I understand -- and if we could publish it on the

11  screen too -- so do I understand correctly that you withdrew

12  the application that had been filed through the Earl David law

13  firm?

14  A.  Yes.

15  Q.  How are you ultimately able to get a green card?

16  A.  My original application advanced and they asked for

17  additional paperwork.  We provided everything, the tax papers,

18  etc.  Then they called me for an interview and I passed and I

19  got my green card.

20         THE COURT:  So were you working for that Long Island

21  flooring company the entire time?

22         THE WITNESS:  Yes, I was, and I'm still at the same

23  job.  It's a profession.

24  Q.  And in fact were you working -- did you also work for other

25  flooring companies?

D1ILCIB2                          Altintas - direct

1    A.  I also worked at Power Floor Sanding.

2    Q.  And do you currently own your own business?

3    A.  Yes.

4    Q.  What kind of business do you own?

5    A.  This is a flooring business.  It's called Noble Floor,

6    Noble Floor Sanding.

7    Q.  And do you continue to work with Long Island Floor Sanding

8    and Power Floor Sanding?

9    A.  Power Floor Sanding was before the year 2000.  I started

10   working in 1993 in Long Island Floor Sanding.  Then I work with

11   my brother because he's doing the same business.  And I went

12   back to Long Island Floor Sanding, but I was always in the same

13   kind of business, always in the flooring business.

14   Q.  Okay.  And, in fact, did you sometimes do subcontracting

15   work with these other companies?

16   A.  Yes.

17   Q.  In total, how much did you pay to the Earl David law firm

18   for your green card application?

19   A.  Between 9,000 and $11,000.

20   Q.  And of that nine to 11,000, how much did you personally pay

21   to the defendant?

22   A.  Around 6,000.

23        MR. PASTORE:  Your Honor, may I have a moment?

24   Q.  If we could publish Government's 1501-2 which was

25   previously admitted into evidence.  If we focus in on the first

D1ILCIB2                         Altintas - direct

1    page, midway down.

2              Do you see where it says employer's name, American

3    Girl Fashion?

4    A.  I see that.

5    Q.  Did you ever in fact work for American Girl Fashion?

6    A.  No, I have not.

7    Q.  Who provided you with the name American Girl Fashion as an

8    employer?

9    A.  Ms. Gulay found these in Earl David's office as sponsor.

10   Q.  Thank you.

11             MR. PASTORE:  No further questions at this time.

12             MR. DONALDSON:  Can I run to the bathroom?  I'll be

13   quick.

14             THE COURT:  Yeah.  I know it's really going to improve

15   your cross.  Go.

16             MR. DONALDSON:  Take my cheat sheet with me.

17             (Pause)

18   CROSS-EXAMINATION

19   BY MR. DONALDSON:

20             MR. DONALDSON:  May I, your Honor?

21             THE COURT:  Go, please.

22   Q.  Good morning.

23   A.  Good morning.

24   Q.  You speak some English?

25   A.  Yes, fairly.

D1ILCIB2                         Altintas - cross

1    Q.   When you interviewed with the federal government regarding

2    your immigration status, did you take a Turkish interpreter

3    with you?

4    A.   No.

5    Q.   You went by yourself?

6    A.   Yes.

7    Q.   Conducted this interview with the American or immigration

8    or Department of Labor by yourself?

9           MR. PASTORE:  Objection, your Honor.  I don't think it

10   was a Department of Labor interview.  Clarify.

11   Q.   Somebody.

12   A.   (In English) I speak good English.

13   Q.   You speak good English?

14   A.   (In English) Not excellent but good English.

15   Q.   Good enough for you to go to an interview with -- strike

16   that.

17          Getting your green card is important to you, right?

18   A.   Excuse me?

19   Q.   Getting your green card is important to you, correct?

20   A.   Yes, it was.

21   Q.   And you went to immigration or an immigration office by

22   yourself, correct?

23   A.   Yes.

24   Q.   You understood what they were asking you, did you

25   understand the questions they were asking you at this

1    interview?

2    A.  Sometimes they had to repeat the question, but I generally

3    understand.

4    Q.  All right.  You spoke with Ms. Cibik several times?

5    A.  In Turkish, yes.

6    Q.  Did you ever speak to her in English?

7    A.  No, we prefer Turkish.

8    Q.  Now, when you -- the last thing I believe you said, one of

9    the last things you said on direct was I believe you were

10   talking about this interview that you went to to get your green

11   card.

12          Do you recall testifying about that?

13   A.  Yes.

14   Q.  And this was the interview that you --

15   A.  There was an interpreter in the green card interview.

16   Q.  Oh, good.  And you went to this interview after you stopped

17   your case with the Earl David law firm, correct?

18   A.  Yes.

19   Q.  And this was based upon the first application you had back

20   in 2001, correct?

21   A.  Yes.

22   Q.  While conducting that interview regarding the application,

23   did you tell the person that you had recently committed fraud?

24   A.  They asked me whether if I was ever arrested and I said no.

25   Q.  Did you tell them that you had recently committed fraud in

1   the -- sorry, I'll repeat that.

2           Did you tell them that you had recently committed

3   fraud in the preparation or application process for getting a

4   green card?

5   A.  They did not ask that question and I did not give that

6   answer.

7   Q.  They didn't ask that question?

8   A.  No.

9   Q.  So and you didn't volunteer it?

10  A.  No.

11  Q.  You decided to hide that from them?

12  A.  They saw the file and they saw the other file which was

13  closed and I didn't have to say anything.

14  Q.  You didn't tell them that you had put together some fake

15  experience letters to get an immigration -- to get a green

16  card?

17  A.  No, I didn't, because they didn't ask.

18  Q.  Now, you said that -- jump around a little bit here if you

19  don't mind.

20          You have four meetings or four conversations with the

21  government in the last two weeks; do you recall those?

22  A.  Yes, I remember.

23  Q.  You had one January 3, January 9, January 16 -- strike

24  that -- January 15, and January 16, correct?

25  A.  Yes.

D1ILCIB2                        Altintas - cross

1   Q.  January 3, 2013, you had that meeting with who?

2   A.  Jim, James.

3   Q.  And you had that meeting where?

4   A.  I don't know it by heart.  I went to the address that was

5   indicated in the paper.

6   Q.  How long did that meeting last?

7   A.  All day.

8   Q.  January 3 meeting last all day?

9   A.  (In English) I go there 10 o'clock.  But when I leave the

10  building, it's not with him all the time because I got other

11  things too.  So it takes about half-hour maximum with him.  But

12  they said maybe I need a lawyer just in case.  So we wait for

13  something long time.

14  Q.  So January 3 meeting with Mr. Pastore lasted approximately

15  half an hour?

16  A.  (In English) Half-hour, yeah.

17  Q.  Then you had a meeting January 9, correct?

18  A.  (In English) That took about two hours.

19  Q.  Now, the meeting on January 3, they ask you questions --

20  Mr. Pastore asked you questions about Ms. Cibik, correct?

21  A.  (In English) They didn't say anything about Ms. Cibik.

22  They say about my application.

23  Q.  On --

24  A.  (In English) Didn't mention her name.

25  Q.  On January 3 meeting, are you saying that Ms. Cibik's name

1    was not mentioned?

2             MR. PASTORE:  Objection, mischaracterizes.  I think he

3    was asking what I asked about and Mr. Altintas responded.

4             MR. DONALDSON:  I'll ask again.

5    Q.  Are you saying on January 3, 2013, in your meeting with

6    Mr. Pastore, that Ms. Cibik's name was not mentioned?

7    A.  (In English) He asked me where did I go to get a green

8    card.

9             THE COURT:  That could be answered yes or no.

10            Are you saying that Ms. Cibik's name did not come up

11   in the meeting with Mr. Pastore on the 3rd?  Yes or no.

12            THE WITNESS:  (In English) yes, yes.

13   Q.  Yes --

14            THE COURT:  Yes, it did not come up.

15            THE WITNESS:  (In English) We talk about her.  We talk

16   about lot of things, where I go for the green card.

17            THE COURT:  Just go back.

18            You met with Mr. Pastore on January 3, correct?

19            THE WITNESS:  (In English) Yes.

20            THE COURT:  In the course of that meeting, during that

21   meeting, did the name Gulay Cibik come up, did someone say the

22   words Gulay Cibik?

23            THE WITNESS:  (In English) Yes.

24            MR. DONALDSON:  Thank you.

25   Q.  Now, on January 9, 2013, you also met with Mr. Pastore and

D1ILCIB2                    Altintas - cross

1    the government, correct?

2    A.  I don't remember the dates exactly.  We met several times.

3    Q.  Okay.  On the second meeting, the meeting after January 3,

4    the second meeting, you met with Mr. Pastore and other people,

5    correct?

6    A.  Yes, I did.

7    Q.  In that meeting you spoke about Ms. Cibik as well, correct?

8    A.  Yes, we did.

9    Q.  And that meeting lasted approximately two hours, correct?

10   A.  More or less, yes.

11   Q.  Now, in that meeting you also spoke about payment to

12   Ms. Gulay, Ms. Cibik, that you said you made, correct?

13   A.  Yes, of course.  We -- I took out the checks that way.

14   Q.  Is it not true that on January 9, the second meeting, you

15   informed Mr. Pastore and other persons that you met with

16   Ms. Cibik approximately 50 times; is that true?

17   A.  Yes.

18   Q.  Is it also not true that on January 9, when you met with

19   Mr. Pastore and other persons, you told them that you paid

20   Ms. Cibik five to $600 every time you met with her, usually in

21   cash?

22   A.  I didn't say anything like this.

23   Q.  You didn't say that?

24   A.  I paid about $6,000 total to her.  (In English) Not total,

25   to her.

D1ILCIB2                        Altintas - cross

1    Q.   One second.

2             You met with the government on January 16, 2013,

3    correct, that was two days ago?

4    A.   I don't know the exact date but it should be true, yes.

5    Q.   And in that meeting you said you paid Ms. Cibik directly

6    $6,000?

7    A.   Not in one shot.  In the first meeting I told the

8    government that in the first meeting I gave her 3,500.  And

9    then in the subsequent meetings, I paid thousand dollars each.

10   I usually used to pay thousand dollars when an advancement

11   happened in the case.

12   Q.   Thousand dollars when an advancement happened in the case,

13   that was what you just said?  You just said you paid a thousand

14   dollars when an advancement happened in the case?

15   A.   When a letter came or something like this.

16   Q.   When did that happen?

17   A.   When they called me for fingerprinting.

18   Q.   We'll go to that.

19             When did this thousand dollar payment happen when an

20   advancement happened in the case, when did that happen?

21   A.   By advancement I mean a paper comes from immigration

22   indicating we have your file, for example.

23   Q.   When did that happen?

24   A.   This happened seven years ago at the times when I went to

25   her office.

D1ILCIB2                            Altintas - cross

1    Q.  Okay.  You remember when you went there the first time you

2    said you paid $3,500 for a check; do you recall that, yes or

3    no?

4    A.  Yes.

5    Q.  Do you remember on the second visit you said you paid a

6    thousand dollars for a check; do you remember that, yes or no?

7    A.  No, that 1,000 was not for myself.

8    Q.  Okay, great.  Now, after that $1,000 payment for not for

9    yourself, for somebody, we'll get to that in a second, when did

10   you pay another thousand dollars for advancements in the case

11   between that check and say June 2006?

12   A.  All right.  In dates, in subsequent dates cash was given.

13   Q.  Pick one date.

14   A.  (In English) Monday.

15   Q.  Monday?

16   A.  (In English) You want to pick day, I pay Monday.

17   Q.  You have your carbon copy checkbook, correct?

18   A.  (In English) Yeah.

19   Q.  Do you have any indication in your carbon copy checkbook

20   where you paid a check for a thousand dollars between that

21   May 1, 2005 date and June 2006?

22   A.  I paid cash.

23   Q.  Do you have a bank account statement or anything indicating

24   that you took a thousand dollars out of the account and paid

25   Ms. Cibik a thousand dollars on a particular day?

D1ILCIB2                          Altintas - cross

1   A.  I'm not saying $1,000.  I paid several thousand dollars.

2   Several times 1,000.

3   Q.  Any -- pick -- do you have anything or anything that was --

4   A.  (In English) There's no proof.

5   Q.  There's no proof?

6   A.  (In English) But I paid.

7   Q.  But you paid?

8   A.  (In English) Yeah.

9   Q.  You want to tell us where the money came from?

10  A.  It's from my work.  I work and I get paid.

11  Q.  You get paid cash?

12  A.  Sometimes cash, sometimes check.

13  Q.  You get paid cash and check.  You were getting paid cash

14  and check from Long Island Sanding Company, is that what you're

15  saying?

16  A.  Mostly check, but there was some occasions when I get cash.

17  Q.  So mostly checks.  So that means you would put that check

18  into an account, correct?

19  A.  Okay.  Sometimes the guy was paying cash, sometimes he was

20  paying cash, sometimes check.  And when he gave me a check, I

21  would put it in the bank account.  If he paid me cash, I would

22  go and buy some necessities.

23  Q.  Okay.  So we'll leave the cash alone.  There's no proof of

24  the cash.  I understand.

25          You also said you paid Ms. Cibik in check?

D1ILCIB2                        Altintas - cross

1   A.  Yes.

2   Q.  Where are those checks?

3   A.  How do you mean?  In the bank.

4   Q.  Let's see.  You have a check on May 1, 2005.  One second.

5   Let me help you out.

6           You said that you paid Ms. Cibik in cash and check

7   totaling $6,000?

8   A.  (In English) About, about.

9   Q.  So the cash and check that you're talking about that you

10  paid Ms. Cibik came -- are you including the first two checks?

11  A.  Yes, together.

12  Q.  So the first two checks total 4,500, correct, yes or no,

13  yes or no?

14          MR. PASTORE:  Objection, your Honor.  The witness I

15  think needs to expand on those two checks.  They're for

16  different things.

17          THE COURT:  The question, do those two checks add up

18  to a certain number, is a yes or no question.

19  Q.  Do those first two checks add up to 4,500; 3,500 plus

20  1,000?

21  A.  Okay.  I'm only counting in this 3,500 because those two --

22  this was paid for myself.  Those two 1,000s were paid for

23  somebody else.

24  Q.  Okay.  So that's 3,500.  You gave her a check for 2,500

25  May 6, 2006, correct?

D1ILCIB2                          Altintas – cross

1    A.  I paid cash.

2    Q.  I'm not asking that question.  Listen to the question.

3           Did you give Ms. Gulay Cibik a check for $2,500 on

4    May 6, 2006, yes or no?

5    A.  (In English) Yes, I did.

6    Q.  So 2,500 for that check, 3,500 for the first check equals

7    how much, equals how much?

8    A.  I'm not counting in the 2,500 because --

9    Q.  So you're not counting that check either, right?

10   A.  (In English) I'm not counting that check.  I paid cash,

11   some cash.

12   Q.  So you're not counting the $2,500 check?

13   A.  (In English) No.

14   Q.  So that means so far you paid a total, according to you,

15   given Ms. Cibik, for you, $3,500 in check, correct?

16   A.  (In English) That's what I can prove.

17   Q.  Okay.  Are you saying that you paid, besides that $3,500

18   check, any other checks to Ms. Cibik to total this 6,000;

19   $9,000 amount you're talking about?

20   A.  (In English) No checks like that.

21   Q.  So everything else was in cash?

22   A.  (In English) Definitely.

23   Q.  And you can't prove that?

24   A.  (In English) No.

25   Q.  Didn't you say on January 9, 2013, the second meeting, that

D1ILCIB2                          Altintas - cross

1    you paid Ms. Cibik $9,000?

2    A.  I said from beginning to end between 9,000 and 11,000.

3    Q.  No, no, no.  You said from beginning to end 9,000 total,

4    didn't you?

5    A.  At one point Ms. Gulay was gone but I continued paying it.

6    Q.  And you're saying on January 9, 2013, last week, that you

7    did not tell Mr. Pastore, Ms. Echenberg, or someone at the

8    table that you paid Ms. Cibik five to -- five to $600 -- one

9    second.

10            You did not say that every time you went to the office

11    you paid Gulay five to $600, usually cash?

12            That would total $25,000?

13    A.  That's not true.  I did not pay in each and every visit.  I

14    didn't say something like that.

15            (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1                   (Witness speaking in Turkish)

2    Q.   There's no question before you.

3            Now this first application that you made, the one you

4    made back in 2000, 2001, did you have misrepresentations or

5    fraudulent information in that application?

6    A.   No.

7    Q.   No.   And that application -- which began in 2001; is that

8    correct?

9    A.   Correct.

10   Q.   And you -- well, how did you start it?   Did you go to a

11   lawyer to get that started?

12   A.   Yes, I went to a lawyer.

13   Q.   And you kept that application until 2000 -- strike that.

14           You went to the Earl David law firm in 2005; correct?

15   A.   Correct.

16   Q.   So between 2001 and 2005, you had one open application;

17   correct?

18   A.   Yes, correct.

19   Q.   How many times did you visit the law office for that

20   application?

21   A.   At least 30 times.

22   Q.   You went to that law firm 30 times too.

23   A.   Yes, I did.

24   Q.   And you were doing it for a sponsor application; correct?

25   A.   Sponsor, yes.

D1i1cib3                        Altintas – cross

1    Q.  Same type of application that you were doing with the Earl
2    David law firm; correct?
3    A.  Same, yes.
4    Q.  You were talking to a lawyer; yes?
5    A.  Yes.
6    Q.  So it would be fair to say, when you came to the Earl David
7    law firm, you had some experience in the sponsorship
8    application process; correct?
9    A.  Well, I know that Earl David is a fast law firm and they
10   get green cards quicker.
11   Q.  That's not my question.
12   A.  That's how I know.
13   Q.  Let me ask the question again.  And I'll give you some
14   foundation.  You had a application open between 2001 and 2005,
15   you said that; correct?
16   A.  (In English)  I had an application, pending application.
17   Q.  Pending application.
18   A.  (In English)  Right.
19   Q.  You also just said you'd been to that law firm, or law
20   office, about 30 times; correct?
21   A.  Yes.
22   Q.  And you spoke to that lawyer about your application when
23   you visited there; correct?  Yes or no?
24   A.  Yes, that many times.
25   Q.  And this is for a sponsorship application similar to the

D1i1cib3                           Altintas - cross

1    one that you applied for with Earl David's office; correct?

2    A.   That application didn't advance.  I waited and waited and

3    waited four years.  That's why I went.

4    Q.   Wasn't it the same type of application --

5            MR. PASTORE:  If the witness could be allowed to

6    finish the answer, your Honor.

7            MR. DONALDSON:  It was a yes or no question.

8    A.   Yes, the same.

9    Q.   Thank you.  So would it be fair to say that because you'd

10   been to this law office 30 times regarding an immigration

11   application similar to the one you were filing with the Earl

12   David application, that you had some experience in sponsorship

13   or filing such applications; would that be fair to say?

14   A.   Some applications resolve very quickly and some don't.

15           THE COURT:  Okay.  That's not the question.  The

16   question is:  Based on your prior experience with your first

17   lawyer, which involved visiting his law office, or her law

18   office, 30 times in connection with a sponsorship application,

19   is it fair to say that you had some experience in sponsorship

20   applications and filing such applications?

21           THE WITNESS:  Let's say yes.

22   Q.   Let's say yes.  Now when you -- you went -- sometime in the

23   summer of 2006 you decided to stop dealing with the Earl David

24   law firm and go to a different law firm; correct?

25   A.   (In English)  Different law firm.  Has no connection with

D1i1cib3                    Altintas - cross

1   the case that I got with Earl David, so --

2   Q.  Right.  So at some point you decided to stop going to the

3   Earl David law firm and that application and go to a different

4   law firm for your own application; is that right?

5   A.  I fired John Kawala (ph), which was the lawyer in the very

6   first application, so I fired him and went to another lawyer.

7           (In English)  And I believe it was a good lawyer.

8   Q.  And you did that, you sought to restart your new

9   application because you really wanted the green card; correct?

10          THE COURT:  Restart the old one.

11  Q.  I'm sorry.  You went to the new lawyer for the old

12  application because you really wanted your green card; is that

13  correct?

14  A.  Yes, of course.

15  Q.  You even called Congress -- your Congresswoman; correct?

16  A.  (In English)  I personally called Congressman,

17  Congresswoman and ask them, what happened my case so long, so

18  many years.  That's what I did.

19  Q.  Your Congresswoman --

20  A.  (In English)  I go to Peter King, I go to --

21  Q.  I don't want the name.  Don't put the name on the record.

22  I don't want the name.

23  A.  All right.

24  Q.  But you did speak to your Congressman or Congresswoman;

25  correct?

D1i1cib3                        Altintas - cross

1   A.  I didn't speak to the Congressperson themselves.  I spoke

2   with their assistants.

3   Q.  And you wrote them letters too; correct?

4   A.  Yes, I did.

5   Q.  And this was after you had stopped dealing with the Earl

6   David law firm; correct?

7   A.  That's correct.

8   Q.  And you actually received correspondence back from this

9   Congressperson; correct?

10  A.  Yes.

11  Q.  Did you tell these United States Congresspersons that you

12  had just conducted or engaged in fraud in filing immigration

13  applications?

14  A.  No, I did not.  They didn't ask.

15  Q.  They didn't ask?  That was something you decided to keep to

16  yourself; is that correct?

17  A.  I asked their help because I had a solid case.

18  Q.  You asked their help on your old application because you

19  had a solid case; is that right?

20  A.  Yes.

21  Q.  And you told them about your immigration, that you came

22  from Turkey; is that right?

23          THE INTERPRETER:  He came from Turkey?

24  Q.  Yes.  You told them that you came from Turkey; correct?

25  A.  Yes, I did.

D1i1cib3                          Altintas - cross

1    Q.  You had a wife and two kids; correct?

2    A.  Yes.

3    Q.  You told them that you haven't had any trouble with the

4    law; is that right?

5    A.  Yes.

6    Q.  But you didn't tell them you just broke the law three

7    months earlier when you were conducting a fraud?  You just left

8    that part out?

9    A.  I didn't say.

10   Q.  Because you wanted to get that green card; correct?  Yes or

11   no?

12   A.  Yes.

13   Q.  And whatever was necessary to get that green card, you were

14   prepared to do; correct?

15          THE INTERPRETER:  Excuse me?

16   Q.  Whatever was necessary to do to get that green card, if

17   that meant not telling United States Congresspersons that I

18   just conducted immigration fraud, I was going to do that to get

19   that green card; correct?

20   A.  I didn't say, yes.

21   Q.  You went as far as, in 2010, two and a half years ago, you

22   wrote letters saying that you have not had any trouble with the

23   law; is that right?

24   A.  (In English)  That's right.

25   Q.  That was after you had broken the law; correct?

D1i1cib3                          Altintas - cross

1    A.  I was never arrested in my life.

2    Q.  Oh, because you weren't arrested?  That's it; you weren't

3    arrested.

4    A.  (In English)  No.  Never had a problem.

5             MR. DONALDSON:  Your Honor, may I approach, please?

6             THE COURT:  Sure.

7    Q.  I'm showing you what's been marked as Government

8    Exhibit 1501-6.

9    A.  What's this?

10            MR. DONALDSON:  One second.  May we approach, your

11   Honor?

12            (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

D1i1cib3                         Altintas - cross

1                (At the sidebar)

2                (Discussion off the record)

3                MR. PASTORE:  He asked me if I had an objection and I

4     said no.

5                THE COURT:  Counsel agreed to the admission of 1501-6.

6                (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D1i1cib3                        Altintas - cross

1              (In open court)

2              MR. DONALDSON:  Your Honor, without objection from the

3    government, I am going to offer 1501-6 in evidence, I imagine

4    as Defense A?

5              THE COURT:  Okay.  In other words, just, is 1501-6

6    page 6 of 1501 or is it a separate exhibit?

7              MR. PASTORE:  Your Honor, it's a separate multipage

8    exhibit, and if it's easier, we're happy to admit it as a

9    government exhibit as well.  Whatever you'd like to do.

10             THE COURT:  I don't care what you call it.  That's up

11   to you.

12             MR. PASTORE:  We can admit it as Government 1501-6,

13   just for purposes of recordkeeping.

14             (Government's Exhibit 1501-6 received in evidence)

15             MR. DONALDSON:  Can we put it up on the screen.

16             Can you go to page -- the last page, the signature

17   page.  Part 4.

18   BY MR. DONALDSON:

19   Q.  Mr. Altintas, we're looking at Part 4, where it says

20   Signature, of 1501-6.  Is that your signature?

21   A.  (In English)  Yes.

22   Q.  What date is that?

23   A.  9/18/2006.

24   Q.  You said you had not seen Ms. Cibik since May 5th or

25   6th of 2006.  Do you recall saying that?

D1i1cib3                          Altintas - cross

1    A.  Yes.

2    Q.  When did you see Ms. -- withdrawn.

3            MR. DONALDSON:  Would you turn to Part 3.  Would you

4    hover in on number 8, 9, and 10.

5            Could you do me a favor, if you can.  Could you read

6    what number 10 says.

7            THE INTERPRETER:  Number 10?

8            MR. DONALDSON:  Number 10.  Feel free to read it out

9    loud.

10           THE INTERPRETER:  You want me to translate into

11   Turkish?

12           (Document translated for the witness by interpreter)

13   A.  I didn't fill this out.  Somebody else filled this out.  I

14   just signed it.

15   Q.  Oh.  You didn't fill it out, somebody else filled it out,

16   you just signed it; is that what we're saying now?

17   A.  That's correct.

18   Q.  Right.  So you didn't know that it doesn't matter if you

19   don't get arrested but if you -- or, "Have you, by fraud or

20   willful misrepresentation of a material fact, ever sought to

21   procure, or procured, a visa, other documentation, entry into

22   the U.S., or any other immigration benefit?"  The box is

23   checked no.

24           My question is:  Did you read that part; yes or no?

25   A.  So the question is?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D1i1cib3                    Altintas - cross

1    Q.  Did you read any part of this contract -- this document

2    before you signed it?

3    A.  I did not read.  I just signed.

4    Q.  You didn't read any part of it.

5    A.  I just looked at the name and last name.  I didn't go

6    through it, because the lawyer filled it out.

7    Q.  Oh.  And you signed it.

8    A.  (In English)  I signed it, yes.

9    Q.  So that you're not -- withdrawn.

10          Now when was the last time you -- you said you gave

11   Ms. Cibik the check, the May 6th, 2006 check for $2500, you

12   gave that to her what date?

13   A.  Yes.

14   Q.  What date did you give it to her?

15          MR. PASTORE:  Judge, it may be helpful, if we're

16   talking, to refer to an exhibit for Mr. Altintas.

17   Q.  I'll try to articulate what's in the exhibit, if it helps

18   you out.  The May 6, 2006 check in the amount of $2500 that you

19   said you gave to Ms. Cibik, when did you give that to her?

20   A.  The date that's on the check is the date that it was given

21   to her.

22   Q.  And you're saying that you gave that check to her in her

23   office.

24   A.  Yes.

25   Q.  And you're saying -- you're saying she had an office, her

1    own office?

2    A.  Yes, she had.

3    Q.  What date did you see her before giving her that check?

4    When was the last time you saw her before that date?

5    A.  I don't remember exactly.

6    Q.  The same week?

7    A.  Possible.

8    Q.  But you're not sure?

9    A.  No, I'm not.

10            (Witness speaking in Turkish)

11   Q.  Thank you.

12            THE COURT:  It's 11:16, actually.  Can we break now,

13   is that all right, or are you almost done?

14            MR. DONALDSON:  Whatever the court wants.  I'm at your

15   beck and call.

16            THE COURT:  I love that.

17            Okay, guys.  Let's take our break.  And just remember

18   to keep an open mind and not talk about the case.

19            MR. PASTORE:  And your Honor, so Mr. Altintas knows,

20   we won't be able to talk during the break.

21            THE COURT:  Okay.  Because you're on

22   cross-examination, you cannot talk to the government counsel or

23   the agents during the break.  So just deposit him someplace.

24            (Jury excused)

25

D1i1cib3                        Altintas – cross

1          MR. GREENFIELD:  Judge, just one thing.  The defense

2     counsel's screens don't seem to be working at the moment.  I

3     didn't think it was significant to interrupt Mr. Donaldson,

4     but --

5          THE COURT:  Without telling me, it's hard to fix the

6     problem.

7          MR. GREENFIELD:  I thought you had electrical tape.

8          THE COURT:  Yeah.  You didn't ask, you know.

9     Anyway --

10          (Discussion off the record)

11          THE COURT:  Okay.  See you at 10 of.

12          (Recess)

13

14

15

16

17

18

19

20

21

22

23

24

25

D1i1cib3                          Altintas - cross

 1              (In open court; jury present)

 2              THE CLERK:  Mr. Altintas, I just remind you that

 3    you're still under oath.

 4              THE WITNESS:  Okay.

 5              THE COURT:  You may proceed, Mr. Donaldson.

 6              MR. DONALDSON:  Thank you.

 7    BY MR. DONALDSON:

 8    Q.  You said on direct that -- strike that.

 9              Ms. Cibik -- these experience letters that you

10    mentioned, that we saw on the screen, Ms. Cibik didn't tell you

11    that she would help you make those; correct?

12    A.  She didn't exactly say she's going to help me, but she

13    showed me samples and explained to me how to do it.

14    Q.  She showed you samples of an experience letter and said

15    this is what an experience letter should look like; correct?

16    A.  Yes.

17    Q.  But you told Mr. Pastore and the government agents on

18    January 15th that she told you -- one second.

19              You told them that she said that she would make up the

20    experience letters for you.  Did you not tell them that?

21    A.  I didn't --

22    Q.  Yes or no.  Did you not tell Mr. Pastore and other persons

23    you met with on January 15th that Gulay Cibik said she would

24    make up the experience letters for you?

25              MR. PASTORE:  Your Honor, objection.  The witness has

D1i1cib3                          Altintas - cross

 1    to be given a chance to answer if Mr. Donaldson wants to --

 2              THE COURT:  Look, the way this goes is, Mr. Donaldson

 3    asks a question, the interpreter interprets the question, the

 4    witness listens to the interpretation, and then answers the

 5    question that Mr. Donaldson asks.  Often on cross-examination

 6    the questions are framed to elicit a yes or no answer.  If

 7    further explanation is necessary, the government can bring that

 8    out on their redirect.

 9              So can we just start again with what your question is.

10              MR. DONALDSON:  Yes.

11    BY MR. DONALDSON:

12    Q.  Isn't it true that on January the 15th, 2013, you told

13    the government in your meeting with the government that Gulay

14    said she would make up the experience letters?

15    A.  No.

16    Q.  You did not say that.

17    A.  No.

18    Q.  Isn't it true on January 16th, 2013, that -- one second.

19              Well, did you tell them that on January 16th as

20    well?  Did you tell the government that Gulay Cibik said she

21    would make up the experience letters for you?

22    A.  No.

23    Q.  So you told -- no.  Strike that.  We'll move on.

24              MR. DONALDSON:  May I approach, your Honor?

25              THE COURT:  Yes.

D1i1cib3                          Altintas - cross

1   Q.  Mr. Altintas -- is that correct?  Am I pronouncing that
2   correctly?
3   A.  Yes.
4   Q.  How many times have you actually seen Ms. Cibik write
5   something?
6   A.  In each and every visit she was writing some things.
7   Q.  To you?
8   A.  No, in the computer.
9   Q.  Oh.  So she was typing something on the computer.
10  A.  Yes.
11  Q.  I'm asking, how many times have you actually seen her
12  handwrite something?
13  A.  I didn't see her writing to -- not regular piece of paper.
14  Q.  So you've never seen her handwriting either.
15  A.  I did not.
16  Q.  So you wouldn't recognize her handwriting; correct?
17  A.  I don't recognize it.
18  Q.  On January 15th, 2013, in meeting with the government,
19  did you not say that one of the checks was Ms. Cibik's
20  handwriting?
21  A.  I assumed that it would be her handwriting because I gave
22  her the check, and the writing on the check was not my
23  handwriting.
24  Q.  Did you tell them that you assumed or did you tell them
25  that that's her handwriting?

D1i1cib3                        Altintas - cross

1    A.  May I see the check?

2              THE COURT:  The issue is not what's on the check.  The

3    question is:  What did you tell the government?

4              THE WITNESS:  She filled out some checks, yes, on top,

5    in the sum.

6              MR. DONALDSON:  I'd move to have that answer stricken

7    as not responsive.

8              MR. PASTORE:  I think it was responsive.  He just

9    testified that he saw Ms. Cibik sign -- fill out portions of

10   the check.

11             MR. DONALDSON:  Really.

12             MR. PASTORE:  I believe he was referring to the

13   amount.

14             MR. DONALDSON:  No, no, no.  Judge, with all due

15   respect, Mr. Pastore is testifying now.

16             THE COURT:  Well --

17             THE INTERPRETER:  He said some.

18             THE WITNESS:  (In English)  Pay to order.

19             THE COURT:  He said she filled out some checks, yes,

20   on top, sum.  I don't know if the sum is an amount or the word

21   S-O-M-E.

22   BY MR. DONALDSON:

23   Q.  Did you tell the government that -- strike that.

24             I want to show you what's been marked as 704,

25   Government Exhibit 704.

D1i1cib3                          Altintas - cross

 1              MR. DONALDSON:  Could you put that up, please.

 2   Q.  Mr. Altintas, do you see what's in evidence as Government

 3   Exhibit 704?

 4   A.  I see that.

 5   Q.  That's the $3500 check that you said you gave to Ms. Cibik?

 6   A.  Yes.

 7   Q.  And that's the check that you said you gave to Ms. Cibik on

 8   the first day or first instance that you met with her?

 9              MR. PASTORE:  Objection.  Mischaracterizes the prior

10   testimony.

11   A.  That's not on the first visit.  On subsequent visits.

12   Q.  Which visit?

13   A.  (In English)  Second.

14   Q.  On the second visit.

15   A.  (In English)  Second visit.

16   Q.  So there was a first visit sometime at the beginning of

17   April; is that correct?

18   A.  Correct.

19   Q.  And then there was a second visit, April 23rd?

20   A.  That's correct.

21   Q.  And then there's a third visit, May 1st?

22   A.  I don't remember.

23              MR. DONALDSON:  May I have one second, please, your

24   Honor.

25              (Pause)

D1i1cib3                        Altintas - cross

1    Q.  On the date that you met with the government, the second

2    time you met with the government, you spoke about your visits

3    with Ms. Cibik; correct?

4    A.  Correct.

5    Q.  And you told them how many visits you had; correct?

6    A.  Yes, I did.

7    Q.  You told them about your first visit and your second visit;

8    correct?

9    A.  Yes, I did.

10   Q.  Did you not tell them on January 9th, 2013, in this

11   two-hour meeting you had with them, that May 1st, 2005 was

12   your second meeting?

13   A.  No, I did not.

14   Q.  You did not tell them that.

15   A.  There were a lot of visits.

16   Q.  Now I believe this $3500 check you said in the memo section

17   has Nurhan Altintas; is that correct?

18   A.  Nurhan Altintas.

19   Q.  And that's your wife?

20   A.  (In English)  My wife.

21   Q.  The first visit to the office was for -- or the intent on

22   your first visit was to take care of your immigration status;

23   correct?

24   A.  No.

25   Q.  No.  So when you went to the Earl David firm initially,

D1i1cib3                        Altintas - cross

1  your purpose was to go to take care of your wife?

2  A.  (In English)  Yes.  Yes.

3       MR. DONALDSON:  May I have a moment, please, your

4  Honor.

5       (Pause)

6  Q.  On January the 9th, 2013, in meeting with the government,

7  is it not true that you told them then that you went to the

8  Earl David office to file a application for yourself because

9  the old application was taking too long?

10 A.  (In English)  Correct.

11 Q.  So then you did go to the Earl David law firm to file an

12 application for yourself; correct?

13 A.  Can you repeat that question, please.

14 Q.  Is it not true, Mr. Altintas, that you initially went to

15 the Earl David law firm to file an application, immigration

16 application for yourself?

17 A.  (In English)  Not correct.

18 Q.  Not correct.

19 A.  (In English)  No.

20 Q.  Did you not tell the government in your meeting with them

21 on January 9th, 2013, that you went to the Earl David law

22 firm to file an application for yourself because the old one

23 was taking too long?

24 A.  (In English)  Correct.

25 Q.  When you got to the Earl David law firm on this first

D1i1cib3                          Altintas - cross

1   visit, who did you meet with?

2   A.  Gulay Cibik.

3   Q.  Did you call before you went there?

4   A.  (In English)  No.  No.

5   Q.  Didn't make an appointment?

6   A.  (In English)  No.

7   Q.  Just went in and walked upstairs?

8   A.  (In English)  Correct.

9   Q.  Or the elevator.

10  A.  (In English)  Correct.

11  Q.  And you went there based on a recommendation from a friend.

12  A.  (In English)  Correct.

13  Q.  And this friend had gotten his green card through the Earl

14  David law firm.

15  A.  (In English)  Correct.

16  Q.  So based upon that recommendation, you went straight there.

17  A.  (In English)  Correct.

18  Q.  Did you ask for Mr. David when you got upstairs?

19  A.  I asked, yes.

20  Q.  Who did you ask?

21  A.  Gulay Cibik.

22  Q.  Where was she?

23  A.  She was in her office room.

24  Q.  So you went straight through the waiting room, straight

25  through the office, saw Ms. Cibik in an office, and asked her

1   for Earl David; is that what you're saying?

2   A.  In my first visit, I didn't ask about Earl David, but in

3   our subsequent visits --

4             THE INTERPRETER:  Okay.  No.  Correction:

5   A.  In the first visit, again, but in the following hours, not

6   at the first moment, she told us that she worked for Earl

7   David.

8   Q.  Was she sitting outside?  Did you ask somebody for a

9   Turkish interpreter?  How did that happen?

10  A.  She speaks Turkish, so we went into her office directly.

11  Q.  My question is:  Earlier you said you'd go into the offices

12  in the waiting area; correct?

13  A.  (In English)  Correct, correct.

14  Q.  And you didn't make an appointment to come there; correct?

15  A.  (In English)  Correct.

16  Q.  And Ms. Cibik didn't recruit you to come up there; correct?

17  A.  (In English)  Correct.

18  Q.  And you hadn't heard Ms. Cibik's name before you got there;

19  correct?

20  A.  That's correct.

21  Q.  So when you got to the waiting area, how did you get to

22  Ms. Cibik?

23  A.  There are people who were working there and we asked them,

24  and they sent us to Ms. Cibik.

25  Q.  There were people.  What person?  Who did you ask?

D1i1cib3                          Altintas - cross

1   A.  There are people who carry documents, etc.

2   Q.  Identify the person you asked.

3   A.  I don't know the name.  I don't recognize.

4   Q.  Male, female, white, black?

5   A.  It was a male.

6   Q.  That's all you got, male?  Just male?

7   A.  One of the people who worked there.

8   Q.  And on that day you went to the -- somehow you got to the

9   office.  You got there.

10  A.  (In English)  Yeah, I found the office fine.

11  Q.  And you began talking to Ms. Cibik on that day about your

12  application; correct?

13  A.  No, not for my application.

14          (In English)  For my wife.

15  Q.  On the first day.

16  A.  Yes.

17  Q.  And this was early April 2005.

18  A.  Yes, that's correct.

19  Q.  And then I believe you said on direct nothing really

20  happened on the first date; is that correct?

21  A.  We spoke about the money and how long it's going to take.

22  Q.  You spoke about the money?  You spoke about the money?

23  A.  Yes, how much do we need to spend to make an application.

24  Q.  Now -- and then you came back and gave that check on the

25  second date.

D1i1cib3                        Altintas - cross

1    A.  (In English)  Correct.

2    Q.  Did you give that check on that date?

3    A.  (In English)  Correct.

4    Q.  You were in her office at Earl David's place on

5    April 23rd, 2005 and gave Ms. Cibik that check.

6    A.  (In English)  Correct.

7    Q.  And I believe you said you gave the check, it was blank.

8    Or strike that.  Not the entire check.  Sorry.  Forgive me.

9          The pay to the order part and the monetary part, that

10   was blank; is that correct?

11   A.  (In English)  Not correct.

12   Q.  Not correct?

13   A.  (In English)  Not correct.

14   Q.  When you gave her the check, that part was filled in?

15   A.  (In English)  I signed the check, I put my wife -- I'm

16   sorry.  I put my wife name on the memo and she filled the top

17   part.  I didn't want to be stuck on the spelling, the rest of

18   it.  She write the top.

19   Q.  You saw her write that?

20   A.  (In English)  Yes.

21   Q.  Didn't you testify earlier that you gave it to her blank?

22   A.  (In English)  No.  But different check.  That was different

23   check.

24   Q.  Your wife was there with you that day?

25   A.  (In English)  Yes.

D1i1cib3                         Altintas – cross

1    Q.  Who else was with you?

2    A.  (In English)  Just me and my wife.

3    Q.  Is this the day that she -- strike that.

4         MR. DONALDSON:  705.  Yes, 705.  Could you put that

5    up, please.

6    Q.  Is that your check, 705?

7    A.  (In English)  You put the check, different check on this

8    screen and talk about the check for $3500.  I was talking

9    about -- this is different check; right?  Now we changed to

10   different check right now?

11   Q.  Yes.

12   A.  (In English)  Now this check, I write this check too.

13   Q.  You wrote that?

14   A.  I gave this check to my nephew to -- for him to give it to

15   Gulay.

16   Q.  So just so we're clear, on May 1st, 2005, you were in the

17   office, the Earl David office with your nephew?

18   A.  (In English)  And my wife.

19   Q.  And your wife.  And you gave your nephew the check and your

20   nephew gave the check to Ms. Cibik; is that what you're saying?

21   A.  (In English)  Correct.

22   Q.  And at that point the check did not have Y.M. Pollack in it

23   or the amount; is that correct?

24   A.  I had filled out everything, date and everything, only I

25   have left blank the pay to the order of line.  And I gave it to

D1i1cib3                         Altintas – cross

1    Ozgur, my nephew.

2    Q.  And you have previously said -- strike that.

3             What was the money for?

4    A.  (In English)  Green card application.

5    Q.  For him.

6    A.  For him, yeah.

7    Q.  This was a thousand dollars.

8    A.  $1,000 for starters.

9    Q.  And the other one was for 3500.

10   A.  Yes.

11   Q.  For your wife.

12   A.  (In English)  My wife.

13   Q.  Nothing to do with you yet.

14   A.  This has nothing to do with me.

15   Q.  Okay.

16   A.  This may also be for a consultation.  I don't know the

17   details.

18   Q.  You don't know what it's for.

19   A.  (In English)  Green card.

20            (Through interpreter)  It's for a green card.  I know

21   that.

22   Q.  For your nephew.

23   A.  Yes.

24            MR. DONALDSON:  Put 706 up, please.

25   Q.  Now this is your check as well; correct?

D1i1cib3                          Altintas – cross

1    A.  (In English)  Right.

2    Q.  This is -- the memo line is for Ismet Urkart; correct?

3    A.  (In English)  Correct.

4    Q.  And that's your brother-in-law.

5    A.  (In English)  Correct.

6    Q.  And you don't know who Mazal & Bruicha Publishing is, do

7    you?

8    A.  No.

9    Q.  And this was for what?  What was the check for?

10   A.  Ismet.  Ismet told me they're asking for this money to put

11   the classified ad on the newspaper.

12   Q.  And this was $225; correct?

13   A.  Correct.

14   Q.  And this is on July 7, 2005?

15   A.  Yes.

16   Q.  That's the day you were in the office.

17   A.  Yes, I was.

18   Q.  And are you -- I think you said on direct that Ismet, your

19   brother-in-law, was also trying to get a green card too?

20   A.  Correct.

21   Q.  And that was for his green card.

22   A.  His green card, yes.

23   Q.  So as of right now, we have a check for $3500 from your

24   checkbook for a different person in the memo line, we have a

25   check for a thousand dollars with a different person in the

D1i1cib3                          Altintas - cross

1   memo line, and we have a check for $225 with a different person

2   in the memo line, and none of this refers to you.

3   A.   That's correct.

4   Q.   One second.  I want to go back to the $3500 check.

5        Did you not tell the government that the $3500 check

6   was for sponsorship fees?

7        THE INTERPRETER:  Sponsorship?

8   Q.   Sponsor fees?

9        MR. PASTORE:  Objection.  Improper impeachment.

10        THE COURT:  I don't have the 3500.

11        MR. PASTORE:  Among other things, we don't have a date

12   for when this is supposed to be.

13        MR. DONALDSON:  January 9, 2013.

14   A.   The answer is no, I did not.  I said it's to start an

15   application.

16   Q.   Mr. Altintas, when did you and Ms. Cibik, according to

17   you -- according to you, when did you and Ms. Cibik talk

18   about -- first talk about starting the application for your

19   wife?

20   A.   The beginning of the month of April 2005.

21   Q.   And on the second time you met with Ms. Cibik with your

22   wife, did you all continue talking about sponsorship or

23   application for your wife?

24   A.   Yes, I continued talking about my wife's application and I

25   gave a check.

D1i1cib3                          Altintas - cross

1    Q.  Is that the day that Ms. Cibik supposedly told you and your

2    wife that she could find her a sponsor?

3    A.  For my wife, yes, she said she can find a sponsor.

4    Q.  Is that the day that you testified that Ms. Gulay showed

5    you -- or began typing an application form on the computer?

6    A.  Yes, and to send to the labor department.

7    Q.  I'm sorry?

8           THE INTERPRETER:  To send it to labor department.

9    Q.  Did you actually see her typing this application out?

10   A.  Yes, I did.

11   Q.  Is this the day that she printed something out as well?  Is

12   this the date that Ms. Cibik supposedly printed the application

13   out?

14   A.  Yes, she did have it printed out, but she sent it herself.

15   Q.  Did you -- when did you first hear about American Girl,

16   American Fashion Girl?

17   A.  I don't know the exact date.  It's in subsequent -- one of

18   the subsequent dates.  It can be one month after the first

19   visit.

20   Q.  About one month after the first visit.

21   A.  (In English)  Maybe.

22   Q.  Maybe.  So sometime in May 2005.

23   A.  Possibly.

24   Q.  And at that time you're suggesting that Ms. Cibik told you

25   that she had this American Fashion Girl -- or American Girl

D1i1cib3                          Altintas - cross

1    Fashion, sponsor for you; is that right?

2    A.  Yes.

3    Q.  And at that point I believe you said you were still working

4    as a floorer.

5    A.  Yes.

6    Q.  You hadn't told her anything about -- well, actually, you

7    told her you were working as a floorer, right, installing

8    floors?

9    A.  Yes, she knows.  Gulay also knows, yes.

10   Q.  You said you brother works -- your brother-in-law -- at a

11   clothing or factory store, something factory in Turkey; right?

12   A.  No.  My brother-in-law doesn't have a factory or something.

13   Q.  So did you do any factory or clothing work while you were

14   in Turkey at all?

15   A.  I worked in a lot of businesses and I worked for a short

16   while in clothing business.

17   Q.  This was in Turkey; correct?

18   A.  Yes.

19   Q.  Well, you didn't tell Ms. Cibik that, did you?

20   A.  I didn't tell her that I worked as a tailor.

21   Q.  So it's your testimony then that Ms. Cibik coincidentally

22   found a sponsor that had the same duties that you did in Turkey

23   back in the '90s.

24   A.  Yes, by coincidence.

25   Q.  By coincidence.  Of all the sponsors you could have found,

D1i1cib3                    Altintas - cross

1   she happened to find one that you just happened to have

2   experience in.

3   A.  There was a mechanic also as a sponsor, but we decided on

4   the American Girl.  American Girl was paying more taxes.

5   That's how it's been spoken.

6   Q.  You also said that -- well, strike that.

7            When did you -- well, in May 2005 you first heard

8   about American Girl.  When did you decide that that's what you

9   wanted to do, that you would agree to that?

10  A.  One of the visits.  I don't know the exact date.

11  Q.  Well, you said she told you about it in May 2005; correct?

12  A.  Possible.

13  Q.  She told you, according to you, that you needed experience

14  letters related to that in May 2005; correct?

15  A.  I don't know the exact date.  It's possible.

16  Q.  When did you -- the experience letters, I believe you said

17  you asked your sister to get them for you; correct?

18  A.  That's correct.

19  Q.  When was that?

20  A.  Before the letters arrived.  I don't know when the letters

21  arrived.

22  Q.  May 2005, June 2005?

23  A.  They prepared and sent, you know, the letters.

24  Q.  When did you ask your sister to give you some letters?

25  A.  I don't remember the date.

D1i1cib3                    Altintas - cross

1   Q.  After you -- your sister had gotten you the letters, you

2   then took them to be translated; correct?

3   A.  Yes, I did.

4   Q.  And you knew these were fake letters; correct?

5   A.  Yes, I knew.

6   Q.  And after you received these fake letters, you then took

7   them to Ms. Cibik's office at the Earl David law firm; correct?

8   A.  That's correct.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D1ILCIB4                        Altintas - cross

1    BY MR. DONALDSON:

2    Q.  This is still in 2005, correct?

3    A.  Possible, yes.

4    Q.  Possibly?

5    A.  Correct.

6    Q.  I think you testified on direct that regarding the -- could

7    you please, 706, this check was July 7, 2005, do you see that?

8    A.  Yes.

9    Q.  You put your or you gave -- strike that.

10            You received your experience letters from Turkey

11   before that date, right?

12   A.  I don't remember.

13   Q.  You spoke to, according to you, Ms. Cibik about this

14   American Girl Fashion prior to July 7, 2005, correct?

15   A.  Yes, we did.

16   Q.  So it was your intention at that point when you spoke to

17   Ms. Cibik, according to you, that you were going to get fake

18   experience letters and try to get your green card, correct?

19   A.  (In English) Correct.  (Through interpreter) That's what

20   she told me.

21   Q.  You testified this morning that this check right here for

22   July 7, 2005, was regarding your brother-in-law getting his

23   green card, correct, didn't you say that this morning?

24   A.  This check was given to Gulay.  He asked for a check and I

25   gave the check.

D1ILCIB4                       Altintas - cross

1    Q.   Okay, good.  And you were in the office, according to you
2    this morning, with him and that's how this transaction took
3    place?
4    A.   (In English) Correct, correct.
5    Q.   I believe you stated this morning that you recommended that
6    he come to the Earl David office to get his green card,
7    correct?
8    A.   That's correct.
9    Q.   So at this point, based upon your testimony, you knew you
10   were engaged in fraud and now you were inviting your
11   brother-in-law to also engage in fraud.  Yes?
12   A.   Correct.
13   Q.   Did you -- strike that.
14        You also had your -- what is it -- your nephew, Ozgur,
15   you brought him to get a green card as well?
16   A.   I'm not sure whether Ozgur started anything or not.  He
17   just had a consultation kind of thing.
18   Q.   You're not sure whether he started anything or not?
19   A.   No, I don't think so.
20   Q.   Did you not tell the government on January 16, 2013, two
21   days ago, that Ozgur -- that Ms. Cibik found sponsors for
22   Ozgur?
23   A.   (In English) Not sure.
24   Q.   Did you not tell these folks, Mr. Pastore and everybody
25   else, on January 16 of this year that Ms. Cibik found a sponsor

D1ILCIB4                          Altintas - cross

1    for Ozgur or whatever his name was?

2    A.  I don't remember.

3    Q.  You don't remember now.

4           Did you not tell Mr. Pastore, Ms. Echenberg, and

5    whoever else was in the office on January 16 of this year that

6    Ms. Cibik found a sponsor for your brother-in-law?

7    A.  (In English) Correct.  Yes, she did.  My brother-in-law,

8    yes.  Ismet, yes.

9    Q.  Who was the sponsor?

10   A.  (In English) I don't know.

11   Q.  When did that happen?

12   A.  Some dates after my case.

13   Q.  Some dates after what case, some dates after?

14   A.  Some days after we started.

15   Q.  So sometime between April 2005 and June 2006, you're saying

16   that Ms. Cibik found your brother-in-law a sponsor?

17   A.  That's correct.

18   Q.  You don't know who that is, who the sponsor is?

19   A.  I don't know.

20   Q.  Who paid for that?

21   A.  Excuse me?

22   Q.  Who paid for Ms. Cibik to find a sponsor?

23   A.  Ismet.

24   Q.  He paid cash too?

25   A.  I don't know.

D1ILCIB4                        Altintas - cross

1          MR. DONALDSON:  Can I have one second please, your

2    Honor.

3    Q.  Ms. Cibik didn't tell you where to go get these fake

4    experience letters translated, did she?

5    A.  No.

6    Q.  You did that on your own?

7    A.  Yes.

8    Q.  Was this based on your experience with the other lawyer?

9    A.  It has nothing to do with that.

10   Q.  Did you tell -- not did you tell -- you knew that this,

11   according to you, that this American Fashion Girl was not real,

12   did you know that?

13   A.  I didn't know.  I thought it was true.

14   Q.  You thought it was true because you saw some paperwork,

15   correct?

16   A.  That's correct.

17   Q.  And the paperwork looked to you genuine?

18   A.  Yes, of course, tax papers.  And it was showing the taxes.

19   Q.  When you gave Ms. Cibik these, according to you, you gave

20   her some experience letters, I believe on direct you said she

21   added them to your application; is that correct?

22   A.  That's correct.

23   Q.  How did she do that?

24   A.  She wrote a lot of things on the computer.  It took really

25   long time.  And then she put all the papers on top of each

1  other.  Then she put everything in an envelope and she closed

2  the envelope.  She did not seal the envelope.  She said

3  tomorrow Earl David is going to sign those papers and then we

4  will send them.

5  Q.  So she didn't mail them?

6  A.  Not in my presence, no.

7  Q.  So she, based upon your testimony, you're saying that she

8  printed out your application, placed the experience letters

9  with the application, put it in an envelope, and told you that

10  Earl David is going to come sign them; is that what you said?

11  A.  Yes, correct.

12  Q.  When was that?

13  A.  There should be a date on the application.  It must be that

14  day.

15  Q.  Really?

16  A.  Possible.

17  Q.  When did you first see a copy of this application that

18  you're saying Ms. Cibik printed out?

19  A.  She was making copies of everything that she writes and

20  then she was handing them to us and she was putting one copy to

21  her own file, okay.  She's making three copies:  one copy she's

22  giving to me, one copy she's putting in the file, and one copy

23  she's sending, mailing to the immigration.

24  Q.  When did this happen?

25  A.  I don't remember the date.

1    Q.   Month?

2    A.   I don't remember that also.

3    Q.   Year?

4    A.   2005.

5    Q.   Did you tell the government on January 9, 2013, that you

6    gave her these experience letters, she put them in an envelope

7    and mailed them?

8    A.   (In English) Yes.

9              MR. DONALDSON:   One second, your Honor.

10   Q.   Now, as you've testified, you met with the government in

11   the last two weeks four times, January 3, January 9,

12   January 15, and January 16 of 2013, this year, correct?

13   A.   I don't remember the dates.  It must be true, yes.

14   Q.   And I believe you testified on January 9 meeting you met

15   with them for approximately two hours; do you recall saying

16   that?

17   A.   What day was the 9th?

18   Q.   The second meeting you had with the government, you believe

19   you met with them for two hours?

20              This morning --

21   A.   It may be also three hours.

22   Q.   Three hours, okay.

23   A.   Possible.

24   Q.   More than two hours?

25   A.   Okay.  They took away my phone.  I didn't have a -- I

D1ILCIB4                      Altintas - cross

1    didn't have a watch so I don't know anything about time.

2    Q.  I understand.  So you met with the government the second

3    meeting for more than two hours, approximately?

4    A.  Possible, yes.

5    Q.  The first meeting you met with them for I believe you said

6    about a half-hour?

7    A.  Half an hour we speak, but I was there the entire day.

8    Q.  Okay.  Fair to say then on that January 3 date, the first

9    meeting, the January 9 date, the second meeting, more than

10   two-hour meeting, you never told them that Ms. Cibik printed

11   out any paperwork?

12   A.  No, I told them.

13   Q.  You told them that she printed out paperwork?

14   A.  Yes, I did.

15   Q.  Who was at that meeting or -- strike that.

16          Was the agent at the meeting?

17   A.  Agent, yes.  (In English) First person close to, yes.

18   Q.  That's the prosecutor.  The prosecutor was there?

19   A.  (In English) It's third.  The lady.

20   Q.  Who was present?

21   A.  I don't remember the lady's name.  (In English) I'm sorry,

22   but her.  Her, that's her.

23   Q.  That woman?

24   A.  (In English) That woman.  Okay, I'm sorry.  I don't

25   remember the name.

D1ILCIB4                     Altintas - cross

1   Q.  Was Agent Gordon, she was there, was she taking down notes

2   while you were doing this?

3   A.  Yes, she was.

4   Q.  She was taking down notes at the first meeting as well?

5   A.  I didn't pay attention to that.  But the second she was,

6   yes.

7   Q.  Now, these multiple meetings you said you had with

8   Ms. Cibik, and I believe you said you were there about 50

9   times; is that right?

10  A.  Yes, must be, yes.

11  Q.  Any sign-in sheets or anything like that?

12  A.  Yes, she signed some things.  I had a lot of paperwork in

13  my hands, some contracts, etc., but I didn't know I would need

14  them so I destroyed them all.

15  Q.  Oh, you mentioned that in direct.  You had a contract?

16  A.  Correct.

17  Q.  And you destroyed it?

18  A.  Yes.  I didn't think I would need them anymore.

19  Q.  When you were there with Ms. Cibik, you -- I believe you

20  heard her talking on the phone, is that correct, with

21  Mr. David, Earl David?

22  A.  Yes, correct.

23  Q.  And when you met with Ms. Cibik, she would call him and ask

24  him questions, correct?

25  A.  Yes.

D1ILCIB4                          Altintas - cross

1    Q.  She would ask him questions about what to do, correct?

2    A.  Yes, correct.

3    Q.  She would ask him questions about how to fill out the

4    paperwork, correct?

5    A.  Correct.

6    Q.  And fair to say every time you was in the office with

7    Ms. Cibik, she was calling Mr. David, asking for help for you,

8    correct?

9    A.  Yes, correct.

10   Q.  There wasn't one time Ms. Cibik and you met that she did

11   not call and ask for assistance from Mr. David, correct?

12   A.  She was not calling every single time that I went.  She was

13   calling when she got stuck on something.

14          MR. DONALDSON:  Can I have one second please, your

15   Honor.

16   Q.  You said that you were working, you've been working with

17   this sanding company since 2000; is that right?

18   A.  That's not true.

19   Q.  Before that?

20   A.  Yes.

21   Q.  Do you use your car or another car for any type of money

22   making endeavors?

23   A.  How do you mean?  I didn't understand.

24   Q.  Do you use your car as a livery, do you use your car --

25   A.  (In English) No, no.

D1ILCIB4                              Altintas - cross

1    Q.   -- to deliver things?

2    A.   No.

3    Q.   Do you use your car at all for your work?

4    A.   To go to work, yes.

5    Q.   To go back and forth to work?

6    A.   Yes.

7    Q.   But that's all?

8    A.   That's all.

9    Q.   2008 you filed taxes, right?

10   A.   Yes, I did.

11   Q.   You also filed taxes in 2009, correct?

12   A.   Yes, I did.

13   Q.   In 2008 taxes, did you not -- isn't it true that you used a

14   vehicle or a truck as a deduction indicating that you used that

15   for work outside of travel back and forth?

16   A.   This was a van.

17   Q.   A van?

18   A.   That I used for work, not a car.

19   Q.   But you used to go back and forth to travel, correct?

20   A.   To do the work.

21   Q.   So you identified this van in 2008 and 2009 on your taxes

22   for deductions; is that correct?

23   A.   Yes, that's a work van, yes.

24   Q.   You didn't do this deduction for 2007 and 2010?

25   A.   It's been a long time.  I don't remember exactly but I

D1ILCIB4                          Altintas - cross

1   always file my taxes.

2   Q.  I'm sure you file your taxes.  I'm -- my question is are

3   you deducting for vans on 2008, 2009, and not 2007, 2010?  Van

4   not working 2007?

5   A.  I don't really understand much about this tax business.  My

6   accountant does my taxes.  So whatever he wrote is I accept.

7               MR. DONALDSON:  I didn't hear that last part.

8               THE INTERPRETER:  I accept whatever he writes.

9               MR. DONALDSON:  Did he just say it's the company's

10  van?

11              THE INTERPRETER:  Company's van?

12              MR. DONALDSON:  Did he just say it's the company's

13  van?

14              THE INTERPRETER:  No.  Accountant.

15  Q.  Is it the company's van?

16  A.  It's somebody that I hired to do my taxes.

17  Q.  Okay.  Fine.  The van that you're speaking of, who owns the

18  van?

19  A.  (In English) I own the van.

20              MR. DONALDSON:  One second, your Honor.  I know I keep

21  saying that.  I'm sorry.

22  Q.  You mentioned seeing an ETA.  In direct you said you saw an

23  ETA?

24  A.  That's correct.

25  Q.  You know what ETA is?

D1ILCIB4                        Altintas - cross

1    A.  I don't know exactly what it means.

2    Q.  Do you know what it is, do you know what an ETA is?

3    A.  I only know it's something about labor department.

4    Q.  So when you said you saw Ms. Cibik filling out an ETA --

5    A.  I saw it, yes.

6    Q.  -- how did you know that's what it was?

7    A.  There was the letters ETA on top and she was filling out

8    the form, names, etc.

9    Q.  The checks for Mr. Ozgur Suri, the thousand dollar check,

10   is that a loan?

11   A.  How much?

12   Q.  705, Government Exhibit 705, was that a loan for your

13   nephew?

14   A.  That's a loan, yes.

15   Q.  Did you get your money back?

16   A.  Yes, I did.

17   Q.  After that, 706, the one for made out to the publishing

18   company, for the memo for your brother-in-law?

19   A.  Correct.

20   Q.  Was that a loan too?

21   A.  Yes.

22   Q.  You got that money back?

23   A.  Yes, I did.

24   Q.  After that July 7, 2005 check that was made out to Mazal

25   and Bruicha Publishing -- and, again, you don't know who that

D1ILCIB4                      Altintas - cross

1    is, right?

2    A.  I don't know.

3    Q.  You don't know who that company is affiliated with,

4    correct?

5    A.  I don't know.

6    Q.  And Earl David didn't call you and say write that check out

7    to my company, correct?

8    A.  No.  Ismet asked for it and I wrote it.

9    Q.  That is your handwriting?

10   A.  Completely, yes.

11   Q.  Did you make out any other checks after July 7, 2005 to

12   Ms. Cibik excluding the May 6 one?

13   A.  I don't remember.  I don't remember.

14   Q.  You don't remember if you wrote any more checks to

15   Ms. Cibik?

16   A.  I don't remember.

17           MR. DONALDSON:  Your Honor, I'm finished.  Thank you

18   very much.

19           THE COURT:  Any other defense counsel want to examine

20   this witness?

21           MR. GREENFIELD:  Just two questions for the witness.

22   CROSS-EXAMINATION

23   BY MR. GREENFIELD:

24   Q.  Sir, did you testify that you first started working for

25   Long Island Floor and Sanding Company as an employee?

D1ILCIB4                          Altintas – cross

```
 1    A.   That's correct.

 2    Q.   They give you a paycheck every week?

 3    A.   There was sometimes when I got paid in cash.

 4    Q.   But you said later on you became a subcontractor; is that

 5    right?

 6    A.   That's correct.

 7    Q.   But you were still getting the work or some of the work as

 8    a subcontractor from the same company that used to be your

 9    employer, the Long Island Sanding; is that right?

10    A.   That's correct.

11              MR. GREENFIELD:  No further questions.

12              THE COURT:  Any other defense counsel?

13              Does the government have any redirect?

14              MR. PASTORE:  Very briefly.

15    REDIRECT EXAMINATION

16    BY MR. PASTORE:

17    Q.   Mr. Altintas, do you remember your first meeting with the

18    government?

19    A.   Yes, I do.

20    Q.   In general what types of things did the government ask you

21    about?

22    A.   They asked me about my immigration application and they

23    asked me about Gulay.

24    Q.   And who is it that identified Gulay Cibik?

25    A.   Excuse me?
```

D1ILCIB4                          Altintas - redirect

1    Q.   Who is it that identified Gulay Cibik?

2    A.   First people came from the FBI to my home.  They asked

3    whether if I know Gulay Cibik.  And then when I spoke with

4    them -- indicating you -- when they told me about immigration

5    things, I told them about Gulay.

6    Q.   During some of these meetings, you mentioned you saw Agent

7    Gordon taking notes; is that right?

8    A.   Yes, correct.

9    Q.   Did you ever review those notes?

10   A.   No.

11   Q.   Were they ever read to you?

12   A.   No.

13   Q.   Do you have any idea what's in the notes?

14   A.   No.

15   Q.   If we could bring up government's 1501-2 on the screen,

16   please.

17            Mr. Altintas, if you look at your screen, do you

18   recognize what this is?

19   A.   This looks like one of the forms filled out for ETA.

20   Q.   And what makes you say it looks like one of the forms

21   filled out for ETA?

22   A.   She was filling those in the computer.

23   Q.   Who was filling them out in the computer?

24   A.   Gulay, Gulay.

25   Q.   And if we focus on the very top of this form, if we could

D1ILCIB4                        Altintas - redirect

1    zoom in, please.

2             At the very, very top, what does it say at the very

3    top under application for permanent employment certification?

4    A.  Question again, please?

5    Q.  Sure.  What does it say right under application for

6    permanent employment certification?

7    A.  (In English) ETA form 9089.

8    Q.  And do you remember seeing that while you were in

9    Ms. Cibik's office?

10   A.  Yes, I did.  Yes, I saw.

11   Q.  Let's look at Section C, American Girl, where it says

12   American Girl Fashion.

13            What's the first time you heard the name of that

14   company?

15   A.  I don't remember the exact date, but on subsequent visits

16   when the application was switched from my wife to my name.

17   Q.  And who it that first told you about American Girl Fashion?

18   A.  Gulay.

19   Q.  And what did she tell you about American Girl Fashion?

20   A.  She said it's a very good company and then they pay very

21   good taxes and if I become my sponsor, I will get my green card

22   quickly and easily.

23   Q.  When Mr. Donaldson was asking you questions, you mentioned

24   something about tax paper for American Girl Fashion.  What did

25   you mean by that?

D1ILCIB4                        Altintas - redirect

1    A.  She showed me tax papers from American Girl Company and

2    there were millions indicated in that piece of paper.

3    Q.  And when you say she, who was it that showed you tax papers

4    indicating that there are millions from American Girl Fashion?

5    A.  Gulay.

6    Q.  You mentioned that you initially were going to file an

7    application for your wife.  What benefit, if any, can you get

8    if your wife's application was approved?

9    A.  I could get my green card from her green card and also my

10   children could get green cards.

11   Q.  With respect to your 2001 application, do you remember

12   Mr. Donaldson asked you if it was the same type of application

13   as the application you did with Ms. Cibik; do you remember

14   that?

15   A.  Yes.

16   Q.  When you filed your application in 2001, did you in fact --

17   were you in fact working for Long Island Floor Sanding?

18   A.  Yes, I was really working.

19   Q.  So who provided a sponsor when you made that application?

20   A.  My boss.

21   Q.  And in 2005 when you made the application for American Girl

22   Fashion, were you actually working for American Girl Fashion?

23   A.  I wasn't working for American Girl Fashion.  I was still

24   working in flooring business.

25   Q.  Who provided the American Girl Fashion sponsor?

D1ILCIB4                         Altintas - redirect

1    A.   Ms. Gulay in Earl David's office.

2    Q.   When you were negotiating prices for different services

3    with Ms. Cibik, was Earl David present?

4    A.   No, no.

5    Q.   So who decided how much you'd have to pay?

6    A.   Gulay.

7    Q.   With respect to your relatives, I think I just want to

8    clarify.

9             With respect to Ismet's application, do you know what

10   happened to that application or in general what type of

11   application that was?

12   A.   For a long time nothing came out of Ismet's application,

13   and he went back to Turkey.  Then a letter came indicating that

14   it was denied.

15            MR. DONALDSON:  Objection.

16            THE COURT:  You can only tell us about what you

17   actually know, not what someone else told you happened.  So if

18   you limit your answer to that, if you could.

19            THE WITNESS:  This is something I know.

20   Q.   This is something you know, how do you know it?

21   A.   We live in the same house.

22            THE COURT:  That's the answer.

23   Q.   And do you know what type, what type of application was

24   filed?

25   A.   It was again a sponsorship application and they found a

D1ILCIB4                    Altintas - redirect

1    sponsor for him.

2    Q.  Who found a sponsor for him?

3    A.  Gulay.

4    Q.  And what about Ozgur's -- first let me ask you:  Do you

5    know what happened to Ozgur's application?

6         Let me stop you.  Do you know what happened to

7    Mr. Ozgur's application?

8    A.  I don't know.

9    Q.  Okay.  And, finally, when you first arrive at the office,

10   Mr. Donaldson was asking you about your walking up the steps

11   and going in.  Do you remember those questions?

12        And, I'm sorry, by the office, I mean the office on

13   Wall Street.

14   A.  Yes.

15   Q.  Okay.  Give us a sense of what it was like when you would

16   walk into the office, both on the first time and on your

17   subsequent visits, just a sense of what the office was like.

18   A.  It was crowded and when I saw that crowd, I thought it was

19   a good office.

20   Q.  Was there any sort of formal receptionist?

21   A.  No.

22   Q.  So how did you figure out where to go?

23   A.  There are people who work there and one of them told me,

24   showed me Gulay's office.

25        MR. PASTORE:  Your Honor, may I have a moment.

1          No further questions.  Thank you.

2               THE COURT:  Anything else, Mr. Donaldson?

3               MR. DONALDSON:  Yes.  I'll try to be brief.

4     RECROSS EXAMINATION

5     BY MR. DONALDSON:

6     Q.  You said you live with Ismet?

7     A.  That's correct.

8     Q.  When did you first, when did you see this sponsor paper

9     come to the house?

10    A.  After Ismet left.

11    Q.  When did he leave?

12    A.  He couldn't bear --

13    Q.  I didn't ask that.  I said:  When did he leave?

14    A.  Four years ago.

15    Q.  2009?

16    A.  Possible.

17    Q.  Okay.  Now, this sponsor paperwork that you're saying

18    Ms. Cibik showed you or told you about American Girl, when did

19    you, when did you first get that or see that?

20              THE INTERPRETER:  I'm sorry, can I have the question

21    again.

22    Q.  The American Fashion Girl paperwork that you're saying

23    Ms. Cibik showed you or gave you, when did that happen?

24    A.  Should be around May or something, 2005.

25    Q.  You also said, if you recall, that you, after you're saying

D1ILCIB4                        Altintas - recross

1   Ms. Cibik left in 2006, you went to another -- you went back to

2   Jed Philwin, another lawyer, and you said they lost the

3   paperwork; do you recall saying that?

4   A.   They moved.  After Gulay left, they moved to another office

5   in Battery Place, and at that location, my files were there at

6   first.  Then they got lost.

7   Q.   And you said you had a copy of your files; do you recall

8   that?

9   A.   At that time, yes.

10  Q.   So you had a copy of this American Fashion Girl stuff too?

11  A.   They never gave me those tax papers, never.

12  Q.   So you got a copy of everything except that?

13  A.   They didn't give me any documents related to American Girl,

14  never.  I just saw the name.

15  Q.   The only proof that we have that Ms. Cibik gave you or

16  showed you this copy is your word?

17            MR. PASTORE:  Objection.

18            THE COURT:  The American Girl?

19            MR. DONALDSON:  For American Girl.

20            MR. PASTORE:  Argumentative.

21            THE COURT:  I thought that the testimony earlier was

22  that he wasn't sure that paper was --

23            MR. DONALDSON:  I'll move on.  I'll move on.

24  Q.   You also said that your wife spoke to Ms. Cibik, and as a

25  group, you all decided to have your wife apply for paperwork;

D1ILCIB4                        Altintas - recross

1    do you recall saying that?

2    A.  In the first meeting.

3    Q.  And at that meeting I believe you said that Ms. Cibik

4    supposedly told you all that she had a sponsor in a nursing

5    home for your wife; do you recall that?

6    A.  That's correct.

7    Q.  And you said that your wife did not work at a nursing home,

8    correct?

9    A.  That's correct.

10   Q.  But you all came back the next visit and paid the money to

11   get the wife's paperwork started?

12   A.  Yes.

13   Q.  Even though you're saying that you knew your wife didn't

14   work at the nursing home?

15   A.  Yes.

16   Q.  So then your fraud began at that moment?

17   A.  Yes.

18   Q.  What nursing home?

19   A.  I don't remember.

20   Q.  Did you see documents regarding that too?

21   A.  There was in the beginning, yes, I saw documents about the

22   nursing home and that was the nursing home's address, I think

23   it was in Connecticut.  But when we quit from that file, we

24   lost those papers.

25              MR. DONALDSON:  I have no further questions.

D1ILCIB4                          Altintas - recross

1              MR. PASTORE:  Nothing further.

2              THE COURT:  Thank you very much for coming.

3              (Witness excused)

4              MS. ECHENBERG:  The government calls Isaac Srugo.

5              (Spanish language Interpreter Anna Maria Riso sworn)

6              (Spanish language Interpreter Elizabeth Caruso sworn)

7     ISAAC SRUGO,

8          called as a witness by the Government,

9          having been duly sworn, testified as follows:

10    DIRECT EXAMINATION

11    BY MS. ECHENBERG:

12             MS. ECHENBERG:  May I proceed, your Honor?

13             THE COURT:  Yes.

14    Q.  Good afternoon, Mr. Srugo.

15             Mr. Srugo, do you speak English?

16    A.  (In English) A little bit.

17    Q.  Can you speak into the microphone, please?

18    A.  (In English) Just a little bit.

19    Q.  Do you speak other languages?

20    A.  (In English) Yes.

21    Q.  What are those languages?

22    A.  (In English) Spanish.

23    Q.  Any other languages?

24    A.  (In English) Hebrew a little bit.

25    Q.  What language are you most comfortable in?

D1ILCIB4                          Srugo - direct

1    A.  (In English) Spanish.

2    Q.  So we have a Spanish interpreter next to you.  I'm going to

3    be asking you questions in English.  If you'd prefer to have

4    them translated, the interpreter will translate both the

5    questions and the answers if you'd like.  Okay?

6    A.  (In English) Okay.

7    Q.  Mr. Srugo, where do you work?

8    A.  (In English) Monsey, New York, 46 Main Street, Monsey, New

9    York.

10   Q.  And what do you do for a living?

11   A.  (In English) We have a copy center.

12   Q.  What is the name of that company center?

13   A.  (In English) Pearson Printing.

14          THE COURT:  Just ask you to speak up a little louder.

15   I'm having trouble hearing you.

16   Q.  I'm showing you what's been marked as Government

17   Exhibit 53.  Do you recognize that photograph?

18   A.  (In English) Yes.

19   Q.  What is it?

20   A.  (In English) This is my place where I work, Pearson

21   Printing Copy Center.

22   Q.  Is that a fair and accurate depiction of your copy center

23   as it currently looks?

24   A.  (In English) Yes.

25   Q.  And is that how it looked in 2006 as well?

D1ILCIB4                          Srugo - direct

1    A.  (In English) Always the same.

2                MS. ECHENBERG:  The government asks to admit

3    Government Exhibit 53.

4                MR. BRILL:  No objection.

5                (Government's Exhibit 53 received in evidence)

6                MS. ECHENBERG:  If we could publish that, please.

7    Q.  So Mr. Srugo, this is your store?

8    A.  (In English) Yes.

9    Q.  And you own this store?

10   A.  (In English) Yes.

11   Q.  Do you own it with anyone else?

12   A.  (In English) No.

13   Q.  And is this where you go to work every day?

14   A.  (In English) Yes.

15   Q.  Do you have any employees?

16   A.  (In English) Yes.

17   Q.  How many employees do you have?

18   A.  (In English) Two.

19   Q.  And if you could repeat the address of this location?  I'm

20   not sure if it was clear.

21   A.  (In English) 46 Main Street, Monsey, New York.

22   Q.  How long have you owned this store?

23   A.  (In English) 18 years.

24   Q.  And what services do you provide to customers at your

25   store?

D1ILCIB4                          Srugo - direct

1    A.   (In English) We do copies and printing.

2    Q.   Do you provide anything else?

3    A.   (In English) We have some -- can use the address for

4    mailing service.

5    Q.   Excuse me?

6    A.   (In English) We use the address for mailing, post boxes.

7    We use the address for people who want to use it as address.

8    It's 46 Main Street unit numbers.

9    Q.   People can use your store as the address for their mail?

10   A.   (In English) correct.

11   Q.   And can they actually rent mailboxes at your store?

12   A.   (In English) Yes.

13   Q.   And what do you charge for a mailbox?

14   A.   (In English) $15 a month.

15   Q.   And approximately how many mailboxes do you have at your

16   store?

17   A.   (In English) About 150.

18   Q.   150?

19            THE COURT:   Please keep your voice up so the jurors

20   can hear you.

21   Q.   Are you familiar with an individual named Nathan Schwartz?

22   A.   (In English) Yes.

23   Q.   And would you recognize him if you saw him?

24   A.   (In English) Yes.

25   Q.   And if you could look around the courtroom and let me know

D1ILCIB4                          Srugo - direct

1    if you see him here today?

2    A.   (In English) Yes.

3    Q.   Can you tell me where he's sitting and describe what he's

4    wearing, please?

5    A.   (In English) He's in the back, sitting in the back on the

6    left side.

7            MR. BRILL:  Stipulate to the ID.

8            MS. ECHENBERG:  Let the record reflect that the

9    defendant, defense counsel has stipulated that the witness has

10   identified the defendant Nathan Schwartz.

11           THE COURT:  It may so reflect.

12   Q.   Did Nathan Schwartz ever rent a mailbox at your store?

13   A.   (In English) Yes.

14   Q.   And what sort of process does one have to go through to

15   rent a mailbox at your store?

16   A.   (In English) We fill out application, fill out an

17   application, we get IDs, make photocopy of the ID.  And this

18   way you open up a mailbox.

19   Q.   I'm showing you what's been marked as Government

20   Exhibit 303.  Do you recognize that set of documents?

21   A.   (In English) Yes.

22   Q.   How do you recognize them?

23   A.   (In English) It's the way we fill out application.

24   Q.   And do you recognize that specific exhibit as something

25   from the files at your business?

D1ILCIB4                          Srugo - direct

1    A.   (In English) It's not my handwriting.  It looks like this

2    is our form.

3    Q.   Did you provide a copy of these documents to the

4    government?

5    A.   (In English) Yes.

6    Q.   And did you take them from the files that are maintained at

7    your business?

8    A.   (In English) Correct.

9    Q.   And are they maintained in the regular course of your

10   business?

11   A.   (In English) Yes.

12          MS. ECHENBERG:  The government moves to admit

13   Government Exhibit 303.

14          MR. DONALDSON:  No objection.

15          MR. BRILL:  No objection.

16          THE COURT:  Received.

17          (Government's Exhibit 303 received in evidence)

18          MS. ECHENBERG:  Can we publish Government Exhibit 303,

19   please.

20   Q.   So what is this first page of these documents?

21   A.   (In English) This is the application where you fill out

22   somebody wants to open up a mailbox.

23   Q.   If you could speak up, sir, sorry.  It's a little hard to

24   hear you.

25   A.   (In English) This is the application we fill out when

D1ILCIB4                         Srugo - direct

1    somebody comes to open up a mailbox.

2    Q.  And who provides the information that's put into this form?

3    A.  (In English) The information is whoever wants to open up

4    this brings his IDs and through this we fill out the

5    information.

6    Q.  So if you could turn to the second page, please.  Are these

7    the IDs you were referring to?

8    A.  (In English) Yes.

9    Q.  So the person, in this case, Nathan Schwartz, who wanted to

10   open this box would have brought these IDs and provided them to

11   you or someone at your store?

12   A.  (In English) Correct.

13   Q.  And you said you didn't fill out this document; is that

14   right?

15   A.  (In English) No, I was not in that day.

16   Q.  You were not in that day?

17   A.  (In English) That day.

18   Q.  How do you know you weren't in that day?

19   A.  (In English) I remember usually when we fill out

20   application when I'm there.  And this day I was not there.

21   Q.  Is this your handwriting?

22   A.  (In English) No.

23   Q.  Do you recognize the handwriting?

24   A.  (In English) Yes.  This used to be my worker.

25   Q.  A worker who used to work for you?

1    A.  (In English) Yes.

2    Q.  And what was the process at that time?

3            If we could go back to page 1.

4            Is there a date on this document?

5    A.  (In English) Yes, there's a date.

6    Q.  And what's the date?

7    A.  (In English) July 15, 2006.

8    Q.  And what does that date indicate?

9    A.  (In English) Usually this is the date we you fill out the

10   application.

11   Q.  And at that time in July of 2006, what was the process for

12   filling out one of these applications, how did it work?

13   A.  (In English) The same way always, fill out the application

14   that day, write down the application.  You fill out the

15   application, you give a copy with the post office, and this is

16   how the application is filled out.

17   Q.  Okay.  So if I wanted to rent a mailbox, I would come in

18   and what would I do?

19   A.  (In English) You bring two IDs, one with a picture, one

20   without a picture, and we take the information and we fill out

21   the application.  Give you a number.

22   Q.  So you take my information and you put it in this form?

23   A.  (In English) Correct.

24   Q.  Okay.  And what is -- so who -- what is section 12 at the

25   bottom?

D1ILCIB4                           Srugo - direct

1    A.   (In English) Section 12 looks like whoever has the right to

2    pick up the mail.

3    Q.   And how many -- how does one go about picking up mail at

4    your business?

5              MR. BRILL:   Objection as to the current practice

6    versus back to the applicable time period.

7    Q.   In 2006, between 2006 and 2009, how did one go about

8    picking up mail at your business?

9    A.   (In English) Whoever has the key comes to pick up the mail.

10   Q.   How many keys do you provide for each mailbox?

11   A.   (In English) Only one.

12   Q.   So what is the purpose of giving other people access to the

13   mailbox here?

14   A.   (In English) It looks like -- I don't know what was the

15   names.  We have the other information from the other ones that

16   was not in that day.  Could be whatever other names is there

17   was in the time when he opened up the mail, opened the box.

18   Q.   So if one of these three people came in without the key,

19   could they get the mail?

20   A.   (In English) Whatever comes.  We don't check who has the

21   key.  Whatever comes with the key pick up the mail.

22   Q.   So if someone has the key, they can get the mail?

23   A.   (In English) Correct.

24   Q.   But if let's say Castillo Gonzalez, that second name, came

25   in and showed ID but didn't have the key, could he get the mail

D1ILCIB4                          Srugo - direct

1    because his name is on this application?

2    A.   (In English) We never had this question.  I don't know.  I

3    never gave nobody who doesn't have the key, usually, except the

4    person that already has fill out.

5    Q.   I'm showing you what's been marked as Government

6    Exhibit 304.  Do you recognize those three pieces of paper?

7    A.   (In English) Yes.

8                    (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D1i1cib5                         Srugo - direct

1   BY MS. ECHENBERG:

2   Q.  And did you provide these three pieces of paper to the

3   government?

4   A.  (In English) Yes.

5   Q.  Did you take them out of the files in your business?

6   A.  (In English) Yes.

7   Q.  And were they kept there in the regular course of your

8   business?

9   A.  (In English) Yes.

10  Q.  And were they made at or around the time of the dates

11  indicated on these three documents?

12  A.  (In English) This I don't know.  I didn't fill out this

13  application.  The numbers were on the work orders, mailboxes, I

14  don't know.  When it was filled out, I don't know.

15  Q.  Is it your understanding that the worker that prepared

16  these documents were noting dates as they occurred?

17          MR. BRILL:  Objection.

18          THE COURT:  Could you just rephrase that.

19  Q.  Sure.  Turning to the last document in this set, there's a

20  date on it.  Do you see that date?

21  A.  (In English) Yes.

22  Q.  And was this document prepared at or around that date, on

23  or around that date?

24  A.  (In English) Until July?

25  Q.  I'm talking about the date in the upper right-hand corner.

D1i1cib5                          Srugo - direct

1    Do you see that date?  Was this document prepared on or around

2    that date?

3    A.  (In English) Yes.

4    Q.  And if you look at the first two pages, there are other

5    dates noted.  Were those dates noted on or around those dates?

6              MR. BRILL:  Objection.

7              THE COURT:  Dates noted or dates entered?  I don't

8    have the documents.  I can't tell what you're talking about.

9              MS. ECHENBERG:  I believe I put them up there.

10             THE COURT:  Maybe you did.  But the point is, if

11   they're scanned entries -- what are you exactly asking about?

12             MS. ECHENBERG:  Your Honor, we can just submit the

13   third page of this document, if that would simplify things.

14             MR. BRILL:  Well, unless I object, or get to voir dire

15   about it.

16             (Pause)

17             THE COURT:  Do you have any voir dire?

18             MR. BRILL:  I do, yes.

19             THE COURT:  Go ahead.

20   VOIR DIRE EXAMINATION

21   BY MR. BRILL:

22   Q.  Mr. Srugo, do you have the last -- good afternoon, first of

23   all.

24             Do you have that last page of the exhibit in front of

25   you, of Exhibit 304?

D1i1cib5                          Srugo - direct

1    A.  (In English) Yes.

2    Q.  And did you fill out Exhibit 304, the last page?

3    A.  (In English) I didn't fill it out.  The worker would have

4    prepared it.  I didn't have to do -- I mean, it was not my job

5    to do.

6    Q.  That's fine.  Just -- so you're not the person who fills it

7    out; correct?

8    A.  (In English) No.

9    Q.  Okay.  And did you supervise the person filling it out on

10   that day, as in, did you witness it being filled out, on that

11   day?

12   A.  (In English) I didn't see them write.

13   Q.  Did you witness him filling it out on any day?

14   A.  (In English) I never saw him.

15   Q.  Other than when the government agents came to ask you for

16   your records, when before that -- well, let me change that

17   question a little bit.

18          When at another time did you see this last page of

19   Exhibit 304?

20   A.  (In English) I don't know when it was.

21   Q.  Do you recall ever seeing that exhibit prior to the

22   government agent coming to ask you for it?

23   A.  (In English) No.  I never -- I never looked in those

24   things.

25          THE REPORTER:  I can't understand.

```
 1              THE COURT:  Please speak slowly, or use the
 2     interpreter, one or the other.
 3     Q.  Please repeat your answer, and if you can't answer it in a
 4     way that's easily understandable, you can certainly speak in
 5     Spanish.
 6              Do you recall the last time you saw this document
 7     prior to the government agents asking you for a copy?
 8     A.  (In English) No.
 9     Q.  Do you recall ever seeing this document prior to that?
10     A.  (In English) I don't remember.
11     Q.  So do you have any independent basis to believe --
12     withdrawn.
13              Do you have any independent basis of knowledge that
14     this document was prepared in any proximity to the events that
15     are described?
16     A.  (In English) No.
17              MR. BRILL:  I continue my objection, your Honor.
18              MS. ECHENBERG:  I'm not going to move to admit this
19     exhibit at this time, your Honor.
20     BY MS. ECHENBERG:
21     Q.  What mailbox did Nathan Schwartz rent at your store?
22              MR. BRILL:  Judge, I'd ask that the witness not be
23     allowed to refer to the document if it's not in evidence.
24              MS. ECHENBERG:  I can take it back.  But we can put
25     the application back up on the screen.
```

1   Q.  Do you know what mailbox Nathan Schwartz rented from your

2   store?

3   A.  (In English) Yes.

4   Q.  Which mailbox?

5   A.  (In English) 223.

6   Q.  And do you know how long that mailbox was open at your

7   store?  Let me ask it a different way.

8          At some point did you close that box?

9   A.  (In English) We closed the box.  I don't know exactly when

10  it was.

11  Q.  Is there anything that would refresh your recollection as

12  to when the box was closed?

13  A.  (In English) Only by papers, what I see.  I don't remember

14  myself.  The only thing is what I see in the papers.  I don't

15  remember it.

16  Q.  Are there papers that would help you remember when the box

17  was closed?

18  A.  (In English) Not remember.  The only thing, what I see is

19  what I -- what I have.  But I don't remember what it was, when

20  it closed.

21          THE COURT:  Show it to him.

22          MR. BRILL:  Judge, with all due respect, he hasn't

23  said he would be able to use anything to refresh his

24  recollection.  He said he can look at it and read from it.

25          MS. ECHENBERG:  Your Honor, if we could speak at the

D1i1cib5                        Srugo - direct

1    sidebar.

2              THE COURT:  You could show him the piece of paper and

3    ask him if it does refresh his recollection.  You can show him

4    a stone.

5              MS. ECHENBERG:  Yes.

6    Q.  Does anything on these documents refresh your recollection

7    as to around when the box was closed?

8    A.  (In English) I don't remember.  But I didn't see -- I don't

9    take care of those boxes, but I don't remember.

10   Q.  But you don't remember when it was.  Do you remember

11   approximately how long it was open?  Let me rephrase that.

12             Was it open a year, multiple years?  Do you have any

13   recollection along those lines?

14             MR. BRILL:  That's just straight out leading, Judge.

15             MS. ECHENBERG:  Your Honor, I was asking for a date.

16   He doesn't remember the date, but he may have some recollection

17   in between the dates.

18             THE COURT:  Well, yeah, you can ask him if he

19   remembers approximately how long the box was open.

20   Q.  Do you remember approximately how long the box was open?

21   A.  (In English) No, I don't remember.

22   Q.  And did you ever see Nathan Schwartz in your business?

23   A.  (In English) Could be I saw him few times, maybe.  I

24   don't --

25             THE COURT:  Did you know Mr. Schwartz before he opened

D1i1cib5                          Srugo - direct

1    the box?

2              THE WITNESS:  (In English) No.

3    Q.  Do you know Mr. Schwartz's family?

4    A.  (In English) Family, yes.

5    Q.  And did you have a conversation with Mr. Schwartz in your

6    store one time about his family?

7    A.  (In English) Yes.

8    Q.  So you've seen him at least once in your store.

9    A.  (In English) Correct.

10   Q.  And is it possible that you saw him more than once in your

11   store?

12   A.  (In English) Not that I remember.  Could be but I don't

13   remember.

14             MS. ECHENBERG:  If I could have one moment, your

15   Honor.

16             (Pause)

17   Q.  We spoke before you took the stand; isn't that right?  We

18   spoke on the phone on December 10, 2012.  Do you remember that?

19   A.  (In English) Yes.

20   Q.  And during that conversation you talked about --

21             MR. BRILL:  Objection.

22   Q.  Did you talk to me about having seen Mr. Schwartz in your

23   store?

24   A.  (In English) I don't remember when it was.

25             THE COURT:  The question right now is:  Do you

D1i1cib5                              Srugo - direct

1    remember seeing Mr. Schwartz in your store?  Forget about when

2    and forget about how often.  Ever?

3              MS. ECHENBERG:  I think he's established that he saw

4    him at least once.

5    Q.  And the time that you're remembering, what did you talk to

6    Mr. Schwartz about?

7    A.  (In English) Talked about his family.

8    Q.  Anything specific?

9    A.  (In English) About his sister.  She died, and --

10             THE COURT:  What about his sister?

11   A.  (In English) She died.  And she was my neighbor.  And I was

12   talking about -- about his family.

13   Q.  And other than that time, that conversation with him, do

14   you have a specific recollection of seeing him in the store

15   another time, even if you didn't talk to him?

16   A.  (In English) I can't remember.

17             MS. ECHENBERG:  One moment, your Honor.

18             (Pause)

19   Q.  Mr. Srugo, would it refresh your memory to review the notes

20   I took when I spoke to you on December 10th, 2012?

21             MR. BRILL:  Objection.  He didn't say he needed his

22   recollection refreshed.

23             MS. ECHENBERG:  He said he didn't remember.

24             MR. BRILL:  He didn't say anything would help refresh

25   his recollection or that he needs his recollection refreshed.

D1i1cib5                              Srugo - direct

1    Q.  Is there anything that would help you remember how many

2    times you'd seen -- you told me you had seen Mr. Srugo in your

3    store -- excuse me -- Mr. Schwartz in your store?

4    A.  (In English) I can't say.  I don't know.

5    Q.  But at this time you don't remember how many times you saw

6    him in your store?

7    A.  (In English) No.

8            MS. ECHENBERG:  Your Honor, may I try to refresh?

9            THE COURT:  Yes.

10           MR. BRILL:  Was there an answer that he said he needed

11   something to refresh his recollection?

12           THE COURT:  He doesn't need it.  He just has no

13   recollection at this time.

14           MR. BRILL:  And he also --

15           THE COURT:  And he doesn't need to know what it is

16   that might refresh his recollection.

17           MR. BRILL:  No.  That part I agree.

18           (Documents translated to witness by interpreter)

19   A.  (In English) I do remember that time.

20   Q.  Okay.  So would you tell the jury about that time.

21           MR. BRILL:  I'm going to object again.  It's not the

22   appropriate question.

23   Q.  Do you remember another time that you saw Mr. Schwartz in

24   your store?

25           MR. BRILL:  Object again.

D1i1cib5                         Srugo - direct

1          THE COURT:  Overruled.

2    A.  (In English) What I remember was this time with a light

3    blue shirt --

4          (Reporter interrupted for clarification)

5          THE COURT:  You have to talk up.  But we have a

6    Spanish interpreter.  If you need to do it in Spanish, then do

7    it in Spanish.

8    A.  (In English) What I remember was, he came to the store with

9    a light blue shirt, that's what I remember, and he asked me a

10   job to do for -- one of his brothers pass away and he wants to

11   make a booklet to pray about him, and this what I remember he

12   was in my store.  The time I was talk about his family, about

13   the sister also, when she died.

14   Q.  So you remember at least two times that you saw him in the

15   store?

16   A.  (In English) It was the same time what I remember from

17   before.  I remember once clear we spoke about his family, his

18   sister, and about the booklet to be made.

19   Q.  And you remember another time when he had a light blue

20   shirt and he came in to make copies?

21   A.  (In English) This was the time we were making copies for

22   him for his brother, the booklet, the copies at this time.

23   Q.  And when someone comes to get mail in your store, would you

24   necessarily notice them coming in or out?

25   A.  (In English) No.

1          MS. ECHENBERG:  One moment.

2          (Pause)

3          MS. ECHENBERG:  Your Honor, I'm approaching again with

4   what was the last page of Government Exhibit 304, but I'm going

5   to mark that now, just that, as 304.

6          THE COURT:  Okay.

7   BY MS. ECHENBERG:

8   Q.  I show you this one more time, Mr. Srugo.  Was it your

9   business' regular practice to make receipts when people paid?

10  A.  (In English) Yes.  Yes.

11  Q.  And do you know who prepared the receipts in 2006?

12  A.  Martin Lieberman.

13  Q.  That was your employee?

14  A.  Yes.

15  Q.  And did he prepare the receipts at or around the time that

16  he dated them?

17  A.  (In English) Probably.

18          MS. ECHENBERG:  The government --

19  Q.  What do you recognize this document to be?

20          MR. BRILL:  Objection.

21          THE COURT:  I'll allow it.

22  A.  (In English) This is my invoice.  That's what we use in the

23  store.

24          MS. ECHENBERG:  The government moves to admit

25  Government Exhibit 304, just that one page.

D1i1cib5                          Srugo - direct

1              MR. BRILL:  Objection.

2              THE COURT:  An invoice is a bill; correct?

3              THE WITNESS:  (In English) Yes.

4              THE COURT:  And when Mr. Lieberman would prepare a

5     bill, would he send it?

6              THE WITNESS:  (In English) No.  He put it in the

7     mailboxes.

8              THE COURT:  Okay.

9     Q.  He put it where?  I'm sorry?

10             THE COURT:  In the mailbox.

11    Q.  And this document you provided to the government from the

12    files at your business; correct?

13    A.  (In English) Correct.

14    Q.  And the files are maintained in the regular course of your

15    business?

16    A.  (In English) Keep records of the -- whatever pays, whatever

17    don't.

18             THE COURT:  It was part of Mr. Lieberman's job to keep

19    track of whether people paid for their mailboxes?

20             THE WITNESS:  (In English) Correct.

21             THE COURT:  Received.

22             (Government's Exhibit 304 received in evidence)

23             MS. ECHENBERG:  If we could publish just the last --

24    the last page of what has been marked as Government 304.

25    Q.  Could you read what's listed under the phone number on this

D1i1cib5                              Srugo - direct

1    document, all the way to the left, the second left.

2    A.  (In English) 6 months --

3    Q.  If you could read the phone number under TEL that's right

4    under the words Contour Framing.

5    A.  (In English) Phone number?

6    Q.  Yes.

7    A.  (In English) 845-721-7455.

8    Q.  And the cell number?

9    A.  (In English) 845-354-5651.

10   Q.  And what was the regular practice of your business to get

11   these phone numbers?  Who would you get them from?

12   A.  (In English) From whatever fill out the application,

13   usually.

14   Q.  Whoever filled out the application?

15   A.  (In English) Yes.

16   Q.  So that would be Martin Lieberman?

17   A.  (In English) Yes.

18   Q.  And he would obtain that information from who?

19   A.  (In English) From whatever comes to open up the box.

20   Q.  So in this case Nathan Schwartz?

21        MR. BRILL:  Objection.

22   A.  (In English) Could be.  Probably.  I mean, I was not there.

23   Q.  And under the next section, under the phone numbers, what

24   does that reflect?

25   A.  (In English) 6 months, small mailbox number 223.

D1i1cib5                    Srugo - direct

1   Q.  And next to that?

2   A.  (In English) Paid 90.

3   Q.  So it was paid through six months initially?

4   A.  (In English) Correct.

5   Q.  And then according to this document, what happened next?

6   A.  (In English) It says due.  It doesn't say paid.  Doesn't

7   look like he pay after that.

8   Q.  But if it's due, that means the mailbox is still open?

9   A.  (In English) Possible.  I can't say for sure, but I don't

10  know exactly what it was.

11  Q.  Would you keep making a notation that the money was due if

12  the mailbox wasn't open?

13  A.  (In English) I think we tried to call this number.

14  Q.  What number?

15  A.  (In English) Usually we call the cell or the telephone

16  numbers.  We try to see the person, whether they pay for the

17  next six months.

18  Q.  Do you know what that other number is next to the word

19  Closed?

20  A.  (In English) 521-9000.

21  Q.  Do you know what that number is?

22  A.  (In English) No.  Looks like a number we got from -- I

23  don't know from who we got that number.

24  Q.  And can you tell by looking at this document around when it

25  was closed?

D1i1cib5                           Srugo - direct

1    A.  (In English) I can't say.

2    Q.  Is it fair to say that it was open at least until July of

3    2009?

4            MR. BRILL:  Objection.

5    A.  (In English) I cannot say.  I don't know.

6    Q.  Is it fair to say that you wouldn't charge someone for a

7    mailbox that wasn't open?

8    A.  (In English) I know it was a long time he didn't pay.  I

9    mean, more or less, no idea.

10   Q.  So it was a long time he didn't pay; right?

11   A.  (In English) Yeah, mm-hmm.

12   Q.  But you didn't close the mailbox, you left it open for a

13   long time while he wasn't paying; right?

14           MR. BRILL:  Objection.  Leading.  Asked and answered.

15   A.  (In English) We have a lot of -- well, you can see other

16   letters, there's a lot of people who didn't pay for years and

17   after that, you know, they will pay, we'll keep it, you know,

18   but it's not my main business.  It's only was considered the

19   side business.

20   Q.  As a general practice, when people wouldn't pay, you would

21   for quite awhile leave the mailboxes open and hope that they

22   would pay?

23           MR. BRILL:  Objection, leading.

24           THE COURT:  Overruled.

25   Q.  Did you understand my question?

D1i1cib5                          Srugo - direct

1    A.  (In English) We can keep a box open a long time even if

2    they didn't pay, yes.

3    Q.  That was the question.

4    A.  (In English) I don't know how long one was open, till when,

5    what mail or anything, I can't remember.  What I remember was

6    that mail -- we sent away mail when it was for sure closed, I

7    know for sure, when it was mail, when it was not picked up for

8    a long time.

9    Q.  In '09 you think you started to send back mail.

10    A.  (In English) We send mail -- probably was back in '09 we

11    send back, whatever was mail.

12    Q.  But until then someone who had the keys to mailbox 226

13    [sic] could access that mailbox and get the mail?

14         MR. BRILL:  Objection.

15    A.  (In English) Could access.  I don't know if they want it or

16    not.

17    Q.  That's not my question.  My question is:  Would it be

18    possible, as long as the box was open, that someone had the

19    key, they could access the mail?

20    A.  (In English) Could be.

21    Q.  Until a box is closed, can someone come with the key, open

22    the box, and take out the mail?

23    A.  (In English) If he has a key, yes.

24         MS. ECHENBERG:  Nothing further at this time, your

25    Honor.

D1i1cib5                          Srugo - cross

 1              THE COURT:  Mr. Brill?

 2              MR. BRILL:  Thank you, your Honor.

 3   CROSS-EXAMINATION

 4   BY MR. BRILL:

 5   Q.  Mr. Srugo, would mail continue to be delivered to a box if

 6   a person who was supposed to be renting the box had an overdue

 7   balance, or would you hold the mail until you received payment?

 8   A.  (In English) We hold the mail, a long time.  We can hold

 9   the mail for a long time.

10   Q.  Okay.  So would the mail be in the box or would someone

11   actually have to speak to someone in the store and pay their

12   balance before they could receive their mail?

13   A.  (In English) Sometimes when they have a lot of mail or

14   something, we take it out of the mailbox.  Could be was nothing

15   there, could be was something there.  I don't know.

16   Q.  And the exhibit here indicates a small mailbox; right?

17   A.  (In English) Yes.

18   Q.  And what is a small mailbox?  Can you describe the size.

19   A.  (In English) It would have small, medium, and large.  For

20   just little, somebody has a little bit, so could be one

21   envelope up to 15 or something like this is a small mailbox.

22   Q.  So about 15 regular business size envelopes would fit in a

23   small mailbox?

24   A.  (In English) Correct.

25   Q.  After that if it gets filled up with --

D1i1cib5                        Srugo - cross

1   A.  (In English) Maybe over -- large, whatever, have packages,

2   a little bigger things in it.

3   Q.  If a small mailbox is full, what do you do with the

4   overflow mail?

5   A.  (In English) Usually, if nobody comes, we put it in the

6   side or we hold till they will come to pick it up.

7   Q.  And if they don't come to pick it up, what happens?

8   A.  (In English) If he owes money, we send it back.

9   Q.  By send back, you mean return to sender; right?

10  A.  (In English) Correct.

11          MR. BRILL:  Would you put 303 back up, please.

12  Q.  Mr. Srugo, you see at the bottom of the page indicates

13  Nathan Schwartz, Castillo Gonzalez, and Francisco Torres as

14  authorized to pick up the mail; right?

15  A.  (In English) Correct.

16  Q.  If you look at the following pages of the exhibit, please,

17  after Mr. Schwartz's ID.

18          Looking at the passport, do you see the name -- there

19  we go.  It appears -- correct me if I'm wrong, Mr. Srugo,

20  but -- that Castillo Gonzalez is the individual's last name and

21  the first name is Henry Fernando.  Would that be accurate?

22  A.  (In English) Yes.  I don't know what -- the document you

23  put up, I have no idea for what -- for --

24  Q.  The copy that was taken of the passport would have been the

25  identification required for the person to be authorized to pick

D1i1cib5                              Srugo - cross

1   up mail; right?

2   A.  (In English) Correct.

3   Q.  And this piece of -- this copy of the passport was kept

4   along with the first page; right?

5   A.  (In English) Correct.

6           MR. BRILL:  And could we scroll down to the next page,

7   please.

8   Q.  And again, this is another copy that was kept by you;

9   right?

10  A.  (In English) Correct.

11  Q.  And this is again Henry Castillo; correct?

12  A.  (In English) Yes.

13          MR. BRILL:  And could we have the next page.

14  Q.  And I'm looking at the passport on this page.  The

15  individual's full name appears to be José Francisco Torres

16  Guarderas; right?

17  A.  Yes.

18          MR. BRILL:  Okay.  Thank you, Mr. Srugo.  Nothing

19  further.

20          THE COURT:  Thank you.  You're excused.  Unless -- I'm

21  sorry.

22          MS. ECHENBERG:  No, you're right, your Honor.  Nothing

23  further.

24          (Witness excused)

25          MR. PASTORE:  Your Honor, the United States recalls

D1i1cib5                    Mirandona – direct

1    Special Agent John Mirandona.

2            THE CLERK:  Mr. Mirandona, I just remind you that

3    you're still under oath.

4            THE WITNESS:  Thank you.

5     JOHN MIRANDONA, resumed.

6    DIRECT EXAMINATION CONTINUED

7    BY MR. PASTORE:

8    Q.  Good afternoon, Mr. Mirandona.  Thanks for bearing with us

9    with the delay.

10   A.  You're welcome.

11   Q.  Okay.  When we were last talking, we were looking at

12   Government Exhibit 3608.  Do you have that exhibit in front of

13   you?

14   A.  Yes.

15           MR. PASTORE:  And if we could also bring up on the

16   screen, please, Government's 3608.

17   Q.  And just remind the jury, if you can, in general terms what

18   Government's 3608 is.

19   A.  It is an e-mail from earlsdavid@yahoo.com to

20   sammy110wall@aol.com.

21   Q.  And is it copied to anyone else?

22   A.  A courtesy copy to leoontherun@aol.com.

23   Q.  And just so that we don't lose our place, if you start down

24   the page, you see where it says, "Note:  Forwarded message

25   attached"?  At the very top there, it says, "Note:  Forwarded

D1i1cib5                          Mirandona - direct

1    message attached"?

2    A.  Yes.

3    Q.  And then there's some information starting with "Received"

4    down to "Content Length: 6489."  Do you see that batch of --

5    A.  Yes.

6    Q.  Okay.  What is that information?

7    A.  That information is the header information of the forwarded

8    message.

9    Q.  And based on this header information, from what e-mail

10   account was the e-mail originally sent?

11   A.  The forwarded e-mail was sent from Earl David,

12   earlsdavid@yahoo.com, to Rafi Bar, arye1998@yahoo.com.

13   Q.  Okay.  And do you have any idea who either of those two

14   people are?

15   A.  No.

16   Q.  Moving down, do you see where it says "REMEMBER" in all

17   caps --

18   A.  Yes.

19   Q.  -- with two exclamation marks?  From that point, if you

20   keep reading down to where it says, "And by the way, stop

21   throwing in my face about your children or your wife's cooking.

22   Those details are only your private matters, not mine.

23   Remember something, we are all permitted to change our mind,

24   our life, and to find happiness in our unique way.  You are not

25   god to say which way to live life and how."  Do you see that?

1    A.  Yes.

2    Q.  So that text from "REMEMBER" in all caps down to "which way

3    to live life and how," what is that text?  Is that the body of

4    an e-mail message?

5    A.  Yes.

6    Q.  Okay.  Now below that do you see where it says Rafi Bar

7    again and it's got carets and then there's an e-mail address in

8    there?

9    A.  Yes.

10   Q.  What does that indicate to you?

11   A.  That the originator of the text was that e-mail account.

12   Q.  Okay.  So below that do I understand correctly then there

13   is yet another e-mail?

14   A.  Yes.

15   Q.  Okay.  Now let's go to that other e-mail.  Let's look -- do

16   you see the paragraph numbered 1?

17   A.  Yes.

18   Q.  What does -- can you just read what it says there.

19   A.  "When Sam continuously, week after week, stole from you

20   amounts of money that were double and tripling the amount we

21   are talking about, I never heard you open your mouth or do

22   anything, you just sat there and took it up the rearend, smiled

23   and carried on.  Where were your cries of poverty then?  Now

24   you cry when I want what is rightfully mine."

25   Q.  Do you have any idea what that refers to?

D1i1cib5                        Mirandona - direct

1   A.  No.

2   Q.  Let's look at subparagraph 2, and if you could begin

3   reading where it says, "The checks."

4   A.  "The checks.  Let me tell you exactly what happened with

5   the checks.  When I had bills to pay, all I did was deposit the

6   cash and immediately issue you a check to buy a few days.

7   There have been several checks that were paid and paid to you

8   on time.  Do you honestly think that if I wanted to screw you I

9   couldn't have done it on 1000 other occasions, from fake

10  deductions or simply making money disappear like everyone else

11  does?  If I was a thief, I would be sitting on a million

12  dollars like everyone else and would have screwed you so badly

13  you wouldn't have known your ass from your elbow.  I'm the only

14  one in that office who has ever been honest with you.  When I

15  complained to Sam the other week about there being no money and

16  he started mumbling and making up bullshit excuses and then he

17  told you to tell me that if I come into the office, I will make

18  money, I went into the office, and what did I get, a hundred

19  dollars?  Yes.  100 lousy dollars.  That is on a night when

20  they took in almost 5,000.  This is the night that I personally

21  witnessed these people going into the bathroom to count money.

22  What the hell is wrong with you?  Wake up and smell the coffee.

23  Do you think I'm stupid?  Does Sam think I was born yesterday?

24  No wonder your checks bounced.  If I'm counting on income and

25  it is being stolen from me under my nose, what the hell did you

1    think would happen?  Be careful before you accuse me of

2    stealing from you.  I could have taken you to the cleaners a

3    hundred times and never did.  If for once in your pathetic life

4    you would wake up and stand up for me, who has always been

5    loyal to you, you wouldn't find yourself in this predicament.

6    For a change speak on your own mind instead of sending me

7    e-mails based on what people around you tell you to write."

8    Q.  Do you have any idea what office is being discussed?

9    A.  No, I have no knowledge of what's transpiring here.

10   Q.  Okay.  Let's read paragraph 3, please, which begins, "About

11   your expenses."

12   A.  "About your expenses.  Your expenses are nobody's but your

13   problem.  You are the one who controls expenses.  If you feel

14   the need to pay the world salaries and let them rip you off,

15   you have no one but yourself to blame.  I have always been

16   there to help you cut costs.  When we moved from W90, who was

17   it that moved the office for you?"

18   Q.  Let me stop you right there.  W90, what does that mean?

19   A.  I have no idea.

20   Q.  Okay.  Continue.

21   A.  "Myself and my wife worked like dogs to move the office to

22   save you the money for movers.  Printing and picked up 4

23   pallets of books, shipped them myself --"

24   Q.  Sorry.  I think you may have skipped a line.  If you could

25   go back up.

D1i1cib5                          Mirandona - direct

1    A.  "Myself and my wife worked like dogs to move the office to

2    save you the money for movers.  Yes, me and my wife, like

3    Mexican workers.  Did you pay me for that?  Did you so much as

4    thank me?  Shame on you.  When I went to Marcy Printing and

5    picked up 4 pallets of books, schlepped them myself and took

6    them to storage, how much did you pay me for that?  Shame on

7    you.  Did you ever pay for the truck I rented?  Nooooo.  After

8    the storage, I have paid out of my --"

9    Q.  Let me stop you there.  If you could just go back.  I think

10   you may have misread a line.  Does it say, "After the storage"?

11   A.  "And the storage, I have paid out of my own pocket $400 a

12   month for the last at least six months?  Did you ever stop to

13   think why the hell I should be paying to store your stuff?  Did

14   you ever offer to reimburse me for that?  Nooo.  Shame on you."

15   Q.  If we could continue to the next page.

16   A.  "Do you remember the first time I had to take the chance of

17   coming to Toronto to bring your car?  I had to sit for an hour

18   under investigation for your crap?  Who else would have done

19   that for you?  Lipa?  Sam?  Greenstein?  Sharoni?  Your wife?

20   Where is your appreciation?  Shame on you.  And you want me to

21   feel bad for you?"

22   Q.  Okay.  Let me stop you there.  Do you have any idea what

23   the author of this e-mail means by storage, paying for storage?

24   A.  No.

25   Q.  Do you have any idea who Lipa is?

D1i1cib5                          Mirandona - direct

1    A.   No.

2    Q.   Do you have any idea who Sam is?

3    A.   No.

4    Q.   Do you have any idea who Greenstein is?

5    A.   No.

6    Q.   Do you have any idea who Sharoni is?

7    A.   No.

8    Q.   Okay.  Let's go now to paragraph 4.  Could you read that.

9    A.   "About my house, let me take you back to a conversation we

10   had at W90 when you sat and looked at me in the eye and said,

11   Everyone here has bought a house.  What about you?  What does

12   that tell you?  And you accuse me of having an extravagant

13   lifestyle.  Yes, maybe I made a mistake buying the house

14   (especially knowing that I was financially dependent on people

15   like Sam) but I've come to realize that mistake and I've put my

16   house up for sale.  I cannot pay my bills so I'm out of here

17   and will go back to Israel and start again."

18   Q.   Okay.  Can you skip now down to paragraph 7, please.  Go

19   ahead and read that.

20   A.   "You make it sound like all I did was go into the office

21   and collect money.  Well, let me tell you this.  If I did not

22   go, you would have nothing at all.  I sat in that office and

23   fought for every penny of your money.  I was the only one you

24   could trust, and it was me that enabled you to go sit in

25   Canada.  You know yourself you didn't and don't trust anyone

1    there.  If it was not for me you would have gotten nothing from

2    that office.  Your whole hookup with the office and your

3    ability to operate remotely was my idea, my setup, against all

4    the losers in the office who said it would never work."

5    Q.  Okay.  Let me stop you there.  Do you have any idea what

6    the reference to Canada is?

7    A.  No.

8    Q.  Paragraph 8, let's go ahead and read that.

9    A.  "About Sunrise Food.  I sent out the file to immigration.

10   If they didn't cash the checks, it's not my problem."  I'm

11   sorry.  "If they didn't cash the check, it's not my problem?

12   So now you're trying to accuse me of cashing the immigration

13   check for myself?  I did what I was supposed to do.  About

14   Bonei.  You and Greenstein got the money for this.  You each

15   took $500, and what did I get for my work?  Zip diddly squat.

16   Yes, she did give me the check which I gave to Greenstein.  If

17   you don't find a record of that money, perhaps you should look

18   to Greenstein for answers, or maybe you just want to accuse me

19   of stealing that as well?"

20   Q.  Okay.  Do you have any idea who Greenstein is?

21   A.  No.

22   Q.  Paragraph 9?

23   A.  "One more thing, which I personally don't need an answer

24   for, but look at yourself in the mirror and answer for

25   yourself, the $10,000 you took from Gulay and got me involved,

D1i1cib5                          Mirandona - direct

1    you cried to her that you were in the streets and took

2    advantage of her feeling for you and asked me to back up your

3    story.  Not only that but before she left the country, you once

4    again tried to get her -- to get more money from her.  Your

5    justification to me was, she doesn't need it.  Did she not work

6    hard for that money?  18 hours a day, at two jobs?  When you

7    come to give me musser, make sure your own hands are clean."

8    Q.    Okay.  And if you could go now to paragraph 10.

9    A.    "To summarize, I once considered you my friend, but you

10   have shown your true colors and made your feelings very clear.

11   Well, here are mine.  I don't give a crap anymore about what

12   happens to you or your office.  After reading your last e-mail

13   I no longer feel any moral, ethical, halachic, or emotional

14   reason to do anything to help your office -- help you or the

15   office.  It's now each person for themselves.  You wanted a

16   fight, you got it.  Please make sure that within the next seven

17   days you get your stuff out of storage.  I refuse to pay

18   another penny to keep it there and am not taking responsibility

19   for anything if you choose to do nothing."

20   Q.    What is the date, all the way back at the top, the date on

21   which this e-mail chain was forwarded by Earl David,

22   earlsdavid@yahoo.com to sammy110wall@aol.com and copied to

23   leoontherun@aol.com?

24   A.    The 21st of May 2006.

25   Q.    Now I want to direct your attention to Government's 3611.

D1i1cib5                          Mirandona – direct

1              THE COURT:  We have to stop now.  It's 2:15.  Remember

2       that we pick up on Tuesday.  Monday is Martin Luther King Day.

3       It's a federal holiday.  So everyone should have a good

4       weekend.

5              Still restrain yourself from talking about the case,

6       keep an open mind, and we'll see you Tuesday bright and early.

7              (Jury excused)

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D1i1cib5

1          (Jury not present)

2          THE COURT:  Anything we need to talk about?

3          MR. DONALDSON:  Not from me.

4          MR. PASTORE:  Your Honor, we do believe -- and I don't

5   know if the court needs to decide it now.  We'll probably all

6   want to take a look at the transcript.  We do believe, in light

7   of Mr. Donaldson's cross-examination today of Mr. Altintas,

8   that the door has been opened to the proffer statements, and

9   we're happy to articulate --

10          THE COURT:  Try to articulate.

11          MR. PASTORE:  Sure.

12          MR. GREENFIELD:  Your Honor, I don't believe this

13   impacts Mr. Tischler.

14          THE COURT:  Your client needs to get home.

15          MR. GERZOG:  And nor as to my client.

16          (Defendants Tischler and Brodjik excused)

17          THE COURT:  Just remind me where in the briefing?  It

18   would be in your memorandum of law, as part of the motions *in*

19   *limine*?

20          MR. PASTORE:  Our initial memorandum of law, yes, your

21   Honor.

22          (Pause)

23          THE COURT:  So your position is that some of the

24   questions that Mr. Donaldson asked this morning opened up the

25   introduction of the statement Ms. Cibik made during the proffer

D1i1cib5

1    on September 8th, 2006?


D1i1cib5

1    on September 8th, 2006?

2              MR. PASTORE:  Correct, your Honor.  Among other things

3    that Mr. Donaldson asked was whether it was just a coincidence

4    that Mr. Altintas had experience as a -- in fabric making,

5    essentially cloth cutting, and that Ms. Cibik just so happened

6    to provide him with that phony sponsor, suggesting that it was

7    actually Mr. Altintas who had come up with the sponsor.  Among

8    other things, in the proffer --

9              THE COURT:  I don't think that was brought out in the

10    question.

11              MR. PASTORE:  I believe he --

12              THE COURT:  I didn't take that away.  That wasn't my

13    take-away from what he said.

14              MR. PASTORE:  I also believe he asked whether

15    Mr. Altintas informed Ms. Cibik that the letters were in fact

16    fraudulent, again, indicating that it was his idea rather than

17    Ms. Cibik's idea to provide the sponsor.  Ms. Cibik noted in

18    her proffer to the government that the letters, the experience

19    letters were, "obviously fraudulent.  David would instruct the

20    client on exactly what the letters should say and offer and

21    provide a job description that he found on the computer.

22    According to Cibik, Sam Salamon, Lipa Teitelbaum were

23    businessmen who made connections in the Jewish communities.

24    Over the course of the last year, Salamon and Teitelbaum had

25    instructed Cibik to change applicants' professions on their

D1i1cib5

| | |
|---|---|
| 1 | application.  Cibik would go to Salamon or Teitelbaum for |
| 2 | assistance.  If a client did not have their own job offer, |
| 3 | either Salamon or Teitelbaum would provide the contact |
| 4 | information for an employer in an appropriate profession, if |
| 5 | possible." |
| 6 | In addition, Ms. Cibik noted during her proffer on |
| 7 | September 8th, 2006 that in at least 50 percent of the cases |
| 8 | the client was instructed to list a profession for which they |
| 9 | had no experience, either by Cibik at David's direction or by |
| 10 | David himself. |
| 11 | And so to the extent that the cross-examination argued |
| 12 | or indicated that Mr. Altintas was the progenitor of the fraud, |
| 13 | we believe that these statements rebut that.  Among other |
| 14 | things -- |
| 15 | THE COURT:  First of all, the whole experience is |
| 16 | backwards.  Mr. Altintas had absolutely no need to cheat.  He |
| 17 | had a legitimate application, he had a job, and he was just |
| 18 | impatient about waiting to have his perfectly legitimate, as I |
| 19 | understand it, application processed.  So actually, it was |
| 20 | bizarre that he would even embark upon this when he had already |
| 21 | hired a lawyer, had a pending application that was a good one. |
| 22 | Right?  I mean, the only problem he got into was this sort of |
| 23 | assisted self-inflicted wound. |
| 24 | MR. PASTORE:  Judge, I think it may be difficult for |
| 25 | us to appreciate just how difficult it is for someone who's |

D1i1cib5

1    been smuggled into the country to not be able to travel to see

2    other family members, to not be able to leave the country, and

3    to live -- he came in in the '90s to live for over a decade in

4    this legal limbo status.  Mr. Altintas, in conversations with

5    me, likened it to being in jail.  He said he felt trapped.  And

6    so, but that notwithstanding, I think -- I think my

7    understanding, or my take-away from Mr. Donaldson's

8    cross-examination is that he's going to suggest that it was

9    Mr. Altintas' idea to commit this fraud, that Ms. Cibik didn't

10   know that it was a phony company, and that Ms. Cibik didn't

11   know --

12            THE COURT:  First of all, he said clearly, whatever it

13   was called, American Girl Fashion, that he had received this

14   piece of paper from her and that she had said this is a good

15   company to use because they pay a lot of taxes; right?

16            MR. PASTORE:  Exactly.  And the fact that he was

17   cross-examined on that in a way to suggest that he was lying

18   about that, that in fact it wasn't Ms. Cibik who provided the

19   information.

20            THE COURT:  He created American Girl Fashion?

21            MR. PASTORE:  That either he created it, it was his

22   idea, or he was mistaken that Ms. Cibik provided the

23   information.

24            THE COURT:  You're going to have to show me where in

25   the transcript that was a reasonable take-away.  That was not

D1i1cib5

1    my take-away.

2              MR. PASTORE:  I think that may make sense.

3              THE COURT:  I think that essentially what the cross

4    was was that it established that Mr. Altintas was a very

5    willing, enthusiastic participant and went to extraordinary

6    lengths to create this phony, you know, documentation about his

7    work experience.  And my take-away from that was that it was

8    going to be the argument that he was a one-man band.

9              MR. PASTORE:  If it's okay with the court, I think it

10   does make sense to look at the transcript, and I think the

11   thrust of the argument -- and we'll see if the transcript bears

12   it out -- is just that intent and knowledge on Ms. Cibik's part

13   has been put into play, and we think that in the proffer

14   statement, it's pretty clear that she had both.  That's the

15   only argument.

16             THE COURT:  Does anyone want to respond?

17             MR. DONALDSON:  I'll wait until Mr. Pastore finds the

18   transcript, but -- I'll wait until that point.  But I -- I'll

19   wait until they get the appropriate transcript that they think

20   supports their argument.

21             I would note one thing, though.  In the court's

22   decision early on, pretrial, the government made the same

23   argument regarding intent, and I believe it was in one of the

24   rulings -- and we have to look back in the rulings -- was that

25   they -- even if I did argue that she did not have intent to do

D1i1cib5

1    X, Y, Z, that that would not open the door for the proffer

2    statement.  But I'll look back at the ruling.

3             THE COURT:  All right.  I think what I said was, to

4    read from the transcript, "With respect to Ms. Cibik, I would

5    think I agree with Mr. Donaldson that there was no clear

6    admission of criminal intent.  Again, if she testifies and

7    denies any criminal knowledge or intent, it is possible that

8    her statements made in the course of her proffer could come

9    in," and I just went on to discuss what I assume would be the

10   argument that the agent misunderstood.

11            MR. DONALDSON:  That's what I recall the ruling was,

12   that if Ms. Cibik testified, then they could argue whatever,

13   but my understanding was --

14            THE COURT:  I thought the thrust of your cross was

15   essentially attacking the witness' credibility and his, you

16   know, willingness to lie more than once.  Okay?

17            (Adjourned to January 22, 2013, at 9:00 a.m.)

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
1                      INDEX OF EXAMINATION
2    Examination of:                              Page
3    ILHAN ALTINTAS
4    Direct By Mr. Pastore . . . . . . . . . . . 444
5    Cross By Mr. Donaldson . . . . . . . . . . . 486
6    Cross By Mr. Greenfield . . . . . . . . . . 543
7    Redirect By Mr. Pastore . . . . . . . . . . 544
8    Recross By Mr. Donaldson . . . . . . . . . . 550
9    ISAAC SRUGO
10   Direct By Ms. Echenberg . . . . . . . . . . 553
11   Cross By Mr. Brill . . . . . . . . . . . . . 579
12   JOHN MIRANDONA
13   Direct By Mr. Pastore . . . . . . . . . . . 582
14                      GOVERNMENT EXHIBITS
15   Exhibit No.                              Received
16    705, 706, 707  . . . . . . . . . . . . . . 474
17    53      . . . . . . . . . . . . . . . . .555
18    303     . . . . . . . . . . . . . . . . .558
19    304     . . . . . . . . . . . . . . . . .574
20    701     . . . . . . . . . . . . . . . . .476
21    704     . . . . . . . . . . . . . . . . .452
22    1501-10  . . . . . . . . . . . . . . . .465
23    1501-1, first page   . . . . . . . .484
24    1501-6   . . . . . . . . . . . . . . .507
25
```