D1OLCIB1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                          11-CR-424 (NRB)

GULAY CIBIK, REFAEL BRODJIK,
a/k/a "Rafi," NATHAN SCHWARTZ,
HAROLD TISCHLER, a/k/a
"Hershy,",

             Defendants.          Jury Trial

------------------------------x

                       New York, N.Y.
                       January 24, 2013
                       9:07 a.m.

Before:

               HON. NAOMI REICE BUCHWALD,

                       District Judge

                  APPEARANCES

PREET BHARARA
    United States Attorney for the
    Southern District of New York
JANIS ECHENBERG
JAMES J. PASTORE, JR.
    Assistant United States Attorneys
MICHAEL DINET, Paralegal Specialist

DONALDSON CHILLIEST LLP
    Attorneys for Defendant Gulay Cibik
BY:  XAVIER R. DONALDSON, ESQ.

LAWRENCE D. GERZOG, ESQ.
JEREMY L. GUTMAN, ESQ.
    Attorneys for Defendant Refeal Brodjik

D1OLCIB1

```
 1                              APPEARANCES
                              (Continued)
 2
     BRILL LEGAL GROUP, P.C.
 3        Attorneys for Defendant Nathan Schwartz
     BY:  PETER E. BRILL, ESQ.
 4
     PAUL GREENFIELD, ESQ.
 5        Attorney for Defendant Harold Tischler
 6   ALSO PRESENT:  DEIDRE GORDON, Special Agent, Homeland Security
                    RYAN GIBBS, Special Agent, U.S. Dept. of Labor
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1        (Trial resumed)

2        (Witness present)

3        (Jury present)

4        THE COURT:  Good morning, everyone.  Looking forward

5    to Mr. Brill's five fabulous questions.  And if he's good,

6    we'll let him go to six or seven.

7        MR. BRILL:  Do I have to stop at five and ask if I'm

8    being good?

9    DAVID GRYNSZTAJN, resumed.

10        called as a witness by the Government,

11        having previously been duly sworn, testified as follows:

12    CROSS-EXAMINATION (cont'd)

13    BY MR. BRILL:

14    Q.  Good morning, Mr. Grynsztajn.

15    A.  Good morning.

16    Q.  Mr. Grynsztajn, yesterday we were talking about the way

17    money was distributed at the firm, and today I want to ask

18    specifically about Sam Salamon.

19        How did Sam Salamon get money from the work that he

20    did at the firm?

21    A.  Money for sponsor, after Mr. David left, the money for

22    sponsor I would give to Mr. Salamon.

23    Q.  Okay.  Let's start with before Mr. David left, how would

24    Mr. Salamon get paid?

25    A.  Before Mr. David, I would give the money to Mr. David.

1    Q.  So any money that came in to you, you would give to

2    Mr. David after you took your cut, correct?

3    A.  No.  I would give the money to Mr. David.  End of the night

4    he would give me the cut.

5    Q.  I see.  Did you see Sam Salamon taking in money on his own

6    before Mr. David left?

7    A.  I don't recall.

8    Q.  And so things changed after Mr. David left, you said?

9    A.  Yes.

10   Q.  And so is it that Mr. Salamon took responsibility for the

11   sponsors at that point?

12   A.  Sam Salamon started providing sponsors sometime in 2000.

13   Q.  In the year 2000?

14   A.  Correct.

15   Q.  Okay.  So that's four or five years prior to Mr. David

16   leaving?

17   A.  Correct.

18   Q.  And when you say he took responsibility for that, what does

19   that mean?

20   A.  He provided most of the sponsors.

21   Q.  And so if you needed a sponsor for one of your clients, you

22   would go to Mr. Salamon and ask for a sponsor?

23   A.  I go to Mr. David.

24   Q.  Okay.  So Mr. Salamon would give the sponsors to Mr. David

25   and Mr. David would give them to you?

1    A.  I would prepare the B forms.  I would give them to

2    Mr. David.  He would get the sponsor from Mr. Salamon, and he

3    would prepare the A form.

4    Q.  And you know that Mr. David got the sponsor from

5    Mr. Salamon because you saw those conversations between

6    Mr. David and Mr. Salamon?

7    A.  Yeah, I see.

8    Q.  What about after Mr. David left, did you -- were you more

9    directly involved with Mr. Salamon in getting the sponsors?

10   A.  I would ask him for sponsor, yes.

11   Q.  And Mr. Salamon would provide the sponsor?

12   A.  Correct.

13   Q.  If you know or if you remember, approximately how many

14   different sponsors would you have gotten from Mr. Salamon in

15   the period after Mr. David left?

16   A.  A lot, but I'm not sure how many.

17   Q.  In terms of a lot, could you estimate, would it be more

18   than ten, more than 20, more than 50?

19   A.  I say more than 50.

20   Q.  And would he keep them in a book or a binder?

21   A.  He usually carried like a book in his brief case.

22   Q.  And inside would be paperwork for all of these sponsors,

23   correct?

24   A.  Correct.

25              THE COURT:  Just to clarify, when you say you got a

D1OLCIB1                          Grynsztajn – cross

1    certain number of sponsors from Mr. Salamon, are you referring

2    to the number of different sponsors or the number of times that

3    you asked him for a sponsor?

4            MR. BRILL:  Good point.  Thank you, Judge.

5    Q.  So I guess two different questions.  Did you -- you

6    processed hundreds of clients, right, aliens, right?

7    A.  Yes.

8    Q.  So each one of those would need a sponsor, correct?

9    A.  Correct.

10   Q.  So in, from that perspective, you used hundreds of sponsors

11   even if some of them were the same, right?

12   A.  Correct.

13   Q.  With regard to individual names of sponsor companies or

14   sponsor employers, would that be your estimate that it was

15   above 50?

16   A.  I'm not sure how many, maybe 30.

17   Q.  Approximately.

18   A.  Approximately 30.

19   Q.  And, again, after Mr. David left, those were all provided

20   by Mr. Salamon?

21   A.  And Mr. Teitelbaum.

22   Q.  And Mr. Teitelbaum.  Mr. Salamon and Mr. Teitelbaum were

23   working together in that regard, in the sponsor creation

24   business?

25   A.  On some of them.

1    Q.  And some of them meaning what?

2    A.  Some companies were set up just to sponsor.

3    Q.  And then some were provided by either Mr. Teitelbaum or

4    Mr. Salamon and, to your knowledge, were not created just for

5    that purpose, right?

6    A.  Correct.

7    Q.  But you don't know where Mr. Salamon or Mr. Teitelbaum got

8    the majority of those companies from, right?

9    A.  No, sir.

10   Q.  If you were, as you testified, in the office and you saw

11   someone providing information, you would possibly know where

12   that sponsor came from, but that happened in a very small

13   number of cases, right?

14   A.  Right.

15   Q.  And correct me if I'm wrong, but you've never met Nathan

16   Schwartz, right?

17   A.  Can you repeat it?

18   Q.  Correct me if I'm wrong, but you've never met Nathan

19   Schwartz, right?

20   A.  To my recollection, no.

21   Q.  You said there were disputes in the office between Sam

22   Salamon and other people about money?

23   A.  Yes.

24   Q.  And what were those disputes about?

25   A.  How many cases they file with the company, how much money

1   did they charge for each sponsor.

2   Q.  Did Mr. Salamon routinely express the need for more money?

3   A.  Seems to be they always talk about money.

4   Q.  He or they?  I didn't hear.

5   A.  Mr. Salamon, Mr. Teitelbaum.

6   Q.  And based upon your observations, did Mr. Salamon appear to

7   be living beyond his means?

8   A.  I don't understand exactly what you mean.

9   Q.  Did it appear to you that his expenses or his needs for

10  money exceeded the amount of money that he was taking in?

11          MR. PASTORE:  Objection.  Foundation.

12          THE COURT:  Overruled.

13  A.  I mean he was wearing, you know, he told me he was wearing

14  expensive clothes, $5,000 coats, custom made shirts.  The

15  tailors were coming to the office to measure him.

16  Q.  And did that appear to you to be in excess of what he was

17  making, what he was spending on all these things?

18          MR. PASTORE:  Objection.  I don't know if he knows how

19  much -- the foundation is to how much he's making.

20          THE COURT:  He did observe he was living --

21          MR. BRILL:  -- well.

22          THE COURT:  -- well.

23  Q.  So you saw that at least, right?

24  A.  Yes.

25  Q.  Were the other people in the office, Mr. Teitelbaum, for

1    example, living as well as Mr. Salamon?

2    A.  They always went shopping together for clothes.

3    Q.  And how about one of the other people up here on the board,

4    how about Mr. Gomaa, was he shopping for clothes as well?

5    A.  Not to my knowledge.

6    Q.  This was a Teitelbaum/Salamon thing, they liked to live

7    well, right?

8    A.  Yes.

9    Q.  You mentioned Mr. -- about Mr. Vago, that clients actually

10   would come to the office to talk to you upset that their

11   paperwork hadn't been filed, right?

12   A.  Correct.

13   Q.  And you went into the drawer and you found some of these

14   files that actually had not been filed, right?

15   A.  Correct.

16   Q.  So correct me if I'm wrong, but the clients were upset that

17   Mr. Vago hadn't engaged in the same level of fraud that

18   everyone else at the law firm had, right?

19            THE COURT:  Maybe just a different kind.

20            MR. BRILL:  Perhaps a different kind.

21            MR. PASTORE:  Also, there are two Mr. Vagos in the

22   case.  Can we just clarify?  I believe we're talking about

23   Mark.

24            MR. BRILL:  I believe we're talking about Mark as

25   well.

1    Q.  Mark was the person who was getting complained about?

2    A.  Yes, sir.

3          MR. BRILL:  Did we have digitally 1113?  I think we

4    did.  Could we put up 1113-13 briefly?

5    Q.  And what's the name of this company?

6    A.  My Favorite Bakery and Cafe.

7    Q.  And it's doing business as or d/b/a Baker's Delight,

8    correct?

9    A.  Correct.

10   Q.  And what's the employer identification number to the right?

11   It's in box B.

12   A.  22-3580242.

13         MR. BRILL:  And can we put up 3065-10F, please.

14   Q.  And can we take a look at what the name of this company is?

15   A.  My Favorite Bakery and Cafe.

16   Q.  Without the doing business as, correct?

17   A.  Yes.

18   Q.  Now, the tax return you just looked at and the tax return

19   that's in front of you here, these were both created for

20   sponsorship purposes?

21   A.  Yes, sir.

22   Q.  And what's the employer identification number on this?

23   A.  22-3580242.

24   Q.  The same as the prior tax return, right?

25   A.  Put them together.

1           MR. BRILL:  Sure.  Put up 1113-13 again next to it.

2   Q.  So that's the same, right?

3   A.  Yes.

4   Q.  Now, you testified here on direct -- we can take that down,

5   thank you -- that the false tax returns were created by

6   somebody within the firm, correct?

7   A.  Some of them, yes.

8   Q.  And who was that?

9   A.  Alex Lev.

10  Q.  And would that have included the two we just looked at?

11  A.  One of them could be, yes.

12  Q.  And when you spoke to Mr. Donaldson yesterday, you said you

13  believe you were misquoted in government's notes about your

14  January of 2006 interview where you said or you were quoted to

15  say that you didn't know who created or where the aliens could

16  get false tax returns, correct?

17          Do you remember yesterday talking to Mr. Donaldson?

18  A.  I don't think that was the question yesterday.

19  Q.  So let's -- let me ask the question again just so we're

20  clear.

21          In January of 2006, it was one of your first meetings

22  with the government when you decided to cooperate, correct?

23  A.  Yes.

24  Q.  And in that meeting there were federal agents, right?

25  A.  Yes.

1    Q.  It was in their office next-door, right?

2    A.  Yes.

3              MR. PASTORE:  Objection.

4              THE COURT:  The objection is?

5              MR. PASTORE:  No good faith basis.

6              THE COURT:  The meeting wasn't next-door?

7              MR. PASTORE:  I think we should -- looking at the

8    actual notes may be, again, helpful.

9              THE COURT:  Okay.  Give me the cite.

10             MR. PASTORE:  I believe it's 3501-1.

11             MR. BRILL:  I'll look over Mr. Donaldson's shoulder

12   here.  It should be the top of the second page of 3501-1.

13             THE COURT:  So the objection is to the location?

14             MR. PASTORE:  Correct, your Honor.  That's the only

15   objection is to the location.

16             THE COURT:  The government is correct.  Look at the

17   top of the first page.

18             MR. BRILL:  Where it actually took place.

19             MR. PASTORE:  No objection to the other part.

20             MR. DONALDSON:  Scared me too for a second.

21   Q.  You had meetings with the government in various locations,

22   correct?

23   A.  Yes.

24   Q.  Some of the meetings that you had were at your residence,

25   right?

1   A.  Correct.

2   Q.  And some of them were at the prosecutor's offices right

3   next-door, correct?

4   A.  Correct.

5   Q.  And, again, approximately how many of those meetings did

6   you have in total?

7   A.  A lot.  I don't know how many now.

8   Q.  And in each of those meetings it was you, correct?

9   A.  Yes.

10  Q.  Obviously.  Your lawyer, right?

11          MR. PASTORE:  Again.

12  Q.  In many of those meetings your lawyer was present, right?

13  A.  Not at the beginning.

14  Q.  Okay, but at some point you had a lawyer present?

15  A.  Correct, but not always.

16  Q.  Okay.  Prosecutors were there, right?

17  A.  Yes.

18          THE COURT:  Not always.

19  Q.  In many of the meetings prosecutors were present, right?

20  A.  Yes.

21  Q.  Would you say all of the meetings there were federal agents

22  present?

23  A.  Yes.

24  Q.  Or at many of them at least?

25  A.  Yes.

1   Q.  And would it be fair to say that in many, if not all of

2   those meetings, there was at least one person taking notes,

3   right?

4   A.  Correct.

5   Q.  And those notes were being taken as you were speaking,

6   right?

7   A.  Yes.

8   Q.  And would it be fair to say that when you prepared your

9   testimony here, the people who were helping you prepare for

10  your testimony were referring back to those notes?

11  A.  Yes.

12  Q.  And the answer that you gave on direct testimony to the

13  prosecutor's question about where the tax returns or where the

14  fraudulent tax returns could be obtained was, again, as you

15  said, from Mr. Lev, right?

16  A.  One of them, yes.

17  Q.  And are you denying that at the beginning when you were not

18  sure exactly what was going on with this case that you denied

19  that false tax returns could be obtained?

20  A.  I don't recall exactly.

21  Q.  So is it that you were misquoted or now that you don't

22  recall?

23  A.  I don't recall.

24          MR. BRILL:  Thank you.  Nothing further.

25          MR. GERZOG:  We decided to go all out of order just to

1    mix everything up, Judge.

2              THE COURT:  You know, variety is the spice of life.

3    CROSS-EXAMINATION

4    BY MR. GREENFIELD:

5    Q.  Good morning, Mr. Grynsztajn.  Is it Grynsztajn?

6    A.  Grynsztajn.

7    Q.  Do you recall that -- withdrawn.

8              When is the last time you saw Harold Tischler before

9    Tuesday when you identified him here in court?

10   A.  Can you repeat it, sir?

11   Q.  When before this past Tuesday when you identified

12   Mr. Tischler here in this courtroom was the last time you saw

13   him?

14   A.  Few months before I left the office.

15   Q.  And that would have been in what year?

16   A.  '06.

17   Q.  Okay.  And it was what, March of '06?

18   A.  Around that date, yeah.

19   Q.  So it's almost seven years ago that you last saw him; is

20   that correct?

21   A.  Yes.

22   Q.  And in the course of your testimony here today, you've

23   mentioned a large number of people who were involved in the

24   operations of the Earl David law firm; is that correct?

25   A.  Yes.

1   Q.  Approximately how many people were involved one way or

2   another in the operation of Earl David's law firm?

3   A.  Maybe around 20 or more.

4   Q.  Well, you've got 15 right there on that board.  Do you see

5   that?

6   A.  Yes.

7   Q.  You say it's only another five?

8   A.  I'm not sure how many.  I didn't count.  I'm not sure how

9   many.

10  Q.  I'm asking you to think now.  You've got 15 there and you

11  just said it's about 20.  So do you think it's only another

12  five people or more than that?

13  A.  Could be more.  I'm not sure.

14  Q.  Be fair to say that most of the people that you mentioned

15  and who you have in mind in the 20 or more are not here in

16  court today; is that right?

17  A.  Correct.

18  Q.  Before you came into court to testify, did you have an idea

19  how many people would be here?

20  A.  I knew there were four people.

21          THE COURT:  What do you mean?

22  Q.  Did you know how many people would be here on trial in this

23  case?

24          THE COURT:  You can answer.  Did you know which?

25  A.  Four people.

D1OLCIB1                          Grynsztajn - cross

1  Q.  You knew it was four people.  Somebody told you in the

2  course of your preparation that there were four defendants

3  going to be on trial?

4  A.  Yes.

5  Q.  And that was somebody who works for the government told you

6  that?

7  A.  Yes.

8  Q.  Did they tell you the name of the four people?

9  A.  I don't remember them telling the names.

10 Q.  Did they tell you Mr. Tischler was going to be here in

11 court?

12 A.  They showed me a picture.  They asked me if I can ID him.

13 Q.  Let me ask you something.  They showed you a picture in

14 September of 2010, is that correct, showed you a series of

15 pictures?

16 A.  I don't recall.

17 Q.  Let me show you what I've marked as Defendant HT -- for

18 Harold Tischler -- No. 1 and ask you if --

19            (Pause)

20 Q.  Ask you, first of all, do you know what that is?

21 A.  Photographs.

22 Q.  Okay.  Are those photographs that were shown to you on

23 September 16, 2010?

24 A.  It's possible.

25 Q.  Okay.  Do you see Mr. Tischler's picture among those?

1    A.  I don't recognize.

2            THE COURT:  I'm sorry, what was your answer?

3            THE WITNESS:  I don't recognize here.

4            THE COURT:  But you don't see Mr. Tischler among those

5    pictures?

6    Q.  You don't recognize Mr. Tischler?

7            MR. PASTORE:  Judge, I think there's -- just for the

8    record, the witness is only looking at the first page.  I think

9    there's some confusion.

10   Q.  Take a look.  There's a whole bunch of pictures there,

11   right?

12   A.  Yes.

13   Q.  Take a look, if you will, at No. 49.  Do you see No. 49?

14   A.  Yes.

15   Q.  Is that a picture that was shown to you on September 16,

16   2010 by the agents?

17   A.  I'm not sure.

18   Q.  Okay.  Let me show you what's been marked as Defendant's

19   Exhibit 2 and ask you if you -- if that refreshes your

20   recollection as to whether or not on September 16, 2010, you

21   looked at those pictures that are in Exhibit 1 and did not

22   identify Mr. Tischler as No. 49 or any other number in that

23   series of pictures?

24   A.  It's possible, yes.

25   Q.  Now, did you also look at the same pictures on December 17,

D1OLCIB1                          Grynsztajn - cross

1    2012, just a little more than a month ago, were you shown the

2    same pictures by the government?

3    A.  I'm not sure I was shown the same pictures.

4    Q.  Were you shown No. 49, the same No. 49 on December 17?

5    A.  It's possible.

6    Q.  And is it true that on December 17 you also could not pick

7    out Mr. Tischler?

8    A.  I'm not sure.

9    Q.  Well --

10              THE COURT:  You don't remember whether you could or

11   you couldn't?

12              THE WITNESS:  I know I was shown the picture that I

13   was able to ID Mr. Tischler.

14   Q.  On December 17?

15   A.  I'm not sure the date, what day it was.

16   Q.  Do you see the picture that you're looking at, No. 49?

17   A.  Yes.

18   Q.  Does that look like Mr. Tischler who's sitting here in

19   court?

20   A.  Yeah, it looks like.

21   Q.  And is that the way you remember him on in March of 2006?

22   A.  He had like a small beard.

23   Q.  Aside from the beard, do you recognize him to look the same

24   as he does here today?

25   A.  Almost the same, yeah.

D1OLCIB1                           Grynsztajn - cross

1   Q.  Did anybody tell you before you came into court on Tuesday

2   where Mr. Tischler was sitting?

3   A.  No, sir.

4   Q.  Now, you said that -- do you recall that on January 14 of

5   January 14 of this year in preparation for your testimony you

6   were shown another picture of Mr. Tischler?

7   A.  Yes.

8   Q.  And you identified him; is that right?

9   A.  Yes.

10  Q.  Did anybody tell you that that was Mr. Tischler?

11  A.  No, sir.

12  Q.  And it was from that picture that you were able to

13  recognize Mr. Tischler in court?

14  A.  I was able to recognize him without the picture.

15  Q.  So you didn't need the picture to recognize him?

16  A.  Correct.

17  Q.  I'm going to show you what's been marked Defendant's HT3

18  and ask you if that's the picture that you were shown on

19  January 14.

20          Is that the picture you saw on January 14?

21  A.  It could have been.

22  Q.  I know it could have been.  I'm asking you if it was.

23  A.  Not a hundred percent that picture, but it looks like this.

24  Q.  And is it your testimony that when you saw that picture you

25  were able to identify Harold Tischler?

D1OLCIB1                              Grynsztajn - cross

```
 1   A.  When I look at the picture that was shown to me, I was able
 2   to ID him, yes.
 3   Q.  So it's your testimony that Exhibit 3, Defendant's HT3
 4   looks the same as Mr. Tischler did back in 2006 when you last
 5   saw him?
 6   A.  Yes, sir.
 7              MR. GREENFIELD:  Your Honor, I offer Defendant's 1, 2,
 8   and 3 into evidence.
 9              MR. PASTORE:  No objection.
10              THE COURT:  Received.
11              (Defendant's Exhibits HT1, HT2, HT3 received in
12   evidence)
13              MR. GREENFIELD:  Can I pass them among the jurors?
14              THE COURT:  Sure.
15              MR. PASTORE:  Your Honor, if I may, that's not
16   actually the picture that was shown to Mr. Grynsztajn.  So if
17   it's going to be passed to the jury, we have the actual
18   picture.
19              MR. GREENFIELD:  This was provided to me by the
20   government pursuant to law.  I marked it.  It's in evidence.
21   This is -- I don't want any testimony from counsel.
22              THE COURT:  Maybe it's not such a big dispute.
23              You're saying you have the original?
24              MR. PASTORE:  Yes.
25              THE COURT:  A real photograph?
```

1              MR. PASTORE:  That's all I'm saying.

2              MR. GREENFIELD:  I'm satisfied with this.

3              THE COURT:  Okay.

4              MR. GREENFIELD:  I guess I'll proceed while --

5              MR. PASTORE:  Your Honor, can I have a moment to talk

6       to Mr. Greenfield?

7              THE COURT:  Sure.

8              (Pause)

9       Q.  When you were present at -- where was it -- 110 Wall

10      Street, is that where you worked?

11      A.  Yes.

12      Q.  Would it be fair to say that you overheard a lot of

13      conversations in which you weren't directly involved between

14      Mr. Salamon and Mr. Teitelbaum and other people?

15      A.  Correct.

16      Q.  Would it be fair to say that you became aware that a lot of

17      company owners called the firm upon learning that applications

18      had been filed in which -- of which they were unaware?

19      A.  Can you repeat that question?

20      Q.  Did you overhear -- withdrawn.

21             Did you tell the agents when you were interviewed on

22      January 23, 2006 that you were aware from conversations in

23      which you had been either involved or overheard that "a lot" of

24      company owners have called the firm upon learning that

25      applications had been filed of which they were unaware?

1     MR. PASTORE:  Objection as to what we're quoting.
2   Objection as to what the quote is from.
3   Q.  Did you say that?
4     THE COURT:  Overruled.
5   A.  Yes.  I told them there were a few companies that
6   complained.
7   Q.  You said a few now and I asked you whether you told the
8   agents that -- withdrawn -- whether you used the words "a lot"
9   when you spoke to the agents?
10  A.  I'm not sure.
11  Q.  As you think back now, was it only a few or was it a lot of
12  employers who called the firm to complain about the use of
13  their companies without their knowledge?
14  A.  A few.
15  Q.  So if the person you were talking to noted the words a lot
16  in quotes, that was a mistake on their part; is that correct?
17  A.  I'm not sure.
18  Q.  You either said a lot or you didn't and you don't recall or
19  you didn't?
20  A.  I don't recall.
21  Q.  And you don't recall now whether it was a lot or only a
22  few; is that right?
23  A.  To my recollection it was a few.
24  Q.  And these were conversations that you heard in person and
25  over the phone?

1    A.  In person.

2    Q.  Who was the biggest source of sponsors to the Earl David

3    law firm during the time that you were there?

4    A.  Mr. Salamon.

5    Q.  Did you ever see Sam Salamon signing other people's names

6    on applications?

7    A.  Yes.

8    Q.  You said earlier that Mr. Teitelbaum created corporations

9    himself; do you recall that?

10   A.  Yes.

11   Q.  Did he create them in his name or in other people's names?

12   A.  I believe it was different names.

13   Q.  Do you know whether he consulted those people before he

14   used their names to form other corporations?

15   A.  I'm not sure.

16   Q.  As far as the tax returns were concerned, was it your

17   experience that companies often would not provide tax returns

18   which showed adequate income to employ the people they were

19   going to sponsor?

20   A.  Correct.

21   Q.  And as a result of that, I believe you've testified that

22   false tax returns were created?

23   A.  Yes.

24   Q.  Now, it wasn't only tax returns, it was accountant audit

25   reports and alleged review of books and records, a whole

D1OLCIB1                         Grynsztajn - cross

1    financial statement; is that correct?

2    A.  Yes.

3    Q.  And all of these were completely false; is that right?

4    A.  Yes.

5    Q.  Were the sponsors, the owners of those companies, were they

6    consulted in any way when before these tax returns and other

7    reports were created?

8    A.  I don't know.

9    Q.  Well, do you know whether they weren't?

10           Did you ever hear anybody tell a sponsor, by the way,

11   we're going to create a tax return that shows that your company

12   earned $1.6 million last year?

13   A.  I heard at least one conversation, yeah.

14   Q.  You heard a conversation between who and who?

15   A.  Mr. David and Mr. Flam.

16   Q.  In which Mr. David told Mr. Flam that he was going to

17   create an inflated income tax return and send it to the

18   government?

19   A.  Yes.

20   Q.  What did Mr. Flam say?

21   A.  He had no problem with it.

22   Q.  Is that what he said, I have no problem with it?

23   A.  I don't know exactly the words he used.  But Mr. David told

24   him this only stays in the immigration, doesn't go anyplace

25   else.

D1OLCIB1                        Grynsztajn - cross

1   Q.  And aside from that conversation, did you ever hear

2   Mr. David or anybody else tell any other employer that they

3   were going to file inflated tax returns and financial reports?

4   A.  I don't recall.

5   Q.  Now, on February, do you recall that on February 28, 2006,

6   you were asked to name the companies that Mr. -- sponsors that

7   Mr. Salamon provided to the Earl David law firm?

8   A.  I don't know exactly the date.

9   Q.  Well, let me show you this document, this piece of paper,

10  ask you to take a look at this and tell me does that refresh

11  your recollection whether or not on that date you were asked to

12  list the sponsors that Mr. Salamon provided and that you did in

13  fact list 13 sponsors.

14          Does that refresh your recollection?

15  A.  Yes.

16  Q.  Okay.  And does it refresh your recollection that on

17  February 28, 2006, when you were asked to list individuals who

18  were sponsors referred by Salamon, you listed 13 separate

19  entities and not one of them was Mr. Tischler or any company

20  associated with Mr. Tischler?

21  A.  I was asked to provide information off my head which

22  company.  I couldn't remember every company.

23          THE COURT:  Just answer his question.

24  Q.  Why don't you just try and answer the question.  We know

25  you have a dog in the fight.  Just try and stick with the

1    question.

2              MR. PASTORE:  Objection.

3              THE COURT:  We don't need the commentary.

4    Q.  Tell me, did you mention Mr. Tischler or any company that

5    he's associated with?

6    A.  No.

7    Q.  Now, you testified -- withdrawn.

8              Would it be fair to say that you didn't -- you never

9    had a conversation yourself with Mr. Tischler?

10   A.  Correct.

11   Q.  And would it be fair to say that you saw him in the office,

12   according to your testimony, only a few times and that's what

13   you told the agents?

14   A.  Yes.

15   Q.  Now, you testified to one occasion when you say you were in

16   the room when Mr. Salamon and Mr. Tischler were arguing; do you

17   recall that?

18             MR. PASTORE:  Objection, mischaracterizes number of

19   times, your Honor.  The question was was there one time when

20   you heard them arguing.  I believe that mischaracterizes.

21             THE COURT:  Even if it happened multiple times, he can

22   still ask about one of those times, right?

23   Q.  You testified on direct to the same argument twice, didn't

24   you?

25             When you testified at the beginning of your testimony,

1    you were talking about an argument that you heard Mr. Salamon

2    and Mr. Tischler have in the office that you occupied when you

3    were about 20 feet away; do you recall that?

4    A.  Yes.

5    Q.  And then at the end of your testimony, you testified about

6    the same incident, isn't that so?

7    A.  There were a few incidents.

8    Q.  You heard them --

9              THE COURT:  That wasn't the question.  Listen to his

10   question.  It's about your testimony.

11             In your testimony, was the second discussion in

12   reference to the same conversation?

13             THE WITNESS:  Okay.

14   Q.  Do you understand the question?

15   A.  Yes.

16   Q.  And what is your answer?

17   A.  Yes.

18   Q.  Okay.  So it's one argument that you overheard?

19             MR. PASTORE:  I can't -- objection.  Again

20   mischaracterizes the testimony, one argument that you

21   overheard.

22             THE COURT:  He just testified that the argument that

23   he testified about twice was the same argument.

24   Q.  Now, you heard other arguments while you were there between

25   Mr. Salamon and other employers; isn't that right?

1  A.  No, I do not hear all the arguments.

2  Q.  I didn't say all.  You heard others besides the one that

3  you testified to with Mr. Tischler?

4  A.  Yes.

5  Q.  As a matter of fact, did you tell the agents, special agent

6  Gibbs, on March 13, 2007, that some employers became upset with

7  Salamon because they had agreed to sponsor one alien and

8  multiple applications had been filed; do you recall that?

9  A.  It's possible, yes.

10  Q.  The answer is yes, correct?

11  A.  I might have.  It was 2007.  I don't recall everything.

12  Q.  Whether you recall what you said, whether the date was

13  2007, do you recall for a fact that some employers became upset

14  with Salamon because they had agreed to sponsor one alien and

15  multiple applications had been filed?

16  A.  I might have said that, yes.

17  Q.  Well, was it true?

18  A.  Could be true.

19        THE COURT:  Yes, no.

20  Q.  It could be true.  I'm asking you whether it is true.

21  A.  Yes.

22  Q.  As a matter of fact, in some cases, you told the agent

23  these employers who had agreed to sponsor one alien, as many as

24  20 were filed in their name; do you recall saying that?

25  A.  Yes.

1    Q.  And that's true, right, when you said it it was true?

2    A.  Yes.

3    Q.  And those 20 you were talking about was an estimate by you,

4    wasn't it?

5    A.  Yes, I said approximately.

6    Q.  So it could have been 30 for all you knew or 40, right?

7    A.  Possible.

8    Q.  And that was only in 2006, right?

9    A.  Correct.

10   Q.  So you don't know what Mr. Salamon did in 2007, 2008, 2009,

11   do you?

12   A.  No.

13   Q.  And did you overhear Mr. Salamon responding to these upset

14   employers in any way?

15   A.  He was having a conversation about it with Mr. Teitelbaum.

16   Q.  Here's my question to you:  You've already testified that

17   on more than one occasion with more than one employer, you were

18   aware that these employers who had agreed to sponsor one person

19   became upset and complained to Mr. Salamon because more than

20   one application been filed in their name without their

21   knowledge, maybe as many as 20, 30, or 40, right?

22   A.  Yes.

23   Q.  And I'm asking you now, when those people complained, did

24   you hear Mr. Salamon on the phone telling those people not to

25   worry, it's just a job offer, did you hear him tell that?

1    A.  I'm not sure.

2    Q.  All right.  Show you document No. 3501-5, which I would

3    like the record to reflect is a document provided to me by the

4    government pursuant to law, and ask you whether the top line

5    there refreshes your recollection as to what you heard

6    Mr. Salamon say to these employers who were upset.

7           Does it?

8    A.  Yes.

9    Q.  What did he say to them?

10   A.  He told them don't worry about it, it's only a job offer.

11   Q.  Did that make any sense to you?

12   A.  He told them don't worry about it, it's only a job offer.

13   Nobody is going to bother you.

14   Q.  So just don't worry about it.  Did you hear him say other

15   things besides it's just a job offer?

16   A.  He said he would take care of them.

17   Q.  He would take care of it, it or them?

18           MR. PASTORE:  I'm sorry, he said he would take care of

19   them, not take care of it, your Honor.

20           MR. GREENFIELD:  I corrected myself.

21           THE COURT:  Okay.

22           MR. GREENFIELD:  Give me half a minute.

23   Q.  He would take care of them?

24   A.  Yes.

25   Q.  Did you hear him say anything else to these employers to

D1OLCIB1                         Grynsztajn – cross

1    make them less concerned about these applications?

2    A.  I don't recall.

3    Q.  Did you ever tell Earl David that Leo Teitelbaum and Sam

4    Salamon were falsifying U.S. Department of Labor approval

5    letters for submission to Homeland Security?

6    A.  I don't recall this one.

7                 (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  BY MR. GREENFIELD:

2  Q.  Do you know whether they were doing that?

3  A.  They changed the dates, but on what form, I don't recall

4  that.

5  Q.  Let me show you a document marked 3501-8, a document

6  provided to me by the government pursuant to law, and ask you

7  whether it refreshes your recollection as to what you told

8  Mr. David.

9  A.  What I told him, they took --

10  Q.  Just answer.  Just tell me whether this refreshes your

11  recollection.

12  A.  Yes.

13  Q.  And what is it that you told Mr. David?

14  A.  I told Mr. David that they were taking cases in

15  Pennsylvania and they were switching the names of the aliens

16  and the dates.

17  Q.  And why did you tell Mr. David that?

18  A.  So he should know.

19  Q.  Was it something that you felt Mr. David would be opposed

20  to?

21  A.  Possibly.

22  Q.  Well, did you think it was illegal?

23  A.  I felt it was very dangerous.

24  Q.  So you were protecting Mr. David, is that right, or trying

25  to?

1   A.  It was my boss so I felt I'd tell him.

2   Q.  But were you trying to protect him?

3   A.  I wanted him to know everything what was going on.

4   Q.  Were you trying to protect him?

5   A.  Yes.

6   Q.  Now you testified yesterday that Mr. Tischler had some sort

7   of plumbing company.  Do you recall that?

8   A.  I said something, All Country Plumbing or something like

9   that.  I wasn't sure the name exactly.

10  Q.  Okay.  Do you recall All County Plumbing as a company that

11  you used?

12  A.  Something like that, yes.

13  Q.  Okay.  Do you know whether Mr. Tischler had anything to do

14  with All County Plumbing?

15  A.  Yes.

16  Q.  And he did; is that your testimony?

17  A.  Yes.

18  Q.  Okay.  And how do you know that, from your own

19  recollection?

20  A.  No, from Mr. David.

21  Q.  So you recall Mr. David telling you that it was

22  Mr. Tischler who had All County Plumbing; right?

23  A.  I'm not sure the name exactly, but something to do with

24  plumbing.

25  Q.  And who started at the David Law Firm first, you or

1    Mr. Salamon?

2    A.   Started the law firm?

3    Q.   No.  Who worked there first, you or Mr. Salamon?

4    A.   It was me.

5    Q.   And when did Mr. Salamon come to the law firm?

6    A.   Around the middle of 2000.

7    Q.   And is it your testimony that it was Mr. Salamon who

8    brought Mr. Tischler and his companies to your attention or

9    Mr. David?

10   A.   The specific company we're talking about, it was I believe

11   Mr. David.

12   Q.   And would that have been before Mr. Tischler even --

13   Mr. Salamon even came to work at the David Law Firm?

14   A.   I'm not sure.

15   Q.   Do you recall thinking that the company that Mr. Tischler

16   had was a legitimate company, that actually did plumbing

17   business?

18   A.   Yes.

19   Q.   And there were other companies not associated with

20   Mr. Tischler, sponsor companies used who did no real business;

21   is that right?

22   A.   Correct.

23   Q.   You were testifying about a bakery yesterday.  You said

24   there was no such bakery?

25   A.   Correct.

1    Q.  Did you ever overhear Mr. Salamon or Mr. Teitelbaum make

2    phone calls to the Department of Labor from the office?

3    A.  Yes.

4    Q.  And did they do -- when they made those calls, did they

5    identify themselves as working for the law firm or for the

6    sponsor?

7    A.  I only overheard conversations with Mr. Teitelbaum with the

8    employee of the labor department.

9    Q.  And did he represent himself in those conversations that

10   you overheard as a sponsor or an employee of the David Law

11   Firm?

12   A.  I don't recall.

13   Q.  You -- do you know somebody named Tzvi, T-Z-V-I, who was

14   connected with the Earl David law firm?

15   A.  I don't recall.

16   Q.  Do you recall yesterday testifying about --

17          MR. GREENFIELD:  Could we get Government

18   Exhibit 3219-1.

19   Q.  Do you recall identifying that exhibit yesterday,

20   testifying about it?

21          MR. PASTORE:  Objection.  Mr. Grynsztajn didn't

22   testify about this document.

23          MR. GREENFIELD:  This wasn't admitted on his

24   testimony?

25          MR. PASTORE:  No, it wasn't.  It was admitted through

D1o1cib2                        Grynsztajn - cross

1  a document custodian who had gone earlier in the day.

2              MR. GREENFIELD:  I apologize.

3  Q.  Do you recognize this document?

4  A.  The form itself, they kept in the office.

5  Q.  Do you recognize the name of the alien?

6  A.  No, sir.

7  Q.  So that wasn't one of your clients; is that right?

8  A.  Correct.

9  Q.  And you didn't have anything to do with the filing of

10  this -- of an application on behalf of this alien.

11  A.  Correct.

12  Q.  And you don't know, I take it, what the reference to "NO

13  TZVI" means at the top.

14  A.  No idea.

15              MR. GREENFIELD:  Okay.  You can take that down.  Thank

16  you.

17  Q.  Oh.  Okay.  I don't think it's necessary to put it up, but

18  I'm going to show you this exhibit and ask you to look at the

19  signature page of the employer.  You see it says Harold

20  Tischler right here?

21  A.  Yes.

22  Q.  Do you see a signature there?

23  A.  Yes.

24  Q.  Do you have any idea, from your own knowledge, whether or

25  not that's actually Mr. Tischler's signature?

D1o1cib2                          Grynsztajn – cross

1  A.  I don't know.

2  Q.  Would it surprise you in any way if someone at the Earl

3  David office besides Mr. Tischler signed his name?

4  A.  Possible.

5  Q.  Not only is it possible, it was common, was it not, for the

6  sponsor's name to be forged, signed by someone else?

7  A.  In cases, yes.

8  Q.  Common.

9  A.  Yes.

10  Q.  And if you look further in this exhibit, there's an income

11  tax return for a company known as 387 Quincy Associates.  Do

12  you see that?

13  A.  Yes.

14  Q.  And the address is 43-16 17th Avenue in Brooklyn.

15  A.  Yes.

16  Q.  And do you see the amount of income there?

17  A.  Over a million dollars.

18  Q.  Over a million dollars.  And can you tell from looking at

19  this who, if anyone, at the Earl David law firm prepared this

20  tax return?

21  A.  Mr. Vago.

22  Q.  Mr. Vago.  And that's because it's not signed and there's

23  no IRS stamp.

24  A.  Correct.

25  Q.  Okay.  By the way, the IRS stamp that someone else at the

D1o1cib2                        Grynsztajn – cross

1    office supplied, was that a real stamp?

2    A.  I don't know, but they were getting it.

3    Q.  Well, I mean, was it your impression that those returns

4    were coming from the IRS?

5    A.  No, they were not coming from IRS.

6    Q.  Okay.  So you knew that all of the returns were phony in

7    one way or another, the only difference was whether they were

8    signed and stamped or just marked Copy; is that correct?

9    A.  Correct.

10          MR. GREENFIELD:  Can I have just one moment, your

11   Honor.

12          (Pause)

13          MR. GREENFIELD:  Thanks, Mr. Grynsztajn.  I have no

14   further questions.

15          MR. GERZOG:  Your Honor, may I have a moment to confer

16   with Mr. Pastore for just a second.

17          (Counsel conferring)

18   CROSS-EXAMINATION

19   BY MR. GERZOG:

20   Q.  Good morning, Mr. Grynsztajn.

21   A.  Good morning.

22   Q.  Good morning, sir.

23   A.  Yes.

24   Q.  Do you remember yesterday during your testimony you gave us

25   all a little language lesson as to what a couple of phrases or

1    words meant?

2    A.   Yes.

3    Q.   Okay.  And one of the things you said was that Mr. David's

4    publishing company, Mazal & Bracha, meant good luck; correct?

5    A.   I said I'm not sure.  I think.

6    Q.   It really means luck and blessings; right?

7    A.   Could be.

8    Q.   You know "bracha" means blessings.  I mean, that's a very

9    common word, right, in Hebrew?

10   A.   I don't know Hebrew.

11   Q.   Oh.  Do you pray in Hebrew?

12   A.   I don't pray.

13   Q.   You don't pray?

14   A.   No.

15   Q.   Oh.  And you said that the word "alter kocker" means old

16   fart; correct?

17   A.   That's a rough translation, yeah.

18   Q.   It really means old complainer, doesn't it?  Old kvetcher,

19   old whiner?

20   A.   Alter kocker could be old fart.

21   Q.   Well, if you're sitting around with your friends and you're

22   saying, "Oh, my leg hurts, my teeth hurt, I have to go to the

23   doctor, oh, this is so terrible," and then you say, "Look at

24   us, we sound like a couple of old alter kockers," you mean old

25   complaining people; right?  That's what that means?

D1o1cib2                    Grynsztajn - cross

1    A.  I'm not sure.

2    Q.  Now you introduced into evidence Government's Exhibit

3    Number 14; correct?

4            MR. GERZOG:  Could I have that up on the screen.

5            Oh, you don't have a copy of it?  All right.

6            MS. ECHENBERG:  It's up on the board.

7    Q.  You introduced that picture into evidence yesterday,

8    Government's Exhibit Number 14, did you not?

9    A.  Yes.

10   Q.  And who is that a picture of?

11   A.  Mr. Philwin.

12   Q.  And who is Mr. Philwin?

13   A.  The attorney that took over after Mr. David left.

14   Q.  And he would sign some of the immigration papers after

15   Mr. David left?

16   A.  Correct.

17   Q.  And do you remember having a meeting on January 13th,

18   2013, a mere 11 days ago, with this agent, Agent Gordon, and

19   this prosecutor, Mr. Pastore?

20   A.  Yes.

21   Q.  It was a Sunday; right?  You came in on a Sunday to work

22   with them; right?

23   A.  Yes.

24   Q.  And you remember because it was a day before you took your

25   second guilty plea in this case; is that right?

D1o1cib2                    Grynsztajn – cross

1   A.  Yes.

2   Q.  And they showed you this picture; isn't that right?

3           (Document handed to witness)

4   Q.  They showed you that picture; right?

5   A.  Yes.

6   Q.  And you said you didn't know who it was, it looks like your

7   brother; correct?

8   A.  Yes.

9           MR. GERZOG:  Move Brodjik –– Defendant Brodjik

10  Exhibit 1 into evidence, your Honor.

11          MR. PASTORE:  I just don't know what it is.

12          MR. GERZOG:  It's this picture.

13          MR. PASTORE:  Which one?

14          Okay.  We have no objection to that.

15          (Defendant's Exhibit Brodjik 1 received in evidence)

16          MR. GERZOG:  All right.  May I publish again 14 and

17  Brodjik Exhibit 9 [sic] for the jury?

18          THE COURT:  Sure.

19  Q.  Now you said you were born in the Soviet Union; is that

20  correct?

21  A.  Yes.

22  Q.  And you're 56 years old, so you were born in 1956; is that

23  correct?

24  A.  Yes.

25  Q.  Sir?

D1o1cib2                    Grynsztajn - cross

1    A.  Yes.

2    Q.  Okay.  And eventually we all know that the Soviet Union

3    broke up as a nation in -- and became several different

4    nations; correct?

5    A.  Yes.

6    Q.  And when you were born, you were a citizen of the Soviet

7    Union; correct?

8    A.  Yes.

9    Q.  And now you're a citizen of what country?

10   A.  My immigration record says stateless.

11   Q.  So technically you're a stateless person?

12   A.  Correct.

13   Q.  That's because you came here as a refugee in -- from the

14   Eastern Bloc?

15   A.  Yes.

16   Q.  And at that time United States had a policy of allowing

17   Jewish people to enter the United States from the Eastern Bloc

18   because of the discrimination against Jewish people in the

19   Eastern Bloc; is that correct?

20   A.  Yes.

21   Q.  And before you moved from what was then the Soviet Union to

22   the United States, you first moved to Poland; correct?

23   A.  Yes.

24   Q.  Was that preparatory to moving to the -- or preparatory to

25   emigrating from the Soviet Union to the West?

D1o1cib2                    Grynsztajn - cross

1    A.  I don't understand this question.

2    Q.  All right.  Was the move to Poland part of the process by

3    which you moved to the West?

4    A.  No, sir.

5    Q.  When did you move to Poland?

6    A.  1956.

7    Q.  Oh.  So you were -- you were born and then you immediately

8    moved to Poland?

9    A.  I was told I was like three months old.

10   Q.  Okay.  Why -- do you know why your family moved to Poland?

11   Did anyone ever tell you?

12   A.  They told me that during the war, they -- they were born in

13   Poland, during the war they escaped to Russia, then in 1956,

14   they returned.

15   Q.  Okay.  And at that time Poland was, while not part of the

16   Soviet Union, it was part of the so-called Iron Curtain

17   countries or Eastern Bloc or Soviet Bloc countries; correct?

18   A.  Yes.

19   Q.  And when you were 13, you came from Poland to the United

20   States; correct?

21   A.  Yes.

22   Q.  Did you have to tell the government that you were

23   emigrating to Israel or did you tell the government that you

24   were emigrating to the United States?

25            THE COURT:  What government?

1   A.  I'm not sure what my parents told.

2   Q.  Oh.  How did you personally, at age 13, feel about moving

3   to the United States?  Were you excited?  Were you

4   disappointed?

5            MR. PASTORE:  Judge, relevance?

6            THE COURT:  What's the relevance of this?

7            MR. GERZOG:  It has relevance, Judge.

8            THE COURT:  Okay.  Get there quickly.

9   A.  I'm not sure.

10  Q.  You don't recall?

11  A.  I don't recall.

12  Q.  Okay.  Well, it's certainly possible that one of -- one of

13  the reactions is you were disappointed because you were leaving

14  your friends; right?

15  A.  Possible.

16  Q.  And but you had to do it because your parents said, you

17  know, we're moving, and when you're 13 and your parents say

18  we're moving, you move; right?

19  A.  Yes.

20  Q.  It's also possible that you were excited because you were

21  leaving a country where Jews did not have a lot of

22  opportunities for a country of the United States where there

23  was freedom and opportunity for Jews; is that correct?

24  A.  Yes.

25  Q.  Now you got to the United States.  How old were you?

D1o1cib2                         Grynsztajn – cross

1    A.  12½, 13.

2    Q.  Okay.  And I assume you started school?

3    A.  Yes.

4    Q.  Where did you start school?

5    A.  The Lubavitcher.

6    Q.  This is a Jewish yeshiva?

7    A.  Yes.

8    Q.  And did you remain in that school through graduation?

9    A.  No, sir.

10   Q.  Did you go to any other school?

11   A.  No.

12   Q.  You dropped out of school?

13   A.  Yes.

14   Q.  How old were you when you dropped out of school?

15   A.  I don't recall.

16   Q.  Were you 17 when you dropped out of school?

17   A.  I don't recall.

18   Q.  Why did you drop out of school?

19   A.  I didn't like the yeshiva.

20   Q.  You didn't like the yeshiva?  Could you have gone to a

21   public school?

22   A.  My parents didn't want me to go to public school.

23   Q.  But they didn't mind you dropping out of the yeshiva; is

24   that correct?

25   A.  Correct.

D1o1cib2                        Grynsztajn – cross

1    Q.  And did you gain employment at that time when you dropped

2    out?

3    A.  Yes.

4    Q.  What did you do?

5    A.  I started delivering orders for fruit and vegetable store.

6    Q.  Okay.  You worked at a fruit and vegetable store.

7    Approximately how much money did you make, let's say a week?

8    A.  I don't remember.

9    Q.  Did you have other jobs between the time that you worked at

10   the fruit and vegetable store and the time you worked for

11   Mr. David's law firm?

12   A.  Yes.

13   Q.  Several other jobs?

14   A.  Yes.

15   Q.  Would it be fair to say that they were all relatively

16   low-paying jobs?

17   A.  Correct.

18   Q.  And were there periods of unemployment interspersed in with

19   the periods of employment?

20   A.  Yes.

21   Q.  It's fair to say that before you went to Mr. David's law

22   firm, you were not terribly economically successful; is that

23   fair to say?

24   A.  Correct.

25   Q.  At some point you got married; correct?

D1o1cib2                          Grynsztajn - cross

1    A.  Excuse me?

2    Q.  At some point you got married; correct?

3    A.  Correct.

4    Q.  When did you get married?

5    A.  1987.

6    Q.  And are you still married to Mrs. Grynsztajn, that same

7    woman?

8    A.  Yes.

9    Q.  And you and she have 12 children; right?

10   A.  14.

11   Q.  14 children.  When was the first child born, what year?

12   A.  June 11th, 1989.

13   Q.  And when was the youngest child born, the 14th child?

14   A.  She's 3 years old.

15   Q.  She was born in 2009?

16   A.  Yes.

17   Q.  Now yesterday you testified that you had -- you had 12

18   children; correct?

19          MR. PASTORE:  No.  Objection.  Mischaracterizes the

20   testimony.

21   Q.  Well, withdrawn.  Withdrawn.  I don't care.

22          14 children, 14 children is a blessing but it's also

23   very expensive; am I right?

24   A.  Yes.

25   Q.  And there came a time when you found yourself living in a

D1o1cib2                    Grynsztajn - cross

1  homeless shelter; correct?

2  A.  Correct.

3  Q.  And what year was that?

4  A.  Sometime in '98.

5  Q.  All right.  Now in 1998 you were living in the homeless

6  shelter; correct?

7  A.  Yes.

8  Q.  And that was in the Bronx?

9  A.  Yes.

10  Q.  Was Mrs. Grynsztajn living in the shelter with you as well?

11  A.  Yes.

12  Q.  And at that point in time how many children did you have?

13  A.  I think nine.

14  Q.  Okay.  Were they all living in the homeless shelter as

15  well?

16  A.  Yes.

17  Q.  And you weren't happy about that situation; correct?

18  A.  Correct.

19  Q.  It's embarrassing when a man with nine children has to rely

20  on charity like that; is that correct?

21  A.  When you're in trouble, it's not embarrassing.

22  Q.  Okay.  But you weren't happy about the situation; correct?

23  A.  Correct.

24  Q.  Now had you ever owned a home, your own home, prior to

25  1998?

1    A.  No.

2    Q.  I take it you were suffering from a period of unemployment

3    which is why you had to live in the homeless shelter; is that

4    correct?

5    A.  Not correct.

6    Q.  You were working?

7    A.  Yes.

8    Q.  You just couldn't make enough money to pay rent anywhere?

9    A.  That wasn't the question involved.

10   Q.  Okay.  What was the question involved?  How did you end up

11   in the homeless shelter?

12   A.  The landlord -- the lease expire, I know the judge allowed

13   to give me only six months.  With the amount of people, we

14   couldn't find -- we couldn't find an apartment.

15   Q.  You couldn't find an apartment you could afford, correct,

16   because you had so many people?

17   A.  No.  Nobody wants to take on that amount of people.

18   Q.  All right.  So no one would rent to you; right?

19   A.  Correct.

20   Q.  So you had to live in a homeless shelter; correct?

21   A.  Correct.

22   Q.  All right.  Then there -- withdrawn.

23       At some point in time you met a man named Earl David;

24   correct?

25   A.  Yes.

D1o1cib2                          Grynsztajn - cross

1    Q.  When did you meet Earl David?

2    A.  Long time ago.  We grew up together.

3    Q.  Well, do you remember how old you were, roughly, when you

     met him?

4

5    A.  Maybe 15, 16.

6    Q.  Okay.  Did he attend the same yeshiva that you did?

7    A.  No.

8    Q.  Were you neighbors?  You lived in the same neighborhood?

9    A.  Same neighborhood, yes.

10   Q.  Okay.  And that's how you met, on the street, you know,

11   hanging around in the neighborhood?

12   A.  I don't remember how we met.

13   Q.  Okay.  Were you close friends?

14   A.  No.

15   Q.  Did you stay in touch with him throughout the years from

16   when you were 15, 16 to 1998?  Or excuse me.  You began work

17   for him in 1999; am I right?

18   A.  Yes.

19   Q.  Did you stay in touch with him from the time you were 14,

20   15, or 15, 16 through 1998?

21   A.  We were in touch a few times.

22   Q.  All right.  Before the meeting you had in 1998 in which he

23   offered you a job, when was the last time you had seen him?

24   A.  He represented me in a landlord/tenants court.

25   Q.  And that was a perfectly legitimate case; right?  You paid

D1o1cib2                    Grynsztajn - cross

1    him a fee, there were no false documents, it was just a regular

2    case; right?

3    A.  He did it pro bono.  He did not charge me.

4    Q.  Oh, he didn't charge you a fee.

5    A.  Correct.

6    Q.  But it was not fraudulent in any way, he didn't create any

7    documents for you, did he?

8    A.  No.

9    Q.  And did you think about asking him for a job at that time?

10   A.  No.

11   Q.  Why not?

12   A.  I was working then.

13   Q.  Did you think perhaps you could make better money at a law

14   firm?

15   A.  Could be.

16   Q.  When you went to him in 1999, were you unemployed?

17   A.  Yes.

18   Q.  Were you still living in the shelter?

19   A.  Yes.

20   Q.  And you went to him because you couldn't find a job, you

21   couldn't find a place to house your family, and you asked him

22   for a job; is that correct?

23   A.  Yes.

24   Q.  Okay.  And he offered you a job; correct?

25   A.  Yes.

D1o1cib2                          Grynsztajn – cross

1   Q.  What kind of job did he offer you?

2   A.  Making copies.

3   Q.  He offered you a job in the copy room at his law firm

4   copying documents; correct?

5   A.  Yes.

6   Q.  How much did that pay?

7   A.  It was only a couple of hours.  He used to give me 20, $30

8   a day.

9   Q.  20, $30 a day?  Was that your only employment at the time?

10  A.  Yes.

11  Q.  Did you notice, as you were working at the law firm making

12  20 or $30 a day, that other people seemed to be making a lot of

13  money?

14  A.  I didn't pay attention to that.

15  Q.  You didn't -- it didn't occur to you, you didn't see that

16  other people were living well?

17  A.  I was just standing by the copy machine making copies.

18  Q.  Minding your own business, not meeting anybody, not talking

19  to anybody?

20  A.  Correct.

21  Q.  When did -- there came a time when you began preparing

22  immigration applications; correct?

23  A.  Yes.

24  Q.  When was that?

25  A.  I believe sometime in 2000.

1  Q.  And what did -- how did that come about?  Tell me about the

2  conversation in which you began -- or before which, you know --

3  which led to you beginning to work in the immigration.

4  A.  All I tell you, there was a lot of people in the office, I

5  didn't even know what was going on, Mr. David showed me forms,

6  there was the B forms, and he told me to fill it out, and

7  that's the way it started.

8  Q.  Okay.  Were you aware at that time that you were committing

9  fraud?

10  A.  Not at the beginning.

11  Q.  Okay.  When did you first become aware you were committing

12  fraud?

13  A.  Few months later.

14  Q.  So we're still talking the year 2000?

15  A.  Yes.

16  Q.  Now you didn't want to commit fraud, you were not proud of

17  the fact that you were committing fraud; right?

18  A.  Right.

19  Q.  But you had 14 -- or a lot of children and you had been

20  unemployed and now you had a chance to make some good money;

21  right?

22  A.  Yes.

23  Q.  So you did what you had to do and you committed fraud;

24  right?

25  A.  Yes.

1   Q.   Okay.  Now you know that Mr. David also had a publishing

2   company; correct?

3   A.   Yes.

4   Q.   And that publishing company was, as we just discussed,

5   Mazal & Bracha, luck and blessings; correct?

6   A.   Yes.

7   Q.   And you knew that Mr. David was into -- interested in what

8   we call Jewish mysticism; correct?

9   A.   Yes.

10  Q.   And that -- one of the aspects of Jewish mysticism is there

11  are hidden messages in the Old Testament, in the Torah, that

12  you can try to divine, that god has put hidden messages in

13  there and you can try to figure them out; right?

14  A.   Yes.

15  Q.   And in fact, he was publishing a book called The Torah

16  Codes; is that correct?

17  A.   Yes.

18  Q.   And in The Torah Codes, the premise of The Torah Codes was

19  to show where this code was so that you could decipher the

20  Torah and see where the hidden messages were, or try to; right?

21  A.   Yes.

22  Q.   And he was also writing a book called something like Code

23  of My Heart, was that -- am I right about the title?

24  A.   Code of the Heart.

25  Q.   Code of the Heart.

D1o1cib2                        Grynsztajn – cross

1    A.  Mm-hmm.

2    Q.  And that was a similar type of book about the codes in the

3    Torah; right?

4    A.  Yes.

5    Q.  Now Mr. David was a very charismatic man.  Do you know what

6    I mean by charismatic?

7    A.  No.

8              THE COURT:  Charming?

9              MR. GERZOG:  What's that?

10             THE COURT:  I was offering up charming as an example.

11   Q.  Charming, inspiring; is that true?

12   A.  Yes.

13   Q.  He was either brilliant or he seemed brilliant, he seemed

14   very smart; right?

15   A.  Yes.

16   Q.  And when did Refeal Brodjik meet Earl David for the first

17   time?

18   A.  I'm not sure.

19   Q.  You have no idea?

20   A.  No.

21   Q.  Can't even give me a year?

22   A.  No.

23   Q.  Okay.  And as it turned out, they hit it off, they had a

24   real rapport between them; correct?

25   A.  Yes.

D1o1cib2                          Grynsztajn – cross

1    Q.  You might even describe it as sort of uncle/nephew or

2    something like that, an older man taking a younger man under

3    his wing, that kind of thing; correct?

4    A.  Yes.

5    Q.  And the basis for that was this Jewish mysticism; correct?

6    A.  Yes.

7    Q.  Mr. Brodjik was also interested in Jewish mysticism,

8    correct?

9    A.  I'm not sure what he was interested.

10   Q.  You don't know whether Mr. Brodjik was interested in Jewish

11   mysticism or not, never learned that?

12   A.  No, I'm not sure.

13   Q.  Okay.  But Mr. David hired Mr. Brodjik to work for the

14   publishing company; correct?

15   A.  Yes.

16   Q.  And he did that; correct?

17   A.  Yes.

18   Q.  Now that's what he did at the offices, at the Earl David

19   offices, he worked for the publishing company; correct?

20   A.  No, he did more than that.

21   Q.  Well, at the beginning, anyway, according to you, at least,

22   that's what he said -- that's what he did; right?

23   A.  Yes.

24   Q.  And then you say later he branched out into other

25   activities; correct?

D1o1cib2                        Grynsztajn - cross

1    A.  Correct.

2    Q.  And one of the activities you claim he branched out into

3    was preparing R-1 applications; correct?

4    A.  Yes.

5    Q.  Can you show this jury one single R-1 application that he

6    prepared?

7    A.  No.

8    Q.  Now you also said that at some time Mr. David left for

9    Canada; correct?

10   A.  Yes.

11   Q.  Well, withdrawn.  At one time Mr. David first left for

12   another address in Manhattan.  I've forgotten what the address

13   is.  Can you remind us.

14   A.  90 Washington Street.

15   Q.  90 Washington Street.  How long was he at 90 Washington?

16   A.  A few months.

17   Q.  Few months.  And he then -- after he was at 90 Washington,

18   he moved to Canada; correct?

19   A.  Yes.

20   Q.  And at that point you say that Mr. Brodjik began collecting

21   money that was owed to Mr. Earl and transmitting it to

22   Mr. Earl; is that correct?

23   A.  Yes.

24   Q.  Can you show this jury one receipt for a penny or a dollar

25   or $10 that you gave Mr. Brodjik?

1   A.  We didn't give no receipts.

2   Q.  Now the atmosphere in that office was like a shark pool;

3   right?  It was cutthroat; is that fair to say?

4   A.  Yeah.

5   Q.  All right.  And you gave over hundreds or perhaps thousands

6   of dollars to Mr. Brodjik and never asked for a receipt?

7   A.  Correct.

8   Q.  And the receipt wouldn't have had to say:  Received for

9   fraudulent immigration applications, X thousand dollars, signed

10  Rafi Brodjik.  It could have just said:  5,000 RB; right?

11  A.  Yes.

12  Q.  And with a date on it; right?

13  A.  Yes.

14  Q.  It could have been in code of some kind so it wasn't even

15  as obvious as that; correct?

16  A.  Correct.

17  Q.  But no receipts.

18  A.  No.

19  Q.  So all we have to go on -- well, withdrawn.

20          No receipts.

21          Now when Mr. David moved from Washington Avenue to

22  Canada, there was a problem.  There was furniture and there was

23  all of Mazal & Bracha in 90 Washington Street; right?

24  A.  He had stuff over there.

25  Q.  And that stuff was office furniture and the Mazal & Bracha

D1o1cib2                         Grynsztajn - cross

1    books.  He had hundreds and hundreds of books; correct?

2    A.  And immigration files too.

3    Q.  But hundreds and hundreds of books also; correct?

4    A.  I don't know how many he had.

5    Q.  Well, you were there; right?

6    A.  Yeah.

7    Q.  You never saw the books?

8    A.  I saw some books.

9    Q.  But you didn't see hundreds and hundreds?

10   A.  No.  I don't recall.

11   Q.  And you -- do you recall that when he moved to Canada,

12   Mr. Brodjik took it upon himself, at his own expense, to move

13   the contents of 90 Washington Avenue to a storage facility?

14   A.  I don't know about that.

15   Q.  You have no idea?  You never heard of such a thing?

16   A.  I don't recall.

17   Q.  Okay.  Now in January of 2006 you were approached at your

18   house in Staten Island; correct?

19   A.  Yeah, they came to my house, yes.

20   Q.  And your house was in Staten Island; correct?

21   A.  Yes.

22   Q.  Don't tell us the address.  Just in Staten Island; correct?

23   A.  Yes.

24   Q.  You purchased that house; that house belonged to you.

25   A.  Yes.

D1o1cib2                          Grynsztajn - cross

1    Q.  When did you purchase it?

2    A.  2001.

3    Q.  And how much did it cost you?

4    A.  The house was 260,000.

5    Q.  260?

6    A.  Yes.

7    Q.  Did you have a mortgage on it?

8    A.  Yes.

9    Q.  How much was the mortgage?

10   A.  I think about 225,000.

11   Q.  Okay.  Now you said during the period of time that you

12   worked at Earl David you didn't file taxes; correct?

13   A.  Yes.

14   Q.  So you didn't have tax returns to show a mortgage company,

15   you didn't have income, you didn't have proof of income to show

16   a mortgage company; correct?

17   A.  Correct.

18   Q.  So you lied to the mortgage company and you told them that

19   you had income and you showed them documents that were false;

20   correct?

21   A.  That's wrong.

22   Q.  That's wrong?

23   A.  Yes.

24   Q.  How did you get a 225,000 mortgage with no income?

25   A.  With no income verification, it came out to 10.75 interest.

D1o1cib2                          Grynsztajn - cross

1  Q.  So you got a mortgage that required no income --

2          MR. PASTORE:  Objection.  That mischaracterizes the

3  testimony, in terms of the no income.

4  Q.  Well, did the -- did the mortgage require no income or it

5  required no income verification?

6  A.  No income verification.

7  Q.  Okay.  So that means you had to put a number on the

8  application of your income but you didn't have to prove where

9  it was from; right?

10 A.  I'm not sure.

11 Q.  You don't remember?

12 A.  I'm not -- I don't remember.

13 Q.  Did you put a number on the application?

14 A.  I don't remember.

15 Q.  You don't remember.  Was it an accurate number?

16 A.  I don't remember.

17 Q.  Did it include the money you were getting by fraud?

18 A.  No.  When I bought the house, the money did not come from

19 the office money.

20 Q.  Well, you said that -- there wasn't much money.  You only

21 put down -- 259, 225 -- forgive my math.  You only put down

22 $35,000; right?

23 A.  I think it was more.

24 Q.  Well, you said the house cost 260 and you put down 225 --

25 you obtained a 225 mortgage.  Are those numbers incorrect?

D1o1cib2                          Grynsztajn - cross

1    A.   Incorrect.  With the closing and everything, it came out to

2    more.

3    Q.   What came out to more?

4    A.   The total amount that was put down.

5    Q.   Okay.  So you paid a little bit more than 35,000 down.

6    A.   I'm not sure exactly how much.

7    Q.   All right.  And you're saying that money somehow didn't

8    come from fraud; correct?

9    A.   No, did not come from that.

10   Q.   Okay.  But the money you used to pay the monthly payment

11   came from fraud; right?

12   A.   Yes.

13   Q.   And that house is in foreclosure now; correct?

14   A.   Correct.

15   Q.   And the reason it's in foreclosure is because you're no

16   longer in the fraudulent immigration business; correct?

17   A.   Correct.

18   Q.   How long has it been in foreclosure?

19   A.   2006.

20           THE COURT:  And you're still living in the house?

21           THE WITNESS:  Yes.

22           THE COURT:  Okay.

23   Q.   Now has the government given you any help with that?

24   A.   No, sir.

25   Q.   Has the government given you any money at all?

D1o1cib2                    Grynsztajn - cross

1   A.  No, sir.

2   Q.  Now you became desperate for money in 2006, is that right,

3   because your house was being foreclosed on; am I right?

4   A.  Yes.

5   Q.  And you started sending e-mails to Earl David; correct?

6   A.  I sent e-mails to Earl David, yes.

7   Q.  And the e-mails were stating essentially that Earl David

8   had better give you money or you were going to be -- or you

9   were going to tell the authorities that he was committing

10  immigration fraud; right?

11  A.  No, sir.

12  Q.  That's not what happened?

13  A.  I don't recall that.

14  Q.  You don't recall telling Earl David that he should give you

15  money or you would tell the authorities?

16  A.  No.  I told him to speak with Sam, to pay me for -- and

17  Gulay, to pay me for my clients, for the referrals.

18  Q.  Well, I understand -- I understand that you believed you

19  were owed the money.  I'm not saying you were stealing from

20  them, although the money you believed you were owed was

21  fraudulently obtained; correct?

22  A.  Yes.

23  Q.  But somehow in your mind you were entitled to that money;

24  right?

25  A.  Yes.

1   Q.  Now you didn't threaten Earl David about whether he

2   should -- what would happen if he didn't give you that money?

3   A.  No, sir.

4   Q.  All right.  I'm going to show you what's been marked as --

5   well, it's going to be marked as Defendant Brodjik Exhibit 2.

6   And I'm going to ask you to look at the bottom back-and-forth.

7           What is that?

8           I'm directing your attention specifically to the

9   bottom of the page.

10  A.  Yes.

11  Q.  That's an e-mail from you, "david grin," to Earl S. David;

12  correct?

13  A.  Yes.

14  Q.  And it says 16 hours left; correct?

15  A.  Yes.

16  Q.  And you sent that e-mail; correct?

17  A.  I'm not sure.

18  Q.  You don't recall sending that e-mail?

19  A.  No.

20  Q.  It came from your e-mail address; right?

21  A.  I don't recall sending it.

22  Q.  But it did come from your e-mail address.

23  A.  It shows here from my e-mail, yes.

24  Q.  And it went to Mr. David's e-mail address; correct?

25  A.  That's what it shows here.

1    Q.  And wasn't it true that at that time you told Mr. David

2    that he had 16 hours to get you money or there were going to be

3    consequences?

4    A.  No, sir.

5    Q.  That's not what that means?

6    A.  No, sir.

7    Q.  What does it mean, 16 hours till the Easter bunny comes?

8    A.  I don't recall seeing that e-mail or sending that e-mail.

9    Q.  What date is on that e-mail?  Excuse me.

10   A.  Tuesday, April 4, 2006.

11   Q.  Showing you what's been marked or what I will have marked

12   as Refeal Brodjik -- Defendant Brodjik Exhibit number 3, ask

13   you to take a look at that.  Do you recognize that?

14   A.  No, sir.

15   Q.  You don't recognize that.

16   A.  No.

17   Q.  At the bottom it says it comes from your e-mail address,

18   David Grynsztajn?

19   A.  That's what it shows.

20   Q.  And it goes to Earl David?

21   A.  Correct.

22   Q.  And you didn't send that?

23   A.  I don't recall sending anything like that.

24   Q.  Okay.  And what you said to him was, "Not much time left."

25   Right?  Or what that e-mail says is, "Not much time left."

D1o1cib2                              Grynsztajn - cross

1    Right?

2    A.  That's what it says here, yes.

3    Q.  Right.  And you don't recall expressing to Mr. David that

4    there was not much time left?

5    A.  No, sir.

6    Q.  Okay.  And so that doesn't mean -- or withdrawn.

7            When was that e-mail sent?

8    A.  April 5th.

9    Q.  Several hours after the "16 hours left" e-mail was sent?

10   A.  It shows here the next day.

11   Q.  Okay.  It's -- April 4th was 2:00, and what time is that?

12   A.  11:00.

13   Q.  Okay.  And that doesn't mean -- that's not a threat?  That

14   doesn't mean there's not much time left for you to pay me or

15   face the consequences; correct?

16   A.  I believe that's fabricated.

17   Q.  You think this is fabricated?

18   A.  Yes.

19           MR. GERZOG:  I'd ask the government to display, if

20   they would, 601-5, which was introduced by the government.

21   Or -- and received.

22   Q.  Now this is a message from you to Mr. David with a cc to

23   Mr. Salamon; is that correct?

24   A.  Yes.

25   Q.  That you remember sending; correct?

D1o1cib2                          Grynsztajn - cross

1   A.  Yes.

2   Q.  And that was sent on May 5th, 2006; correct?

3   A.  Correct.

4   Q.  And in it you say you are still -- you are not looking to

5   take anybody down; correct?

6   A.  Yes.

7   Q.  What does that mean?

8   A.  When I asked them to -- for the money and they knew I was

9   visited by the agent, they thought I was threatening them.

10  Q.  They thought you were threatening them or you were in fact

11  threatening them?

12  A.  No, they thought I was threatening them.  They took it as a

13  threat.

14  Q.  You didn't mean it as a threat, though.

15  A.  No, I didn't mean it as a threat.

16  Q.  No.  You weren't going to take anybody down; right?

17  A.  Correct.

18  Q.  In fact, by May of 2006, you had said many, many

19  incriminating things about Earl David and Sam Salamon to the

20  agents, had you not?

21  A.  Yes.

22  Q.  So you were looking to take them down, were you not?

23  A.  Yes.

24  Q.  And you again threatened that you don't want to take down

25  families.  You're referring to their personal families, their

D1o1cib2                          Grynsztajn - cross

1    wives and children?

2    A.  He sent me an e-mail that, "Don't take families down."

3    Q.  I ask you if -- when you said, "I am not -- I don't want to

4    take down families," you didn't mean Mafia families, you meant

5    their personal families, their wives and their children;

6    correct?

7    A.  Yes.

8    Q.  And what you meant by that was, you don't want to put the

9    head of the family in jail, thereby making the rest of their

10   family suffer; correct?

11   A.  Yes.

12   Q.  But that wasn't true.  That's exactly what you were looking

13   to do; correct?

14   A.  When I met with the government, that was part of my

15   agreement with the government, to tell the truth.

16   Q.  You were exactly looking to take down the -- Earl David,

17   Sam Salamon, and their families; correct?

18   A.  I wasn't looking to take down nobody.  I was -- I had to

19   tell the government what I knew.

20   Q.  And you knew the result of that would be that they would --

21   that if a jury believed the story you told, that they would

22   go -- that they would be "taken down"; correct?

23   A.  Correct.

24   Q.  Okay.  Now you say your family is down to zero; right?

25   A.  Yes.

D1o1cib2                        Grynsztajn - cross

1    Q.  And you say, "You have to understand that I have my own 12
2    children to take care of"; right?
3    A.  Right.
4    Q.  And you say to them, "If you're so religious, I'm not even
5    supposed to ask you for money, you're supposed to offer it";
6    correct?
7    A.  Yes.
8    Q.  All right.  Now that meant that you were seeking money from
9    Earl David and Sam Salamon; correct?
10   A.  Yes.
11   Q.  And you thought in some twisted way that you were entitled
12   to that money even though you know it was obtained from fraud;
13   right?
14   A.  Yes.
15   Q.  Now were you telling the government in May of 2006 that you
16   were sending this kind of exchange to David and Salamon?
17   A.  I'm not sure what I told them, the government.  I was
18   talking to them.
19   Q.  So you're telling me now under oath that you don't recall
20   if you told the agents and the prosecutors that you were
21   sending this e-mail to Mr. David and Mr. Salamon?
22   A.  I don't recall.
23            (Continued on next page)
24
25

D1OLCIB3                        Grynsztajn - cross

1    BY MR. GERZOG:

2    Q.  You certainly didn't tell them on or about May 5, the time

3    you were sending it, correct?

4    A.  I recall just telling them I will meet Sam Salamon.

5    Q.  But you certainly didn't recall telling them that you sent

6    this email, did you?

7    A.  No, sir.

8    Q.  You didn't.  Just so we're clear, you did not in fact tell

9    them that you sent this email on or about May 5, meaning, you

10   did not tell them on or about May 5 that you sent this May 5

11   email, correct?

12   A.  Correct.

13   Q.  And that was because of two things, correct?

14   A.  I don't know what two things.

15   Q.  Well, the first thing is it's extortion, it's blackmail,

16   it's a crime, right?

17   A.  I wasn't blackmailing nobody.

18   Q.  You weren't blackmailing anyone?

19   A.  No.

20   Q.  Is it your understanding of blackmail that threatening

21   someone to get them to give you money is blackmail?

22   A.  I ask them what belongs to me from my approvals and my

23   referrals.

24   Q.  So in your twisted world -- in your world, if someone owes

25   you money that you think you're entitled to, you're entitled to

D1OLCIB3                    Grynsztajn – cross

1  threaten them to get it back, right, that's what you believe?

2  A.  No, sir.

3  Q.  But that's what you did, right?

4  A.  No, sir.

5  Q.  Well, your understanding is that when you threaten someone

6  to give you money, whether you are actually owed it either

7  legitimately or not, either through fraud or it's just a loan,

8  you loaned somebody 500 bucks and he won't give it back to you,

9  you know that you're not allowed to threaten him to get it

10  back, right?

11          MR. PASTORE:  Objection, compound, asked and answered,

12  confusing.

13          MR. GERZOG:  Let me try to break it down, Judge.

14  Q.  If someone owes you a debt and let's say for the time being

15  that debt is legitimate, you're not alloyed to threaten them to

16  get the debt back, correct?

17  A.  Yes.

18  Q.  And that's because it's blackmail or extortion, correct?

19  A.  Yes.

20  Q.  And if someone owes you money that you're not entitled to

21  because it was fraudulently obtained, you're certainly not

22  allowed to threaten them to get it back, right?

23  A.  Right.

24  Q.  And that's because it's blackmail or extortion, right?

25  A.  Yeah.

1  Q.  And, in fact, Earl David wrote back to you and says, Sam

2  says once your threats and blackmail stop, we'll consider

3  giving you money, correct?

4  A.  Yes.

5  Q.  And so you knew that Earl David considered this a blackmail

6  attempt, correct?

7  A.  To him, yeah.

8  Q.  You didn't write back and say, wait a minute, I'm not

9  blackmailing you, step back, I didn't say anything about

10 blackmail, you didn't say that, did you?

11 A.  No, sir.

12 Q.  And there came a time when you did meet with Mr. Salamon,

13 correct?

14 A.  Yes.

15 Q.  And Mr. Salamon gave you money, correct?

16 A.  Yes.

17 Q.  At 2 o'clock in the morning on the street, correct?

18 A.  I don't think it was 2 o'clock in the morning.

19 Q.  What time was it?

20 A.  I think it was more like ten, 11 p.m., I'm not sure.

21 Q.  Did you make any other threats to -- withdrawn.

22          How much did Mr. Salamon give you?

23 A.  I think around 1,500.

24 Q.  And did you tell the government about that?

25 A.  Yes.

D1OLCIB3                        Grynsztajn - cross

1    Q.  You told the government that Sam Salamon had given you

2    $1,500?

3    A.  Yes.

4    Q.  You told them immediately?

5    A.  I don't know what period of time, but I did tell them.

6    Q.  You told them within several days of receiving the money?

7    A.  Days or weeks, I'm not sure.

8    Q.  Days or weeks?

9    A.  Yeah.

10   Q.  And you told them that was money from the fraudulent

11   enterprise?

12   A.  I got it from Sam Salamon.

13   Q.  Right, which, and you told them that -- that it was money

14   from the fraudulent enterprise that Salamon, it was money you

15   believed Salamon owed you from the fraudulent enterprise,

16   correct?

17   A.  Yes.

18   Q.  And did they take it from you?

19   A.  No, sir.

20   Q.  Okay.  Now, you say you -- part of your plea agreement is

21   that you're going to pay back your back taxes; is that correct?

22   A.  Yes.

23   Q.  You owe a lot of back taxes, right?

24   A.  Yes.

25   Q.  And with penalties and interest and all that stuff, it's

1   probably a pretty significant number, in the hundreds of

2   thousands, at least, right?

3   A.  I don't think so.

4   Q.  You don't think it's in the hundreds of thousands at this

5   point?

6   A.  I don't know yet.

7   Q.  You didn't pay taxes from 1999 to 2006; is that correct?

8   A.  I did pay in between couple of years, I believe so.

9   Q.  Which couple?

10  A.  I'm not sure what year.

11  Q.  You don't even remember which years you paid?

12  A.  Correct.

13  Q.  Have -- when did you agree to pay back those taxes, back in

14  2007, correct?

15  A.  Yes.

16  Q.  That was six years ago, correct?

17  A.  Yes.

18  Q.  Have you paid any of it back?

19  A.  Not yet.

20  Q.  Now, do you remember making other threats to Earl David?

21          MR. PASTORE:  Objection.  The witness has testified

22  that he's not made any threats, your Honor.

23          MR. GERZOG:  I believe he said he sent 6015, and I

24  believe eventually he said it was blackmail.

25          THE COURT:  Sort of argument, but go ahead.

1  Q.  Do you remember making threats in April, on April, Sunday,

2  April 16, 2006, at 3:30 in the afternoon to Mr. David?

3  A.  No, sir.

4  Q.  Okay.  Do you remember saying to him, if there is no

5  settlement by tomorrow morning, this will be for a lot of

6  people the last Passover holiday in the free world.

7         Now, you didn't mean they were going to be shipped off

8  to North Korea, did you?

9  A.  I don't recall ever saying words like that.

10 Q.  You never said that?

11 A.  I don't recall that.

12 Q.  In fact, you were threatening them with prison, correct,

13 that's what you meant by the free world, correct?

14 A.  No, sir.  I don't know what you're talking about.

15 Q.  Okay.  You say, did you not say, is it true that you said

16 Lipa is giving out my home number -- and who is Lipa?

17 A.  Teitelbaum.

18 Q.  Leo Teitelbaum?

19 A.  Yes.

20 Q.  Lipa is giving out my home number to clients to get their

21 money back.  Remember this.  The people that were sponsored by

22 your fake companies, tomorrow morning my machine will advise

23 clients that companies don't exist and they should go to the

24 office immediately and take their money back.  Also, Jed will

25 find out all about the cases filed by Maritza under his name

1    Pennsylvania connection.

2            Did you say that?

3    A.  Possibly, yes.

4    Q.  You might have said that, but you didn't say the other?

5    A.  Possibly.

6    Q.  Okay.  Did you say, we'll blow up in the sky.  If I am

7    going down, I am taking everybody with me.  Did you say that?

8    A.  Possibly.

9    Q.  Yes or no?

10   A.  I might have said it.

11   Q.  Did you say it or did you not say it?

12   A.  I don't recall.

13           MR. GERZOG:  I'm going to show what I'm asking marked

14   Brodjik Defense Exhibit 4.

15   Q.  Would you take a look at that, addressing your attention in

16   particular to the bottom part of the page.

17           Did you send that email to Mr. David?

18   A.  I don't recall.

19   Q.  You might have but you might not have, you just don't

20   recall one way or the other?

21   A.  Correct.

22   Q.  You would agree with me in characterizing that as a

23   threatening email, correct?

24   A.  Yes.

25           MR. GERZOG:  I'd ask it be received, your Honor.

1           MR. PASTORE:  No objection.

2           THE COURT:  Received.

3           (Defendant's Exhibit Brodjik 4 received in evidence)

4    Q.  Now, you never sent Refeal Brodjik threatening email, did

5    you?

6    A.  I don't recall.

7    Q.  You never demanded money from him, did you?

8    A.  I never -- I don't recall sending anything to Rafi.

9    Q.  I beg your pardon?

10   A.  I don't recall sending anything to him.

11   Q.  So you didn't send anything to Mr. Brodjik, you didn't send

12   any emails to Mr. Brodjik?

13   A.  No, sir.

14   Q.  You didn't ask him for any money, right?

15   A.  Right.

16   Q.  You didn't threaten him with prison, right?

17   A.  Right.

18   Q.  And all this time you were threatening Sam Salamon and Earl

19   David with prison and acting like you were going to not talk to

20   the government about them, you were in fact talking to the

21   government about them, correct?

22   A.  Yes.

23   Q.  And you didn't tell them that, right -- withdrawn.

24           You didn't -- you did tell Mr. David that the

25   government had contacted you, correct?

1   A.  Yes.

2   Q.  But you also told him that you didn't say anything

3   incriminating about him, correct?

4   A.  Correct.

5   Q.  And so he didn't know that in fact you were telling

6   incriminating things about him to the government, correct?

7   A.  Yes.

8   Q.  So you lied to Mr. David, right?

9   A.  Yes.

10  Q.  The man who rescued you from the homeless shelter, right?

11  A.  Yes.

12  Q.  And there came a time when you signed a cooperation

13  agreement -- withdrawn.

14      You knew that Earl David had been involved in a

15  previous case, previous criminal case, did you not?

16  A.  Yes.

17  Q.  And you knew that in fact when his license was suspended in

18  2004, it wasn't suspended because of the immigration activity,

19  but it was suspended because of the previous criminal activity,

20  correct?

21  A.  Yes.

22  Q.  And you knew that Mr. David had acted as a cooperating

23  witness in that case, correct?

24  A.  Yes.

25  Q.  And you knew that Mr. David had promised the same things

D1OLCIB3                      Grynsztajn - cross

1    you promised, to tell the truth and not to commit more crimes,

2    correct?

3            MR. PASTORE:  Objection, relevance, speculation as to

4    what Mr. David and his cooperation in another case.

5            MR. GERZOG:  If he knows.

6            THE COURT:  Sustained.

7    Q.  Mr. David was quite gleeful about the fact that he was

8    putting one over on the government, correct?

9    A.  Yes.

10           MR. PASTORE:  Judge, again, objection, relevance to

11   this whole line of questioning about Mr. David and cooperate --

12           MR. GERZOG:  If I can come to the side bar and

13   explain, I will, Judge.

14           THE COURT:  Come on up.

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1           (At the side bar)

2           MR. GERZOG:  My point, Judge, is that he was -- Earl

3   David bragged to him about how he was putting one over on the

4   government, that he had signed a cooperation agreement and that

5   he was running this fraudulent immigration firm anyway and that

6   the government hadn't caught him and that it was easy to break

7   one's cooperation agreement and that that is one of the reasons

8   why he took a chance breaking his own cooperation agreement

9   because he was of the opinion that it was easy to do and that,

10  you know.

11          THE COURT:  So what?  The bottom line is he did what

12  he did.  Whether he did so because he thought he'd get away

13  with it, which you'd presume regardless of what David had told

14  him, of course he thought he was going to get away with it.

15  Here were these people engaged in this incredible massive fraud

16  on immigration authorities and they were getting away with it.

17          MR. GERZOG:  Right.

18          THE COURT:  For years.

19          MR. GERZOG:  And on top of, on top of signing, on top

20  of --

21          THE COURT:  Really upsetting actually.

22          MR. GERZOG:  -- on top of signing an agreement, which

23  we all know, even though Mr. Pastore objects, says you can't

24  commit any crimes and you can't lie.  We may not have that

25  agreement in hand, it was not produced to me in discovery.

1      MR. PASTORE:  Yes, it was.  Yes, it was.

2      MR. GERZOG:  Maybe it was.

3      THE COURT:  The whole point is you can ask him that.

4      MR. PASTORE:  Correct.

5      THE COURT:  You can ask him didn't you pledge in this

6  cooperation agreement.

7      MR. GERZOG:  I want to know about what he -- I want to

8  know about David bragging to him.

9      THE COURT:  So what?

10      MR. GUTMAN:  Your Honor, if I could, because evidence

11  of his understanding about David getting away with this shows

12  the jury how brazen he's willing to be in lying and --

13      THE COURT:  But his brazenness has already been

14  demonstrated by what he actually did.

15      MR. GUTMAN:  But the full of extent of it is an issue

16  for the jury.

17      THE COURT:  The full extent is what he did, not what

18  Mr. David did.

19      MS. ECHENBERG:  Can we ask one logistical thing while

20  we're here.  We had Mr. Salamon in the witness room.  We

21  brought him back.  We don't want the two of them in the same

22  room.  Is there either another witness room on this floor?

23      THE COURT:  I have no idea.

24      MS. ECHENBERG:  Then we may need a short break when

25  he's done --

 1              MR. GERZOG:  I have 15 minutes.

 2              MS. ECHENBERG:  -- and get Mr. Salamon up.  If we take

 3    our break before Mr. Grynsztajn is done, we need another short

 4    break.

 5              THE COURT:  There's going to be redirect, so there's

 6    no point in, you know, timing it right now.  We'll just take

 7    our regular break now and excuse the jury and just come back.

 8              (In open court)

 9              THE COURT:  Ladies and gentlemen, why don't you take

10    your break now and let's, because remember today is a shortened

11    day, let's try to limit our break to 25 minutes.

12              (At the side bar)

13              MR. PASTORE:  Judge, for the record, one thing that

14    we -- we believe the cooperation agreement that was entered

15    into with Earl David was not in the Southern District.

16              MR. GERZOG:  So what?

17              MR. PASTORE:  We further believe it's totally

18    irrelevant.

19              MR. GERZOG:  The fact that it wasn't entered into in

20    the Southern District of New York has nothing to do with the

21    fact that Earl David bragged about the fact that it was easy to

22    defraud the government, that he was defrauding the government.

23              THE COURT:  That was pretty obvious from the life

24    experience of all these people, I think.

25              (Recess)

D1OLCIB3

1           (In open court)

2           (Jury not present)

3           MR. PASTORE:  Your Honor, if we could have a brief

4    moment just to put something on the record before the jury

5    comes out.

6           THE COURT:  Okay.

7           MR. PASTORE:  During Mr. Greenfield's cross, I think

8    you probably saw that I approached him and told him something.

9    What I told him, just for the record, is one of the days that

10   Mr. Grynsztajn was here but did not testify, we took him down

11   in the freight elevator in an effort to avoid running into any

12   of the defendants.  When we opened the door from the freight

13   elevator, we, we meaning myself, Agent Deidre Gordon and

14   Mr. Grynsztajn, almost walked literally into Mr. Tischler.

15           And at that point, Mr. Grynsztajn, as we walked away,

16   although no one said anything, Mr. Grynsztajn came up to us and

17   said "I think that was Mr. Harry."  I told Mr. Greenfield.

18           THE COURT:  Say that again.  Who said that?

19           MR. PASTORE:  Mr. Grynsztajn came up to us after we

20   almost literally walked into Mr. Tischler and he said, "I think

21   that was Mr. Harry."  I told Mr. Greenfield that on

22   cross-examination because I realized it didn't -- I don't think

23   it was contained in any of our 3500 notes because it wasn't

24   during a meeting.  I told him that.  I gave him the opportunity

25   if he wanted to to cross-examine.  He said he did not, and the

D1OLCIB3

1    government does not intend to bring that up on redirect.

2            But it was just an issue because the witness said the

3    last time he had seen the defendant was in 2006.  And I believe

4    he -- that testimony is not untruthful.  I believe he meant the

5    last time he met him or saw him for an extended period, not

6    almost literally bumping into him in the hallway in the

7    courtroom.

8            MR. GREENFIELD:  I'm satisfied with the state of the

9    record I have.  No intention of bringing it up.  I heard it

10   from my client after I heard it from Mr. Pastore in a slightly

11   different version, but it's not, it's not relevant as long as

12   it's just between us here.  That's satisfactory to me.

13           MR. DONALDSON:  I would just like Mr. Pastore to keep

14   calling him the defendant.  I don't have a problem with that.

15   If we can keep calling him the defendant, that would be great.

16   No?

17           MR. PASTORE:  It's not inaccurate.

18           THE COURT:  Okay.

19           MR. BRILL:  Judge, one more thing, really hasn't

20   affected me specifically, but there's been from the government

21   a regular objection of mischaracterization of the testimony on

22   cross-examination.  All of the witnesses that the government

23   are calling, as much as we would like to believe otherwise, are

24   intelligent adults and know what they have said or what they

25   haven't said and certainly can answer for themselves.  I don't

D1OLCIB3

1    think they need Mr. Pastore protecting them from

2    mischaracterizing their testimony.  If the lawyer is saying

3    something wrong, the witness can clearly say, no, that's not

4    what I said.

5         THE COURT:  I mean I think the bottom line issue with

6    that type of objection is Mr. Pastore may have a perfect

7    memory.  I do not.  There are no page and line references.  I

8    think most of the time the questions are close enough to what

9    the witness said.  It may not be, you know, exact quotes.  I

10   kind of think just as a strategic matter --

11        MR. BRILL:  I think so.

12        THE COURT:  -- I think it's better for the government

13   to keep its mouth shut.  Let the witness get beaten up if the

14   witness gets beaten up.  I don't think that kind of protection

15   is positive.  But I think it's not necessary more than it's not

16   that far from actually what the testimony was.

17        There hasn't been a habit of on some of the use of

18   3500 material, it would seem the better procedure would be for

19   the government to ask defense counsel what document are you

20   referring to before challenging it because it's not always the

21   case.  You know, there's so much that it's easy to be wrong.

22   And I would assume that defense counsel have a massive interest

23   in not being wrong.

24        So, listen, we're ending at one, so unless this is

25   very important, let's get the jury.

D1OLCIB3

1          MR. GERZOG:  Your Honor, may I ask of probably your

2     clerk whether you have any Defendant Exhibit stickers.  Abide

3     by the Court's ruling.  I did not premark.

4          THE COURT:  My rule?  I'm not aware of my rule.

5          MR. GERZOG:  I thought you had a local rule saying

6     exhibits are supposed to be premarked.

7          THE COURT:  We ask them to.  I thought he said he was

8     following the rule that he not premark.

9          MR. GERZOG:  I was saying I violated your rule and I

10     apologize.

11          THE COURT:  That's good.  Mr. Donaldson?  We have a

12     minute.

13          MR. DONALDSON:  I was standing for the jury.

14          THE COURT:  Okay.  Just getting ready.

15          MR. DONALDSON:  Getting my stand up in now.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

D1OLCIB3

```
 1                (Jury present)

 2                THE COURT:  All right.  I just got a note from --

 3     we'll say from the jury since it's not signed.  Let me just

 4     read it into the record.

 5                "1.  Can testimony given in this case be used as

 6     evidence in another trial?  In other words, are we to assume

 7     that all of the questioning has some relevance to this case and

 8     these four defendants or might some of the questioning be

 9     intended to draw out information about people who are not

10     currently on trial?"

11                That's question one.  The second question is:

12                "Does the law distinguish between intentionally

13     committing a crime (conspiring to commit a crime) and allowing

14     a crime to be committed in your name?"

15                Okay.  I'd like to answer question one.

16                MR. GERZOG:  May we be heard about that at the side

17     bar?

18                THE COURT:  Okay.  And as far as question two, I think

19     we should just wait until the charge.

20                MR. GERZOG:  Your Honor just said what I was going to

21     ask for.  That would be my preference as well.

22                THE COURT:  I think I can do this without stepping on

23     anybody's interests or toes.

24                I think the jury should proceed on the understanding

25     that the testimony that you're hearing is for this case.  The
```

D1OLCIB3

1    reason that you hear about people who are not on trial, not in

2    this courtroom, is because if you find when you deliberate --

3    well, go back.

4            Remember I told you this case charges a conspiracy,

5    okay.  A conspiracy is an agreement to commit an illegal act.

6    If you find that there is a conspiracy, that there was a

7    conspiracy, you are then going to have to ask yourselves

8    whether these, any of these defendants -- you have to consider

9    them separately -- whether any of them joined that conspiracy.

10   But all the people involved in the conspiracy do not have to be

11   on trial in one case.  And the acts of other people who you

12   conclude were part of the conspiracy, if you find that there

13   was a conspiracy, is part of the evidence that you can use

14   against a coconspirator.

15           Does that explain it enough for why you hear about

16   others?

17           Okay.  And the second question I will -- that is a

18   subject that when I give you your charge, I will give you

19   charges on what it means to intentionally -- and those are

20   defined words -- what intentionally means, and whether someone

21   can be guilty if all they do is just see somebody else commit a

22   crime.  So a simple example might be you're not guilty because

23   you observe somebody committing a bank robbery.  Obviously,

24   something more is involved.  I'm going to give you instructions

25   on that.  Okay.

D1OLCIB3

1           MR. GERZOG:  Thank you, your Honor.  May I begin?

2           THE COURT:  Yes, please.

3   BY MR. GERZOG:

4   Q.  When you took out the mortgage for your house in Staten

5   Island, did you tell the mortgage company that you were going

6   to be paying the mortgage with fraud money?

7   A.  No, sir.

8   Q.  Okay.  Did you tell the mortgage company that your entire

9   job at the David law firm at that time in 2006 -- strike

10  that -- 2001 was premised on fraud?

11  A.  No, sir.

12  Q.  Do you believe in your mind that you committed mortgage

13  fraud in obtaining that loan?

14  A.  No, sir.

15  Q.  Now, yesterday you said and today you reiterated that

16  Mr. Brodjik was hired for the book project, correct?

17  A.  Yes.

18  Q.  And yesterday it might have sounded like he was hired to be

19  the editor, to clean up Mr. David's language, but in fact

20  Mr. Brodjik's written English is not very good, correct?

21  A.  Correct.

22  Q.  So it wasn't, he wasn't hired to be the editor, he wasn't

23  hired to clean up Mr. David's language.  He was hired to be a

24  sort of general gofer, helper, that type of thing with the

25  book.  Right?

D1OLCIB3                    Grynsztajn - cross

1   A.  Yes.

2   Q.  Now, Mr. Sam Salamon, you know who he is, right?

3   A.  Yes.

4   Q.  His picture is up there, we've talked about him?

5   A.  Yes.

6   Q.  He had his office on the 16th floor of this operation,

7   correct?

8   A.  Yes.

9   Q.  And Rafi Brodjik insisted on sitting on the 21st floor

10  because he couldn't stand Mr. Salamon; is that true?

11  A.  That's one thing that Mr. David wanted him to do on the

12  21st floor.

13  Q.  In fact, Mr. Brodjik told you that he wanted to sit on the

14  21st floor because he couldn't stand Mr. Salamon, couldn't get

15  along with Mr. Salamon, right?

16  A.  No.  He didn't want Sam to find out that he's doing these

17  cases.

18  Q.  So according to your testimony now, it had nothing to do

19  with how Mr. Brodjik felt about Mr. Salamon personally?

20  A.  Correct.

21  Q.  So your testimony is that Mr. Brodjik liked Mr. Salamon?

22  A.  No.  I didn't say.

23  Q.  He didn't like him, he didn't like him, right?

24  A.  I don't know.

25  Q.  You have no idea?

1    A.  No.

2    Q.  You worked with Mr. Salamon, with Mr. Brodjik for several

3    years, and you have no idea whether they liked each other?

4    A.  I don't know if they like each other, no.

5    Q.  Now, you agreed with me that the Earl David law firm was

6    essentially a pool of sharks, people all working for their own

7    interests, trying to make their own money, trying to skim a

8    little bit off where they could to keep more for themselves,

9    trying to cheat each other; is that a fair characterization?

10   A.  Yes.

11   Q.  And is it a fair characterization that Mr. Salamon was the

12   biggest shark of all, the nastiest shark of all?

13   A.  Yes.

14           MR. GERZOG:  Nothing further.

15           MR. PASTORE:  Redirect, your Honor?

16           THE COURT:  Yes.

17           MR. PASTORE:  Your Honor, as an initial matter, I

18   don't believe RB2 and RB3 were offered into evidence.

19           MR. GERZOG:  I beg your pardon, Judge.  I'm really

20   very sorry.  I had intended to move Defendant Brodjik's

21   Exhibits 2 and 3 into evidence and I forgot.  And it's with

22   Mr. Pastore's indulgence, may I do that now?

23           MR. PASTORE:  Without objection from the government.

24           THE COURT:  Okay.  So, all right.  I think if my

25   memory is -- my notes are good, four was already in.

1            MR. GERZOG:  Right, and one was already in.

2            THE COURT:  Okay.

3            MR. PASTORE:  That's consistent with the government.

4            THE COURT:  All right.  So all four are in.

5            MR. GERZOG:  Thank you, your Honor.

6            (Defendant's Exhibits Brodjik 1 through 4 received in

7    evidence)

8    REDIRECT EXAMINATION

9    BY MR. PASTORE:

10   Q.  I'm handing you, Mr. Grynsztajn, what's been marked for

11   identification as 3501-77, and I've broken it up into two

12   different documents.

13            And I want to direct your attention to the first

14   document.  Do you recognize what that is?

15   A.  Yes.

16   Q.  Tell us what it is.

17   A.  It is my cooperation agreement.

18   Q.  Sorry, Mr. Grynsztajn, if you could lean forward, we can't

19   hear you.

20            Did you say 3501-77 is your cooperation agreement?

21   A.  This is the charges against me.

22   Q.  Okay.  It's the charges against you, in other words, the

23   information to which you pled guilty?

24   A.  Yes.

25   Q.  And do you see where it says Count One?

1  A.  Yes.

2  Q.  If you go to the second page and then the third page, do

3  you see the third page?

4  A.  Yes.

5  Q.  What does the third page say at the top?

6  A.  Forfeiture allegation.

7  Q.  Forfeiture allegation?

8  A.  Yes.

9  Q.  Is this a true and accurate copy of the charges against you

10  as you've seen them before?

11  A.  Yes.

12            MR. PASTORE:  The government offers 3501-77.

13            THE COURT:  There's no objection.  Received.

14            (Government's Exhibit 3501-77 received in evidence)

15  Q.  Okay.  And the forfeiture allegation, paragraph 5, read

16  along with me and tell me if I'm reading this correctly.

17            "As a result of committing the offense alleged in

18  Count One of this information, David Grynsztajn, the defendant,

19  shall forfeit to the United States, pursuant to 18 U.S.C.

20  Section 981(a)(1)(C) and 28 U.S.C. Section 2461, any and all

21  property, real and personal, that constitutes or is derived

22  directly or indirectly from gross proceeds traceable to the

23  commission of the offenses and all property traceable to such

24  property."

25            Did I read that correctly?

D1OLCIB3                        Grynsztajn – redirect

1    A.  Yes.

2    Q.  Does your cooperation agreement also include something

3    about this forfeiture allegation?

4    A.  Yes.

5    Q.  What is your understanding of what you're required to

6    forfeit to the United States as a result of committing your

7    crimes?

8    A.  Whatever I own, property, everything.

9    Q.  I'm sorry, whatever you?

10   A.  Whatever I own, property.

11   Q.  Whatever you own are you saying?

12   A.  Property, whatever I profited from the crimes.

13   Q.  Whatever you profited from the crimes?

14   A.  Correct.

15   Q.  Do you know when you will be required to turn that over to

16   the United States government?

17   A.  I believe right before sentencing.

18   Q.  In fact, will it be at your sentencing, Mr. Grynsztajn?

19   A.  Yes.

20   Q.  Okay.  You were asked several questions about identifying

21   Mr. Tischler.  Do you remember that?

22   A.  Yes.

23   Q.  When was the first time that you told the government about

24   Mr. Tischler and his role in the fraud?

25   A.  I really have no recollection of the specific date.

D1OLCIB3                          Grynsztajn - redirect

1   Q.  Do you think it would refresh your memory if I showed you
2   some notes from a May 15, 2006 meeting with the government?
3   A.  It might, yes.
4   Q.  I'm showing the witness what has been marked for
5   identification as 3501-4.  Okay.
6       Are those notes dated May 15, 2006?
7   A.  Yes.
8   Q.  And do they record a meeting between you and the
9   government?
10  A.  Yes.
11  Q.  I'll direct your attention to the third paragraph, to the
12  highlighting.
13  A.  Yeah.
14  Q.  Can you just read to yourself the highlighted sentence and
15  then once you finish reading, tell us if it refreshes your
16  recollection.  Okay.  You finished reading the sentence?
17      Having looked at these notes, what is your
18  recollection of the first time you told the United States
19  government about Harold Tischler's role in the fraud?
20  A.  Yeah, I recall telling the government that I saw
21  Mr. Salamon --
22      MR. GREENFIELD:  The question is the date.  I don't
23  want the witness reading from or reciting from memory what he
24  just read.
25  A.  May 15, '06.

D1OLCIB3                    Grynsztajn - redirect

1    Q.  And what did you tell the government on May 15, 2006?

2    A.  I saw Sam Salamon handing money over to Mr. Tischler for

3    company called Vintage Partners.

4    Q.  Now, did you mention Vintage Partners on your direct

5    testimony?

6    A.  No.

7    Q.  Okay.  So now seeing this note, do you remember anything

8    about Vintage Partners?

9    A.  Yes.

10   Q.  What can you tell us about Vintage Partners?

11   A.  We had a few cases with this company.

12   Q.  Do you remember what address was used for Vintage Partners?

13   A.  Yes.

14   Q.  What address was used for Vintage Partners?

15   A.  4316 17th Avenue.

16   Q.  The same address as 387 Quincy Associates; is that right?

17   A.  Yes.

18   Q.  You were also asked about several emails by Mr. Brodjik's

19   counsel.  Do you recall that?

20   A.  Yes.

21   Q.  And, okay, I'm handing you what was admitted as RB4.  Do

22   you see that email?

23   A.  Yes.

24   Q.  At the bottom, is that your email address?

25   A.  Yes.

D1OLCIB3                    Grynsztajn - redirect

1  Q.  So is it possible that you sent this email?

2  A.  Yes.

3  Q.  Did you ever tell the government that you were having

4  conversations with Earl David about money?

5  A.  No recollection of that.

6  Q.  Do you think it would refresh your memory if I showed you

7  some notes from May 15, 2006?

8  A.  Yes.

9  Q.  I'm going to direct your attention to the second full

10  paragraph.  Read the second full paragraph and the third full

11  paragraph, please, and when you're done, let us know and I'll

12  come back.  Okay?

13          THE COURT:  You're asking him to look at 3501-4?

14  Q.  Mr. Grynsztajn, have you completed reading those two

15  paragraphs?

16  A.  Yeah.

17  Q.  So I'm going to retrieve the document from the witness.

18          All right.  So on May 15, 2006, did you tell the

19  government about your conversations with Earl David?

20  A.  Yes.

21  Q.  What did you tell, what did you tell the government that

22  Earl David told you?

23          MR. BRILL:  I would object to the witness reading from

24  the document.

25          MR. GERZOG:  Join the objection.

1           MR. PASTORE:  Your Honor, first of all, the document

2      is not in front of the witness.  Second, pursuant to Rule

3      801(d)(1)(B), documents can be introduced as consistent

4      statements to rebut any implication of recent fabrication.

5           THE COURT:  I'm totally confused.  Sorry.  This is a

6      follow through on the email, Brodjik Exhibit 4?

7           MR. PASTORE:  No, your Honor.

8           THE COURT:  What's it connected to?

9           MR. PASTORE:  Sure.

10     Q.  Mr. Grynsztajn, do you remember on cross-examination being

11     asked if you disclosed to the government that you had

12     conversations with Earl David about asking for money?

13     A.  Yes.

14     Q.  And you were also asked on cross-examination whether you

15     had informed the government that you were in fact going to pick

16     up money from Sam Salamon?

17     A.  Yes.

18          THE COURT:  And you want to help me out?  Which

19     paragraph in 3501-4 are you looking at?

20          MR. PASTORE:  I'm looking at the second paragraph on

21     the second page.  It is the second sentence that begins "over

22     the phone."

23          THE COURT:  Sorry.

24          MR. PASTORE:  And then there's also relevant text for

25     the Court's reference in paragraph 3 going -- I believe it's

D1OLCIB3                           Grynsztajn – redirect

1    the fourth, begins at the fourth sentence, including the

2    fourth, fifth, and sixth sentences.

3              MR. GERZOG:  Your Honor, could we come up and discuss

4    this at side bar?

5              THE COURT:  Yeah.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (At the side bar)

2           THE COURT:  Okay.

3           MR. GERZOG:  Could I ask Mr. Pastore for a quick

4    little proffer of the next two or three questions, what he's

5    trying to get at?  Mr. Grynsztajn already said that he told

6    them about meeting Mr. Salamon and getting money, and I even

7    asked that the government make you give it to them and he said

8    no.  So if he's going to say when did you first tell us about

9    money, he already said he told them about money.

10          THE COURT:  I don't read this -- all right.  So.

11          MR. GERZOG:  And, furthermore, it only says that he

12   has contacted David and Salamon and asked for money.  He didn't

13   say he threatened to put them in jail.

14          THE COURT:  It says Grynsztajn spoke to Brodjik and

15   David about money, by the way.

16          MR. GERZOG:  It does say that.  But it doesn't say

17   that he threatened to put them in jail and it doesn't say that

18   he showed them the email.

19          MR. PASTORE:  Your Honor, quote, David told Grynsztajn

20   don't kill everybody, meaning, not to take everyone down.

21          MR. GERZOG:  So if he wants to get in David's

22   statement as a statement of a coconspirator, I don't have a

23   problem with that.  That's fair game.

24          THE COURT:  The whole point is this morning he spent

25   all this time denying that he had sent threatening emails to

1    these people, despite the fact they're on his account to people

2    he knows, and many of them had internal indicia of reliability.

3            This doesn't say I called them and asked for money as

4    a threat.  It doesn't even -- this doesn't even -- it's not

5    even clear in time frame when he had this conversation, and he

6    doesn't claim to have asked Brodjik for anything.

7            MR. PASTORE:  Judge, I think the relevance is that

8    there was questions that stated that he didn't disclose this

9    information to the government, and this document is being

10   proffered to show that David told Grynsztajn don't kill

11   everyone, don't take everyone down.

12           THE COURT:  The point is David could have told him

13   that regardless of whether he had been threatened.  As soon as

14   David learns that law enforcement has contacted him, he could

15   have still just said to him, hey, keep your mouth shut.  Don't

16   bring everybody down.  It is not necessarily an admission,

17   contrary to his denials this morning that he was threatening

18   these people and giving them a time countdown.

19           MR. PASTORE:  I'm not so much focused on that as when

20   he disclosed it to the government.  In other words, this is

21   May 15, 2006.  The emails are April 2006.  I think it's

22   significant that he disclosed to the government May 15, 2006

23   that he in fact had conversations in which people discussed

24   taking people down and thereafter --

25           MR. GERZOG:  David said taking people down.  He never

D1OLCIB3                    Grynsztajn - redirect

1    said that he threatened anybody.

2            THE COURT:  I don't know why this morning your witness

3    decided to deny sending an email that appears to be sent from

4    him.  I don't know why.

5            MR. PASTORE:  But, again, it's not -- the disclosure

6    of the information to the government that I think has been put

7    at issue.

8            THE COURT:  He doesn't disclose in here that --

9            MR. PASTORE:  Discloses he's going to put up money

10   from Sam Salamon and in particular --

11           THE COURT:  Which he admitted, so it's consistent.

12   He's admitted on direct.  He admitted it again, or at least

13   he's admitted it more than once.

14           MR. GERZOG:  That's correct.

15           MR. PASTORE:  And that's exactly why it was offered as

16   a prior consistent.

17           THE COURT:  No one is challenging that.

18           MR. GERZOG:  No one is challenging that he met

19   Salamon, took money from.

20           THE COURT:  That it was either 1,500 or maybe it was

21   1,700.

22           MR. PASTORE:  So in --

23           THE COURT:  That part, there's no one is challenging

24   that.

25           MR. PASTORE:  So what we would suggest is, I think

1    Mr. Gerzog has no objection to eliciting that Mr. Grynsztajn

2    disclosed to the government that he had conversation with

3    Mr. David in which Mr. David said don't kill everybody or don't

4    take everybody down and that he also advised the government he

5    was going to pick up money from Sam Salamon on the very day.

6              MR. GERZOG:  He's already said three times that he is

7    going to.

8              THE COURT:  You don't need to get that in as some sort

9    of prior consistent statement.

10             MR. PASTORE:  Mr. Gerzog said, in questioning the

11   witness directly, said, you didn't disclose it to the --

12             MR. GERZOG:  The threats, not the request.

13             MR. PASTORE:  Larry.

14             MR. GERZOG:  The threats.

15             MR. PASTORE:  Larry -- didn't disclose.  He said, and

16   I can remember this almost perfectly, he said you did not, you

17   didn't tell the government right away, did you?  And it was

18   some days later, perhaps weeks later, and I don't think he said

19   months.

20             MR. GUTMAN:  That was his testimony.  It was some

21   point afterward, which is totally consistent.

22             MS. ECHENBERG:  The point is he said it was possibly

23   days or weeks, he wasn't sure.  The fact is the day he was

24   going to do it, he told the government about it and so --

25             THE COURT:  And then what did you guys do about it?

1   Nothing.  Unbelievable.

2           MS. ECHENBERG:  This goes to his credibility, your

3   Honor.

4           MR. GERZOG:  No, it doesn't.  We asked him if he took

5   the money and he said yes.  He just said he disclosed it to the

6   government.

7           MS. ECHENBERG:  Your Honor.

8           MR. GERZOG:  He got to keep it.

9           MR. PASTORE:  The point is there will also be --

10          THE COURT:  I think it's fair to say that he told them

11  that he was going to get it before he got it.

12          MS. ECHENBERG:  And that he had this conversation with

13  David about taking everyone down, that contemporaneously --

14          MR. GERZOG:  What's that got to do with anything?

15          MS. ECHENBERG:  Contemporaneously --

16          MR. GERZOG:  This is redirect.  In what way?  He

17  didn't deny that he had a conversation with David or that David

18  didn't ask him not to take everybody down.  What are you

19  rehabilitating him about?

20          MS. ECHENBERG:  He didn't remember those emails or

21  denied those emails.  The fact is this was seven years ago and

22  contemporaneously he was advising the government.

23          MR. GERZOG:  So you're rehabilitating him that he lied

24  to me about sending those emails?

25          MS. ECHENBERG:  We're rehabilitating him through what

D1OLCIB3                        Grynsztajn – redirect

1    he said contemporaneously when it was happening.

2              MR. GERZOG:  Is your point that he lied to me about

3    sending those emails and that's what you want to rehabilitate

4    him?

5              MS. ECHENBERG:  That's not our point.

6              Excuse me.  As it was happening, he was advising the

7    government what was happening.  That's the only point that

8    we're intending.

9              MR. GERZOG:  He didn't.  He threatened to put hem in

10   jail and he didn't tell the government he threatened to put

11   them in jail.

12             THE COURT:  This doesn't support a contemporaneous

13   statement to the government that Grynsztajn threatened David

14   and everyone else with bringing them down unless he got money.

15   It doesn't say that.

16             So I'm okay with that he told them, that he told you

17   in advance that he was going to get money that night.  Defense

18   will have a good time with that.  And I think that he never

19   denied that David told him.

20             MS. ECHENBERG:  Believed he was being threatened.

21             MR. GERZOG:  On the emails themselves it says –– do

22   you have them with you?  May I?

23             MR. PASTORE:  I don't have them with me.

24             MR. GERZOG:  On the email itself, on the one where he

25   threatened him.

1          THE COURT:  David's response.

2          MR. GERZOG:  David sends back, don't threaten me,

3    don't take us down, think of your own family, think of our

4    families.

5          THE COURT:  I mean.

6          MR. GERZOG:  He tells him.

7          MS. ECHENBERG:  The implication was made that the

8    government -- he was not telling the government what was going

9    on.

10         MR. GERZOG:  He wasn't threatening them.

11         MS. ECHENBERG:  And to an extent he was advising the

12   government contemporaneously that was going on.

13         MR. GERZOG:  They had contact, but not the nature of

14   the contact.

15         MR. PASTORE:  Of course, the nature of the contact, it

16   says, quote, don't kill everybody, and he says he warned him

17   not to take everyone down.

18         MR. GERZOG:  It says that on the email.  It says on

19   the exhibit, words to that very effect.

20         MR. PASTORE:  It's not the words on the email that

21   matter.  It's the timing of the disclosure to the government.

22   That is all we're seeking through this document.

23         MR. GERZOG:  I don't want any implication in the

24   jury's mind that he told the government that he threatened.

25         THE COURT:  Yeah.  He didn't.  If he had told you

D1OLCIB3                              Grynsztajn – redirect

 1    that, what would you have done with that?  Would you let him do

 2    it?  So he didn't tell you that.

 3             MR. PASTORE:  But, your Honor, that's the point.  The

 4    emails precede.  They're in April 2006, post May 2006.  In

 5    May 2006 he tells us he gets the money.  That's the end of it.

 6    That's the point.

 7             MR. GERZOG:  We know that.  He testified to that more

 8    than once.

 9             THE COURT:  You can get out that he told you before he

10    met with Salamon that he was going to get money at the deli or

11    on the street.  You can get that out.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2    BY MR. PASTORE:

3    Q.  All right.  Without going into the nature of the

4    conversations that you had with Earl David, did you in fact

5    tell the government generally that you were having

6    conversations --

7              MR. GERZOG:  Objection.  That's not what we agreed to.

8              THE COURT:  That is not what we agreed to.

9              MR. PASTORE:  I'm sorry.  Then I misunderstood, your

10   Honor.  I'm not going into the content.

11             THE COURT:  There was one thing you can go into.  I

12   think you know what it is.

13   Q.  Mr. Grynsztajn, did you tell the -- did you discuss with

14   the government that you were receiving money from Sam Salamon?

15   A.  Yes.

16   Q.  And approximately, in relation to when you received the

17   money from Sam Salamon, when did you tell the government about

18   that?

19   A.  I believe it was sometime in 2006.

20   Q.  Okay.  When you met with the government prior to trial,

21   were you shown several different photographs?

22   A.  Yes.

23   Q.  On how many occasions were you shown photographs?

24   A.  Two, three occasions.

25   Q.  I'm sorry?

D1OLCIB3                    Grynsztajn - redirect

1    A.  A few occasions.

2    Q.  Few occasions, okay.  I'm handing you what's been marked as

3    Government Exhibit 1.  Do you recognize that?

4    A.  Yes.

5    Q.  What is it?

6    A.  Mr. Tischler.

7    Q.  And does fairly and accurately depict Mr. Tischler as you

8    knew him at the time that you were dealing with him?

9    A.  Yes.

10            MR. PASTORE:  Government offers 1.

11            MR. GREENFIELD:  Can you put it up there or can I see

12   it?  It's the same as --

13            MR. PASTORE:  It's the one that we discussed.  Sorry.

14            MR. GREENFIELD:  It's the same as this, right?

15            MR. PASTORE:  Your Honor, is Government's 1 received?

16            THE COURT:  No objection?  It's received.

17            (Government's Exhibit 1 received in evidence)

18            MR. PASTORE:  If we could bring up picture 49.

19            Your Honor, I'd like to publish it by passing it to

20   the jury.

21   Q.  Okay.  Were you also shown picture 49 at some point,

22   Mr. Grynsztajn?

23   A.  I believe so, yes.

24   Q.  Okay.  And is picture 49 the same or different than

25   Government's 1?

D1OLCIB3                          Grynsztajn – redirect

1   A.  It's different.

2   Q.  You were asked about the amount of money that you earned in

3   connection with the fraud.  Do you recall that?

4   A.  Yes.

5   Q.  Did you ever hear anyone else talking about the amount of

6   money that they made in connection with the fraud while you

7   were in the office?

8   A.  Yes.

9   Q.  Who did you hear talking about the amount of money that

10  they made in connection with the fraud?

11  A.  Sam, Alex Lev, Earl David, Teitelbaum, Gulay Cibik, Rafi

12  Brodjik.

13  Q.  Okay.  Did you ever see Mr. Tischler in the office?

14  A.  Yes.

15  Q.  Did you ever overhear him discussing anything with Sam?

16  A.  Yes.

17              (Continued on next page)

18

19

20

21

22

23

24

25

D1o1cib4                          Grynsztajn – redirect

1  BY MR. PASTORE:

2  Q.  What were they discussing?

3  A.  They were discussing too many people put in one company

4  and --

5  Q.  Who was complaining that there were too many people into

6  one company?

7  A.  Mr. Tischler.

8  Q.  And what else was Mr. Tischler saying?

9  A.  Complaining that he's not getting paid enough money.

10  Q.  When he was complaining that there were too many people in

11  one company, did he explain why he was upset?

12  A.  He didn't get paid for all the cases.

13  Q.  When you heard Ms. Cibik talking about money, what did you

14  hear her saying?

15  A.  She told me she only made like a hundred thousand dollars.

16  Q.  During what time period did she only make a hundred

17  thousand dollars?

18  A.  For the pay, when she did the extraordinary ability cases.

19  Q.  And what period was she doing the extraordinary ability

20  applications?

21  A.  I think from '05 till I left the office.

22  Q.  So approximately '05 to '06?

23  A.  Yes.

24  Q.  And when you say that she was complaining about only making

25  a hundred thousand dollars, what was she complaining about?

D1o1cib4                          Grynsztajn - redirect

1    A.  That Mr. David would tell her, give money to this person

2    and to this person.  She said, "I only made a hundred thousand

3    dollars.  What do you want from me?"

4    Q.  Mr. Brodjik, what did you hear him saying about the amount

5    of money he was making at the firm?

6    A.  Mr. Brodjik said that whatever he collects of everybody,

7    his cut is 20 percent.

8    Q.  Did you ever hear him complaining about the amount of money

9    that he was being paid?

10   A.  Yes.

11   Q.  What --

12   A.  When Mr. David left to Canada, he was accusing Mr. Salamon

13   and Mr. Teitelbaum to cutting of the -- they didn't give the

14   right amount of money to Mr. David, by cutting Mr. David,

15   'cause he was losing 20 percent.

16   Q.  Okay.  You said that Mr. -- you said on cross-examination

17   that Mr. Brodjik was hired to work on a book with Mr. David?

18   A.  Correct.

19   Q.  Did Mr. Brodjik do anything else at the law firm?

20   A.  Yes.

21   Q.  What other duties and responsibilities did Mr. Brodjik have

22   at the law firm?

23   A.  Filing cases and collecting money.

24   Q.  What kind of cases did Mr. Brodjik file at the law firm, if

25   you know?

D1o1cib4                          Grynsztajn - redirect

1    A.  R-1.

2    Q.  How do you know that?

3    A.  Because he told me himself and Mr. David told me.

4    Q.  90 Washington Street, you said you visited there on several

5    occasions; is that right?

6    A.  Yes.

7    Q.  Who, if anyone, at the office had a key to 90 Washington

8    Street?

9    A.  Mr. Brodjik.

10            MR. PASTORE:  Could we bring up 101-30-A.

11   Q.  Do you remember being asked about this document on

12   cross-examination?

13   A.  Yes.

14   Q.  Before Mr. Brill showed it to you, had you ever seen a

15   document like this before?

16   A.  No.

17   Q.  I'm sorry.  I couldn't hear you.

18            Mr. Grynsztajn?

19   A.  One second.  I'm trying to re --

20   Q.  Okay.

21   A.  No, sir.

22   Q.  What type of documents did you hear -- well, did you ever

23   hear that documents were created at the Department of Labor?

24   A.  Yes.

25   Q.  Phony documents?

```
 1   A.  Yes.

 2   Q.  What type of phony documents?

 3           MR. BRILL:  Objection.

 4           THE COURT:  I'll allow that.

 5   A.  The documents they would create it was approved.

 6   Q.  I'm sorry.  I can't hear you, Mr. Grynsztajn.

 7   A.  Changing the dates and changing the alien's name.

 8   Q.  On what?

 9   A.  On the labor certification.

10   Q.  On labor certifications.

11   A.  Correct.

12   Q.  Those are the documents that you're aware of as being

13   phonied up.

14   A.  Correct, yes.

15   Q.  Do you remember being asked about the PERM process on

16   cross-examination?

17   A.  Yes.

18   Q.  In general how were PERM applications submitted, if you

19   know?

20   A.  I think first you have to set up an e-mail address, you

21   e-mail it to Department of Labor, then they e-mail back a

22   password, and then you --

23   Q.  So do I understand correctly it's done electronically?

24   A.  Yes.

25   Q.  How good are you with computers?
```

D1o1cib4                          Grynsztajn - redirect

1   A.  Not good at all.

2   Q.  You received training at the law firm from Mr. David.  Do

3   you remember being asked about that?

4   A.  Yes.

5   Q.  Did you ever see Mr. David training anyone else at the law

6   firm?

7   A.  Yes.

8   Q.  Who did you see Mr. David training at the law firm?

9   A.  Gulay Cibik.

10  Q.  Did you see -- what types of training did you see Mr. David

11  giving to Ms. Cibik?

12  A.  In PERM cases and the extraordinary ability cases.

13  Q.  Aside from seeing Mr. David train Ms. Cibik to do those

14  things, do you have any other basis to believe that Ms. Cibik

15  knew how to prepare PERM applications?

16  A.  Yes.  I referred my clients to her.

17  Q.  Why did you refer your clients to her?

18  A.  Because people were waiting for a long time and they didn't

19  get no -- no response from the labor department.  The PERM

20  system was the fastest system to move.

21  Q.  And what service or services did you refer them to?  In

22  other words, what did you expect Ms. Cibik would be doing?

23  A.  Filing the case.

24          MR. PASTORE:  Your Honor, may I have a moment?

25          THE COURT:  Yes.

D1o1cib4                          Grynsztajn - redirect

1           (Pause)

2           MR. PASTORE:  Handing the witness what's been

3     previously admitted as Government's 3100-4 and 3100-7.

4           If we could bring up 3100-7.

5     Q.  When you were talking about phony labor certifications, can

6     you take a look at 3100-7.

7     A.  Yes.

8     Q.  Is this one of the types of documents that you understood

9     were being created or altered in some way?

10    A.  No, sir.

11    Q.  Okay.  Now let's look at 3100-4.

12          Looking at this document, do you understand that these

13    documents were being altered in some way?

14    A.  Yes.  This type of document.

15    Q.  I'm sorry.

16    A.  3100-7, -7.

17    Q.  Okay.  So Mr. Grynsztajn, if you can look at your screen,

18    please.  Are these the -- 3100-4 is displayed there.  Do you

19    see that?

20    A.  Yes.

21    Q.  Okay.  When you said that the phony documents were being

22    created, did you mean this type of document?

23    A.  No, sir.

24          MR. PASTORE:  Okay.  Now let's bring up 3100-7.

25    Apologies for the confusion.

D1o1cib4                         Grynsztajn – redirect

1   Q.  So do you see 3100-7 on your screen?

2   A.  Yes.

3   Q.  Are these the documents that you understand were being

4   falsified?

5   A.  Yes.

6            MR. BRILL:  Objection as to "Are these the documents"

7   as opposed to the type of documents.

8            MR. PASTORE:  I'll rephrase.

9   Q.  Are these the types of documents that you understand were

10  being falsified?

11  A.  Yes.

12  Q.  Okay.  Looking at your screen, if you could tell us what

13  information you understood was being falsified.

14  A.  Would be the name of the alien.

15  Q.  The name of the alien?  So is that the field that says

16  Alien Name and it has a colon after that?

17  A.  Correct.

18  Q.  Is the priority date mentioned anywhere on this document?

19  A.  Case Received, that was the date that would be changed.

20  Q.  Case Received Date, that's two below Alien Name; is that

21  right?

22  A.  Yes.  And the Priority Date.

23  Q.  Mr. Grynsztajn, do you remember being asked on

24  cross-examination if you committed fraud?

25  A.  Yes.

D1o1cib4                              Grynsztajn – redirect

1    Q.  Did you commit that fraud alone?

2            MR. DONALDSON:  Objection.  Objection.  Alone as in

3    that alone or alone with people?

4            THE COURT:  Did you commit that fraud alone?  What

5    does that mean?

6    Q.  Did other people help in committing the fraud?

7    A.  Yes.

8    Q.  Did Ms. Cibik help in committing the fraud?

9    A.  This here?

10   Q.  No, not on this.  Do you remember you were asked whether

11   you committed fraud at the law office?

12   A.  Yes.

13   Q.  Do you remember that?  While you were at the law office,

14   were other people working there?

15   A.  Yes.

16   Q.  Did they also participate in the fraud?

17   A.  Yes.

18   Q.  Did Ms. Cibik assist you in creating -- did Ms. Cibik

19   assist you while you were committing fraud at the law office?

20   A.  Yes.

21   Q.  What did she do?

22   A.  She filed cases for me.

23   Q.  Did Mr. Brodjik have a role in committing the fraud?

24   A.  Yes.

25   Q.  What did he do?

D1o1cib4                          Grynsztajn - redirect

1    A.  Filed R-1s, and he collected money from everybody.

2    Q.  Did Mr. Tischler have a role in the fraud as well?

3    A.  Yes.

4    Q.  What did he do?

5    A.  He signed for sponsorship companies.

6            MR. PASTORE:  Nothing further at this time, your

7    Honor.

8            MR. DONALDSON:  May I, your Honor?

9            THE COURT:  Yes.

10           MR. DONALDSON:  Your Honor, if I can have one second,

11   please.

12           (Pause)

13           MR. DONALDSON:  Could you put 3501-77 up, page 5,

14   please.  Do you have it?  I've got to --

15           MS. ECHENBERG:  Yeah.

16           MR. DONALDSON:  It's Government Exhibit --

17           (counsel conferring)

18   RECROSS EXAMINATION

19   BY MR. DONALDSON:

20   Q.  Mr. Grynsztajn -- is it "Grin-steen" or "Grin-stine"?  I

21   want to make sure I have it right.

22   A.  "Grin-stine."

23   Q.  "Grin-stine."  Okay.  Mr. Grynsztajn, you were just asked

24   about this document, 3501-77, I believe, and it's admitted into

25   evidence.  First full paragraph on that page, you see that

D1o1cib4                    Grynsztajn - recross

1    first full paragraph?

2    A.   Yes.

3    Q.   Where it says, "It is further understood that this Office

4    will not object to" you, Grynsztajn, "remaining at liberty,"

5    meaning outside of jail, "subject to the condition that he

6    executes a $500,000 personal recognizance bond; that his travel

7    is restricted to the Southern District of New York and the

8    Eastern District of New York; that he surrender all travel

9    documents; and that he pledges that he will apply for no new

10   travel documents.  This Office reserves the right to move

11   without notice to Grynsztajn for a revocation or modification

12   of the above bail conditions should it determine that

13   Grynsztajn has violated any provision of this agreement or

14   condition of his release, or should it determine that such a

15   revocation or modification is otherwise appropriate.

16   Grynsztajn hereby consents to any such revocation or

17   modification."

18          Do you see that paragraph?

19   A.   Yes.

20   Q.   That's the same type of paragraph that you had in your

21   first agreement; correct?

22   A.   Yes.

23   Q.   And so you were -- you pled guilty, you were let out, or

24   you were out at liberty, out of jail, on a $500,000 bond, as

25   long as you didn't violate your agreement; correct?

D1o1cib4                    Grynsztajn - recross

1    A.  Yes.

2    Q.  And then you committed more fraud; correct?

3    A.  Yes.

4    Q.  And you violated the agreement; correct?

5    A.  Yes.

6    Q.  Knowing that you would have to execute -- knowing that you

7    had executed a $500,000 personal recognizance bond and you'd be

8    put in jail; is that right?

9    A.  Yes.

10   Q.  So knowing that, you still committed more immigration

11   fraud.

12   A.  Yes.

13   Q.  What did you -- you're still out, you're still at liberty;

14   correct?

15   A.  Repeat?

16   Q.  You're still at liberty, out of jail; correct?

17   A.  Yes.

18   Q.  So you pled guilty again, signed another plea agreement,

19   and you're still out of jail?

20   A.  Yes.

21   Q.  Do you work now?

22   A.  Not at the present time.

23   Q.  Have you been doing any other immigration work since this

24   last plea agreement?

25   A.  No, sir.

D1o1cib4                          Grynsztajn - recross

1    Q.  No?

2    A.  No.

3    Q.  When did you stop?  Have you done any this year or last

4    year?

5    A.  I did about three years ago.

6    Q.  So in 2010, you did more immigration work; is that correct?

7    A.  Yes.

8    Q.  Let me get this right.  So you -- you started out in

9    immigration fraud, you pled guilty, you signed a cooperation

10   agreement, you then violated that agreement by doing more

11   immigration fraud, pled guilty -- well, strike that.

12           You committed immigration fraud, pled guilty, signed a

13   cooperation agreement, committed immigration fraud again, back

14   in 2007, and now you're saying three years ago, in 2010, you

15   were doing immigration work again?

16           Is that a yes or no?

17   A.  The understanding with the government was that I could

18   continue -- I can do immigration form as long as it knows I am

19   working with other people, with other lawyer.

20   Q.  So you're telling the jury now that after you've done

21   immigration fraud and pled guilty to doing immigration fraud,

22   you then worked out an agreement with the government to allow

23   you to continue doing immigration work, as long as it wasn't

24   fraud?

25   A.  I can do -- I can fill out immigration form as long as it's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D1o1cib4                          Grynsztajn - recross

1    not connected to this attorney.

2    Q.  So then you were -- after you pled guilty to immigration

3    fraud and signed a cooperation agreement saying that you had

4    done immigration fraud and then had done immigration fraud

5    again in violation of that agreement, you then had another

6    agreement with the government saying you could do more

7    immigration work; is that correct?

8    A.  I can fill out forms, yes.

9    Q.  And it was based upon the good faith that you would do it

10   properly?

11   A.  As long as I have no connection to this attorney.

12          THE COURT:  Which attorney are you talking about?

13          THE WITNESS:  Mr. David.

14   Q.  So you could do immigration with -- you said you

15   fabricated -- strike that.

16          Somebody showed you e-mails on the board a few minutes

17   ago.  I believe it was one of these fantastic attorneys over

18   here.  And you said that's fabricated.  Do you recall saying

19   that?

20   A.  Yes.

21   Q.  Those were your words, "that's fabricated"; correct?

22   A.  I said yes.

23   Q.  Lean in close so I can hear you.

24   A.  Yes.

25   Q.  The e-mails that were sent from your box to someone you

D1o1cib4                          Grynsztajn - recross

1    know, you said were fabricated?

2    A.  I believe some were fabricated.

3    Q.  You didn't say you believed, you said these were

4    fabricated; correct?

5    A.  Yes.

6    Q.  How were they fabricated?

7    A.  They might have sent out my e-mail and everything, and the

8    genius on the computer was Mr. Brodjik.

9    Q.  So you said Mr. Brodjik somehow fabricated your e-mails to

10   go to somebody else?

11   A.  I believe he played with it, with some of them.

12   Q.  That happened a lot in your office, at the Earl David law

13   firm, people fabricating e-mails?

14   A.  I don't know.  Mr. Brodjik was the computer genius in the

15   office, so --

16   Q.  You just mentioned that Ms. Cibik told you during a

17   conversation sometime between 2005 and 2006 that, I believe

18   your words were, "I don't know.  I only made a hundred thousand

19   dollars."  Is that what she said to you?

20   A.  That's what she said.

21   Q.  When did she say that?

22   A.  Before I left the office.

23   Q.  You left the office in 2006, April, May; correct?

24   A.  Yes.

25   Q.  And you were there in '99; correct?

1    A.   Yes.

2    Q.   Sometime between '99 and 2006 she told you that?

3    A.   When there was an argument in the office, when Mr. David

4    left to Canada and he asked her to pay some bill or something,

5    she would say, "What do you want from me?  I only -- I only

6    made a hundred thousand dollars."

7    Q.   She said that to Earl David?

8    A.   No, she said in the office.

9    Q.   So she just out loud in the office one day, walking through

10   your office, said, to anybody who would listen, "What do you

11   want from me?  I only made a hundred thousand dollars," is that

12   how it worked?

13   A.   No, she screamed every day in the office.

14   Q.   She was screaming every day in the office.

15   A.   Yeah.

16   Q.   So she was just walking down the hallway one day pursuant

17   to a phone call from Earl, she just decided to scream out,

18   "What do you want from me?  I made a hundred thousand dollars,"

19   to nobody in particular.  Is that what you're saying?

20            I can't hear you.

21   A.   I'm saying that this woman said a lot of things.  Every day

22   there was a different -- different words, something screaming

23   about.  Everybody knows it.

24   Q.   And this one you just happened to remember, the hundred

25   thousand dollars one.

1    A.  I remember a lot more of it.

2    Q.  When did you tell the government that?

3    A.  I don't recall the date.

4    Q.  You met with them several times; correct?

5    A.  Yes.

6    Q.  Okay.  So January of 2006, you didn't tell them that;

7    correct?

8    A.  I'm not sure.

9            MR. PASTORE:  Objection.  Improper impeachment.  If we

10   have some notes to go over, that would -- he's being asked

11   about specific meetings without being shown the notes.

12           THE COURT:  Either he has an absence of recollection

13   or a recollection.

14           MR. DONALDSON:  Doesn't matter.  I'll move on.

15   Q.  You took care of the personal business for Mr. David while

16   he was gone; correct?

17   A.  I don't understand the question.

18   Q.  Okay.  I'll ask it a different way.  You paid his personal

19   bills, utility bills and things like that, while he was gone;

20   correct?

21   A.  No, sir.

22           MR. DONALDSON:  Nothing further at this time.

23   RECROSS EXAMINATION

24   BY MR. BRILL:

25   Q.  Mr. Grynsztajn, you said you heard about the phony

1    documents being created, correct, on, the phony labor

2    certifications, I believe?

3    A.  I dealt with them too.

4    Q.  You dealt with them too?

5    A.  Yes.

6    Q.  So you were -- were you responsible for creating the phony

7    documents?

8    A.  No.

9    Q.  Okay.  You received them from someone?

10   A.  Yes.

11   Q.  All right.  And who did you receive them from?

12   A.  From Mr. Teitelbaum.

13   Q.  And did Mr. -- Mr. Teitelbaum was not the person who

14   created the phony documents; right?

15   A.  No, sir.

16   Q.  In fact, Mr. Teitelbaum had a man inside the Department of

17   Labor, didn't he?

18   A.  Correct.

19   Q.  A corrupt government official who he was paying to create

20   these phony documents; right?

21   A.  Yes.

22   Q.  All right.  Did you ever meet this person?

23   A.  Once.

24   Q.  All right.  And did you ever go over the details of which

25   phony documents he was creating?

1   A.  I never spoke to him.

2   Q.  So you met him but never spoke to him?

3   A.  No.

4   Q.  You did meet him?

5   A.  Just in the office.

6   Q.  Okay.  You said hi?

7   A.  Came in, hi, yeah.

8   Q.  You spoke to him but just didn't speak back to him about

9   anything significant; right?

10  A.  He didn't discuss nothing with me.  He came to visit

11  Mr. Salamon and Mr. Teitelbaum.

12  Q.  So Mr. Salamon and Mr. Teitelbaum told you that the phony

13  labor certifications came from this corrupt government

14  official; right?

15  A.  Yes.

16  Q.  Okay.  But they didn't -- that's the entire basis of your

17  knowledge about what documents were phonied up; right?

18  A.  Yes.

19  Q.  You don't know if other documents were also phonied up by

20  that corrupt government official; right?

21  A.  Yes.

22  Q.  In fact, there could have been many other documents that

23  were forged by that person.

24  A.  Yes.

25  Q.  And you don't have any specific information about, let's

D1o1cib4                         Grynsztajn - recross

1    say --

2              MR. BRILL:  Can we look at 3100-4, please.

3              Thank you.

4    Q.  Do you have any specific information about the accuracy of

5    3100-4?

6    A.  No, sir.  Just the name, Maritza Diaz.

7    Q.  Because she was an attorney who worked at the David firm;

8    correct?

9    A.  Correct.

10   Q.  An attorney who has since been disbarred; correct?

11   A.  I don't know about that.

12   Q.  Okay.  But you don't know anything about whether this

13   document is accurate or inaccurate; right?

14   A.  Correct.

15             MR. BRILL:  Can we look at document 3100-7, please.

16   Q.  And again, other than that this is the type of document

17   that was forged, based upon your knowledge, you don't know if

18   this specific document was forged or not forged; correct?

19   A.  Correct.

20   Q.  Now in terms of the forfeiture allegation that Mr. Pastore

21   spoke to you about in your -- the charges against you, do you

22   recall him asking you about that?

23   A.  Yes.

24   Q.  He said that you will forfeit --

25             MR. BRILL:  We can take that down.  Thank you.

D1o1cib4                          Grynsztajn – recross

1    Q.  It said that you will forfeit any assets the government can

2    find that are a result of your fraud; correct?

3    A.  Yes.

4    Q.  And in fact, if they can't find those specific assets,

5    there's something called a substitute asset provision, which

6    means that if you moved assets out of your name or if you

7    somehow have other assets because you spent the assets that are

8    a result of the fraud, that they can go after those assets as

9    well; right?

10   A.  Yes.

11   Q.  It's a fact, isn't it, that you actually have no assets?

12   A.  Correct.

13   Q.  Your house is in foreclosure; right?

14   A.  Yes.

15   Q.  You have no -- you own nothing else of value; correct?

16   A.  Correct.

17   Q.  And you're not working currently so they can't even, you

18   know, go after your salary; right?

19   A.  Right.

20   Q.  So essentially what you'll wind up with for this forfeiture

21   is a big fat judgment against you that you have no prospects of

22   ever paying; right?

23   A.  Yes.

24           MR. BRILL:  I have nothing further.  Thank you.

25           MR. GREENFIELD:  I have no questions.

D1o1cib4                          Grynsztajn – redirect

1          MR. GERZOG:  No questions, Judge.

2          THE COURT:  Okay.

3          MR. PASTORE:  Just very briefly.

4    REDIRECT EXAMINATION

5    BY MR. PASTORE:

6    Q.  With respect to the second cooperation agreement, do you

7    know how the government found out about the crimes?

8    A.  I told the government.

9    Q.  Okay.  And under the old cooperation agreement, how much

10   time were you facing?

11   A.  20 years.

12   Q.  And what happened to that agreement?

13   A.  Got ripped up.

14   Q.  How much time are you facing now?

15   A.  25 years.

16   Q.  And with respect to Ms. Cibik, under what circumstances did

17   you hear her complaining that she was being asked to pay rent?

18   How did that come about?

19   A.  I'm not sure how it happened.

20   Q.  Okay.  But in other words, where did that conversation take

21   place?

22   A.  In my office.

23   Q.  And in general, what was happening?

24          MR. DONALDSON:  Objection.

25          THE COURT:  That's a little too broad.

D1o1cib4                          Grynsztajn – redirect

1   Q.  She was in your office, what happened next?

2   A.  Next thing she was asked to pay money and she went crazy.

3           MR. PASTORE:  Nothing further.  Thank you.

4           THE COURT:  Rather perfect.  12:59.

5           Okay.  So remember the two cardinal rules and I'll see

6   you tomorrow at 9, and we have a full day tomorrow.

7           (Jury excused)

8           (Witness excused)

9           THE COURT:  Is there anything we need to talk about?

10          MR. PASTORE:  Nothing from the government.

11          MR. DONALDSON:  Nothing from defense.

12          MR. GERZOG:  No, your Honor.

13          MR. BRILL:  No.

14          THE COURT:  See you tomorrow.

15          (Adjourned to January 25, 2013, at 9:00 a.m.)

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATION

2     Examination of:                        Page

3     DAVID GRYNSZTAJN

4     Cross By Mr. Brill . . . . . . . . . . . . . .1023

5     Cross By Mr. Greenfield . . . . . . . . . .1035

6     Cross By Mr. Gerzog . . . . . . . . . . . .1059

7     Redirect By Mr. Pastore . . . . . . . . . .1113

8     Recross By Mr. Donaldson . . . . . . . . .1140

9     Recross By Mr. Brill . . . . . . . . . . .1147

10    Redirect By Mr. Pastore . . . . . . . . . .1152

11                    GOVERNMENT EXHIBITS

12    Exhibit No.                          Received

13     1  . . . . . . . . . . . . . . . . 1130

14     3501-77  . . . . . . . . . . . . . 1114

15                    DEFENDANT EXHIBITS

16    Exhibit No.                          Received

17     HT1, HT2, HT3  . . . . . . . . . . . . .1041

18     Brodjik 1 through 4  . . . . . . . . . . .1113

19     Brodjik 1  . . . . . . . . . . . . 1062

20     Brodjik 4  . . . . . . . . . . . . 1098

21

22

23

24

25