```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

           v.                            11 CR 424 (NRB)

ANDRE HERBST,

                Defendant.

------------------------------x
                                         New York, N.Y.
                                         February 14, 2013
                                         6:45 p.m.


Before:

              HON. NAOMI REICE BUCHWALD,

                                         District Judge


                     APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
JAMES J. PASTORE, JR.
JANICE ECHENBERG
     Assistant United States Attorneys

DAVID GORDON
     Attorney for Defendant
```

1                (Case called)

2                (In open court)

3            THE DEPUTY CLERK:  United States v. Andre Herbst.

4    Counsel, please state your appearances for the record.

5            MR. PASTORE:  Jim Pastore and Janice Echenberg for the

6    United States and joining us at counsel table is Special Agent

7    Ryan Gibbs with the Department of Labor.  Good evening, your

8    Honor.

9            MR. GORDON:  David Gordon for Mr. Herbst.

10           THE COURT:  Again, let me begin by stating for the

11   record the documents I've received in connection with the

12   sentence.  The first is the report of the probation department.

13   It's dated January 9, 2013.  I have Mr. Gordon's letter of

14   January 31 and I have a financial affidavit, which again I

15   requested from Mr. Herbst and counsel.

16           I just actually, well, let me confirm that's all the

17   documents I should have received.

18           MR. PASTORE:  Yes.

19           MR. GORDON:  Yes, your Honor.

20           THE COURT:  And did you give the government a copy of

21   the financial affidavit when you sent it to me?

22           MR. GORDON:  I believe I e-mailed them a copy as well.

23   I believe I did.  And, your Honor, with respect to the

24   financial affidavit, this case is different from the last one

25   in that the probation officer went through the form with

1   Mr. Herbst at the time of the interview. Unfortunately,
2   they're looking at the form, I see that it calls for the
3   defendant to initial every page. That wasn't done, and the
4   probation officer didn't ask that it be done, we didn't know it
5   should be done. The writing, most of the writing --
6          THE COURT:  That's my question, whose writing?
7          MR. GORDON:  It's the probation officer.
8          THE COURT:  That's what I thought.
9          MR. GORDON:  Initially it was done at the time of the
10  interview. So this is not a situation where the defendant
11  didn't turn it in.
12         THE COURT: Okay. Okay. All right. In any event,
13  should I have received anything else aside from the documents I
14  mentioned?
15         MR. PASTORE:  Nothing from the government.
16         THE COURT:  Let me confirm that both of you received a
17  copy of the probation report.
18         MR. PASTORE:  We have and we have no objection.
19         MR. GORDON:  Yes.
20         THE COURT:  Mr. Gordon, have you had a chance to
21  review it with Mr. Herbst?
22         MR. GORDON:  Yes.
23         THE COURT:  Any objection to it?
24         MR. GORDON:  Only the tone that the probation officer
25  seemed to think there might be some hidden assets.

            THE COURT:  I think perhaps one of the things the probation officer was sort of curious about and seemed, was how is it that Mr. Herbst manages to rent a house for $700 a month which includes electric, heating and gas, water and basic cable when any homeowner knows that your heating bill and electric bill could easily be $700 a month or some number approaching that.  It just doesn't, there's something that doesn't kind of make sense and maybe that's what it is.  It uses a number of names, that he has a license, a Canadian license in another name than what he uses here.  I'm guessing that that's --
            MR. GORDON:  My understanding is the rent is subsidized, your Honor, by Rockland County.  He can explain.  He rents.  In fact, it mentions there's another renter, there was another room that was rented.  He doesn't own the building, he doesn't collect the rent.
            THE COURT:  I understand he doesn't own it.
            MR. GORDON:  There's another renter that owns it.
            THE COURT:  Who is subsidizing your --
            THE DEFENDANT:  Section 8, your Honor.  And your Honor, I did tell the probation officer about that, I don't know why he didn't write it up.
            MR. GORDON:  Your Honor, the addendum indicates that they did make a correction.  Initially the probation officer thought that I was retained.
            THE COURT:  I understand.

          MR. GORDON:  So that may explain one of the reasons he's questioning, how could he afford to pay for a lawyer given the fact that he has so little income.  Had I been retained I would have asked to be relieved a long time ago, because I don't think Mr. Herbst would be able to pay me my fee.

          THE COURT:  Let me, Mr. Pastore, if I can, can we begin as I did in the last sentence?  Would you detail for me the involvement of Mr. Herbst in this case?

          MR. PASTORE:  Certainly.  As your Honor asked, we've agreed on the range of 25 to 99 with Mr. Herbst.  The total potential universe was significantly smaller than Mr. Weber.  Indeed it was also significantly -- well, somewhat smaller than Mr. Walter as well.  Mr. Herbst's total potential universe was 152 applications for 114 aliens.  Of those applications we believe that there were several that were sent to P.O. boxes not under Mr. Herbst's control.  Unlike Mr. Weber, we don't have evidence of Mr. Herbst going and opening up P.O. boxes or engaging in other immigration businesses.  It appears that he played sort of the quintessential sponsor role.  Obviously, it was a significant number.  He got involved in the fraud under slightly different circumstances, I think, than Mr. Walter.  I don't believe that there is any pre-existing debt that he was attempting to sort of work off.  He did this for monetary gain and everything that we know suggests that he was receiving sort of the standard sponsor fee of somewhere between 300 and $500

1    for approved applications.

2             With respect to Mr. Herbst, the thing that jumped out
3    at us for justifying a guidelines sentence was, frankly, what
4    is contained in the PSR, the somewhat inconsistent in some
5    respects statements, for example, saying that he didn't own a
6    car, which I guess is literally true, but of course there are
7    several fairly nice leased cars, things along those lines that
8    raised the government's concern.  But in terms of what he did
9    in connection with this fraud pretty commensurate with what
10   Mr. Walter did, significantly less involved than what Mr. Weber
11   was doing.

12            MR. GORDON:  Your Honor, the several nice leased cars,
13   one of them is paid for by his employer so he can get back and
14   forth to work, so the employer paid for that one.  That's the
15   Honda.  And I understand that the lease on the other one is not
16   a huge amount, it's 200 something dollars a month which is not
17   a very high lease amount.

18            With respect to paragraph 68 mentions other cars that
19   have been registered, but not all at the same time.  He never
20   had more than the two cars that he has now at any one time.
21   The 1994 Chevrolet Cavalier, which expired in 2009.  They all
22   expired.  I mean, he had two cars and they were leased and one
23   of them is paid for by his employer.

24            THE COURT:  Well, I think that what was, I'm trying
25   to, I didn't speak to the probation officer but --

1           MR. GORDON:  Your Honor, there's something else I
2  noticed in the presentence report, maybe this is what you were
3  thinking about, paragraph 54 which talks about his reticence in
4  discussing certain things.  Mr. Herbst feels that he did
5  something wrong, he's responsible, he understands why the
6  probation officer is asking him questions about himself.  He
7  doesn't understand why they're asking about his wife, his
8  family, all these questions that he doesn't see as relevant.  I
9  understand why they're relevant, but I understand his
10 reticence --
11          THE COURT:  Were you with him when he was speaking to
12 the probation officer?
13          MR. GORDON:  If I remember correctly I arrived late.
14          THE DEFENDANT:  No, you were on the phone.
15          MR. GORDON:  No, I had a problem, I was on the phone.
16 But he questions things.  But he gives the information, if it's
17 relevant, the probation officer is entitled to it, he gives it.
18 It's just he feels he did something wrong, whatever you want to
19 know about me, fine.
20          THE COURT:  Well, except that you're sufficiently
21 sophisticated to understand that a probation officer who does
22 these interviews over and over again can be wondering how is it
23 that Mr. Herbst had six kids, all of whom I think have gone to
24 private school, gone to college, law school and yet he is now
25 I've learned living in Section 8 housing, is on Medicaid and,

1   you know, a question that arises, is there, you know, is all
2   this finances on the up and up.
3              MR. GORDON:  Your Honor, there's a letter from his
4   son, the lawyer --
5              THE COURT:  Right.
6              MR. GORDON:  And I spoke to the son and he tells me as
7   far as he knows his father did not pay for any of these
8   tuitions, that there was -- first of all, it's parochial
9   school, the tuitions are not as high as some of the other
10  private schools, but that it was scholarships, and my
11  understanding is that Mr. Herbst didn't pay anything for his
12  children's education.
13             THE COURT:  But his kids went through, at least one of
14  them, went to a private university and --
15             MR. GORDON:  Your Honor, it wasn't all scholarship,
16  there were loans.  There were grants and loans, but my
17  understanding is he did not pay for them at all.  And I asked
18  the son about it.
19             THE COURT:  The son went to law school, is a lawyer.
20             MR. GORDON:  Your Honor, the son who went to law
21  school was married at the time and his wife's an accountant and
22  she may very well have helped him out from the amount of money
23  that she was making that she was earning.  But Mr. Herbst did
24  not pay for his son's law school degree.  The son mentions that
25  he had to drop out of school in the fourth grade initially

1   because the parents were unable to pay the tuition.
2           THE COURT:  Mr. Herbst, you had gastric bypass surgery
3   this past August, is that correct?
4           THE DEFENDANT:  Yes.
5           THE COURT:  Did Medicaid pay for that?
6           THE DEFENDANT:  Yes, it did.
7           THE COURT:  They do?
8           THE DEFENDANT:  I certainly didn't pay for it.  I have
9   high blood pressure and that's why they -- that's when they
10  accepted it.
11          THE COURT:  Mr. Herbst, I think you were in the
12  courtroom when I asked Mr. Weber the question of basically why
13  did you do this.  How is it that you on the one hand can lead a
14  life of devotion, of, you know, family, charity and then, you
15  know, you're in your 50's, approaching your 50's --
16          MR. GORDON:  No, I'm sorry.
17          THE COURT:  You're 55.
18          THE DEFENDANT:  No, I'm not approaching.  I wish.
19          THE COURT:  I'm going back in time when you were --
20  all right.  It's not like magic, I don't make you younger, but
21  you're, you know, a mature adult.  You know, certainly at a
22  point where the legal system can expect you to know better.
23  Why did you get involved with this?
24          THE DEFENDANT:  Your Honor, I asked myself the same
25  question many more times than your Honor does.  I don't know

1  why. It hurts, the pain that this has caused my family, the
2  pain that it caused me and also the pain that it caused those
3  people that I think I tried to help and naturally I did not
4  only not help them, I actually harmed them and I really don't
5  know what caught up with my cousin, Mr. David, whom I thought
6  was trying to help people, and he was basically running a
7  business. I just don't, I really ask myself that question.
8  What, you know, we have an expression in Hebrew that says a
9  person does not sin unless a spirit of stupidity enters him,
10 and that's really my only explanation, that it was very, very
11 foolish on my part to do this knowing that the government
12 definitely would know. It's really of no benefit. This whole
13 activity was no benefit to the person that I was supposedly
14 helping out.
15         THE COURT: The reality is that the scheme did fool
16 the Department of Labor and immigration a good number of times
17 and there are people who are now currently in this country, I
18 assume, with green cards that obtained them improperly.
19 Whether, you know, some of them could have obtained them
20 properly I don't know, but I suspect the answer is not, but in
21 any event, it certainly makes it hard to deal with the
22 immigration issues in this country when there's fraud like this
23 and there are systemic problems within the system which
24 permitted this fraud to be actually very successful for a
25 number of people. You were involved and it made hundreds and

1    hundreds of thousands of dollars.

2            THE DEFENDANT:  I would assume that if anybody got a
3    green card illegally the government could and most probably
4    would reverse the situation.  I don't know, I'm not the
5    government.  I'm not going to take part in that, but --

6            THE COURT:  Let me ask does anybody else have anything
7    they would like to say?

8            MR. PASTORE:  Your Honor, I would, again, I understand
9    what's in the PSR and the concerns about the financials, but
10   just in terms of what your Honor has considered today and with
11   respect to relative culpability looking at what Mr. Weber got,
12   I do think it's significant to note that Mr. Herbst I think was
13   a lesser of a player and more consistent with a Mr. Walter, to
14   the extent that that factors into the Court's decision.

15           MR. GORDON:  Your Honor, I know probation recommended
16   a split sentence.  It's very rare that they recommend anything
17   other than a guidelines sentence and here they recommended a
18   guidelines sentence.  It seems to me that he's working, he has
19   to work.  He also visits his mother, he visits his mother every
20   week.  She doesn't know about this.  She's elderly, she's a
21   Holocaust survivor.  She's very concerned that if she finds out
22   this would really hurt her, and if there's any way, I don't
23   know whether your Honor was considering any form of
24   confinement, but I think that to impose any sentence that would
25   prevent him from seeing his mother and working and supporting

1  his family would certainly not be necessary to meet the
2  objectives of 3553(a).  It would seem to me that a sentence of
3  probation, as far as community service goes, I know your Honor
4  imposed that with some other people.  He's going to do it
5  whether you impose it or not.  He spends most of his time
6  giving to others when he's not working.  But to have any form
7  of confinement I think would be unnecessary in this case, it
8  would be especially harsh to his family.
9            THE COURT:  Mr. Herbst, I'm going to sentence you to
10  18 months probation with the special condition that you perform
11  150 hours of community service.  And the other mandatory and
12  standard conditions set out on page 22 and 23 are imposed,
13  obviously not the home confinement condition, and there's
14  further a special assessment of $100.  I assume there are some
15  open counts that need to be dismissed?
16            MR. PASTORE:  Two things.  We move to dismiss those
17  open counts and also I think your Honor didn't implicitly but
18  does your Honor formally adopt the offense level and guidelines
19  calculation set forth in the PSR?
20            THE COURT:  Yes, there's been no challenge.
21            MR. GORDON:  We don't challenge.
22            MR. PASTORE:  We move to dismiss the open counts and
23  underlying indictments against this defendant.
24            THE COURT:  I think Mr. Herbst probably waived appeal
25  of the sentence.

his family would certainly not be necessary to meet the objectives of 3553(a).  It would seem to me that a sentence of probation, as far as community service goes, I know your Honor imposed that with some other people.  He's going to do it whether you impose it or not.  He spends most of his time giving to others when he's not working.  But to have any form of confinement I think would be unnecessary in this case, it would be especially harsh to his family.

          THE COURT:  Mr. Herbst, I'm going to sentence you to 18 months probation with the special condition that you perform 150 hours of community service.  And the other mandatory and standard conditions set out on page 22 and 23 are imposed, obviously not the home confinement condition, and there's further a special assessment of $100.  I assume there are some open counts that need to be dismissed?

          MR. PASTORE:  Two things.  We move to dismiss those open counts and also I think your Honor didn't implicitly but does your Honor formally adopt the offense level and guidelines calculation set forth in the PSR?

          THE COURT:  Yes, there's been no challenge.

          MR. GORDON:  We don't challenge.

          MR. PASTORE:  We move to dismiss the open counts and underlying indictments against this defendant.

          THE COURT:  I think Mr. Herbst probably waived appeal of the sentence.

1                MR. GORDON:  Yes.
2                THE COURT:  Off the record.
3                (Discussion off the record)
4                MR. GORDON:  Your Honor, one other matter.  It's too
5    late for him to report to probation now.  I guess he could
6    report to tomorrow, or within 72 hours?
7                THE COURT:  Within 72 hours.
8                MR. GORDON:  His mother who he normally visits every
9    week in Brooklyn happens to live in Florida and he wants to
10   know if he needs permission from your Honor to go one time
11   while she's still in Florida.  She's going to be back sometime
12   in March.  Probation will probably want to know what your
13   Honor's view is.  If your Honor has no objection, then I don't
14   think probation will have an objection.
15               THE COURT:  Didn't I let him go --
16               THE DEFENDANT:  Yes, you did, your Honor.
17               THE COURT:  -- let him go to Israel?
18               THE DEFENDANT:  Not Israel.  To Canada, I went to
19   Canada and I went to Florida last year.
20               MR. PASTORE:  In the ordinary course once probation
21   commences then the probation officer is asked and as long as
22   they say it's okay --
23               MR. GORDON:  They may want to know your views.
24               MR. PASTORE:  And we would have no objection.
25               THE COURT:  It's okay.  Be kind to your mother.

D2EFHERS                        Sentence

1            MR. GORDON:  Thank you.
2            THE DEFENDANT:  Thank you very much, your Honor.
3            (Adjourned)