D2EFWEBS                          Sentence

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                              11 CR 424 (NRB)

5    MAYER WEBER,

6                   Defendant.

7    ------------------------------x

8                                         New York, N.Y.
                                          February 14, 2013
9                                         4:00 p.m.

10
     Before:
11
                     HON. NAOMI REICE BUCHWALD,
12
                                          District Judge
13

14                        APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     JAMES J. PASTORE, JR.
17        Assistant United States Attorney

18   HAFITZ NECHLIS & ROCCO
          Attorneys for Defendant
19   SUSAN NECHLIS, ESQ.
     NOAH SHELANSKI, ESQ.
20

21

22

23

24

25

D2EFWEBS                          Sentence

1          (Case called)

2          (In open court)

3          THE DEPUTY CLERK:  United States v. Mayer Weber.

4  Counsel, please state your appearances for the record.

5          MR. PASTORE:  Jim Pastore for the United States.  Good

6  afternoon, your Honor.

7          MS. NECHLIS:  Susan Nechlis and Noah Shelanski for

8  Mr. Weber, who is also present.

9          THE COURT:  Let me begin as I always do to confirm

10  that I've actually received all the documents in connection

11  with the sentencing that I should have.  First there's the

12  report of the probation office which bears a cover memo date to

13  me February 7, 2013.  Then there is the sentencing submission

14  submitted by defense counsel which is accompanied by 130

15  letters on behalf of Mr. Weber and finally at my request I

16  received this morning the financial statement that Mr. Weber

17  had not provided to the probation department.  Actually,

18  looking at this I do not see a CC to the United States

19  Attorney.

20          MS. NECHLIS:  I think we sent it to probation.  We

21  could certainly provide a copy.

22          THE COURT:  Why don't, if you have an extra on you or

23  I can ask one of my clerks to make a copy.

24          MS. NECHLIS:  I apologize.

25          THE COURT:  All right.  Let me give Mr. Pastore a few

1  minutes to flip through it.  While he does that let me just ask

2  are there any other documents I should have received in

3  connection with the sentencing?

4              MS. NECHLIS:  No, your Honor.

5              THE COURT:  Let me just confirm that you have received

6  the report of the probation department and had an opportunity

7  to review it with your client.

8              MS. NECHLIS:  Yes, your Honor.

9              THE COURT:  Do you have any objections to it?

10             MS. NECHLIS:  No, your Honor.

11             MR. PASTORE:  The government also does not have any

12 objections.

13             (Pause)

14             MR. PASTORE:  Thank you.  We've reviewed the financial

15 disclosure.

16             THE COURT:  Thank you.  I'd like to begin by asking

17 the government to detail for me the evidence against Mr. Weber.

18 Specifically, having sat through the trial of four other

19 defendants in this case I'm in a somewhat better position to

20 formulate the precise questions and specifically I would at

21 least like to know, and you can tell me what else you think is

22 important, I would like to know the number of applications that

23 were filed with Mr. Weber, a company of his being a sponsor.  I

24 would also like to know what evidence there is relating to

25 calls from the Department of Labor to Mr. Weber's companies

D2EFWEBS                          Sentence

1     which would indicate contact between him and the Department of

2     Labor and also whatever information you can provide with

3     respect to how much money he earned from participating in this

4     fraud.

5          MR. PASTORE:  Yes, your Honor.  In preparing for

6     today's sentencing we looked not only at some of those

7     questions but also just tried to get a sense of where Mr. Weber

8     fit relative to the other defendants that your Honor has

9     already sentenced and that have also been sentenced by other

10    judges in related cases.

11          In terms of the number of applications, the total

12    potential universe, and I put it that way because unlike the

13    defendants who went to trial we did not do the same deep dive

14    on the applications that were associated with Mr. Weber's

15    companies, in other words, the call notes, for example.  We

16    pulled those only for defendants that were going to trial.  The

17    total possible number of applications associated with Mr. Weber

18    were 305, associated with 219 aliens.  Now, because -- we do

19    not believe, and consistent with our plea agreement, we do not

20    believe he is accountable for that high of a number.

21    Obviously, as I mentioned, there was not as much done to vet

22    that number as compared to the defendants who went to trial.

23    So we reached a negotiated plea agreement here and the parties

24    agreed that there were between 25 -- there were at least 25 to

25    99 applications that Mr. Weber was responsible for and so --

D2EFWEBS                          Sentence

1              THE COURT:  When you say -- I think you said there

2       were 305 applications, that was the maximum number associated

3       with how many aliens?

4              MR. PASTORE:  219.  And I hesitate because when I say

5       the maximum and the total potential universe, as your Honor

6       heard from both cooperating witnesses sometimes companies

7       would, applications would be submitted and the sponsor would

8       not be fully informed of what was going on, they would

9       essentially sign off on generally what was going on, but they

10      weren't asked to sign each and every application.  And so

11      ultimately in this case with respect to Mr. Weber we ultimately

12      determined that 25 to 99 was an appropriate number to hold him

13      accountable for, that there was no doubt and both parties

14      agreed and wouldn't contest that he was responsible for at

15      least between 25 and 99 applications.  So a significant number.

16             But Mr. Weber's involvement went a little deeper than

17      that.  There was a post office box that he opened to which

18      fraudulent applications and mail associated with fraudulent

19      applications was directed.  And we know that he opened that

20      P.O. box because we have the rental application associated with

21      it.  We also know that he controlled several businesses.  Your

22      Honor heard and probably recalls testimony about nursing homes

23      that were used in the fraud.  Indeed, as cooperating witness

24      David Greenstein testified, Mr. Weber and he engaged in

25      additional criminal conduct in the form of a company that

Mr. Weber at least partially owned that was separate but

related to their law firm.  Your Honor may remember that

Mr. Greenstein filed two additional fraudulent applications and

that was with Mr. Weber, with Mr. David.  Now, of course

Mr. Weber at the time that those additional applications had

been filed, he had not yet been charged so this isn't

additional criminal conduct for him, this is part and parcel.

But I think that makes him differently situated than the other

defendants your Honor has seen in this case because he went on

to do other applications as part of the fraud, it's covered by

his plea agreement, but he did it essentially with David

Greenstein and with Earl David even after Earl David had left

for Canada.

          And so what emerges is although he was a minor player

in the sense that he was not in the law firm, and we're

certainly not backing away from the minor role adjustment, we

gave it to him, he was not one of the law firm people and I

think that was sort of the dividing line.  I also think the

guidelines in this case strike the government as reasonable.

As your Honor knows, the guidelines are 10 to 16 months and it

could be satisfied by supervised release that includes a

condition of home confinement as long as at least half of the

time is spent in prison, at least five months.  And when you

look at the other defendants who have been sentenced, you look

at Mr. Flohr, for example, and the application numbers there,

D2EFWEBS                    Sentence

much lower, 40 applications was the total potential universe

for 30 aliens, and in fact there was a different guidelines

range, it was guidelines range where the offense level was 10,

which means that defendant Flohr was actually in zone B as

opposed to zone C.  So it's sort of doubly significant in the

sense that it was a totally different guideline range and a

totally different zone, zone B instead of zone C, which as your

Honor knows can be satisfied by the guidelines by a term of no

imprisonment at all, instead home confinement alone is a

guideline sentence.

       When you look at Mr. Walter, that's probably a person

that Mr. Weber is most closely associated with, but even there

there are differences.  Mr. Walter was potentially responsible

for 198 applications associated with 163 aliens, but Mr. Walter

had a slightly different way into this fraud.  He owed

Mr. Teitlebaum money.  There was no evidence, at least that the

government was aware of, that the fraudulent applications were

going to P.O. boxes that he himself had opened.  Instead, all

of the P.O. boxes that we identified associated with

Mr. Walter's companies were actually controlled by

Mr. Teitlebaum or others in the fraud and then we come to

Ms. Urbanek who actually was more involved.  She was in the law

firm, as your Honor knows, but as your Honor heard and I won't

go into it in detail here, she had significant personal

circumstances, and in reading Mr. Weber's sentencing

D2EFWEBS                    Sentence

submission, I don't mean to suggest that he doesn't have a lot

of support, he clearly does, and there were an extraordinary

number of at least in my experience an extraordinary number of

exhibits and letters submitted on his behalf, but at the same

time it just did not strike the government -- as you know, the

government agreed to take the position at sentencing that a

below-guidelines sentence was appropriate for Ms. Urbanek

because of everything that happened including her domestic

situation, but we didn't feel compelled to do that here.

         With respect to the other defendants that were

sentenced by some of the other judges in the courthouse,

Mr. Vago was sentenced at 366 days, so a year and a day.  He

was a tax preparer and it makes sense.  His guidelines are

higher and he played a more significant role and no one is

suggesting that 13 months' imprisonment here would necessarily

be the right term of imprisonment, although it's certainly

within the guidelines.

         Mr. Nolan was the corrupt DOL employee, he got an

18-month sentence.  Mr. Choudry got a 24-month sentence.  Again

he was someone who worked at the law firm.  Ms. Diaz, she was

an attorney, I think this was probably the outlier sentence and

she had personal circumstances including care of a minor child

as the sole provider, so I think that that is likely what drove

the decision to impose probation on her.

         Ms. Sitao -- I'm sure I'm pronouncing that wrong --

D2EFWEBS                        Sentence

1   had a significant number of applications, approximately 34

2   applications, was sentenced to 15 months' imprisonment and then

3   Mr. Hussein and Mr. Saleem both provided various services.

4   Mr. Hussein worked at the law firm, Mr. Saleem was one of the

5   accountants, although he only did tax returns for a single

6   company which I think accounts for his probationary sentence,

7   whereas Mr. Hussein got a 13-month sentence as someone who

8   worked at the law firm.

9           So when you lay out and compare the relative roles of

10  Mr. Weber and the other defendants I mentioned the guidelines

11  particularly because they allow for a split sentence of home

12  confinement and some incarceration seem to be appropriate both

13  in terms of looking at them on their face and in terms of the

14  relative roles of the defendants here.  I think probably the

15  most difficult thing, at least as I was looking at it, to

16  balance it is the level of charitable works that Mr. Weber has

17  done in his life, the number of supporting letters, the amount

18  of community support that he has certainly weighs in his favor

19  and perhaps that augers for not a full ten-month imprisonment

20  sentence and the split sentence being the appropriate sentence,

21  but certainly the government does believe that a guidelines

22  sentence here is appropriate, notwithstanding the charitable

23  works and taking that into account because of the several

24  things that Mr. Weber did, because of the not just lending his

25  name but opening P.O. boxes, the additional -- well, again, I

D2EFWEBS                        Sentence

 1  don't mean to call it additional criminal conduct, it was

 2  additional criminal conduct for Mr. Greenstein but part and

 3  parcel of this was Mr. Weber was perfectly willing to continue

 4  the fraud among the law firm.

 5          THE COURT:  And you have some independent evidence in

 6  addition to Mr. Greenstein's testimony about, I think the

 7  company was named something like Immigration Consultants.

 8          MR. PASTORE:  It was something along those lines,

 9  North American Immigration Consultants, something along those

10  lines.  May I have a moment to speak with Mr. Gibbs?

11          THE COURT:  He can sit with you.

12          MR. PASTORE:  He apologizes, he did not dress

13  appropriately.

14          So, your Honor, completely separate and apart from

15  the two aliens that Mr. Greenstein assisted along with

16  Mr. Weber the agents interviewed two different aliens who

17  reported meeting with Mr. Weber and apparently, and I say

18  apparently, it looks like money was taken from those aliens but

19  applications never were filed because we didn't find, the

20  agents didn't find any applications in the system.  So the

21  aliens reported paying money but we didn't see a corresponding

22  Department of Labor immigration application.  It's difficult to

23  prove a negative, but it appears that the money may have been

24  pocketed.

25          So in addition to Mr. Greenstein's testimony about his

two aliens, the agents corroborated Mr. Weber doing additional

applications by talking to two people who actually were

serviced.

THE COURT:  I'll hear from Ms. Nechlis now.

MS. NECHLIS:  Thank you, your Honor.  Your Honor, I'm

surprised by the government's statements here today.

Mr. Pastore was not involved in our negotiations with Ms. Perry

and Ms. Echenberg about this plea and there were extensive

negotiations, they went over many months.  We discussed all

these allegations and we told the government that we disagreed

with them, that there was no money taken and we reached an

agreement with the government, we were going to plead guilty to

certain things and it would be a stipulation as to what the

conduct was.  Notably the government did not respond to our

sentencing memo and did not put any of this in writing.  So we

had gone through all of this, but this was never put before the

Court.  We were never, we never briefed this to your Honor.  So

to come in today --

THE COURT:  Do you want an adjournment?

MS. NECHLIS:  No, I don't, your Honor.  I think that

these -- there was a reason why we reached the stipulation and

the government reached the stipulation that they stipulated to.

They stipulated to what the conduct was.  So to at this point

be raising other conduct is really kind of surprising.  And we

gave them our sentencing memorandum before we submitted it to

D2EFWEBS                    Sentence

1    the Court to make sure that we were aware there had been a

2    trial on this, that they had done an extensive investigation to

3    be sure that we were not saying something about the conduct

4    that the government found offensive.  We e-mailed it to them

5    and we discussed it with them before we submitted it to the

6    Court.  And none of this was raised before today.

7            So there's a couple of levels of this.  One is the

8    number of people.  Before we entered into these stipulations

9    with the government we had extensive discussions about the

10   number of applications.  We showed the government that on many

11   of the applications that Mr. Weber supposedly signed his name

12   was spelled wrong.  It had the wrong Social Security number.

13   There were so many inaccuracies.  He never signed those

14   documents.  His name was forged on them.  It was based on this

15   back and forth.  So, yes, there are many documents which listed

16   his name, but they clearly, he clearly was not actually

17   involved in those documents.

18            THE COURT:  Well, one of the things that I've learned

19   by spending over three weeks at trial is that while that was

20   true in many of the cases, that the sponsors did not personally

21   sign the applications, nonetheless the correspondence from the

22   government in response to the applications had to go back to

23   the sponsor, and so you have, let's say, a situation where you

24   have this post office box, and whether or not Mr. Weber or some

25   other sponsor signed the application, there becomes an

1    awareness from the fact that there then -- there's mail from

2    the Department of Labor, there are phone calls --

3           MS. NECHLIS:  Judge, I want to be a hundred percent

4    clear here.  We are not contesting in any way his

5    responsibility.  He pled guilty and we've accepted

6    responsibility.

7           THE COURT:  Well, it's very important --

8           MS. NECHLIS:  But what I'm saying is there were a

9    number of post office boxes.  Some of them went to him.  The

10   ones he had actual businesses, he had actual nursing homes, he

11   had an employment agency.  He opened post office boxes in

12   connection with those.  He did.  He opened those post office

13   boxes.  Mail did go to him.  He got some of this stuff.  He

14   knew what was going on.  He's not saying he wasn't involved or

15   he didn't do it.  But we showed --

16          THE COURT:  But there's a great --

17          MS. NECHLIS:  We went through a lot of the specifics.

18   We spent a lot of time going through the documents and showed

19   after that, we showed the government that some of these

20   documents could never have gone to him, he didn't see.  So,

21   yes, there were 300-something applications, but we agreed with

22   the government that the best estimate of what he personally was

23   responsible for was up to I believe it was to 99.

24          THE COURT:  Well, that number, as you know and I know,

25   just comes from the guidelines book and there is, guidelines

book or no guidelines book, an enormous difference from my

point of view, and I think there ought to be, whether the

number is 25 or it's 99 or it's really 150 or 125, but the

government as part of plea negotiations says we're going to put

you in another guidelines category.  So, you know --

MR. PASTORE:  Your Honor, I do want to be clear when I

was talking to my colleague Ms. Echenberg, there were, of those

199 that I mentioned there were some that Mr. Weber could not

have known about, so we credited defense counsel's arguments

and that's why we agreed on the 25 to 99, one of the reasons we

agreed on the 25 to 99 and no one is suggesting that --

THE COURT:  No, I understood you.

MR. PASTORE:  I just wanted to make that clear that

we're not backing away from that number.  We heard what defense

counsel -- again, I wasn't involved in those negotiations, but

I understand that it was negotiated very hard that number and

there was a pretty convincing presentation made about why the

number should be lower for several reasons.

THE COURT:  Okay, but from my perspective it does

matter whether it's at the low end or the high end of that

number and if you have a situation where the potential universe

is 305, there's a huge difference just in mathematical terms

whether the real number is a third or the real number is --

well, let me -- a twelfth and one would logically think it's

not a twelfth, it's something higher than that.

D2EFWEBS                         Sentence

1          MS. NECHLIS:  Your Honor, if I may respectfully.  I

2     think nobody was able to say where it was between the 25 and

3     the hundred, the 99; that clearly he got mail on this stuff, he

4     got documents.  He received documents over the years.  Some of

5     the documents went to his post office box.  He appears to have

6     signed very few of the documents himself.  But he did get the

7     mail.  He knew that this was going on.  He knew that his firm

8     was being -- his companies were being used on an ongoing basis

9     and he did nothing about it over time and then after he did

10    have some involvement with Immigration Associates.  We went

11    back and forth with the government over this issue of whether

12    there were other immigrants he took money from.  We disputed

13    that.  We said we did not believe it ever occurred and the

14    government as we understood it dropped that out of any

15    consideration.  That was not to be part of today.

16          THE COURT:  Let me make something perfectly clear.  On

17    the yellow piece of paper in front of me with my questions is

18    the following note:  David G. for Greenstein, Immigration

19    Consultants.  I was going to ask him whether he volunteered it

20    or not because we did something not very sophisticated but we

21    reviewed the trial transcript with an index to find all the

22    references to Mr. Weber.  So we found it.  So it wasn't that I

23    remembered it, frankly, but we found it.

24          MS. NECHLIS:  As did I, your Honor.  And there's no --

25    Immigration Associates, I understand.  But what I'm surprised

1    by today is the allegation about theft from other immigrants.

2    Not the two applications that were put in through Immigration

3    Associates but the allegation that money was stolen from other

4    people, which is something that we had extensive discussions

5    about with the government before this case and so that we would

6    want a hearing about it.  We asked for the names of the people.

7    We disputed it.  So to hear it now when they did not put it in

8    any memorandum, it was not part of the testimony, I'm frankly

9    surprised that it is coming up today, and it was not part of

10   the agreement, it was not part of the sentencing, it was

11   never -- it was something we always told the government, no,

12   that did not occur.  That is not what occurs here.

13            THE COURT:  But you don't dispute that Mr. Weber was

14   himself involved in some company, organization called

15   Immigration Consultants which had activities that were not

16   dissimilar from the scheme involving Earl David, right?

17            MS. NECHLIS:  My understanding, your Honor, was that

18   there were two times that his firm was used as a sponsor at

19   that point as well.  And that this fit well within the whole

20   sort of 25 to 99 for --

21            THE COURT:  Was Immigration Consultants a sponsoring

22   company?

23            MS. NECHLIS:  No.

24            THE COURT:  It was a feeder company, right?

25            MS. NECHLIS:  No.

 1        THE COURT:  No?

 2        MS. NECHLIS:  My understanding about it was

 3   Immigration Associates, one of the things that it did was you

 4   were allowed under the regulations to bring, you're allowed to

 5   assist people filling out applications and so that's what that

 6   company, that was one of the roles it did.  It also on a couple

 7   of occasions my understanding is helped people with phony

 8   applications where another one of Mr. Weber's companies was

 9   used as the sponsor, and with respect to that, that was part of

10   the allocution in his case, that was part of the 25 to 99 cases

11   that the government had considered, that we had extensive

12   discussions about.  He allocuted specifically to that as well.

13   That was part of our concern that that be covered in the

14   allocution here and it was agreed to that that was part of this

15   whole scheme, the same scheme, the 25 to 99 here.  So this is

16   not, it's not some additional amount that went on.  This was

17   part of the negotiations with the companies.

18        THE COURT:  But isn't the more salient point that even

19   after Earl David fled to Canada, that did not totally

20   discourage Mr. Weber in continuing to be involved in this

21   fraudulent activity?

22        MR. PASTORE:  Yes, and, your Honor, just to make the

23   record clear, although we've mentioned it, based on what I'm

24   hearing from defense counsel, we're not going to in any way

25   rely on the allegation of theft as a sentencing factor.  The

D2EFWEBS                    Sentence

1    purpose of bringing the other immigration firm up was exactly

2    what your Honor just said.  The salient point was that even

3    after Earl David leaves there's applications being filled out

4    by this company that it sounds like there's no dispute that

5    Mr. Weber was involved in that company and that additional

6    phony applications were filed through it.  So we will

7    explicitly not rely on any allegation of theft to avoid any

8    problems.

9             THE COURT:  Actually, the reason that I asked you the

10   question was there some independent evidence was to confirm or

11   be sure that what Mr. Greenstein had said was correct and

12   honest.  So that was why I asked that.  I can tell you that in

13   candor.

14            MS. NECHLIS:  Your Honor, with respect to Mr. David's

15   fleeing, I do not believe that at that point -- it's a funny

16   thing.  He flees, Mr. Weber knew he was doing something wrong.

17   He knew it before, he knew it after.  He left.  He was doing

18   something wrong by allowing his name.  I don't think he focused

19   on the significance or how wrong this was.  I guess that sort

20   of standing here today, I don't think that Mr. David fleeing,

21   it's not like the witness who had pled guilty and continued on,

22   was in a cooperation agreement and continued to do wrong.  I

23   think of it all as just a continuum.  It's not like we're

24   saying before he fled he didn't know he was doing something

25   wrong.  He knew he was doing something wrong here, he should

1    not have allowed his company to be used, his name to be used.

2    And he knew that even though he was only doing a portion others

3    were doing more and that this is what that law firm was doing.

4    Immigration Associates also did legitimate work, legitimate

5    help to try to get immigrants who were legitimate immigrants to

6    try to assist them in getting their papers in or their

7    applications put in.  You don't need to be a lawyer to be able

8    to do this, to assist people in this kind of work.  But he also

9    knew that he was doing something wrong with respect to being a

10   sponsor for these things.  But in that sense I do not believe

11   that he is in any different position than the other sponsors or

12   defendants who have been sentenced by your Honor.

13          THE COURT:  I can tell you that the, and I went back

14   over it because you made the argument, as did Mr. Herbst's

15   counsel, I did review all the other sentences and Mr. Pastore

16   may look at it from one perspective, but my perspective was

17   apart from the degree of involvement in kind of a measurable

18   way there were in my view certain family circumstances and

19   other situations that were particularly compelling to me.  So I

20   assure you that I have, and I always try to sentence as

21   proportionately as possible.  Whether it's perfect or not I

22   can't, you know, that I can't guarantee you.

23          Let me ask you about some other matters that I find

24   pretty troubling, and let me just put -- we can totally put to

25   one side the issue of whether Mr. Weber has engaged in

D2EFWEBS                        Sentence

1    exceptional charitable activity.  I'm not questioning that.

2    But there are things that concern me.  As you're aware,

3    paragraph 69 of the probation report states that the defendant

4    was instructed to complete and return a personal financial

5    affidavit to the Probation Office.  To date we have not

6    received a personal affidavit from the defendant or defense

7    counsel and as you know I had my law clerk call you to obtain

8    that affidavit, which as I said earlier I got this morning.

9    It's dated yesterday.  So it's not like you gave me a Xerox of

10   something that had been previously submitted.

11       The information in this affidavit, which I would not

12   have known had my eye not caught the absence of one given to

13   probation, makes the paragraph 69 information wholly misleading

14   and fundamentally bottom line untrue.  For example, it says

15   that Mr. Weber had $240 cash on hand.  Well, I don't know,

16   maybe that was what was in his pocket at that moment, but if we

17   look at his net worth statement, and it's a tough Xerox so I

18   may not have the numbers quite right, but he has over $2,500 in

19   bank accounts, he has brokerage accounts that sort of looks

20   like approaching $50,000.  He has cash value on life insurance

21   policies.  He has other assets.

22       MS. NECHLIS:  Your Honor, your Honor may not be aware,

23   the presentence report was given to us very late in this case,

24   so it was given to us on the, it was given to us I believe last

25   week and we went ahead with sentencing because I have a trial

D2EFWEBS                          Sentence

1    coming up and wanted to -- didn't want to adjourn this until

2    after sentencing.  However, my colleague, Mr. Shelanski,

3    talking to the probation officer all along, he was busy on some

4    other things and had said, had been told we would submit this

5    report two or three weeks earlier and that we could put in the

6    financial affidavit afterwards.  And then things got sped up

7    and we did not put the financial information in.  The

8    presentence report was submitted and the --

9              THE COURT:  But the whole thing is I've only caught

10   you in the falsehood because I asked for it and the fact is

11   that what he says in here is totally misleading.

12             MS. NECHLIS:  All right.

13             THE COURT:  And it's so grossly inaccurate and when

14   you go past that and then you learn that, you know, the

15   portrayal of somebody who --

16             MS. NECHLIS:  Could I address what's in the financial

17   report and what's in the PSR?  Because I'm troubled by this,

18   because I don't see it as that different.

19             THE COURT:  Oh, he has $240 cash on hand, but he has

20   four bank accounts, brokerage accounts, these are all what we

21   call, you know, cash or cash equivalents.

22             MS. NECHLIS:  Okay.  Your Honor, three of those

23   accounts are his wife's.  They're not his.  So when he answered

24   what was in his account, what he had, he was accurate.  It

25   turns out his wife had about $3,000 more, but he had $250 in

1    his account as of the date last night.  So I don't think that

2    that's inaccurate.

3           With respect to his, the securities, one of those

4    accounts is his.  The KEOGH, the $30,000 one.  The other two

5    which have about, I don't know, $14,000 or $13,000 are -- no,

6    one more is his, it has another 3,000 that he omitted to tell

7    probation, but the other 10,000 is his wife's, it's not his.

8           THE COURT:  The question is, include all stocks --

9           MS. NECHLIS:  He did.

10           THE COURT:  -- and public companies you own or have an

11    interest in.

12           MS. NECHLIS:  No, or your spouse owns.

13           THE COURT:  Where does it say that?

14           MS. NECHLIS:  If you look at the top it says, note,

15    you should put individual, joint or spouses.

16           THE COURT:  Okay, I see it now.

17           MS. NECHLIS:  On the front page the instructions say

18    not only your assets should be listed but also your spouse's

19    assets.

20           THE COURT:  Fair enough.

21           MS. NECHLIS:  In fact, his house is being foreclosed

22    on.  He has no money.  He has 30,000, the only money he'll be

23    left with --

24           THE COURT:  But his house is being foreclosed on

25    because he chose to take out an enormous mortgage on his house

1    and his house, according to this, is still worth more than the

2    mortgage amount that's outstanding.

3         MS. NECHLIS:  You know, your Honor, we tried in this

4    financial statement to be really cautious.  I was sort of taken

5    by surprise that this had not been given to probation.  Things

6    had moved quickly.  We tried to be very cautious and not

7    understate his assets in any way, in any way.  Because to me

8    that would be the problem, to be coming in here and have put in

9    an affidavit that falsely understated it.  It never occurred to

10   me that there was a question that it somehow contradicted what

11   he previously told probation.  I don't think it significantly

12   contradicted it and certainly we weren't trying to hide any of

13   this.  We put it all in the financial statement.  I think to a

14   large extent it does reflect what was told to probation.

15   Really, his main assets is his 30,000 in an IRA account.  His

16   wife has some other assets, there's a trust for the

17   grandchildren.

18        THE COURT:  What is that trust?  I wanted to ask you.

19        MS. NECHLIS:  It's money he will inherit when his

20   father passes away.  We tried to list everything, your Honor.

21   That is not money he has access to.  That is money that he will

22   inherit, I'm not sure -- the grandchildren will inherit, not

23   him.  So it's not money that he controls, but part of the

24   instructions here are, you know, people --

25        THE COURT:  It's his daughter or all --

1            MS. NECHLIS:  His daughters.  So we really tried to be

2    very -- I mean, I'm always concerned.  I don't want my clients

3    making a false statement in these documents so I say overstate

4    if you have to your assets; if you're guessing, say, put it on

5    the high side, you know, but --

6            THE COURT:  I also, I'll be perfectly candid with you.

7    There's a couple of your letters talk about the bar mitzvah

8    that he gave to the young man Mordechai, and it is described as

9    no expense or detail was spared.  If my math is right that was

10   about four years ago?

11           MS. NECHLIS:  Five years ago, your Honor.

12           THE COURT:  13, Mordechai says he's 17.

13           MS. NECHLIS:  He's 18.  I think he was 17 when he

14   wrote the letter.  He's 18 now.

15           Your Honor, I just have two things to say about that.

16   I do want to talk further about Mordechai because I think that

17   goes to the heart of sort of the --

18           THE COURT:  How about just throw in there when you

19   discuss it the fact that in 2009 after throwing this bash he

20   then filed for bankruptcy.

21           MS. NECHLIS:  So, your Honor probably noticed as well

22   that Mr. Weber's father has been paying the tuition for

23   Mordechai for school for all of this year and his father is a

24   wealthy man and he paid my fees and has paid most of these

25   things.  So he is the one who has been providing a lot of the

1    support here.  In addition -- and he's very close to Mordechai

2    as well.  He has been supporting Mordechai.  He has become part

3    of his family, so this is essentially his foster grandson who

4    is being bar mitzvahed in what is a very important thing about

5    this child.  But in addition, I don't know whether your Honor

6    has been to any bar mitzvahs in this community.  No expense

7    spared is not like an upper west side bar mitzvah.  This is not

8    at the Plaza.  These are in schul with, you know, lavish food

9    set out, but this is not dancing all night at some fancy hotel.

10   This is not $100,000 bar mitzvah.  That is not what impresses

11   in that community.

12           So when I read this, it did not even occur to me that

13   it was an expensive thing.  I've been to beautiful weddings in

14   this community where it's all in schul.  It's not -- everybody

15   is invited, there's plenty of food, but I can't imagine it

16   costs that much money.  It doesn't cost what my friend's kids'

17   bat mitzvahs and bar mitzvahs cost because it's a different

18   community, a different thing is important.  What's important is

19   on the day of his birthday, on his birthday is when the bar

20   mitzvah happens at 9:00 at night.  Often it's only the men

21   there or maybe some other people, but it's not that you have it

22   Saturday afternoon in schul sometime near the birthday and then

23   you go -- so I actually had not asked, you know -- and then you

24   have a big party at night.  That's not what happens here.

25           So I hadn't even asked about this so I can't tell you,

1    your Honor, how much it costs because having been to these kind

2    of bar mitzvahs hearing that, they're not fancy.  They're not

3    like our bar -- my kid's bat mitzvah is going to be, which I

4    will try to do modest, but it will probably cost three times

5    what his foster son's bar mitzvah costs because to them what is

6    important is praying for hours and the significance of this

7    child getting up on the bima and praying for hours.

8          So I read that as talking, what to me was the

9    significance was he got this kid the education, he put it all

10   together, he got him the clothing that was needed.  But I don't

11   even know if there was dancing, I don't know if there was, what

12   there was.  It's not --

13         THE COURT:   I'm just reading what Mordechai's mother

14   said.  "A year later when Mordechai turned 13 he took care of

15   his bar mitzvah celebration and no expense or detail was

16   spared.  It is now five years later and everybody is still

17   ranting and raving about it."

18         MS. NECHLIS:  I don't know what she meant.

19         THE COURT:  I don't know what she meant, either.

20         MS. NECHLIS:  I'm told it cost about $4,000, your

21   Honor, the bar mitzvah.  I don't know why she says everybody is

22   still ranting and raving.  I'm really -- these are, a bar

23   mitzvah in this community is not a big dance affair, it's not

24   where the kids get brought in on elephants.

25         THE COURT:  I think I understand that.  I am just

1    reading what is in a letter that you submitted and there is an

2    interesting to me sequence of reading the letter and then

3    thinking about the fact that Mr. Weber, who is obviously the

4    son of an extremely, very wealthy -- I don't want to say

5    "extremely" -- a very wealthy person, decides, chooses to file

6    for bankruptcy thereby taking advantage of the civil law and

7    not paying the civil debts that he accumulated.

8              MS. NECHLIS:  I could address that, your Honor.

9    Mr. Weber had a number of nursing homes in Connecticut and some

10   other businesses, and the rates changed for reimbursement.  He

11   floundered.  He didn't do well.  He's not a very good

12   businessman.  And it failed and there were enormous debts

13   associated with that.  And, yes, he then took advantage of the

14   laws that allowed him to file for bankruptcy and that's what he

15   did and he filed for bankruptcy.

16             THE COURT:  There's a difference between business

17   bankruptcy and personal.

18             MS. NECHLIS:  I think his business and personal were

19   intertwined.  He had taken personal loans out to invest in the

20   business.  He lad tried to make these businesses succeed.  He

21   failed at it.  And so because -- at that point he filed for

22   bankruptcy for it.  But I don't think there's any allegation

23   anywhere that he did something improper in that respect.  And

24   in addition I don't think there's any allegation that he lives

25   an extravagant lifestyle or had done anything, hidden assets or

D2EFWEBS                        Sentence

1    had done anything phony.

2              I mean, in this entire net worth statement here there

3    just isn't that much there.  Even when you count in his wife's

4    assets there's just, you know, it's another $10,000 in cash.

5    You know, at the same time this is a man who has taken on

6    extraordinary responsibility for two other foster children,

7    bringing them into his life, greatly increasing his expenses in

8    what he's doing.  Because it's an expensive lifestyle.  It's

9    expensive to send these children to Yeshivas, to private

10   schools.  You've read these letters that all of these children

11   got extensive psychological care, that the two children he took

12   in, they were children very much in need.  But it's not, really

13   in all of this when I was putting together the letters and

14   putting all of this together, I never really focused on the

15   money, your Honor, because respectfully, he's poor.  He has

16   almost nothing.  He walks around with plastic bags with things.

17   I've never seen him dressed well.

18             THE COURT:  But they're all the letters of all of the

19   things that he is providing to these charities, where is it

20   coming from?

21             MS. NECHLIS:  Much of it is him going and doing things

22   there, helping, setting things up.  Yes, some of it is him

23   giving money, but, and I don't know when that is from.  Some of

24   it is him buying clothing for people in his community on the

25   holidays or stuff.  I don't know that that is that much money

D2EFWEBS                    Sentence

1    to be putting out, you know.  I mean, you see also in his

2    financial statements he gets money.  He's supported by his

3    father for the most part.  His father has helped him.  Does he

4    give some of his money away?  It is an enormously charitable

5    family.  His father, who is wealthy, has also done unbelievable

6    charitable acts.  He organized and established, he was the

7    founder of Hatzolah, the ambulance service that is worldwide

8    now that is a volunteer ambulance service and he gives millions

9    of dollars and has given millions of dollars to that and he

10   gives to other charities and that is sort of the model that

11   Mr. Weber has tried to live with, and so he does give money to

12   charity, he does do it, and, your Honor, honestly, I actually,

13   when I looked at this letter, it is a community that is, this

14   community is very much, part of it is to do these different

15   charitable acts, caring for the sick, caring for the dead.

16   You've seen it in other cases I'm sure.  To me what is

17   different about this case and when I came into court tonight

18   and what I have been thinking about for days is what is done

19   with these children, the two children he fosters and the Ungers

20   who also wrote letters to you as well where they talked about,

21   people in the community talk about his bringing into his home,

22   he and his wife Panina bringing kids into his home who came

23   from extremely troubled homes, and particularly this woman,

24   there was a letter from Gitty Manson who talks about this

25   child, their childhood friend Raizi, who was just a mess.  She

 1   came from a horrible family, an abusive family, she went to

 2   live with grandparents who were Holocaust survivors, always a

 3   problematic situation.  Then she married an abusive alcoholic

 4   man and then has this child who clearly has psychological

 5   problems, ADD, anger management issues, the stealing things

 6   from the community, is in trouble, nobody can do anything.

 7   There are many organizations that are trying to help him with

 8   this boy in the community, nobody would take him in.  I can't

 9   imagine as a mother trying to take in someone else's child like

10   this, taking on that kind of responsibility.  But he and his

11   wife, Panina, who is here in the courtroom did that and have

12   done it not just this last year, not just for a few months, but

13   for years now, for over five years.  I think it's six or seven

14   years with this boy.  Before that they did it with another boy.

15   These boys have written to your Honor and other people have

16   written to your Honor about how he did that.

17          Those to me are just extraordinary acts and go far

18   deeper.  Yes, he gave money to this kid, yes, but the amount of

19   time and devotion and caring and patience that you would have

20   to have with boys like this who are on the verge of just

21   becoming delinquents, just being drug addicts, thieves, being

22   in serious, serious trouble and there's just no question that

23   that was where Mordechai is.  You have many, many letters from

24   that.  So you see with all of that that that is really what I

25   think he has done here, you know, and then even more you see,

1    and I didn't really focus on this before, but if you're going

2    back and looking through the letters there are these other two

3    boys who live next door, the Ungers, who also talk about how he

4    has taken them in.  They have no father around either.  It is a

5    community where sexes are very segregated and a boy needs a

6    father, a boy needs a man to help him get bar mitzvahed, help

7    him in a community like this.  The rabbis will take care of

8    some of it in the community but Mr. Weber has stepped up to the

9    plate on this with these children and two others as well.

10           So with respect to Mordechai's bar mitzvah, I think it

11   occurred in 2008, before he declared bankruptcy, it's hard for

12   me to imagine a that it was a very lavish affair.  Yes, I see

13   that that sentence is in Mordechai's mother letter.  This is

14   the woman who is described by everybody else as being a little

15   crazy, a bit, you know, as being a troubled, troubled woman

16   which is why her child is not with her, why Mr. Weber and his

17   wife have been raising --

18           THE COURT:  Explain to me why somebody who is the son

19   of a multimillionaire who engages in exceptional charitable

20   works, has a clear sense of family, of community, is willing to

21   break the civil law.  The civil law, what I mean by that is

22   broadly the non-religious law, in this case the criminal part

23   of the law.  It is -- there is a disconnect there that I really

24   don't comprehend.

25           MS. NECHLIS:  So, I agree with that, your Honor, that

1  is the most challenging part of this case.  I do believe that

2  Mr. Weber is a really good person, a really good person who did

3  something wrong here.  I think he did something wrong for a

4  couple of reasons, you know, having spent a long time with him,

5  with his family.  I know a lot of his family members over the

6  years and with him I think that he's had a lot of health

7  issues, he had a tremendous failing in his business.  He is not

8  the success of his father, of his brothers, maybe, he is not

9  the success.  In other ways he is, in his personal life he is a

10  tremendous success in his business he is not, he is really kind

11  of a failure there.  I think he was floundering, he was looking

12  for things to do, looking for business.  He doesn't have a job,

13  he's a messenger essentially today.  He is supported by his

14  father.

15          He became friends with some people at this law firm,

16  he started off working for them legitimately, they said to him

17  here's an easy way to get money, these are people who just need

18  to come into the country, it's no big deal.  And it is a big

19  deal.  I don't mean to say that, that it's not a big deal.  It

20  is a big deal, it was wrong to do it.  But I think he

21  disregarded how wrong it was.  He didn't think of it as a big

22  deal.  He's not stealing money, he's just helping people come

23  into the country.  And I think he just did something stupid, he

24  didn't think of it as that significant and he did something

25  stupid, maybe because he was in a very hard part of his life, a

D2EFWEBS                    Sentence

bad time in his life, maybe because he's not the success of

other people, maybe because he's having health problems and

problems that we talk about in his submission, in our

submission to your Honor, but there is often no good reason why

somebody does something that was just wrong and

uncharacteristic.

It is not, what I would say, though, it is not a

situation, sometimes you'll get a situation where it's

pervasive in someone's lifestyle that they are on the one hand

religious, but on the other hand they're defrauding the

government out of benefits.  They're not paying their taxes.

They're doing this -- that's not what went on here at all.

This is a man who I believe has led a righteous life, who

thinks, who is not a cheat or dishonest person, but who did

this thing and it was wrong.  It went on.

I don't think he made a lot of money out of it.

Somehow the government was alleging he got $100 a transaction.

He didn't have a lot of money.  He's not a success and I think

he was trying to find a new way, maybe I can do this

immigration business, maybe I can start that as a business.  In

fact, at one point he was asking me is this okay, can we do

this, can I help people with this, here are the regulations.

He has no place to -- he was lost, and so none of that is meant

to justify it, to say that this was in any way okay, but it was

just I feel a failing.

1            MR. PASTORE:  Judge, just very briefly.  In terms of,

2     so defense counsel has raised this idea of paying taxes.  I'm

3     just looking at paragraph 70 and it doesn't appear that he's

4     paid any taxes from 2007 to 2011, since his taxable income is

5     zero.  I'm not sure how that is if he was employed earning $400

6     a week during that time period.  And it looks like maybe

7     negative income was reported for 2007 and 2008.  I don't know

8     if the parenthesis indicate negative income or not.  The tax on

9     the return for one year in 2007 is $1,266, the taxable income

10    is zero.  Taxable income is zero in each of those years.  I'm

11    not really sure of what's going on there but I raise it only

12    because the tax issue was brought up.

13            Second, with respect to the mortgage, it looks like

14    essentially equity was stripped out of the home and then it was

15    allowed to go into foreclosure.  The purchase price of the

16    home, if you look at --

17            THE COURT:  I'm very familiar with that part.  Yes,

18    the purchase price is around --

19            MR. PASTORE:  255, but then you have a mortgage in

20    excess or close to a half million dollars and then on the other

21    page it looks like there's a home equity line of credit and I'm

22    not, I have no idea what was in that loan application.  I know

23    from my experience in the white collar unit that equity

24    stripping is something that folks do to get money when they

25    don't intend to pay it back.  I have no --

1          THE COURT:  Well, I mean --

2          MS. NECHLIS:  Judge, I don't know why Mr. Pastore

3    would have just said that with no knowledge of it.  Yes, that

4    happens.  That has no applicability here.  This money, my

5    understanding, was taken out a number of years ago to help fund

6    his businesses.  That's what I was saying before, that his

7    personal, he took money to try to save his business, to try to

8    make his businesses -- people often do that in small

9    businesses.  It wasn't a stripping recently of money taken out.

10   And in fact, I don't even know that you could get a home equity

11   loan today, that he could get a home equity loan in the last

12   three years.

13          When I say he has always paid his taxes and is not a

14   tax cheat, he doesn't make enough money to pay taxes at the end

15   of the year, but he's declaring his income and just as there's

16   this whole debate about what it means to not pay -- he's paying

17   taxes.  He's paying taxes on his income.  He's paying his

18   Social Security tax.  He is not earning money.  His income is

19   very low, so he's not paying a tax rate that's high, but he's

20   paying taxes and he's not illegally declaring -- that's my only

21   point here.  It's not a case where somebody is coming in, I

22   kind of find it shocking that prosecutor comes in here and says

23   he's not paying his taxes.  He's being investigated, there's

24   allegations.  He hasn't done anything else wrong.  To come in

25   and say well, maybe this is stripping, to have these kind of

1    allegations thrown up like this at sentencing with no basis and

2    the prosecutor then says, well, I don't have any basis for

3    saying, then don't say it.  Don't say it.  It's wrong.  We're

4    sentencing a man here today, and to suggest that maybe --

5            THE COURT:  Let me say that had you put your financial

6    affidavit in timely I think it would have been a lot, this

7    presentence report would have reflected the numbers that

8    finally appear because I asked for it.

9            MS. NECHLIS:  I understand, but can I say, the

10   government knew about this bankruptcy, they knew about it.  We

11   discussed it with the government when we were negotiating the

12   plea.

13           THE COURT:  That may be.

14           MS. NECHLIS:  No, I understand your Honor didn't, but

15   the prosecutors did.  I never heard any allegation that there

16   was any fraud or anything wrong.  There wasn't anything wrong.

17   Your Honor, I think that, I do believe that Mr. Weber is an

18   extraordinary man.  I think that to have saved these two

19   children's lives and also the Unger boys, taken them in, is the

20   kind of conduct that you almost never see somebody do.  When we

21   talk about, when people think about adopting a child or taking

22   a child in for foster care, it's a very hard thing to do.  As

23   parents we all know that.  We know how hard it is to raise our

24   own children with their own problems, but to take in someone

25   else's problem child and children like this who everybody knows

D2EFWEBS                        Sentence

are problem children, these are the kids that never get placed.
And for him to have taken in, it is really just extraordinary.

I think he is an extraordinary man who did something
wrong here, and more than that, your Honor, I think that when
your Honor talked about home circumstances and circumstances
that -- extraordinary home circumstances that I believe is what
the PSR was addressing, what they specifically talk about there
as to why probation is the right sentence in this case.  You
have letters from Mordechai's, from his doctor who has written
to your Honor and told your Honor that this is a boy who is at
risk still, even though he is now 18 years old.  He is at risk.
His school, his principal has written from the Yeshiva to talk
about here is a boy who is at risk.  Others have written about
how Mordechai is still very much a boy who does not, a juvenile
who is behind on things and has been acting out, is under a lot
of stress.  He's not here today because he -- because there was
a worry in the family that what would happen to this boy if he
comes here today and this kind of stress of him actually seeing
what was going on here.  He knows about it, but to actually be
put in this situation.  But it's not his doctor, it's a
guidance counselor who has written your Honor, I think it was
Exhibit 5, from Mordechai Landau who gave your Honor his phone
number and has talked about how he has worked with this boy as
he's grown into a teenager and he says that, "I've worked with
this child as he's grown into a teenager.  Mayer Weber and his

1    wife has raised them on his own paying for his schools."  As

2    you know from other letters that was paid for by Mr. Weber's

3    father, as well as all the other services that this child

4    needs.  Now, "Not having Mr. Weber around as his father would

5    cause irreparable damage to Mordechai.  Mordechai is deeply

6    attached to Mr. Weber who he accepts as his father."

7            Mordechai writes in his letter to your Honor as well

8    about just how important this family relationship is and how he

9    doesn't talk about all the horrible things that happened to him

10   in the way that Getty has written to your Honor, about how he

11   would be beaten, how he would be walking his father home drunk

12   on the streets on shabbot, how other people would see it, how

13   he started stealing so he could hang out in a store hoping to

14   see his father in a store after his father deserted the family.

15   But he does talk about no one who was home to feed him, to

16   bathe him, to do anything for him, and then he found the Webers

17   who took him in and brought him up, and how in all the things

18   that they have done for him, and he says I need this man in my

19   life.  He is a boy who, he's 18 now, but 18 is still young.  I

20   mean, it's not so young in that community but he's young enough

21   so that they're not looking to get married yet.  Some think

22   that in that community they marry very young, but there's been

23   no thought of trying to place this boy in that situation

24   because he's really just not together enough.  He needs

25   Mr. Weber and it really has been extraordinary what Mr. Weber

1    has done here.

2            We recognize the wrongdoing that Mr. Weber did.  He

3    made very little money from this wrongdoing, which, of course,

4    doesn't really capture the significance of what he did wrong.

5    That's why that was not part of our argument, but it wasn't a

6    crime of greed, it was really a crime of stupidity and we ask

7    that your Honor sentence him to probation, to a period of

8    probation and if you see fit community service as well, but I

9    do believe that this is a indication as strong as any I've ever

10   seen of extraordinary family circumstances.

11           THE COURT:  Mr. Weber, we've been talking a lot about

12   you, and this is your chance to speak on your own behalf.

13           THE DEFENDANT:  I'm deeply sorry what I did, you heard

14   everything, you saw all the letters, you saw everything.  I'm

15   deeply sorry what I did, I messed up.

16           THE COURT:  Can you explain to me why you did what you

17   did?

18           THE DEFENDANT:  I was in -- I had two nursing homes in

19   Connecticut and I bought them, I raised my own money, I

20   refinanced my house then.  That's exactly the date when I

21   refinanced it was in 2002.  That's when I bought the nursing

22   homes.  I lost over $2 million my own money.  Nobody helped me

23   with that.  I had -- my dad helped me and when I lost money,

24   he's helping me throughout just to pay my bills now.  Further

25   on, I had a problem why I filed for bankruptcy.  I had a major

D2EFWEBS                    Sentence

 1    problem.  I paid the mortgages for several years, until 2001

 2    both mortgages, I paid it every month.  I filed for bankruptcy

 3    in '09.  I had with the IRS settlement, I owed them money, I

 4    paid them $109,000, your Honor.  I'm not a scapegoat, I paid.

 5    I have an agreement, I paid it.  I have copies of a certified

 6    check and I paid the IRS up and I have a satisfaction note from

 7    them.  I'm not a -- I filed every year my taxes.  The

 8    government has a copy of my tax return.  I'm not a crook.  This

 9    is what I earn.

10            Now, to your main question why I did this, it's

11    exactly what my attorney says that's the truth.  I've been

12    struggling, I'm trying to make a go, something out of it, not

13    to sit around being depressed, to make a go of something since

14    I lost my literally life savings and my hope since I had these

15    two nursing homes.  And again, I'm sorry.  I messed up.

16            THE COURT:  All right.  We're just going to take a

17    brief break.

18            (Recess).

19            MS. NECHLIS:  Your Honor, if I could just make one

20    more statement?

21            THE COURT:  Sure.

22            MS. NECHLIS:  I'm concerned because I feel that it was

23    my firm's fault that this financial statement was not submitted

24    in a timely matter.  My understanding, I was on trial in

25    another matter and my understanding that the documents

1    underlying it were given to probation but we hadn't filled out

2    the form and we didn't tell the client afterwards, he had asked

3    us is there anything else he needed to do.  I'm told that he

4    was told no, there was nothing else, and it wasn't until a

5    couple of days ago that we focused on the fact that we had not

6    submitted this financial statement.  So I would like to take

7    responsibility for that, your Honor, and to let you know that

8    as you're inquiring about it I am told that it was my firm's

9    fault that this was not submitted before.  We didn't think it

10   was an issue.  If we thought it was an issue we would have

11   asked for more time for sentencing so everybody could be

12   comfortable.

13           THE COURT:  Let me say the reason it's an issue -- I'm

14   not -- I think that many of the questions I have about it have

15   essentially been satisfied.  I had an experience in connection

16   with another sentencing some years ago where after I sentenced

17   the defendant, fortuitously we did a Google search to see,

18   looking to see what the coverage was of the sentencing, which

19   revealed that the defendant indeed had an outstanding judgment

20   to the SEC in a huge amount of money and I couldn't understand

21   how that was a piece of information that I hadn't known.  So

22   when I contacted the probation department and asked and said

23   don't you -- where's this guy's financial statement, don't you

24   ask about these things, it turned out that it had been

25   flippantly, deliberately flippantly not filled out completely

1    and as a consequence you may notice, you may be aware because

2    you've been practicing a long time, it now requires the

3    defendant to initial every page.  That is a consequence of my

4    experience.  So therefore, when I saw that no financial

5    affidavit had been filed, and there's some other financial

6    issues with the next defendant, it set off bells for me, okay?

7    And that's why I look for it.

8            MS. NECHLIS:  I understand.

9            THE COURT:  And then I admit that I didn't fully

10   accurately read it, which then caused me to have concern that

11   it was quite inconsistent with what had been disclosed which

12   was, of course, the experience I had had some years ago.

13           MS. NECHLIS:  I would just ask that if your Honor has

14   any further concerns, because it was my fault, that we just

15   have an adjournment so I could address anything that your Honor

16   is concerned with.

17           THE COURT:  Fine.  I really don't think so.  I think

18   you've cleared up the bankruptcy timing issue.  I think you

19   cleared up the statement of assets in paragraph 69.  I think

20   you cleared up the million dollar trust issue.  That was just

21   something that I was curious about, and I think you also

22   cleared up any concerns that might have lurked about tax

23   returns.  Okay.  All right.

24           Obviously, any time that one spends close to two hours

25   I think now on a sentence indicates that it is a difficult one.

1    As I said earlier, I endeavor not only to explore carefully the

2    circumstances of the individual performing but also the

3    circumstances of other people in the same case.  I think that

4    as we've discussed, there isn't any question that Mr. Weber

5    presents with extraordinary charitable deeds, actually not too

6    unlike a lot of the other defendants that have been sentenced

7    here, including taking a child into the home, one of the other

8    defendant's similar situation.  And certainly Mr. Weber is

9    entitled to consideration for that, and all of those deeds.

10   Nonetheless, his involvement went on for a long time.  He

11   admitted to seven years and a good number of applications,

12   although I can't pin them down, the opening of the post office

13   box and also his involvement with Immigration Consultants.  It

14   all leads to a decision that he should be placed on home

15   confinement for three months.

16          Now, what I am uncertain about is whether that should

17   be a condition of supervised release or a condition of

18   probation.  So I need a little guidance from counsel.  I'm not

19   sure -- I know how to structure it as a condition of supervised

20   release, I'm not totally certain whether I can do it as a

21   condition of probation.  It is not material to me.

22          MS. NECHLIS:  I don't think it's material to me either

23   but I think that, I thought supervised release only follows

24   incarceration.

25          THE COURT:  Well, it could be time served.  It could

D2EFWEBS                          Sentence

always be time served, but the question is if I want to have

the condition be home confinement can home confinement be a

condition of probation or does it have to be a condition of

supervised release.

MS. NECHLIS:  Your Honor, I am embarrassed to say I

cannot give a definitive answer.  I thought it could be a

condition of probation, but I'm not positive.

MR. PASTORE:  Judge, I believe it can be a condition

of probation, in this case probation while authorized by

statute is not within guidelines, so it may just be easier, to

the extent it matters to the Court, to do a sentence of time

served with a special condition of supervised release -- I'm

sorry, followed by supervised release with a special condition

of three months' home confinement.

MS. NECHLIS:  Judge, I really hate to do this, but

does it make sense to adjourn this to consult with probation,

the probation department as to what they, how they would like

to do it?  My only concern is that if it's supervised release

is it, does it have to go through the prison system, does

someone else have to supervise?  How will it work?

THE COURT:  No.

MR. PASTORE:  No, it's just -- I'm just looking at the

guidelines, by the way, your Honor, and guideline Section 5B1.1

does consider that imposition of a term of probation can

include a special condition requiring intermittent confinement,

D2EFWEBS                        Sentence

1    community confinement or home detention.

2              MS. NECHLIS:  So we would ask for that, your Honor.

3              THE COURT:  Okay, that's fine.  All right.  So I'm

4    going to place Mr. Weber on probation for 18 months with the

5    special condition of home confinement for three months.

6    There's a special assessment of $100.  The mandatory and

7    standard conditions are imposed, and I'm not going to impose

8    the community service condition because I really think it's

9    unnecessary since I assumed he would continue to do what he

10   does.

11             He may leave home to go to work.  And I will also, he

12   may also leave for religious services, but I would need you to

13   send me a letter perhaps tomorrow or the next day.  Tomorrow

14   would be -- well, I may not sign the J and C for a while

15   because I'm not going to be here next week, so it doesn't

16   matter when you get it to me.  I would like to have a specific

17   request so I could respond to that.

18             MS. NECHLIS:  And I would assume that that would start

19   promptly so I wouldn't have to include the fall holidays, I

20   would just assume that it will be starting promptly so I'll

21   take whatever holidays are now into account and not the fall.

22             THE COURT:  Certainly.  I don't recall, but I assume

23   that you waived any right to appeal.

24             Is there anything else?  Are there any open counts?

25             MR. PASTORE:  The government moves to dismiss any open

D2EFWEBS                          Sentence

1    counts and underlying indictments against this defendant.

2              THE COURT:  All right.  Thank you.

3              MS. NECHLIS:  Thank you, your Honor.  Thank you for

4    your consideration.

5              THE DEFENDANT:  Thank you, your Honor.

6              (Adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25