UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

       - v. -                           :        S3 11 Cr. 424 (NRB)

JED PHILWIN,                      :

              Defendant.           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM

                                              PREET BHARARA
                                              United States Attorney for the
                                              Southern District of New York
                                              Attorney for the United States of America

Janis Echenberg
James J. Pastore, Jr.
Assistant United States Attorneys
    - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA              :

       - v. -                                              :           11 Cr. 424 (NRB)

JED PHILWIN,                                     :

                    Defendant.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## SENTENCING MEMORANDUM

The Government respectfully submits this memorandum in connection with the sentencing of defendant Jed Philwin ("Philwin" or the "defendant"), which is currently scheduled for May 7, 2013 at 4 p.m. In its Presentence Investigation Report, dated April 30, 2013 ("PSR"), the United States Probation Department ("Probation Department") calculates an applicable United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range of 30 to 37 months' imprisonment because the Probation Department includes an enhancement for abuse of position of private trust or use of a special skill (an enhancement that was not included in the parties' plea agreement). Instead, in the plea agreement, the parties agreed to a Stipulated Guidelines range of 24 to 30 months' imprisonment. The Probation Department recommends a sentence of 30 months' incarceration.

Philwin seeks a below-Guidelines sentence, arguing for leniency due to his age, personal and medical history, and his role in caring for elderly parents. Consistent with the Probation Department's recommendation, and for the reasons set forth below, given the nature and

circumstances of the massive fraud in which Philwin was involved, his legal training, and the great need in this case to promote deterrence, respect for the law and ensure just punishment, a sentence within the Stipulated Guidelines range of 24 to 30 months' imprisonment is entirely appropriate in this case.

## BACKGROUND

### A. Philwin Took Over As The Primary Lawyer For The Immigration Firm When Earl David's Law License Was Suspended

Beginning in at least 1996, attorney Earl David operated a Manhattan-based immigration law firm that took in millions of dollars through a sophisticated immigration fraud scheme. (PSR ¶ 22.) The firm was in David's name until he lost his law license in or around 2004. At David's request, in or about 2004, Philwin began to serve as the named lawyer for the firm, and most immigration applications associated with the firm were submitted under Philwin's name from 2004 until in or around 2007. Philwin remained involved, and continued to collect proceeds from the firm, until in or about August 2008. During this time, David continued to run the firm from afar – first from another office in Manhattan, and then from Canada.

As Your Honor is aware, United States Citizenship and Immigration Services ("CIS") considers the fraud charged here to be one of the largest immigration fraud schemes ever committed in the United States. The scheme exploited several immigration laws, including an amnesty period that ended in 2001 and a law permitting aliens to petition for legal status after obtaining a certification from the United States Department of Labor ("DOL") signifying that a U.S. employer wished to employ, or "sponsor," them. (PSR ¶ 23.) The firm doctored dates on documents to make it look like applications had been submitted within the amnesty period and

paid "sponsors" to pretend that they intended to hire aliens when they had no intention of doing so. (*Id.*)

Philwin's critical role was to serve as a licensed attorney to sign and submit the fraudulent applications. As Sam Salamon explained during the recent trial of Philwin's co-defendants, having a lawyer associated with the fraud added legitimacy to the operation, and facilitated processing with Immigration authorities. (Tr. 1263-65). Philwin willingly played this role in exchange for money, typically cash. By his own admission in an "innocence proffer," Philwin was paid approximately $3,000 per week for doing virtually no work except for being the lawyer who signed off on fraudulent applications.

The firm ceased operations in early 2009, when federal search warrants were executed at several locations associated with the firm. (PSR ¶ 25.) Twenty-seven people have been charged with immigration fraud offenses in connection with their work for and with the firm. All but two (who remain fugitives) have pleaded guilty or been convicted at trial. (PSR ¶¶ 7-18.)

**B.    The Indictment, Philwin's Guilty Plea, and the Guidelines Calculation**

On or about January 3, 2013, Philwin waived indictment and the Government filed a superseding information charging Philwin with conspiracy to commit immigration fraud and make false statements, in violation of Title 18, United States Code, Section 371 ("Count One"). Philwin pleaded guilty that same day to Count One. (PSR ¶ 4.)

The Probation Department calculates the defendant's Offense Level and Criminal History Category under the Guidelines, resulting in an Adjusted Total Offense Level of 19 and a Criminal History Category of I. (PSR ¶¶ 48, 51.) This results in a Guidelines range of 30 to 37 months' imprisonment, which is higher than the parties' calculation in the plea agreement. (PSR

¶ 78). The Probation Department recommends a two-point enhancement for abuse of a position of private trust or special skill, an enhancement which was not part of the parties' plea agreement. The Government did not impose this enhancement for Philwin or Maritza Diaz, another attorney who worked at David's direction. Accordingly, the Government stands by the calculation in its plea agreement, which results in a Guidelines range of 24 to 30 months' imprisonment.

## ARGUMENT

A Guidelines sentence is warranted in this case. The Government has identified at least 25,000 immigration applications filed with U.S. government agencies by David, Philwin and their co-conspirators – the vast majority of which have been determined to contain false, fraudulent, and fictitious information. At least 7,000 of these applications were submitted in connection with Philwin's law practice; Philwin personally signed many of the applications and allowed a stamp of his signature to be used for other applications.

For the reasons set forth below, as well as for the importance of deterrence, promoting respect for the law, and providing just punishment in this case, the Government respectfully submits that a sentence within the Stipulated Guidelines range of 24 to 30 months' imprisonment would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

**I.   Applicable Law**

Although they are no longer mandatory, the Guidelines still provide strong guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). "[A] district court should begin all sentencing proceedings by

correctly calculating the applicable Guidelines range" – that range "should be the starting point and the initial benchmark." *Gall* v. *United States*, 128 S. Ct. 586, 596 (2007). As the Second Circuit has remarked *en banc*, although the Guidelines do not dictate a presumptively reasonable sentence, they are not merely a "body of casual advice." *United States* v. *Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (internal quotation marks omitted). The Guidelines' relevance throughout the sentencing process stems in part from the fact that, while they are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 127 S. Ct. 2456, 2463 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 128 S. Ct. at 594; *see also Rita*, 127 S. Ct. at 2464.

After making the initial Guidelines calculation, a sentencing judge must then consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); "the kinds of sentences available," *id.* § 3553(a)(3); the Guidelines range itself, *see id.* § 3553(a)(4); any relevant policy statement by the Sentencing Commission, *see id.* § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and "the need to provide restitution to any victims," *id.* § 3553(a)(7). *See Gall*, 128 S. Ct. at 596 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, including:

>   (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

      (B)    to afford adequate deterrence to criminal conduct;

      (C)    to protect the public from further crimes of the defendant; and

      (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). To the extent District Court imposes a sentence outside the range recommended by the Guidelines, the Court must "'consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *Cavera*, 550 F.3d at 189 (quoting *Gall*, 128 S. Ct. at 596).

## II. The Nature And Circumstances Of This Offense Are Serious

As set forth above, this is one of the largest immigration fraud schemes ever committed in the United States. Given his level of education and his training as an attorney, Philwin's role in the fraud is especially significant. Philwin's critical role allowed the fraud to continue for approximately four years after David was suspended from the practice of law. As stated above, Philwin is associated with at least 7,000 fraudulent applications. Also, Philwin earned a significant amount of money from the fraud -- approximately $3,000 per week, or $156,000 per year.

## III. Philwin's Conduct And Circumstances Can Be Distinguished From That Of Maritza Diaz

Philwin argues that Maritza Diaz's (10 Cr. 889 (JFK)) conduct and personal circumstances are comparable to his and therefore he, too, should be given a sentence of probation. While Diaz and Philwin were both attorneys at the firm, and both participated in the preparation and signing of fraudulent documents – the similarities end there. First, Philwin's

name was the one on the door of the firm for several years – Diaz did not take on such a significant role. After David was suspended, most fraudulent applications submitted between 2004 and 2007 were in Philwin's name. And Philwin continued to collect a significant percentage of proceeds from the firm for approximately one year after another attorney's name began to be associated with most applications.

Second, Philwin has repeatedly minimized, or presented misleading information about, his role in the fraud in an apparent effort to cover-up his extensive involvement. In May 2009, just before Sam Salamon was arrested, Philwin reported Salamon to the Manhattan District Attorney's Office, claiming identity theft – Philwin reported that Salamon stole his identity to commit this immigration fraud. In October 2011, Philwin testified before the Departmental Disciplinary Committee of the First Judicial Department, again essentially denying his role in and knowledge of the fraud. Finally, on June 7, 2012, Philwin came to the U.S. Attorney's Office for an "innocence proffer." During this proffer, Philwin acknowledged a certain awareness of the fraud – including, among other things, (i) he knew that David doctored dates on applications to make them appear to be within the amnesty period; (ii) he knew that tax documents were doctored; (iii) he was very suspicious of the activities of Sam Salamon and Leo Teitelbaum and, in particular, the legitimacy of their "sponsors," but, nonetheless, he allowed them to operate unchecked and took a percentage of their profits; (iv) he attempted to check if certain sponsors were legitimate but never really followed up on many who did not respond to his inquiries; (v) he wrote several checks, made out to cash, to one sponsor, at Salamon or Teitelbaum's direction; (vi) he allowed David to manage the firm even though Philwin's name was on the door and David was no longer able to practice law (and at a later point had fled to

Canada), and; (vii) he deposited firm proceeds in an account David controlled, in the name of "Mazel and Bracha." Despite these statements during the proffer, Philwin significantly minimized his active role in the fraud, claiming his knowledge and involvement were extremely limited. Philwin pleaded guilty to his true role in the fraud approximately six months later. Diaz, on the other hand, readily admitted her role and pleaded guilty shortly after being arrested in 2010.

Finally, the Probation Department recommended that Diaz receive a sentence of probation – a recommendation that was influenced heavily by her role as the primary caretaker for an ill six year old child and her mother. The Probation Department recommends 30 months' incarceration here. (Sentencing Recommendation at 23.) While Philwin does play a role caring for his elderly father, he also has a sister nearby who helps with the care of their father (B. at 9.), and is therefore (as noted by Probation) not comparable to Diaz in terms of caretaking.

### IV.  The Need to Promote Respect for the Law, to Ensure Just Punishment, and for Deterrence in This Case

There is a critical need in this case to promote respect for the law and ensure just punishment. While all participants' roles in this fraud were serious, the role of this lawyer was critical. Moreover, given Philwin's efforts to cover-up his involvement – efforts that, remarkably, included reporting a co-conspirator to the authorities and falsely claiming to be a *victim* of the crime–specific deterrence is especially important here.

### V.  A Guidelines Sentence Is Consistent With Sentences In Related Cases

A Guidelines sentence would not create any unwarranted sentencing disparities. Many of the defendants who worked at the law firm have received Guidelines or near-Guidelines

sentences of incarceration. Earl David, who faced a Guidelines of 78-97 months, was sentenced to 60 months' imprisonment. Abdulbassit Choudary, who worked at the firm as a paralegal, and faced Guidelines of 24 to 30 months' imprisonment, was sentenced to 24 months' imprisonment. Mir Hussain, another firm employee, faced Guidelines of 15 to 21 months' imprisonment and was sentenced to one year and one day in prison. David Vago, an accountant who prepared fictitious tax returns for the firm, faced Guidelines of 15 to 21 months' imprisonment, and was sentenced to one year and one day in prison. (PSR ¶ 19.) John Albert Nolan, a corrupt DOL employee who helped create fake documents to support fraudulent applications, faced Guidelines of 18 to 24 months' imprisonment and was sentenced to 18 months. Janine Sitao, who was a sponsor, but also ran a separate fraud involving hiring undocumented workers, faced Guidelines of 15 to 21 months' imprisonment, and was sentenced to 15 months. Another firm employee, Alexandra Urbanek, also received a probationary sentence after facing a Guidelines range of 24 to 30 months' imprisonment; however, even her plea agreement recognized the extraordinary circumstances present there, and noted that the Government agreed that a below-Guidelines sentence was appropriate due to her personal circumstances. (PSR ¶ 12.) Another accountant, Mohammed Saleem, faced Guidelines of 8 to 14 months' imprisonment, but Probation recommended he not be incarcerated, and he was sentenced to 3 years' probation. And, as described above, one other lawyer, Maritza Diaz, who faced Guidelines of 24 to 30 months' imprisonment, was sentenced to three years' probation, in large part due to Probation's recommendation that she not be incarcerated due to personal obligations to an ill son and elderly mother. (PSR ¶ 20.)

## VI. Conclusion

For the foregoing reasons, the Government respectfully submits that a sentence within the Stipulated Guidelines range of 24 to 30 months is sufficient, but not greater than necessary, to meet the goals of Section 3553(a).

Dated: New York, New York
   April 30, 2013

               Respectfully Submitted,

               PREET BHARARA
               United States Attorney

By: _____
  Janis M. Echenberg/James J. Pastore, Jr.
  Assistant United States Attorneys
  (212) 637-2597/2418